EXHIBIT A

JAMS ARBITRATION NO. 5160000075

---

Bungie, Inc.,

    Claimant,

       v.

Aimjunkies.com; Phoenix
Digital Group, LLC; David
Schaefer; Jordan Green;
Jeffrey Conway; and James
May,

    Respondents.

---

## FINAL AWARD

---

### PROCEDURE

Claimant Bungie, Inc. commenced this arbitration proceeding by a written demand dated February 10, 2022.  Respondents, all of whom are represented by counsel, responded to the demand.  In that response, filed on June 22, 2022, respondents all "agree[d] to resolve the matter through this arbitration."

I was appointed arbitrator in this matter by letter to the parties dated March 18, 2022.  JAMS determined, by letter to the parties dated May 9, 2022, that the JAMS Policy on Consumer Arbitration Pursuant to Pre-Dispute Clauses Minimum Standards of Procedural Fairness does not apply to this proceeding.  Thereafter, I adopted this JAMS ruling as my own.

I conducted a preliminary hearing with the parties on June 3, 2022.  A scheduling order dated June 20,2022, followed.  Among the provisions of that order is my decision that the substantive law of Washington applies to this proceeding.

I conducted an evidentiary hearing commencing on December 19, 2022, which ended on December 21, 2022.  The following persons testified at the hearing;  Dr. Edward Kaiser, Steven Guris, Jeffrey Conway, James May, David Schaefer, Jordan Green, Drew Voth, and "Y.S."

"Y.S." is a current employee of Bungie.  The parties stipulated, in writing, that:

> [T]he identity of the witness identified as ["Y.S.'] in Respondents' witness list ,if called as a witness, will be shared only with the Respondents' counsel and the Arbitrator.  The witness will testify by video if called. Respondents may be present for the witness's testimony.  If the content of the testimony reveals personally identifiable information of the witness, such as the witness's name, that limited testimony will only be shared with Respondents' counsel and the Arbitrator.

This witness was called to testify.  I admitted that testimony in accordance with this stipulation of the parties.

I reviewed exhibits that the parties submitted for my consideration.  I heard opening and closing arguments of the parties and considered briefing and other submissions to me.

Based on the evidence before me, the arguments of counsel, and the record, I then issued an Interim Award, which was filed on January 13, 2023.  Because the Interim Award concluded that Bungie was the prevailing party for purposes of an attorney fees award, I directed the parties to provide briefing on the amount of such and

award. Bungie provide that briefing. Aimjunkies and the other respondents elected not to provide any briefing.

Moreover, I directed briefing on the question of what should be included in an injunction. Bungie provided a proposed form of order. Aimjunkies and the other respondents elected not to provide any comment on the proposed order.

## FACTUAL FINDINGS

These factual findings are based on the evidence in the record. Some findings are based on my judgment of the credibility of witnesses giving testimony. I state other factual findings, as necessary, in the legal analysis of the claims that follows.

1. Bungie, Inc. is a company that has been primarily involved in the development and sale of videogames for more than three decades. One of its prior products is the *Halo* series of games. Its current product, *Destiny 2* is also very popular. *Destiny 2* is the source of the claims at issue here.

2. Aimjunkies.com is a website. It was owned by Phoenix Digital, LLC during relevant times for the matters at issue in this proceeding. Among other things, this website was used by Phoenix to sell the "cheats" that are the subject of the claims here.

3. Phoenix Digital, LLC was formed before the events giving rise to the claims in this proceeding by its then owners David Schaefer, Jordan Green, and Jeffrey Conway. Each of these owners had equal ownership interests in the company, but each had different duties in running it. Each profited by virtue of the sale of the cheats at issue in this case.

3

4. "Cheats" are devices designed to give an unfair advantage to those videogame
players who purchase them over other players who do not have these devices.
They constitute unauthorized third-party manipulation and/or copying of a
videogame's software that circumvents protective measures in that software.

"Aimbots" are examples of a feature in the cheats in this case.  These
allow the cheater to automatically aim a weapon in a game.  "ESP" is another
feature in the cheats in this case.  This provides a cheater information that would
not otherwise be available (e.g., the location of another player behind a wall or
other visual obstruction).

The net adverse effect of cheats is to make the game less enjoyable for
those who do not use the cheats.  In turn, this negatively impacts Bungie in that
its *Destiny 2* product is less enjoyable to its customers.

5. David Shaefer is the managing member of Phoenix and one of its owners.  He
makes the day-to-day decisions about the company's operations.  These include
deciding what products it would purchase and then sell on the Aimjunkies
website.  He also determined what bills to pay and in what amounts.

I find that Shaefer was not a credible witness for the matters that are
material to my decision.  First, he authored, but did not sign, the November 20,
2022, response to the Bungie cease and desist letter dated November 4, 2022.
Instead, he directed another member of Phoenix to sign and return the response.
The letter contains the blatantly false statement regarding sale of the Aimjunkies
website: that it had been sold.  Second, he answered an interrogatory, under
oath, in the companion federal action that substantially understates the revenue

4

from the sale of the cheats. Specifically, the answer fails to state there were other sources of income from the cheats. For these reasons and based, further, on his demeanor at the evidentiary hearing, he was not credible.

6. Jordan Green is another owner of Phoenix. He was responsible for website hosting and security. His technical background includes writing his own cheats as well as holding a B.S. in Computer Science from Portland State University. I find it reasonable to conclude that he was also involved in the cheat activities at issue in this case.

7. Jeffrey Conway was another owner of Phoenix at times relevant to the claims in this proceeding. His chief functions included setting up and running the financial systems of the company and paying the bills that Schaefer said to pay.

8. James May is not an owner of Phoenix. However, he acted in concert with Phoenix and its owners on matters giving rise to the claims that are the subject of this proceeding.

9. Dr. Edward Kaiser gave expert testimony on behalf of Bungie. I find that he was a credible witness due to his educational and practical background on the subjects that are before me, as well as his demeanor at the evidentiary hearing.

10. According to Dr. Kaiser, *Destiny 2* is known as a "first person shooter" video game. It is designed for online individual or group play. Users are allowed to simulate different scenarios in a virtual world. Among the features of the game is the ability to shoot at adversaries and perform other activities that may lead to rewards of various types.

*Destiny 2* is the subject of copyright filings.  Moreover, Bungie maintains and develops robust measures to protect its game from unauthorized intrusions, at substantial expense.  These measures were described, in detail, by Dr. Kaiser at the hearing as "defenses in depth."

These measures include, among other things, code obfuscation, user account bans, anti-process attachment tools, anti-reverse engineering tools, hardware bans, auto-eject tools for injected code & evacuation threads, and cheat detections: data manipulation detections and code manipulation detections.

Without getting into the technical details of these measures, I find that it is undisputed from the evidence before me that these measures are all designed to prevent unauthorized access to *Destiny 2* videogames.

11. At least as early as October 2019, James May began to sign in to obtain access to *Destiny 2*. On sign-in, he was required to accept the terms of Bungie's Limited Software License Agreement ("LSLA").  These terms contain a number of prohibitions regarding use of the license to *Destiny 2*.  The cheat May used to gain access was the same cheat sold by Phoenix over the Aimjunkies website.

12. One of the terms of the LSLA prohibited a licensee from reverse engineering of *Destiny 2*.  Nevertheless, this is exactly what May did a number of times.  This activity allowed Phoenix to modify and sell through its website, Aimjunkies.com, a beta version of a cheat for *Destiny 2*.  The beta version of the cheat was followed by revisions that included "ESP" and then the full *Destiny 2* cheat.  Over the course of, at least, the next year, May engaged in the unauthorized access of

6

*Destiny 2* many times.  Phoenix sales of these various versions of the cheat

continued throughout this period as well.

13. The evidence also shows that there were many instances of Phoenix sales of

cheats during the period relevant to the claims in this proceeding.

14. Bungie sent a cease and desist letter dated November 4, 2020, to respondents.

This letter demanded that they cease selling the cheats for *Destiny 2*.

Specifically, the letter also identified how they were violating Bungie's copyright

and other rights:

> "[O]perating a service called 'Aimjunkies' that offers various cheats
> intended to be used with Destiny 2…the service allows Destiny 2 players
> to utilize 'undetected cheats such as aimbots, player/NPC ESP, item ESP,
> no recoil, and other cheats and hacks to gain advantages in the game
> without fer of being banned….The cheats that you offer are specifically
> designed to interfere with gameplay and otherwise impair the user
> experience of online games such as Destiny 2."

The letter further advised that:

> "The foregoing activities are unlawful and violate the Limited Software
> License Agreement, and may further constitute copyright
> infringement…You are also intentionally interfering with Bungie's contracts
> with its users by encouraging them to use these cheats to violate the
> LSLA."

Lastly, the letter demanded that:

> "[Y]ou immediately cease and desist from any and all of the foregoing
> activity, as well as any other unauthorized activities in which you may be
> partaking in connection with any of Bungie's games and services…***[Y]ou
> are required to maintain any and all electronic or hard copy
> documents, communications, and electronic data and information
> which may be relevant to Bungie's claims…"*** [1]

15. By letter dated November 20, 2020, respondents replied to this cease-and-desist

letter.  Schaefer drafted this response but did not sign it.  Instead, he directed

---

[1] (Emphasis added).

Conway to sign it.  Conway followed these instructions, without any involvement in drafting the response.

The reply acknowledged the subject matter dealt with "Bungee [sic] games."  It stated that respondents "know[sic] longer own Aimjunkies.com or any other sites that [Bungie] named."  This statement was false.  The record shows that this website was not sold until May of 2022.  It further shows that prior to that sale, Respondent Phoenix and its members had operational control over and continued to benefit financially from the sales through the Aimjunkies.com website.

This control was akin to a loan servicer operating on behalf of investors who actually own the loan serviced.  Both the servicer and the owner profit from this type of relationship.

The response does not otherwise address the demands of the cease-and-desist letter.  However, it does request that no further communication from Bungie follow, and states that "legal relief from [Bungie's] harassment" might follow.

16. Thereafter, Phoenix and its members failed to preserve evidence of the type described in the November 4, 2020, cease and desist letter.  Specifically, they deleted records of cheat software and destroyed financial records related to the sales of the cheats.  Moreover, information from the Aimjunkies website was automatically deleted, despite the warning stated in this letter.

17. In June 2021, Bungie commenced an action against respondents in federal court in the Western District of Washington.  In that action, Bungie asserted claims

8

against all respondents in this arbitration for nine counts: copyright infringement, trademark infringement, false designation of origin, circumvention of technological measures, trafficking in circumvention technology, breach of contract, tortious interference, violation of the Washington Consumer Protection Act, and unjust enrichment.

In January 2022, pursuant to a motion in that court by respondents here, certain of the claims asserted there were deemed arbitrable by the parties. Accordingly, Bungie made its February 2022, demand for arbitration for the following claims:  all claims asserted in the federal court action except copyright infringement, trademark infringement, and false designation of origin ("Counts One through Three" of federal court action).

The federal court action for these three counts is still pending.

18. In May 2022, Phoenix sold the Aimjunkies.com website.  Phoenix did not preserve any documents relating to the website or *Destiny 2* cheats when it sold the site.

19. Steven Guris  provided expert testimony at the evidentiary hearing regarding the technical functions of how the Phoenix cheats interact with *Destiny 2*.  I found his testimony credible for the matters that are material to my decision in this case.  I do so on the bases of his educational and practical experience, to which he testified, as well as his demeanor during the hearing.

20. Notably, he tested the cheats by purchasing one from the Aimjunkies website in September 2022.  There is no reason to believe that these cheats materially differed from those sold prior to the purported sale by Phoenix of this site in May

2022.  Guris detailed his analysis of the cheats in his written report, which was admitted as an exhibit during the hearing.

21. Guris noted that the Aimjunkies website advertised both the price of the cheat as well as its features.  Among the features were Aimbot and ESP, both of which are described elsewhere in these factual findings.

He further explains the process the purchaser of a cheat follows and its impact on the *Destiny 2* software.  The cheater downloads and extracts a loader from the Aimjunkies website to a USB flash drive.  The cheater then goes to the Windows Firewall and manipulates it to allow the cheat as an exception afforded by the firewall.  What follows is disabling of several features of the *Destiny 2* game.  This allows use of the cheat without another player knowing that they are playing against the cheat operated by another player.

Respondents failed to provide any expert testimony to refute this evidence.

## DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA")

Bungie claims that respondents violated the provisions of the Digital Millennium Copyright Act ("DMCA").  I agree.

### *Circumvention*

The first provision of the act that I address is that regarding "circumvention of technological measures."

10

The DMCA Anti-circumvention law prohibits the (1) circumvention of (2) a technological measure that effectively controls access to a (3) copyrighted work.[2] The evidence shows that respondents violated this section of the statute.

As to the first element, *Destiny 2* is Bungie's copyrighted work. Likewise, I found that Bungie employs robust methods to protect that work. The evidence shows that May, in concert with the other respondents, circumvented Bungie's technological measures. "[T]o "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."[3]

May testified that on many occasions, he connected reverse engineering tools to the *Destiny 2* process in order to reverse engineer it and develop a cheat for the game. He also testified that after being caught and banned by Bungie several times for doing so, he attempted various ways to bypass the bans and circumvent the protections Bungie had in place to prevent reverse engineering. For example, May renamed the reverse engineering tool in order to bypass the security; made alterations to the reverse engineering tool in order to circumvent protections in the game meant to prevent reverse engineering; and used other devices to hide his identity to obtain access to *Destiny 2* even after being banned.

---

[2] 17 USC § 1201(a)(1). Disney Enters., Inc. v. VidAngel, Inc., 371 F. Supp. 3d 708, 714-15 (C.D. Cal. 2019).

[3] 17 USC § 1201(a)(3). The "technological measure" at issue does not need to be "a strong means of protection," and applies even if there are known methods around the protection. Realnetworks, Inc. v. DVD Copy Control Ass'n, 641 F. Supp. 2d 913, 932 (N.D. Cal. 2009); see also Yout, LLC v. Recording Indus. Ass'n of Am., Inc., No. 3:20-CV-1602 (SRU), 2022 WL 4599203, at *14 (D. Conn. Sept. 30, 2022) ("the relative strength or weakness of a technological measure is not dipositive regarding its efficacy").

Each of these acts circumvents Bungie's technological protection and violates 17 USC § 1201(a)(1).[4] May's actions were also done in concert with and for the benefit of respondents. Notably, the files he used to reverse engineer *Destiny 2* belonged to Phoenix Digital, bearing Phoenix Digital's signature.

May reverse engineered *Destiny 2* in order to help develop a cheat for *Destiny 2* that Phoenix sold on its website.  Thus, the remaining respondents are liable for May's violations.[5] They are likewise liable for the circumvention by the many users of the cheats sold by Phoenix on the website.

Bungie is entitled to recover statutory damages of up to $2,500 "per act of circumvention." 17 U.S.C. § 1203. Here, given the malicious nature of the circumvention, Bungie is entitled to $2,500 for each act of circumvention committed by respondents.[6]  Respondents fail to present any evidence to the contrary.

Here, the §1202(a)(1) damages calculation is:

$2,500.00 x 102 violations = $255,000.00

---

[4] See e.g., Davidson & Associates v. Jung, 422 F.3d 630, 641 (8th Cir. 2005) (affirming district court's determination that defendants' "reverse engineering violated § 1201(a)(1) as well as § 1201(a)(2)" where defendants reverse engineered plaintiffs' video game software, "which allowed for a circumvention" of plaintiffs' protection measures); see also Blizzard Entm't, Inc. v. Bossland GmbH, No., 2017 WL 7806600, at *4 (C.D. Cal. Mar. 31, 2017) (holding that distribution of video game cheat software that evaded anti-cheating measures employed by plaintiff violated DMCA).

[5] See Rosenthal v. MPC Computs., LLC, 493 F. Supp. 2d 182, 190 (D. Mass. 2007) (holding that vicarious liability may apply to DMCA anti-circumvention claims where the party has "(1) the right and ability to supervise the infringing activity of the [other] and (2) an obvious and direct financial interest in the exploitation of the copyrighted materials"); Microsoft Corp. v. Silver Star Micro, Inc., No. 1:06-cv-1350-WSD, 2008 WL 115006, at *8 n.8 (N.D. Ga. Jan. 9, 2008) ("The Court analyzes contributory and vicarious liability under the DMCA in the same manner as determining personal liability for violations of the Copyright Act.").

[6] See, e.g., TracFone Wireless, Inc. v. SND Cellular, Inc., 715 F. Supp. 2d 1246, 1262 (S.D. Fla. 2010) (granting award of $2,500 per circumvention device where defendant "caused damage and substantial irreparable harm to" plaintiff and "Defendants' actions were willful").

*Trafficking*

In addition to prohibiting circumvention itself, the DMCA Anti-circumvention law also prohibits (1) manufacturing, importing, offering to the public, providing or **otherwise trafficking** any (2) technology, product, service, device, component or part that (3) meets any of the following criteria: (a) is primarily designed or produced for the purpose of circumventing a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; (b) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or (c) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological that effectively protects a right of a copyright owner under this title in a work or a portion thereof. 17 U.S.C. § 1201(2).  I conclude that respondents are also liable for trafficking under these provisions of the DMCA.

Here, Bungie has proven the elements necessary to recover.  The evidence shows that Phoenix sold more than one thousand copies of the cheats. They also distributed more than one thousand copies of the cheat loader that was used to inject the cheats into the *Destiny 2* process. Those sales of the cheats and loader satisfy the first and second elements. Finally, while Bungie only needs to satisfy one of the three criteria to establish the third element, each one is clearly met here. To operate, the cheats necessarily create unauthorized copies of the *Destiny 2* code and unauthorized derivative works. The cheats were designed to circumvent the protections in place in

13

*Destiny 2* and allow a player to use the cheat undetected. Likewise, the cheat loader was designed to circumvent protections by injecting code into the *Destiny 2* program without detection.[7] Both the cheat and cheat loader's core functions involve working undetected by Bungie's technological measures.

As with respondents' direct circumvention of Bungie's technological measures, Bungie is entitled under the DMCA's antitrafficking provision to statutory damages of up to $2,500 per violation. For the trafficking of a device that circumvents technological measures, respondents are liable for statutory damages of up to $2,500 for each of the at least 1,316 copies of the cheats sold, as well as for each copy of respondents' cheat loader used with the Cheat Software (which directly correlates to sales of the Cheat Software).[8]

Given respondents' egregious and willful conduct, including their ongoing concealment of sales, Bungie is entitled to the full statutory damages available. Respondents have failed to present any evidence to the contrary.

Here, the damages calculation for violation of §§ 1202(a)(2) and (b)(1) is:

$2,500.00 x 1,361 violations = $3,402,500.00

Thus, the total for violations of the applicable sections of the DMCA is:

---

[7] See 321 Studios v. Metro Goldwyn Mayer Studios, Inc., 307 F. Supp. 2d 1085, 1097 (N.D. Cal. 2004) (circumventing measures intended to prevent access to, and thus copying of, a DVD violated § 1201(b)(1)).

[8] See Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1064 (N.D. Cal. 2010) (calculating statutory damages based on number of units of circumvention device sold); Dish Network, L.L.C. v. SatFTA, No. 5:08-cv-1561 JF (PSG), 2011 WL 856268, at *6–7 (N.D. Cal. Mar. 9, 2011) (calculating statutory damages based on number of downloads or distributions of multiple types of circumvention software distributed by defendant).

$3,657,500.00

Respondents deny liability under the act.  Their arguments are not convincing.

During closing argument, they cite two cases:   Grand Upright Music Ltd. V. Warner Bros. Records, Inc.[9] and Lewis Galoob Toys, Inc. v Nintendo of America, Inc.[10] But neither case deals with the DMCA.  Thus, they are not helpful in deciding the DCMA claims before me.

They next challenge the credibility of the testimony of Dr. Kaiser, a principal witness for Bungie.  I found him credible as an expert witness for the matters that are material to my decision.

Notably, respondents did not have any expert testimony of their own to counter the testimony of either Dr. Kaiser or Steven Suris, the other expert witness who testified on behalf of Bungie.  I also found Steven Suris credible.

Respondents also argued that May is not the agent of Phoenix.  In doing so, they claim that his violations of the LSLA cannot be attributed to them.  But the evidence shows otherwise.  Over the course of time, he repeatedly attacked the defenses used by Bungie to protect its *Destiny 2* copyrighted property.  And in doing so he used proprietary signature authority of Phoenix to attain his objectives.  The fact that he was allegedly not an employee of Phoenix is irrelevant under these circumstances.  He acted in concert with the other respondents.

---

[9] 780 F.Supp. 183(1991).

[10] 964 F2d 965 (1996).

Respondents also appear to argue that there were no proven damages for these alleged violations. That is also contrary to the record.

Expert witness Drew Vost credibly testified that actual damages were no less than $41, 904. And, in making this argument, respondents fail to deal with the statutory damages that arise from violation of the DMCA.

## BREACH OF CONTRACT

Bungie next argues that respondents breached the terms of a contract. The contract at issue is the LSLA. Each user of *Destiny 2* must accept the terms and conditions of this license before gaining access to the game. I conclude that the respondents breached this license multiple times and in several ways.

To succeed on a breach of contract claim, there must be a (1) valid contract, (2) a breach of a duty imposed by the contract, and (3) resultant damages.[11]

Here, there is no legitimate dispute that the LSLA is the relevant contract. Likewise, there is no legitimate dispute that there were resultant damages to the extent of breach of the license. These damages include both actual damages and statutory damages for violation of the DMCA. Thus, the remaining questions are whether there was a breach and by whom.

The evidence concerning May proves that he breached the LSLA multiple times by his reverse engineering of *Destiny 2* an express condition of the license. Moreover, the evidence also shows that he did so in concert with Phoenix and its owners. For

---

[11] Univ. of Wash. v. GEICO, 200 Wn. App. 455, 467 (2017).

example, he used a Phoenix owned tool in these activities.  Phoenix, its members, and May all have profited from these unauthorized activities.

There was also evidence that Phoenix, through its website, gained access to *Destiny 2*.  This evidence supplements the evidence of May's unauthorized activities regarding *Destiny 2*.

Bungie has proven this claim.

## TORTIOUS INTERFERENCE

Bungie also asserts that respondents are liable for tortious interference.  I agree.

To establish this claim, a plaintiff must show "(1) the existence of a ... [valid] business expectancy; (2) that [the defendant] had knowledge of that [expectancy]; (3) an intentional interference inducing or causing ... termination of the ... expectancy; (4) that [the defendant] interfered for an improper purpose or used improper means; and (5) resultant damage."[12]

Here again, there is no legitimate dispute over whether Bungie has established the first, second, and fifth elements of its claim.  The LSLA is evidence of the business expectancy that users of *Destiny 2* would use it in a manner consistent with the license. Respondents all knew of the existence of this expectancy.  And there were resultant damages, both actual and statutory.

May and the other respondents intentionally interfered with the expectancy of Bungie.  They did so be obtaining unauthorized access to the *Destiny 2* software,

---

[12] <u>Greensun Grp., LLC v. City of Bellevue</u>, 7 Wash. App. 2d 754, 768, 436 P.3d 397, 405 (2019)

manipulating it, and selling cheats to profit from these activities.  That is sufficient to prove the third element.

And the violation of the DMCA shows that the methods used were for both an improper purpose and by improper means.  This fourth element is satisfied.

Bungie has also proven this claim.

## CONSUMER PROTECTION ACT (CPA)

Bungie also claims respondents violated the state CPA. I agree.

In Washington, Consumer Protection Act claims must satisfy five elements. A plaintiff must establish (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation.[13]  "A Consumer Protection Act claim may be based on a per se violation of a statute or on unfair or deceptive practices unregulated by statute but involving the public interest."[14]  I find Bungie has established each of these elements by the evidence at the hearing.

Here, there is an unfair or deceptive practice: the cheats subject users who do not have access to them with an unfair disadvantage because the cheats are hidden from their view and knowledge.  That the users of the cheats know about their unfair advantage is irrelevant to the analysis.  What is relevant is that this process violates the provisions of the DMCA.

---

[13] Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 723, 225 (2009).

[14] Keyes v. Bollinger, 31 Wn. App. 286, 289 (1982).

The second and third elements of the claim cannot be seriously disputed.  The sales by Phoenix on its website constitutes trade and commerce.  Any this affects the public interest.  This is not a private affair.

Thus, the remaining elements are the only issues in dispute.  I find there was both injury to Bungie's business and causation supporting the damages already discussed in this decision.

Bungie has proven this CPA claim.

## SPOLIATION

Spoliation is another claim that Bungie alleges. I find Bungie has proven this claim.

This claim requires proof of the "intentional destruction of evidence."[15] Spoliation is willful if the party acted in bad faith or conscious disregard of the importance of the evidence.[16] Spoliation is considered to have been done in bad faith if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed."[17] In fashioning an appropriate sanction, courts consider: "(1) the potential importance or relevance of the missing evidence; and (2) the culpability or fault of the adverse party."[18]

---

[15] Henderson v. Tyrrell, 80 Wn. App. 592, 605 (1996).
[16] Tavai v. Walmart Stores, Inc., 176 Wn. App. 122, 135 (2013).
[17] Leon v. IDX Sys. Corp., 464 F.3d 951, 959 (9th Cir. 2006).
[18] Homeworks Const., Inc. v. Wells, 133 Wn. App. 892, 899 (2006).

There can be no serious doubt that Phoenix and its members engaged in spoliation by their actions after receipt of the November 4, 2022, cease and desist letter from Bungie. Specifically, they lied in response to the letter, failed to preserve many of the financial records concerning sales of the cheats, and either deleted records concerning the Aimjunkies website or failed to stop the automatic deletion of those records. None of this was done innocently.

In making this finding, I have drawn adverse inferences against respondents regarding the missing evidence in my factual findings. I also conclude that Bungie is entitled to the recovery of its attorney fees allocable to dealing with this issue as part of any overall award of fees in this proceeding.

## OTHER RELIEF

Bungie seeks additional relief by way of injunction. Bungie has prepared a proposed order specifying the terms of an injunction. Respondents have elected not to comment on the proposed order. I have reviewed and approved the form of that order. It is contemporaneously filed separately from this final award.

## ATTORNEY FEES AND EXPENSES

Bungie seeks an award of reasonable attorney fees and expenses against respondents on two bases, the DMCA and the CPA. Reasonable attorney fees and expenses are awardable on both bases.

The DMCA, 17 U.S.C.A. § 1203, provides, in relevant part as follows:

20

**(b) Powers of the court.**--In an action brought under subsection (a), the court--

...

**(4)** in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;
**(5)** in its discretion may award reasonable attorney's fees to the prevailing party;

...

The state CPA, § 19.182.150, provides in relevant part as follows:

...

For purposes of a judgment awarded pursuant to an action by a consumer under chapter 19.86 RCW, the consumer shall be awarded actual damages and costs of the action together with reasonable attorney's fees as determined by the court.

...

Bungie correctly cites the controlling law on the question of the proper amount of fees:

In calculating fee awards, courts should be guided by the lodestar methodology. (citation omitted). Under the lodestar methodology, courts multiply "the number of hours it finds the prevailing party reasonably expended on the litigation by a reasonable hourly rate." (citation omitted). There is a "strong presumption" that the lodestar amount constitutes a "reasonable" fee. (citation omitted).

I find that the respective billing rates of the various timekeepers are reasonable. Specifically, the hourly rates are Rava ($1,010), Marcelo ($785), Dini ($670), Marino ($400), and Blackburn-Clapes ($250) are all within the range of prevailing rates that apply here.

21

Likewise, I find that the total hours expended by the various timekeepers was reasonable.  The total is 878.7 hours, covering a period from January 27, 2022, through December 22, 2022.

The product of applicable rates and applicable hours totals $598,641, which is a reasonable attorney fees award in this case.  This includes fees sought for spoliation.

Bungie also seeks an award of its expenses incurred in this case.  Having carefully reviewed the itemized submissions and taking into consideration the purposes for those expenses in this case, I award the full amount of the request: $101,800 for expert witness fees and $38,281 in other expenses.

Dated:  February 1, 2023

Judge Ronald E. Cox (Ret.),
Arbitrator