THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

BUNGIE, INC.,

               Plaintiff,

v.

AIMJUNKIES.COM; PHOENIX DIGITAL GROUP LLC; DAVID SCHAEFER; JORDAN GREEN; JEFFREY CONWAY; and JAMES MAY,

               Defendants.

No. 2:21-cv-811-TSZ

**DECLARATION OF CHRISTIAN W. MARCELO IN SUPPORT OF PLAINTIFF'S MOTION FOR DISCOVERY SANCTIONS AND TO COMPEL DISCOVERY RESPONSES**

**EXHIBITS E, F, H FILED UNDER SEAL**

I, Christian W. Marcelo, declare as follows:

1.    I am an attorney licensed to practice law before the courts of the State of Washington.  I am Counsel at Perkins Coie LLP, and counsel in this action for Plaintiff Bungie, Inc. ("Bungie" or "Plaintiff").  I submit this declaration in support of Plaintiff's Motion for Discovery Sanctions and to Compel Discovery Responses.  I have personal knowledge of the facts stated herein and, if called upon, could and would testify competently thereto under oath.

2.    Attached hereto as **Exhibit A** is a true and correct copy of a screenshot of an archive.today capture of an archived version of the AimJunkies.com website from May 18, 2020 that was captured on October 28, 2022.

MARCELO DECL. ISO PLAINTIFF'S
MOT. FOR SANCTIONS AND COMPEL
(No. 2:21-cv-811-TSZ) – 1

161652654.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

3.      Attached hereto as **Exhibit B** is a true and correct copy of a November 4, 2020 letter sent by Mark C. Humphrey to Jeffrey Conway bearing Bates number BUNGIE_WDWA_0000542-543.

4.      Attached hereto as **Exhibit C** is a true and correct copy of a November 9, 2020 letter sent by Mark C. Humphrey to Jordan Green bearing Bates number BUNGIE_WDWA_0000546-547.

5.      Attached hereto as **Exhibit D** is a true and correct copy of a November 9, 2020 letter sent by Mark C. Humphrey to David Schaefer bearing Bates number BUNGIE_WDWA_0000549-550.

6.      Attached hereto as **Exhibit E** are true and correct copies of excerpts from the October 28, 2022 personal deposition of David Schaefer.

7.      Attached hereto as **Exhibit F** are true and correct copies of excerpts from the October 31, 2022 Rule 30(b)(6) Deposition of David Schaefer as the corporate representative of Phoenix Digital Group LLC.

8.      Attached hereto as **Exhibit G** is a true and correct copy of an October 31, 2022 email from Phillip Mann to Michele Wilson.

9.      Attached hereto as **Exhibit H** are true and correct copies of excerpts from the October 19, 2022 deposition of Jeffrey Conway.

10.     Attached hereto as **Exhibit I** is a true and correct copy of a press release issued by Defendants bearing the title "Ukrainian BME TO Acquire Leading Independent US Videogame Cheat Distributor, Aimjunkies" produced by Defendants in this action with file name PDG0099.

11.     Attached hereto as **Exhibit J** are true and correct copies of emails sent by admin@aimjunkies.com to David Schaefer in December 2019 and January 2020 produced by Defendants in this action with file names PDG0060, PDG0048, PDG0050, PDG0053, and PDG0057.

MARCELO DECL. ISO PLAINTIFF'S
MOT. FOR SANCTIONS AND COMPEL
(No. 2:21-cv-811-TSZ) – 2

161652654.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

12. Attached hereto as **Exhibit K** are true and correct copies of excerpts from the March 23, 2023 deposition of James May.

13. Attached hereto as **Exhibit L** is a true and correct copy of the transcript from the March 20, 2023 Rule 30(b)(6) deposition of David Schaefer as the corporate representative of Phoenix Digital Group LLC.

14. Attached hereto as **Exhibit M** is a true and correct copy of Phoenix Digital Group LLC's supplemental responses to Bungie's First Set of Requests for Production No. 28.

15. Attached hereto as **Exhibit N** are true and correct copies of Phoenix Digital Group LLC's original and supplemental responses to Bungie's First Set of Interrogatories Nos. 1 and 7.

16. Attached hereto as **Exhibit O** is a true and correct copy of David Schaefer's responses to Bungie' First Set of Requests for Production Nos. 15 and 25.

17. Attached hereto as **Exhibit P** is a true and correct copy of an email sent by me to Phillip Mann on August 24, 2022.

18. Attached hereto as **Exhibit Q** is a true and correct copy of an email sent by Phillip Mann to Jacob Dini on November 16, 2022.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of March, 2023.

*/s/Christian W. Marcelo*
Christian W. Marcelo

MARCELO DECL. ISO PLAINTIFF'S
MOT. FOR SANCTIONS AND COMPEL
(No. 2:21-cv-811-TSZ) – 3

161652654.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# EXHIBIT A



## Videos & Screenshots

▶ 0:00

●



## Hack Features

**Aimbot:**

-Aim at enemy players
-Aim fov slider
-Aim fov circle
-Aim button selection
-Smooth aim slider

**ESP:**

-Player Name Esp
-Player Box Esp
-Player Health Esp
-Player Snapline Esp
-Friendly Player Esp
-Player Glow Hack
-Custom Esp view distance slider

**Miscellaneous:**

MISC
-Custom crosshair selection
-Remove Recoil

## Overview

**Hack Information**

Released: October, 2019

**Game Information**

Developer: Bungie

Publisher: Bungie

Engine: Bungie Proprietary Engine

## Description

Destiny 2 is an online-only multiplayer first-person shooter video game developed by Bungie. It was released for PlayStation 4 and Xbox One on September 6, 2017, followed by a Microsoft Windows version the following month.[1][2] The game was published by Activision until early 2019, when Bungie acquired the publishing rights to the franchise. It is the sequel to 2014's Destiny and its subsequent expansions. Set in a "mythic science fiction" world, the game features a multiplayer "shared-world" environment with elements of role-playing games. Like the original, activities in Destiny 2 are divided among player versus environment (PvE) and player versus player (PvP) game types. In addition to normal story missions, PvE features three-player "strikes" and six-player raids. A free roam patrol mode is also available for each planet and features public events as well as new activities not featured in the original. These new activities have an emphasis on exploration of the planets and interactions with non-player characters (NPCs); the original Destiny only featured NPCs in social spaces. PvP features objective-based modes, as well as traditional deathmatch game modes.

Players assume the role of a Guardian, protectors of Earth's last safe city as they wield a power called Light to protect the Last City from different alien races. One of these races, the Cabal, led by the warlord Dominus Ghaul, infiltrate the Last City and strips all Guardians of their Light. The player sets out on a journey to regain their Light and find a way to defeat Ghaul and his Red Legion army and take back the Last City. Like the original Destiny, the game features expansion packs which further the story and adds new content and missions. Year One of Destiny 2 featured two small expansions, Curse of Osiris in December 2017 and Warmind in May 2018. A third, large expansion, Forsaken, was released in September 2018, beginning Year Two with an overhaul on gameplay. The base game and the first three expansions were packaged into Destiny 2: Forsaken Legendary Collection. An annual pass was also available alongside this release, containing three premium content drops for Year Two. Year Three will begin with the large expansion, Shadowkeep, scheduled for October 2019 as a standalone release, not requiring the previous expansions to play. Alongside the expansion will be a version of Destiny 2 called "New Light", a free-to-play re-release of Destiny 2 and the first two expansions. wikipedia

© 2020 AimJunkies

# EXHIBIT B



**MITCHELL SILBERBERG & KNUPP LLP**
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Mark C. Humphrey
Attorney-at-Law
(310) 312-3265 Phone
(310) 231-8315 Fax
mxh@msk.com

November 4, 2020

**BY HAND**

Jeffrey Conway
8837 W Vernon
Phoenix, AZ, 85037

Re:     **Infringement of Bungie Intellectual Property**

Dear Mr. Conway:

We are counsel for Bungie, Inc. ("Bungie").  Bungie is the publisher, developer, and owner of the intellectual property rights in and to the video game *Destiny 2* and its various expansions, including the upcoming *Beyond Light*.

It has come to our attention that you are engaged in unlawful and malicious conduct that violates Bungie's rights.  Specifically, we understand that you, through a company called Phoenix Digital Group LLC, are operating a service called "AimJunkies" that offers various cheats intended to be used with *Destiny 2*.  According to the AimJunkies website (https://cheats-hacks-aimbot.aimjunkies.com/destiny-2/), the service allows *Destiny 2* players to utilize "undetected" cheats such as aimbots, player/NPC ESP, item ESP, no recoil, and other cheats and hacks to gain advantages in the game without fear of being banned.  We understand that the service is being offered to players for $34.95 a month.  We also are aware of your involvement with other sites offering *Destiny 2* cheats, including but not limited to "mombotcheats.com" and "virtual-advantage.com."[1]

The cheats that you offer are specifically designed to interfere with gameplay and otherwise impair the user experience of online games such as *Destiny 2*.  This is no small matter for our client.  Bungie's business, and specifically the *Destiny* experience, depends upon player engagement with a vibrant community that has been painstakingly developed and nurtured over several years.  As such, your activities—which upset and irritate scores of dedicated *Destiny* players—have caused and continue to cause serious injury to the value and integrity of Bungie's products and services.

Moreover, the foregoing activities are unlawful and violate the Limited Software License Agreement ("LSLA") that you entered into with Bungie,[2] and may further constitute copyright infringement, both direct and contributory. You also are intentionally interfering with Bungie's

---

[1] *See* https://mombotcheats.com; https://www.virtual-advantage.com/destiny-2-cheats-aimbot-esp.
[2] Among the License Limitations contained in the LSLA, users agree that they will not "hack or modify the Program, or create, develop, modify, distribute, or use any unauthorized software programs to gain advantage in any online or multiplayer game modes[.]"  *See* http://www.bungie/.net/7/en/Legal/SLA.

2049 Century Park East, 18th Floor, Los Angeles, California 90067-3120
Phone: (310) 312-2000  Fax: (310) 312-3100  Website: WWW.MSK.COM

12629630.1

BUNGIE_WDWA_0000542



Jeffrey Conway
November 4, 2020
Page 2

contracts with its users by encouraging them to use these cheats and violate the LSLA, as well. Furthermore, given the boasts on the AimJunkies website that your cheats are undetected, it is abundantly clear that your conduct is knowing and willful, which may subject you to statutory penalties under United States copyright law.

Lest there be any doubt as to the severity of this matter, Bungie has engaged us as outside litigation counsel and is prepared to promptly enforce its rights against you. Accordingly, demand hereby is made that you *immediately cease and desist* from any and all of the foregoing activity, as well as any other unauthorized activities in which you may be partaking in connection with any of Bungie's games and services, whether through AimJunkies, mombotcheats.com, virtual-advantage.com, or any other cheat suite or service. Furthermore, demand hereby is made that you identify the amount of all revenue generated in connection with the foregoing activity, as well as any other activity through which you may have exploited Bungie's intellectual property without authorization. Bungie has every intention of obtaining your ill-gotten gains, to the fullest extent possible under the law, should you fail to comply.

Confirm, *in writing and within five (5) days of receiving this letter*, that you will comply with these demands. I advise you to take this seriously, as you may not have another opportunity to resolve this matter short of legal action.

In that regard, note that under applicable law, you are required to maintain any and all electronic or hard copy documents, communications, and electronic data and information which may be relevant to Bungie's claims, including but not limited to hard drives, databases, web pages, server logs, spreadsheets, programming code, correspondence, postage logs, user "chat" messages, email and other electronic communications, instant messages, word processing documents, notebooks, social media posts, calendars, telephone logs, Internet usage files, off-line storage or information stored on removable media, information contained on laptops (whether business or personal), and network access information. To the extent that you engage in the manual or automated deletion/destruction of emails, you must forego doing so or disable any automated system that you utilize, in order to ensure the preservation of all such documents and information. Failure to abide by these requirements may result in penalties against you and form the basis of legal claims for spoliation.

Nothing contained in this letter is intended to be, nor should it be deemed to constitute, a waiver or relinquishment of any rights, claims, defenses, or causes of action possessed by Bungie, all of which expressly are reserved.

Sincerely,

Mark C. Humphrey
Attorney-at-Law for
MITCHELL SILBERBERG & KNUPP LLP

MCH/szm

12629630.1

BUNGIE_WDWA_0000543

# EXHIBIT C



**MITCHELL SILBERBERG & KNUPP LLP**
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Mark C. Humphrey
Attorney-at-Law
(310) 312-3265 Phone
(310) 231-8315 Fax
mxh@msk.com

November 9, 2020

**VIA FEDEX & E-MAIL (ADMIN@AIMJUNKIES.COM; JGWEB@HOTMAIL.COM)**

Jordan Green
2839 SW Dickenson Street
Portland OR, 97219

Re:   **Infringement of Bungie Intellectual Property**

Dear Mr. Green:

We are counsel for Bungie, Inc. ("Bungie").  Bungie is the publisher, developer, and owner of the intellectual property rights in and to the video game *Destiny 2* and its various expansions, including the upcoming *Beyond Light*.

It has come to our attention that you are engaged in unlawful and malicious conduct that violates Bungie's rights.  Specifically, we understand that you, through a company called Phoenix Digital Group LLC, are operating a service called "AimJunkies" that offers various cheats intended to be used with *Destiny 2*.  According to the AimJunkies website (https://cheats-hacks-aimbot.aimjunkies.com/destiny-2/), the service allows *Destiny 2* players to utilize "undetected" cheats such as aimbots, player/NPC ESP, item ESP, no recoil, and other cheats and hacks to gain advantages in the game without fear of being banned.  We understand that the service is being offered to players for $34.95 a month.  We also are aware of your involvement with other sites offering *Destiny 2* cheats, including but not limited to "mombotcheats.com" and "virtual-advantage.com."[1]

The cheats that you offer are specifically designed to interfere with gameplay and otherwise impair the user experience of online games such as *Destiny 2*.  This is no small matter for our client.  Bungie's business, and specifically the *Destiny* experience, depends upon player engagement with a vibrant community that has been painstakingly developed and nurtured over several years.  As such, your activities—which upset and irritate scores of dedicated *Destiny* players—have caused and continue to cause serious injury to the value and integrity of Bungie's products and services.

Moreover, the foregoing activities are unlawful and violate the Limited Software License Agreement ("LSLA") that you entered into with Bungie,[2] and may further constitute copyright infringement, both direct and contributory. You also are intentionally interfering with Bungie's

---

[1] *See* https://mombotcheats.com; https://www.virtual-advantage.com/destiny-2-cheats-aimbot-esp.
[2] Among the License Limitations contained in the LSLA, users agree that they will not "hack or modify the Program, or create, develop, modify, distribute, or use any unauthorized software programs to gain advantage in any online or multiplayer game modes[.]"  *See* http://www/bungie/.net/7/en/Legal/SLA.

2049 Century Park East, 18th Floor, Los Angeles, California 90067-3120
Phone:  (310) 312-2000  Fax:  (310) 312-3100  Website: WWW.MSK.COM

12624510.1

BUNGIE_WDWA_0000546



Jordan Green
November 9, 2020
Page 2

contracts with its users by encouraging them to use these cheats and violate the LSLA, as well. Furthermore, given the boasts on the AimJunkies website that your cheats are undetected, it is abundantly clear that your conduct is knowing and willful, which may subject you to statutory penalties under United States copyright law.

Lest there be any doubt as to the severity of this matter, Bungie has engaged us as outside litigation counsel and is prepared to promptly enforce its rights against you. Accordingly, demand hereby is made that you ***immediately cease and desist*** from any and all of the foregoing activity, as well as any other unauthorized activities in which you may be partaking in connection with any of Bungie's games and services, whether through AimJunkies, mombotcheats.com, virtual-advantage.com, or any other cheat suite or service. Furthermore, demand hereby is made that you identify the amount of all revenue generated in connection with the foregoing activity, as well as any other activity through which you may have exploited Bungie's intellectual property without authorization. Bungie has every intention of obtaining your ill-gotten gains, to the fullest extent possible under the law, should you fail to comply.

Confirm, ***in writing and within five (5) days of receiving this letter***, that you will comply with these demands. I advise you to take this seriously, as you may not have another opportunity to resolve this matter short of legal action.

In that regard, note that under applicable law, you are required to maintain any and all electronic or hard copy documents, communications, and electronic data and information which may be relevant to Bungie's claims, including but not limited to hard drives, databases, web pages, server logs, spreadsheets, programming code, correspondence, postage logs, user "chat" messages, email and other electronic communications, instant messages, word processing documents, notebooks, social media posts, calendars, telephone logs, Internet usage files, off-line storage or information stored on removable media, information contained on laptops (whether business or personal), and network access information. To the extent that you engage in the manual or automated deletion/destruction of emails, you must forego doing so or disable any automated system that you utilize, in order to ensure the preservation of all such documents and information. Failure to abide by these requirements may result in penalties against you and form the basis of legal claims for spoliation.

Nothing contained in this letter is intended to be, nor should it be deemed to constitute, a waiver or relinquishment of any rights, claims, defenses, or causes of action possessed by Bungie, all of which expressly are reserved.

Sincerely,

Mark C. Humphrey
Attorney-at-Law for
MITCHELL SILBERBERG & KNUPP LLP

MCH/szm

12624510.1

# EXHIBIT D



**MITCHELL SILBERBERG & KNUPP LLP**
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

<div align="right">

Mark C. Humphrey
Attorney-at-Law
(310) 312-3265 Phone
(310) 231-8315 Fax
mxh@msk.com

</div>

November 9, 2020

**VIA FEDEX & E-MAIL (ADMIN@AIMJUNKIES.COM;**
**PHOENIXDIGITALGROUP2012@GMAIL.COM)**

David Schaefer
5973 Jacques Drive
San Jose CA, 95123

Re:   **Infringement of Bungie Intellectual Property**

Dear Mr. Schaefer:

We are counsel for Bungie, Inc. ("Bungie").  Bungie is the publisher, developer, and owner of the intellectual property rights in and to the video game *Destiny 2* and its various expansions, including the upcoming *Beyond Light*.

It has come to our attention that you are engaged in unlawful and malicious conduct that violates Bungie's rights.  Specifically, we understand that you, through a company called Phoenix Digital Group LLC, are operating a service called "AimJunkies" that offers various cheats intended to be used with *Destiny 2*.  According to the AimJunkies website (https://cheats-hacks-aimbot.aimjunkies.com/destiny-2/), the service allows *Destiny 2* players to utilize "undetected" cheats such as aimbots, player/NPC ESP, item ESP, no recoil, and other cheats and hacks to gain advantages in the game without fear of being banned.  We understand that the service is being offered to players for $34.95 a month.  We also are aware of your involvement with other sites offering *Destiny 2* cheats, including but not limited to "mombotcheats.com" and "virtual-advantage.com."[1]

The cheats that you offer are specifically designed to interfere with gameplay and otherwise impair the user experience of online games such as *Destiny 2*.  This is no small matter for our client.  Bungie's business, and specifically the *Destiny* experience, depends upon player engagement with a vibrant community that has been painstakingly developed and nurtured over several years.  As such, your activities—which upset and irritate scores of dedicated *Destiny* players—have caused and continue to cause serious injury to the value and integrity of Bungie's products and services.

Moreover, the foregoing activities are unlawful and violate the Limited Software License Agreement ("LSLA") that you entered into with Bungie,[2] and may further constitute copyright infringement, both direct and contributory. You also are intentionally interfering with Bungie's

---

[1] *See* https://mombotcheats.com; https://www.virtual-advantage.com/destiny-2-cheats-aimbot-esp.

[2] Among the License Limitations contained in the LSLA, users agree that they will not "hack or modify the Program, or create, develop, modify, distribute, or use any unauthorized software programs to gain advantage in any online or multiplayer game modes[.]"  *See* http://www.bungie/.net/7/en/Legal/SLA.

<div align="right">

2049 Century Park East, 18th Floor, Los Angeles, California 90067-3120
Phone:  (310) 312-2000  Fax:  (310) 312-3100  Website: WWW.MSK.COM

</div>

12624502.1

BUNGIE_WDWA_0000549



David Schaefer
November 9, 2020
Page 2

contracts with its users by encouraging them to use these cheats and violate the LSLA, as well. Furthermore, given the boasts on the AimJunkies website that your cheats are undetected, it is abundantly clear that your conduct is knowing and willful, which may subject you to statutory penalties under United States copyright law.

Lest there be any doubt as to the severity of this matter, Bungie has engaged us as outside litigation counsel and is prepared to promptly enforce its rights against you. Accordingly, demand hereby is made that you *immediately cease and desist* from any and all of the foregoing activity, as well as any other unauthorized activities in which you may be partaking in connection with any of Bungie's games and services, whether through AimJunkies, mombotcheats.com, virtual-advantage.com, or any other cheat suite or service. Furthermore, demand hereby is made that you identify the amount of all revenue generated in connection with the foregoing activity, as well as any other activity through which you may have exploited Bungie's intellectual property without authorization. Bungie has every intention of obtaining your ill-gotten gains, to the fullest extent possible under the law, should you fail to comply.

Confirm, *in writing and within five (5) days of receiving this letter,* that you will comply with these demands. I advise you to take this seriously, as you may not have another opportunity to resolve this matter short of legal action.

In that regard, note that under applicable law, you are required to maintain any and all electronic or hard copy documents, communications, and electronic data and information which may be relevant to Bungie's claims, including but not limited to hard drives, databases, web pages, server logs, spreadsheets, programming code, correspondence, postage logs, user "chat" messages, email and other electronic communications, instant messages, word processing documents, notebooks, social media posts, calendars, telephone logs, Internet usage files, off-line storage or information stored on removable media, information contained on laptops (whether business or personal), and network access information. To the extent that you engage in the manual or automated deletion/destruction of emails, you must forego doing so or disable any automated system that you utilize, in order to ensure the preservation of all such documents and information. Failure to abide by these requirements may result in penalties against you and form the basis of legal claims for spoliation.

Nothing contained in this letter is intended to be, nor should it be deemed to constitute, a waiver or relinquishment of any rights, claims, defenses, or causes of action possessed by Bungie, all of which expressly are reserved.

Sincerely,

Mark C. Humphrey
Attorney-at-Law for
MITCHELL SILBERBERG & KNUPP LLP

MCH/szm

12624502.1

BUNGIE_WDWA_0000550

# EXHIBIT E
# FILED UNDER SEAL

# EXHIBIT F
# FILED UNDER SEAL

# EXHIBIT G

| | |
|---|---|
| **From:** | Phil Mann <phil@mannlawgroup.com> |
| **Sent:** | Monday, October 31, 2022 10:17 AM |
| **To:** | Michele Wilson; Dini, Jacob (SEA); Michelle Nemeth |
| **Cc:** | Rava, William C. (SEA); Harkness, Brooke (SEA); Dave Dwight; Marcelo, Christian W. (SEA) |
| **Subject:** | Re: Bungie, Inc vs. Aimjunkies.com, et al. - JAMS Ref No. 5160000075 - Discovery Issue |

Dear Ms. Wilson,

Please also forward to Judge Cox our response that: Respondents simply do not have, "loader software...in their possession," do not have, "prior version(s) of that loader," in their possession, and do not have, "documents related to any version(s) of the loader, including but not limited to instructions on use, the download page from the website, and any user guides or associated documentation," in their possession either. Accordingly, such documents do not exist and cannot be produced.

Furthermore, as the loader software used during the relevant period, namely November 2019 to January 2021, was not preserved *because the underlying lawsuit was filed six months after that loader software was no longer in existence,* Respondents were under no obligation to preserve such software and Claimant's implication of wrongdoing is baseless.

Thank you,

Phil


On 10/31/22 10:07 AM, Michele Wilson wrote:

Thank you. I have forwarded this to Judge Cox.

Michele Wilson
Senior Case Manager
JAMS


**From:** Dini, Jacob (SEA) <JDini@perkinscoie.com>
**Sent:** Monday, October 31, 2022 10:06 AM
**To:** Michele Wilson <MWilson@JAMSADR.com>; Michelle Nemeth <mnemeth@jamsadr.com>
**Cc:** Rava, William C. (SEA) <WRava@perkinscoie.com>; Harkness, Brooke (SEA) <BHarkness@perkinscoie.com>; Dave Dwight <d7958@hotmail.com>; Phil Mann <phil@mannlawgroup.com>; Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
**Subject:** RE: Bungie, Inc vs. Aimjunkies.com, et al. - JAMS Ref No. 5160000075 - Discovery Issue

> **Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Nemeth and Ms. Wilson,

This is the first time Respondents have issued any response to Claimant's RFP No. 9, and Respondents offer no explanation for their failure to timely respond to Claimant's RFP which was due October 20, 2022. It is well established that failure to timely respond to requests for production constitutes a waiver of any objections. *See, e.g.*, *Rhinehard v. Seattle Times Co.*, 51 Wn. App. 561, 563-64, 754 P.2d 1243 (1988) (upholding trial court's denial of objection to request for production after responding party failed to timely raise objection under applicable discovery rules, noting that "[a] waiver of the right to object or of a protective order may result from a failure to timely respond or object") (citing *L. Orland, Wash. Prac., Rules Practice*, § 5427, at 153 (3d ed. 1983)); *Lim v. Franciscan Health Sys.*, No. C06-5191 FDB, 2006 WL 3544605, at *1 (W.D. Wash. Dec. 8, 2008) ("It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection."); *Hansen v. Boeing Co.*, No. C09-1247RSM, 2010 WL 11527328, at *1 (W.D. Wash. Aug. 30, 2010) (same).

Respondents must produce whatever loader software is in their possession, any prior version(s) of that loader, and all documents related to any version(s) of the loader, including but not limited to instructions on use, the download page from the website, and any user guides or associated documentation. Moreover, at his deposition on October 28, 2022, Respondent Schaefer confirmed that from 2019 through 2022 the same loader was used (with various updates) and thus the current loader remains relevant. If Respondents failed to preserve the loader or earlier versions of it, they must confirm their failure to do so.

Claimant disagrees with Mr. Mann's "substantive note" at the end of his message; however, it is irrelevant to the resolution of the narrow dispute before Judge Cox and Claimant will not respond to such editorializing at this time.

Finally, as Mr. Mann notes in his email, there are several other discovery issues brewing and a number of documents remain unproduced by Respondents that are either being withheld, were not preserved, or were deleted. Claimant plans to bring these issues to the Arbitrator's attention shortly.

Best,


**Jacob Dini** | **Perkins Coie LLP**
ASSOCIATE
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3832
F. +1.206.359.4832
E. JDini@perkinscoie.com

---

**From:** Michele Wilson <MWilson@JAMSADR.com>
**Sent:** Friday, October 28, 2022 8:29 AM
**To:** Phil Mann <phil@mannlawgroup.com>; Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
**Cc:** Dini, Jacob (SEA) <JDini@perkinscoie.com>; Rava, William C. (SEA) <WRava@perkinscoie.com>; Harkness, Brooke (SEA) <BHarkness@perkinscoie.com>; Dave Dwight <d7958@hotmail.com>; Michelle Nemeth <mnemeth@jamsadr.com>
**Subject:** RE: Bungie, Inc vs. Aimjunkies.com, et al. - JAMS Ref No. 5160000075 - Discovery Issue

Dear Counsel –

Good morning.  Judge Cox asked me to advise the moving party that it has until Noon on October 31 to file a reply.  He'll then rule on the issues.

Thank you,

Michele

**Michele Wilson**
Senior Case Manager
JAMS

---

**From:** Phil Mann <phil@mannlawgroup.com>
**Sent:** Thursday, October 27, 2022 11:33 PM
**To:** Michelle Nemeth <mnemeth@jamsadr.com>; Michele Wilson <MWilson@JAMSADR.com>
**Cc:** Dini, Jacob (SEA) <JDini@perkinscoie.com>; Rava, William C. (SEA) <WRava@perkinscoie.com>; Harkness, Brooke (SEA) <BHarkness@perkinscoie.com>; Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>; Dave Dwight <d7958@hotmail.com>
**Subject:** Re: Bungie, Inc vs. Aimjunkies.com, et al. - JAMS Ref No. 5160000075 - Discovery Issue

> **Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Michelle and Michelle,

As I will be in depositions tomorrow with limited email access, I want to send to you both Respondent's response now.

Please provide the following to Judge Cox before his 9:00 am requested deadline.

_____

Dear Judge Cox;

As counsel for Respondents, I am responding to the email Claimant's counsel sent yesterday at 8:01 am.

Claimant frames the discovery matter before you solely as:

"Claimant seeks an order compelling Respondents to produce all documents responsive to Claimant's RFP No. 9, including a copy of the loader software itself."

As this is the only issue Claimant has raised, it will be the only one that I will address here.

Should Claimant raise additional issues beyond the single one they have identified above, I respectfully request a further opportunity to address them before a decision is made.

Turning to the matter at hand, Respondents do not formally object to RFP No. 9, but, rather, respond that the "loader" and "loader software" are not in Respondent's possession or control and, therefore, cannot be produced.

As Claimant well knows, the products at issue in this case were distributed by Respondents between November 2019 and January, 2021. Distribution of these products thus ended well over one-and-one-half years ago, approximately six month before the related case in the District Court was filed, and more

than one year before this arbitration was filed.

The relevant "loader" was modified after January, 2021.  The loader as it existed during the relevant time period no longer exists and no copies of it were retained by Respondents. Accordingly, there is nothing to produce.

As Claimant further knows, the website Respondents operated, and through which the subject products were distributed, was sold to an overseas purchaser on May 6, 2022.  All "loader" software was transferred as part of that sale and is no longer in the possession or control of Respondents.  And even if it were, which it is not, such "loader" software would not be that in existence at the relevant time.

Claimant is well aware of the sale of the website and knows the identity of the overseas buyer.

On a more substantive note, we are shocked to hear Claimant represent, at this late date, that it does not have, and apparently has not even examined or inspected, the "loader" software that it, itself, now says, "is relevant to several of Claimant's claims including as to the circumvention of Claimant's technological protections."  On what ground, then, does it base the very serious charges it has leveled against Respondents? If, as we suspect, this is an ill-considered case filed simply to extract information from Respondents, we reserve all rights to seek fees and expenses.

Finally, we note that this arbitration was filed last February, and discovery has been open for months.  We question why Claimant waited to the last moment to request a "loader" that it now claims is central to its case.

In any event, the materials sought in RFP No. 9 cannot be produced because they are not in the possession or control of Respondents.

I will be happy to supplement this should you have any questions or request further information.

Very truly yours,

*Philip P. Mann*

**Mann Law Group PLLC**
403 Madison Ave. N, Ste. 240
Bainbridge Island, WA 98110
206-436-0900
www.mannlawgroup.com

Attorney for Respondents


On 10/27/22 8:51 AM, Michelle Nemeth wrote:

> Judge Cox requests a written response from Mr. Mann by 9am tomorrow, October 28, 2022.   Either upload in Access or if you email it, kindly copy Michele Wilson and she will provide to Judge Cox.
>
> Thank you, Michelle

**From:** Phil Mann <phil@mannlawgroup.com>
**Sent:** Thursday, October 27, 2022 8:28 AM
**To:** Michelle Nemeth <mnemeth@jamsadr.com>; Marcelo, Christian W. (SEA)
<CMarcelo@perkinscoie.com>
**Cc:** Dini, Jacob (SEA) <JDini@perkinscoie.com>; Rava, William C. (SEA)
<WRava@perkinscoie.com>; Harkness, Brooke (SEA) <BHarkness@perkinscoie.com>;
Michele Wilson <MWilson@JAMSADR.com>
**Subject:** Re: Bungie, Inc vs. Aimjunkies.com, et al. - JAMS Ref No. 5160000075 -
Discovery Issue

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Michelle,

As Bungie has once again, provided a one-sided account of the present situation,
Respondent's respectfully request that we either have a hearing before Judge Cox, or
that Judge Cox entertain a submission from us before a decision is made on Bungie's
request.

Thank you and all the best,

Phil

Counsel for Respondents

On 10/27/22 8:16 AM, Michelle Nemeth wrote:

> Good morning,
>
> I will forward your request to Judge Cox who may be unavailable to
> review this until the weekend.  I've copied my colleague Michele Wilson
> who can assist if needed when I'm out of the office tomorrow and
> Monday.
>
> Sincerely, Michelle
>
> ---
>
> **From:** Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
> **Sent:** Thursday, October 27, 2022 8:01 AM
> **To:** Michelle Nemeth <mnemeth@jamsadr.com>
> **Cc:** Dini, Jacob (SEA) <JDini@perkinscoie.com>; Rava, William C. (SEA)
> <WRava@perkinscoie.com>; Harkness, Brooke (SEA)
> <BHarkness@perkinscoie.com>; Phil Mann <phil@mannlawgroup.com>
> **Subject:** Bungie, Inc vs. Aimjunkies.com, et al. - JAMS Ref No.
> 5160000075 - Discovery Issue

**Caution:** This email originated from outside JAMS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Nemeth,

Claimant is writing regarding a discovery issue for Judge Cox's attention and to request the production of documents in response to a discovery request.

On September 20, 2022, Claimant served the attached discovery request consisting of a single Request for Production (RFP No. 9) seeking the loader software used by Respondents to load/launch the cheat software at issue in this case, and any documents relating to that software. This loader software is relevant to several of Claimant's claims including as to the circumvention of Claimant's technological protections because it is the method the cheat software is launched on users' computers.

Respondents' response was due on October 20, 2022. Respondents did not respond or provide any objections to the request. Claimant contacted Respondents regarding this request on several occasions, but have not received a response to the RFP. The email thread between counsel relating to this RFP is attached here.

**Claimant seeks an order compelling Respondents to produce all documents responsive to Claimant's RFP No. 9, including a copy of the loader software itself.**

Because Respondents failed to object (or respond at all), they have waived any objections and we believe this issue is straightforward and can be resolved without a conference. The parties are also in depositions today, tomorrow and Monday. However, if Judge Cox believes a conference regarding this matter would be helpful, counsel for Claimant is available at the lunch break of the depositions or can take a break during the deposition for the conference.

Best,

Christian

**Christian Marcelo** | **Perkins Coie LLP**
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3315
F. +1.206.359.4315
E. CMarcelo@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

# EXHIBIT H
# FILED UNDER SEAL

# EXHIBIT I

## Ukrainian BME To Acquire Leading Independent US Videogame Cheat Distributor, Aimjunkies

KYIV, Ukraine.- -Blome Entertainment ("BME") announced today that it has completed and signed definitive agreements with Phoenix Digital Group LLC("PDG"), to acquire "Aimjunkies.com" a premier independent videogame cheat retailer that has distributed some of the videogame industry's most highly-acclaimed cheats. This acquisition will give BME access to Aimjunkies's world-class cheat library and approach to live game cheats services and technology expertise, furthering BME's vision to reach billions of players. Aimjunkies will continue to operate independently, maintaining the ability to self-distribute and reach players wherever they choose to play.

Based in Phoenix Arizona and with more than 90 volunteer staff and 50 independent contractor cheat developers around the world, Aimjunkies is renowned for distributing unforgettable, evolving cheats centered around high-quality gameplay experiences that foster meaningful player connections. Currently, the team is focused on the long-term development of its hugely successful distribution platform, expanding the game cheat universe, and creating entirely new worlds in future IP. The total financial consideration for this transaction is undisclosed, but is inclusive of purchase price and committed volunteer incentives, and is subject to customary working capital and other adjustments.

"Aimjunkies has distributed and continues to distribute some of the world's most beloved videogame cheats and, by aligning its values with people's desire to share gameplay cheat experiences in Eastern Europe, they bring together millions of people around the world," said Maxim Arshinov, Chairman, President and CEO, BME. "As part of our purpose to 'continue through all of the turmoil our country is enduring', we will utilize BME's diverse array of IP and technology assets worldwide to support further evolution of Aimjunkies and its ability to distribute iconic cheats across multiple platforms and media."

 "In BME, we have found a purchasing partner that fully supports us and wants to accelerate our vision of distributing meaningful entertainment experiences that span generations, all while valuing the creative independence that is the heartbeat of Aimjunkies," said David Schaefer, CEO and Chairman of PDG.  Aimjunkies. "Will continue pursuing the vision of one, unified Aimjunkies community, distributing cheats that value our community and meet them wherever and however they choose to play.  Both Aimjunkies and BME believe that game cheat worlds are only the beginning of what our IP will become. Our original universes have immense potential and, with BME's support, this will propel Aimjunkies into becoming a global multi-media entertainment company dedicated to delivering on our creative vision."

Post-acquisition, Aimjunkies will be an independent subsidiary of BME and run by its Board of Directors, chaired by Maxim Arshinov and Aimjunkie's current site management team. Phoenix Digital Group LLC has released to BME all equity and property rights for Aimjunkies.com,VirtualAdvantage.com and Mombot.com. The transaction is subject to certain closing conditions.

**About BME Entertainment**

Recognized as a leader in Eastern Europe interactive and digital entertainment, Blome Entertainment (BME) is a Ukrainian based corporation responsible for the sale and distribution of video game cheats around the world predominately in Eastern Europe and the Asia's..

**About Aimjunkies**

Aimjunkies is  based in Phoenix Arizona, dedicated to creating hopeful worlds that inspire passionate player communities for video game cheaters and non cheaters alike with lifelong friendships between both groups. For more than a decade, Aimjunkies.com has worked towards that vision, distributing cheats and outstanding customer support for some of the world's most celebrated video game franchises.. Aimjunkies is focused on developing the future of the cheat universe with new opportunities to come.

*Contacts*
Andreas Banek
Sr. Global Communications Manager, Blome Entertainment
banekandreas@protonmail.com


Warren Apenzeller
Director of Global Communications, Aimjunkies
admin@aimjunkies.com

# EXHIBIT J



# SCP SECRET LABORATORY

Know where everyone is and keep yourself protected with features like no recoil, rapid fire, no spread, and more!

**MORE INFO HERE**

---

## UPCOMING CHEATS

 
DESTINY 2


HALO REACH


MINECRAFT


PAYDAY 2


WORLD OF TANKS


DESTINY 2 ESP ONLY

---

# OTHER RECENT RELEASES



### BLOONS TD 6

The Bloons are back and tougher than ever. Show them the monkeys are still king with our latest release. Unlimited money and health along with fast xp and the ability to unlock everything.

**MORE INFO HERE**



### WORLD OF TANKS BLITZ

Safely roll through the maps with full player ESP to dominate the battlefield and secure objectives. Never miss a shot with a deadly aimbot with prediction.

**MORE INFO HERE**

 



Unsubscribe

© 2019 AimJunkies

**yahoo/mail**

Search your Mailbox                Dave Jensen      Account Info ▾   Go      Sign Out    Home

| destiny 2 | Contacts | Notepad | Calendar |    Switch to the newest Yahoo Mail

Compose

Inbox 999+
Drafts 3
Sent
Archive
Spam 🗑
Trash 🗑

Folders  Edit  Hide

+ New folder

destiny 2  5

Compose

↩ ↩ ➡         🗑 Delete  ❌ Spam  Actions ▾  Apply     ⌃ ⌄ ✕

d7958@ymail.com/destiny 2

### AimJunkies - 12 Days of Christmas Event - Free CSGO Cheat | Destiny 2 Aimbot Released

🅰️  **AimJunkies** <admin@aimjunkies.com>          Dec 23, 2019 at 8:55 PM  ✆ ☆
     To: Springspecials <d7958@ymail.com>                    Print   Raw message

View in Browser

Your Browser | Facebook

Home | Forums | Cheats

## 12 DAYS OF CHRISTMAS SALE
🎅🎄 NEW FREE CHEAT AND SALE DAILY 🎄
🎅

Every day a new cheat will be free to all subscribers for 24 hours. Along with this cheat being free, it will be discounted handsomely. The coupon code for 25% off is

## AJCOOKIES19

### TODAY'S JOLLY FREE CHEAT IS

___

# OTHER RECENT RELEASES

## DESTINY 2 FULL CHEAT

The full cheat with aimbot is now released. Pair it with the full player and NPC ESP along side OPK to tear your way through raids and missions.

[ MORE INFO HERE ]

### GTFO

**Switch to DIRECTV STREAM**
Sponsored by DIRECTV STREAM

Handle all your enemies with ease with features like a full aimbot, ESP, god mode, key esp and more!



# UPCOMING CHEATS

HALO REACH

RISK OF RAIN 2

MINECRAFT

WORLD OF TANKS

WORLD OF WARSHIPS

PAYDAY 2

# TRUSTED CHEATS

Unsubscribe

© 2019 AimJunkies



Handle all your enemies with ease with features like a full aimbot, ESP, god mode, key esp and more!

---

# UPCOMING CHEATS

HALO REACH          RISK OF RAIN 2          MINECRAFT

PAYDAY 2          WORLD OF TANKS          WORLD OF WARSHIPS

---

# TRUSTED CHEATS

---

Unsubscribe

© 2019 AimJunkies



yahoo!mail

Search your mailbox

Dave Jensen    Account Info    Go    Sign Out    Home

Compose

| destiny 2 | Contacts | Notepad | Calendar |

Switch to the newest Yahoo Mail

Inbox — 999+
Drafts — 3
Sent
Archive
Spam
Trash

Folders    Edit    Hide

+ New folder
destiny 2 — 4

Compose

Delete    Spam    Actions    Apply

d7958@ymail.com/destiny 2

**AimJunkies - 12 Days of Christmas Event - Free Sea of Thieves Cheat | Destiny 2 Aimbot Released**

AimJunkies <admin@aimjunkies.com>
To: Springspecials <d7958@ymail.com>

Dec 28, 2019 at 9:20 PM

Print    Raw message

View in Browser

Home | Forums | Cheats

# 12 DAYS OF CHRISTMAS SALE
🎅 🎄 NEW FREE CHEAT AND SALE DAILY 🎄
🎅

Every day a new cheat will be free to all subscribers for 24 hours. Along with this cheat being free, it will be discounted handsomely. The coupon code for 25% off is

## AJCOOKIES19

## TODAY'S JOLLY FREE CHEAT IS

## OTHER RECENT RELEASES

# DESTINY 2 FULL CHEAT

The full cheat with aimbot is now released. Pair it with the full player and NPC ESP along side OPK to tear your way through raids and missions.

MORE INFO HERE

GTFO

THE KARDASHIANS

NOW STREAMING

Plans start at $6.99/month.

START YOUR FREE TRIAL

hulu

Terms apply.



Handle all your enemies with ease with features like a full aimbot, ESP, god mode, key esp and more!



# UPCOMING CHEATS

HALO REACH

RISK OF RAIN 2

MINECRAFT

WORLD OF TANKS

WORLD OF WARSHIPS

PAYDAY 2

# TRUSTED CHEATS

APEX LEGENDS

PLANTS VS ZOMBIES

VERMINTIDE 2

APEX LEGENDS

<u>Unsubscribe</u>

© 2019 AimJunkies





RISK OF RAIN 2

HALO REACH

MINECRAFT

WORLD OF WARSHIPS

RISK OF RAIN 2

HALO REACH

WORLD OF WARSHIPS

PAYDAY 2

WORLD OF TANKS

PAYDAY 2

WORLD OF TANKS

## TRUSTED CHEATS

APEX LEGENDS

PLANTS VS ZOMBIES

VERMINTIDE 2

APEX LEGENDS

Unsubscribe

© 2020 AimJunkies

# EXHIBIT K

```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
 2                         AT SEATTLE

 3 BUNGIE, INC.                )
                               )
 4      Plaintiff,             )         CERTIFIED COPY
                               )
 5 vs.                         ) CASE NO. 2:21-cv-811-TSZ
                               )
 6 AIMJUNKIES.COM; PHOENIX     )
   DIGITAL GROUP LLC; DAVID    )
 7 SCHAEFER; JORDAN GREEN;     )
   JEFFREY CONWAY; and JAMES   )
 8 MAY,                        )
                               )
 9      Defendants.            )

10

11

12              ORAL VIDEOTAPED ZOOM DEPOSITION

13                         JAMES MAY

14                      March 23, 2023

15

16    ORAL VIDEOTAPED ZOOM DEPOSITION OF JAMES MAY,

17 produced as a witness at the instance of the Plaintiff

18 and duly sworn, was taken in the above-styled and

19 numbered cause on the 23rd day of March, 2023, from

20 7:58 a.m. to 11:45 a.m., via Zoom, before Debra K.

21 Zebert, Registered Professional Reporter, reported by

22 computerized stenotype machine, pursuant to the Federal

23 Rules of Civil Procedure and the provisions stated on

24 the record or attached hereto.

25 Job No.: 971992
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 2

```
 1                      APPEARANCES

 2

 3 FOR PLAINTIFF:

 4      Jacob Dini, Esquire
        PERKINS COIE, LLP
 5      1201 Third Avenue, Suite 4900
        Seattle, Washington  98101
 6      206.359.8000
        JDini@perkinscoie.com
 7
   FOR DEFENDANT, JAMES MAY:
 8
        Philip P. Mann, Esquire
 9      MANN LAW GROUP PLLC
        403 Madison Avenue, North, Suite 240
10      Bainbridge Island, Washington  98110
        206.855.8839
11      phil@mannlawgroup.com

12
   ALSO PRESENT:
13
        Scott Norton, Videographer
14      James Barker, In-house Counsel, Bungie, Inc.
        Ed Kaiser, PhD
15

16

17

18

19

20

21

22

23

24

25
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

```
 1                         INDEX

 2                                            PAGE

 3 JAMES MAY

 4 Examination by Mr. Dini .........................4
   Signature Page  ...............................175
 5 Signature Page - No Changes  ..................178
   Court Reporter's Certificate ..................179
 6

 7                        EXHIBITS

 8

 9 EXHIBIT              DESCRIPTION            PAGE

10 70            PDX02                          16

11 71            Defendants' Answer and Amended  42
                 Counterclaims
12
   72            Defendant James May's          67
13               Supplemental Response to
                 Plaintiff's Interrogatory No. 8
14
   73            Invoice                       102
15
   74            Counterclaim Exhibit D        160
16
   75            Counterclaim Exhibit B        172
17

18

19

20

21

22

23

24

25
```

Central Litigation Services  |  800.442.3376
www.litigationservices.com  |  The LIT Group 079F

Page 4

```
 1                    THE VIDEOGRAPHER:  Good morning, everyone.
 2 Here begins the remote deposition of James May in the
 3 matter of Bungie, Inc. versus AimJunkies.com et al.
 4 This case is in the United States District Court,
 5 Western District of Washington, at Seattle.  The case
 6 number is 2:21-CV-811-TFZ.  Today's date is Thursday,
 7 March 23rd, 2023, and the current time is 7:58 a.m.
 8 Pacific time.
 9                    This is a remote deposition through Zoom
10 videoconferencing.  Our videographer is Scott Norton,
11 appearing on behalf of Centext Litigation Services.
12 Would counsel please introduce yourselves, state whom
13 you represent.
14                    MR. DINI:  My name is Jacob Dini.  I'm
15 counsel for Bungie.  I'm also joined today by in-house
16 counsel, James Barker -- or in-house counsel for Bungie.
17                    MR. MANN:  My name is Philip Mann.  I'm
18 here on behalf of Mr. May.
19                    THE VIDEOGRAPHER:  Thank you both.  Our
20 reporter today is Kathy Zebert, with Centext.  Would the
21 reporter please swear in our witness.
22                          JAMES MAY,
23 having been first duly sworn, testified as follows:
24                            ***
25                          EXAMINATION
```

Page 5

1 BY MR. DINI:

2     Q.   Okay.  Good morning, Mr. May.

3     A.   Good --

4     Q.   I know you've --

5     A.   -- morning.

6     Q.   I know you've done this before.  You were

7 deposed in connection with the arbitration proceeding

8 between these parties too, right?

9     A.   Yes.

10     Q.   Okay.  I know Mr. Marcelo went through the

11 deposition rules during that deposition too, but I think

12 it's helpful for both of us just to have a brief

13 refresher at the top here too.

14     A.   Definitely.

15     Q.   Yeah.  So we, again, have a court reporter,

16 Ms. Kathy Zebert.  So I ask that you please answer all

17 questions verbally even if it's just a "yes" or a "no."

18 I'm going to ask you not to use sort of sounds like

19 "uh-huh" or "nuh-uh," because those are difficult to

20 record accurately.  And please avoid any nonverbal

21 answers like a nod or a shake of the head.  We need a

22 clear record in this case.  Do you --

23     A.   Gotcha.

24     Q.   -- understand that?

25     A.   Yeah.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 9

 1    A.    Okay.

 2    Q.    Other than DoorDash, have you worked for any

 3 other companies since your last deposition in October of

 4 2022?

 5    A.    No, I have not.

 6    Q.    Okay.  Are you still working for DoorDash?

 7    A.    Yes.

 8    Q.    Is -- is that why we have to end the deposition

 9 at 5:00 p.m. Eastern time today?

10    A.    Yes.

11    Q.    Okay.  Got it.  You say you still work or you

12 still are an independent contractor for the website

13 AimJunkies.com.  Did I hear that right?

14    A.    Yes.

15    Q.    What do you do for AimJunkies.com still?

16    A.    I still do the same thing I did before; making

17 cheats and stuff like that that.  Yeah, still the exact

18 same thing.

19    Q.    So you're still making cheats for

20 AimJunkies.com?

21    A.    Yeah.

22    Q.    How are you paid by AimJunkies.com?

23    A.    I get paid through Bitcoin.

24          MR. MANN:  I'm going to raise an objection

25 at this point, because I don't see what this has to do

Page 10

1 with the counterclaims, and this seems like we're going

2 over familiar ground.  Continue, but I want to make that

3 for the record.  I'll permit this for a while, but this

4 is not going to be a complete redo of the deposition

5 that has already been taken.  I would ask that it be

6 confined to the counterclaim issues that are properly

7 the subject matter for this deposition.  Please go

8 ahead.

9 BY MR. DINI:

10      Q.    Mr. May, I'll ask you the question again.  How

11 are you paid by AimJunkies.com?

12      A.    Through Bitcoin.

13      Q.    Are you paid through any other methods by

14 AimJunkies.com other than Bitcoin?

15      A.    No.

16      Q.    Who pays you from AimJunkies.com?

17      A.    It's still coming from -- I still think they're

18 handling the payments.  I'm not a hundred percent sure

19 on that, but I believe Dave Schaefer is still handling

20 the payments.

21      Q.    So you're still being paid by David Schaefer

22 for your work in connection with AimJunkies.com?

23      A.    I believe they're the payment provider, like

24 they handle the payments for them.  I'm not a hundred

25 percent sure, but I believe so.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 11

1     Q.    So who is the payment provider that pays you on

2  behalf of AimJunkies.com?

3     A.    I believe it's David Schaefer.

4     Q.    Do you know your current Bitcoin wallet ID?

5     A.    I do not.

6     Q.    Do you have a Bitcoin wallet ID currently?

7     A.    It's just through Coinbase.

8     Q.    Do you have a Coinbase -- do you have a

9  Coinbase account?

10    A.    Yes, I do.

11    Q.    And is that Coinbase account the one that is

12 paid -- is -- that you use to get paid by

13 AimJunkies.com?

14    A.    Yes.

15    Q.    Do you know David Schaefer's Bitcoin wallet ID?

16    A.    No.

17    Q.    Do you have a record of the payments being made

18 to your Coinbase account?

19    A.    No.

20    Q.    Coinbase does not keep a record of how much

21 Bitcoin you've been paid?

22    A.    They might, but I'm not sure.  I don't check.

23    Q.    Have you ever looked at the balance of your

24 Bitcoin wallet in Coinbase?

25    A.    I transfer it right away.  So it goes right to

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

 1 my bank account.

 2     Q.    Is that transfer automatic, or is it manual?

 3     A.    I automatically transfer it as soon as I get a

 4 notification I've been paid.

 5     Q.    What e-mail address do you use for your

 6 Coinbase wallet or your Coinbase account?

 7     A.    The same e-mail address that you guys have for

 8 everything else.

 9     Q.    Can you remind what that e-mail address is,

10 please?

11     A.    Yeah, it's james.q3abc@gmail.com.

12     Q.    Do you have access to that Coinbase account if

13 you wanted to access it?

14     A.    Yeah.

15     Q.    When was the last time you accessed it?

16     A.    Last time I got paid.  I don't know the exact

17 date.

18     Q.    Was it within the last week?

19     A.    Last month, probably.

20     Q.    So sometime in February 2023 was the last time

21 you accessed your Coinbase account?

22     A.    Yeah, correct.

23     Q.    Okay.  Do you have any other sources of income

24 other than for your work for AimJunkies.com and -- and

25 DoorDash currently?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 81

1 registry and ran antivirus software, and didn't do

2 anything else, right?

3                MR. MANN:  Same objection.

4 BY MR. DINI:

5     Q.   You can answer.

6     A.   This all -- oh, okay.  Reviewing -- so during

7 my reviewing of files for indication of compromises,

8 this is the subject we're talking about, right?

9     Q.   Yeah.  I'm asking for what you looked for in

10 your indications of compromise.

11    A.   Oh, okay.  Gotcha.  Yeah, that's about it,

12 then.

13    Q.   Okay.  Nothing else?

14    A.   No.

15    Q.   What is your basis for alleging that Bungie

16 accessed the files on your computer?

17    A.   The documents you guys provided -- or Bungie

18 provided.

19    Q.   When you say the documents that Bungie

20 provided, you're referring to Bungie's document

21 produced, Bates numbered 409 and 367?

22    A.   Correct.

23    Q.   That was when you first realized that Bungie

24 had accessed files on your computer?

25    A.   Yes.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 82

1       Q.    When you reviewed Bungie's documents 409 and

2  367, that was the first time that you realized that your

3  files had been accessed by Bungie?

4       A.    I suspected before, but I had no proof until

5  then.

6       Q.    When did you suspect?

7       A.    I suspected probably right when I got the

8  lawsuit.

9       Q.    When was that?

10      A.    I don't know --

11            MR. MANN:   Objection.  That's a matter of

12  record, but do your best to remember.

13      A.    I don't know.  Was it June of 20 -- was it

14  2021?  I don't know.  Yeah, or -- yeah, I think it was

15  like June of 2021 or something like that, or July,

16  somewhere in there.  I don't remember.

17  BY MR. DINI:

18      Q.    Why did you --

19            MR. MANN:   Again, that's a matter of

20  record, and it is what it is.

21  BY MR. DINI:

22      Q.    Why did you suspect that Bungie accessed your

23  files in 2021?

24      A.    I'm always skepticable (phonetic) -- or

25  skeptical of companies that -- that are always like

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 83

1 scanning things on the computer.  I mean, you never know

2 what companies are doing.  I never trust anyone.

3     **Q.   I guess, what specifically made you believe or**

4 **suspect that Bungie accessed files on your computer**

5 **prior to receiving the documents 409 and 367?**

6     A.   Because I was indicated in being the developer

7 of the cheat, when I was not.  So they had to have done

8 some kind of research to -- to suspect me of doing

9 something.

10    **Q.   Did you review your files for indications of**

11 **compromise in 2021, when the lawsuit was filed?**

12    A.   I did not.

13    **Q.   Why not?**

14    A.   Because I wasn't sure then.  I just had a

15 suspicion.

16    **Q.   When were you sure?**

17    A.   Once I got the files or the -- once I got the

18 documents produced by Bungie; those two that we looked

19 over.

20    **Q.   Which files did you think that Bungie had --**

21 **well, what files did you suspect Bungie had accessed**

22 **prior to the production of those documents, 409 and 367?**

23    A.   I have -- I had no clue.  I -- it was just all

24 speculation at that point, until I actually got the

25 files to know exactly.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 93

1    Q.    So you have no evidence that Bungie accessed

2 any files on your G drive?

3    A.    Just the ones that are reported in that

4 document.

5    Q.    By "that," you mean Bungie 409?

6    A.    Yes, correct.

7    Q.    Those are the only documents from -- those are

8 the only files from your G drive that you have evidence

9 were accessed by Bungie?

10    A.    That I have evidence for, yes, but I believe

11 that there was more.

12    Q.    What is your belief based on?

13    A.    Because when you can get that kind of access to

14 those files, you can get access to anything else on the

15 PC.

16    Q.    What's stored on your H drive?

17    A.    Probably games.  I mean, the only -- everything

18 else is games except for the external drive.

19    Q.    Any files on the H drive that you created?

20    A.    I mean, only -- the only way it would be H

21 drive is if it -- sometimes, it'll change from G to H,

22 depending on the drive when I plug in the external.

23 Like it -- it changes them around sometimes.  It renames

24 them when I plug in the external drive.  So sometimes,

25 it could be the H, or it could be the G.  Just depends

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 94

1 on when I plug it in.  It reorders the drive sometimes.

2      Q.   So I guess, getting back to my question, then,

3 are there any files stored on the H drive that are files

4 you created?

5      A.   No, not -- it would be the same thing on the

6 external drive.  So whatever that drive shows up for the

7 external drive is where all those files are.  The other

8 drives have nothing to do with anything I created.

9      Q.   Okay.  Do you still have access to the C, D, F,

10 G, and H drives from your old computer prior to May

11 2022?

12     A.   It's all been cleaned since then, since I moved

13 over to the new PC.

14     Q.   So is that a no, you don't have access to those

15 files anymore?

16     A.   No, because I cleaned everything and wiped

17 everything when all this was going on.  The only thing I

18 have are all the files on my external drive still that

19 were developed and everything.

20     Q.   So you still have the G drive files?

21     A.   Yes.

22     Q.   But the C, D, F and H drives from your old

23 computer prior to May 2022 have all been wiped?

24     A.   Yes, I cleaned the whole PC, the whole thing.

25     Q.   So the files that were on the C, D, F and H

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 95

1 drives of your old computer have been deleted?

2      A.    Yes.

3      Q.    Can you get them back?

4      A.    I don't believe so.

5      Q.    When did you delete them?

6      A.    Months ago, probably when I got the new

7 computer.  I got everything moved over to the new PC.

8      Q.    And is it your allegation that Bungie accessed

9 files in the C, D, F or H drives that form the basis of

10 your counterclaims asserted in your amended

11 counterclaims?

12      A.    Yeah, it's possible they could have.

13      Q.    And you deleted that evidence?

14      A.    I didn't purposely delete it.  I did it before

15 I filed the counterclaim, when I got the new PC.

16      Q.    Okay.  You said that you spent time cleaning

17 files when compromise was detected.  I think we talked

18 about this a little bit already, but just to confirm,

19 what does cleaning files mean?

20      A.    Going over, checking with the virus, see if

21 anything has been comprised -- the antivirus -- and

22 before copying it back over to the external drive.

23      Q.    So what does it mean to clean the file?

24      A.    Basically, if there's a virus, it'll just

25 delete it.  And I just scanned everything.  I didn't

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 96

1 find any programs related to Bungie at the time that --
2 like they had modified anything.  So I'm still not sure
3 if -- what was accessed, but I know the files were
4 accessed.  Doesn't mean they didn't access them, but
5 they didn't modify anything.

6   **Q.   So cleaning meant that it would delete viruses**
7 **if it found them, right?**

8   A.   Yeah, I was scanning and trying to clean any
9 virus found.

10   **Q.   Okay.  Did cleaning mean anything else other**
11 **than deleting viruses that it found?**

12   A.   Probably cleaning the drives, like reformatting
13 the computer and stuff.

14   **Q.   Okay.  So deleting viruses and reformatting the**
15 **drives?**

16   A.   Yeah.

17   **Q.   What does "reformatting the drives" mean?**

18   A.   Basically, it wipes everything to a new state,
19 like so nothing is on there.  It's like a clean slate.

20   **Q.   Okay.  And you wiped the drives because you**
21 **believed that Bungie might have accessed them, right?**

22   A.   I wasn't sure, but I believed so, yes.

23   **Q.   Okay.  So other than deleting viruses and**
24 **reformatting drives, does cleaning files mean anything**
25 **else?**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 178

1                    REPORTER'S CERTIFICATE

2        ORAL VIDEOTAPED ZOOM DEPOSITION OF JAMES MAY

3                       March 23, 2023

4

5        I, the undersigned Registered Professional Reporter,

6 certify that the facts stated in the foregoing pages are

7 true and correct.

8        I further certify that I am neither attorney or

9 counsel for, related to, nor employed by any parties to

10 the action in which this testimony is taken and,

11 further, that I am not a relative or employee of any

12 counsel employed by the parties hereto or financially

13 interested in the action.

14        SUBSCRIBED AND SWORN TO under my hand on this the

15 28th day of March, 2023

16

17

18

19

20

21                       Debra K. Zebert, BS, RPR, CSR
                         RPR No. 839015
22                       Expiration:  12/31/23

23

24

25

# EXHIBIT L

```
 1              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
 2                     AT SEATTLE

 3    _____

 4  BUNGIE, INC.,                )
                                          ┌─────────────────┐
 5            Plaintiff,          )        │ CERTIFIED COPY  │
                                          └─────────────────┘
 6    vs.                        ) No. 2:21-cv-811-TSZ

 7  AIMJUNKIES.COM; PHOENIX      )

 8  DIGITAL GROUP, LLC; DAVID    )

 9  SCHAEFER; JORDAN GREEN;      )

10  JEFFREY CONWAY; and JAMES    )

11  MAY,                         )

12            Defendants.        )

13    _____

14  VIDEO RECORDED 30(B)(6) DEPOSITION UPON ORAL EXAMINATION

15           OF PHOENIX DIGITAL GROUP, LLC

16             BY DAVID SCHAEFER

17    _____

18                   6:02 P.M.

19               MARCH 20, 2023

20      WITNESS LOCATED AT:  UNDISCLOSED LOCATION

21

22

23

24  REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25  JOB NO.: 971984
```

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

---

Page 2

```
1            A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4     CHRISTIAN W. MARCELO
      Perkins Coie LLP
5     1201 Third Avenue
      Suite 4900
6     Seattle, Washington 98101-3099
      (206) 359-8000
7     cmarcelo@perkinscoie.com
8
9   FOR THE DEFENDANTS:
10    PHILIP P. MANN
      Mann Law Group
11    403 Madison Avenue North
      Suite 240
12    Bainbridge Island, Washington 98110
      (206) 855-8839
13    phil@mannlawgroup.com
14
15  ALSO PRESENT:  SCOTT NORTON, Videographer
                   JAMES BARKER
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1                  I N D E X
2
3   EXAMINATION BY:                          PAGE(S)
4     MR. MARCELO                            5
5
6
7   EXHIBITS FOR IDENTIFICATION             PAGE
8
    Exhibit 60  Counterclaim Exhibit E       13
9
    Exhibit 61  Screen Shot AimJunkies
10              Website 3/19/23              36
11  Exhibit 62  Notice of Deposition         74
12  Exhibit 63  Notice of Deposition         75
13  Exhibit 64  Phoenix Digital's Supplemental
                Responses to Interrogatory 10  78
14
    Exhibit 65  Exhibit 5 to Bungie's
15              Amended Complaint           101
16  Exhibit 66  Screen Shot of AimJunkies
                Website with Post
17              Dated 3/19/23               118
18
19
20
21
22
23
24
25
```

---

Page 4

```
1                  MARCH 20, 2023
2                     6:02 P.M.
3                       --oOo--
4
5            VIDEOGRAPHER:  Good evening, everyone.  Here
6    begins the remote deposition of Phoenix Group, LLC,
7    pursuant FRCP 30(b)(6).  This is in the matter of
8    Bungie, Inc. versus AimJunkies.com, et al.  This case is
9    in the United States District Court, Western District of
10   Washington at Seattle.  Case number is 2:21-cv-811-TSZ.
11           Today's date is Monday, March 20th, 2023.  The
12   current time is 6:02 p.m. Pacific time.  This is a
13   remote deposition through Zoom video conferencing.  The
14   videographer is Scott Norton, here on behalf Centex
15   Litigation Services.  Would counsel please introduce
16   yourselves and state whom you represent?
17           MR. MARCELO:  Christian Marcelo for
18   Plaintiff, Bungie.  I'm joined by James Barker, general
19   counsel for Bungie.
20           MR. MANN:  And I am Philip Mann.  I'm here
21   on behalf of all Defendants, in particular Phoenix
22   Digital for this particular 30(b)(6) deposition.
23           VIDEOGRAPHER:  Thank you all very much.  Our
24   reporter today is of Betsy Decater with Centex.  Will
25   the reporter please swear in the witness.
```

---

Page 5

```
1                 DAVID SCHAEFER,
2    sworn as a witness by the Certified Court Reporter,
3                 testified as follows:
4
5                   EXAMINATION
6    BY MR. MARCELO:
7      A.  Now, is this the personal or the 30(b)(6)?
8      Q.  This is the 30(b)(6) deposition of Phoenix
9    Digital.  My hope is that we will get everything done in
10   this one deposition.  But we can always shift over to
11   the other deposition after if we need to.
12           Mr. Schaefer, you've been through this deposition
13   process before, right?
14     A.  Yes.
15     Q.  You were deposed in connection with the
16   arbitration?
17     A.  Yes.
18     Q.  Okay.  So same general rules apply.  I'm going to
19   kind of go through them again.  Remember to talk one at
20   a time, wait for me to finish the question before you
21   start answering.  If something's unclear, ask me, I'll
22   try to make the question more clear.  No nonverbal
23   answers.  We'll need answers on the record.  Okay?
24     A.  Yes.
25     Q.  And especially in video chats we tend to start
```

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 6

1  talking fast or talking over each other, and for our
2  court reporter it's necessary that we try to refrain
3  from doing so.  Okay?
4      A.  Sure.
5      Q.  And you understand you are under oath?
6      A.  Yes.
7      Q.  That's the same oath you would take in a
8  courtroom?
9      A.  Yes.
10      Q.  The same oath you took at the other prior
11  depositions?
12      A.  Yes.
13      Q.  Any reason you're not able to give truthful
14  testimony today?
15      A.  No.
16      Q.  Where are you testifying from today?
17      A.  An undisclosed location.
18      Q.  What -- are you in the U.S.?
19      A.  Yes.
20      Q.  I'm just wondering why the deposition needed to
21  be started at 6:00 p.m.  Are you in a different time
22  zone?
23      A.  No.  Because I'm in the middle of my vacation.
24  Thank you, though.
25      Q.  And you don't want to tell me where your vacation

Page 7

1  is?
2      A.  I don't think it's any of your business.  I don't
3  think it's anybody's business where I'm on my vacation
4  at.
5      Q.  Your last deposition in October 2022, my
6  understanding was that you were self-employed, right?
7      A.  Yes.
8      Q.  And your work consisted of work for Phoenix
9  Digital?
10      A.  That is correct.
11      Q.  Was there any other employment at that time?
12      A.  This is 30(b)(6), isn't it?
13      Q.  Mr. Schaefer, did you have any other employment
14  at that time?
15      A.  What does that have to do with Phoenix Digital?
16      Q.  Mr. Schaefer, I'm going to continue to ask you
17  questions.  If you don't know the answer, you can say
18  that.  But what I'm asking you is at the time in
19  October --
20      A.  As the representative of Phoenix Digital Group, I
21  do not know the answer to that.
22      Q.  Mr. Schaefer, you don't know whether you were
23  employed by anyone other than Phoenix Digital in October
24  2022?
25          MR. MANN:  Mr. Marcelo, what is the

Page 8

1  deposition -- or what is the 30(b)(6) category this
2  question relates to?
3          MR. MARCELO:  Well, Mr. Mann, it was at your
4  request that we try to get the entire deposition done
5  under the 30(b)(6) of Phoenix Digital.
6          MR. MANN:  No --
7          MR. MARCELO:  Let me finish.  Let me finish
8  my statement.
9          MR. MANN:  Don't mischaracterize what I
10  said.
11          MR. MARCELO:  Let me finish my statement.
12          MR. MANN:  Don't mischaracterize what I
13  said.
14          MR. MARCELO:  If -- if what you're saying is
15  that we're going to refuse to answer simple foundational
16  questions such as Mr. Schaefer's employment in this
17  deposition and that we need to conduct two separate
18  depositions for that, let me know.
19          MR. MANN:  You have already taken Mr.
20  Schaefer's deposition on two prior occasions.  You have
21  examined Mr. Schaefer under oath at a arbitration
22  hearing.  You already have these questions.  Judge Zilly
23  asked us to be professional and not to ask the same
24  questions over and over again.  This is a 30(b)(6)
25  deposition.  My question to you is what 30(b)(6)

Page 9

1  category does that question relate to?
2          MR. MARCELO:  Sure.  It relates to the
3  foundational --
4          MR. MANN:  I do not see foundational --
5          MR. MARCELO:  Mr. Mann, Mr. Mann, you asked
6  a question, let me finish the answer.
7          MR. MANN:  Mr. Marcelo --
8          MR. MARCELO:  No.  Mr. Mann, when you ask a
9  question, let me finish the answer.
10          MR. MANN:  Answer my question.
11          MR. MARCELO:  I am.  This is a foundational
12  question as to one of the three members of Phoenix
13  Digital and their employment.
14          MR. MANN:  Okay.  Now, which category is
15  that by number?  My question to you is which 30(b)(6)
16  category does this come under?  You can answer that with
17  a number?
18          MR. MARCELO:  Sure.  Mr. Mann, this is a
19  normal foundational question.  If you're instructing the
20  witness not to answer, put that on the record, but keep
21  your objections to form.
22          MR. MANN:  I am not going to -- I have not
23  instructed my witness anything.  In fact, he raised it
24  on his own.  Mr. Schaefer, you know what the rules
25  are --

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 10

1    A.  Yeah.  I believe -- am I interpreting this
2    correctly?  This is a 30(b)(6).  It means I'm a
3    representative of the corporation.  What -- there is no
4    relevance to my personal status in regards to my
5    personal employment when it comes to the corporation.
6    They're two different separate entities.  So if you want
7    to ask me questions about the corporation, you are
8    welcome to do so.  But when you delve into the personal
9    side of my life, then you're not doing 30(b)(6).
10   Q.  (BY MR. MARCELO)  Mr. Schaefer, are you refusing
11   to answer the question of whether you had any other
12   employment?
13   A.  Yes.
14   Q.  Where are you currently working?
15   A.  I'm not going to answer that.
16   Q.  You're refusing to answer where you're currently
17   working?
18   A.  When you're ready to get into a personal
19   deposition, then we can cross that bridge when we get
20   there.  But right now this is a 30(b)(6).
21   Q.  And, Mr. Schaefer, you're refusing to answer
22   where you're currently working?
23   A.  Yes.
24   Q.  What are your current sources of income?
25   A.  Yes.

Page 11

1    Q.  Yes what?
2    A.  I don't remember.
3    Q.  You don't recall what your current sources of
4    income are?
5    A.  No.
6         MR. MANN:  Objection.  What is the 30(b)(6)
7    category to which this question relates?
8    Q.  (BY MR. MARCELO)  Mr. Schaefer, did you do
9    anything to prepare for this deposition.
10   A.  Yes.
11   Q.  What did you do?
12   A.  I looked at all the categories that you listed
13   that I needed to have myself prepared for and none of
14   those included these questions.
15   Q.  And are you prepared to testify as to those
16   topics as Bungie's corporate representative?
17   A.  No.  I'm prepared to testify to the topics that
18   you listed that the corporate representative needed to
19   address.  There was nothing in that list that addressed
20   me personally, was there, Christian?
21   Q.  Mr. Schaefer, I'm going to ask that you listen to
22   the question.  What I said was are you prepared to
23   testify on each of the topics in the notice of
24   deposition as Bungie's corporate representative?
25   A.  Yes.  As Phoenix Digital's corporate

Page 12

1    representative.
2    Q.  Thank you.  Did you review any documents to
3    prepare for this deposition?
4    A.  Yes.
5    Q.  What documents?
6    A.  What documents I had in my possession.
7    Q.  Do you recall any of those documents?
8    A.  Not off the top of my head, no.
9    Q.  Did you review any e-mails?
10   A.  There weren't any e-mails to review.
11   Q.  Did you review Phoenix Digital's terms of
12   service?
13   A.  Yes, I did.
14   Q.  Any other documents you recall reviewing?
15   A.  I don't remember.
16   Q.  Did you --
17   A.  I looked at -- I looked at the list that you
18   provided me with, I followed up on it myself personally,
19   and I'm ready to answer the questions of them.  And I
20   didn't see anywhere in there where it asked Mr.
21   Schaefer's employment status, did it?  Were any of those
22   questions in there, Christian, address my employment
23   status personally?
24   Q.  Did you review your --
25   A.  Yes or no?

Page 13

1    Q.  -- prior testimony in preparation for this
2    deposition?
3    A.  Excuse me?
4    Q.  Did you review your prior testimony in
5    preparation for this deposition?
6    A.  Yes.  Did you -- and in my prior testimony you
7    asked me what my employment status was, didn't you?
8    Q.  And at that time you could actually recall what
9    your employment status was?
10   A.  At that time I wasn't doing a 30(b)(6).
11        MR. MANN:  I'm going to raise an objection.
12   Judge Zilly expressly directed us not to go over
13   familiar grounds.  You're asking the same questions that
14   have been answered on multiple occasions.
15   A.  You can't have another bite at the apple,
16   Christian.  I won't give to it you.
17   Q.  (BY MR. MARCELO)  In it's counterclaims, Phoenix
18   Digital alleged that Bungie breached Phoenix Digital's
19   terms of service, right?
20   A.  Yes.
21   Q.  Let's -- I'm going to hand the court reporter
22   what will be marked as Exhibit 60 and put the document
23   in the chat.
24        (Deposition Exhibit 60 was marked for
25        identification.)

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 14

1    Q.  (BY MR. MARCELO)  Mr. Schaefer, this document is
2  marked Exhibit 60, and it's Counterclaim Exhibit E.
3    A.  Okay.
4    Q.  Do you recognize this document?
5    A.  Yes.
6    Q.  And what is it?
7    A.  It's our terms of service at that time.
8    Q.  By our, you mean Phoenix Digital's terms of
9  service?
10   A.  Yes.  I am a corporate representative for Phoenix
11 Digital.  So when I say ours, that would be Phoenix
12 Digital when we owned the site.
13   Q.  And you said at that time.  What time are you
14 referring to?
15   A.  The time when you alleged that we were making a
16 cheat and you guys purchased the cheat, when Bungie,
17 Inc., purchased the cheat.
18   Q.  Who drafted the terms of service?
19   A.  Our attorney.
20   Q.  And who was your attorney at that time?
21       MR. MANN:  And in answering this question, I
22 will caution the witness not to reveal any private
23 communications you may have had with your attorney.
24   A.  Yeah, I can't.  He's deceased.
25   Q.  (BY MR. MARCELO)  Do you recall his name?

Page 15

1    A.  Now, you already asked me this question and I
2  already answered it.  You can go back on the record and
3  look.
4    Q.  And, Mr. Schaefer, when I ask you questions in
5  this deposition, you still are going to be required to
6  answer.  But what I'm wondering is if you recall the
7  attorney's name that drafted the terms of service.
8        MR. MANN:  As I recall, we went over this.
9  You asked this question before, Mr. Marcelo.  Mr.
10 Schaefer remembered the name of it after a few minutes.
11 That's in the record.  You can go back and read the
12 transcript.  If you can't remember it now, we can wait
13 ten minutes for him to remember.  But you already have
14 the name.  Let's be professional.
15       MR. MARCELO:  Mr. Mann, I'm going to ask
16 that you keep your objections to form.
17       MR. MANN:  No, no, no.  No, no, I am going
18 to --
19   A.  Christian, what part of --
20       MR. MANN:  I am going to make my objections
21 based on procedures.  We have directions -- we have
22 directions from Judge Zilly.  And if you depart from
23 those directions, I have every right to make an
24 objection and I intend to make that direction.  You are
25 under instructions to follow the rules.  We are

Page 16

1  insisting you follow those rules, Mr. Marcelo.
2        THE WITNESS:  Hey, Phil.  Phil.  Hold on.
3        MR. MARCELO:  Mr. Mann, we disagree on what
4  was said at that hearing.  But I note your objection on
5  this matter.  We have never discussed the AimJunkies
6  terms of service and I have every right to ask who
7  drafted the terms of service.
8        MR. MANN:  You have the answer to that.  No,
9  your questions was not who drafted, you said our
10 attorney.  Your question was who is that attorney.  Mr.
11 Schaefer says he does not recall that attorney.  The
12 name of his attorney is already in the deposition
13 transcript from a few months ago.
14       MR. MARCELO:  Mr. Mann, I know you want to
15 testify, but I'm going to ask --
16       MR. MANN:  Don't.  Don't give me this.
17 Don't give me this.  As I said, you already have the
18 answer to that.  Mr. Schaefer has already testified what
19 the name of that attorney is.  Do you not recall that?
20   Q.  (BY MR. MARCELO)  Mr. Schaefer --
21   A.  Let me -- now, hold on.  This is where I'm going
22 to say something.
23   Q.  Mr. Schaefer, there's no question pending.
24   A.  Christian, we are going to visit --
25   Q.  There's no question pending, Mr. Schaefer.

Page 17

1    A.  We are going to visit this one more time.  If you
2  feel the need to continue to try to take another bite at
3  the apple, I will end this deposition and you can take
4  it up with Judge Zilly and we'll show Judge Zilly the
5  video.  All right.  And we'll see if you're following
6  the guidelines that he laid out.
7    Q.  So, Mr. Schaefer, do you recall --
8    A.  Now, are we going to play by the rules of the
9  game or are we going to do it Christian's way?
10   Q.  Mr. Schaefer, do you recall the name of the
11 attorney who drafted the terms of service?
12   A.  Bob Hahn.
13   Q.  When did Mr. Hahn draft the terms of service?
14   A.  The year that the corporation was formed.
15   Q.  When was that?
16   A.  I don't remember.
17   Q.  Do you recall roughly what year?
18   A.  You already have that information.
19   Q.  Mr. Schaefer, do you recall roughly what year
20 Phoenix Digital was formed?
21   A.  No, I do not remember.
22   Q.  Did anyone assist Mr. Hahn in drafting the terms
23 of service?
24   A.  I have no idea.
25   Q.  Did anyone from Phoenix Digital assist Mr. Hahn

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 18

1  in drafting the terms of service?
2      A.  I have no idea.
3      Q.  I'm going to go to page 4 of Exhibit 60.  You see
4  this paragraph that starts "You shall not copy,
5  distribute, reproduce"?
6      A.  Yes, I see that.
7      Q.  And it says, "You shall not copy, distribute,
8  reproduce or display or use any part of our software
9  except as expressly authorized herein."  Right?
10     A.  Yes.
11     Q.  What does our software refer to?
12     A.  The product that we sell.
13     Q.  And specifically what does -- what does that
14  mean?
15     A.  We don't make product.  And I'm not going to go
16  over this again because we've already gone over this
17  again, Christian.  This is your last chance.  All right?
18  Go there again where I have to go over it again and this
19  deposition is done.  Do you understand me?
20     Q.  Mr. Schaefer, what does our software refer to?
21     A.  This deposition is -- our software is a product
22  that we sell.  We have contractors that make our product
23  for us.  We sell that product.  We do not make any
24  product in house, none.
25     Q.  And what products are you referring to?

Page 19

1      A.  The product that the AimJunkies website sold.
2      Q.  And that includes cheat software?
3      A.  Yes.
4      Q.  Anything else?
5      A.  I don't remember.
6      Q.  You don't recall anything else that falls under
7  the category of our software in the terms of service?
8      A.  No, I do not remember.
9      Q.  Under Proper Use of Our Services, it says, "Our
10  services include the use of private software, provided
11  by AimJunkies."  What does our services refer to in
12  that?
13     A.  Just exactly what it says.
14     Q.  What services offered by Phoenix Digital are
15  included in the terms of service covered by the word
16  "our services"?
17     A.  I guess that would include the website, that
18  would include the loader, anything -- any service that
19  we provided to our customers.
20     Q.  Website, loader and any other services.  Any
21  other services come to mind?
22     A.  No.
23     Q.  Okay.  So just the website and loader?
24     A.  Yeah.  That's all that's on my tip of my tongue
25  at this point.

Page 20

1      Q.  Let's go to page 5 of the privacy policy.  You
2  see at the bottom where it says "Privacy Policy, What
3  Information Do We Collect?"
4      A.  Yes.
5      Q.  And what is your understanding of what this
6  privacy policy identifies?
7      A.  I don't understand the question.
8      Q.  Sure.  That privacy policy lists information that
9  Phoenix Digital collects, right?
10     A.  Yes.
11     Q.  And if we scroll down a page to page 6 of Exhibit
12  60, it says, "We collect information when you use our
13  services.  When you use our software, we collect
14  information to identify the devices used.  We collect
15  information that allows us to diagnose and improve our
16  software," right?
17     A.  Okay.
18     Q.  And it says, "We collect records of use of our
19  website and services," right?
20     A.  Okay.
21     Q.  What is it referring to when it says "we collect
22  records of use of our website and services"?
23     A.  I don't know.
24     Q.  Do you know what records Phoenix Digital
25  collected regarding it's AimJunkies website and

Page 21

1  services?
2      A.  No.
3      Q.  Do you know any of the information that the
4  AimJunkies website collected regarding its use of its
5  website?
6      A.  Just what was provided to us by the payment
7  processors, which was the e-mail like it listed and the
8  subscription links which fits into the category of
9  website and services.  Because when you buy a
10  subscription, the payment processor gives you a date of
11  when it's done and what they paid for it.  So you know
12  from that the use of the website and services.
13     Q.  So other than those third-party payment
14  processors, Phoenix Digital was not collecting
15  information through the use of AimJunkies website?
16     A.  Not that I am aware of, no.
17     Q.  Okay.  And I missed this on page 5.  It says, "We
18  collect information that you give to us.  This includes
19  information such as your email address when you create
20  an account," right?
21     A.  Yes.  Yes.
22     Q.  So AimJunkies at least collected the various
23  e-mail accounts used to create accounts on AimJunkies,
24  right?
25     A.  Yes.

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 22

1    Q.  On page 6 when it says, "We collect information
2  to identify the devices used," what does that mean?
3    A.  I do not know.
4    Q.  Do you know if it collects hardware ID?
5    A.  I don't -- I never dealt with that.  It wasn't
6  our loader.
7    Q.  What do you mean by that, you never dealt with
8  that because it wasn't your loader?
9    A.  I'm not in the information collecting business,
10  so I don't know what information is collected.  It
11  could -- for all we know here, it -- you know, I don't
12  know what's collected.  I really don't.
13    Q.  Did you ever check to see what information was
14  collected?
15    A.  Not once in my life.
16    Q.  How about when the litigation began, did you ever
17  check to see what information was collected?
18    A.  That information was long gone before the
19  litigation began.  We've already crossed this bridge,
20  and we've already had this conversation about stuff that
21  was stored on the website.  So we're not going back
22  there, are we, Christian?
23    Q.  And, Mr. Schaefer, what I asked was did you go
24  check what information was collected when the litigation
25  began?

Page 23

1    A.  No.  Because I knew there wasn't any there
2  because it was automatically purged, like I told you, 90
3  days after the subscription expired.
4    Q.  Was the purpose of AimJunkies' terms of service
5  meant to prevent entities from investigating the cheat
6  software to determine if it violated their intellectual
7  property rights?
8    A.  No.
9    Q.  That wasn't the intended purpose of this terms of
10  service?
11    A.  No.
12    Q.  Was the intent of these terms of service to
13  prevent entities from investigating the cheat loader
14  software if it violated their intellectual property
15  rights?
16    A.  No.
17    Q.  Was the terms of service meant to prevent
18  investigations of the AimJunkies website so they --
19  Phoenix Digital couldn't be sued for distributing their
20  cheats?
21    A.  No.
22    Q.  What was the intent of the terms of service?
23    A.  Because we live in a world of hackers, okay, and
24  they take your product and they go and sell it somewhere
25  else.  So this is put in place to make sure -- because

Page 24

1  we've had -- I don't know even know why I'm revisiting
2  this again.  As I told you before, Christian, we've had
3  our website dumped several times and had our product
4  distributed on other websites.  This was a deterrent
5  from that happening.
6    Q.  Were the terms of service available on the
7  AimJunkies.com website?
8    A.  Yes.
9    Q.  When did --
10    A.  You could not -- you could not purchase a
11  subscription without approving this.
12    Q.  When did Phoenix Digital launch the AimJunkies
13  website?
14    A.  I don't remember.
15    Q.  Was the terms of service on the website the day
16  it was launched?
17    A.  Yes.
18    Q.  Who added the terms of service to the AimJunkies
19  website?
20    A.  I did.
21    Q.  Describe that process.
22    A.  It's a WordPress page.  You copy/paste.
23    Q.  Where -- where are the terms of service available
24  on the website?
25    A.  I don't remember.  I know there was a tab where

Page 25

1  you could click on it, and I also know that you could
2  not purchase without seeing this page and clicking "I
3  agree."  In fact, this -- this page came from the actual
4  website page.  This didn't come from the place where you
5  went through it; otherwise, it would have the tab on the
6  bottom to approve.
7    Q.  Let me try to break that down.  You had said
8  there was a tab where you could get to the terms of
9  service; is that right?
10    A.  If I remember correctly, yes.  Don't -- I -- I
11  should say I don't know for sure because, to be honest
12  with you, I don't remember.  But there was a web page
13  that had this on it and it was the same identical one
14  that you had to click through when you purchased a
15  subscription.
16    Q.  Okay.  But to back up, there was two locations,
17  right, you were talking about one was the click through
18  to purchase?
19    A.  Yes.
20    Q.  And the other was somewhere on the website
21  without actually having to purchase anything you could
22  see the terms of service?
23    A.  Yes.  And that -- the lawyer told us to do it
24  that way.
25    Q.  Mr. Hahn?

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 26

1    A. Yes.
2    Q. Was there any attorneys other than Mr. Hahn that
3  ever worked in connection with the terms of service?
4    A. No.
5    Q. Have there ever been any changes to the terms of
6  service since they were first implemented?
7    A. Not that I'm aware of.
8    Q. Who would have the ability to change the terms of
9  service at Phoenix Digital?
10   A. Me.
11   Q. Anyone else?
12   A. Not that I'm aware of.
13   Q. Not Mr. Green or Mr. Conway?
14   A. Well, Mr. Conway doesn't have the knowledge to be
15 able to do it.  And Mr. Green probably could, but that
16 wasn't his domain so he didn't touch it.
17   Q. Understood.  So it sounds like they might have
18 been able to, but in Mr. Conway's case he
19 technologically wasn't able to; is that right?
20   A. Well, I don't think he could even log into the
21 back end of the website.  I don't think he had the
22 ability.
23   Q. And could Mr. Green log --
24   A. He was too busy making cheats, Christian.
25   Q. Could Mr. Green log into the back end of the

Page 27

1  website?
2    A. Yes.
3    Q. Scroll to the bottom of Exhibit 60, the terms of
4  service.  It says "copyright 2020 AimJunkies."  You see
5  that?
6    A. Yes.
7    Q. So is this the terms of service in the year of
8  2020?
9    A. Yes.
10   Q. And, you know, when there was a 2021 version,
11 would it say "copyright 2021 AimJunkies"?
12   A. There weren't different versions.  The copyright
13 was changed every year.
14   Q. And that's what I'm wondering is where it says
15 2020, based on the year, that would change to reflect
16 the current year?
17   A. Yes.
18   Q. And did that effect go in -- strike that.  When
19 did that effect go in each year?
20   A. From day one.
21   Q. So on January 1st of 2021, this would now say
22 "copyright 2021 AimJunkies"?
23   A. Yes.
24   Q. And who made that change?
25   A. I did.

Page 28

1    Q. So each year when would you make that change?
2    A. January 1st.
3    Q. That's what I'm looking for.  So on January 1st
4  each year, you log in and you update the copyright
5  footer for the AimJunkies website?
6    A. Yeah.  I mean, it might not have been exactly on
7  that day, but it was close to the first of the year.
8  Don't quote me on it.
9    Q. Does Phoenix Digital have an earlier version of
10 the terms of service --
11   A. No.
12   Q. -- than the 2019 terms of service?
13   A. No.
14   Q. How about a later one, 2021?
15   A. No.
16   Q. Where did this document, Exhibit 60, where did
17 Phoenix Digital get this document?
18      MR. MANN:  Asked and answered.
19   A. Thank you.
20   Q. (BY MR. MARCELO)  Mr. Schaefer, where did Phoenix
21 Digital get this document, Exhibit 60?
22      MR. MANN:  Same objection.
23   Q. (BY MR. MARCELO)  You can answer.
24   A. I've already answered the question.
25   Q. I don't believe I remember hearing it, but could

Page 29

1  you just remind me of where Phoenix Digital got this
2  document?
3    A. No.  I don't remember now.
4    Q. You don't remember where Phoenix Digital got this
5  document?
6    A. I think I told you earlier I don't remember now.
7      MR. MANN:  This document is the terms of
8  service that he said he got from his lawyer, Mr. Hahn.
9  Can we grow up?
10      MR. MANN:  Mr. Mann --
11      MR. MANN:  Answer the question.  Mr.
12 Christian, can we go up and act like professionals?
13      MR. MARCELO:  Yeah.  And I'm trying to get
14 an answer to a question which is where --
15   A. You already asked the question and I already
16 answered it.
17   Q. (BY MR. MARCELO)  Understood.  You don't recall
18 where you got this document from?
19   A. Oh, my God.  Ask another question.
20      MR. MANN:  Dave, just tell him you got it
21 from your lawyer.
22   A. I got it from my lawyer.
23      MR. MANN:  You already said that.  I mean,
24 is that an accurate answer?  Is that a truthful answer,
25 you got it from your lawyer?

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 30

1           THE WITNESS: Yes. I got it from Bob Hahn.
2           MR. MANN: Can we move on, Christian?
3       Q.  (BY MR. MARCELO)  And what I'm wondering is this
4   specific file, the -- the 2020 AimJunkies terms of
5   service, when it was produced was it saved on a personal
6   computer, this version?
7       A.  God.  No.
8       Q.  It wasn't still on the AimJunkies website, right?
9       A.  No.
10      Q.  Because the current one would be 2023 now, right?
11      A.  No.
12      Q.  Either way this terms of service wasn't printed
13  from the current AimJunkies website, right?
14      A.  No.
15      Q.  So when you got this document to produce to
16  Bungie, where did it come from?
17      A.  I don't remember.
18      Q.  Who saved this 2020 version of the terms of
19  service?
20      A.  The website saved the 2020 version.
21      Q.  So this is archived on the AimJunkies website?
22      A.  It was archived on the AimJunkies website.
23      Q.  When was it archived on the AimJunkies website?
24      A.  In 2020.
25      Q.  Is that archive still there?

Page 31

1       A.  I have no idea.
2       Q.  When did Phoenix Digital pull this document off
3   of the archive of the AimJunkies website?
4       A.  I don't remember.
5       Q.  Was it after this litigation began?
6       A.  I don't remember.
7       Q.  So there's a chance it was before the litigation
8   began you had just pulled a copy?
9       A.  I didn't say that.  Don't put words in my mouth.
10      Q.  I'm asking you a question, Mr. Schaefer.
11      A.  I don't remember.
12      Q.  Why wasn't the 2019 version archived?
13      A.  The 2019 and the 2020 versions were archived on
14  Wayback Machine.
15      Q.  So is this version, Exhibit 60, from the Wayback
16  Machine?
17      A.  I don't remember.
18      Q.  Well, somebody had to pull this document from
19  somewhere, right?
20      A.  No.  It's probably like our tax statements and
21  our filings with the court, they're all lies.  None of
22  this is real.  We're just a bunch of liars, and you guys
23  are the only straight-up guys.
24      Q.  Mr. Schaefer, who pulled this document, Exhibit
25  60, the 2020 AimJunkies terms of service?  Who collected

Page 32

1   that document?
2       A.  Oh, my God.  I don't remember.
3       Q.  When was it collected?
4       A.  I don't remember.
5       Q.  And to be clear, there's no current versions of
6   the 2019, 2018, 2017 terms of service, right?
7       A.  I have no idea.  How would -- you sell a car and
8   a year later you're asking me what's in the fucking
9   ashtray.
10      Q.  No, Mr. Schaefer, what I'm asking you is how come
11  you have this very specific document, the 2020 terms of
12  service, when you sold the car and didn't keep any other
13  piece except for this?
14      A.  Oh, my God.  Did I say that?
15          MR. MANN:  Objection to the form.  I mean,
16  what is a current -- what is a current version of a 2019
17  document.  It's self-contradictory.  The questions are
18  ridiculous.
19      A.  Christian, what's the relevance of what the 2019
20  looked like anyway?
21      Q.  (BY MR. MARCELO)  Did Mr. Green collect this
22  document, Exhibit 60?
23      A.  No.  He doesn't have any access to that.
24      Q.  Did Mr. Conway collect this document, Exhibit 60?
25      A.  No.  He doesn't have any access to it.

Page 33

1       Q.  Did Mr. May collect this document, Exhibit 60?
2       A.  He's got 50 of them.
3       Q.  So are you saying that Mr. May is the person that
4   collected this document to be produced?
5       A.  Oh, my God.  You're asking a
6   sub-fucking-contractor who made cheats whether or not he
7   had access to the website.  Come on, Christian.
8       Q.  Mr. Schaefer, I'm going to repeat the question
9   because we need an answer on the record.  If you're
10  being sarcastic or making a joke --
11      A.  I'm being sarcastic because you're asking stupid
12  questions.
13          MR. MANN:  And I want to raise an objection
14  at this point, objection to the form of the question.
15  You know that Mr. May is not --
16          THE WITNESS:  Barker, this is what you're
17  paying for.  I hope you get your monies worth.
18          MR. MANN:  Mr. May is not an officer,
19  director, owner, employee of Phoenix Digital.  We've
20  already established that.  He has no connection with
21  Phoenix Digital, other than from time -- other than from
22  time to time he has produced cheats.  He would not have
23  access to this.  You know that, Christian.  This that
24  been asked and answered on at least three different
25  occasions.  Again, the questions are ridiculous.

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 34

1        MR. MARCELO:  I actually have not received
2  an answer to this question.
3        MR. MANN:  Let me finish my objection.
4  Well, you have a lot of -- we have established that Mr.
5  May is not part of Phoenix Digital.  If he is not part
6  of Phoenix Digital, he does not create the terms of
7  service.  He has no connection to the terms of service.
8        MR. MARCELO:  Mr. Mann, this is a highly
9  improper objection at this point.
10        MR. MANN:  I don't care whether you think
11  it's improper or not.  This is -- these are the facts,
12  and you know them.  And it relates directly to Judge
13  Zilly's order and direction that we not go over ground
14  that's been covered three times already.  Now, if you
15  want to go to Judge Zilly and say that, no, you are not
16  professional, that you will not limit this deposition.
17        THE WITNESS:  We'll just play the video.
18  That will be fine.  Christian, we can play the video.
19        MR. MANN:  -- (simultaneous talking) judge
20  say?
21     Q.  (BY MR. MARCELO)  So I didn't get an answer to
22  this, and it's important that I do.  So I'm going to ask
23  it again.  Did Mr. May collect this document, Exhibit
24  60, to be produced in this case?
25        MR. MANN:  Mr. Schaefer --

Page 35

1     A.  He doesn't have access.
2        MR. MANN:  Mr. Schaefer, go ahead and answer
3  that question yes or no.  It's a yes or no question.
4     A.  He doesn't have access.
5        MR. MANN:  It's a yes or no question.  Give
6  Mr. Marcelo an answer to his yes or no question.
7     Q.  (BY MR. MARCELO)  I'm going to repeat the
8  question so the record's clear.  Did Mr. May collect
9  this document, Exhibit 60, to be produced in this
10  litigation?
11     A.  No.
12        MR. MANN:  Good.  We're making progress.
13        THE WITNESS:  You're welcome.
14     A.  Wouldn't your time be better spent asking
15  relevant questions than to try to put me in a pickle.
16        MR. MANN:  Let Mr. Barker see what he's
17  getting for his money.
18        THE WITNESS:  Yeah.  He's getting his
19  money's worth here.  James, I'd keep going -- James, I
20  would keep going.  You're going to get your money's
21  worth here.
22     Q.  (BY MR. MARCELO)  Mr. Schaefer, did you collect
23  this document?
24        MR. MANN:  Again, that's a yes or no.
25     Q.  (BY MR. MARCELO)  You don't recall if you were

Page 36

1  the one that collected this?
2     A.  No.
3     Q.  So I want to walk through when a user of the
4  AimJunkies website would encounter the terms of service.
5  I know we talked about queue high level times, right?
6  That was somewhere on the actual website and when
7  purchasing a product on AimJunkies, right?
8     A.  That is correct.
9        MR. MARCELO:  I'm going to drop into the
10  chat what will be marked as Exhibit 61.
11        (Deposition Exhibit No. 61 was marked for
12        identification.)
13     Q.  (BY MR. MARCELO)  I will share my screen.  Mr.
14  Schaefer, do you see Exhibit 61?
15     A.  Yes.
16     Q.  Now, this is a screen shot from the AimJunkies
17  website with the timestamp March 19, 2023, yesterday.
18  You see that?
19     A.  Okay.
20     Q.  If we scroll to the bottom, it says "Terms of
21  Service, February 2023, Blome Entertainment," right?
22     A.  Okay.
23     Q.  Is that where the terms of service was located in
24  2020 on the AimJunkies website?
25     A.  No.  No.

Page 37

1     Q.  It was located somewhere else?
2     A.  Yes.
3     Q.  And you don't recall where it was on the website
4  though?
5     A.  No, I don't remember.  Bob Hahn told us that we
6  had to have it in both places, you had to have it in a
7  click on the website and you had to have it on a click
8  through when you purchase.  That's what we were told,
9  and that's what we did.
10     Q.  Up here on the first page, there's a couple of
11  different tabs, home, forms, cheats, packages, purchase.
12  You see that?
13     A.  Yes.
14     Q.  Was there a separate tab for the terms of service
15  in 2020?
16     A.  I do not remember.
17     Q.  Okay.  So there was a place you could find the
18  terms of service on the AimJunkies website and then you
19  also said you would encounter it when a consumer
20  purchases a good from AimJunkies website, right?
21     A.  That is correct.
22     Q.  Walk me through the process -- a consumer goes to
23  AimJunkies, buys a cheat.  Walk me through the process
24  of when they would encounter the terms of service.
25     A.  I don't remember if they encountered it before

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 38

1  they were sent to the payment processor or if they
2  encountered it after.  I believe they encountered it
3  before they were sent to the payment processor.
4      Q.  Okay.  I want to take a step back.  A consumer
5  goes to AimJunkies website, right, and finds a cheat
6  they want.  Okay?
7      A.  Yes.
8      Q.  When they -- how do they select that cheat to buy
9  it?
10     A.  There was a list of products that you could
11  purchase, and you would select the product that you want
12  to purchase.
13     Q.  Okay.  They select that product.  When they
14  select, does the terms of service pop up?
15     A.  Yes.
16     Q.  On the initial selection of the product is when
17  it pops up?
18     A.  I -- I -- I've already answered that question,
19  and I said I don't remember if it was you selected the
20  product and purchased and then did the terms of service
21  or if you did the terms of service and then were sent to
22  purchase.  I don't remember that, which step was which.
23     Q.  Okay.  And I'm trying to narrow it down between
24  those two where -- where it falls in the process.
25     A.  I don't remember.  All I know -- all I remember

Page 39

1  is that there was absolutely no way that you could
2  purchase one of those products without agreeing to the
3  terms of service.
4      Q.  And but the two ways you mentioned would be you
5  either select the product and then the terms of service
6  pops up, or you select the product, press purchase and
7  then the terms of service would pop up?
8      A.  No.  You would go purchase -- if it was after the
9  purchase, then you would be sent to the payment
10 processor.  You would pay for the product, and then you
11 would come back and you had to agree to the terms of
12 service.  One or the other.  I don't remember which way
13 it was.
14     Q.  I see.  The question is whether it occurred
15 before or after you pay for the cheat itself?
16     A.  I don't remember.
17     Q.  Right.  But that's what --
18     A.  You could not --
19     Q.  -- I'm trying to clarify what you were saying.
20     A.  You could not access the product without agreeing
21 to terms of service.  You would never get access to
22 anything without agreeing to the terms of service.
23     Q.  When the terms of service -- we're saying the
24 terms of service popped up, walk me through what
25 actually happens on the user's screen.

Page 40

1      A.  The terms of service pops up and you had to
2  scroll to the bottom and hit "I agree."
3      Q.  And that's what I'm wondering.  So when we say
4  pops up, it opens a new window --
5      A.  Page.
6      Q.  -- on the screen?
7      A.  Yeah.  It opens a new page.
8      Q.  And then the user has to actually scroll all the
9  way to the bottom of it?
10     A.  Yes.  Yes.  You could not get around it without
11 hitting accept.
12     Q.  Did Phoenix Digital keep a record of what
13 accounts accepted the terms of service?
14     A.  Every one of them had to accept the terms of
15 service.  There was no need to keep records.
16     Q.  What about a user that created an account but
17 didn't purchase anything?
18     A.  No, you did not have to agree to the terms of
19 service if you didn't purchase anything.
20     Q.  And so that's what I'm wondering is did Phoenix
21 Digital keep a record of users that actually accepted
22 the terms of service?
23     A.  I don't remember.
24     Q.  If it had kept a record of that, where would that
25 be located?

Page 41

1      A.  I don't know.  I mean, they had to of been on the
2  website somewhere.  But I know -- I know there was no
3  specific log of people who accepted terms of service
4  because anybody who purchased -- it -- it eliminated
5  having to have that going on.  You would have had to of
6  built something to do that and I didn't build anything
7  to do that.
8      Q.  That's what I'm wondering is whether there was
9  something built into the website that tracked which
10 users accepted the terms of service?
11     A.  No.  The only thing that I built was so that
12 after the purchase went on, or before -- I don't
13 remember which was -- which -- you know, because it's
14 been a while, if it happened before or after -- but
15 there was no way that anybody could purchase a cheat
16 without agreeing to the terms of service, you know,
17 nobody could ever have access to the product without
18 agreeing to the terms of service first.
19     Q.  And Phoenix Digital alleges that Bungie accepted
20 the terms of service, right?
21     A.  Everybody that purchased accepted the terms of
22 service.  Bungie said in court that they purchased the
23 cheat.  And if they purchased the cheat, then they
24 accepted the terms of service.
25     Q.  Is there any other basis or any other evidence of

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 42

1  Bungie accepting the terms of service other than what
2  you just said?
3      A.  What do you mean?
4      Q.  Is there any record of Bungie accepting the terms
5  of service?
6      A.  Is there any record of David Schaefer accepting
7  Bungie's terms of service?  Is there any record of Jeff
8  Conway accepting Bungie's terms of service?  Is there
9  any record of James May accepting Bungie's terms of
10 service?  Is there any record of Phoenix Digital Group,
11 LLC, accepting Bungie's terms of service?
12     Q.  Mr. Schaefer, I'll just redirect you to my
13 question.  Is there any record of Bungie --
14     A.  I just answered it.
15     Q.  Mr. Schaefer, are there any records of Bungie
16 accepting Phoenix Digital's terms of service?
17             MR. MANN:  Object to the form of the
18 question.
19     A.  I'm still waiting for you to show me my accepting
20 your terms of service or anybody else in our group.
21     Q.  (BY MR. MARCELO)  Mr. Schaefer, I'm going to need
22 an answer.
23     A.  Including Jeff Conway.
24     Q.  Are there any records showing that Bungie agreed
25 to Phoenix Digital's terms of service?

Page 43

1             MR. MANN:  You mean other than the records
2  that are in the possession of Bungie?
3      Q.  (BY MR. MARCELO)  Mr. Schaefer, what was your
4  answer to the question of whether --
5      A.  The answer to the question is no.
6      Q.  And who -- how many times did Bungie accept
7  Phoenix Digital's terms of service?
8      A.  If they purchased once, then they agreed to it
9  once.  Every time you purchased, you had to agree.
10     Q.  Does Phoenix Digital allege that Bungie agreed to
11 the terms of service more than once?
12     A.  No.  We're not a -- I don't think they purchased
13 more than once, if I -- if I remember correctly.  And
14 another thing too, if you take a look in them terms of
15 service, it says that you can't go in there and purchase
16 under an alias also.  And if you look at PayPal's terms
17 of service, it's against PayPal's rules to use a fake
18 name like you guys did when you purchased it.  So not
19 only did you violate our terms of service, you violated
20 PayPal's terms of service.  Are you aware of that, Mr.
21 Barker?
22     Q.  So walk me through how Phoenix Digital alleges
23 that Bungie accepted its terms of service.
24     A.  Bungie accepted what?
25     Q.  Walk me through how Phoenix Digital alleges that

Page 44

1  Bungie accepted and agreed to Phoenix Digital's terms of
2  service?
3             MR. MANN:  And I will remind the witness at
4  this point we do not have to play around with any of the
5  faking the names.  If you remember the names of the
6  person who did it, just say it.  We're -- enough of
7  this.  We're not going to sit here and try and protect
8  the guilty by using fake names.
9      Q.  (BY MR. MARCELO)  So, again, walk me through --
10     A.  Bungie testified that they had their agent
11 purchase the cheat.
12     Q.  Who set up the process on the AimJunkies website
13 of making accepting the terms of service a requirement?
14     A.  I did.
15     Q.  And so you were the one that, you know, wrote the
16 website in a way that whenever you purchased the product
17 you had to accept the terms of service?
18     A.  Yes.  It's called an API.
19     Q.  What's called an API?
20     A.  The application to do that.
21     Q.  And that API, it only required that someone
22 actually accept the terms of service before they
23 purchased it, but it doesn't actually collect any
24 information about that person that accepts it?
25     A.  No.

Page 45

1      Q.  Phoenix Digital alleges that Bungie breached
2  Phoenix Digital's terms of service, right?
3      A.  Yes.
4      Q.  Okay.  Explain each way that Phoenix Digital
5  alleges Bungie breached the Phoenix Digital terms of
6  service.
7      A.  Not only did they purchase the software and
8  disassemble it, they purchased the software and used it.
9      Q.  Okay.  So they breached by disassembling the
10 software?
11     A.  Yes.
12     Q.  And they breached it by using the software?
13     A.  Yes.
14     Q.  Any other ways?
15     A.  Not that I can think of at the moment.
16     Q.  And this was one of the topics in the deposition
17 notice, right, was the ways that Phoenix Digital alleges
18 that Bungie breached the terms of service?
19     A.  Yes.
20     Q.  Okay.  How -- how exactly did Bungie disassemble
21 the software?
22     A.  I don't know.  I'm not Bungie.
23     Q.  Okay.  Let me back up actually.  When you say
24 disassemble and use the software, what software are you
25 referring to?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

---

Page 46

1    A. The cheat and the loader.
2    Q. Okay. So what did Bungie disassemble?
3    A. I'm not a technical person.
4    Q. Does Phoenix Digital allege that Bungie
5  disassembled the cheat?
6    A. Yes.
7    Q. Does Phoenix Digital allege that Bungie
8  disassembled the cheat loader?
9    A. Yes.
10   Q. And what about -- you said the other way that
11 Phoenix Digital alleges Bungie breached was by using the
12 software. Did Phoenix Digital allege that Bungie used
13 the cheat?
14   A. Yeah. I believe it's -- I believe there's
15 some -- I'd have to -- Phil, if you want bring up the
16 terms of service, we can probably find where it
17 explicitly says where companies of your type are not at
18 liberty to purchase or use it.
19   Q. (BY MR. MARCELO) And when you said "companies of
20 your type," what do you mean?
21   A. You know, any corporate entity.
22   Q. Oh, a corporate entity is not allowed to use
23 AimJunkies --
24   A. Yeah. I believe it's in the terms of service.
25 We'd have to take a look. I don't remember. I believe

Page 47

1  there's something in there in that department, but I
2  don't have in it in front of me right now so I can't dig it
3  out.
4    Q. You have it as Exhibit 60. That was sent over.
5    A. Yeah. How do I bring that up?
6    Q. You should be able to open it from the chat. And
7  I will -- I'll share the screen actually. I'd like to
8  walk through this.
9    A. Yeah, let's walk through it.
10   Q. So I'm pulling back up Exhibit 60. This is
11 Counterclaim Exhibit E. Do you see that?
12   A. Okay. All right. Just leave it right there a
13 minute. Now, like I said, this was posted on the
14 website not only when you had to purchase and it says
15 right here "By accessing our website, you agree to the
16 terms of service and privacy policy." So you had --
17 you, as a user, had access to this terms of service and
18 it clearly says what your responsibilities are.
19   Q. And what I'm focused on here is what -- to
20 identify each way that Phoenix Digital alleges Bungie
21 breached --
22   A. I'm working my way down --
23   Q. Mr. Schaefer, let me finish the question. I'm
24 wondering each way that Phoenix Digital alleges Bungie
25 breached these terms of service?

Page 48

1    A. I'm working down it. Like I said, it clearly
2  says here whether you purchase or not, by accessing the
3  website you're agreeing to the terms of service and
4  privacy policy. That's the first item. All right.
5  Scroll on. Next page. "You shall not copy, distribute,
6  reproduce or display any use of our software except as
7  expressly authorized herein."
8    Q. And, Mr. Schaefer, what -- which of those does
9  Phoenix Digital allege that Bungie did?
10   A. They distributed it between themselves in the
11 business and they displayed it.
12   Q. When you say "they distributed it between
13 themselves in the business," what do you mean?
14   A. The person that purchased it wasn't the only
15 person that opened it up. That was your guy said that
16 that happened.
17   Q. And then you said they display it. How do Bungie
18 display it in breach of --
19   A. Your guys said that they opened it up and checked
20 to see how it works.
21   Q. And that's how they breached the terms of service
22 by displaying it?
23   A. Let's keep going.
24   Q. Mr. Schaefer, I'm asking you how --
25   A. Yes.

Page 49

1    Q. What is Phoenix Digital's allegation regarding
2  how Bungie breached the terms of service by displaying
3  the cheat software?
4    A. Let's scroll down two paragraphs. "Unless
5  explicitly authorized by AimJunkies, our services and
6  our software may not be sold, resold, leased, rented,
7  leased, distributed, transferred or used in any
8  commercial way." What is commercial way --
9    Q. We'll get there in a second. Mr. Schaefer, but
10 I'm still -- I just need an answer to the question
11 regarding the display.
12        MR. MANN: Objection. He already answered
13 your question.
14   A. It was used in a commercial way.
15        MR. MANN: And I object to you arguing with
16 the witness. He answered your question.
17   Q. (BY MR. MARCELO) I'm going to take back the
18 question again so that I have a clean answer. What ways
19 is Phoenix Digital alleging that Bungie displayed the
20 cheat software that breached the terms of service?
21        MR. MANN: Asked and answered.
22   A. Yes.
23        MR. MANN: Go ahead and answer again. Let's
24 play the game here.
25   A. Your -- what do you call that, a 301(b)(6) or

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 50

1   whatever, the want-a-be expert said that you guys got it
2   from the guy that purchased it and you opened it up and
3   took a look at it.
4       Q.  (BY MR. MARCELO)  Okay.
5       A.  Also, also, our expert has looked at the AEO that
6   was provided and has provided us reports showing that
7   you guys did more than just look at it.
8           MR. MANN:  I'll caution you, Mr. Schaefer.
9   Don't get into any of that stuff.  That's a
10  non-testifying expert, so I'll caution you not to talk
11  about it.
12      Q.  (BY MR. MARCELO)  Mr. Schaefer, any other ways
13  Phoenix Digital alleges Bungie breached Phoenix
14  Digital's terms of service?
15      A.  Two paragraphs down it says that it was used in a
16  commercial way, and it's not to be used in any
17  commercial way.
18      Q.  And what exactly was the commercial way Bungie
19  used the cheat software?
20      A.  Your expert stated that they fired it up so they
21  could see how it worked.  A representative of Bungie who
22  said that they used it to see how it works, that's a
23  commercial way.
24      Q.  Can you explain that to me?  What do you mean
25  that is a commercial way?

Page 51

1       A.  Was it used for personal use?
2       Q.  So any use that's not personal use is commercial
3   use?
4       A.  100 percent.
5       Q.  Any other ways that Phoenix Digital alleges
6   Bungie breached the Phoenix Digital terms of service?
7       A.  Let's go to the next paragraph, "You shall not
8   modify, hack, decompile, disassemble, reverse engineer,
9   derive source code or create derivative works of our
10  software in part or in whole.  You shall not transfer
11  our software or display the software's object code on
12  any computer screen or to make any hard copy memory
13  dumps of the software's object code."  We allege you did
14  that.
15      Q.  And when you say "we allege you did that," which
16  of those actions that you just read --
17      A.  All of the above.
18      Q.  Mr. Schaefer, just let me finish the question.
19          Which of those actions that you just read does
20  Phoenix Digital allege Bungie did?
21      A.  All of the above.
22      Q.  So Phoenix Digital alleges that Bungie modified
23  the cheat software?
24          MR. MANN:  Asked and answered.
25      Q.  (BY MR. MARCELO)  Is that right?

Page 52

1       A.  Yes.
2           MR. MANN:  Go ahead.
3       Q.  (BY MR. MARCELO)  In what ways did Bungie modify
4   the cheat software?
5       A.  They did not use it in the way it was delivered.
6       Q.  Any other way that Phoenix Digital alleges Bungie
7   modified the cheat software?  Mr. Schaefer?
8       A.  No, not at this time.
9       Q.  And did -- does Phoenix Digital allege that
10  Bungie modified the AimJunkies cheat loader?
11      A.  Yes.
12      Q.  How?
13      A.  They decompiled it.  That's not how it was
14  delivered.  It was not delivered decompiled.
15      Q.  And I see that two actions later, but I'm
16  wondering on the modify.  Are you saying that by
17  decompiling it that was also modification?
18      A.  Yes.
19      Q.  Any other basis?
20      A.  No, not at this time.
21      Q.  How did Bungie hack the cheat software or cheat
22  loader?
23      A.  I don't know.  Ask your 30(b)(6).
24      Q.  Does Phoenix Digital have any allegation of how
25  Bungie hacked the cheat software or cheat loader?

Page 53

1       A.  You've already given it to us.
2       Q.  Mr. Schaefer, I'm wondering if Phoenix Digital
3   knows of any way at all that Bungie hacked the cheat
4   software or cheat loader?
5       A.  What's your definition of hacked?
6       Q.  Well, these are Phoenix Digital's terms of
7   service, and what does Phoenix Digital mean by hack
8   here?
9       A.  That can be interpreted widely.
10      Q.  What do you understand it to mean here?
11      A.  Any -- even opening it up is hacking it.
12      Q.  And you're saying even opening up the cheat
13  loader is hacking it?
14      A.  Yeah.  Anything beyond just the proper use of it
15  is -- fits into that category.
16      Q.  And so what ways did Bungie hack the cheat loader
17  or cheat software?
18      A.  I already answered that question.
19      Q.  I'm not sure I heard the answer.
20      A.  I'm not sure I'm going to tell you again.  Have
21  them read it back to you.
22      Q.  So, Mr. Schaefer, what ways did Bungie hack the
23  cheat software or cheat loader?
24      A.  I already answered that question.
25      Q.  And what was the answer?

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 54

1    A.  I don't remember.  You'll have to go back and
2  look in the record.
3    Q.  Do you recall any ways that Bungie hacked the
4  cheat software or cheat loader?
5    A.  I already answered that question.  You know, this
6  wouldn't take eight hours if you quit asking the same
7  questions over and over and over and think you're going
8  to get a different answer.
9    Q.  Well, I'm going to ask this one again because I'm
10  not sure I got an answer to this.  In what ways did
11  Bungie hack the cheat software or cheat lowered?
12    A.  And, again, I will say ask them to replay the
13  record and you will have your answer because I've
14  already answered that question.
15    Q.  What ways did Bungie decompile the chief software
16  and chief loader?
17    A.  I can't tell you that specifically because it's
18  ABO.
19    Q.  What do you mean by that?
20    A.  Just exactly what I said.
21    Q.  Why can't you tell me what ways Phoenix Digital
22  alleges that Bungie decompiled the cheat loader or cheat
23  software?
24    A.  If you want to cut it loose from ABO, I'll be
25  happy to take a look at it and tell you.

Page 55

1    MR. MANN:  What the witness is saying here
2  is the information that you provided us in response to
3  our questions about that have been designated ABO, and I
4  have not been able to provide that information to Mr.
5  Schaefer.  If you are willing to remove the ABO
6  designation of that information, I can pass it on to Mr.
7  Schaefer and he will be happy to provide a supplemental
8  answer.  At this point we're restricted because Bungie
9  has designated that information attorneys' eyes only.
10    MR. MARCELO:  And, Mr. Mann, I'm going to
11  ask that you let Mr. Schaefer answer the question.
12    MR. MANN:  He answered the question.  He
13  said it's ABO.  He said you designated it ABO, that's
14  why he can't answer your question.  It's not that
15  complicated.
16    MR. MARCELO:  I'm going to ask that you let
17  the witness answer the questions --
18    A.  I already did.  Go back and have them repeat the
19  record.
20    Q.  (BY MR. MARCELO)  Any other ways --
21    MR. MANN:  Madam court reporter, could you
22  go back and look back through the question and see what
23  Mr. Schaefer testified to?
24    Q.  (BY MR. MARCELO)  Mr. Schaefer, any other ways
25  that Phoenix Digital --

Page 56

1    MR. MANN:  Am I taking that as -- Mr.
2  Marcelo, are you overriding my request to the court
3  reporter, which is fine.  If you want to do that, that's
4  fine.
5    MR. MARCELO:  I didn't understand what your
6  request was.
7    MR. MANN:  It's in the record.  We can go
8  back and see what the witness testified to.  If you
9  choose not to go back into the record and see what the
10  witness testified to, that is fine.  But don't accuse us
11  of not answering your questions.
12    Q.  (BY MR. MARCELO)  Mr. Schaefer, any other ways
13  that Phoenix Digital alleges Bungie decompiled the cheat
14  loader or cheat software?
15    A.  I already answered that question.  I mean, we
16  haven't even finished going through the terms of
17  service.
18    Q.  We're going to walk through each way that Phoenix
19  Digital alleges Bungie breached the terms of service.
20  So how many -- how many times did Bungie decompile the
21  cheat loader or cheat software?
22    A.  I can't tell you because it's ABO.
23    Q.  How does Phoenix Digital know that Bungie
24  decompiled the cheat loader or cheat software?
25    A.  Because we got a report of the ABO from the

Page 57

1  expert that supports that -- that you've agreed on us to
2  have for an expert, he looked at it and told us what's
3  going on.
4    Q.  Did Bungie decompile both the cheat loader and
5  cheat software?
6    A.  I do not know.  I can't -- I don't have access to
7  the ABO.
8    Q.  How did Bungie disassemble the cheat software?
9    A.  Again, I don't have access to the ABO.
10    Q.  So without access to a specific document, Phoenix
11  Digital doesn't know how Bungie disassembled the cheat
12  software?
13    A.  We were told by the expert that it was
14  disassembled.  He would have been going out of his
15  purview of the court to give us anything specific.
16    Q.  Did Bungie disassemble the cheat loader and cheat
17  software?
18    A.  I don't know.  It's ABO.  Cut the ABO loose, and
19  I'll answer all your questions.
20    Q.  Does Phoenix -- what are Phoenix Digital's
21  allegations of how Bungie reverse engineered the cheat
22  software?
23    A.  I believe it's in the court documents.
24    MR. MANN:  Well, if Bungie wants to admit
25  they brought this lawsuit without doing any sort of

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 58

1  investigation and doesn't know what it's talking about,
2  we'll be happy to accept that?
3            MR. MARCELO: Mr. Mann, what was that
4  objection?
5            MR. MANN: The objection is that if you want
6  to admit that you did not do a proper pre-filing
7  investigation and did not actually in fact investigate
8  what Phoenix Digital was distributing and that you are
9  guessing in this entire lawsuit, we will be happy to
10  accept that. Just admit it.
11            MR. MARCELO: Because Bungie would have
12  needed to reverse engineer this before bringing a
13  lawsuit?
14            MR. MANN: Bungie would need to do a
15  pre-filing investigation to bring good faith claims
16  against my clients. I don't believe you did personally,
17  but we don't know. If you want to admit that you
18  didn't, that's fine.
19            MR. MARCELO: And that pre-filing
20  investigation would require reverse engineering?
21            MR. MANN: It would require doing something
22  to enable Bungie to understand what it's saying.
23            THE WITNESS: No, no, no, no, Phil. No,
24  Phil, we just had to take their word for it.
25            MR. MANN: This partic -- this particular

Page 59

1  lawsuit -- (simultaneous talking) -- yeah, this
2  particular lawsuit is you're saying that Phoenix Digital
3  copied the copyrighted software of Bungie. If you do
4  not have the actual source code of the Phoenix Digital
5  product, how do you say that that was copied?
6            THE WITNESS: Phil, they just believe it.
7            MR. MANN: I don't want to get into an
8  argument with them.
9            THE WITNESS: Yeah, it's fucking shit.
10       Q. (BY MR. MARCELO) So, Mr. Schaefer, name each way
11  that Bungie reverse engineered the cheat software?
12       A. I can't tell you because it's ABO.
13       Q. Is the same true of the cheat loader?
14       A. Yes.
15       Q. How did Bungie derive source code of the cheat
16  software?
17       A. I can't tell you because it's ABO.
18            MR. MANN: Our allegation's that you didn't.
19  You brought these -- you brought these allegations
20  without doing a proper investigation.
21       Q. (BY MR. MARCELO) Well, actually, then, Mr.
22  Schaefer, let me clarify. Is Phoenix Digital alleging
23  that Bungie derived the source code of the cheat
24  software?
25       A. No.

Page 60

1       Q. Did Bungie derive the source code of the cheat
2  loader?
3       A. I don't know.
4       Q. Okay. Let me back up then just to make sure. Is
5  Phoenix Digital alleging that Bungie reverse engineered
6  the cheat software and cheat loader?
7       A. Yes.
8       Q. And that's reverse engineering both of those,
9  right?
10       A. I don't know. It's ABO.
11       Q. Well, then, let's just break it up. Is -- is
12  Phoenix Digital alleging that Bungie reverse engineered
13  the cheat software?
14       A. We've already visited this question. Asked and
15  answered.
16       Q. Mr. Schaefer, I'm asking following up on your
17  attorney's comment that Phoenix Digital is not
18  alleging --
19       A. I answered this question before the attorney's
20  comment. Same answer.
21       Q. Right. And I -- and I want to make sure. Okay?
22       So same answer Bung -- Phoenix Digital is
23  alleging that Bungie reverse engineered both the cheat
24  software and cheat loader?
25       A. Did I say that?

Page 61

1       Q. Is that the answer?
2            MR. MANN: I would point out as a matter of
3  law, our allegations are contained in the pleadings that
4  we have submitted here.
5       A. Is this a deposition, Christian, or a --
6            MR. MANN: Mr. Schaefer, if you want to --
7  if you can answer his questions, if you know what
8  additional information Mr. Marcelo is seeking --
9       A. I don't know.
10            MR. MANN: -- go ahead and answer his
11  questions. But the -- you know, the allegations are
12  written down, they're a matter of public record in
13  pleadings. Add whatever you can to it. Let's try to
14  get this done before sunrise.
15       A. I don't have anything to add to what I've already
16  answered, Christian.
17       Q. (BY MR. MARCELO) Is Phoenix Digital alleging
18  that Bungie breached the Phoenix Digital terms of
19  service in any way not identified in Bungie's
20  counterclaims?
21       A. We haven't even finished the terms of service.
22  When are we finishing that?
23       Q. Mr. Schaefer, back to my question, is Phoenix
24  Digital alleging that Bungie breached the Phoenix
25  Digital's terms of service in any way not identified in

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 62

1   Phoenix Digital's counterclaims?
2            MR. MANN:  Object to the form.
3       A.  I'm not answering any more questions, Christian,
4   until we finish the question of going down the terms of
5   service.  We got a --
6            MR. MANN:  No, no, no --
7       Q.  (BY MR. MARCELO)  This is not your deposition.
8       A.  Mr. Schaefer, Mr. Schaefer, play
9   along with Mr. Marcelo.  It's his -- he can ask whatever
10  ridiculous questions he wants.  Play along with him.  Go
11  ahead.  Let's not take the bait on that.  Go ahead and
12  answer his questions.
13      Q.  (BY MR. MARCELO)  So I'm going to ask it again.
14           Mr. Schaefer, is Phoenix Digital alleging that
15  Bungie breached Phoenix Digital's terms of service in
16  any way not identified in Bungie's counterclaims?
17           MR. MANN:  Object to the form.
18      A.  I don't know.  Until we're done with discovery, I
19  don't know.
20      Q.  (BY MR. MARCELO)  Currently, as discovery sits,
21  are there any other ways, other than that's outside --
22      A.  Excuse me?
23      Q.  Currently as discovery sits, are there any other
24  ways other than identified in Phoenix Digital's
25  counterclaims that Phoenix Digital is alleging that

Page 63

1   Bungie breached Phoenix Digital's terms of service?
2       A.  I do not know.
3       Q.  The next part you said Bungie breached was
4   creating a derivative of work of our software, right?
5       A.  Yes.
6       Q.  How did Bungie create the derivative work?
7       A.  Any -- anything beyond the original packaging,
8   how it was put together, is a derivative work.  That's
9   you guy's story, ain't it?
10      Q.  And so how exactly did Bungie create a derivative
11  work?
12      A.  When you opened up our software, you created a
13  derivative work.
14      Q.  Any other way?
15      A.  I don't know.  Too early to tell.
16      Q.  Is Phoenix Digital alleging that Bungie
17  transmitted Phoenix Digital's software?
18      A.  Yes.
19      Q.  How?
20      A.  Through your -- through discovery you provided
21  documentation showing you transmitted it.
22      Q.  Does Phoenix Digital allege that Bungie displayed
23  the software object code on any computer screen?
24      A.  I do not know at this point.  It's too early.
25      Q.  But currently as you sit, you don't know of an

Page 64

1   instance where Bungie displayed the software object code
2   on a computer screen?
3       A.  I'm not saying yes or no.  That's all AEO and to
4   be determined.
5       Q.  Well, what I'm wondering is there current
6   knowledge as you sit here today?
7       A.  I cannot answer that question.
8       Q.  You cannot answer or you don't know the answer to
9   it?
10      A.  I do not know the answer to that question at this
11  point in time.  It's premature.
12      Q.  Does Phoenix Digital know if Bungie made a hard
13  copy memory dump of the software's object code?
14      A.  I do not know at this point in time.
15      Q.  Any other ways that Phoenix Digital alleges
16  Bungie breached its terms of service?
17      A.  "Any explicit and intentional misuse of our
18  services or our software may re -- may result in legal
19  action being investigated.  You agree that the use of
20  this software is explicitly intended for offline use or
21  single-player use and not intended for live game player
22  versus player or tournaments.  Any use beyond" -- scroll
23  down -- "is forbidden and AimJunkies is not legally
24  liable."
25      Q.  And so where it says "explicit intentional

Page 65

1   misuse," does that include anything not listed above?
2       A.  Yeah.  Your 30(b)(6) guy said that they opened it
3   up and used it.
4       Q.  Yeah.  So exactly what actions is Phoenix Digital
5   alleging constitute breaches of its terms of service?
6       A.  Well, I think we've named about half a dozen of
7   them so far.  Let's keep going on the document.
8       Q.  I'm wondering when -- when Bungie purchased the
9   cheat software, are you alleging that that was a breach
10  of the terms of service?
11      A.  Well, let's scroll down and see if it's in here.
12      Q.  Mr. Schaefer --
13      A.  I don't know.  Let -- let's scroll down and see
14  if it's in here.
15      Q.  Do you need to look at that?  I can show you the
16  rest of the terms of service.
17      A.  Let's just keep going where we left off.
18      Q.  Just let me know when you're finished reading.
19      A.  (Witness reviewing document.)  All right, keep
20  going.  Scroll back up a little bit, please.  Okay.
21  Scroll down some more.  Yeah, it's not in there.
22      Q.  What's not in there?
23      A.  It doesn't say anything in there that it's
24  illegal for a corporation to buy it.
25      Q.  Okay.  So was -- is opening the cheat software a

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 66

1   breach of the terms of service?
2       A.  Yes, it was for Bungie.
3       Q.  And why is that?
4       A.  Because it wasn't purchased on a Bungie computer
5   and it was transferred to a Bungie computer.
6       Q.  Any other reasons?
7       A.  Any other reasons what?
8       Q.  Any other reasons why Bungie opening the cheat
9   software would be a breach of these terms of service?
10      A.  Not that I'm aware of.  You provided the records
11  of a hardware ID reset, which showed that it was
12  transferred to another computer.  Your witness testified
13  that he acquired it for Bungie.  It's not transferrable.
14      Q.  Was Bungie's investigation of the cheat software
15  a breach of the terms of service?
16      A.  If they did anything besides -- well, yeah,
17  absolutely it was because Bungie didn't purchase it.
18      Q.  Any other reasons Bungie investigating the cheat
19  software would be a breach of the terms of service?
20      A.  Not that I'm aware of.  It doesn't say anything
21  in there that Bungie can't purchase the cheat.  Instead
22  they sent a lackey to purchase it and then transferred
23  it over.
24      Q.  Does Phoenix Digital currently own the Destiny 2
25  cheat software?

Page 67

1       A.  They never did.
2       Q.  And so just on my question, is the answer, no,
3   Phoenix Digital does not own the Destiny 2 cheat
4   software?
5           MR. MANN:  Object to the form of the
6   question.  The witness gave his answer.
7       Q.  (BY MR. MARCELO)  Mr. Schaefer, what I was asking
8   is currently does Phoenix Digital own the Destiny 2
9   cheat software?
10      A.  They never have.
11      Q.  So they never have and they don't currently,
12  right?
13      A.  That is correct.
14      Q.  Who owns --
15          MR. MANN:  Mr. Schaefer has stopped beating
16  his wife or whatever.
17      Q.  (BY MR. MARCELO)  Who owns the Destiny 2 cheat
18  software?
19      A.  I do not know.
20      Q.  Do you know if Mr. Banek owns it?
21      A.  I don't know.
22      Q.  Does -- does Phoenix Digital currently own the
23  cheat loader used on the AimJunkies website?
24      A.  They never did.
25          MR. MANN:  Asked and answered.

Page 68

1       A.  No, no, Phil.  Let me answer that question.
2   First of all, we never owned a loader; and, second of
3   all, how the fuck do I know what they got on their
4   website?
5           MR. MANN:  Not to mention this has already
6   been the subject of prior deposition testimony and
7   testimony at the arbitration.  We're going over familiar
8   ground for at least a second, possibly the third time.
9       Q.  (BY MR. MARCELO)  And do you know if Blome
10  Entertainment currently owns the cheat loader?
11      A.  No, I do not.
12          MR. MANN:  Again, object to the question.
13  It's never been established that they ever did own the
14  cheat loader.
15      Q.  (BY MR. MARCELO)  For instance, was the cheat
16  loader part of the sale of the AimJunkies website to
17  Blome Entertainment?
18          MR. MANN:  Object to the form.  It has not
19  been established that it ever -- that they ever owned
20  the loader and therefore could not transfer it.
21      A.  Exactly.  Thank you.
22          MR. MANN:  Mr. Marcelo, this is objection to
23  the foundation.  It hasn't been established that they
24  ever owned the loader.
25          THE WITNESS:  We didn't own the loader.

Page 69

1           MR. MANN:  And again -- and, again, this has
2   been the subject of extensive deposition testimony
3   earlier.  You already know this.
4           MR. MARCELO:  I don't think that question --
5           MR. MANN:  If you want to ask these
6   questions, if we're going to be pedantic about this,
7   let's be pedantic.  Lay a foundation.  You went to law
8   school.  You know how to do that.  Lay the foundation
9   before you start asking the questions.
10          MR. MARCELO:  I don't believe this question
11  actually has ever been asked.
12      Q.  (BY MR. MARCELO)  And the question was:  Was the
13  cheat loader sold with the AimJunkies website to Blome
14  Entertainment?
15          MR. MANN:  No, it has been asked.  Because
16  in order for them to sell it, they have to own it.  And
17  it hasn't been established that they ever owned it.  Mr.
18  Marcelo, this is first year law school stuff.  Second,
19  I'm sorry, second year, evidence.  It has never been
20  established that they owned it.  Lay that foundation.
21      Q.  (BY MR. MARCELO)  Mr. Schaefer, was the cheat
22  loader a part of the sale of the AimJunkies website?
23      A.  The list of questions that are topics that we
24  were going to go over, can you tell me which one that
25  was that this pertains to?

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 70

1  Q. I'm asking whether you know whether --
2     A. I'm -- I'm saying, you said -- you gave me a list
3  of topics. Can you tell me which topic that is that
4  this is relevant to?
5        MR. MANN: And for the record, I reviewed
6  those topics. I do not recall any of the topics being
7  related to the loader because I was going to object that
8  the loader has already been the subject of prior
9  depositions. When I reviewed the 30(b)(6) notice, I did
10 not see any categories relating to the loader, but, Mr.
11 Marcelo, perhaps I'm mistaken. Tell me which category
12 that is.
13       MR. MARCELO: Sure. Mr. Schaefer already
14 testified that the terms of service covered the cheat
15 loader.
16       MR. MANN: My question to you is which
17 category? Again, the answer to that question is a
18 number, not what Mr. Schaefer testified to. Which
19 category are you referring to?
20       MR. MARCELO: Mr. Mann, I'm going to ask the
21 questions at my deposition as I want to ask them.
22       MR. MANN: And if you're not going to
23 violate the rules of Judge Zilly, who told you not to go
24 over familiar ground, that is your choice. And more
25 fundamentally, this is a 30(b)(6) deposition. You

Page 71

1  wanted to do this in two separate stages. This is a
2  30(b)(6) deposition. Which category covers that
3  particular question? If I'm mistaken, let me know. I'm
4  looking for a number.
5        MR. MARCELO: Mr. Mann -- Mr. Mann, there is
6  no specific rule that the only questions you can ask are
7  within those categories. Those are categories that --
8        MR. MANN: Oh, oh, oh, oh. Okay. Okay.
9  Okay. Okay.
10       MR. MARCELO: Mr. Mann --
11       MR. MANN: Remember when I took your
12 30(b)(6) deposition? If the rule is I can ask anything
13 I want and you can't object, fine. Fine. Now, my
14 question to you, Mr. Marcelo, is which category does
15 this question relate to for the fourth time? Can you
16 give me an answer? I'm looking for a number.
17       MR. MARCELO: I don't have it up in front of
18 me. It relates to the breach of terms of service.
19       THE WITNESS: No, it doesn't. It's not
20 relevant.
21       MR. MANN: Mr. Schaefer's answered those
22 questions. Your questions are going to the loader. The
23 loader has already been the subject of extensive
24 deposition testimony and arbitration testimony earlier.
25 You're going over familiar ground.

Page 72

1        MR. MARCELO: Mr. Mann, if you want to take
2  this up with Judge Zilly, you can do so.
3        MR. MANN: No, I don't want to take --
4        MR. MARCELO: I'm going to keep asking my
5  questions and --
6        MR. MANN: I don't want to take this up with
7  Judge Zilly. It's when you try to take it up with Judge
8  Zilly, I want there to be a record of exactly what is
9  going on so you don't try to bamboozle the Judge and say
10 we were being uncooperative.
11       MR. MARCELO: I don't think Judge Zilly is
12 going to be bamboozled in the slightest.
13       MR. MANN: I hope not, because you're asking
14 questions for the fourth time that have been asked and
15 answered before, and Judge Zilly told us not to do this.
16     Q. (BY MR. MARCELO) So, Mr. Schaefer, I don't think
17 I got an answer to this question: Was the cheat loader
18 part of the sale of the AimJunkies website to --
19       MR. MANN: Objection. Foundation.
20     A. Christian, since it was not a question -- I mean,
21 since it was not in the list of question -- of topics
22 that we were going to be covering tonight, I didn't
23 discuss it and I didn't get myself familiarized with the
24 answers to these kinds of questions. So with that in
25 mind, Christian, I'm sorry, I can't answer the question.

Page 73

1        MR. MANN: Let me ask a couple of questions.
2  Mr. Schaefer --
3        MR. MANN: No, no, Mr. Mann.
4        MR. MANN: -- Phoenix Digital ever own the
5  loader software?
6        MR. MARCELO: Mr. Mann --
7        MR. MANN: Mr. Schaefer, did Phoenix Digital
8  ever own the loader software?
9        MR. MARCELO: Mr. Mann, stop. This is not
10 your deposition.
11       MR. MANN: The answer is no. Let -- Mr.
12 Schaefer, did Phoenix Digital ever own the loader
13 software?
14       MR. MARCELO: Let's take a break.
15       MR. MANN: Did Phoenix Digital ever own the
16 loader software?
17       THE WITNESS: No.
18       MR. MANN: Did Phoenix Digital ever sell the
19 loader software?
20       MR. MARCELO: Mr. Mann, if you continue with
21 this, I will take this up with Judge Zilly and seek
22 sanctions.
23       MR. MANN: You don't like the answers, huh?
24       MR. MARCELO: Mr. Mann, this is my
25 deposition. (Simultaneous talking.) You want to take

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 74

1  this up with Judge Zilly we will -- and we will seek
2  attorney's fees.
3          MR. MANN:  Oh.
4          THE WITNESS:  Phil, let it go.
5          MR. MANN:  Ask your questions, Mr. Marcelo.
6          (Deposition Exhibit No. 62 was marked for
7      identification.)
8      Q.  (BY MR. MARCELO)  Now I put into the chat what
9  will be marked as Exhibit 62.  Mr. Schaefer, you see
10  this Notice of Deposition?
11     A.  Yes.
12     Q.  And you reviewed this notice of deposition ahead
13  of this deposition?
14     A.  Yes.
15     Q.  Read for me topic No. 8 out loud, please.
16          MR. MANN:  Hold on a second.  Mr. Marcelo,
17  this is not the notice of deposition that you sent over
18  to me about a week ago.  Don't play games here.  This
19  one's dated February, is it not?  Pull up the
20  deposition -- the 30(b)(6) notice that you sent over
21  about a week ago.
22          MR. MARCELO:  This is not the right one.
23          THE WITNESS:  No, it's not the right one.
24          MR. MARCELO:  Mr. Mann, if I had the wrong
25  one, I'll get the right one.

Page 75

1          MR. MANN:  Well, let's get the right one,
2  young man.  Come on.  Let's get professional.
3          MR. MARCELO:  I agree, Mr. Mann, I'd like
4  you to be professional.
5          MR. MANN:  Oh, oh.  Don't try to pull this.
6  Pull up his answers and --
7      A.  Christian, if you asked questions that were
8  relevant to the topics that were listed, then I would be
9  more than happy to answer them.  But when you want to go
10  off, then this is what happens.
11          (Deposition Exhibit No. 63 was marked for
12      identification.)
13     Q.  (BY MR. MARCELO)  Dropped in the chat will be
14  marked as Exhibit 63.  And apologies, I had the wrong
15  notice of deposition up.  Let me share the screen.  You
16  see this Notice of Deposition, Mr. Schaefer?
17     A.  Yes.
18     Q.  And it's dated March 14, 2023, right?
19     A.  Yes.
20     Q.  This is the notice of deposition you reviewed
21  ahead of this deposition?
22     A.  Yes.
23     Q.  Go ahead and read for me topic 8.
24     A.  "Information regarding the ownership and/or
25  authorship of any software, program, data and/or files

Page 76

1  that Phoenix Digital alleges Bungie improperly accessed,
2  downloaded, copied, used, tested, decompiled, reverse
3  engineered or otherwise inspected in Phoenix Digital's
4  counterclaims, including any transfer of ownership or
5  sales of such software programs to Phoenix Digital."  My
6  apologies, it's in there.
7      Q.  Now, did the sale of the AimJunkies website
8  include the cheat loader?
9      A.  No.  It can't.  Phoenix Digital didn't own it.
10  How do you sell something you don't own?  That's why
11  Phil's upset because we've already covered this.
12          MR. MANN:  Thank you.
13     Q.  (BY MR. MARCELO)  Move on to --
14     A.  You don't want to ask that question eight times?
15     Q.  Let's move on Phoenix Digital's alleged damages.
16          Explain to me every way that Phoenix Digital was
17  damaged by Bungie's alleged breaches of Phoenix
18  Digital's terms of service?
19     A.  The negative press that has came from this, the
20  loss of trust with our customer base, the loss of market
21  share, all of those things were experienced and factored
22  into the sale price of the site.  All of them resulted
23  in a reduction in revenues and the -- I use the times
24  revenue method for calculating value.  And you can have
25  the best times revenue method in the world.  But if

Page 77

1  somebody doesn't want to pay what that number is, then
2  that's what the market will bear.
3      Q.  And we'll get into each of these, but I want to
4  make sure we finish the list.  So negative press, loss
5  of trust, loss of market share.  Any other ways that
6  Phoenix Digital alleges it was damaged by Bungie's
7  breaches of Phoenix Digital's terms of service?
8      A.  Using our customer base information.
9      Q.  What do you mean by that?
10     A.  When they subpoenaed the PayPal and gave that
11  information to their -- to the plaintiff.  That was
12  proprietary information that the plaintiff should have
13  never gotten.
14     Q.  Any other ways?
15     A.  What was the question again?
16     Q.  Are there any other ways Phoenix Digital alleges
17  that Bungie's breaches of Phoenix Digital's terms of
18  service damaged Phoenix Digital?
19     A.  Yes.
20     Q.  What are the other ways?
21     A.  A judgment that should have never happened
22  because the information was illegally gotten.  It's
23  tainted evidence.  The attorney fees that I've had to
24  incur as a result of this.
25     Q.  Anything else?

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 78

1    A. Not that I can think of at the moment.
2       (Deposition Exhibit No. 64 was marked for
3    identification.)
4    Q. (BY MR. MARCELO) I'm going to drop the chat
5    what will be marked as Exhibit 64. Mr. Schaefer, do you
6    see this document that was marked as Exhibit 64?
7    A. Yes.
8    Q. And it's Phoenix Digital's Supplemental Responses
9    to Interrogatory No. 10, right?
10   A. Yes.
11   Q. And if I scroll down --
12   A. Yes.
13   Q. -- the verification page -- just let me ask my
14   questions -- is that your signature?
15   A. Yes.
16   Q. So Interrogatory 10 asked "Calculate and provide
17   the basis for each category of Phoenix Digital's alleged
18   damages specifying how Phoenix Digital reached those
19   calculations." You see that?
20   A. Yes.
21   Q. If you look at the second sentence of the
22   supplemental response, it says, "Such damages include
23   but are not limited to investigating and responding to
24   inaccurate and factually baseless claims by Bungie both
25   in and outside of court." Do you see that?

Page 79

1    A. Yes.
2    Q. I want to focus on both in and outside of court.
3       Let's start with in. What inaccurate and
4    factually baseless claims in court is Phoenix Digital
5    referring to here?
6    A. First of all, Bungie claimed that we copied their
7    software, which we've not in any way. We don't even
8    make the software, let alone copied it. They claim --
9    Bungie claims that we circumvented their anti-cheat
10   either with the loader or with the game. And we have
11   e-mail evidence which is current to the time, not live
12   documents that change every other day of the week that
13   makes it look like you had an anti-cheat when we
14   actually have the e-mails that say the only way in 2019
15   and 2020 you were catching cheaters by looking at
16   YouTube videos, player statistics and player reports.
17   That's what your specific e-mails went to your
18   higher-ups in your company saying what your anti-cheat
19   program was. ████████████████████████████████
20   ███████████████████████████████████████████████
21   █████████
22       So when you go into court and you lie in court
23   and say that you had those in place but yet the e-mails
24   which are time stamped for that time said you had
25   nothing of the sort, those are the kinds of things that

Page 80

1    fit into this category.
2    Q. Okay. Mr. Schaefer, I have two things down so
3    far. Claims that Phoenix Digital copied software and
4    claims that Phoenix Digital circumvented anti-cheat
5    software. Are there any other in court claims that
6    Phoenix Digital is alleging harmed Phoenix Digital?
7       MR. MANN: I'm going to raise an objection.
8    It doesn't matter what Mr. Marcelo wrote down. It
9    matters what the record reflects Mr. Schaefer testified
10   to. With that objection, please continue.
11   Q. (BY MR. MARCELO) Mr. Schaefer, any other
12   in-court claims that Phoenix Digital's alleging harmed
13   Phoenix Digital?
14   A. Yes.
15   Q. What are they?
16   A. Your 30(b)(6) respondent claimed that they only
17   looked at software that was attached to the game, the
18   game process. Your evidence clearly shows that they
19   went way above and beyond that and went onto the user's
20   computer and gathered additional information, which is a
21   direct lie to what your 30(b)(6) respondent said, Mr.
22   Kaiser.
23       Mr. Kaiser also said in his 30(b)(6) that all
24   they did was started it up and took a look at it, when
25   the ABO from our guy says that they went beyond that. I

Page 81

1    guess I should have made an even -- I should have made a
2    list of everything. What was the original question?
3    And I'll see if I can think of a couple more because I'm
4    sure they're there because there was about 30 of them
5    that you got away with there.
6    Q. Are there any other in-court claims that Phoenix
7    Digital is alleging harmed Phoenix Digital as a result
8    of Bungie's breach of contract?
9    A. Well, as I said before, our loss of sales, you
10   know, loss of revenue, loss of trust in the community,
11   you know.
12   Q. And did those stem from the filing of the
13   complaint?
14   A. Yes.
15   Q. And then anything else that was filed in the
16   case?
17   A. Yes.
18   Q. When you refer to outside of court, claims made
19   outside of the court, what claims is that referring to?
20   A. I don't have the answer for that. I'd need to
21   confer with my counsel first.
22   Q. But sitting here right now, you can't recall what
23   the outside court claims would be?
24   A. I can't answer that question at this time.
25   Q. So is it -- these are claims made in and outside

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 82

1  of court, those are what damaged Phoenix Digital?
2      A.  Yes.  Good for -- how about your lead attorney
3  says it's good for business to go after cheat sites?
4  That's a quote from him.  Even though you don't have any
5  evidence and you've testified in court that you have no
6  evidence, that you just believe that we must be doing
7  something nefarious there.  Because you haven't
8  presented a single shred of evidence in either court,
9  whether -- whether it's the arbitration or whether it's
10 this federal, not one single shred of evidence that what
11 we've done is illegal.
12     Q.  Okay.  And the claims here that -- both the
13 claims made inside and outside of court, are there any
14 other basis for Phoenix Digital's alleged damages?
15     A.  The others that I've listed off before.
16     Q.  Negative press, loss of trust, loss of market
17 share?
18     A.  Loss of revenue, loss of site valuation.
19     Q.  And what I'm wondering is, those are all a result
20 of the public filing and public discussion of this case?
21     A.  Yes.
22     Q.  Okay.  Let's talk about the legal fees.  Now, it
23 says "Phoenix Digital's legal fees and expenses in
24 defending the false accusations against it stand, at
25 present, at at least $206,116.05," right?

Page 83

1      A.  Yes.
2      Q.  Do those legal fees include time spent on the
3  arbitration?
4      A.  I don't know.  You'd have to sort that out with
5  Phil.
6          MR. MANN:  And for the record, Mr. Marcelo, I
7  assume you got the -- at your request, I provided you
8  with copies of our invoices.  So you should have
9  received those yesterday.  Did you get those?
10         MR. MARCELO:  Yes, I did.  Thank you.
11         MR. MANN:  Well, then those documents say
12 what they say and your answer can be determined by
13 reference to those billing records.
14     Q.  (BY MR. MARCELO)  Mr. Schaefer, was --
15         MR. MANN:  And just so there's no mystery,
16 yes, that includes both actions.
17     Q.  (BY MR. MARCELO)  Mr. Schaefer, who is paying the
18 legal fees?
19     A.  The plaintiff -- I mean, excuse me, the
20 defendants.
21         MR. MANN:  I wish that were the case.
22         THE WITNESS:  Yeah, no shit.
23     Q.  (BY MR. MARCELO)  And what I'm wondering is, is
24 Phoenix Digital paying all of the legal fees for all the
25 defendants?

Page 84

1      A.  Phoenix Digital is paying none of the legal fees
2  for none of the defendants because they don't have any
3  revenue to pay fees.
4      Q.  So who is paying the legal fees, then?
5      A.  The individuals when they're financially capable.
6  And at this point that's not happening real fast.  But,
7  hey, I keep pushing.
8      Q.  And so do these legal fees then include charges
9  for Mr. May as well?
10     A.  I can't speak for Mr. May.
11     Q.  You don't know one way or another whether the
12 legal fees claimed as damages here include legal fees
13 for Mr. May?
14     A.  No, they do not.  I can only speak -- I'm
15 30(b)(6) and I can only speak for Phoenix Digital.  His
16 would be on top of this.
17     Q.  Let's scroll back up for a second to the second
18 sentence, "Such damages include but are not limited to
19 investigating and responding to inaccurate and factually
20 baseless claims."  Would you agree if the claims were
21 accurate, then there wouldn't be damages to Phoenix
22 Digital?
23     A.  I don't understand the question.
24     Q.  Yeah.  Let me phrase it a different way.
25         If the claims made by Bungie were accurate,

Page 85

1  Phoenix Digital isn't alleging that Bungie would be
2  liable for asserting those claims, right?
3      A.  You can assert until the cows come home, but you
4  ought to have some evidence to back it up.  No, it was
5  your 30(b)(6) guy that said we don't have any evidence,
6  we just believe.
7      Q.  What I'm asking here is where it says "inaccurate
8  and factually baseless claims," if the claims are
9  accurate, is it Phoenix Digital's position that Bungie
10 would still be liable for these damages?
11     A.  I don't know.  I'm not a lawyer.
12     Q.  Let's talk about the valuation of AimJunkies.
13     A.  Yes.
14     Q.  Okay.  So in the supplemental response exhibit --
15 sorry, what exhibit is this?
16         THE COURT REPORTER:  I believe it's 64.
17         MR. MARCELO:  Thank you.
18     Q.  (BY MR. MARCELO)  Mr. Schaefer, in Exhibit 64,
19 supplemental response, it says, "The value of the
20 AimJunkies website declined from a high of $6,384,000 in
21 2019," right?
22     A.  Yes.
23     Q.  Where did the valuation of $6,384,000 come from?
24     A.  It came from a times revenue method of
25 calculating based on the federal tax returns.

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 86

1    Q.  Explain to me what a times revenue calculation
2    is.
3    A.  I'll read it to you.  "Under the times revenue
4    business valuation method, a stream of revenues
5    generated over a certain period of time is applied to a
6    multiplier which depends on the industry and economic
7    environment."
8    Q.  And where are you reading that from?
9    A.  Investopia.  Investopedia, excuse me.
10   Q.  Who came up with this valuation?
11   A.  I did.
12   Q.  And how did you come up with it for 2019
13   specifically?  What inputs did you use?
14   A.  I used the federal tax return, like I've already
15   said.
16   Q.  And so the -- you used the revenue for Phoenix
17   Digital in 2019?
18   A.  Yes.
19   Q.  Do you have any educational background in
20   providing valuations of companies?
21   A.  What was the question?
22   Q.  Do you have any educational background in
23   providing valuations of companies?
24   A.  I don't understand the question.
25   Q.  Would you say you're an expert at providing

Page 87

1    valuations of companies?
2    A.  I wouldn't say I'm an expert.
3    Q.  Is there any other factors you considered in
4    determining the value of the AimJunkies website?
5    A.  No.
6    Q.  Were there any offers to purchase the AimJunkies
7    website in 2019?
8    A.  Yes.
9    Q.  From who?
10   A.  Banek.
11   Q.  How much did he offer to purchase the website
12   for?
13   A.  I don't remember.
14   Q.  You remember the conversation with him --
15   A.  Yeah.  We've already covered all of this before,
16   Christian.  I'm not going to go down this path again.
17   Q.  I'm going to keep asking about these because
18   these are your specific damages.  The conversation with
19   Mr. Banek about purchasing the AimJunkies website, that
20   was in 2019?
21   A.  I believe so.  We sent -- if you remember
22   correctly, we sent a response to what's his name down in
23   LA and told him that we had sold it because we had it
24   sold.
25   Q.  And do you remember roughly how much Mr. Banek

Page 88

1    agreed to pay for the AimJunkies website?
2    A.  I do not remember.
3    Q.  Was it over one million?
4    A.  I do not remember.
5    Q.  And I'm just asking you if you remember if it was
6    over a million dollars or not?
7    A.  I'm not going to commit to a number because I do
8    not remember what it was.
9    Q.  Was anyone else involved in the conversation with
10   Mr. Banek about purchasing the website?
11   A.  No.
12   Q.  Any notes or writing evidencing that
13   conversation?
14   A.  No.
15   Q.  And it's just conversation between you and Mr.
16   Banek?
17   A.  Yes.
18   Q.  Who called who regarding that sale?
19   A.  Nobody called anybody.
20   Q.  How did you communicate around the sale?
21   A.  We've already covered all of this.
22   Q.  Mr. Schaefer, how did you communicate regarding
23   this sale?
24   A.  I don't remember.
25   Q.  And you don't remember if the sale -- the

Page 89

1    potential sale was for six million or one million or
2    $500?
3    A.  I do not remember.
4    Q.  Okay.  The next sentence you state that "The
5    value fell to $1,920,000 in 2021 when the lawsuit was
6    filed and Bungie's allegations against Phoenix Digital
7    became public," right?
8    A.  That is correct.
9    Q.  So making sure I get this right, are you saying
10   that the value of AimJunkies used to be roughly six
11   million and then when the lawsuit was filed, after it
12   was filed it dropped to 1.9 million?
13   A.  Using a times revenue method of calculating the
14   valuation of the business, you use the same multiplier
15   through all of the calculations.
16   Q.  I see.  So the 2021 valuation is based purely on
17   the revenue --
18   A.  Yes.
19   Q.  -- brought in -- and just let me finish the
20   question.  The 2021 valuation is based purely on the
21   revenue brought in in 2021?
22   A.  20 -- late 2020 and early '21 up to the sale of
23   the site, 12 months.
24   Q.  Did you do anything to connect the drop of
25   revenue to the filing of the complaint?

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 90

1    A. Why would I?
2    Q. Well, is Phoenix Digital alleging that the filing
3  of the complaint is what reduced the value of the
4  website?
5    A. If you owned a business for almost ten years and
6  it's cruising along and all of a sudden it takes a dive,
7  it doesn't take a rocket scientist to figure out what's
8  going on.
9    Q. So, Mr. Schaefer, is Phoenix Digital alleging
10 that the drop of value in the website was caused by the
11 filing of the complaint?
12   A. Yes.
13   Q. Are there any other factors that contributed to
14 the dropping of the value of the website other than the
15 filing of the complaint?
16   A. No. Actually, in fact, during that time with
17 COVID the revenue should have gone up because you had
18 players that were locked down at home. Other
19 websites -- other websites during that time got a
20 drastic increase in revenue during that time.
21   Q. Right. But here Phoenix Digital is alleging the
22 drop in value between 2019 and 2021 is based purely on
23 the filing of the complaint, right?
24   A. Yes.
25   Q. And then you allege that it dropped from 1.9

Page 91

1  million to 7,000 in May 2020?
2    A. 7,000 was what we could get for it.
3    Q. What caused the drop from 1.9 million to 7,000?
4    A. The lawsuit.
5    Q. Anything else?
6    A. No.
7    Q. And the $7,000, that was not the times revenue
8  valuation, right?
9    A. No.
10   Q. That was the actual sale price to Blome
11 Entertainment?
12   A. Yes.
13   Q. And in 2021 was there any offer to purchase
14 AimJunkies website?
15   A. I'd have to go back and take a look at what we
16 wrote to what's his name out of LA. I don't remember
17 what year that was.
18   Q. Well, did Mr. Banek make more than one offer to
19 purchase the AimJunkies website?
20   A. We had a deal done, and he ended up backing out
21 of it at that time. I don't think he had the money to
22 pay for it.
23   Q. And my understanding is what you were saying is
24 you don't know what year that was in?
25   A. No. I'd have to take a look at the discovery

Page 92

1  documents that were put into the record when I sent that
2  e-mail or when Jeff sent the letter to the attorney
3  telling him that it had been sold.
4    Q. And all I'm asking here is, other than that
5  discussion that you're talking about with Mr. Banek --
6    A. No, no other discussion.
7    Q. Let me finish -- did Mr. Banek offer to purchase
8  the AimJunkies website more than once?
9    A. When we finally sold it, yes.
10   Q. Okay. So those are two times, right? Was there
11 a third timed that he offered to buy AimJunkies website?
12   A. No.
13   Q. Did Phoenix Digital do anything to try to connect
14 the loss of selling the Destiny 2 cheat software to the
15 decreased market value of AimJunkies website?
16   A. It wasn't relevant.
17   Q. Why wasn't it relevant?
18   A. It was $40,000.
19   Q. And so it --
20   A. $40,000 over two years, how's that going to kill
21 your website?
22   Q. Right. So the stopping selling the Destiny 2
23 cheat software did not impact the value of AimJunkies
24 website?
25   A. Minimal. $20,000 a year on a three-quarters of a

Page 93

1  million dollar a year business.
2    Q. Did anyone else at Phoenix Digital contribute to
3  producing the valuation of AimJunkies here in Exhibit
4  64?
5    A. No.
6    Q. Did you consult with any experts about the value
7  of AimJunkies website?
8    A. I think I know what my website's worth.
9    Q. But so it's just your valuation, right?
10   A. Yes.
11   Q. And how do you know that the complaint that
12 Bungie filed is what caused the value of the website to
13 decrease?
14   A. Because revenues precipitously fell after the
15 filing.
16   Q. Any other basis to believe that the filing of the
17 complaint was connected to the drop of the value of the
18 website?
19   A. No.
20   Q. So the lawsuit's filed in 2021, Phoenix Digital
21 alleges that dropped the value from 6 million to 1.9,
22 right?
23   A. Yes.
24   Q. Why would it drop another potentially $1.9
25 million if the lawsuit's already been filed?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 94

1    A. You have -- you know, the used car dealer can ask
2    for $20,000 for a car. But the only -- if you want to
3    sell the car, you're going to take what the market will
4    bear. And we wanted to sell the car.
5        Q. And I'm not quite sure I'm connecting the
6    analogy.
7        A. We wanted to sell the website.
8        Q. Okay.
9        A. We had one offer.
10       Q. Do you know what the time revenue value of the
11   website was in May of 2022?
12       A. I can give you a rough number. In 2022? For
13   what, the previous 12?
14       Q. Sure.
15       A. I gave that to you, didn't I?
16       Q. Well, I'm just wondering. You did the time
17   revenue for 2019, 2021, and I'm wondering what it was in
18   2022?
19       A. No, no, no. That -- that -- scroll down where
20   the numbers are -- oh, hold on a minute. The revenue
21   stayed pretty much flat from -- from that point on.
22       Q. When you say "from that point on," what point?
23       A. 2021.
24       Q. The revenue for AimJunkies ran flat from about
25   2021 through 2022?

Page 95

1        A. Yes. We didn't see anything that was going to
2    get us where we needed to go until this was over.
3        Q. As part of the valuation of AimJunkies website,
4    did you analyze the website traffic at all?
5        A. No.
6        Q. Do you know if the website traffic increased or
7    decreased after the lawsuit was filed?
8        A. It all depended on the press releases. Usually
9    there was a spike after whenever there was a filing.
10       Q. Was there a spike in sales as well?
11       A. No. Looky-loos.
12       Q. Would you say the consumers that purchased the
13   Destiny 2 cheat were sophisticated in general?
14       A. What does this have to do with the questions that
15   were presented to me to be up to speed on?
16       Q. I'm asking just generally whether you think the
17   consumers --
18       A. I don't know.
19       Q. Does Phoenix Digital know the general consumer
20   base for the Destiny 2 cheat?
21       A. I don't know.
22       Q. Does Phoenix Digital know their general customer
23   base for its cheats in general?
24       A. I don't know.
25       Q. For instance, does -- you know, does Phoenix

Page 96

1    Digital know if it's predominantly male purchases of the
2    Destiny 2 cheats?
3        A. Never did the demographics.
4        Q. And what about the age range of the consumers of
5    the cheats?
6        A. 8 to 80, deaf, dumb and crazy.
7        MR. MANN: At this point -- Mr. Marcelo, at
8    this point, I have no objection, do we want to switch
9    into a personal deposition or do you want to --
10       THE WITNESS: It sounds like we're there
11   already.
12       MR. MANN: Well, and I just want to make
13   sure that we're -- that it's clear just as a matter of
14   form. I'll be happy to go into a personal deposition.
15   It's your deposition, Christian. How do you want to
16   work it? Continue with 30(b)(6) or slide into something
17   different? What's your preference?
18       MR. MARCELO: I think this is fine how
19   we're -- how we're going. I was asking about Phoenix
20   Digital's customer base.
21       MR. MANN: Okay. Then if Mr. Schaefer's
22   testifying to his own personal knowledge and we
23   understand that, that's fine.
24       A. Well, that's why I say I don't know. Next
25   question.

Page 97

1        MR. MARCELO: I think now's probably a good
2    time to take a break because I'm sure that Betsy would
3    love a break.
4        VIDEOGRAPHER: The time 8:03 p.m. We're now
5    off the record.
6        (Recess taken.)
7        VIDEOGRAPHER: The time is 8:39 p.m. We are
8    back on the record.
9        Q. (BY MR. MARCELO) Mr. Schaefer, you understand
10   you're still under oath?
11       A. Yes.
12       Q. Let's go back for a second to Exhibit 60, the
13   terms of service for Phoenix Digital. What evidence
14   does Phoenix Digital have that that terms of service was
15   on the website in January of 2020?
16       A. I'd have to think about that answer. I don't
17   have an answer for that right now. I know what the
18   facts are. I don't have to guess. I don't have to
19   surmise. It's been on the site for years, and you can
20   ask anybody that's dealing with the site, whether it's
21   Jordan or Jeff or James or whoever, anybody you want to
22   bring in, and they're going to tell you all the same
23   thing because they know that's been there from day one.
24       MR. MANN: And I'll state for the record
25   that testimony under oath is in fact evidence.

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 98

1    Q.  (BY MR. MARCELO)  And, Mr. Schaefer, all I'm
2  asking is what evidence is there, whether it's
3  testimony, whether it's documents --
4    A.  Testimony.  I gave -- I gave you the documents
5  that are on the site.  To be honest with you, your
6  people have been there.  Is it the same one that's on
7  there now as what was there before?  You tell me.
8    Q.  When you say you gave the documents on the site,
9  what documents are you referring to?
10   A.  The one that you've got here in -- on the record.
11   Q.  Right.  Are there any other documents related to
12  this 2020 terms of service that Phoenix Digital
13  produced?
14   A.  They're as accessible as what yours are from
15  2019.
16   Q.  Mr. Schaefer, I want to focus on Phoenix
17  Digital's terms of service, if there's any other records
18  of that 2020 terms of service being on the AimJunkies
19  website in January of 2020?
20   A.  Not that I'm aware of unless it's on Wayback or
21  something like Wayback.
22   Q.  And you referenced an expert earlier, and I don't
23  want to get into anything privileged, I'm just wondering
24  if that expert is expected to testify in this trial?
25   A.  I can't tell you at this point.

Page 99

1    Q.  You don't know one way or another?
2    A.  We will have expert this time.
3    Q.  You will have a testify -- the answer is you will
4  have a testifying --
5         MR. MANN:  At this point, wait, I'm going to
6  object.  This is getting into attorney work product
7  matters and attorney-client privilege.  Mr. Schaefer,
8  you do not have to answer any questions regarding the
9  strategy that you're going to follow based on advice
10  that you may or may not have received from your counsel.
11        MR. MARCELO:  And I -- Mr. Mann, let me know
12  if you disagree.  I think with this specific question of
13  whether the expert that was referred to is intended to
14  be a testifying expert, just one way or another is not
15  privileged.
16        MR. MANN:  Did you say is intended to?
17        MR. MARCELO:  Right.  The expert --
18        MR. MANN:  No.  No.  If you're talking -- if
19  you're talking -- if you're asking about what our
20  intentions are, what procedures we intend to follow in
21  the course of this litigation, you are asking for
22  attorney work product.  We are not obliged to tell you
23  what our strategy is, what our intentions are and how
24  we're going to handle this litigation.  That is
25  privileged.  You do not have to answer.

Page 100

1         MR. MARCELO:  And, Mr. Mann, you're saying
2  that covers whether or not the expert that's been
3  referred to will testify at the trial or not?
4         MR. MANN:  Your all -- you're asking for
5  what our intentions are.  Have we identified anyone as a
6  testifying expert?
7         MR. MARCELO:  Well, and that's why I'm
8  clarifying.
9         MR. MANN:  No.  Can you read English?  Have
10  you seen us identify anyone as a testifying expert?
11        MR. MARCELO:  Mr. Mann, I'll remind you of
12  your own reminder of professionalism.
13        MR. MANN:  I'm asking you a question.  You
14  understand this.  Have we identified any testifying
15  experts?  That's a yes or no question, and it can be
16  answered by somebody who can read and understand
17  English.
18        MR. MARCELO:  No, not to our knowledge you
19  haven't identified --
20        MR. MANN:  Then, then, then you have no
21  business asking this question.  You're asking for what
22  our intentions are and how we're going to handle this
23  lawsuit.  We are not going to tell you our strategy or
24  what our intentions are.  You will find out what you're
25  entitled to in due course.  Simple as that.

Page 101

1    Q.  (BY MR. MARCELO)  Mr. Schaefer, is Phoenix
2  Digital contending that Bungie's trademark for the
3  Destiny 2 mark are invalid?
4    A.  That Bungie's Destiny 2 marks are invalid?
5    Q.  Right.
6    A.  Yes.
7    Q.  On what basis?
8    A.  The only ones that were valid was for Beyond
9  Light, and there were eight subscriptions sold in Beyond
10  Light.  Everything else is not valid.
11   Q.  And when you say not valid as to Phoenix -- or as
12  to Bungie's Destiny 2 marks --
13   A.  There were -- there were no trademarks -- if you
14  look at the date of the trademarks, they were not in
15  place at the time of the litigation or the time that we
16  were selling the cheat.
17        (Deposition Exhibit No. 65 was marked for
18        identification.)
19   Q.  (BY MR. MARCELO)  I'll drop into the chat what
20  will be marked as Exhibit 65.  Mr. Schaefer, do you see
21  this document?
22   A.  Yep.
23   Q.  This was attached to Bungie's Amended Complaint,
24  Exhibit 5.
25   A.  That's Destiny.  That's not Destiny 2.

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 102

1    Q.  And you see this registration number 4321315?
2    A.  Yes.
3    Q.  My question is:  Is Phoenix Digital alleging
4    that --
5    A.  We never made a Destiny cheat.
6    Q.  Mr. Schaefer, is Phoenix Digital contending that
7    this trademark registration is invalid?
8    A.  Yes.
9    Q.  Based on what?
10   A.  It's not Destiny 2.
11   Q.  Any other basis?
12   A.  No.
13   Q.  And there were several copyright registrations
14   listed in the complaint; do you recall that?
15   A.  Yeah.  Have you brought up the Destiny 2
16   trademark yet?  Can you bring that up, Christian?  We'll
17   take a look at that.
18   Q.  Mr. Schaefer, do you recall the copyright
19   registrations listed in the -- in Bungie's Amended
20   Complaint?
21   A.  Yes.
22   Q.  Is Phoenix Digital alleging that those copyright
23   registrations are invalid?
24   A.  You never put the dates in them.
25   Q.  Is that a yes?

Page 103

1    A.  You never put the dates in that filing.  You
2    conveniently left them out.
3    Q.  Mr. Schaefer, I'm asking whether Phoenix Digital
4    is contending that Bungie's copyright registrations are
5    invalid?
6    A.  I answered the question.
7    Q.  Was it a yes or a no?
8    A.  How can -- ask the question again.
9    Q.  Is Phoenix Digital contending that Bungie's
10   copyright registrations are invalid?
11   A.  Yes.
12   Q.  Based on what?
13   A.  They were acquired after we stopped selling the
14   cheat.
15   Q.  Any other basis?
16   A.  None at this time.
17   Q.  You had testified --
18        MR. MANN:  And I will point out for the
19   record that Mr. Schaefer is not an expert on the law and
20   he is expressing his lay opinions on -- or his lay
21   beliefs on these things.
22        THE WITNESS:  That is correct.
23   Q.  (BY MR. MARCELO)  You testified at an earlier
24   deposition that you had made the decision to sell the
25   Destiny 2 cheat, right?

Page 104

1    A.  Yes.
2    Q.  Is it safe to say that when you made that
3    decision you knew what Destiny 2 was?
4    A.  What do you mean what Destiny 2 was?
5    Q.  You knew Destiny 2 was a video game at the time
6    you made the decision to sell that cheat?
7    A.  Yes.
8    Q.  And you knew it was an online multi-player game?
9    A.  Yes.
10   Q.  And you knew that the Destiny 2 cheat --
11   A.  I knew that it was a single player and I knew
12   that it was an online player game.  And as you saw in
13   our terms of service, we sell for single player.
14   Q.  And you knew the Destiny 2 cheat was designed to
15   and meant to be used in connection with the Destiny 2
16   video game, right?
17   A.  Off line, yes.
18   Q.  And Bungie is not associated with the Destiny 2
19   cheat, right?
20   A.  No.  And we never claimed they are.
21   Q.  Bungie didn't sponsor the Destiny 2 cheat?
22   A.  And we never claimed they did.
23   Q.  Is that a no?
24   A.  We never claimed they did.
25   Q.  And I'm just asking a yes or no question.  Did

Page 105

1    Bungie ever sponsor the Destiny 2 cheat?
2    A.  No.
3    Q.  Did Bungie ever authorize the Destiny 2 cheat?
4    A.  We never claimed they did.
5    Q.  And, again, it's a yes or no question.  Did
6    Bungie ever authorize the Destiny 2 cheat?
7    A.  We didn't ask them for their permission to do our
8    own independent software.
9    Q.  And when Phoenix Digital was distributing the
10   cheat, they didn't think it was authorized by Bungie,
11   right?
12   A.  No.  We knew it wasn't authorized by Bungie.
13   It's fair use.
14   Q.  Phoenix Digital has various developers for
15   cheats, right?
16   A.  Yes.
17   Q.  And those developers let Phoenix Digital know
18   what they're working on?
19   A.  Have we not visited this already, Christian?
20   Q.  Well, let me lay some foundation for some
21   questions.  And the question I have to you is:  Do those
22   developers let Phoenix Digital know what they're working
23   on?
24   A.  Where's the foundation?  You just said you were
25   going to lay a foundation and you asked the same

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 106

1  question again.
2      Q.  This -- this is foundation, Mr. Schaefer.
3      A.  No, that's not foundation.  That's the same
4  question you asked me just with two different words in
5  it.  Try again.
6      Q.  Mr. Schaefer -- Mr. Schaefer, do the developers
7  let Phoenix Digital know what cheats they're working on?
8      A.  Again, we have already covered this in a previous
9  deposition.
10     Q.  Are you refusing to answer that question?
11         THE WITNESS:  Phil.
12         MR. MANN:  Well, I'm going to say I think
13  this is going over the same ground.  You know, it will
14  help our claim for attorney's fees to say that they were
15  wasting time and so forth and why not go ahead and
16  answer it again.  You've already explained how Phoenix
17  Digital works ad nauseam.  Say it again.  Some people
18  are apparently hard of hearing.
19         THE WITNESS:  No.  He's trying to catch me
20  in a lie.
21     Q.  (BY MR. MARCELO)  Mr. Schaefer, do the developers
22  let Phoenix Digital know what they're working on?
23         MR. MANN:  I'm going to object to
24  foundation.  First of all, it's -- you know, that the
25  developers --

Page 107

1      A.  What does this have to do with copyright,
2  Christian?  What does this have to do with fair use?
3  Where's the relevance here in whether they let us know
4  or not?  Where's the relevance?
5      Q.  (BY MR. MARCELO)  Mr. Schaefer, I'm going to ask
6  the question --
7      A.  Not relevant.  I'm not answering the question.
8      Q.  You're refusing to answer --
9         MR. MANN:  I'm also -- I'm going to point
10  out the question has been asked and answered before.
11     A.  Yeah, I'm not answering the question.  I've had
12  enough.
13         MR. MANN:  Okay.  It's going to be -- it's
14  going to turn on the deposition transcripts and the
15  testimony at the arbitration which is a matter of
16  record, the words are written down, it's in black and
17  white, they say what they say.  Somebody's right and
18  somebody's wrong.  Mr. Schaefer, if you believe that
19  you're right on this thing, stick with your answer.  If
20  there's anything you want to change, now's your
21  opportunity to change it.
22         My recollection is Mr. Marcelo and others have
23  already asked this question.  It's already been
24  answered, but I'm not the witness, you are.
25     Q.  (BY MR. MARCELO)  So, Mr. Schaefer, are you

Page 108

1  refusing to answer the question of whether Phoenix
2  Digital's developers inform Phoenix Digital of what
3  cheats they're working on?
4      A.  I don't remember.
5      Q.  Do you recall if they sometimes let Phoenix
6  Digital know what cheats they're working on?
7      A.  I don't remember.
8      Q.  Specifically as to the Destiny 2 cheat, Mr. May
9  told you he was working on a cheat for Destiny 2, right?
10     A.  No.
11     Q.  Mr. Banek informed Phoenix Digital he was
12  developing a cheat for the Destiny 2, right?
13     A.  Yes.
14     Q.  Did any other developers inform Phoenix Digital
15  they were developing a cheat for Destiny 2?
16     A.  No.
17         MR. MANN:  And, obviously, Mr. Marcelo knows
18  this because he's already asked these questions before,
19  but that's another matter.
20     Q.  (BY MR. MARCELO)  Is Phoenix Digital currently
21  providing services for Mr. Banek?
22     A.  We process payments.  That's standalone from the
23  website.  That's all we're doing is processing payments
24  for him.
25         MR. MANN:  And, again, this is a matter of

Page 109

1  further inquiry previously.  This is in the record.  You
2  know it.
3      A.  No.  The status -- Phil --
4      Q.  (BY MR. MARCELO)  What I'm asking you is has --
5      A.  Hold on, Christian.  The status has changed.  The
6  last time you asked this question we were in the back
7  end of the website and processing payments.  That's --
8  that status has changed to where we're not in the
9  website in any way, shape or form.
10     Q.  And that is why we are asking these questions.
11     A.  And that's why I'm answering them.
12     Q.  Now, so Phoenix Digital processes payments for
13  AimJunkies.com right now, right?
14     A.  That is correct.
15     Q.  And is it the same process we discussed before
16  where if someone purchases a cheat it goes to a Phoenix
17  Digital account?
18     A.  Yes.
19     Q.  And then Phoenix Digital distributes that to a
20  cheat developer?
21     A.  And to Banek.
22     Q.  And then what portion does Phoenix Digital
23  retain?
24     A.  10 percent.
25     Q.  Does Mr. Banek still only accept payment in

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 110

1   bitcoin?
2       A.  Yes.
3       Q.  And so is there still a Phoenix Digital bitcoin
4   wallet?
5       A.  There never was a Phoenix Digital bitcoin wallet.
6       Q.  What bitcoin wallet -- strike that.  Who owns the
7   bitcoin wallet that pays Mr. Banek?
8       A.  I don't remember.
9       Q.  But there is a bitcoin wallet that's operated by
10  Phoenix Digital that makes payments to Mr. Banek, right?
11      A.  I have to think about that.  I don't remember.
12      Q.  Well, how does Mr. Banek receive payment?
13      A.  Through bitcoin.
14      Q.  Who pays Mr. Banek?
15      A.  I pay Mr. Banek.
16      Q.  And how do you transfer bitcoin to Mr. Banek?
17      A.  Phoenix Digital doesn't have a wallet.  The
18  website has a wallet, I believe, and -- and I got to
19  think about that one a little bit.  I don't know whose
20  fucking wallet that is, but whatever.  This will be a
21  good one in court.
22      Q.  But there's a wallet that Phoenix Digital has
23  control of, right?
24      A.  Yes.
25      Q.  And it's used to pay Mr. Banek, right?

Page 111

1       A.  Yeah.  I don't know whose wallet it is.
2       Q.  And when you say you don't know whose wallet it
3   is, does that mean you don't know who created the
4   wallet?
5       A.  I don't know who created the wallet.  It's not
6   one of our personal wallets.
7       Q.  Who has access to that wallet?
8       A.  I do.
9       Q.  Does anyone else have access to that wallet?
10      A.  No.
11      Q.  How long have you been using that bitcoin wallet?
12      A.  For 20 days.
13      Q.  And you also have a personal bitcoin wallet,
14  right?
15      A.  No.
16      Q.  You previously had a bitcoin wallet?
17      A.  Yes.
18      Q.  When did you get rid of that?
19      A.  Last year.
20      Q.  What is the bitcoin wallet address of the wallet
21  that's used to pay Mr. Banek?
22      A.  I have no idea.
23      Q.  But you would have access to look it up, wouldn't
24  you?
25      A.  I would have to ask Banek what he's taking

Page 112

1   payments on.
2       Q.  But you just said you have control of the wallet
3   that makes payments to Banek, right?
4       A.  Yes.
5       Q.  So I'm wondering, you'd be able to look up the
6   wallet address of that wallet, right?
7       A.  I do not have access to that wallet.
8       Q.  You don't have access to the wallet that pays Mr.
9   Banek?
10      A.  No.
11      Q.  But you make the payments from that wallet to Mr.
12  Banek?
13      A.  Yes.
14      Q.  How do you not have access to it?
15      A.  Because I don't.
16      Q.  How do you make payments to Mr. Banek from a
17  wallet you have no access?
18      A.  Oh, my God.  You've already asked this question.
19      Q.  How do you make payments to Mr. Banek from a
20  wallet that you can't access?
21          MR. MANN:  Go ahead and answer it again if you
22  can.
23      A.  The money gets sent to a cold wallet and the cold
24  wallet gets sent to Banek, what's in the cold wallet.
25  The cold wallet is destroyed every month and it's sent

Page 113

1   to Banek.
2       Q.  (BY MR. MARCELO)  You said the money gets sent to
3   a cold wallet.  That's money from a consumer purchasing
4   a cheat?
5       A.  Yes.
6       Q.  Okay.  The cold wallet, is that the wallet that
7   you use to send money to Mr. Banek?
8       A.  Yes.
9       Q.  And how do you actually send the money from the
10  cold wallet to Mr. Banek?
11      A.  It's bitcoin.
12      Q.  Don't you have to start a transaction?
13      A.  Oh, my God.  Do you deal in bitcoin at all?
14      Q.  Mr. Schaefer, I'm asking for you to explain it to
15  me.  Walk me through how you send money to Mr. Banek
16  from the cold wallet.
17      A.  I don't know.  I really don't know.
18      Q.  You -- you do not know how you send money to Mr.
19  Banek but you do it every month?
20      A.  Yes, I do.
21      Q.  You need Mr. Banek's wallet ID to send him money
22  for bitcoin, right?
23      A.  Yes.
24      Q.  What's Mr. Banek's --
25          MR. MANN:  I'm going to raise an objection

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 114

1  at this point. What does this have to do with any of
2  the counterclaims and why couldn't these questions have
3  been asked before? In fact, you have asked before.
4      THE WITNESS: They're trying to sew the
5  fucking groundwork when it comes time to chase the money
6  down when they think they're going to get some money.
7  That's what this is about.
8      MR. MANN: Mr. Marcelo, what does this have
9  to do with the counterclaims and what -- how is this any
10 different than questions you did not already ask
11 previously? This is a question to you, a serious
12 question to you.
13     THE WITNESS: It's the exact same questions
14 he asked three months ago.
15     MR. MANN: Exactly. Exactly.
16     MR. MARCELO And, Mr. Mann --
17     MR. MANN: No, we covered -- Mr. Marcelo, we
18 covered this before. This -- you're going over the same
19 ground you covered three times before. How -- what does
20 this have to do with any of the counterclaims?
21     MR. MARCELO: This deposition is not limited
22 to the counterclaims.
23     MR. MANN: You may say that. You may say
24 that. I don't know. Dave, it's up to you. You want to
25 take your chances with Judge Zilly?

Page 115

1      THE WITNESS: I don't know what to give him.
2  I don't know what he wants.
3      MR. MANN: He doesn't know what he wants.
4  Q. (BY MR. MARCELO) Do you know --
5      THE WITNESS: No, he knows exactly what he
6  wants and I know what he wants.
7      MR. MANN: Well, my -- my question is this:
8  Do you want to take it up with the judge?
9      THE WITNESS: I don't have the answers
10 to his questions.
11 Q. (BY MR. MARCELO) I'm going to ask my question
12 again.
13 A. Sure. Go ahead and ask again.
14 Q. You have Mr. Banek's bitcoin wallet address?
15 A. No, I do not.
16 Q. When you send him money, you have his bitcoin
17 wallet address, right?
18     MR. MANN: Objection. Asked and answered.
19 A. Yes.
20 Q. (BY MR. MARCELO) And then -- but you have never
21 retained that bitcoin wallet address?
22 A. No. But I think I've already said that in
23 previous depositions.
24     MR. MANN: You have several times. Mr.
25 Marcelo was on thin ice asking the exact same

Page 116

1  questions --
2  A. My advice to you, Mr. Marcelo, is to move on.
3  Otherwise, we're going to stop here.
4      MR. MANN: We'll be happy to answer any
5  questions that relate to the counterclaims.
6      MR. MARCELO: And again, Mr. Mann, that is
7  certainly not the scope of the deposition.
8      MR. MANN: What -- what is the scope of this
9  deposition? I was on the -- I was on the phone with Mr.
10 Zilly -- or Judge Zilly, I heard what he said. You tell
11 me what do you think the scope of this deposition is?
12     MR. MARCELO: As Judge Zilly said, there's
13 no limitations on counterclaims or the claims and to try
14 to --
15     MR. MANN: Oh, the counterclaims. He did
16 not say "or the claims." He did say, yes, you can talk
17 about the counterclaims. He also said I expect you
18 people to be professional and not to go over familiar
19 ground, don't ask the same questions.
20 A. And what part of that, Christian --
21     MR. MANN: And I said -- and I said -- and I
22 said if this becomes abusive, I want to retain the right
23 to come back to him and complain if the questioning
24 becomes abusive. And he said you're all professionals,
25 I assume it will not become abusive. I think we are

Page 117

1  crossing over into the line -- we're crossing the line
2  into abusiveness.
3      MR. MARCELO: You're certainly allowed to
4  take it up with -- Phil, you're certainly allowed to
5  take it up with Judge Zilly if you'd like to.
6      MR. MANN: Well, I want -- I'm asking you a
7  simple question: Why couldn't you have asked these
8  questions when you deposed Mr. Schaefer twice before and
9  when you examined him during the hearing at the
10 arbitration?
11     THE WITNESS: He did ask these questions.
12     MR. MANN: I know he did. I'm asking him --
13 it's a rhetorical question, why couldn't he ask these
14 questions before, what has changed?
15     MR. MARCELO: Are you done?
16     THE WITNESS: Sure am.
17 Q. (BY MR. MARCELO) Has Mr. Banek ever asked you
18 not to reveal his bitcoin wallet address in this
19 litigation?
20 A. Never had a conversation.
21 Q. You never had a conversation about the bitcoin
22 wallet?
23 A. No.
24 Q. You've had a conversations with Mr. Banek, right?
25 A. Absolutely.

Bungie, Inc. vs Aimjunkies.com, et al.                30(b)(6) David Schaefer 03/20/2023

Page 118

1    Q.  I've dropped into the chat -- I believe this is
2    Exhibit 66.
3         MR. MARCELO:  Betsy, please let me know if
4    that's not right.
5         (Deposition Exhibit No. 66 was marked for
6         identification.)
7    Q.  (BY MR. MARCELO)  I'm sharing the screen to show
8    what's been marked as Exhibit 66.  This is a screen shot
9    from the AimJunkies website with a date 3/19/23.  You
10   see that?
11   A.  Yep.
12   Q.  You recognize this as a screen shot of AimJunkies
13   website?
14   A.  I have no idea.
15   Q.  There's a post listed March 24th, 2017.  You see
16   that?
17   A.  Okay.
18   Q.  And it's by admin.  Do you see that?
19   A.  Okay.
20   Q.  In 2017 who had control of the AimJunkies admin
21   account?
22   A.  How do you know that that date is factually
23   correct?
24   Q.  Well, I'm asking you in 2017 who had control of
25   the admin AimJunkies account?

Page 119

1         MR. MANN:  Hold on.  Hold on.  Objection.
2    What the hell does this have to do with counterclaims?
3         THE WITNESS:  He's bringing in a page from
4    '23 and then asking me about something that could have
5    been modified that I have no idea.
6         MR. MANN:  This line --
7         THE WITNESS:  -- fucking clown that you had
8    in and asking him about the fucking loader in the site
9    when I hadn't owned it for six months and you want to
10   come in and say that he's legitimate, Guris.  The
11   clown -- you sell the car and then six months later you
12   want to tell me how the car works.
13        MR. MANN:  My -- my objection is what does
14   this have to do with the counterclaims?  You asked this
15   line of questions during the October 28th deposition of
16   Mr. Schaefer.  Why couldn't this have been asked before?
17   In fact, it could have been asked before.  You're going
18   over familiar ground.
19        My question to you, Mr. Marcelo, is what does
20   this have to do with the counterclaims or any matters
21   that could not have been asked for and in fact were
22   asked for in October of last year?
23        MR. MARCELO:  Are you done with your
24   objection?
25        MR. MANN:  I want an answer.

Page 120

1    A.  I'm not answering your question.
2         MR. MANN:  I want an answer.
3    Q.  (BY MR. MARCELO)  Mr. Schaefer --
4         MR. MANN:  And if you don't answer, that's
5    sufficient because it means you can't, you don't have an
6    answer.
7    Q.  (BY MR. MARCELO)  Mr. Schaefer, in 2017 who had
8    control of the AimJunkies admin account?
9    A.  I have no idea.
10   Q.  Whoever had --
11        MR. MANN:  Mr. -- Mr. -- Mr. Marcelo, are
12   you going to continue going over familiar ground or do
13   you have any further questions regarding the
14   counterclaims?
15   Q.  (BY MR. MARCELO)  Who had control of the admin
16   account when Phoenix Digital owned AimJunkies website?
17        MR. MANN:  Asked and answered.
18   A.  I don't remember.
19   Q.  (BY MR. MARCELO)  Say that again, Mr. Schaefer?
20   A.  I don't remember.
21        MR. MANN:  Objection.  Asked and answered.
22   Q.  (BY MR. MARCELO)  Do you recognize this post?
23   A.  Nope.
24   Q.  Do you know who wrote this post?
25   A.  No idea.

Page 121

1    Q.  Do you know if someone at Phoenix Digital wrote
2    this post?
3    A.  Are you aware that you can go into the database
4    and change anything in any post at any time?  I can't
5    speak to a website that I haven't owned for almost a
6    year.  You're asking me to comment on a website that I
7    haven't owned for a year that you can go in and modify
8    anything in the database.  This is merely speculation on
9    your part.
10        MR. MANN:  And not to mention it's matters
11   that could have been and were in fact addressed several
12   months ago.
13        THE WITNESS:  He's trying to do revision of
14   history.  Maybe you should have Guris take a look at
15   this and tell you whether or not the data base can be
16   changed and anything in there including the dates can be
17   changed.
18   Q.  (BY MR. MARCELO)  So, Mr. Schaefer, fair to say
19   you don't know who wrote this post?
20   A.  I have no fucking clue.
21        MR. MANN:  And he's already asked -- he's
22   already answered that question.  What part of I don't
23   know is difficult to understand, Mr. Marcelo?  You do in
24   fact understand English I trust.
25        THE WITNESS:  No.  He understands that he

Bungie, Inc. vs Aimjunkies.com, et al.                    30(b)(6) David Schaefer 03/20/2023

Page 122

1  wants to take 85 bites at the apple and hopes that he
2  gets something that he's looking for.  It's great video
3  that you can play in court.  And, you know what, I don't
4  care.  It's four and a half million, Christian.  You're
5  not getting that.  Come on, Barker, tell your --
6      Q.  (BY MR. MARCELO)  Are you referring to the
7  arbitration award?
8      A.  Tell your boss to get off of his horse because
9  where's this going to go?
10     Q.  What do you mean by that?
11     A.  Just what I said.  Do really think, James, that
12  this is going to fix your problem?
13     Q.  When Phoenix Digital owned AimJunkies you used
14  resellers of its cheats, right?
15     A.  We've already covered this.
16     Q.  Is that right?
17     A.  I don't remember.
18     Q.  You don't recall whether AimJunkies used
19  resellers?
20     A.  No.
21     Q.  Do you know if the resellers agreed to the terms
22  of service?
23     A.  I have no -- I don't remember.
24     Q.  Does Phoenix Digital have any requirements that
25  resellers provide a terms of service to the consumers

Page 123

1  they were reselling cheats to?
2      A.  I don't remember.  And what's the relevance?  You
3  didn't purchase it through a reseller.  You purchased it
4  directly.  Martin Zeniu.
5          MR. MARCELO:  Let's take a quick break.
6          THE WITNESS:  Hold on a minute.  James, when
7  this is done, I will go to the media.  Unless we cut a
8  deal, I will go to the media and tell them exactly what
9  you guys have done.  That's illegal.
10     Q.  (BY MR. MARCELO)  Are you referring to --
11     A.  No deal, no gag.
12     Q.  Are you referring to something aside from the
13  counterclaims?
14     A.  I'm talking about all of it.
15     Q.  What do you mean by all of it you'll go to the
16  media?
17     A.  Just exactly what I said, Christian.  When your
18  30(b)(6) guy says that he has not a single shred of
19  evidence that we bypassed their anti-cheat or that we
20  violated your copyright, that will go to the media.
21     Q.  You're not referring to any confidential
22  information, right?
23     A.  No.  I'm talking about your actual testimony by
24  your 30(b)(6) guy.
25         MR. MANN:  And I will point out in this

Page 124

1  case, this is going to be tried in public before a jury,
2  no confidentiality in federal court litigation.
3      A.  Your guy testified that they have no evidence
4  that we violated copyright or that we bypassed your
5  anti-cheat.  And your e-mails prove you never even had
6  an anti-cheat.  That will go to the media because it
7  will come out in court.
8          MR. MARCELO:  Okay.  Let's take a quick
9  break.
10         VIDEOGRAPHER:  The time is 9:11 p.m.  We're
11  now off the record.
12             (Off the record.)
13             (Recess taken.)
14         VIDEOGRAPHER:  The time is 9:24 p.m. and we
15  are back on the record.
16     Q.  (BY MR. MARCELO)  Mr. Schaefer, you understand
17  you're still under oath?
18     A.  Yes.
19     Q.  Let's talk about the bitcoin payments to Mr.
20  Banek?  Previously you testified in October that after
21  you would make payments to Mr. Banek you would shred his
22  bitcoin wallet ID, right?
23     A.  Yes.
24     Q.  Have you continued that practice since that time?
25     A.  Yes.

Page 125

1      Q.  Leading all the way up to the present?
2      A.  Yes.
3      Q.  Have you destroyed any other records that might
4  help identify Mr. Banek?
5          MR. MANN:  Object to the form of the
6  question.
7      A.  Mr. Banek's not in this litigation.
8      Q.  (BY MR. MARCELO)  Mr. Schaefer, have you
9  destroyed any other documents that might reveal the
10  identity of Mr. Banek?
11         MR. MANN:  Objection to the form.
12  Foundation.
13     A.  You guys are trying hard on that one.  Good luck.
14     Q.  (BY MR. MARCELO)  Mr. Schaefer, can you answer
15  the question?
16     A.  What was the question again?
17     Q.  Have you destroyed any other records that might
18  help identify the identity of Mr. Banek?
19         MR. MANN:  Object to form.  Foundation.
20     A.  I don't understand.
21     Q.  (BY MR. MARCELO)  Mr. Schaefer --
22         THE WITNESS:  I'd go more towards relevance.
23     Q.  (BY MR. MARCELO)  Mr. Schaefer, yes or no?
24         MR. MANN:  And not to mention this is new
25  ground, got nothing to do with the counterclaim.  Mr.

Bungie, Inc. vs Aimjunkies.com, et al.                 30(b)(6) David Schaefer 03/20/2023

Page 126

1  Marcelo was out of bounds here. But, Mr. Schaefer, try
2  to humor him. Answer to the extent you can.
3      A. I don't remember.
4      Q. (BY MR. MARCELO) Are you aware of Mr. May's
5  counterclaims?
6      A. Yes.
7      Q. And you're aware that he's alleging that Bungie
8  accessed certain files on his computer?
9          MR. MANN: At this point I'm going to ask
10 are you asking Mr. Schaefer personally or asking as the
11 30(b)(6) designee?
12         MR. MARCELO: As the 30(b)(6) designee.
13         MR. MANN: Well, as the 30(b)(6) designee,
14 Mr. May is not part of Phoenix Digital. Therefore,
15 Phoenix Digital has no information regarding Mr. May's
16 counterclaims. If you want to ask Mr. Schaefer
17 personally what he may or may not know about that, you
18 may do so. But the legal position we are taking is and
19 we've been taking since day one is Mr. May is not a part
20 of Phoenix Digital, he's not an employee of Phoenix
21 Digital, he's not an owner of Phoenix Digital, he is not
22 an officer or director of Phoenix Digital; therefore,
23 Phoenix Digital does not know anything regarding Mr.
24 May's counterclaims. If you want to ask Mr. Schaefer
25 what he knows personally, have at it.

Page 127

1          MR. MARCELO: Ms. Decater, can you re-read
2  the last question I asked?
3          (The Reporter read from page 126, line 7 to page
4  126, line 8.)
5          MR. MANN: And the keyword there is you're.
6  Are you referring to Phoenix Digital or are you
7  referring to Mr. Schaefer?
8      Q. (BY MR. MARCELO) I'll rephrase.
9          Is Phoenix Digital or anyone at Phoenix Digital
10 aware that Mr. May is alleging that Bungie accessed
11 files on Mr. May's computer?
12     A. No.
13     Q. No one at Phoenix Digital has knowledge that Mr.
14 May has alleged those counterclaims?
15     A. No.
16     Q. Do you know if Phoenix Digital owns any of the
17 files on Mr. May's computer?
18     A. I have no idea.
19     Q. Did Phoenix Digital ever provide files to Mr.
20 May?
21     A. No.
22         MR. MARCELO: Okay. That's all my
23 questions.
24         MR. MANN: Does that mean the deposition is
25 concluded?

Page 128

1          MR. MARCELO: It is.
2          MR. MANN: Okay. Thank you. We have no
3  cross-examination and we will reserve signature.
4          VIDEOGRAPHER: Okay, Betsy. Do you need any
5  other copy orders on the record?
6          THE COURT REPORTER: Sure. That works.
7          VIDEOGRAPHER: Okay. All right. And will
8  there be additional video requests other than Counsel
9  Marcelo?
10         MR. MANN: Okay. Just to make the record
11 clear, we are not, I say again not, asking for a
12 transcript and we are not, I say again not, asking for a
13 copy of the video on this.
14         VIDEOGRAPHER: Okay. The time is 9:29 p.m.
15 We are now off the record.
16         (Deposition concluded at 9:30 p.m. )
17         (Signature was reserved.)
18              * * * * *
19
20
21
22
23
24
25

Page 129

1              REPORTER'S CERTIFICATE
2      I, BETSY E. DECATER, the undersigned Certified Court
3  Reporter, pursuant to RCW 5.28.010 authorized to
4  administer oaths and affirmations in and for the State
5  of Washington, do hereby certify that the sworn
6  testimony and/or proceedings, a transcript of which is
7  attached, was given before me at the time and place
8  stated therein; that any and/or all witness(es) were
9  duly sworn to testify to the truth; that the sworn
10 testimony and/or proceedings were by me stenographically
11 recorded and transcribed under my supervision, to the
12 best of my ability; that the foregoing transcript
13 contains a full, true, and accurate record of all the
14 sworn testimony and/or proceedings given and occurring
15 at the time and place stated in the transcript; that a
16 review of which was requested; that I am in no way
17 related to any party to the matter, nor to any counsel,
18 nor do I have any financial interest in the event of the
19 cause.
20     WITNESS MY HAND and DIGITAL SIGNATURE this 27th day
21 of March, 2023.
22 _____
23 BETSY E. DECATER, RPR
   Washington Certified Court Reporter, CCR 3109
24
25

# EXHIBIT M

THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BUNGIE, INC., a Delaware corporation,<br><br>Plaintiff<br><br>v.<br><br>AIMJUNKIES.COM, a business of unknown classification; PHOENIX DIGITAL GROUP LLC, an Arizona limited liability company; JEFFREY CONWAY, an individual; DAVID SCHAEFER, an individual; JORDAN GREEN, an individual; and JAMES MAY, an individual,<br><br>Defendants. | Cause No. 2:21-cv-0811 TSZ<br><br>**DEFENDANT PHOENIX DIGITAL GROUP LLC'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION NOS.  1-8, 9-11, 12, 16, 17, 20, 23, 26, 27, 28 AND 30** |

Pursuant to Federal Rule of Civil Procedure 26, 33 AND 34, Defendant Phoenix Digital Group LLC ("Phoenix Digital") hereby supplements its responses to Plaintiff Bungie, Inc.'s  First Set of Requests for Production as follows:

**<u>GENERAL OBJECTIONS</u>**

Phoenix Digital's General Objections set out in its RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION NOS. 1-30 served July 25, 2022 are incorporated as if set out fully herein.

Phoenix Digital Response to First Set of RFPs
Cause No. 21-CV-0811-TSZ

Page 1

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

**REQUEST FOR PRODUCTION NO. 27**:

Produce all communications with James May.

**RESPONSE:**

Phoenix Digital will produce relevant, non-privileged documents if, and to the extent, any exist.  At present, no such documents are believed to exist.

**SUPPLEMENTAL RESPONSE:**

After a reasonably diligent search, no documents in Phoenix Digital's possession, custody or control responsive to this request have been found.

**REQUEST FOR PRODUCTION NO. 28**:

Produce documents sufficient to identify all bank accounts, financial accounts, payment processor accounts, or any other source(s) of funds or accounts owned by Phoenix Digital that are or have been used to process and/or store funds related to the sale of the Cheat Software.

**RESPONSE:**

Phoenix Digital objects to this request as being irrelevant to any issue in presently before the Court.  Subject to and without waiver of the foregoing objection, certain records responsive to this request have already been made available to Plaintiff via PayPal and otherwise.

**SUPPLEMENTAL RESPONSE:**

Records from PayPal reflecting information responsive to this request have now been produced by PayPal and are in Plaintiff's possession.  Records from Stripe responsive to this request are being produced contemporaneously herewith.

After a reasonably diligent search, no other documents in Phoenix Digital's possession, custody or control responsive to this request have been found.

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

**REQUEST FOR PRODUCTION NO. 30**:

Produce documents sufficient to show any email address(es), IP address(es), and Internet Service Provider(s) ("ISP") used by Phoenix Digital, and anyone employed by, acting at the direction of, or otherwise associated with Phoenix Digital, including but not limited to David Schaefer, Jeffrey Conway, Jordan Green, Warren Apenzeller, and James May.

**RESPONSE:**

Phoenix Digital objects to this request as being irrelevant to any issue in presently before the Court and as calling for personal information not relevant to any issue before this Court.

**SUPPLEMENTAL RESPONSE:**

Records from PayPal reflecting information responsive to this request have now been produced by PayPal and are in Plaintiff's possession.  Records from Stripe responsive to this request are being produced contemporaneously herewith.

After a reasonably diligent search, no other documents in Phoenix Digital's possession, custody or control responsive to this request have been found.

Dated September 2, 2022.

*/s/ Philip P. Mann*
Philip P. Mann, WSBA No: 28860
**Mann Law Group PLLC**
403 Madison Ave. N. Ste. 240
Bainbridge Island, Washington  98110
Phone (206) 436-0900
phil@mannlawgroup.com
Attorneys for Defendants

Phoenix Digital Response to First Set of RFPs
Cause No. 21-CV-0811-TSZ                     Page 12

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

## __CERTIFICATE OF SERVICE__

2

3      I hereby certify that on September 2, 2022, I caused the foregoing document to be

4   electronically mailed to counsel of record as follows:

5   WRava@perkinscoie.com

6

7   JDini@perkinscoie.com

8   CMarcelo@perkinscoie.com

9                                              *s/ Philip P. Mann*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Phoenix Digital Response to First Set of RFPs
Cause No. 21-CV-0811-TSZ                         Page 13

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

EXHIBIT N

THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BUNGIE, INC., a Delaware corporation,<br><br>Plaintiff<br><br>v.<br><br>AIMJUNKIES.COM, a business of unknown classification; PHOENIX DIGITAL GROUP LLC, an Arizona limited liability company; JEFFREY CONWAY, an individual; DAVID SCHAEFER, an individual; JORDAN GREEN, an individual; and JAMES MAY, an individual,<br><br>Defendants. | Cause No. 2:21-cv-0811 TSZ<br><br>**DEFENDANT PHOENIX DIGITAL GROUP LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES NOS.  1-7** |

Pursuant to Federal Rule of Civil Procedure 26, 33 AND 34, Defendant Phoenix

Digital Group LLC ("Phoenix Digital") hereby responds to Plaintiff Bungie, Inc.'s First Set of

Interrogatories Nos. 1-7 as follows:

## GENERAL OBJECTIONS

Phoenix Digital makes the following objections to Plaintiff's First Set of Requests For

Production of Documents:

1.      To the extent Plaintiff's definitions and instructions are inconsistent with the

appropriate Federal Rules of Civil Procedure, such as Fed. R. Civ. P. 26 and 34, Phoenix

Digital will rely upon the Federal Rules of Civil Procedure, the Local Rules and governing

case law with respect to the subject definitions and instructions and responses.

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ

Page 1

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

2.      Where a request includes words or concepts indicative of a legal conclusion, Phoenix Digital does not represent or concede that such legal conclusions or concepts apply.

3.      In those instances where the responses to Plaintiff's document requests can be derived from the records of Phoenix Digital or from an examination, audit or inspection of such records, and the burden of deriving or ascertaining the response is substantially the same for Plaintiff and Phoenix Digital, Phoenix Digital will specify the records from which a complete response may be ascertained and afford Plaintiff's counsel a reasonable opportunity to audit, inspect and copy such records or provide categorized copies of such records in accordance with Federal Rules of Civil Procedure 33(c).

4.      The absence of Phoenix Digital's standing on objections should not be construed as agreement that particular documents exist or will be produced.  (Colloquially: "The absence of 'no' does not mean 'yes.'").

5.      Certain categories are premature since they request Phoenix Digital to produce documents it does not necessarily have right now, but may or will have in the future (e.g., documents on which Phoenix Digital will rely for particular issues, exhibits Phoenix Digital will use, witnesses and witness lists, documents relating to damages, etc.).  Phoenix Digital will comply with such requests through seasonal supplementation of its document production or through reliance on documents produced by others.

6.      To the extent any document request calls for documents or things that are governed by contractual confidentiality provisions against disclosure, Phoenix Digital objects to providing any such documents or things in any manner that would contravenePhoenix Digital's obligations absent a Court order.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**:

Identify all person(s) involved in the creation, development, modification, updating, and/or patching of the Cheat Software.

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                                    Page 2

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

**RESPONSE:**

Andreas Banek; Communications through public (free channel) TeamSpeak; maxsso@bk.ru.

**INTERROGATORY NO. 2**:

Describe all facts concerning Phoenix Digital's decision to create, develop, and sell the Cheat Software, including but not limited to the person(s) involved in those decisions and the reason Phoenix Digital decided to sell the Cheat Software.

**RESPONSE:**

Phoenix Digital does not create, develop or sell the "Cheat Software" but instead distributes products created by others.  Answering further, Phoenix Digital identifies David Schaefer.

**INTERROGATORY NO. 3**:

Describe all facts relating to the creation, development, modification, updating, and/or patching of the Cheat Software.

**RESPONSE:**

See Responses to Interrogatories Nos. 1 and 2 above.  Answering further, Phoenix Digital does not create, develop, modify, update and/or patch the "Cheat Software."

**INTERROGATORY NO. 4**:

Describe all facts relating to how each feature of the Cheat Software functions, including but not limited to how the Cheat Software copies, modifies, or otherwise interacts with or affects the Destiny 2 software code.

**RESPONSE:**

The "Cheat Software" at issue here does not copy, modify, interact with or otherwise affect the Destiny 2 software code.  Furthermore, it is believed that the answer to this interrogatory can be ascertained from records and documents already in the possession of Bungie.

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                          Page 3

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

**INTERROGATORY NO. 7**:

Identify all bank accounts, financial accounts, payment processor accounts, or any other source(s) of funds or accounts owned by Phoenix Digital that are or have been used to process  and/or store funds related the sale of the Cheat Software.

**RESPONSE:**

Phoenix Digital objects to this Interrogatory as being irrelevant to any of the issues before the Court in this case and as calling for personal information not relevant to any issue before the Court in this matter.

Dated July 25, 2022.

_/s/ Philip P. Mann_____

Philip P. Mann, WSBA No: 28860
**Mann Law Group PLLC**
403 Madison Ave. N. Ste. 240
Bainbridge Island, Washington  98110
Phone (206) 436-0900
phil@mannlawgroup.com
Attorneys for Defendants

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                    Page 5

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

**Verification**

2

3            **AS TO RESPONSES TO INTERROGATORIES:**

4            David Schaefer, being duly sworn, deposes and says that he is the President of

5    Phoenix Digital Group LLC, Defendant in the above-captioned action, that he has read the

6    foregoing responses by him subscribed, that said responses were prepared with the assistance

7    of counsel upon which he has relied and is based on his experiences and knowledge, and that

8    subject to said limitations, the responses are true, correct and complete to the best of his

9    information and belief.

10

11           DATED this 25th day of July, 2022.

12

13

14                                                                        David Schaefer

15           **AS TO OBJECTIONS:**

16

17                                                          /s/ Philip P. Mann
                                                            Philip P. Mann
18

19

20

21

22

23

24

25

26

27

28

Phoenix Digital Response to First Set of ROGS          Page 6
Cause No. 21-CV-0811-TSZ

Mann Law Group PLLC
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

## <u>**CERTIFICATE OF SERVICE**</u>

2

3      I hereby certify that on July 25, 2022, I caused the foregoing document to be

4  electronically mailed to counsel of record as follows:

5  WRava@perkinscoie.com

6

7  JDini@perkinscoie.com

8  CMarcelo@perkinscoie.com

9                                        _s/ Philip P. Mann_____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Phoenix Digital Response to First Set of ROGS              Page 7
Cause No. 21-CV-0811-TSZ

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

BUNGIE, INC., a Delaware corporation,

Plaintiff

v.

AIMJUNKIES.COM, a business of unknown
classification; PHOENIX DIGITAL GROUP
LLC, an Arizona limited liability company;
JEFFREY CONWAY, an individual; DAVID
SCHAEFER, an individual; JORDAN GREEN,
an individual; and JAMES MAY, an individual,

Defendants.

Cause No. 2:21-cv-0811 TSZ

**DEFENDANT PHOENIX
DIGITAL GROUP LLC'S
RESPONSES TO PLAINTIFF'S
INTERROGATORIES NOS. 2,
6 AND 7**

Pursuant to Federal Rule of Civil Procedure 26, 33 AND 34, Defendant Phoenix

Digital Group LLC ("Phoenix Digital") hereby supplements its responses to Plaintiff Bungie,

Interrogatories Nos. 2, 6 and 7 as follows:

## GENERAL OBJECTIONS

Phoenix Digital's General Objections set out in its RESPONSES TO PLAINTIFF'S

FIRST SET OF INTERROGATORIES NOS. 1-7 served July 25, 2022 are incorporated as

if set out fully herein.

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                    Page 1

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

limited information sufficient to identify and/or locate (e.g., IP address or website URL) each server where the Cheat Software is/was hosted, and how Phoenix Digital enabled the connection between the purchaser and third-party developers' computer servers.

**RESPONSE:**

After accessing the AimJunkies.com website, customers wishing to obtain a product will, after placing an order, be directed and connected with the third-party developers computer server, which then downloads the product directly to the customer's computer without passing through any Phoenix Digital computer.  Furthermore, it is believed that the answer to this interrogatory can be ascertained from records and documents already in the possession of Bungie.  To the extent this interrogatory requests, "information sufficient to identify and/or locate (e.g., IP address or website URL) each server where the Cheat Software is/was hosted," Phoenix Digital objects to this Interrogatory as being irrelevant to any of the issues before the Court in this case and as calling for personal information not relevant to any issue before the Court in this matter.

**SUPPLEMENTAL RESPONSE:**

After further review, the answer above is slightly in error in that, after placing an order, the customer is directed and connected with the third-party developer's computer server, which then passes the product through a Phoenix Digital computer to the customer's computer.

As of May 5, 2022, Phoenix Digital no longer owns the Aimjunkics.com website and has no access to information regarding the identity or location of each server where the relevant products were hosted.  Nor does Phoenix Digital have any records in this regard.

**INTERROGATORY NO. 7**:

Identify all bank accounts, financial accounts, payment processor accounts, or any other source(s) of funds or accounts owned by Phoenix Digital that are or have been used to process  and/or store funds related the sale of the Cheat Software.

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ

Page 3

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone: 206.436.0900

**RESPONSE:**

Phoenix Digital objects to this Interrogatory as being irrelevant to any of the issues before the Court in this case and as calling for personal information not relevant to any issue before the Court in this matter.

**SUPPLEMENTAL RESPONSE:**

The answer to this Interrogatory may be ascertained form the records produced by PayPal in response to Plaintiff Bungie, Inc.'s subpoena dated June 23, 2022 and from the Stripe records produced in Phoenix Digital's supplemental responses to Bungies Requests for Documents served contemporaneously herewith.  Answering further, Phonix Digital states:

PayPal.

Stripe.

Dated September 2, 2022.

/s/ Philip P. Mann
Philip P. Mann, WSBA No: 28860
**Mann Law Group PLLC**
403 Madison Ave. N. Ste. 240
Bainbridge Island, Washington  98110
Phone (206) 436-0900
phil@mannlawgroup.com
Attorneys for Defendants

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                    Page 4

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

**Verification**

2

3      **AS TO SUPPLEMENTAL RESPONSES TO INTERROGATORIES 2, 6 AND 7:**

4           David Schaefer, being duly sworn, deposes and says that he is the President of

5      Phoenix Digital Group LLC, Defendant in the above-captioned action, that he has read the

6      foregoing responses by him subscribed, that said responses were prepared with the assistance

7      of counsel upon which he has relied and is based on his experiences and knowledge, and that

8      subject to said limitations, the responses are true, correct and complete to the best of his

9      information and belief.

10          DATED this 2nd day of September, 2022.

11

12

13

14                                              _____
                                                David Schaefer
15      **AS TO OBJECTIONS:**

16

17                                              /s/ Philip P. Mann
                                                Philip P. Mann
18

19

20

21

22

23

24

25

26

27

28

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

## <u>**CERTIFICATE OF SERVICE**</u>

2

3       I hereby certify that on September 2, 2022, I caused the foregoing document to be

4   electronically mailed to counsel of record as follows:

5   WRava@perkinscoie.com

6

7   JDini@perkinscoie.com

8   CMarcelo@perkinscoie.com

9
                                        *s/ Philip P. Mann*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

# EXHIBIT O

THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BUNGIE, INC., a Delaware corporation,<br><br>Plaintiff<br><br>v.<br><br>AIMJUNKIES.COM, a business of unknown classification; PHOENIX DIGITAL GROUP LLC, an Arizona limited liability company; JEFFREY CONWAY, an individual; DAVID SCHAEFER, an individual; JORDAN GREEN, an individual; and JAMES MAY, an individual,<br><br>Defendants. | Cause No. 2:21-cv-0811 TSZ<br><br>**DEFENDANT DAVID SCHAEFER'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION NOS.  1-25** |

Pursuant to Federal Rule of Civil Procedure 26, 33 AND 34, Defendant David Schaefer ("Mr. Schaefer") hereby responds to Plaintiff Bungie, Inc.'s First Set of Requests for Production as follows:

**GENERAL OBJECTIONS**

David Schaefer makes the following objections to Plaintiff's Second First Set of Requests For Production of Documents:

1.      To the extent Plaintiff's definitions and instructions are inconsistent with the appropriate Federal Rules of Civil Procedure, such as Fed. R. Civ. P. 26 and 34, Mr. Schaefer will rely upon the Federal Rules of Civil Procedure, the Local Rules and governing case law with respect to the subject definitions and instructions and responses.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 12**:

Produce all documents and communications referring or relating to your decision to offer the Cheat Software for sale and/or distribute the Cheat Software on AimJunkies.com, including documentation concerning advertisements of the Cheat Software, and particularly advertisements referencing Destiny 2.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 13**:

Produce all documents and communications related to the "third party developers" of the Cheat Software described in paragraph 5 of your declaration in Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. No. 39-1).

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 14**:

Produce documents sufficient to identify the name(s) of any account(s) on the AimJunkies.com forums that you, Lisa Holliday, or any other member of your family have used and/or controlled.

**RESPONSE:**

Mr. Schaefer is unable to respond to this request in that he does not have possession or control of documents relating to non-party Lisa Holliday.

**REQUEST FOR PRODUCTION NO. 15**:

Produce documents sufficient to show any distributions or other payments made by Phoenix Digital to you, Lisa Holliday, and/or any other member of your family, including but not limited to documents sufficient to show the date of the payment, the accounts from which the payment was sent and to which it was received, and the purpose of the payment.

Schaefer Response to First Set of RFPs
Cause No. 21-CV-0811-TSZ                    Page 5

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

**RESPONSE:**

Mr. Schaefer is unable to respond to this request in that he does not have possession or control of documents relating to non-party Lisa Holliday.

**REQUEST FOR PRODUCTION NO. 16**:

Produce all communications with James May relating to AimJunkies.com, the Cheat Software, Bungie or its games including Destiny 2, or this Action.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 17**:

Produce all communications with Jordan Green relating to AimJunkies.com, the Cheat Software, Bungie or its games including Destiny 2, or this Action.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 18**:

Produce all communications with Jeffrey Conway relating to AimJunkies.com, the Cheat Software, Bungie or its games including Destiny 2, or this Action.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 19**:

Produce all communications with Defendants and/or Warren Apenzeller relating to, Bungie, the Cheat Software and/or the Action.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer.

**REQUEST FOR PRODUCTION NO. 20**:

Produce documents sufficient to identify any Bungie and/or Destiny 2 account(s) created and/or controlled by you.



MANN LAW GROUP PLLC
403 Madison Ave. N. Ste. 240
Seattle, WA 98110
Phone: 206.436.0900

creation and drafting of the press release, and documents and communications relating to and sufficient to identify Andreas Banek and Warren Apenzeller.

**RESPONSE:**

No such documents are in the possession and/or control of Mr. Schaefer. Answering further, no press release concerning a "purported" sale of AimJunkies.com to Blome Entertainment," was ever "issued."

**REQUEST FOR PRODUCTION NO. 25**:

Produce all documents related to payment or funds you received in connection with the sale of the Cheat Software, including but not limited to documents showing such receipt for any bank accounts, financial accounts, payment processor accounts, or any other source(s) of funds or accounts owned by you that are or have been used to process such payments or funds.

**RESPONSE:**

Documents responsive to this request have already been produced by Phoenix Digital and or the recipients of Bungie's subpoenas. Answering further, no additional documents responsive to this request are in the possession and/or control of Mr. Schaefer.

Dated October 10, 2022.

_/s/ Philip P. Mann_ _____

Philip P. Mann, WSBA No: 28860
**Mann Law Group PLLC**
403 Madison Ave. N. Ste. 240
Bainbridge Island, Washington  98110
Phone (206) 436-0909
phil@mannlawgroup.com
Attorneys for Defendants

Schaefer Response to First Set of RFPs
Cause No. 21-CV-0811-TSZ

Page 8

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone: 206.436.0909

1

## <u>**CERTIFICATE OF SERVICE**</u>

2

3      I hereby certify that on July 25, 2022, I caused the foregoing document to be

4  electronically mailed to counsel of record as follows:

5  [WRava@perkinscoie.com](WRava@perkinscoie.com)

6

7  [JDini@perkinscoie.com](JDini@perkinscoie.com)

8  [CMarcelo@perkinscoie.com](CMarcelo@perkinscoie.com)

9                                            *<u>s/ Philip P. Mann</u>*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT P

**From:** Marcelo, Christian W. (SEA)
**Sent:** Wednesday, August 24, 2022 5:09 PM
**To:** Phil Mann
**Cc:** Rava, William C. (SEA); Dini, Jacob  (SEA)
**Subject:** RE: Bungie, Inc. v. AimJunkies.com, et al., No. 2:21-cv-811-TSZ - Phoenix Digital Group LLC's Discovery Deficiencies
**Attachments:** 2022-08-16 Letter to P. Mann.pdf

Phil,

Thanks for jumping on the call this morning. Below, I provide a summary of what I understand the parties agreed to, but please correct if I misunderstood something.

- You are checking on Defendants' production in this case generally. So far, Bungie has not received a production in this litigation, though it did receive a production in connection with the on-going AAA arbitration. And while you offered that documents produced in the arbitration could be used in this litigation, we prefer for various reasons that the documents be separately produced, even if they are the same documents. We'd ask that you also please Bates stamp the pages (rather than just the file name) so that the parties can easily reference those in depositions, briefs, or otherwise. Along those lines, please note that documents produced by Bungie in connection with the arbitration should not be used in this litigation, and vice versa.

- Where Defendants indicated they will produce "<u>relevant</u>, non-privileged documents responsive to" certain requests (RFPs 1-7, 9-12, 14-23 and 27) you confirmed that Defendants are not withholding responsive, non-privileged documents on the basis of relevance. That is, where Defendants agreed to produce responsive documents to a request, they are not withholding any such responsive documents on the basis that Defendants believe the document is not relevant. When Defendants supplement their responses, please update these responses to remove the reference to "relevant".

- For requests for production that Defendants indicated they would produce responsive documents identified in the letter (RFPs 1, 7, 12, 14, 15, 16, 18, 19, 21, 22, and 27) your understanding was that they have already produced all such responsive documents or that no responsive documents exist. Defendants agreed to supplement those responses to reflect that.

- Defendants will produce documents responsive to RFP No. 23

- Defendants will produce any responsive, non-privileged documents in response to RFP Nos. 26, 28, and 30, if any exist. And if none exist, will supplement the response to indicate that.

- Regarding RFP No. 8, Defendants will review the categories of information identified in our August 16, 2022 letter (reattached) regarding that Request to determine if responsive documents exist, and produce any such responsive, non-privileged documents.

- Defendants will supplement answers to Rogs 2, 6, and 7.

- Where Defendants agreed to supplement responses or produce documents noted above, they will do so by September 2, 2022.

**Christian Marcelo** | **Perkins Coie LLP**
D. +1.206.359.3315

**From:** Phil Mann <phil@mannlawgroup.com>
**Sent:** Thursday, August 18, 2022 2:05 PM
**To:** Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>; Dini, Jacob (SEA) <JDini@perkinscoie.com>
**Cc:** Rava, William C. (SEA) <WRava@perkinscoie.com>
**Subject:** Re: Bungie, Inc. v. AimJunkies.com, et al., No. 2:21-cv-811-TSZ - Phoenix Digital Group LLC's Discovery Deficiencies

Thanks, that works,

Phil

On 8/18/22 1:42 PM, Marcelo, Christian W. (SEA) wrote:

> Thanks, Phil. Let's do Wednesday 8/24 at 11am. I'll plan to give you a call then.
>
> **Christian Marcelo** | **Perkins Coie LLP**
> D. +1.206.359.3315
>
> **From:** Phil Mann <phil@mannlawgroup.com>
> **Sent:** Thursday, August 18, 2022 10:50 AM
> **To:** Dini, Jacob (SEA) <JDini@perkinscoie.com>
> **Cc:** Rava, William C. (SEA) <WRava@perkinscoie.com>; Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
> **Subject:** Re: Bungie, Inc. v. AimJunkies.com, et al., No. 2:21-cv-811-TSZ - Phoenix Digital Group LLC's Discovery Deficiencies
>
> Thanks Jacob, I am available to speak with you regarding these matters on Wednesday or Thursday of next week at any times between 10:30 and 5 pm.  Please let me know what works for you.
>
> Regards,
>
> Phil
>
> On 8/16/22 12:02 PM, Dini, Jacob (SEA) wrote:
>
>> Phil,
>>
>> Please see the attached.
>>
>> Best,

**Jacob Dini** | **Perkins Coie LLP**
ASSOCIATE
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3832
F. +1.206.359.4832
E. JDini@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

# PERKINSCOie

1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099

T +1.206.359.8000
F +1.206.359.9000
PerkinsCoie.com

August 16, 2022

William C. Rava
WRava@perkinscoie.com
D.   +1.+1.206.359.6338
F.   +1.+1.206.359.7338

**VIA EMAIL**

Philip P. Mann
Mann Law Group PLLC
403 Madison Ave. N.
Suite 240
Bainbridge Island, WA 98110
phil@mannlawgroup.com

Re:    ***Bungie, Inc. v. AimJunkies.com, et al.*, No. 2:21-cv-811 (W.D. Wash.)**
       **Phoenix Digital Group LLC's Discovery Deficiencies**

Dear Mr. Mann:

We write regarding various deficiencies in the discovery responses served by Defendant Phoenix Digital Group LLC ("Phoenix Digital") and to request that Phoenix Digital supplement those discovery responses.  Please advise us as to your availability to confer regarding the below issues next week.

**A.      Requests for Production**

As an initial matter, Phoenix Digital has not yet produced any responsive documents, despite stating they will do so in response to at least Requests for Production ("Requests") Nos. 12, 14, 15, 18, 19, 21, and 22.  Please let us know when we can expect Phoenix Digital to begin producing responsive documents.

Additionally, in response to Requests No. 1–7, 9–11, 16, 17, and 20, Phoenix Digital responds that "At present, no such documents are in the possession and/or control of Phoenix Digital." Notably, such a response asserts that no Phoenix Digital managers, employees, agents, members—including Messrs. Schaefer, Conway, or Green—have responsive documents in their possession.  This representation appears to be, at best, unintentionally inaccurate.  For instance, Request No. 7 seeks documents sufficient to show all downloads of the Cheat Software, and yet Phoenix Digital claims to not have responsive documents in its possession or control even though it has previously represented to have sold over $27,000 worth of the Cheat Software.  In addition, Phoenix Digital has not produced any documents concerning sales of the Cheat Software made through the AimJunkies reseller associated with the screen name "banek192," which Phoenix Digital appears to have access to because it purports to have identified at least one email address associated with a purchase through the account.

Philip P. Mann
August 16, 2022
Page 2

Phoenix Digital's blanket assertions that no such documents exist to *all* of these requests
suggests that Phoenix Digital did not conduct a reasonable search to find such documents, as it is
required to do.  Bungie requests that Phoenix Digital promptly conduct such a search.  Further
explanation of specific deficient responses is provided below.

> **1.     Request No. 1**

Phoenix Digital's response to Request No. 1 requesting copies of all versions of the Cheat
Software is deficient.  Dating back to August 2021 and as recently as December 30, 2021,
Defendants had represented to Bungie that they could produce copies of the Cheat Software
binary, object code, and source code for each version of the Cheat Software.  Phoenix Digital
also issued a press release last week stating that it had offered to work with Bungie to
"implement our features in a version of their game for distribution."[1]  If Phoenix Digital is
offering to do so, then it must have a copy of the Cheat Software that performs those features.
Phoenix Digital's response to Request No. 1 directly contradicts these prior representations.  In
addition, Phoenix Digital has been previously put on notice as early as November 2020 that it
was under an obligation to preserve any and all documents and electronic data relevant to
Bungie's claims.  This would include, of course, copies of the Cheat Software central to
Bungie's claims.  If, as Phoenix Digital's current and prior representations imply, Phoenix
Digital was at one time in possession of the Cheat Software, but is no longer in possession of it,
Phoenix Digital could be subject to serious penalties.  Bungie therefore requests that Phoenix
Digital either produce copies of the Cheat Software responsive to this Request or amend its
response to describe the circumstances under which Phoenix Digital destroyed or lost copies of
the Cheat Software.

Likewise, Phoenix Digital's communications with Torrent Freak, any other third party, or
between Phoenix Digital members or employees regarding the Cheat Software are responsive to
Bungie's Request for Production No. 8 and must be produced.

> **2.     Request Nos. 7 and 12**

Phoenix Digital objects to the relevance of Request Nos. 7 and 12, which seek documents
sufficient to show all downloads of the Cheat Software and each sale or distribution of the Cheat
Software by Phoenix Digital, including the identity of person(s) that downloaded the Cheat
Software.  However, as the Court has already held in this case over Defendants' objection: "To
the extent that PayPal produces records containing identifying information for Defendants'
customers, the Court concludes that **such information is relevant** given Bungie's allegations
that the Defendants are vicariously and/or contributorily liable for their customers' alleged
copyright infringement."  Dkt. No. 55 p. 2 n.3 (emphasis added).  The Requests clearly seek

---

[1] https://torrentfreak.com/images/phoenix-press.pdf

Philip P. Mann
August 16, 2022
Page 3

relevant documents, and certainly discoverable documents given the broad scope of discovery, and Phoenix Digital must produce such documents.

In addition, Phoenix Digital's claim that it does not have responsive documents in response to Request No. 7 contradicts its prior representations to Bungie.  As recently as December 30, 2021, Defendants have represented they can provide username, IP address, customer name, email address, and date purchased for all purchasers of the Cheat Software.  And on July 8, 2021, Defendants provided to Bungie spreadsheets that appear to show sales of the Cheat Software through the payment processor Stripe, which collects information about the purchasers.  These documents are responsive to this Request.  Bungie therefore requests that Phoenix Digital produce documents responsive to these Requests or amend its response to describe the circumstances under which Phoenix Digital deleted or lost these records that it once possessed and offered to provide to Bungie.

### 3.   Request No. 8

Phoenix Digital's response to Request No. 8 requesting all documents and communications referring or relating to the Cheat Software is also deficient.  A non-exhaustive list of the types of documents that may be responsive to this Request include, but are not limited to: customer or potential customer inquiries regarding the Cheat Software; support requests from purchasers regarding the Cheat Software; installation, update, or other technical support-related documents associated with the Cheat Software; customer complaints or reports that they have been banned from Destiny 2 in connection with the Cheat Software; communications among Defendants regarding the Cheat Software; posts and stored messages between users on the AimJunkies.com web forums referring or relating to the Cheat Software; documents and communications relating to the prospective sale of the Cheat Software or any distribution channels for the Cheat Software to third parties such as but not limited to "Andreas Banek" or "BME;" and/or posts on Phoenix Digital's social media, AimJunkies.com, or other of Phoenix Digital's websites concerning the Cheat Software, among any other document or communication referring or relating to the Cheat Software.  Any document that refers or relates to the Cheat Software is relevant and responsive to this Request.  Bungie therefore requests that Phoenix Digital conduct a search for documents responsive to this Request and amend its response to this Request accordingly.

### 4.   Request No. 16

Request No. 16 seeks documents sufficient to show payments made by Phoenix Digital to any person involved in the creation, development, modification, updating, and/or patching of the Cheat Software, including to whom the payment was made.  Phoenix Digital's objections are misplaced and its representation that it has no responsive documents appears to be inaccurate. The identity of the developer(s) of the Cheat Software is plainly relevant to this case, and certainly discoverable information.  Payments made to the developer(s) of the Cheat Software

Philip P. Mann
August 16, 2022
Page 4

are relevant to, at a minimum, any costs that Phoenix Digital may claim were associated with the development and sale of the Cheat Software.  Third party discovery has also made clear that Phoenix Digital made payments to the developer(s) of the Cheat Software in exchange for their work.  Phoenix Digital must produce documents sufficient to identify payments made at least to "Andreas Banek," the developer identified in response to Bungie's Interrogatory No. 1.

     **5.**      **Request No. 23**

Phoenix Digital's response to Request No. 23 requesting all documents and communications relating to its May 23, 2022 press release is deficient.  At a minimum, the press release itself, and any prior drafts of the press release, exist and are responsive and should be produced.  Moreover, to the extent there were any communications between Phoenix Digital and Andreas Banek and/or Warren Apenzeller, those documents would be responsive to this Request and should be produced.  Additionally, before responding to this Request, Phoenix Digital was required to conduct a reasonable search and its response that "no such documents are **believed** to exist" is not an appropriate response to the Request.  Bungie requests that Phoenix Digital search for and produce documents responsive to this Request.

     **6.**      **Request No. 26**

Phoenix Digital's response to Request No. 26 requesting documents sufficient to identify current and past employees, independent contractors, or any other agent of Phoenix Digital is deficient.  These documents are relevant to Defendants' arguments that individual Defendants David Schaefer, Jeffrey Conway, and Jordan Green did not personally participate in the infringement of Bungie's intellectual property.  *See, e.g.*, Dkt. No. 56 p. 5–7.  If employees or other agents exist, any direction that the managers or members of the company gave to employees regarding the infringing conduct is relevant to show the managers' or members' personal participation.  *See, e.g.*, *Corker v. Costco Wholesale Corp.*, ___ F. Supp. 3d ___, 2022 WL 457963, at *3 (W.D. Wash. Feb. 14, 2022) (holding that evidence that individual defendant instructed employees to create infringing product was evidence of individual's personal participation).  And Bungie is entitled to learn the identities and take the testimony of any such employees.  If, however, there are no employees or other agents, then that may also be evidence that Messrs. Schaefer, Conway, and Green necessarily personally participated the infringement, as there were no other actors through which Phoenix Digital could operate.  Bungie therefore requests that Phoenix Digital produce documents responsive to this Request.

     **7.**      **Request No. 27**

Phoenix Digital's response to Request No. 27 requesting all communications with James May is deficient.  As Phoenix Digital knows, through third party discovery Bungie has identified numerous payments made by Phoenix Digital to Mr. May from 2019 through 2020.  At a

Philip P. Mann
August 16, 2022
Page 5

minimum, any communications related to or explaining the reasons for these payments are
responsive to this Request.  Additionally, before responding to this Request, Phoenix Digital was
required to conduct a reasonable search and its response that "no such documents are **believed** to
exist" is not an appropriate response to the Request.  Bungie requests that Phoenix Digital search
for and produce documents responsive to this Request.

### 8.      Request No. 28

Phoenix Digital's response to Request No. 28 requesting documents sufficient to identify bank
accounts, financial accounts, payment processor accounts, or any other source(s) of funds or
accounts owned by Phoenix Digital as relevant to the Cheat Software is deficient.  First, Phoenix
Digital's relevance objection is meritless.  Financial and account information for financial
institutions and payment processors used by Phoenix Digital in connection with the Cheat
Software is plainly relevant to at least the issue of damages in this case.  Moreover, Phoenix
Digital is required to produce responsive documents, even if those documents are available from
third party sources.  That third parties, like PayPal, may have documents responsive to this
Request does not excuse Phoenix Digital from its discovery obligations to produce those
documents.  Bungie therefore requests that Phoenix Digital produce documents responsive to this
Request.

### 9.      Request No. 30

Phoenix Digital's response to Request No. 30 requesting documents sufficient to show email
address(es), IP address(es), and Internet Service Provider(s) used by Phoenix Digital and those
acting on its behalf is deficient.  Defendants have repeatedly placed Phoenix Digital's—and their
agents'—computer activities and Bungie's ability to detect those activities squarely in issue in
this case.  *See* Dkt. No. 32 p. 5; Dkt. No. 40 p. 4–5; Dkt. No. 56 p. 8.  The documents sought
through this Request are therefore relevant to resolving those issues that Defendants have
insisted Bungie answer.  Bungie therefore requests that Phoenix Digital produce documents
responsive to this Request.

## B.     Interrogatories

### 1.      Interrogatory No. 2

Phoenix Digital's response to Interrogatory No. 2 asking that it describe all facts concerning its
decision to create, develop, and sell the Cheat Software is deficient.  While Phoenix Digital
identifies David Schaefer as the decisionmaker, it does not provide any other facts regarding that
decision to sell, including but not limited to: when the decision was made; how Mr. Schaefer
connected with Mr. Banek; when the Cheat Software was posted for sale; or why Phoenix Digital

Philip P. Mann
August 16, 2022
Page 6

decided to offer the Cheat Software on its website.  Bungie therefore requests that Phoenix Digital amend its response to fully answer the Interrogatory.

## 2.    Interrogatory No. 6

Interrogatory No. 6 asks that Phoenix Digital, among other things, provide information sufficient to identify and/or locate each server where the Cheat Software is/was hosted.  Phoenix Digital's objection to relevance is without merit.  Information sufficient to identify and/or locate (e.g. IP address or website URL) each server where the Cheat Software is/was hosted is directly relevant to this case, including to determine how Phoenix Digital (or others) distributed or facilitated the distribution of the Cheat Software, where copies of the Cheat Software (which Phoenix Digital no longer claims to have possession of) may be kept, and to ensure Phoenix Digital is in compliance with the terms of the preliminary injunction issued in this matter (Dkt. No. 50).  It may also be relevant to identifying and contacting the developers of the Cheat Software who may have relevant knowledge regarding how the Cheat Software was created and updated, if Phoenix Digital was not involved in that process.  Indeed, Phoenix Digital has made the location of these servers relevant by claiming that the Cheat Software did not pass through a Phoenix Digital computer.  Bungie is entitled to seek discovery regarding these issues to test Phoenix Digital's claims.  Bungie therefore requests that Phoenix Digital amend its response to identify each server where the Cheat Software is or was hosted.

## 3.    Interrogatory No. 7

Phoenix Digital's response to Interrogatory No. 7 seeking the identity of all bank accounts, financial accounts, payment processor accounts, or any other source(s) of funds or accounts owned by Phoenix Digital as relevant to the Cheat Software is deficient.  As explained in connection with Request No. 28 above, this information is plainly relevant to, among other issues, damages in this case.  To the extent personal information may be disclosed responding to this Interrogatory, the Court has entered the parties' Stipulated Protective Order in this case to protect those person(s)' confidentiality interests.  Bungie therefore requests that Phoenix Digital amend its response to this Interrogatory.

We look forward to confirming your availability to meet and confer regarding the issues raised above.

Sincerely,

William C. Rava

WCR:jpd

EXHIBIT Q

| | |
|---|---|
| **From:** | Phil Mann <phil@mannlawgroup.com> |
| **Sent:** | Wednesday, November 16, 2022 10:27 AM |
| **To:** | Dini, Jacob  (SEA) |
| **Cc:** | Rava, William C. (SEA); Marcelo, Christian W. (SEA) |
| **Subject:** | Re: Bungie, Inc. v. AimJunkies.com, et al., No. 2:21-cv-811-TSZ - Discovery Deficiencies |

Thanks Jacob,

Your email below is inaccurate in that its various references to our "claims" implies we are not being honest with you.  We find that offensive.

To avoid wasting our time and the time of the Court, if you believe we have not been open and forthcoming in discovery, we call upon you to provide whatever information you have to establish that, other than your mere suspicions.

Bungie's case has already been shown to be based primarily on unsupported guesswork on the part of Bungie, and Bungie's continued accusations of discovery chicanery are both unfounded and tiresome.

Nevertheless, here are our responses to your email.  They are highlighted in color below.

Regards,

Phil


On 11/11/22 1:14 PM, Dini, Jacob (SEA) wrote:

> Phil,
>
> Thanks for the call this morning.  Below is a summary of what I understand the parties discussed and agreed to concerning the issues Bungie identified in its November 3, 2022 letter, but feel free to correct me if I misunderstood anything.  As I understand it, you will follow up regarding the open issues identified below prior to **November 17**.
>
> 1. **AimJunkies Terms of Service.**  Defendants have only ever had one version of the Terms of Service, and they have produced all documents related to the Terms of Service that they have.  We discussed whether Defendants may have a version of the Terms of Service with any associated metadata, and I understand you will ask Mr. Schaefer if there are additional documents in Defendants' possession responsive to RFP 35.  This is correct- we have produced the Terms of Service as they existed at the relevant dates and have no other documents to produce.  When my clients owned the site, the Terms of Service were avaiable at www.aimjunkies.com/terms-of-service.
>
> 2. **Bitcoin-related documents.**  Defendants do not have any records of any Bitcoin transactions, including payments to Mr. Schaefer and Banek, or any purchases of the Destiny 2 cheat software made through Bitcoin.  As stated in depositions no documents exist. Bitcoin wallets were destroyed monthly and new ones created for safety/security of the asset.

3. **Other payment providers (Payssion, Payment Wall, eCheck)**. Defendants claim that records from these payment providers do not exist and Defendants are therefore unable to produce them. Defendants do not possess any records for Payssion /Payment Wall or E Check.

4. **Phoenix Digital E-Trade Bank Accounts.** Defendants do not have any E-trade records, whether for the prior Phoenix Digital accounts owned/operated by Mr. Conway or the E-trade accounts used after Mr. Conway's departure from Phoenix Digital and that they deleted these on a regular basis. No sales were directly deposited or processed by or in E-trade. Accordingly, no relevant information pertaining to sales was contained in ANY E-Trade account that was open at the time and was closed. Defendants do not have any E-Trade records in their possession from the time that Destiny 2 cheat was sold. The accounts were closed upon Mr. Conway's departure from the company and no records are available to the defendants from E-trade. Any accounts that are open now were created after Destiny 2 sales stopped and contain no relevant information to this case.

5. **Teamspeak written communications.** Mr. Conway did not maintain any written Teamspeak records of his conversations with Mr. Schaefer, and he does not believe that Teamspeak retains these communications. Defendants claim that these written communications are ephemeral/temporary. No documents were ever created via written instruction in Teamspeak and as a result no written instructions exist.

6. **Cascade Vinyls PayPal account transactions & Etrade payments to Green.** I understand that you have not spoken to Mr. Green about his Cascade Vinyls PayPal account and that you will ask Mr. Green whether documents related to this PayPal account exist. We understand that Defendants do not have any records related to E-trade transfers related to Mr. Green. Mr. Green Does not have any records. Those accounts as mentioned above were shut down and he does not have access to them.

7. **ROG 7 to Phoenix Digital.** We understand it is Defendants' position that the full answer to this Interrogatory can be gleaned from the deposition testimony of Defendants in the arbitration matter and that they will supplement this answer only if Bungie believes there is information not provided in their current answer to this Interrogatory or via deposition testimony that is responsive to this Interrogatory. You have had full and complete opportunities to depose each of the named defendants, as well as third party Jason Hahn and Phoenix Digital via Rule 30(b)(6), and each witness answered every question Bungie asked, including those relating to Interrogatory No. 7. The answer to this interrogatory can thus be obtained by reference to the deposition transcripts of these witnesses. (Hint: Do a search for "bank accounts," "financial accounts," "payment processor accounts," etc. using the search function in the transcripts -- it works.)

8. **Documents from AimJunkies.com Website.** Defendants no longer have access to the database referenced in the deposition testimony of Mr. Schaefer and Mr. Conway after the sale of the website. Mr. Conway also does not have access to his "Crusher" AimJunkies.com account. Defendants do not have any documents related to the website that they can produce. Correct.

9. **Conway and Green ROG 1, May ROG 5, Schaefer ROG 3.** Defendants will review their answers to these and determine whether they need supplementation. Again, supplementation is not needed. Each of these witness provided answers during their depositions and the information can be easily found doing appropriate searches of the deposition transcripts.

2

10. **Green RFP 17.**  We understand you will ask Mr. Green if he has documents that can show Mr. Green's Xbox Live and Steam accounts.  <span style="color:red">No such documents exist.  Mr. Green's X Box email for log in <u>"JGWebb2000@hotmail.com"</u> and his             Steam Username is "JGWebb2000"</span>

11. **Schaefer RFP 14.**  We understand you will ask Mr. Schaefer if he has documents responsive to this request.  <span style="color:red">No such documents exist.</span>

12. **Schaefer RFP 15.**  We understand that Mr. Schaefer claims to have been paid only through PayPal and Bitcoin, and Mr. Schaefer contends that Bungie already has the documents related to the former and that there are no documents in Mr. Schaefer's possession responsive to the latter.  <span style="color:red">We stand by this answer.</span>

13. **Conway and May RFP 13.**  Mr. Conway and Mr. May claim that Bungie already has records of all payments made to them before Phoenix Digital was suspended from PayPal, and that for those payments after Phoenix Digital's suspension from PayPal, none of Phoenix Digital, Mr. Conway, or Mr. May have documents related to E-trade records.  <span style="color:red">All documents responsive to payments made to Mr. Conway and Mr. May based on sales of the "cheat software" at issue in this matter have either been produced or do not exist.</span>

**Jacob Dini** | <span style="color:red">**Perkins Coie LLP**</span>
ASSOCIATE
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3832
F. +1.206.359.4832
E. <u>JDini@perkinscoie.com</u>

**From:** Phil Mann <u><phil@mannlawgroup.com></u>
**Sent:** Tuesday, November 8, 2022 1:21 PM
**To:** Dini, Jacob (SEA) <u><JDini@perkinscoie.com></u>
**Cc:** Rava, William C. (SEA) <u><WRava@perkinscoie.com></u>; Marcelo, Christian W. (SEA) <u><CMarcelo@perkinscoie.com></u>
**Subject:** Re: Bungie, Inc. v. AimJunkies.com, et al., No. 2:21-cv-811-TSZ - Discovery Deficiencies

That works.

Please be prepared to identify where any of the witnesses said the documents you claim have not been produced exist and are in the possession and control of the Defendants.  I don't believe those questions were ever asked, and no witness testified that documents are being withheld.

Regards,

Phil

On 11/8/22 1:02 PM, Dini, Jacob (SEA) wrote:

>  Thanks, Phil. Let's do 11 on Friday.  I'll send a calendar invite.  We have reviewed the testimony, but if there is anything specific you want to discuss in connection with the discovery issues raised in our letter, let me know so I can review ahead of our call.

**Jacob Dini** | **Perkins Coie LLP**
ASSOCIATE
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3832
F. +1.206.359.4832
E. JDini@perkinscoie.com

---

**From:** Phil Mann <phil@mannlawgroup.com>
**Sent:** Tuesday, November 8, 2022 11:16 AM
**To:** Dini, Jacob (SEA) <JDini@perkinscoie.com>
**Cc:** Rava, William C. (SEA) <WRava@perkinscoie.com>; Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
**Subject:** Re: Bungie, Inc. v. AimJunkies.com, et al., No. 2:21-cv-811-TSZ - Discovery Deficiencies


Jake,

I am free to speak with you regarding this at any time Friday.

In the meantime I suggest you review the actual testimony of the witnesses and be prepared to discuss it in detail during our conference.

Regards,

Phil



On 11/3/22 9:56 AM, Dini, Jacob (SEA) wrote:

> Phil,
>
> Please see the attached correspondence.
>
> **Jacob Dini** | **Perkins Coie LLP**
> ASSOCIATE
> 1201 Third Avenue Suite 4900
> Seattle, WA 98101-3099
> D. +1.206.359.3832
> F. +1.206.359.4832
> E. JDini@perkinscoie.com

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.