THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BUNGIE, INC.,<br><br>                         Plaintiff,<br><br>v.<br><br>AIMJUNKIES.COM; PHOENIX DIGITAL GROUP LLC; DAVID SCHAEFER; JORDAN GREEN; JEFFREY CONWAY; and JAMES MAY,<br><br>                         Defendants. | No. 2:21-cv-811-TSZ<br><br>**DECLARATION OF JACOB P. DINI IN SUPPORT OF BUNGIE, INC.'S MOTION FOR PROTECTIVE ORDER** |

I, Jacob P. Dini, declare as follows:

1.      I am an attorney licensed to practice law before the courts of the State of Washington.  I am an attorney at Perkins Coie LLP, and counsel in this action for Plaintiff Bungie, Inc. ("Bungie" or "Plaintiff").  I submit this declaration in support of Bungie, Inc.'s Motion for Protective Order.  I have personal knowledge of the facts stated herein and, if called upon, could and would testify competently thereto under oath.

2.      Attached hereto as **Exhibit A** is a true and correct copy of an email sent by Christian Marcelo to Phil Mann on April 6, 2023.

3.      Attached hereto as **Exhibit B** is a true and correct copy of an email sent by Christian Marcelo to Phil Mann on April 18, 2023.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

4.      Attached hereto as **Exhibit C** is a true and correct copy of the complaint (Dkt. No. 1) filed in *Bungie, Inc. v.* ████████, Case No. 2:22-cv-00981-RAJ (W.D. Wash.).

5.      Attached hereto as **Exhibit D** are true and correct copies of excerpts from the October 31, 2022 30(b)(6) deposition of David Schaefer as the corporate representative of Phoenix Digital Group LLC.

6.      Attached hereto as **Exhibit E** are true and correct copies of excerpts from the March 20, 2023 30(b)(6) deposition of David Schaefer as the corporate representative of Phoenix Digital Group LLC.

7.      Attached hereto as **Exhibit F** are true and correct copies of excerpts from the October 28, 2022 personal deposition of David Schaefer.

8.      Attached hereto as **Exhibit G** is a true and correct copy of a decision in the Canadian case captioned *Bungie, Inc., et al. v. TextNow Inc.*, No. CV-22-682808, 2022 ONSC 4181 (CanLII July 15, 2022).


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 20th day of April, 2023.

*/s/Jacob P. Dini*
Jacob P. Dini

DINI DECL. ISO BUNGIE'S MOT. FOR
PROTECTIVE ORDER
(No. 2:21-cv-811-TSZ) – 2

161878328.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# EXHIBIT A

**Dini, Jacob  (SEA)**

---

| | |
|---|---|
| **From:** | Marcelo, Christian W. (SEA) |
| **Sent:** | Thursday, April 6, 2023 9:39 PM |
| **To:** | Phil Mann |
| **Cc:** | Rava, William C. (SEA); Dini, Jacob  (SEA) |
| **Subject:** | RE: Bungie v. Aimjunkies et al. |

Received. We'll check regarding availability. As a reminder Bungie has designated the identity of this deponent as Attorneys Eyes Only. Please treat this notice as AEO under the protective order.

Christian Marcelo | Perkins Coie LLP
D. +1.206.359.3315

-----Original Message-----
From: Phil Mann <phil@mannlawgroup.com>
Sent: Thursday, April 6, 2023 5:02 PM
To: Rava, William C. (SEA) <WRava@perkinscoie.com>; Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>; Dini, Jacob (SEA) <JDini@perkinscoie.com>
Subject: Re: Bungie v. Aimjunkies et al.

Dear Counsel,

Attached for service on you is Defendants Notice of Deposition for the witness identified therein.

Best Regards,

Phil

# EXHIBIT B

**Dini, Jacob  (SEA)**

| | |
|---|---|
| **From:** | Marcelo, Christian W. (SEA) |
| **Sent:** | Tuesday, April 18, 2023 1:02 PM |
| **To:** | Phil Mann |
| **Cc:** | Rava, William C. (SEA); Dini, Jacob  (SEA) |
| **Subject:** | RE: Bungie v. Aimjunkies et al. |

Let's plan on 5/3 then.

Thanks,

Christian

Christian Marcelo | Perkins Coie LLP
D. +1.206.359.3315

-----Original Message-----
From: Phil Mann <phil@mannlawgroup.com>
Sent: Tuesday, April 18, 2023 10:31 AM
To: Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
Cc: Rava, William C. (SEA) <WRava@perkinscoie.com>; Dini, Jacob (SEA) <JDini@perkinscoie.com>
Subject: Re: Bungie v. Aimjunkies et al.

Thanks Christian, we can make either day work.

Phil


On 4/18/23 8:38 AM, Marcelo, Christian W. (SEA) wrote:
> Thanks, was just writing a follow up from our call Wednesday. I understand Defendants' position on the witness is that
they do not object to a Confidential designation, but do object to a Highly Confidential (AEO) designation under the
parties' stipulated protective order.
>
> As I indicated on the call, we will plan to file a motion for a protective order on this issue, aiming to file this week. For
the witness's deposition availability we can do May 2 or May 3, which will hopefully allow enough time for Judge Zilly to
rule on the motion. Let us know if either works on your end.
>
> Best,
>
> Christian
>
> Christian Marcelo | Perkins Coie LLP
> D. +1.206.359.3315
>
> -----Original Message-----
> From: Phil Mann <phil@mannlawgroup.com>
> Sent: Tuesday, April 18, 2023 8:35 AM
> To: Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>
> Cc: Rava, William C. (SEA) <WRava@perkinscoie.com>; Dini, Jacob (SEA)

> <JDini@perkinscoie.com>
> Subject: Re: Bungie v. Aimjunkies et al.
>
> Christian, I am following up on this.  Is the witness available on the 20th?  Also, as you have not to our our knowledge filed a motion with the court, it is our intention to have Mr. Schaefer witness the entire deposition, albeit on a "confidential" basis.
>
> Regards,
>
> Phil
>
>
> On 4/6/23 9:39 PM, Marcelo, Christian W. (SEA) wrote:
>> Received. We'll check regarding availability. As a reminder Bungie has designated the identity of this deponent as Attorneys Eyes Only. Please treat this notice as AEO under the protective order.
>>
>> Christian Marcelo | Perkins Coie LLP
>> D. +1.206.359.3315
>>
>> -----Original Message-----
>> From: Phil Mann <phil@mannlawgroup.com>
>> Sent: Thursday, April 6, 2023 5:02 PM
>> To: Rava, William C. (SEA) <WRava@perkinscoie.com>; Marcelo,
>> Christian W. (SEA) <CMarcelo@perkinscoie.com>; Dini, Jacob (SEA)
>> <JDini@perkinscoie.com>
>> Subject: Re: Bungie v. Aimjunkies et al.
>>
>> Dear Counsel,
>>
>> Attached for service on you is Defendants Notice of Deposition for the witness identified therein.
>>
>> Best Regards,
>>
>> Phil
>>
>>
>> _____
>>
>> NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.
> _____
>
> NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

# EXHIBIT C
# FILED UNDER SEAL

# EXHIBIT D

```
 1                    ARBITRATION BEFORE JAMS

 2    _____

 3
      BUNGIE, INC.,                    )
 4                                     )        ┌─────────────────┐
              Plaintiff,               )        │ CERTIFIED COPY  │
 5                                     )        └─────────────────┘
         v.                            )   No. 5160000075
 6                                     )
      AIMJUNKIES.COM; PHOENIX          )
 7    DIGITAL GROUP LLC; DAVID         )
      SCHAEFER; JORDAN GREEN;          )
 8    JEFFERY CONWAY; and JAMES MAY,   )
                                       )
 9                Respondents.         )

10

11    _____

12
          REMOTE VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
13
                                OF
14
                    DAVID SCHAEFER 30(B)(6)
15    _____

16
                          9:02 A.M.
17
                      October 31, 2022
18
          (All participants appeared via videoconference.)
19

20

21

22

23

24    LAURA GJUKA, CSR #10555

25      JOB NO.: 928469
```

```
 1                     REMOTE APPEARANCES

 2
     FOR THE CLAIMANT (via videoconference):
 3
             CHRISTIAN MARCELO
 4           JACOB P. DINI
             PERKINS COIE, LLP
 5           1201 Third Avenue, Suite 4900
             Seattle, WA 98101-3099
 6           CMarcelo@perkinscoie.com
             JDini@perkinscoie.com
 7
             JAMES BARKER
 8           BUNGIE, INC.
             550 106th Avenue NE
 9           Bellevue, WA 98004
             jbarker@bungie.com
10

11   FOR THE RESPONDENTS (via videoconference):

12           PHILIP P. MANN
             MANN LAW GROUP, PLLC
13           403 Madison Avenue North, Suite 240
             Bainbridge Island, WA 98110
14           phil@mannlawgroup.com

15
     VIDEOGRAPHER:
16
             ALBERT SALAZ
17
     ALSO PRESENT:
18
             JEFFERY CONWAY
19           JAMES MAY
             JORDAN GREEN
20           WILLIAM RAVA

21

22

23

24

25
```

1                          I N D E X

2    EXAMINATION BY:                                        PAGE

3    MR. MARCELO                                              5

4    MR. MANN                                               118

5

6

7                       EXHIBIT INDEX

8    EXHIBIT MARKED                                         PAGE

9    45      Amended Notice of Deposition                    7

10   46      PayPal Statement, 0031                          22

11   47      Excel Worksheet                                 24

12   48      PayPal Statement, 3354                          43

13   49      Ukrainian BME To Acquire Leading               45
             Independent US Videogame Cheat
14           Distributor, Aimjunkies

15   50      Website Asset Purchase Agreement               52

16   51      PayPal Statement, 7696                          57

17   52      Excel Worksheet                                 60

18   53      PayPal Statement, 3104                          65

19   54      Excel Worksheet                                 68

20   55      PayPal Statement, 1346                          70

21   56      Excel Worksheet                                 72

22   57      Declaration                                     90

23   58      Form 1065, 2019, Phoenix Digital               96
             Group
24
     59      Form 1065, 2020, Phoenix Digital               99
25           Group

1                    VIDEOGRAPHER:  Good morning.  Here

2    begins the remote deposition of David Schaefer in the

3    matter of Bungie, Incorporated, versus AimJunkies.com et

4    al.  This case is in arbitration before JAMS.

5    Today's -- today's date is October 31st, 2022, and we're

6    on the record at 9:02 a.m.  This is a remote deposition

7    through Zoom video conferencing.  The videographer is

8    Albert Salaz appearing on behalf of Centext Litigation

9    Services.

10                   Would counsel for all parties please identify

11   themselves and state whom they represent.

12                   MR. MARCELO:  Christian Marcelo from

13   Perkins Coie representing Claimant Bungie, Inc., and I'm

14   joined by William Rava and Jacob Dini from Perkins Coie,

15   as well as James Barker from Bungie.

16                   MR. MANN:  And I'm Phillip Mann

17   representing the respondents in this case as well as the

18   individual witness, David Schaefer.

19                   VIDEOGRAPHER:  Thank you.  The reporter

20   today is Laura Gjuka with Centext.  Would the reporter

21   please swear in the witness.

22

23

24

25

1    DAVID SCHAEFER,      witness herein, having been

2                        duly sworn by the Certified

3                        Court Reporter, testified

4                        under oath as follows:

5

6                   VIDEOGRAPHER:  Please begin.

7

8                        EXAMINATION

9    BY MR. MARCELO:

10        Q.    Mr. Schaefer, good to see you again.

11        A.    Good to see you.

12        Q.    So I know we just went through a deposition

13   on Friday, so you probably know the rules, so I'll --

14   I'll go over some quickly again, you know, same rules as

15   Friday.  Let's speak one at a time.  When I -- let me

16   finish my question before you answer the question.  And

17   if something's unclear, please ask me to clarify the

18   question, okay?

19        A.    Sure.

20        Q.    And you understand --

21        A.    My apologies for answering before you finish

22   asking.

23        Q.    You understand you're under oath today?

24        A.    Yes.

25        Q.    The same oath you would take in a courtroom?

```
 1        A.    I wouldn't go that far.
 2        Q.    It received income from selling Destiny 2
 3   cheats, right?
 4        A.    That is correct.
 5        Q.    And it distributed that income to various
 6   parties, right?
 7        A.    I would have to, you know, sit -- I don't
 8   remember.
 9        Q.    You don't remember if various parties
10   received payments based on the number of cheats sold at
11   Phoenix -- through Phoenix Digital?
12        A.    I don't remember.
13              (Simultaneous speaking.)
14        A.    I testified on Friday that they were paid
15   through Bitcoin.
16        Q.    And so they were paid?  Developers were paid
17   for cheats sold through Phoenix Digital, right?
18              MR. MANN:  Object to the form.
19        A.    What's the question again?
20        Q.    Phoenix Digital paid developers of cheats,
21   right?
22        A.    Yes.
23        Q.    Based on the number of cheats that the
24   developer sold, right?
25        A.    Yes.
```

1      Q.    **Let's go through some of the payments from**

2    **this PayPal account.  I'm going to filter the account**

3    **party name to Lisa's Repair.**

4      A.    Really?  You want to go there again?

5      Q.    **You see --**

6      A.    Is this -- Christian, is this a big player in

7    this lawsuit, or is this just trying to harass me?

8      Q.    **You see these --**

9      A.    Because when you're fucking around with an

10   ex-girlfriend, you're going to get me up on the tire

11   because she has nothing to fucking do with this shit,

12   and if you guys -- just wait until we open up your

13   people because then when I go to the guy that bought the

14   cheat and I have my lawyer ask him who his girlfriend

15   might have been or when was or where they rented from at

16   the time or what they did together, let's see what his

17   fucking answers are.  Christian, back off.  Stay in your

18   lane.

19     Q.    **Mr. Schaefer, are you saying Lisa Holly is an**

20   **ex-girlfriend?**

21     A.    I'm not saying that.  I used that as an

22   example, young man.

23     Q.    **Is Lisa Holly an ex-girlfriend?**

24     A.    It's not relevant, and I won't fucking answer

25   the question.  And if you want to go digging, you go

1  ahead and dig.  We'll fight on that one too.  Because

2  you guys can play around in the Sandbox all you want,

3  but when you start getting into personal shit, I don't

4  give a shit if it's Jeff Conway, I don't give a shit if

5  it's Jordan Green, or if it's me, you're going to find

6  out what I'm about.  Because when I open your people up

7  over there at Bungie, let's see what they got hiding in

8  their closets.  Am I saying I got something hiding in my

9  closet?  No.  But you know what?  I know those engineers

10 over there when we open them up, they're not exactly

11 going to say nice things either.

12      **Q.    Mr. Schaefer, on Friday you testified that**

13 **payments to Lisa Holly were strictly for rent payments;**

14 **do you recall that?**

15      A.    That is correct.  What do you want to do?

16 You want to talk about the car rental, or what do you

17 want to talk about?

18      **Q.    Did Lisa Holly do any work for**

19 **Phoenix Digital?**

20      A.    No.

21      **Q.    Let's go to Row 291.**

22      A.    Do you understand, how many entries in here

23 has Conway put in here for a tax deduction?  Have you

24 ever thought about that, or do you just think you've got

25 to go down this path?

1       Q.      Do you see Row 291?

2       A.      Sure.  Why not?

3       Q.      And the notes column says, "Website Support."

4  Do you see that?

5       A.      Yep.

6       Q.      Did Lisa Holly provide website support for

7  Phoenix Digital?

8       A.      Not a fucking day in her life.

9       Q.      When you say Mr. Conway put in entries for

10  tax deduction, are you saying that he put entries

11  related to Phoenix Digital in order to get a tax

12  deduction?

13      A.      No, are all -- every one of these entries in

14  here itemized so that when it comes to tax time he has

15  some sort of reference what was going on.  Have I not

16  told -- have we not proven time and time again that

17  these entries were probably entered incorrectly?  I

18  don't think Mr. Conway did it intentionally.  I have no

19  doubt that he didn't do it intentionally.

20      Q.      Do you know what website support is referring

21  to in Column 291?

22      A.      Oh, God.  No idea.  Do you?

23      Q.      There's also a number of references to Amex,

24  Rows 104, 105, 356, 357.  Do you know what those are

25  referring to?

1   A.  Yeah, Mr. Conway's perm- -- personal American

2 Express account.  Do you want to go in there?

3   **Q.**  **So the payments to Lisa's Repair were in**

4 **regards to Mr. Conway's personal Amex account?**

5   A.  I don't know what he paid her for.

6   **Q.**  **Didn't you just testify that you directed**

7 **Mr. Conway what payments to make?**

8   A.  Sure.  Absolutely.

9   **Q.**  **Are these payments that you directed**

10 **Mr. Conway to make?**

11      MR. MANN:  Object to the form.

12   A.  What are they for?

13   **Q.**  **Well, let's look at Row 356.  It says, "Mini**

14 **Gourmet Amex."  Do you know what that refers to?**

15   A.  No, I do not.

16   **Q.**  **Did you direct Mr. Conway to make that**

17 **payment?**

18   A.  Yes.

19   **Q.**  **Do you know what the Holiday Inn Amex is?**

20   A.  No, I do not.

21   **Q.**  **Do you know what the Parker's Lighthouse Amex**

22 **is?**

23   A.  No, I do not.

24   **Q.**  **Do you know -- do you know what the Hertz**

25 **Amex is?**

Page 123

1   STATE OF CALIFORNIA ) ss

2

3        I, LAURA A. GJUKA, CSR 10555, do hereby declare:

4

5        That, prior to being examined, the witness named

6   in the foregoing deposition was by me duly sworn

7   pursuant to Section 2093(b) and 2094 of the Code of

8   Civil Procedure;

9

10        That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to text under my direction.

13

14        I further declare that I have no interest in the

15   event of the action.

16

17        I declare under penalty of perjury under the laws

18   of the State of California that the foregoing is true

19   and correct.

20

21        WITNESS my hand this 7th day of November, 2022.

22

23   _____
     LAURA A. GJUKA, CSR 10555

24

25

# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
 2                      AT SEATTLE

 3   _____

 4   BUNGIE, INC.,                 )
                                                 CERTIFIED COPY
 5            Plaintiff,          )

 6     vs.                        ) No. 2:21-cv-811-TSZ

 7   AIMJUNKIES.COM; PHOENIX      )

 8   DIGITAL GROUP, LLC; DAVID    )

 9   SCHAEFER; JORDAN GREEN;      )

10   JEFFREY CONWAY; and JAMES    )

11   MAY,                         )

12            Defendants.         )

13   _____

14   VIDEO RECORDED 30(B)(6) DEPOSITION UPON ORAL EXAMINATION

15            OF PHOENIX DIGITAL GROUP, LLC

16               BY DAVID SCHAEFER

17   _____

18                  6:02 P.M.

19               MARCH 20, 2023

20       WITNESS LOCATED AT:  UNDISCLOSED LOCATION

21

22

23

24   REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25   JOB NO.: 971984
```

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4       CHRISTIAN W. MARCELO
        Perkins Coie LLP
5       1201 Third Avenue
        Suite 4900
6       Seattle, Washington 98101-3099
        (206) 359-8000
7       cmarcelo@perkinscoie.com

8

9   FOR THE DEFENDANTS:

10      PHILIP P. MANN
        Mann Law Group
11      403 Madison Avenue North
        Suite 240
12      Bainbridge Island, Washington 98110
        (206) 855-8839
13      phil@mannlawgroup.com

14

15  ALSO PRESENT:   SCOTT NORTON, Videographer
                    JAMES BARKER
16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    EXAMINATION BY:                          PAGE(S)

4       MR. MARCELO                            5

5

6

7    EXHIBITS FOR IDENTIFICATION              PAGE

8
     Exhibit 60  Counterclaim Exhibit E        13
9
     Exhibit 61  Screen Shot AimJunkies
10               Website 3/19/23              36

11   Exhibit 62  Notice of Deposition         74

12   Exhibit 63  Notice of Deposition         75

13   Exhibit 64  Phoenix Digital's Supplemental
                 Responses to Interrogatory 10  78
14
     Exhibit 65  Exhibit 5 to Bungie's
15               Amended Complaint            101

16   Exhibit 66  Screen Shot of AimJunkies
                 Website with Post
17               Dated 3/19/23               118
18

19

20

21

22

23

24

25

1                    MARCH 20, 2023

2                      6:02 P.M.

3                      --oOo--

4

5           VIDEOGRAPHER:  Good evening, everyone.  Here

6   begins the remote deposition of Phoenix Group, LLC,

7   pursuant FRCP 30(b)(6).  This is in the matter of

8   Bungie, Inc. versus AimJunkies.com, et al.  This case is

9   in the United States District Court, Western District of

10  Washington at Seattle.  Case number is 2:21-cv-811-TSZ.

11          Today's date is Monday, March 20th, 2023.  The

12  current time is 6:02 p.m. Pacific time.  This is a

13  remote deposition through Zoom video conferencing.  The

14  videographer is Scott Norton, here on behalf Centex

15  Litigation Services.  Would counsel please introduce

16  yourselves and state whom you represent?

17          MR. MARCELO:  Christian Marcelo for

18  Plaintiff, Bungie.  I'm joined by James Barker, general

19  counsel for Bungie.

20          MR. MANN:  And I am Philip Mann.  I'm here

21  on behalf of all Defendants, in particular Phoenix

22  Digital for this particular 30(b)(6) deposition.

23          VIDEOGRAPHER:  Thank you all very much.  Our

24  reporter today is of Betsy Decater with Centex.  Will

25  the reporter please swear in the witness.

1                      DAVID SCHAEFER,

2      sworn as a witness by the Certified Court Reporter,

3                     testified as follows:

4

5                        EXAMINATION

6    BY MR. MARCELO:

7      A.  Now, is this the personal or the 30(b)(6)?

8      Q.  This is the 30(b)(6) deposition of Phoenix

9    Digital.  My hope is that we will get everything done in

10   this one deposition.  But we can always shift over to

11   the other deposition after if we need to.

12          Mr. Schaefer, you've been through this deposition

13   process before, right?

14     A.  Yes.

15     Q.  You were deposed in connection with the

16   arbitration?

17     A.  Yes.

18     Q.  Okay.  So same general rules apply.  I'm going to

19   kind of go through them again.  Remember to talk one at

20   a time, wait for me to finish the question before you

21   start answering.  If something's unclear, ask me, I'll

22   try to make the question more clear.  No nonverbal

23   answers.  We'll need answers on the record.  Okay?

24     A.  Yes.

25     Q.  And especially in video chats we tend to start

1   Bungie accepting the terms of service other than what

2   you just said?

3      A.  What do you mean?

4      Q.  Is there any record of Bungie accepting the terms

5   of service?

6      A.  Is there any record of David Schaefer accepting

7   Bungie's terms of service?  Is there any record of Jeff

8   Conway accepting Bungie's terms of service?  Is there

9   any record of James May accepting Bungie's terms of

10  service?  Is there any record of Phoenix Digital Group,

11  LLC, accepting Bungie's terms of service?

12     Q.  Mr. Schaefer, I'll just redirect you to my

13  question.  Is there any record of Bungie --

14     A.  I just answered it.

15     Q.  Mr. Schaefer, are there any records of Bungie

16  accepting Phoenix Digital's terms of service?

17          MR. MANN:  Object to the form of the

18  question.

19     A.  I'm still waiting for you to show me my accepting

20  your terms of service or anybody else in our group.

21     Q.  (BY MR. MARCELO)  Mr. Schaefer, I'm going to need

22  an answer.

23     A.  Including Jeff Conway.

24     Q.  Are there any records showing that Bungie agreed

25  to Phoenix Digital's terms of service?

1                MR. MANN:  You mean other than the records

2      that are in the possession of Bungie?

3      **Q.  (BY MR. MARCELO)  Mr. Schaefer, what was your**

4      **answer to the question of whether --**

5      A.  The answer to the question is no.

6      **Q.  And who -- how many times did Bungie accept**

7      **Phoenix Digital's terms of service?**

8      A.  If they purchased once, then they agreed to it

9      once.  Every time you purchased, you had to agree.

10     **Q.  Does Phoenix Digital allege that Bungie agreed to**

11     **the terms of service more than once?**

12     A.  No.  We're not a -- I don't think they purchased

13     more than once, if I -- if I remember correctly.  And

14     another thing too, if you take a look in them terms of

15     service, it says that you can't go in there and purchase

16     under an alias also.  And if you look at PayPal's terms

17     of service, it's against PayPal's rules to use a fake

18     name like you guys did when you purchased it.  So not

19     only did you violate our terms of service, you violated

20     PayPal's terms of service.  Are you aware of that, Mr.

21     Barker?

22     **Q.  So walk me through how Phoenix Digital alleges**

23     **that Bungie accepted its terms of service.**

24     A.  Bungie accepted what?

25     **Q.  Walk me through how Phoenix Digital alleges that**

1    Bungie accepted and agreed to Phoenix Digital's terms of

2    service?

3              MR. MANN:  And I will remind the witness at

4    this point we do not have to play around with any of the

5    faking the names.  If you remember the names of the

6    person who did it, just say it.  We're -- enough of

7    this.  We're not going to sit here and try and protect

8    the guilty by using fake names.

9    Q.  (BY MR. MARCELO)  So, again, walk me through --

10   A.  Bungie testified that they had their agent

11   purchase the cheat.

12   Q.  Who set up the process on the AimJunkies website

13   of making accepting the terms of service a requirement?

14   A.  I did.

15   Q.  And so you were the one that, you know, wrote the

16   website in a way that whenever you purchased the product

17   you had to accept the terms of service?

18   A.  Yes.  It's called an API.

19   Q.  What's called an API?

20   A.  The application to do that.

21   Q.  And that API, it only required that someone

22   actually accept the terms of service before they

23   purchased it, but it doesn't actually collect any

24   information about that person that accepts it?

25   A.  No.

1    Q.  Phoenix Digital alleges that Bungie breached

2  Phoenix Digital's terms of service, right?

3    A.  Yes.

4    Q.  Okay.  Explain each way that Phoenix Digital

5  alleges Bungie breached the Phoenix Digital terms of

6  service.

7    A.  Not only did they purchase the software and

8  disassemble it, they purchased the software and used it.

9    Q.  Okay.  So they breached by disassembling the

10  software?

11    A.  Yes.

12    Q.  And they breached it by using the software?

13    A.  Yes.

14    Q.  Any other ways?

15    A.  Not that I can think of at the moment.

16    Q.  And this was one of the topics in the deposition

17  notice, right, was the ways that Phoenix Digital alleges

18  that Bungie breached the terms of service?

19    A.  Yes.

20    Q.  Okay.  How -- how exactly did Bungie disassemble

21  the software?

22    A.  I don't know.  I'm not Bungie.

23    Q.  Okay.  Let me back up actually.  When you say

24  disassemble and use the software, what software are you

25  referring to?

1               REPORTER'S CERTIFICATE

2       I, BETSY E. DECATER, the undersigned Certified Court

3   Reporter, pursuant to RCW 5.28.010 authorized to

4   administer oaths and affirmations in and for the State

5   of Washington, do hereby certify that the sworn

6   testimony and/or proceedings, a transcript of which is

7   attached, was given before me at the time and place

8   stated therein; that any and/or all witness(es) were

9   duly sworn to testify to the truth; that the sworn

10  testimony and/or proceedings were by me stenographically

11  recorded and transcribed under my supervision, to the

12  best of my ability; that the foregoing transcript

13  contains a full, true, and accurate record of all the

14  sworn testimony and/or proceedings given and occurring

15  at the time and place stated in the transcript; that a

16  review of which was requested; that I am in no way

17  related to any party to the matter, nor to any counsel,

18  nor do I have any financial interest in the event of the

19  cause.

20      WITNESS MY HAND and DIGITAL SIGNATURE this 27th day

21  of  March, 2023.

22  _____

23  BETSY E. DECATER, RPR
    Washington Certified Court Reporter, CCR 3109

24

25

# EXHIBIT F

1                  ARBITRATION BEFORE JAMS

2   _____

3   BUNGIE, INC.,                    )
                                     )   **CERTIFIED COPY**
4                  Claimant,         )
                                     )
5   vs.                              ) No. 5160000075
                                     )
6   AIMJUNKIES.COM; PHOENIX          )
    DIGITAL GROUP LLC; DAVID         )
7   SCHAEFER; JORDAN GREEN;          )
    JEFFREY CONWAY; and JAMES MAY,)
8                                    )
                                     )
9                  Respondents.      )
    _____

10

11    VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

12                     DAVID SCHAEFER

13  _____

14

15                   *** CONFIDENTIAL ***

16

17                        9:15 A.M.

18              FRIDAY, OCTOBER 28, 2022

19          1201 THIRD AVENUE, SUITE 4900

20                 SEATTLE, WASHINGTON

21

22

23  Reported by: Tami Lynn Vondran, CRR, RMR, CCR/CSR

24  WA CCR #2157; OR CSR #20-0477; CA CSR #14435

25  JOB NO.: 928464

Page 2

```
 1              A P P E A R A N C E S

 2

 3   FOR THE CLAIMANT:

 4           CHRISTIAN W. MARCELO

 5           WILLIAM C. RAVA

 6           JACOB P. DINI

 7           Perkins Coie

 8           1201 Third Avenue, Suite 4900

 9           Seattle, Washington 98101

10           206.359.8000

11           cmarcelo@perkinscoie.com

12           wrava@perkinscoie.com

13           jdini@perkinscoie.com

14

15   FOR THE RESPONDENTS:

16           PHILIP P. MANN

17           Mann Law Group

18           403 Madison Avenue North, Suite 240

19           Bainbridge Island, Washington 98110

20           206.436.0900

21           phil@mannlawgroup.com

22

23   ALSO PRESENT:

24           MATTHEW WOLCOTT, Videographer

25           JAMES BARKER, Bungie in-house counsel
```

Page 3

```
 1                      I N D E X

 2   EXAMINATION BY:                        PAGE:LINE

 3        Mr. Marcelo ...............................8: 2

 4        (Afternoon Session) Mr. Marcelo ..........144:11

 5

 6

 7

 8

 9   EXHIBITS FOR IDENTIFICATION                   MARKED

10   Exhibit 25  Limited Liability Company ..........31:22

11               Agreement of Phoenix Digital Group,

12               LLC, a Delaware Limited Liability

13               Company

14   Exhibit 26  PayPal Account Info for David .......67:16

15               Schaefer, PP_WDWA_0000014-21

16   Exhibit 27  Excel Spreadsheet, .................73: 9

17               PP_WDWA_0000146

18   Exhibit 28  Printout from Virtual Advantage, ....76:17

19               BUNGIE_JAMS_0001627-1628

20   Exhibit 29  Printout from AimJunkies, ..........93:15

21               BUNGIE_JAMS_0001633-1634

22   Exhibit 30  Defendant Phoenix Digital Group ....138: 5

23               LLC's Responses to Plaintiff's

24               First Set of Interrogatories

25               Nos. 1-7
```

```
                                                   Page 4
 1   EXHIBITS FOR IDENTIFICATION                     MARKED

 2   Exhibit 31   Printout from AimJunkies, ..........183: 1

 3                BUNGIE_JAMS_0001629-1632

 4   Exhibit 32   Printout from AimJunkies, Cheat ....188:16

 5                Status

 6   Exhibit 33   Printout from Mombot, Cheat .......193:20

 7                Status

 8   Exhibit 34   Printout from AimJunkies, ..........200:19

 9                BUNGIE_JAMS_0001635

10   Exhibit 35   Email from admin@aimjunkies.com, ...209:16

11                dated 12/17/19

12   Exhibit 36   Spreadsheet, BUNGIE_JAMS_1613 ......240: 1

13   Exhibit 37   Printout from AimJunkies, ..........249: 6

14                Destiny 2 Hack Features

15   Exhibit 38   Email from admin@aimjunkies.com, ...252:11

16                dated 12/7/19

17   Exhibit 39   Email from admin@aimjunkies.com, ...266:25

18                dated 1/3/20

19   Exhibit 40   Email from admin@aimjunkies.com, ...267:15

20                dated 12/31/19

21   Exhibit 41   Printout from AimJunkies, ..........271: 9

22                Recruiting Cheat Developers

23   Exhibit 42   Letter and Envelope to Mark ........278: 2

24                Humphrey, dated 11/20/20

25
```

Page 5

```
 1   EXHIBITS FOR IDENTIFICATION                    MARKED

 2   Exhibit 43  Letter from Mark Humphrey, dated ...293:24

 3               11/4/20, BUNGIE_WDWA_0000542-543

 4   Exhibit 44  Spreadsheet, PP_WDWA_0000146 .......294:17

 5   Exhibit 45  Spreadsheet, PP_WDWA_0000152 .......298: 8

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SEATTLE, WASHINGTON; FRIDAY, OCTOBER 28, 2022

2                         9:15 A.M.

3                         --ooo--

4

5          THE VIDEOGRAPHER:  And we are on the record.

6    Here marks the beginning of File 1 in the deposition of

7    David Schrader --

8          THE WITNESS:  Schaefer.

9          THE VIDEOGRAPHER:  -- in the matter of Bungie

10   incorporated versus AimJunkies.com, et al., in an

11   arbitration before JAMS, Case Number 5160000075.

12          Today's date is October 28th, 2022.  And the

13   time is approximately 9:15 a.m.

14          This deposition is taking place at the offices

15   of Perkins Coie, located at 1201 Third Avenue,

16   Suite 4900, Seattle, Washington 98101, and was noticed

17   by the claimant.

18          I'm the videographer today.  My name is

19   Matthew Wolcott of Central Court Reporting, 1700

20   Seventh Avenue, Suite 2100, Seattle, Washington 98101.

21   Phone number 206.682.5896.

22          The court reporter today is Tami Vondran, also

23   of Central Court Reporting.

24          Would counsel please introduce yourself and

25   state whom you represent.

1           MR. MARCELO:  Christian Marcelo from Perkins

2   Coie, representing Claimant Bungie, Inc.  And I'm joined

3   by William Rava and Jacob Dini from Perkins Coie, as

4   well as James Barker from Bungie.

5           MR. MANN:  And I am Philip Mann.  I am here on

6   behalf of the respondents.

7           And before we get started, would you mind if I

8   take a look at the video monitor just to make sure --

9           THE VIDEOGRAPHER:  Please do.

10          MR. MANN:  Thank you.

11          Make sure we got his good side and all that

12  stuff.

13          THE VIDEOGRAPHER:  There we go.

14          MR. MANN:  Looks fine.  Thanks.

15          THE WITNESS:  Oh, I was going to...

16          THE VIDEOGRAPHER:  And will the court reporter

17  now please swear in the witness.

18

19                    DAVID SCHAEFER,

20    sworn as a witness by the Certified Court Reporter,

21                  testified as follows:

22

23          THE COURT REPORTER:  Thank you.

24          Please proceed.

25

```
 1                    AFTERNOON SESSION

 2                       1:05 P.M.

 3                       --oOo--

 4

 5           THE VIDEOGRAPHER:  And we are back on the

 6  record.

 7           Here marks the beginning of File 5 in the

 8  deposition of David Schaefer.  The time is 1:05 p.m.

 9

10                  EXAMINATION RESUMED

11  BY MR. MARCELO:

12      Q.    Mr. Schaefer, before we had gone to lunch, we

13  had briefly discussed an individual named Lisa Holiday.

14      A.    Uh-huh.

15      Q.    And you had said that's your landlady?

16      A.    Was.

17      Q.    Was your landlady.

18            Did you have any other relationship with Lisa

19  Holiday?

20      A.    No.

21      Q.    Not your girlfriend?

22            THE WITNESS:  Is that fair?

23            MR. MANN:  Confidential.  I don't know what

24  the relevance is, but it would be easier if you just --

25  if you can answer, unless you have a concern.
```

```
 1        A.   What was the question?
 2        Q.   (BY MR. MARCELO)  She wasn't your girlfriend?
 3        A.   No.
 4        Q.   Not your wife?
 5        A.   No.
 6             See that?
 7        Q.   And to be clear, no other relationship with
 8   Lisa Holiday other than her being your landlady?
 9        A.   Yes.
10             For the record, there's no ring on my finger.
11        Q.   Did Lisa Holiday ever receive payments for you
12   from PDG?
13        A.   Yes.
14        Q.   And so were you paid through Lisa Holiday?
15             I can rephrase it, if that's helpful.
16        A.   Yeah.
17        Q.   PDG paid Lisa Holiday; right?
18        A.   Yes.
19        Q.   What did they pay Lisa Holiday for?
20        A.   Rent.
21        Q.   Anything else?
22        A.   Not that I'm aware of.
23             See, if you're the guy that controls the
24   money, and you know that you've got -- if you take a
25   look in those docs -- I know what you're referring to --
```

1    you'll look at all the payouts are the same.  It's all

2    partner pay.  Well, I designate -- she gave me her

3    PayPal.  I owed her money.  So instead of sending it to

4    me, I just sent it directly to her.

5           But if you look, the partner payouts are all

6    the same.  So it's not like there's some random number

7    going to Lisa Holiday.

8      Q.   I see.

9           So PDG account with money from the cheat

10   sales; right?

11     A.   Yes.

12     Q.   And you're owed a certain amount that would

13   normally go into your PayPal account?

14     A.   Yes.

15     Q.   And instead you -- because you're the one

16   directing where the finances go -- have that payment go

17   to -- directly to Lisa Holiday?

18     A.   That's correct.  Lived at the same address

19   because I rented a room.

20     Q.   Oh, you were renting a room in her apartment?

21     A.   House.

22     Q.   House?

23     A.   Yes.

24     Q.   From the payments sent from PDG to Lisa

25   Holiday, did she ever send payment back to you?

1       A.   I don't know.

2       **Q.   Did Lisa Holiday regularly pay you?**

3       A.   I did -- I did some work for her, you know,

4  for her -- for her -- you know, because she has a

5  regular job.  And I did some work for her and sometimes,

6  yes, she did pay me.

7       **Q.   Was it a regular payment, like monthly**

8  **payments?**

9       A.   No.  I think they were mixed -- there might

10  have been -- there was nothing set.  She -- you know,

11  her clients, I would do side work for.  That's why when

12  you were talking about PayPal payments, are all my

13  PayPal payments me, you know, or just from PDG, and I

14  said "I don't know," and now you just reminded me of

15  that.  I forgot about that.

16       **Q.   What was the type of work you were doing for**

17  **Lisa?**

18       A.   Search engine optimization and website

19  building and things like that.

20       **Q.   And is her company Lisa Repairs?**

21       A.   Yes.

22       **Q.   What does her company do?**

23       A.   I can't talk about that.  We're going to go

24  through the same deal that we went through yesterday.

25  She has clientele that do not want to be -- that she has

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, TAMI LYNN VONDRAN, the undersigned Certified

 4   Court Reporter/Shorthand Reporter for the State of

 5   Washington, the State of Oregon and the State of

 6   California, do hereby certify that the sworn testimony

 7   and/or proceedings, a transcript of which is attached, was

 8   given before me at the time and place stated therein; that

 9   any and/or all witness(es) were duly sworn to testify to

10   the truth; that the sworn testimony and/or proceedings

11   were by me stenographically recorded and transcribed under

12   my supervision, to the best of my ability; that the

13   foregoing transcript contains a full, true, and accurate

14   record of all the sworn testimony and/or proceedings given

15   and occurring at the time and place stated in the

16   transcript; that a review of which was requested; that I

17   am in no way related to any party to the matter, nor to

18   any counsel, nor do I have any financial interest in the

19   event of the cause.

20          WITNESS MY HAND AND DIGITAL SIGNATURE this 9th day

21   of November, 2022.

22   _____

23   TAMI LYNN VONDRAN, CRR, RMR, CCR/CSR
     Washington CCR #2157, Expires 10/6/2023
24   Oregon CSR #20-0477, Expires 9/30/2024
     California CSR #14435, Expires 10/31/2023
25
```

# EXHIBIT G

2022 ONSC 4181 (CanLII)

**CITATION:** Bungie Inc. v. TextNow Inc., 2022 ONSC 4181
**COURT FILE NO.:** CV-22-682808
**DATE:** 20220715

## ONTARIO SUPERIOR COURT OF JUSTICE

**RE:**       BUNGIE INC., JAMES DOE, AND JANE DOE Applicants

       -and-

       TEXTNOW INC., Respondent

**BEFORE:**  FL Myers J

**COUNSEL:** Neil Paris, Adam Stikuts, and Zach Parrott, for the Applicants

**READ:**     June 15, 2022

## ENDORSEMENT

### The Motion

[1]    I granted *ex parte* relief in this urgent motion in writing on June 15, 2022. In view of the serious nature of the allegations of danger to the individual applicants, I have withheld reasons until counsel for the applicants advised recently that the need for confidentiality had abated.

[2]    This is an application for an urgent and confidential *Norwich Pharamacal* order requiring the respondent to disclose the identity of customers who are using the respondent's anonymized telephone numbers to make racist and serious physical threats against the individual applicants.

[3]    The applicants have submitted evidence that customers of the respondent are "doxxing" the individual applicants. Doxxing refers to a malicious use of the internet to search for and expose on social media and elsewhere private information about individuals so as to threaten to harm them or to enable others to do so.

[4]    The application raised a number of procedural issues to which the applicants responded.

2022 ONSC 4181 (CanLII)

### The Facts

[5]  Bungie Inc. operates the popular multiplayer online game known as *Destiny 2*. More than 40 million users play or stream it (i.e. watch others play the game online).

[6]  The applicants James Doe and Jane Doe are employees of Bungie Inc. One is a developer. The other is a "Community Manager" who receives player feedback and communicates with players.

[7]  The two employees live together with their child in the United States. The precise location is not important.  What is clear however is that the underlying criminal and tortious activity against the two employees is aimed at them in the US and not in Ontario.

[8]  The respondent TextNow Inc. is a CBCA company with its registered office in Waterloo, Ontario. It is a mobile virtual network operator.

[9]  TextNow buys access to phone networks operated by telephone companies. It then provides its customers with access to telephone numbers in its name throughout North America for very little cost.

[10]  TextNow's terms of service make clear its intention to protect the anonymity of its customers.

[11]  While protecting customers' private information is usually a good and necessary function of any business, it comes as no surprise that a business that provides cheap, anonymous telephone numbers for customers might find its services used for nefarious purposes. One might pause to wonder whether this is the intent of TextNow's business model. But it makes no difference to the outcome and I have no evidence to make any findings on the point in any event.

[12]  On June 2, 2022, one of the applicant employees tweeted an advertisement for *Destiny 2* on his or her personal account on Twitter. The ad consisted of two videos of a *Destiny* player who goes by the online name or handle "Uhmaayyze".

[13]  Uhmaayyze is African-American. He is well known among those who play and watch *Destiny 2* because he performs freestyle rap on live-streaming platforms while he plays the game.

[14]   The video ads tweeted by an applicant name Uhmaayyze as a "Hero". They are part of a series of ads celebrating unique contributions of members of the "Destiny Community".

[15]   The Twitter account used by the applicant identified her as a representative of Bungie Inc.

[16]   Later that day, an anonymous person posted messages on Twitter directed at Bungie accounts threatening to kill Bungie employees on June 14, 2022. Shortly after, several employees of Bungie began receiving voicemails and text messages on personal, unpublished telephone numbers repeatedly using the racial slur referred to colloquially as the "N-word".

[17]   That night a person who called himself "Brian" left a voicemail on the personal telephone line of the employee who posted the ads. Brian referred to the employee by name and requested that *Destiny 2* provide a scene or a downloadable piece of the game (a "DLC") for "N-word killing". A few minutes later he called back and identified himself as a member of a far-right-wing social network known to publish material that is censored from mainstream social media. He repeated the request for an "N-word killing" DLC to be added to *Destiny 2*.

[18]   About an hour later, the other employee spouse received an anonymous text message saying:

> Hey actually scratch that. You're a fat bitch and [OTHER EMPLOYEE'S NAME] is a limp wristed homo. Tell him to pass this up to the team. ADD A N****R KILLING DLC.

[19]   Several voicemail messages were then left for the second employee including a recorded voice saying the N-word electronically chopped and edited to rapidly repeat the word in different pitches over 20 times.

[20]   In another voicemail, the caller said "Enjoy your pizza."

[21]   Around the same time, a person using the same telephone number as the anonymous caller ordered a pizza to the employees' home address.

[22]   Not surprisingly, the use of the employees' home address frightened them. They called the local police and made a report.

2022 ONSC 4181 (CanLII)

[23]  The applicants' evidence also reports that recently, a *Destiny 2* user with the username "@Inkcel" had been making threats against one of the employee applicants. Inkcel tweeted a picture of the employee's Bungie staff ID card. He tweeted that he had moved to live 30 minutes from the employee.

[24]  Inkcel tweeted that the employee "is not safe". Inkcel tweeted the employees full legal name.

[25]  The similarity of the name "Inkcel" to the term "incel" makes the threats more frightening to the applicants as well. The term "incel" stands for "involuntary celibate" and refers to a violent misogynist ideology espoused by some who identify themselves with that term.

[26]  The employees also fear that the use of their home address may be a prelude to a dangerous attack referred to as "swatting". This is a "prank" where someone reports to the police that a serious crime is under way at the victim's house. The goal is to induce the police to dispatch a SWAT team to the victim's home. If the victim is livestreaming at the time, the people watching on the internet presumably find it entertaining to watch the police invade the home of the unsuspecting victim.

[27]  Not only is it terrifying to have a SWAT team descend upon one's house, but it is dangerous. People have been killed in such "pranks".

[28]  Sending a pizza to a doxxing victim's home is a threat by the doxxer that he knowns where the victim and his or her family live.

**The Respondent**

[29]  The telephone number through which the anonymous person has been harassing the applicant employees is operated by the respondent TextNow.

[30]  I quote from the applicants' factum to describe information held by TextNow about its customers:

> 38.  According to [TextNow's] Privacy Policy, TextNow collects and retains information about its users, including: name; user ID; email address; phone number; Internet protocol ("IP") address; device ID; advertiser ID; device type, settings, and operating system; logs of calls and messages sent and received; credit card

2022 ONSC 4181 (CanLII)

number; records of purchases of TextNow services, information about the user's interactions with the TextNow application and advertisements; and latitude/longitude coordinates and general physical location or movements of the user from IP and Wi-Fi access information.

39. To create a new TextNow user account, the user must connect their TextNow account to a pre-existing Google, Facebook, or Apple account. TextNow likely has additional information connected to the Facebook, Apple, or Google account that John Doe used to register for TextNow's services. ***TextNow states it will only preserve its records for 90 days and absent a non-disclosure order, TextNow will inform users of any requests for their customer information and give them seven days to dispute the request in court.***

**Form of the Order**

40. To its credit, TextNow publishes a help page on its website describing the directions and details that it requires to process a court order for the production of user data. TextNow's policy specifies that the order must: be Addressed to "TextNow, Inc."; contain a valid TextNow number or username; contain a specific list of user data; contain a specific date or date range of the requested records due to number recycling; contain a specific time zone the requested records are in; be signed and dated; and include a requested due date of the Order. TextNow also provides an email address for receiving subpoenas and court processes. [Emphasis added. Footnotes omitted.]

**Procedural Issues**

[31]   On June 13, 2022, counsel submitted a request for an urgent hearing by email under s. C.1.8 of the *Notice to Profession – Toronto; Toronto Expansion Protocol for Court Hearings During COVID-19 Pandemic*. Counsel provided an unissued draft notice of application. It named only TextNow as the applicant. The draft application was accompanied by an affidavit of in-house counsel. The evidence in the affidavit was entirely based on unattributed hearsay and a fair degree of speculation.

2022 ONSC 4181 (CanLII)

[32]  In granting an urgent hearing in writing the next morning, I had the Trial Coordinator send the following endorsement to the counsel:

> This matter is urgent. It is brought without notice. Applications without notice are heard in writing under s. C.1.3 of the *Notice to the Profession* in the Toronto Region.
>
> I have several concerns about this application. The applicant is the employer of two people who are allegedly being harassed. Its standing to act for the victims is not at all clear. Moreover, the affiant has little personal knowledge of the matters to which he attests. The filing of articles about swatting and professing a fear of increasing degrees of risk of harm to the employees is purely speculative. This may be more a criminal matter for law enforcement where the employees reside.
>
> This is a *Norwich Pharamcol* [*sic*] proceeding to learn the name of the alleged harasser. Usually these orders are made on notice to the respondent and orders go on consent or are unopposed. The only rationale for proceeding *ex parte* here is the concern that the respondent has a policy to tell its customers of applications of this type. The court should hear submissions about the availability of an interim order prohibiting disclosure of the application by the respondent to its customer pending the outcome of the application on notice.
>
> I will consider the question of whether to make an interim order prohibiting disclosure of this application by the respondent when served. The applicant may deliver further evidence if so advised. It shall deliver a factum to establish (a) its standing to bring the *Norwich Pharmacal* application; (b) the admissibility of the General Counsel's evidence; and (c) the test for making an order without notice prohibiting a respondent from disclosing a *Norwich Pharamcal* [*sic*] application to the target of the investigation. The applicant shall also deliver a draft order. Material can be delivered to my Judicial Assistant at Therese.navrotski@ontario.ça.

[33]  Late that afternoon, counsel submitted revised material that resolved all of the issues that I had raised. Their factum was especially helpful and I express my gratitude to counsel for reacting so quickly and thoroughly.

2022 ONSC 4181 (CanLII)

### Anonymized proceedings

[34]    The applicants solved my concern about its standing by naming the employees as parties. It also delivered brief affidavits from the employees attesting to the information in the lead affidavit. The affidavits did not identify the employees by name. But they were signed and pursuant to my endorsement discussed below, I required that the application be commenced using the employees' legal names.

[35]    Where a party to a proceeding wishes anonymity, they need an order. Typically, the order is obtained in Civil Practice Court or in writing just before the commencement of the proceeding. The order should require the proceeding to be commenced in the parties' legal names. If there are grounds to do so, the initial material will be sealed immediately and the order will approve the use of pseudonyms to refer to those parties thereafter. In that way, there is a proper record of a proceeding brought by an identified person *sui juris* or with capacity to sue. Moreover, by using pseudonyms, an order sealing the full court file can usually be avoiding protecting the open courts principle.

### Notice to the Respondent

[36]    Some case law questions whether notice of applications for *Norwich Pharmacal* orders ought to be given to the alleged wrongdoer who is the target of the order. See, for example, *York University v. Bell Canada Enterprises*, 2009 CanLII 46447 (ON SC). The arguments against doing so usually centre on whether providing notice to the alleged wrongdoer might precipitate dissipation of assets or further wrongdoing. In this case, for example, it would border on the foolhardy to give notice to the alleged wrongdoer given the types of threats that he has made against the employees.

[37]    But here, the applicants go further and move without notice to the respondent service provider/recordkeeper. As I said in my first endorsement, usually these orders are made on notice and without opposition by credible recordkeepers like the banks, internet service providers (like Rogers, Bell, and Telus) or major website operators (like Google and Facebook for example).

2022 ONSC 4181 (CanLII)

[38]     The applicants submit that given the express promise by TextNow to inform its customers if their names are sought as set out in its terms of service, it is necessary to obtain an order preventing TextNow from doing so before it has a chance to follow through. One does not need a very broad imagination to think that there may be service providers who share the interests of those to whom they knowingly offer anonymizing services. Providing notice of an application for a *Norwich Pharmacal* order to such a company would be an invitation for it to hurry to notify its costumer before an order is made to prevent it from doing so.

[39]     Rule 38.06 allows a party to move for directions as to whether notice of an application is required. No specific factors are provided for the judge to consider on such a motion. However, by way of analogy, Rules 37.07 (2) and (3) allow for motions to be made without notice as follows:

> (2) Where the nature of the motion or the circumstances render service of the notice of motion impracticable or unnecessary, the court may make an order without notice.

> (3) Where the delay necessary to effect service might entail serious consequences, the court may make an interim order without notice.

[40]     In my view, in light of the express terms of service of TextNow, this is a case in which notice of the application should be waived in the interests of justice. The delay necessary to give notice of this proceeding "might entail serious consequences". If TextNow tells its customer, as it has committed to do, the harm he might commit given his anti-social behaviour and overt threats is very serious.

[41]     Accordingly, I made the following endorsement in granting the order sought on June 15, 2022:

> For reasons to be delivered, order to go as sought. The applicants shall commence the application in their legal names. The issued Notice of Application and any original amended notices and original affidavits shall be sealed and shall not form part of the public record pending further order of the court.

2022 ONSC 4181 (CanLII)

These proceedings are hereby anonymized. All references to the individual applicants shall use the pseudonyms James Doe and Jane Doe respectively. As soon as the application is commenced in

2022 ONSC 4181 (CanLII)

the parties' legal names, the title of proceeding is amended to substitute the pseudonyms for the legal names. All parties shall file only anonymized versions of their materials in the public court file.

The test for a *Norwich Pharmacal* order is readily met. The respondent's business model and public policies make it too dangerous to risk providing notice to it before non-disclosure and anonymization orders are in place. There will be no prejudice to the respondent by the issuance of this order. If the respondent moves to set aside this order, the burden will be on the applicants to justify the order afresh.

I am satisfied that a non-disclosure order is required to prevent the purpose of this order from being undermined.

The applicants shall give notice of the making of the sealing and confidentiality order to the press in accordance with the court's Practice Direction. A case conference may be convened before me if any member of the press advises the applicants' counsel that it wishes to question the order.

### The Norwich Pharmacal Order

[42]   In the *York University* decision mentioned above, Strathy J. (as he then was) set out the legal test for a *Norwich Pharmacal* order:

> [13] On August 21, 2009, the Court of Appeal for Ontario released its decision in GEA Group AG v. Ventra Group Co., [2009] O.J. No. 3457, 2009 ONCA 619 ("GEA Group"), which conducted an extensive review of the Canadian cases in which Norwich orders have been granted and discussed "the circumstances in which this extraordinary discretionary relief may be obtained in Ontario" (at para. 1). The Court of Appeal agreed with earlier authorities that the following factors govern the determination of whether to grant a Norwich order [at para. 51]:
>
> > (i) Whether the applicant has provided evidence sufficient to raise a valid, bona fide or reasonable claim;
> >
> > (ii) Whether the applicant has established a relationship with the third party from whom the information is sought,

2022 ONSC 4181 (CanLII)

such that it establishes that the third party is somehow involved in the acts complained of;

(iii) Whether the third party is the only practicable source of the information available;

(iv) Whether the third party can be indemnified for costs to which the third party may be exposed because of the disclosure; and

(v) Whether the interests of justice favour obtaining the disclosure. [List of cases omitted.]

[43]  The purpose of the order is to let the plaintiffs or applicants obtain the name of the person whom they wish to sue. No money damages are sought. The plaintiffs just seeks discovery of information – usually a name and address.

[44]  There also usually is no allegation that the respondent in the *Norwich Pharmacal* proceeding has done anything wrong itself. But, the target defendant, whom the plaintiff alleges is a wrongdoer, must have implicated the respondent somehow in his or her wrongful acts.

[45]  Here he used the respondent's anonymous telephone line to conduct his racist harassment and to make his threats. In most fraud cases, the fraudster deposits money in one or more bank accounts and uses the bank's services to move the money away from the plaintiff. The acts of the wrongdoer engage the recordkeeper respondent sufficiently in the wrongdoing that equity requires the recordkeeper to assist as the applicant/plaintiff seeks access to justice.

[46]  In *GEA Group AG v. Flex-N-Gate Corporation*, 2009 ONCA 619 (CanLII), the Court of Appeal stressed the importance for the court to assess the need for discovery and the proposed use to which the information sought may be put:

[85]…It is therefore incumbent on the applicant for a Norwich order to demonstrate that the discovery sought is required to permit a prospective action to proceed, although the firm commitment to commence proceedings is not itself a condition precedent to this form of equitable relief.'

...

> [91]… While an applicant for Norwich relief must establish that the discovery sought is needed for a legitimate objective, this requirement may be satisfied in various ways. The information sought may be needed to obtain the identity of a wrongdoer (as in Norwich Pharmacal), to evaluate whether a cause of action exists (as in P. v. T.), to plead a known cause of action, to trace assets (as in Bankers Trust and Leahy), or to preserve evidence or property (as in Leahy). The crucial point is that the necessity for a Norwich order must be established on the facts of the given case to justify the invocation of what is intended to be an exceptional, though flexible, equitable remedy.

[47]   In this case, the applicants have no intention to sue the target(s) in Ontario. Whether they sue in the US or just give the name to the police, I am satisfied that the exceptional equitable remedy ought to be available to identify people who harass others, with base racism, who dox, abuse personal information, and make overt threats of physical harm and death. Obtaining discovery of the identity of a purported criminal and civil wrongdoer is a recognized purpose of a *Norwich Pharmacal* order. It makes no difference that the wrongdoer target is not in Ontario or that proceedings will not be brought here. We exercise comity with the US courts and justice system and we know we can rely upon them to provide full faith and credit to our requests for assistance. While this request could have come though other routes (criminal or judicial), there is nothing objectionable about the use of a *Norwich Order* providing its prerequisites are met as they are here.

_____

FL Myers J

**Date:** July 15, 2022

2022 ONSC 4181 (CanLII)