# EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
 2                         AT SEATTLE

 3   _____

 4   BUNGIE, INC.,                  )
                                    )
 5             Plaintiff,           )
                                    )
 6      vs.                         ) No. 2:21-cv-811-TSZ
                                    )
 7   AIMJUNKIES.COM; PHOENIX        )
                                    )
 8   DIGITAL GROUP, LLC; DAVID      )
                                    )
 9   SCHAEFER; JORDAN GREEN;        )
                                    )
10   JEFFREY CONWAY; and JAMES      )
                                    )
11   MAY,                           )
                                    )
12             Defendants.          )

13   _____

14   VIDEO RECORDED 30(B)(6) DEPOSITION UPON ORAL EXAMINATION

15              OF PHOENIX DIGITAL GROUP, LLC

16                   BY DAVID SCHAEFER

17   _____

18                        6:02 P.M.

19                     MARCH 20, 2023

20        WITNESS LOCATED AT:  UNDISCLOSED LOCATION

21

22

23

24   REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25   JOB NO.: 971984
```

CERTIFIED COPY

Page 2

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4        CHRISTIAN W. MARCELO
         Perkins Coie LLP
5        1201 Third Avenue
         Suite 4900
6        Seattle, Washington 98101-3099
         (206) 359-8000
7        cmarcelo@perkinscoie.com

8

9    FOR THE DEFENDANTS:

10       PHILIP P. MANN
         Mann Law Group
11       403 Madison Avenue North
         Suite 240
12       Bainbridge Island, Washington 98110
         (206) 855-8839
13       phil@mannlawgroup.com

14

15   ALSO PRESENT:    SCOTT NORTON, Videographer
                      JAMES BARKER
16

17

18

19

20

21

22

23

24

25

Bungie, Inc. vs Aimjunkies.com, et al.   30(b)(6) David Schaefer 03/20/2023

Page 3

```
 1                          I N D E X

 2

 3    EXAMINATION BY:                                    PAGE(S)

 4       MR. MARCELO                                        5

 5

 6

 7    EXHIBITS FOR IDENTIFICATION                         PAGE

 8
      Exhibit 60   Counterclaim Exhibit E                  13
 9
      Exhibit 61   Screen Shot AimJunkies
10                 Website 3/19/23                         36

11    Exhibit 62   Notice of Deposition                    74

12    Exhibit 63   Notice of Deposition                    75

13    Exhibit 64   Phoenix Digital's Supplemental
                   Responses to Interrogatory 10           78
14
      Exhibit 65   Exhibit 5 to Bungie's
15                 Amended Complaint                      101

16    Exhibit 66   Screen Shot of AimJunkies
                   Website with Post
17                 Dated 3/19/23                          118

18

19

20

21

22

23

24

25
```

Page 4

1                    MARCH 20, 2023

2                        6:02 P.M.

3                         --oOo--

4

5           VIDEOGRAPHER:  Good evening, everyone.  Here

6   begins the remote deposition of Phoenix Group, LLC,

7   pursuant FRCP 30(b)(6).  This is in the matter of

8   Bungie, Inc. versus AimJunkies.com, et al.  This case is

9   in the United States District Court, Western District of

10  Washington at Seattle.  Case number is 2:21-cv-811-TSZ.

11          Today's date is Monday, March 20th, 2023.  The

12  current time is 6:02 p.m. Pacific time.  This is a

13  remote deposition through Zoom video conferencing.  The

14  videographer is Scott Norton, here on behalf Centex

15  Litigation Services.  Would counsel please introduce

16  yourselves and state whom you represent?

17          MR. MARCELO:  Christian Marcelo for

18  Plaintiff, Bungie.  I'm joined by James Barker, general

19  counsel for Bungie.

20          MR. MANN:  And I am Philip Mann.  I'm here

21  on behalf of all Defendants, in particular Phoenix

22  Digital for this particular 30(b)(6) deposition.

23          VIDEOGRAPHER:  Thank you all very much.  Our

24  reporter today is of Betsy Decater with Centex.  Will

25  the reporter please swear in the witness.

Page 5

1                     DAVID SCHAEFER,
2      sworn as a witness by the Certified Court Reporter,
3                     testified as follows:
4
5                          EXAMINATION
6    BY MR. MARCELO:
7       A.  Now, is this the personal or the 30(b)(6)?
8       Q.  This is the 30(b)(6) deposition of Phoenix
9    Digital.  My hope is that we will get everything done in
10   this one deposition.  But we can always shift over to
11   the other deposition after if we need to.
12          Mr. Schaefer, you've been through this deposition
13   process before, right?
14      A.  Yes.
15      Q.  You were deposed in connection with the
16   arbitration?
17      A.  Yes.
18      Q.  Okay.  So same general rules apply.  I'm going to
19   kind of go through them again.  Remember to talk one at
20   a time, wait for me to finish the question before you
21   start answering.  If something's unclear, ask me, I'll
22   try to make the question more clear.  No nonverbal
23   answers.  We'll need answers on the record.  Okay?
24      A.  Yes.
25      Q.  And especially in video chats we tend to start

1    Q.  What is Phoenix Digital's allegation regarding
2    how Bungie breached the terms of service by displaying
3    the cheat software?
4    A.  Let's scroll down two paragraphs.  "Unless
5    explicitly authorized by AimJunkies, our services and
6    our software may not be sold, resold, leased, rented,
7    leased, distributed, transferred or used in any
8    commercial way."  What is commercial way --
9    Q.  We'll get there in a second.  Mr. Schaefer, but
10   I'm still -- I just need an answer to the question
11   regarding the display.
12              MR. MANN:  Objection.  He already answered
13   your question.
14   A.  It was used in a commercial way.
15              MR. MANN:  And I object to you arguing with
16   the witness.  He answered your question.
17   Q.  (BY MR. MARCELO)  I'm going to ask back the
18   question again so that I have a clean answer.  What ways
19   is Phoenix Digital alleging that Bungie displayed the
20   cheat software that breached the terms of service?
21              MR. MANN:  Asked and answered.
22   A.  Yes.
23              MR. MANN:  Go ahead and answer again.  Let's
24   play the game here.
25   A.  Your -- what do you call that, a 301(b)(6) or

Page 50

1   whatever, the want-a-be expert said that you guys got it
2   from the guy that purchased it and you opened it up and
3   took a look at it.
4       Q.  (BY MR. MARCELO)  Okay.
5       A.  Also, also, our expert has looked at the AEO that
6   was provided and has provided us reports showing that
7   you guys did more than just look at it.
8           MR. MANN:  I'll caution you, Mr. Schaefer.
9   Don't get into any of that stuff.  That's a
10  non-testifying expert, so I'll caution you not to talk
11  about that.
12      Q.  (BY MR. MARCELO)  Mr. Schaefer, any other ways
13  Phoenix Digital alleges Bungie breached Phoenix
14  Digital's terms of service?
15      A.  Two paragraphs down it says that it was used in a
16  commercial way, and it's not to be used in any
17  commercial way.
18      Q.  And what exactly was the commercial way Bungie
19  used the cheat software?
20      A.  Your expert stated that they fired it up so they
21  could see how it worked.  A representative of Bungie who
22  said that they used it to see how it works, that's a
23  commercial way.
24      Q.  Can you explain that to me?  What do you mean
25  that is a commercial way?

Page 51

```
 1     A.   Was it used for personal use?
 2     Q.   So any use that's not personal use is commercial
 3  use?
 4     A.   100 percent.
 5     Q.   Any other ways that Phoenix Digital alleges
 6  Bungie breached the Phoenix Digital terms of service?
 7     A.   Let's go to the next paragraph, "You shall not
 8  modify, hack, decompile, disassemble, reverse engineer,
 9  derive source code or create derivative works of our
10  software in part or in whole.  You shall not transfer
11  our software or display the software's object code on
12  any computer screen or to make any hard copy memory
13  dumps of the software's object code."  We allege you did
14  that.
15     Q.   And when you say "we allege you did that," which
16  of those actions that you just read --
17     A.   All of the above.
18     Q.   Mr. Schaefer, just let me finish the question.
19          Which of those actions that you just read does
20  Phoenix Digital allege Bungie did?
21     A.   All of the above.
22     Q.   So Phoenix Digital alleges that Bungie modified
23  the cheat software?
24          MR. MANN:  Asked and answered.
25     Q.   (BY MR. MARCELO)  Is that right?
```

```
 1     A.  Phoenix Digital is paying none of the legal fees
 2   for none of the defendants because they don't have any
 3   revenue to pay fees.
 4     Q.  So who is paying the legal fees, then?
 5     A.  The individuals when they're financially capable.
 6   And at this point that's not happening real fast.  But,
 7   hey, I keep pushing.
 8     Q.  And so do these legal fees then include charges
 9   for Mr. May as well?
10     A.  I can't speak for Mr. May.
11     Q.  You don't know one way or another whether the
12   legal fees claimed as damages here include legal fees
13   for Mr. May?
14     A.  No, they do not.  I can only speak -- I'm
15   30(b)(6) and I can only speak for Phoenix Digital.  His
16   would be on top of this.
17     Q.  Let's scroll back up for a second to the second
18   sentence, "Such damages include but are not limited to
19   investigating and responding to inaccurate and factually
20   baseless claims."  Would you agree if the claims were
21   accurate, then there wouldn't be damages to Phoenix
22   Digital?
23     A.  I don't understand the question.
24     Q.  Yeah.  Let me phrase it a different way.
25         If the claims made by Bungie were accurate,
```

Page 85

```
 1   Phoenix Digital isn't alleging that Bungie would be
 2   liable for asserting those claims, right?
 3       A.   You can assert until the cows come home, but you
 4   ought to have some evidence to back it up.  No, it was
 5   your 30(b)(6) guy that said we don't have any evidence,
 6   we just believe.
 7       Q.   What I'm asking here is where it says "inaccurate
 8   and factually baseless claims," if the claims are
 9   accurate, is it Phoenix Digital's position that Bungie
10   would still be liable for these damages?
11       A.   I don't know.  I'm not a lawyer.
12       Q.   Let's talk about the valuation of AimJunkies.
13       A.   Yes.
14       Q.   Okay.  So in the supplemental response exhibit --
15   sorry, what exhibit is this?
16            THE COURT REPORTER:  I believe it's 64.
17            MR. MARCELO:  Thank you.
18       Q.   (BY MR. MARCELO)  Mr. Schaefer, in Exhibit 64,
19   supplemental response, it says, "The value of the
20   AimJunkies website declined from a high of $6,384,000 in
21   2019," right?
22       A.   Yes.
23       Q.   Where did the valuation of $6,384,000 come from?
24       A.   It came from a times revenue method of
25   calculating based on the federal tax returns.
```

Page 86

1   Q.  Explain to me what a times revenue calculation
2   is.
3   A.  I'll read it to you.  "Under the times revenue
4   business valuation method, a stream of revenues
5   generated over a certain period of time is applied to a
6   multiplier which depends on the industry and economic
7   environment."
8   Q.  And where are you reading that from?
9   A.  Investopia.  Investopedia, excuse me.
10  Q.  Who came up with this valuation?
11  A.  I did.
12  Q.  And how did you come up with it for 2019
13  specifically?  What inputs did you use?
14  A.  I used the federal tax return, like I've already
15  said.
16  Q.  And so the -- you used the revenue for Phoenix
17  Digital in 2019?
18  A.  Yes.
19  Q.  Do you have any educational background in
20  providing valuations of companies?
21  A.  What was the question?
22  Q.  Do you have any educational background in
23  providing valuations of companies?
24  A.  I don't understand the question.
25  Q.  Would you say you're an expert at providing

Page 87

```
 1   valuations of companies?
 2       A.   I wouldn't say I'm an expert.
 3       Q.   Is there any other factors you considered in
 4   determining the value of the AimJunkies website?
 5       A.   No.
 6       Q.   Were there any offers to purchase the AimJunkies
 7   website in 2019?
 8       A.   Yes.
 9       Q.   From who?
10       A.   Banek.
11       Q.   How much did he offer to purchase the website
12   for?
13       A.   I don't remember.
14       Q.   You remember the conversation with him --
15       A.   Yeah.  We've already covered all of this before,
16   Christian.  I'm not going to go down this path again.
17       Q.   I'm going to keep asking about these because
18   these are your specific damages.  The conversation with
19   Mr. Banek about purchasing the AimJunkies website, that
20   was in 2019?
21       A.   I believe so.  We sent -- if you remember
22   correctly, we sent a response to what's his name down in
23   LA and told him that we had sold it because we had it
24   sold.
25       Q.   And do you remember roughly how much Mr. Banek
```

```
 1   agreed to pay for the AimJunkies website?
 2       A.  I do not remember.
 3       Q.  Was it over one million?
 4       A.  I do not remember.
 5       Q.  And I'm just asking you if you remember if it was
 6   over a million dollars or not?
 7       A.  I'm not going to commit to a number because I do
 8   not remember what it was.
 9       Q.  Was anyone else involved in the conversation with
10   Mr. Banek about purchasing the website?
11       A.  No.
12       Q.  Any notes or writing evidencing that
13   conversation?
14       A.  No.
15       Q.  And it's just conversation between you and Mr.
16   Banek?
17       A.  Yes.
18       Q.  Who called who regarding that sale?
19       A.  Nobody called anybody.
20       Q.  How did you communicate around the sale?
21       A.  We've already covered all of this.
22       Q.  Mr. Schaefer, how did you communicate regarding
23   this sale?
24       A.  I don't remember.
25       Q.  And you don't remember if the sale -- the
```

```
 1              MR. MARCELO:  I think now's probably a good
 2   time to take a break because I'm sure that Betsy would
 3   love a break.
 4              VIDEOGRAPHER:  The time 8:03 p.m.  We're now
 5   off the record.
 6              (Recess taken.)
 7              VIDEOGRAPHER:  The time is 8:39 p.m.  We are
 8   back on the record.
 9       Q.  (BY MR. MARCELO)  Mr. Schaefer, you understand
10   you're still under oath?
11       A.  Yes.
12       Q.  Let's go back for a second to Exhibit 60, the
13   terms of service for Phoenix Digital.  What evidence
14   does Phoenix Digital have that that terms of service was
15   on the website in January of 2020?
16       A.  I'd have to think about that answer.  I don't
17   have an answer for that right now.  I know what the
18   facts are.  I don't have to guess.  I don't have to
19   surmise.  It's been on the site for years, and you can
20   ask anybody that's dealing with the site, whether it's
21   Jordan or Jeff or James or whoever, anybody you want to
22   bring in, and they're going to tell you all the same
23   thing because they know that's been there from day one.
24              MR. MANN:  And I'll state for the record
25   that testimony under oath is in fact evidence.
```

Page 98

```
 1      Q.  (BY MR. MARCELO)  And, Mr. Schaefer, all I'm
 2   asking is what evidence is there, whether it's
 3   testimony, whether it's documents --
 4      A.  Testimony.  I gave -- I gave you the documents
 5   that are on the site.  To be honest with you, your
 6   people have been there.  Is it the same one that's on
 7   there now as what was there before?  You tell me.
 8      Q.  When you say you gave the documents on the site,
 9   what documents are you referring to?
10      A.  The one that you've got here in -- on the record.
11      Q.  Right.  Are there any other documents related to
12   this 2020 terms of service that Phoenix Digital
13   produced?
14      A.  They're as accessible as what yours are from
15   2019.
16      Q.  Mr. Schaefer, I want to focus on Phoenix
17   Digital's terms of service, if there's any other records
18   of that 2020 terms of service being on the AimJunkies
19   website in January of 2020?
20      A.  Not that I'm aware of unless it's on Wayback or
21   something like Wayback.
22      Q.  And you referenced an expert earlier, and I don't
23   want to get into anything privileged, I'm just wondering
24   if that expert is expected to testify in this trial?
25      A.  I can't tell you at this point.
```

Page 99

1    Q.   You don't know one way or another?

2    A.   We will have expert this time.

3    Q.   You will have a testify -- the answer is you will

4    have a testifying --

5             MR. MANN:  At this point, wait, I'm going to

6    object.  This is getting into attorney work product

7    matters and attorney-client privilege.  Mr. Schaefer,

8    you do not have to answer any questions regarding the

9    strategy that you're going to follow based on advice

10   that you may or may not have received from your counsel.

11            MR. MARCELO:  And I -- Mr. Mann, let me know

12   if you disagree.  I think with this specific question of

13   whether the expert that was referred to is intended to

14   be a testifying expert, just one way or another is not

15   privileged.

16            MR. MANN:  Did you say is intended to?

17            MR. MARCELO:  Right.  The expert --

18            MR. MANN:  No.  No.  If you're talking -- if

19   you're talking -- if you're asking about what our

20   intentions are, what procedures we intend to follow in

21   the course of this litigation, you are asking for

22   attorney work product.  We are not obliged to tell you

23   what our strategy is, what our intentions are and how

24   we're going to handle this litigation.  That is

25   privileged.  You do not have to answer.

Page 100

```
 1              MR. MARCELO:  And, Mr. Mann, you're saying
 2   that covers whether or not the expert that's been
 3   referred to will testify at the trial or not?
 4              MR. MANN:  Your all -- you're asking for
 5   what our intentions are.  Have we identified anyone as a
 6   testifying expert?
 7              MR. MARCELO:  Well, and that's why I'm
 8   clarifying.
 9              MR. MANN:  No.  Can you read English?  Have
10   you seen us identify anyone as a testifying expert?
11              MR. MARCELO:  Mr. Mann, I'll remind you of
12   your own reminder of professionalism.
13              MR. MANN:  I'm asking you a question.  You
14   understand this.  Have we identified any testifying
15   experts?  That's a yes or no question, and it can be
16   answered by somebody who can read and understand
17   English.
18              MR. MARCELO:  No, not to our knowledge you
19   haven't identified --
20              MR. MANN:  Then, then, then you have no
21   business asking this question.  You're asking for what
22   our intentions are and how we're going to handle this
23   lawsuit.  We are not going to tell you our strategy or
24   what our intentions are.  You will find out what you're
25   entitled to in due course.  Simple as that.
```

Page 101

1  Q. (BY MR. MARCELO)  Mr. Schaefer, is Phoenix
2  Digital contending that Bungie's trademark for the
3  Destiny 2 mark are invalid?
4  A. That Bungie's Destiny 2 marks are invalid?
5  Q. Right.
6  A. Yes.
7  Q. On what basis?
8  A. The only ones that were valid was for Beyond
9  Light, and there were eight subscriptions sold in Beyond
10 Light.  Everything else is not valid.
11 Q. And when you say not valid as to Phoenix -- or as
12 to Bungie's Destiny 2 marks --
13 A. There were -- there were no trademarks -- if you
14 look at the date of the trademarks, they were not in
15 place at the time of the litigation or the time that we
16 were selling the cheat.
17        (Deposition Exhibit No. 65 was marked for
18        identification.)
19 Q. (BY MR. MARCELO)  I'll drop into the chat what
20 will be marked as Exhibit 65.  Mr. Schaefer, do you see
21 this document?
22 A. Yep.
23 Q. This was attached to Bungie's Amended Complaint,
24 Exhibit 5.
25 A. That's Destiny.  That's not Destiny 2.

Page 129

1      REPORTER'S CERTIFICATE

2      I, BETSY E. DECATER, the undersigned Certified Court

3   Reporter, pursuant to RCW 5.28.010 authorized to

4   administer oaths and affirmations in and for the State

5   of Washington, do hereby certify that the sworn

6   testimony and/or proceedings, a transcript of which is

7   attached, was given before me at the time and place

8   stated therein; that any and/or all witness(es) were

9   duly sworn to testify to the truth; that the sworn

10  testimony and/or proceedings were by me stenographically

11  recorded and transcribed under my supervision, to the

12  best of my ability; that the foregoing transcript

13  contains a full, true, and accurate record of all the

14  sworn testimony and/or proceedings given and occurring

15  at the time and place stated in the transcript; that a

16  review of which was requested; that I am in no way

17  related to any party to the matter, nor to any counsel,

18  nor do I have any financial interest in the event of the

19  cause.

20      WITNESS MY HAND and DIGITAL SIGNATURE this 27th day

21  of  March, 2023.

22  *[signature: Betsy E. Decater]*

23  BETSY E. DECATER, RPR
    Washington Certified Court Reporter, CCR 3109
24

25