1

2

THE HONORABLE THOMAS S. ZILLY

3

4

5

6

7               UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
8                        AT SEATTLE

9    BUNGIE, INC.,                          No. 2:21-cv-811-TSZ

10                        Plaintiff,         DECLARATION OF WILLIAM C. RAVA
                                            IN SUPPORT OF PLAINTIFF BUNGIE,
11   v.                                     INC.'S MOTION FOR SUMMARY
                                            JUDGMENT
12   AIMJUNKIES.COM; PHOENIX
     DIGITAL GROUP LLC; DAVID               EXHIBITS 7, 8, 9, 10, 11, 12, 18, 25, 26, 36
13   SCHAEFER; JORDAN GREEN;                FILED UNDER SEAL
     JEFFREY CONWAY; and JAMES MAY,
14
                        Defendants.
15

16         I, William C. Rava, declare as follows:

17         1.      I am an attorney licensed to practice law before the courts of the State of

18   Washington.  I am a Partner at Perkins Coie LLP, and counsel in this action for Plaintiff Bungie,

19   Inc. ("Bungie" or "Plaintiff"). I submit this declaration in support of Plaintiff Bungie, Inc.'s

20   Motion for Summary Judgment. I have personal knowledge of the facts stated herein and, if called

21   upon, could and would testify competently thereto under oath.

22         2.      Attached hereto as **Exhibit 1** is a true and correct copy of the trademark registration

23   certificate for DESTINY (& design) (U.S. Reg. No. 4,321,315) produced bearing Bates numbers

24   BUNGIE_WDWA_0000365-366.

25

26

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the copyright registration certificate for *Destiny 2* (TX 8-933-655), which covers the software code for *Destiny 2*, produced bearing Bates numbers BUNGIE_WDWA_0000355-356.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the copyright registration certificate for *Destiny 2: Beyond Light* (TX 8-933-658), which covers the software code for *Destiny 2: Beyond Light*, produced bearing Bates numbers BUNGIE_WDWA_0000360-361.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the copyright registration certificate for *Destiny 2: Beyond Light* (PA 2-280-030), which covers the audiovisual material for *Destiny 2: Beyond Light*, produced bearing Bates numbers BUNGIE_WDWA_0001384-1385

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the copyright registration certificate for Destiny 2 (PA 2-282-670), which covers the audiovisual material for *Destiny 2*, produced bearing Bates numbers BUNGIE_WDWA_0001410-1411.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the November 21, 2022 Video Game Cheating Expert Witness Report of Mr. Steven Guris.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the Limited Liability Company Agreement of Phoenix Digital Group, LLC, produced by Defendants with the Bates-numbered file name PDG0091.

9.      Attached hereto as **Exhibit 8** are true and correct copies of excerpts from the October 19, 2022 deposition of Jeffrey Conway.

10.     Attached hereto as **Exhibit 9** are true and correct copies of excerpts from the October 12, 2022 deposition of Jordan Green.

11.     Attached hereto as **Exhibit 10** are true and correct copies of excerpts from the October 28, 2022 deposition of David Schaefer.

12.     Attached hereto as **Exhibit 11** are true and correct copies of excerpts from the October 25, 2022 deposition of James May.

RAVA DECL. ISO BUNGIE'S
MOT. FOR SUMMARY JUDGMENT
(No. 2:21-cv-811-TSZ) – 2

163010126.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

13.     Attached hereto as **Exhibit 12** is a true and correct copy of a spreadsheet produced by PayPal in response to Bungie's June 23, 2022 subpoena to PayPal, Inc. that reflects transactions from Phoenix Digital Group LLC's PayPal account for AimJunkies.com.  The spreadsheet has been modified to remove columns with no information or irrelevant information.  The total amount of sales, as reflected in column J, is $951,712.67

14.     Attached hereto as **Exhibit 13** is a true and correct copy of a November 15, 2019 email, produced by Defendants with the Bates-numbered file name PDG0058.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of a December 17, 2019 email, produced by Defendants with the Bates-numbered file name PDG0055.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of a December 23, 2019 email, produced by Defendants with the Bates-numbered file name PDG0048.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of a screenshot from the website located at https://twitter.com/AimJunkies, captured at my direction on December 2, 2020 and produced bearing Bates number BUNGIE_WDWA_0000608.

18.     Attached hereto as **Exhibit 17** is a true and correct copy of a screenshot from the website located at https://forum.aimjunkies.com/f124/destiny-2-cheat-information-120587/, captured at my direction on December 2, 2020 and produced bearing Bates numbers BUNGIE_WDWA_0000602-605.

19.     Attached hereto as **Exhibit 18** are true and correct copies of excerpts from the October 31, 2022 Rule 30(b)(6) deposition of David Schaefer as the corporate representative of Phoenix Digital Group LLC.

20.     Attached hereto as **Exhibit 19** are true and correct copies of excerpts from the April 5, 2023 deposition of Jeffrey Conway.

21.     Attached hereto as **Exhibit 20** is a true and correct copy of Deposition Exhibit 37 from the October 28, 2022 deposition of David Schaefer.

RAVA DECL. ISO BUNGIE'S
MOT. FOR SUMMARY JUDGMENT
(No. 2:21-cv-811-TSZ) – 3

163010126.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

22.     Attached hereto as **Exhibit 21** is a true and correct copy of a screenshot from the Destiny 2 – Official Gameplay Reveal Trailer, produced bearing Bates number BUNGIE_WDWA_0000324.

23.     Attached hereto as **Exhibit 22** is a true and correct copy of a December 25, 2019 email, produced by Defendants with the Bates-numbered file name PDG0050.

24.     Attached hereto as **Exhibit 23** is a true and correct copy of a December 28, 2019 email, produced by Defendants with the Bates-numbered file name PDG0053.

25.     Attached hereto as **Exhibit 24** is a true and correct copy of a January 3, 2020 email, produced by Defendants with the Bates-numbered file name PDG0057.

26.     Attached hereto as **Exhibit 25** is a true and correct copy of the November 21, 2022 Expert Report of Drew E Voth.

27.     Attached hereto as **Exhibit 26** are true and correct copies of excerpts from the May 9, 2023 deposition of John Doe, the individual who is the subject of the Court's May 2, 2023 Protective Order (Dkt. No. 126).

28.     Attached hereto as **Exhibit 27** are true and correct copies of excerpts from the March 20, 2023 Rule 30(b)(6) deposition of David Schaefer as the corporate representative of Phoenix Digital Group LLC.

29.     Attached hereto as **Exhibit 28** are true and correct copies of excerpts from the October 4, 2022 deposition of Dr. Edward Kaiser.

30.     Attached hereto as **Exhibit 29** is a true and correct copy of Phoenix Digital Group LLC's September 2, 2022 Supplemental Responses to Plaintiff's Interrogatories Nos. 2, 6, and 7.

31.     Attached hereto as **Exhibit 30** is a true and correct copy of a screenshot of an archived screenshot of the website located at https://cheats-hacks-aimbot.aimjunkies.com/destiny2 from June 18, 2021, captured at my direction on October 28, 2022 and produced bearing Bates numbers BUNGIE_WDWA_0001395-1397.

RAVA DECL. ISO BUNGIE'S
MOT. FOR SUMMARY JUDGMENT
(No. 2:21-cv-811-TSZ) – 4

163010126.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    32.    Attached hereto as **Exhibit 31** are true and correct copies of excerpts from the

2  March 23, 2023 deposition of James May.

3    33.    Attached hereto as **Exhibit 32** is a true and correct copy of a document titled

4  "Swifty (AimJunkies)", produced bearing Bates number BUNGIE_WDWA_0000367.

5    34.    Attached hereto as **Exhibit 33** is a true and correct copy of Defendant James May's

6  March 14, 2023 Supplemental Response to Plaintiff's Interrogatory No. 8.

7    35.    Attached hereto as **Exhibit 34** is a true and correct copy of a document titled

8  "Terms of Service – AimJunkies Terms of Service", produced by Defendants with the Bates-

9  numbered file name PDG0066.

10   36.    Attached hereto as **Exhibit 35** is a true and correct copy of Defendant Phoenix

11 Digital Group LLC's March 15, 2023 Supplemental Response to Plaintiff's Interrogatory No. 10.

12   37.    Attached hereto as **Exhibit 36** is a true and correct copy of the April 21, 2023

13 Supplemental Expert Report of Dew E. Voth.

14

15

16   I declare under penalty of perjury under the laws of the United States that the foregoing is

17 true and correct.

18

19   Executed this 20th day of July, 2023.

20                              /s/William C. Rava
21                              William C. Rava

22

23

24

25

26

RAVA DECL. ISO BUNGIE'S
MOT. FOR SUMMARY JUDGMENT
(No. 2:21-cv-811-TSZ) – 5

163010126.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# EXHIBIT 1

# United States of America

## United States Patent and Trademark Office

# D E S T I N Y



**Reg. No. 4,321,315**

**Registered Apr. 16, 2013**

**Int. Cl.: 9**

**TRADEMARK**

**PRINCIPAL REGISTER**

BUNGIE, INC. (DELAWARE CORPORATION)
550 106TH AVENUE NE
SUITE 207
BELLEVUE, WA 980045088

FOR: COMPUTER GAME SOFTWARE; COMPUTER GAME SOFTWARE DOWNLOADABLE
FROM A GLOBAL COMPUTER NETWORK; VIDEO GAME SOFTWARE, IN CLASS 9 (U.S.
CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-1-2013; IN COMMERCE 2-1-2013.

THE MARK CONSISTS OF THE STYLIZED WORD "DESTINY" AND MISCELLANEOUS
DESIGN WHICH CONSISTS OF A ROUNDED THREE SIDED SHAPE POINTING DOWN
WITH AN OBLONG VERTICAL SHAPE CENTERED IN THE TOP OF THE DESIGN.

SN 77-784,606, FILED 7-20-2009.

BRIAN PINO, EXAMINING ATTORNEY



Acting Director of the United States Patent and Trademark Office

BUNGIE_WDWA_0000365

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

---

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

Page: 2 / RN # 4,321,315

BUNGIE_WDWA_0000366

# EXHIBIT 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**
## TX 8-933-655
**Effective Date of Registration:**
February 09, 2021
**Registration Decision Date:**
February 10, 2021

---

## Title
_____

**Title of Work:**   Destiny 2

## Completion/Publication
_____

**Year of Completion:**   2017
**Date of 1st Publication:**   September 09, 2017
**Nation of 1st Publication:**   United States

## Author
_____

- **Author:**   Bungie, Inc.
  **Author Created:**   computer program
  **Work made for hire:**   Yes
  **Citizen of:**   United States

- **Author:**   Activision Publishing, Inc.
  **Author Created:**   computer program, contributions to computer code
  **Work made for hire:**   Yes
  **Citizen of:**   United States

## Copyright Claimant
_____

**Copyright Claimant:**   Bungie, Inc.
550 106th Ave NE, Suite 207, Bellevue, WA, 98004, United States
**Transfer statement:**   By written agreement

## Limitation of copyright claim
_____

**Material excluded from this claim:**   computer program, previously published and third-party contributions to the computer code
**Previous registration and year:**   TX0008047244, 2015

**New material included in claim:**   computer program, new and revised computer code

Page 1 of 2

BUNGIE_WDWA_0000355

## Rights and Permissions

|                         |                                  |
|------------------------:|----------------------------------|
| **Organization Name:**  | Bungie Legal Department, Bungie, Inc. |
| **Email:**              | legal@bungie.com                 |
| **Address:**            | 550 106th Ave NE                 |
|                         | Suite 207                        |
|                         | Bellevue, WA 98004 United States |

## Certification

|                                |                      |
|-------------------------------:|----------------------|
| **Name:**                      | Patchen M. Haggerty  |
| **Date:**                      | February 09, 2021    |
| **Applicant's Tracking Number:** | 139303-6000.US01   |

|                    |     |
|-------------------:|-----|
| **Correspondence:** | Yes |

BUNGIE_WDWA_0000356

# EXHIBIT 3

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**
**TX 8-933-658**
**Effective Date of Registration:**
February 09, 2021
**Registration Decision Date:**
February 10, 2021

## Title
_____

Title of Work: Destiny 2: Beyond Light

## Completion/Publication
_____

Year of Completion: 2020
Date of 1st Publication: November 10, 2020
Nation of 1st Publication: United States

## Author
_____

- Author: Bungie, Inc.
  Author Created: computer program
  Work made for hire: Yes
  Citizen of: United States

- Author: Activision Publishing, Inc.
  Author Created: computer program, contributions to computer code
  Work made for hire: Yes
  Citizen of: United States

## Copyright Claimant
_____

Copyright Claimant: Bungie, Inc.
550 106th Ave NE, Suite 207, Bellevue, WA, 98004, United States
Transfer statement: By written agreement

## Limitation of copyright claim
_____

Material excluded from this claim: computer program, previously published and third-party contributions to the computer code
Previous registration and year: TX0008047244, 2015

New material included in claim: computer program, new and revised computer code

Page 1 of 2

BUNGIE_WDWA_0000360

## Rights and Permissions

|                        |                                         |
|-----------------------:|-----------------------------------------|
| **Organization Name:** | Bungie Legal Department, Bungie, Inc.   |
|             **Email:** | legal@bungie.com                        |
|           **Address:** | 550 106th Ave NE                        |
|                        | Suite 207                               |
|                        | Bellevue, WA 98004 United States        |

## Certification

|                                 |                        |
|--------------------------------:|------------------------|
|                       **Name:** | Patchen M. Haggerty    |
|                       **Date:** | February 09, 2021      |
| **Applicant's Tracking Number:**| 139303-6000.US02       |

|                        |       |
|-----------------------:|-------|
| **Correspondence:**    | Yes   |

BUNGIE_WDWA_0000361

# EXHIBIT 4

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**
## PA 2-280-030
**Effective Date of Registration:**
February 10, 2021
**Registration Decision Date:**
March 05, 2021

## Title _____

**Title of Work:** Destiny 2: Beyond Light

## Completion/Publication _____

**Year of Completion:** 2020
**Date of 1st Publication:** November 10, 2020
**Nation of 1st Publication:** United States

## Author _____

- **Author:** Bungie, Inc.
  **Author Created:** audiovisual material including music and sounds
  **Work made for hire:** Yes
  **Citizen of:** United States

- **Author:** Activision Publishing, Inc.
  **Author Created:** contributions to audiovisual material
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant _____

**Copyright Claimant:** Bungie, Inc.
550 106th Ave NE, Suite 207, Bellevue, WA, 98004, United States
**Transfer statement:** By written agreement

## Limitation of copyright claim _____

**Material excluded from this claim:** preexisting audiovisual material, music compositions and sound recordings from previous versions of "Destiny 2" videogame

**New material included in claim:** audiovisual material including musical compositions and sounds

## Rights and Permissions _____

BUNGIE_WDWA_0001384

|  |  |
|---|---|
| **Organization Name:** | Bungie Legal Department, Bungie, Inc. |
| **Email:** | legal@bungie.com |
| **Address:** | 550 106th Ave NE |
| | Suite 207 |
| | Bellevue, WA 98004 United States |

## Certification

|  |  |
|---|---|
| **Name:** | Patchen M. Haggerty |
| **Date**: | February 10, 2021 |
| **Applicant's Tracking Number**: | 139303-6000.US04 |

|  |  |
|---|---|
| **Correspondence:** | Yes |

BUNGIE_WDWA_0001385

# EXHIBIT 5

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director



**Registration Number**

## PA 2-282-670

**Effective Date of Registration:**
March 23, 2021
**Registration Decision Date:**
March 24, 2021

## Title

**Title of Work:**  Destiny 2

## Completion/Publication

**Year of Completion:**  2017
**Date of 1st Publication:**  September 09, 2017
**Nation of 1st Publication:**  United States

## Author

- **Author:**  Bungie, Inc
  **Author Created:**  audiovisual material including music and sounds
  **Work made for hire:**  Yes
  **Citizen of:**  United States

- **Author:**  Activision Publishing, Inc
  **Author Created:**  contributions to audiovisual material
  **Work made for hire:**  Yes
  **Citizen of:**  United States

## Copyright Claimant

**Copyright Claimant:**  Bungie, Inc
550 106th Ave NE, Suite 207, Bellevue, WA, 98004, United States
**Transfer statement:**  By written agreement

## Limitation of copyright claim

**Material excluded from this claim:**  preexisting audiovisual material from prior "Destiny" videogame

**New material included in claim:**  audiovisual material including musical compositions and sounds

## Rights and Permissions

Page 1 of 2

BUNGIE_WDWA_0001410

|  |  |
|---|---|
| **Organization Name:** | Bungie Legal Department, Bungie, Inc |
| **Email:** | legal@bungie com |
| **Address:** | 550 106th Ave NE |
| | Suite 207 |
| | Bellevue  WA 98004 United States |

## Certification

|  |  |
|---|---|
| **Name:** | Patchen M  Haggerty |
| **Date** | March 23, 2021 |
| **Applicant's Tracking Number.** | 139303-6000 US03 |

|  |  |
|---|---|
| **Correspondence:** | Yes |

BUNGIE_WDWA_0001411

# EXHIBIT 6



# Video Game Cheating
# Expert Witness Report
# of
# Mr. Steven Guris
# for
# Perkins Coie LLP

*Client Confidential*

*Client Confidential*

# Table of Contents

**Introduction**                                                                                              **2**
   Qualifications                                                                          3
   Compensation                                                                          4

**Summary of Opinions**                                                                          **4**

**Background & Opinions**                                                                     **5**
   Background                                                                              5
      General Definitions and Categorization                     5
      Genre- & Destiny 2-specific Terminology                  6
      Game Devices and Digital Download                         9
      Technical Terms                                                        10
   Importance of Viral Marketing                                               11
   Game Ecosystem Investment                                               12
      Game Setting and Suspension of Disbelief                 12
      Long Term Player Investment                                  13
         Microtransactions and Cosmetic Purchases     14
   Security Relationships                                                          15
   Cheating in Video Games                                                       16
      The Anatomy of a Modern Cheat                           17
         Relevant Terminology                             17
      AimJunkies Cheat Loader Download and Installation    19
      AimJunkies Cheat Loader: Static Analysis             21
      AimJunkies Cheat: General Inferences                  24
      AimJunkies Loader Dynamic Analysis and Reverse-Engineering     26
   Game Product Devaluation                                                   29

**Conclusion**                                                                                            **31**

*Client Confidential*

# Introduction

1. I have been retained as an expert by Bungie, Inc. ("Bungie") to provide my report and testimony in connection with the litigation titled *Bungie, Inc. v. AimJunkies.com, et al.*, No. 2:21-cv-811 before Hon. Thomas S. Zilly at the United States District Court for the Western District of Washington.

2. I have been asked to provide my opinion regarding the video game industry, video game gameplay, and the impact of video game cheats on video games and the video game industry, as well as my technical knowledge of general modern video game cheat operation and the investigative work I have done on the AimJunkies loader specifically.

3. I have been asked to provide this expert report to lay out my opinions on the matter in dispute.

4. The opinions set forth in this report are based on my expertise related to video games and Bungie's *Destiny 2*, as well as my professional experience as an active investigator in digital forensics and cybercrime, and my review of the following documents:

   - BUNGIE_WDWA_0000469
   - BUNGIE_WDWA_0000602
   - BUNGIE_WDWA_0000606
   - PDG_0048
   - PDG_0049
   - PDG_0050
   - PDG_0052
   - PDG_0053
   - PDG_0054
   - PDG_0055
   - PDG_0056
   - PDG_0057
   - PDG_0058
   - PDG_0059
   - PDG_0060
   - HAHN_0000001
   - HAHN_0000004
   - HAHN_0000007
   - HAHN_0000010
   - HAHN_0000013
   - HAHN_0000016
   - HAHN_0000019
   - HAHN_0000022
   - HAHN_0000025
   - HAHN_0000028
   - HAHN_0000031

*Client Confidential*

- - HAHN_0000035
  - HAHN_0000038
  - Rogers, Everett M.; Larsen, Judith K., Silicon Valley Fever: Growth of High-technology Culture, 1985.
  - https://www.marketwatch.com/story/videogames-are-a-bigger-industry-than-sports-and-movies-combined-thanks-to-the-pandemic-11608654990
  - https://www.statista.com/statistics/499703/share-consumers-ever-play-video-games-by-age-usa/, Vorhaus Digital Strategy Study 2022, p. 91.
  - https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/
  - https://www.trade.gov/ecommerce-frontline-social-media-forecast
  - https://www.indeed.com/hire/job-description/community-manager
  - https://www.oxfordreference.com/view/10.1093/oi/authority.20110803100544310
  - https://www.jstor.org/stable/j.ctv1hp5hqw.13
  - https://www.bungie.net/7/en/legal/sla
  - https://support.microsoft.com/en-us/topic/june-28-2022-kb5014666-os-builds-19042-1806-19043-1806-and-19044-1806-preview-4bd911df-f290-4753-bdec-a83bc8709eb6
  - https://support.microsoft.com/en-us/topic/july-12-2022-kb5015807-os-builds-19042-1826-19043-1826-and-19044-1826-8c8ea8fe-ec83-467d-86fb-a2f48a85eb41
  - https://docs.microsoft.com/en-us/windows/security/identity-protection/user-account-control/how-user-account-control-works
  - https://www.virustotal.com/gui/file/2abae185fc87476e00e45c7d3a171a4a2c0a57d714b03608dc566c988ca6ee48/detection
  - https://www.virustotal.com/gui/file/f2c08cec764e85a42888250cf79747c47b3a7614199f2b4cba98b8745bb7749c/detection
  - https://kotaku.com/diablo-immortal-p2w-pvp-broken-blizzard-rite-exile-1849355846, titled: "Diablo Immortal Player Says He Can't Get A Match After Spending $100,000."

## Qualifications

5. I am the Director of Threat Investigations of Unit 221B, a cybersecurity firm contracted by Bungie to investigate cheats and their developers.

6. Until my present appointment, which began August 1, 2022, I had been employed by Unit 221B beginning in 2020 as a Cybersecurity Analyst. From January 2022 until August 1, 2022, I served as the Lead Project Engineer for Networking Testing and Development and as a Senior Investigator within the Investigations division. From August 1, 2022 until September 1, 2022, I served as the Tactical Operations Manager for the Investigations, Network Testing, and Development branches of Unit 221B.

7. As part of my responsibilities for Unit 221B, I lead and conduct investigations into fraud, abuse, and other cybercrime; conduct and lead vulnerability assessments and penetration tests; and spearhead internal development of new software offerings.

*Client Confidential*

8. I hold a BSc in software engineering from Kennesaw State University.

9. I have personally played countless hours of video games. I had been a player of Bungie's *Destiny 2* prior to my initial hiring by Unit 221B and continue to play *Destiny 2* in my personal time, with over 2000 hours of active play time currently applied to my account.

10. Through my experience and education, I am familiar with video game design, infrastructure, and play.

## Compensation

11. I am being compensated for my time at a rate of $750 per hour for time expended reviewing this matter and for providing testimony or other opinions. My compensation in no way depends on the outcome of this opposition.

# Summary of Opinions

12. Bungie's *Destiny 2* is a first-person looter-shooter massively multiplayer online game, extensively marketed through social media and other online mechanisms. Bungie actively participates in their player community through designated Community Managers, company-hosted streams, and other player outreach activities.

13. *Destiny 2* is frequently the subject of organic social media advertising by fans of the game and content creators (generally streamers) whose positive statements and feelings about the game provide incentive for more gamers to choose to play *Destiny 2*.

14. *Destiny 2* is a live-service game, following the "Software as a Service" model. New content expansions and cosmetic upgrades are made available for purchase at regular intervals following the initial release of the game to allow for greater player investment and continued interest. This "microtransaction" model, common to many modern video games, relies upon this player investment and interest for continued revenue from the game; and requires significant ongoing investment by the studio to maintain.

15. Bungie has a security commitment to its players to provide a fair and balanced game environment where the success of a player is defined by the investment of their time and effort on skill-building and gameplay.

16. The presence of cheaters within this environment damages Bungie, poisons the well for players and content creators, and creates an unsustainable and unsafe environment for legitimate players. People who have invested their time, effort, and money into the game will be prevented from completing in-game goals and activities by the presence of these cheaters, driving down player engagement, new player acquisition, and long-term player retention.

17. Modern cheats for live-service games are also dangerous to the user. Installation instructions provided by cheat developers instruct users to perform unsafe and ill-informed configuration changes to their devices that immediately put them at higher risk of malware infection or data theft. Continued operation of a cheat exposes users to this risk whenever the cheat is run.

*Client Confidential*

18. The AimJunkies *Destiny 2* cheat appears to interact with the *Destiny 2* game client in unauthorized and potentially dangerous ways.

19. The AimJunkies loader intentionally attempts to complicate debugging and reverse-engineering efforts and obfuscate loader operation through techniques commonly associated with malware. While the loader itself does not appear to be malware as traditionally understood, its presence and operation on a user's device represents a critical security vulnerability to that user.

20. The AimJunkies *Destiny 2* cheat provides cheaters with unfair competitive advantages against their fellow players in both competitive and cooperative gameplay. The continuing presence of cheaters in the game environment discourages communication between players and game developers, disincentivizes digital content creators from featuring the game, and drives legitimate current and prospective players away from the game entirely – all of which cause harm to Bungie.

# Background & Opinions

## Background

### General Definitions and Categorization

21. On a broad level, a video game can be defined as "any of various interactive games played using a specialized electronic gaming device or a computer or mobile device and a television or other display screen, along with a means to control graphic images." [1]

22. In a more colloquial sense, a video game may be thought of as any form of interactive entertainment operated via technology – most commonly a personal computer, specific gaming console such as Sony's Playstation or Microsoft's XBox, or through a smartphone. The interactive nature of the entertainment is what truly defines a video game. This interaction distinguishes video games from traditional entertainment forms such as film and music, which are absorbed more or less passively.

23. The video game industry in the United States has rapidly become the most profitable entertainment industry, far outstripping both the film, music, and professional sporting industries in terms of profit. Even in 1982, the arcade video game industry made $8 billion, more than the revenues of pop music ($4 billion) and Hollywood films ($3 billion).[2] The industry has only grown since 1982; during 2020, the video game industry reported revenues surpassing the combined revenues of the film industry and North American professional sports.[3] 73% of Americans reported playing a video game of some variety in 2021.[4]

---

[1] https://www.dictionary.com/browse/video-game
[2] Rogers, Everett M.; Larsen, Judith K., Silicon Valley Fever: Growth of High-technology Culture, 1985.
[3] https://www.marketwatch.com/story/videogames-are-a-bigger-industry-than-sports-and-movies-combined-thanks-to-the-pandemic-11608654990
[4] https://www.statista.com/statistics/499703/share-consumers-ever-play-video-games-by-age-usa/, Vorhaus Digital Strategy Study 2022, p. 91

*Client Confidential*

24. The broad category of video games may be subdivided into a variety of genres. Genres are based on gameplay elements, settings, or basic structural models that follow accepted standards of gameplay and style. These genres themselves may be further subdivided into more specific categories. For the purposes of this report, only genres and categories that apply to Bungie's *Destiny 2* are defined here.

25. *Destiny 2* may be categorized as a "first-person shooter," a "massively multiplayer online" game, and a "looter-shooter."

26. In a "first-person shooter,"[5] the player experiences the game environment from the first-person perspective, that is, through the eyes of their in-game character. Gameplay heavily features the use of virtual guns or other weapons as the primary method of play. Success within the game environment is defined by survival in simulated combat, either against computer-controlled enemies or against other players.

27. A "massively multiplayer online"[6] (MMO) game is defined as "any online video game in which a player interacts with a large number of other players." MMOs generally require connection to a remote server for game operation. Social interactions and other community-driven features are often key components of an MMO game. Players may join together to form defined in-game groups, defined in *Destiny 2* as "clans." They find other players for cooperative or competitive play through "looking for group" and matchmaking features.

28. Based on their specific styles of gameplay, or the "gameplay loop," first-person shooter games may be then further subdivided into more specific categories. *Destiny 2* is termed a "looter-shooter." One of the primary goals of *Destiny 2* players is the acquisition of new in-game items, most commonly weapons and armor. Within the *Destiny 2* environment, such items are subject to randomization of various attributes that may dramatically increase the item's effectiveness or value to the player. As a result, the pursuit of these in-game items, also known as "loot," often by repeating activities over long periods of time, forms a core component of *Destiny 2* gameplay. The fact that "loot" is given to players as a reward for completion of gameplay objectives ("shooting"), is what defines *Destiny 2* as a "looter-shooter."

29. With these definitions in mind, *Destiny 2* may be described as a "first-person looter-shooter massively multiplayer online game." Players control their in-game characters from a first-person perspective while completing objectives, frequently based in combat, to gain loot, often with real-world friends or new social connections made during the course of *Destiny 2* gameplay. Players are given multiple options to compete against other players in player vs. player activities.

## Genre- & *Destiny 2*-specific Terminology

30. While the above definitions and classifications may serve to give a broad overview of Bungie's *Destiny 2*, this report will make use of multiple genre-specific and game-specific terminology beyond the scope of the definitions above. These terms are defined below for clarity.

---

[5] https://www.dictionary.com/browse/first-person-shooter
[6] https://www.dictionary.com/browse/mmo

*Client Confidential*

31. MMO games such as *Destiny 2* provide features that may be broadly divided into two categories: "player vs. environment" or "PvE" activities, and "player vs. player," or "PvP" activities. Players complete these activities using their "player character."

32. A "player character" is the model through which the player interacts with the game world. In *Destiny 2* and its player community, a player character is also referred to as a "Guardian," the term used within the narrative of the game to describe players. I will refer to player characters in *Destiny 2* as "Guardians." An image from *Destiny 2* of a Guardian is shown below.



33. These player characters are distinct from "non-player characters," or "NPCs." The term NPC generally refers to any computer-controlled entity within a video game. Colloquially, NPCs more specifically refer to characters who interact with the player in some capacity. A NPC in a game may be an ally who assists the player, may assign the player activities, or may be an enemy of the player.

34. In "player vs. environment," or "PvE" activities, players fight either individually or cooperatively against NPCs. The primary gameplay loops of *Destiny 2* may be classified as PvE activities.

35. In "player vs. player," or "PvP" activities, players engage other players as opposed to NPCs. PvP activities may feature players competing to complete a specific goal – often point-based and defined in-game – or else engaging in direct competitive combat with one another. This variety of gameplay usually takes place as a "match" in some kind of in-game arena and involves shooting the Guardians of other players to do "damage," a value defined by the gun a character is shooting and the player's accuracy. Once a player has been dealt a certain amount of damage, they are defeated and removed from the arena. Defeating another player typically awards points. *Destiny 2* offers PvP activities for both 6 and 12 players at a time, split into equal teams.

36. The use of the term "map" in the context of this report should be understood to refer to the 3D landscape used as the setting for a game's action. In a PvP match, the map refers to the entire arena used for that match. For example, "from across the map" typically refers to an action that has occurred across a substantial distance. The ability to "see through the map" refers to the power to see through walls or other obstacles that would typically block a player's line of sight. This is the advantage provided by the AimJunkies *Destiny 2* cheat.

*Client Confidential*

37. As players use the in-game weapons of a video game, they frequently have the ability to better aim their weapon by using that weapon's simulated sights. This ability, known as "aim-down-sights," or "ADS," refers to a player zooming in with their weapon as though looking down weapon sights or a scope. The camera will zoom in to provide a larger target and afford a player increased weapon accuracy. Examples of views showing a weapon without ADS (on the left) and with ADS (on the right) are shown below.

 

38. One of the most common features of first-person shooter games such as *Destiny 2* is the inclusion of a common weak spot on enemies encountered by the player. (These weak spots are assigned not just to NPCs, but to the Guardians of other players during PvP activities as well.) As this weak spot is generally a target's head, a critical hit on such a spot is commonly referred to as a "headshot" by players, even if this weak spot is located elsewhere on an enemy's body. Within *Destiny 2*, some in-game weapons are capable of defeating an opposing player in a PvP match with a single headshot.

39. A "heads-up display," or "HUD," refers to graphical elements within the game that provide information to the player. A HUD typically includes information about a player's current health, equipped weapons and remaining ammunition, an overview of their current ability status, or any other data deemed relevant by the developers of the game.

40. The HUD of a *Destiny 2* player also includes a "radar," a graphical element that grants a player information about the locations of other Guardians or NPC enemies, even if the player cannot directly see them. The radar available to players in *Destiny 2* does not provide the exact locations of other players or NPCs, but rather their general direction and distance relative to the player's Guardian. A screenshot showing the standard HUD from *Destiny 2* is shown below, with circles drawn around some of the elements described in paragraphs 38-39.

*Client Confidential*



## Game Devices and Digital Download

41. Modern video game players have a wide variety of options when choosing a technological method, or "platform," on which to play their games. Platforms fall into three broad categories: personal computers ("PCs"); dedicated game consoles ("consoles"); and mobile devices. Bungie's *Destiny 2* is available to players on PCs and consoles.

42. In this report, a PC refers to a desktop or laptop computer running the Windows operating system. As there are significant structural differences between the Windows operating system published by Microsoft, the macOS published by Apple for their Mac computers, and versions of the open-source Linux operating system, Mac and Linux computers are commonly considered a separate category from Windows-based PCs. For the purposes of this report, the term PC should be understood as a personal computer running the Windows operating system.

43. Consoles may be defined as "computer systems specially made for playing video games that are connected to televisions or other displays for video and sound."[7] Consoles are purpose-built in order to provide players with a computer powerful enough to run modern games easily. Consoles generally feature an operating system unique to that family of devices, allowing software to be optimized by a variety of developers. Commonly owned consoles include Microsoft's Xbox, Sony's Playstation, Nintendo's Switch, or Google's Stadia. *Destiny 2* is available on the Xbox and Playstation.

44. The vast majority of modern games are delivered to consumers via digital download; many games no longer offer any hardware-based (i.e., CD-ROM or DVD) installation mechanism. As of 2013, digital downloads accounted for more than half of all video games sold; as of 2018, over

---

[2] https://www.dictionary.com/browse/game--console

*Client Confidential*

80% of purchased games were provided to customers via digital download.[8] Files required for game operation are downloaded and stored directly on a consumer's device, allowing for faster updates from developers, clearer communication between devices and game servers, and lower costs for developers. Purchases for these digital downloads are handled through a variety of marketplace services, depending on the platform.

## Technical Terms

45. While full definitions of every technical aspect of video games and client/server interactions are beyond the scope of this report, I will refer to several key concepts which are briefly defined as follows.

46. An "instance" is a "zone to which access is limited to a player or group of players entering simultaneously and working together. Each instance is one copy of the zone in which the quests, enemies, items, events, etc are staged exclusively for the player or group accessing it, without interference from other player characters in the large online population of the game."[9] For example, when players compete in PvP matches against one another, they may be said to be "within an instance." Players may not randomly join the match, and the instance's isolation prevents players not involved in the match from influencing it.

47. The "game client," or, simply, the "client," refers to the locally stored and executed version of a game used by players to interact with the game world. In the case of Bungie's *Destiny 2* (and the overwhelming majority of modern video games), the client is digitally downloaded and stored on a user's file system until loaded into memory for use.

48. "Game servers," or, simply, "servers," refer to the specialized networking devices used by the game developers to connect players to shared, multiplayer instances facilitated by their game client. Servers provide information about the environment to players. Each game client reports the player's actions to the server, and the server updates all players with the results of those actions.

49. The "game state" refers to the positions and statuses of all game pieces and environmental features at any given time. In *Destiny 2*, the positions of each player, their velocity and trajectory, the direction they are facing, and their health are just some of the elements that comprise the game state. The server coordinates changes to the game state and communicates those changes to a player's client.

50. The protocols used by clients and servers to update and communicate this game state data may collectively be referred to as "netcode." This includes procedures for reconciling differences in game state as reported by different clients. Colloquially, players use "netcode" as an umbrella term for the overall consistency and responsiveness of the gameplay experience while playing online.

---

[8] https://www.statista.com/statistics/190225/digital-and-physical-game-sales-in-the-us-since-2009/
[9] https://www.dictionary.com/browse/instance

*Client Confidential*

# Importance of Viral Marketing

51. The use of social media for advertising and marketing represents one of the fastest-growing and most powerful tools available to companies. The International Trade Administration of the U.S. Department of Commerce forecast a growth rate of 18.1% per year through 2026 for the global social media advertising segment.[10]

52. Recognizing its value, Bungie makes extensive first-party use of social media and viral marketing to promote *Destiny 2*. Reliance on social media and viral marketing is a widespread industry practice, but Bungie makes particularly effective use of these outlets. While Bungie maintains a footprint on all major social media platforms, including Facebook[11] and Instagram,[12] their strongest presence appears on Twitter and Reddit. On Twitter alone, Bungie operates a corporate account,[13] a *Destiny 2*-specific account,[14] and a third account solely for providing technical updates and support for the *Destiny* game environments.[15]

53. In addition to these first-party accounts, Bungie employs specific personnel known as Community Managers[16] to interact with the *Destiny* community through repurposed personal accounts. These Community Managers write blog posts distributed through social media, respond to community concerns and statements, and generally act as liaisons between game developers and the fans of their game.

54. This kind of first-party social media marketing allows Bungie and other companies like it to interact directly with and promote content creators, influencers, and other members of their gaming communities. These interactions in turn provide players with a feeling of ownership and personal investment in the game, allowing them to feel seen by the developers, including Bungie, in a way unique to social media marketing.

55. Content creators and influencers who find satisfaction in these interactions provide immeasurable value to companies by continuing to produce content about the game. This content keeps discussion of the game in the public eye, recruits new players, encourages lapsed users to resume playing, and creates further connections to the game for active players through deepened interactions with these streamers. The most influential streamers for *Destiny 2* list over one million YouTube or Twitch.tv subscribers. Particularly popular videos or content may have an even broader reach.

56. While no concrete metrics exist to evaluate the value of such marketing, Bungie very clearly displays a great deal of skill and interest in promoting these creators and in fostering an active streamer community. A perfect example of this may be seen in Bungie's biannual World First Day One Race event,[17] in which a new six-player activity known as a "raid" is released into the game for the first time. The first team of six players to complete this activity within the first 24 hours of

---

[10] https://www.trade.gov/ecommerce-frontline-social-media-forecast
[11] https://www.facebook.com/Bungie/
[12] https://www.instagram.com/bungie/?hl=en
[13] https://twitter.com/Bungie, 2.8 million followers
[14] https://twitter.com/DestinyTheGame, 2.7 million followers
[15] https://twitter.com/BungieHelp, 1 million followers
[16] https://www.indeed.com/hire/job-description/community-manager
[17] https://www.youtube.com/watch?v=WiAd15wfVRo

*Client Confidential*

release is promoted heavily by Bungie through their social media arms. The winning team receives a variety of physical prizes, and other players who achieve a Day One completion can earn coveted in-game rewards.

57. The success of this positive feedback loop between developers, fans, and content creators over social media is contingent upon the health of the game environment and positive player feelings toward the game. Strong player feedback and a tightly-knit community encourage content creators to continue promoting the game, which in turn encourages developers to take a more active role in community engagement and involvement. This creates a sense of positive ownership for fans, and the cycle continues. When negative third-party elements invade this space – when players encounter cheaters acting independently of the game developers, for example – the well is poisoned, and the feedback loop degrades. Angry fans are less likely to play the game, and developers are less likely to interact with the increasingly negative feedback. Interest in game content diminishes, and content creators feel less incentive to continue. All of this harms Bungie's brand and reputation.

# Game Ecosystem Investment

## Game Setting and Suspension of Disbelief

58. While video games are by definition an interactive experience, they share many of the same conceits and structural concerns as other narratives. The effectiveness of the game turns on the concept of suspension of disbelief, "the concept that to become emotionally involved in a narrative, audiences must react as if the characters are real and the events are happening now, even though they know it is 'only a story.'"[18] Films, literature, and art rely upon this suspension of disbelief to engage consumers. Viewers who feel the world is real and alive are much more likely to remain invested. Successfully evoking suspension of disbelief is the sign of a compelling narrative or idea that consumers will continue to seek out.

59. In the interactive medium of a video game, the suspension of disbelief takes on an even greater importance for developers. Players who feel as if they are part of a dynamic world in which they have agency tend to invest more money and time in the game.

60. Video game developers therefore take pains to design and implement varied and detailed environments within the game in an effort to enhance the suspension of disbelief. These environments are often woven into the game's larger narrative in ways that resemble classical literary techniques in order to strengthen the perception that the player is part of a living world in which their choices carry weight.

61. To this end, video games may be set in nearly any genre or variety of location. *Destiny 2*, a work of science fiction, takes place centuries in the future in various locations across the solar system. Players are pitted against extraterrestrial enemies in the corridors of space ships, the ruins of Earth cities, or on an icy moon of Jupiter. *Destiny 2* Guardians, created by players as their in-game avatars, are immortal warriors of peerless combat prowess.

---

[18] https://www.oxfordreference.com/view/10.1093/oi/authority.20110803100544310

*Client Confidential*

## Long Term Player Investment

62. Suspension of disbelief through compelling narrative and well-designed environments is a useful tool for solidifying a player's emotional and financial investment. Yet while positive investment during a game's release cycle can build early awareness and consumer excitement about future property, this excitement will only last so long without additional investment. Players and video game media outlets quickly move to the next offering as the initial excitement fades.

63. The issue of long-term investment is increasingly addressed by adopting a responsive software-as-a-service model (SaaS), particularly by developers of MMO games like *Destiny 2*.

64. Games designed using this model are considered to be "living games." Very few elements are wholly static. Instead, they may be updated, expanded on, or removed by game developers for a variety of reasons. SaaS games receive frequent updates, or "patches," from developers. These may increase the game's stability or change its mechanics, improvements frequently referred to as "balancing." For example, the amount of damage a gun does to an enemy may be reduced or increased based on gameplay performance. The health of an enemy may be increased to add difficulty to the game experience. Bugs within the game may be resolved to increase the game's general stability.

65. The most basic versions of many SaaS games, including *Destiny 2*, are increasingly offered to consumers for free in an effort to draw in new customers. Known as "free-to-play" (FtP), this model allows players access to basic features or to an introductory storyline of a game in the hope that the player, after experiencing the game's core offering, will pay for additional content.

66. Additional content not included with the original or "base" version of a game may be offered at any point within the game's life cycle. Some of this content may be offered as free additions, but additional content more commonly requires a user purchase. Large expansions to the game's mechanics, items, and environments may be offered to players as "expansion packs" or "downloadable content" (DLC). The prices for this content vary depending on the developer and level of change to the game itself.

67. *Destiny 2* is free to play, but offers multiple content expansion packs to players for purchase. While the new features of a paid expansion may only be available to players that have purchased the upgrade, they do not usually offer a competitive advantage, or do so only in carefully considered ways. The reasoning for this is explained below in the "Competition and Fairness" section of this report.

68. FtP and SaaS model games generally employ release cycles of varying lengths for regular content upgrades, referred to as a "seasonal model." Large changes and updates are made on a regular schedule to encourage players to come back to the game over longer intervals. *Destiny 2* uses a seasonal model, with content typically refreshed within the game every three months, and individual narrative story "beats" released on a week-by-week basis.

69. In a *Destiny 2* season, players are delivered a new narrative experience, multiple new activities, new items to earn, and, typically, an expansion of features or functionality. This cycle is designed to encourage a positive, shared narrative experience for all active players, to encourage players to continue or resume play, and potentially to spend more money at more frequent intervals. As

*Client Confidential*

with the content expansion packages, these features do not generally offer competitive advantages to the players who purchase them.

Microtransactions and Cosmetic Purchases

70. In addition to the release of DLC and seasonal content, *Destiny 2* also offers players an in-game store where, for additional cost, players may purchase cosmetic changes ("cosmetics" or "ornaments") for their characters' armor, weapons, tools, and vehicles. Each ornament is offered for a low one-time cost to players, a business model known as "microtransactions."[19] The concept of this business model is clear; rather than relying on new sales of the game, players are given further opportunities to spend incremental amounts within the game they already own whenever they like.

71. Almost universally, these microtransactions are made within the game environment itself with a "premium currency" separate from the usual items and currencies of the game. While this currency may be earned in-game in some cases, its premium status derives from its ability to be purchased with real-world money. Cosmetic microtransactions within the game are listed in this currency, which may be purchased by players in packs of varying sizes and prices. Discounts are generally offered to players who purchase more premium currency in a single transaction.

72. Bungie's *Destiny 2* uses the premium currency "Reef Silver," or, simply, "Silver." Within *Destiny 2,* Silver is only obtainable by purchasing packs of the currency from the relevant platform store. For example, on the Steam platform for PC, *Destiny 2* has the following Silver packs available for player purchase:



73. After purchasing one of these packs, the amount immediately becomes available in that player's in-game account balance. As seen in the image below, taken from the in-game *Destiny 2* store, the premium currency can be redeemed in-game to obtain levels, cosmetic ornaments, or other player items or attributes.

---

[19] https://www.jstor.org/stable/j.ctv1hp5hqw.13

*Client Confidential*



74. Players within *Destiny 2* are offered a variety of cosmetic microtransactions for purchase, with new cosmetics being added to the in-game store on a regular basis. These cosmetic offerings encourage players to routinely purchase bundles of the in-game premium currency and provide the developers a consistent revenue stream beyond the initial release of a game, which in turn funds the continued development of compelling content that encourages players to invest more deeply in the game. Players who make these purchases tend to be more loyal to the game, to feel pride and a sense of ownership over their well-appointed avatar, and to have a continued desire to engage with the game's ongoing narrative and the community of other players.

## Security Relationships

75. In multiplayer games that offer competitive play against other players (PvP play), video game developers have a clear interest in promoting fairness within the game.

76. In the context of PvP play, fairness may be thought of as supplying a level starting position for all players. No player should be seen to have an immediate advantage over another because they have spent more money. Such games develop a reputation as "pay-to-win" games, where players who have spent more real-world money have an overwhelming advantage over those who have not. In *Destiny 2,* select abilities and exotic weapons are locked behind purchase of expansions, but their efficacy is balanced to avoid creating a "pay-to-win" environment.

77. Competitive games strive to avoid a "pay-to-win" impression, as these games tend to drive players away from the game environment. Only a small subset of players will have resources to buy every upgrade, meaning that the average player competing against them will always be at a disadvantage.[20] In a race between a high performance sports car and a family minivan, the sports car clearly has every advantage over the minivan, and will almost certainly win the race. Why would the driver of the minivan agree to the race in the first place? This is why developers are careful not to include goods that confer competitive advantages in upgrade packages.

78. Game developers have a clear incentive then to provide each player within a multiplayer environment a level playing field independent of that player's financial commitment. There is an

---

[20]https://kotaku.com/diablo-immortal-p2w-pvp-broken-blizzard-rite-exile-1849355846, titled: "Diablo Immortal Player Says He Can't Get A Match After Spending $100,000."

*Client Confidential*

implicit understanding between developer and player that the developer will create, promote, and maintain the idea that a player's skill is what defines their competitive success, not the money they have paid.

79. Competitive video games, including *Destiny 2*, enforce this principle in the agreements each user must sign, typically referred to as an end-user license agreement (EULA), limited software license agreement (LSLA), or terms of service (ToS). The *Destiny 2* LSLA itself states that users may not "hack or modify the Program, or create, develop, modify, distribute, or use any unauthorized software programs to gain advantage in any online or multiplayer game modes."[21] The user purchases a license to install and use one copy of the game software and only as installed by the game software or platform itself. Users are not permitted to manipulate (e.g., copy, reverse engineer, or commercially exploit) the Destiny 2 software. Specific enumerated "LICENSE CONDITIONS'' in the LSLA and EULA, if violated, result in immediate termination of the license; and users are warned that continued use of the program "will be an infringement of Bungie's copyrights in and to the Program." *Id*.  The document further notes that violation of any of its clauses entitles Bungie to suspend or ban the account found to be in violation of the ToS, and to take any further remedies available and deemed appropriate. The EULA, which tracks to the LSLA, is displayed prominently when a user runs the Destiny 2 software for the first time and on each occasion that the EULA is changed. The user is required to indicate assent by holding a controller, keyboard, or mouse command.

## Cheating in Video Games

80. "AimJunkies" is a cheat software brand and the domain name for a website from which the cheat software is sold. Cheats for live-service online multiplayer games like *Destiny 2* are developed by third-party actors like AimJunkies' owner Phoenix Digital Group LLC (PDG), who profit by offering video game users unfair and unauthorized advantages. "AimJunkies" will be used throughout to refer to the owners of PDG and to the network of developers who create cheat software to be sold under the AimJunkies brand.

81. Video game companies protect their games to prevent manipulation and copying of their software, and they advertise the fact that these protections are in place. AimJunkies and other cheat developers circumvent these protection measures, and are advertised as circumventing these protections, to introduce features not foreseen by the games' developers that degrade the game as a whole.

82. Customers are almost always charged for cheats for live-service online multiplayer games, and cheat developers often require a monetary subscription to their provider for continued functionality.

83. Cheats for live-service online multiplayer games are frequently intended for use within a shared online environment with potentially thousands of other players.

84. Cheats for live-service online multiplayer games are frequently advertised using highlight videos of the cheat in action against unsuspecting players of the game.

---

[21] https://www.bungie.net/7/en/legal/sla

*Client Confidential*

85. Cheats for live-service online multiplayer games, including the AimJunkies cheat, typically require users to disable system security protections. Since the cheat must inject itself into low-level system processes to circumvent *Destiny 2*'s anti-cheat measures, both native and third-party antivirus software frequently block the cheat from download or installation. Almost universally, cheat installation instructions instruct users not just to disable, but to remove entirely any installed antivirus software from their computer. Native features such as Microsoft's Windows Defender must be disabled from an administrator account. All firewalls must be uninstalled and removed entirely, or else disabled from an administrator account. Users must enter their computer's BIOS, the most basic and essential firmware typically packaged with their motherboard, and disable key stability and security features. These protections are there to prevent malicious programs from accessing core operating system components of the user's computer that can be used to take it over. Software installation does not normally require the disabling or removal of such protections. When users disable these protections in order to install the cheat, they render their computers susceptible to viruses, trojans, and ransomware. If a cheat developer decides to use this access for their own ends, consumers no longer have standard protections in place to defend against this.

86. As a result, modern cheats are frequently flagged by antivirus software and threat intelligence vendors as malware. While the cheat itself may not execute ransomware or steal a user's data, simply installing it according to the cheat developer's instructions opens the user's computer to the possibility of immediate and catastrophic attack.

## The Anatomy of a Modern Cheat

### Relevant Terminology

87. The success of modern cheats is a function of the quality and quantity of features they offer potential customers. Often, these features are described with slang, jargon, and acronyms that do not provide any information about how they actually work. Some cheat features and their functionality are described below.

88. One of the most common features sold by cheat developers is the classic "aimbot." This cheat functionality automates the movements of a player's Guardian as they attempt to aim their weapon at a specific target. An aimbot is typically configured to snap to an opponent's head when the player goes into ADS. The cheat confers perfect accuracy on the Guardian, giving them the ability to score headshots with every shot to rapidly eliminate opponents.

89. A wide range of cheat functionality may be defined under the category "extrasensory perception," or "ESP." ESP functionalities provide data to the cheating player about the game state that would normally be hidden to them, such as the locations of other players behind walls, the state of another player's health, or the status of their abilities.

90. The most common ESP feature built into modern cheats is the "wallhack," the ability to see through opaque objects such as walls. Cheats will typically highlight another player's Guardian's exact location when line-of-sight is obstructed. Wallhack is also used as a generic slang term for the ability to see through the map. While some games, including *Destiny 2*, grant this ability to

*Client Confidential*

players under certain constraints, a cheat wallhack grants this information without the conditions, limitations, or structures imposed by the game's developers.

91. The image below, taken from an AimJunkies promotional video for their *Destiny 2* cheat, demonstrates this functionality well.[22] In the image below, although the NPC enemies should be obscured from the view of the player by pillars and other objects, the AimJunkies cheat identifies them by highlighting their locations using yellow boxes.



92. With these definitions in mind, a general description of the technical operations of the AimJunkies cheat may be provided. This description must begin with several caveats, however.

93. I have personally participated in the acquisition, review, and analysis of multiple cheats for *Destiny 2* throughout the course of my work. This includes de-compilation, or unpacking, of cheat executables for code analysis and potential reverse-engineering.

94. While I have examined other cheats for *Destiny 2*, it does not at present appear to be possible to directly examine the specific *Destiny 2* cheat produced and sold by AimJunkies. My understanding is that the Respondents in this arbitration have not produced a copy of the cheat.

95. However, I have conducted static and dynamic analysis of the currently available AimJunkies cheat loader. I have further reviewed and analyzed footage of the AimJunkies *Destiny 2* cheat in operation in promotional videos that I understand were captured and archived for the purpose of this arbitration.

96. Even absent the *Destiny 2* specific cheat files, I have been able to draw reasonable inferences about the AimJunkies *Destiny 2* cheat through these analyses, review of accessible footage of the cheat in operation, and the similarity of the AimJunkies loader and framework to comparable cheats.

---

[22] BUNGIE_WDWA_0000469

*Client Confidential*

## AimJunkies Cheat Loader Download and Installation

97. Cheats for *Destiny 2* are distributed by means of a specialized program called a "loader." The loader is a program that authenticates the cheat user, validates their purchased license, downloads the cheat itself, and injects that cheat into Microsoft Windows system libraries and/or into the game client module.

98. For the AimJunkies *Destiny 2* cheat, this loader is first downloaded by a user immediately after the purchase of a cheat from the AimJunkies website. The loader represents a serious threat to users who follow AimJunkies' instructions.

99. After purchasing an AimJunkies cheat and downloading the loader, AimJunkies provides the cheat user a how-to guide[23] for installation through their forums. These instructions direct the user to perform several highly unsafe actions on their PC. Samples of these instructions were taken from the AimJunkies website in early September 2022 and are provided in the following paragraphs.

100. The process described in these instructions is potentially highly dangerous to the user, as it involves disabling or creating exceptions in antivirus and firewall services, disabling Windows security controls, and granting the loader full administrative rights to the user's device. Users following these instructions potentially open themselves to ransomware, data theft or loss, and other forms of cyberattack.

101. In their installation instructions, AimJunkies recommends that users upgrade their Windows operating system to the latest version. On its face, this is a reasonable step before installing any software. However, in heading-size font, AimJunkies immediately notes that two Microsoft patches, KB5014666 and KB5015807, "can cause problems with the cheats."[24,25] The instructions recommend that users uninstall these patches. Since Microsoft's published patch notes describe KB5015807 as a "security update," and both patches appear to introduce security and quality of life improvements to the Windows operating system, this recommendation raises security questions.

> NOTE: It is a know that the following MS patch KBs can cause problems with the cheats. If you have KB5014666 & KB5015807 installed, please uninstall them

102. The loader installation instructions further direct the user to install and "place the loader on a USB Flash drive formatted in FAT32 (This is a security measure)." This is false. Selecting FAT32 as the file system does not impart any security features to the newly formatted drive. Instead, placing the loader on this fresh drive serves to prevent the loader from being immediately quarantined by system antivirus measures.

103. Users are next instructed to add an exception to the Windows Defender antivirus and security tool which comes packaged with all current Windows operating systems. Windows itself strongly

---

[23]https://forum.aimjunkies[.]com/f139/read-thread-just-bought-cheat-134981/
[24]https://support.microsoft.com/en-us/topic/june-28-2022-kb5014666-os-builds-19042-1806-19043-1806-and-19044-1806-preview-4bd911df-f290-4753-bdec-a83bc8709eb6
[25]https://support.microsoft.com/en-us/topic/july-12-2022-kb5015807-os-builds-19042-1826-19043-1826-and-19044-1826-8c8ea8fe-ec83-467d-86fb-a2f48a85eb41

19

*Client Confidential*

advises against disabling Defender entirely; even less technically adept cheat purchasers would be likely to recognize disabling Defender as a dangerous step. Adding an exception for AimJunkies allows users to feel they are still protected, but this "precaution" is no less dangerous than simply turning the antivirus protection off. This step marks any files within the AimJunkies installation folder as trusted, meaning any process execution originating from this folder will be ignored by Windows Defender. Coupled with further AimJunkies installation steps, this represents a critical vulnerability to users.

## Windows Defender – Add the Exception **DO NOT DISABLE

- Open Windows Defender by searching for "Windows Security" in the start menu and clicking on the result.
- Click on the "Virus & Threat Protection" option.
- The above action will take you to the Virus & Threat Protection screen. Here, click on the "Manage Settings" link under Virus & Threat Protection Settings section.
- In the advanced options page, scroll down until you find the Exclusions section. Here, click on the "Add or remove exclusions" link.
- This is where you can add exclusions. To exclude a folder, click on the "Add an exclusion" button and then select the "Folder" option.
- The above action will open the "Browse" window. Find the folder you want to exclude, select it, and click on the "Select Folder" button. I would recommend exclude the folder to where the loader will download into as well as the entire drive letter of the USB flash drive you put your loader onto.
- Close the application.

104. Users are further directed to add an exception within the Windows Firewall configuration, also packaged with all current Windows operating systems. As before, the exception allows users to feel they are still protected, but this exception is again as dangerous as simply turning the firewall off.

105. AimJunkies' users are directed to disable the User Account Control (UAC)[26] features also packaged with all current Windows operating systems. UAC features prompt the user for confirmation before any major changes may be made to the settings, configurations, or installed applications of an operating system. As a result, UAC features function as a strong defense against malware infection. Disabling UAC allows any program, such as the AimJunkies *Destiny 2* cheat, to make administrative changes to the device – and to do it without the user's knowledge.

## Disable UAC

- Go to Control Panel and go to "User Accounts".
- Go to User Accounts.
- Change User Account Control Settings, move the slider all the way to the bottom and click "Ok" to apply this setting.

106. In the final step of the loader installation instructions, AimJunkies provides a note about third-party software that says, "AimJunkies only supports using Windows Defender/Firewall." Since what the user has actually done is manually created exceptions for the AimJunkies loader through these services, a more accurate statement would be, "AimJunkies only provides instructions for evading Windows Defender/Firewall." AimJunkies then provides a list of

---

[26] https://docs.microsoft.com/en-us/windows/security/identity-protection/user-account-control/how-user-account-control-works

*Client Confidential*

third-party security software that "have caused known issues with our loader/cheat, please disable or uninstall them if you run into issues using the loader/cheat." This list includes several major security software vendors as well as anti-cheat software used by game developers.



## AimJunkies Cheat Loader: Static Analysis

107. On September 15, 2022, I performed static analysis on the AimJunkies cheat loader. I acquired the loader from their website as a compressed .zip archive and used the industry standard malware analysis platform VirusTotal for the analysis.[27] The archive contains two files: a .cfg configuration file used to define settings and other variables for installation, and a .exe portable executable file, which appears to be the AimJunkies loader itself. The archive in its compressed form and the two files it contains were each analyzed independently. Note that this loader is not the same thing as the cheat software specific to *Destiny 2.* The loader's function is to facilitate the operation of game-specific cheat software modules like the *Destiny 2* cheat on a user's computer.

108. Static malware analysis examines suspect resources – in this case, the .zip archive, the .exe, and the .cfg configuration file – in their at-rest state. The programs are not executed or installed. Information about the general behavior and characteristics of the file may be gathered with this analysis. Code decompilation reveals some data about functionality and system interaction.

---

[27] https://www.virustotal.com/

*Client Confidential*

109. Dynamic malware analysis involves executing the suspect resource and observing the resulting behavior. Dynamic malware analysis is typically conducted using debugging, monitoring, and logging tools to monitor system-wide effects of any executed malware.

110. One of the major strengths of the VirusTotal platform is its aggregation of analysis and assessments of potential threats from a wide range of vendors, including Microsoft, Google, Malwarebytes, Bitdefender, and many others. This aggregation helps avoid false positives potentially given by a single service or tool, and provides a more comprehensive understanding of the potential threats posed by an inspected resource.

111. As the list below shows, the compressed .zip archive used to download the loader from the AimJunkies website is flagged as potential malware by 22 vendors.[28]



112.  The AimJunkies loader executable stored within this archive is flagged as potential malware by 48 vendors.[29] This number has increased from 31 since the loader was first uploaded to VirusTotal on September 15, 2022.

---

[28]https://www.virustotal.com/gui/file/2abae185fc87476e00e45c7d3a171a4a2c0a57d714b03608dc566c988ca6ee48/detection
[29]https://www.virustotal.com/gui/file/f2c08cec764e85a42888250cf79747c47b3a7614199f2b4cba98b8745bb7749c/detection

*Client Confidential*



113. The configuration file stored within the downloaded archive was not flagged as potential malware.

114. Detection by these vendors does not conclusively indicate that the analyzed resource is or is not malware. Detection criteria are specific to the vendor providing the detection, but commonly involve decompilation of submitted resources for static analysis as well as execution of resources for dynamic analysis, where possible. From this combination of analysis methods, the behavior of a potential piece of malware may be observed and classified.

115. Therefore, while the VirusTotal detections do not definitively identify the AimJunkies loader as traditional malware, they do clearly show that the way the loader behaves when it is active on a user's device behaves like traditional malware, and may be used to facilitate the installation and

*Client Confidential*

operation of malware. These detections are also the probable reason for AimJunkies' instructions to add exceptions to or disable security features in advance of loader installation. Leaving these features untouched would almost certainly result in the downloaded .zip archive and the loader inside it to be quarantined and removed from the device.

116. Finally, even if the AimJunkies loader itself is not malware, and does not directly harm a user or their device, it represents a clear and present danger to the user the moment it is successfully downloaded and installed – even on a USB flash drive, as AimJunkies suggests. Installing the Aimjunkies software according to the vendor's instructions immediately leaves the user's computer vulnerable to infection by viruses, trojans, and ransomware. In a potential worst-case scenario, the cheat publishers themselves would be able to gain full administrative access to a user's computer with trivial effort.

## AimJunkies Cheat: General Inferences

117. Microsoft Windows uses a set of core libraries containing code for basic actions the operating system may perform. For example, a system library can contain the functions that read from a file, that register mouse or keyboard input, or that send data over the network. One way cheat software functions is to require the cheat process to inject itself, or "hook," into one of these basic actions. Once this is done, when the *Destiny 2* game client attempts to perform a modified system action, it causes the installed cheat to execute as well. Cheat loaders need to be run with administrative access in order to hook into system libraries. Another way for cheat software to function is for the cheat process to inject itself or to "hook" into the game client process. Video game developers use numerous techniques to block the manipulation of system core libraries, and cheat software must circumvent those protections in order for the cheat software to function.

118. The *Destiny 2* program resides on disk before it executes. When launched by the user, the program then copies itself into memory. Each program has its own designated space in memory, and programs typically cannot access the memory space of another program. However, system libraries are considered to be trusted, and, because the injected cheat is hooked to an action in the system library, it, too, gains access to the *Destiny 2* disk space. When the *Destiny 2* client program calls the function that the cheat is hooked to, the cheat executes with the ability to read and modify *Destiny 2* memory.

119. As described in Section 48, each *Destiny 2* player has a local copy of the game state. This game state contains all of the information available to the player through in-game displays, as well as information that is meant to be hidden from the player. The game client determines what information to provide to the player. For example, the game client knows when another player is on the other side of a wall. The game client allows the player to see the wall, but not the player on the other side of the wall. It intentionally obscures that information from the player. However, AimJunkies and other similar cheats can read this information out of the game client's memory and display it to the cheater to grant an advantage.

120. The cheat projects graphical elements onto the visual display of the *Destiny 2* program containing this information. This type of display modification almost always requires that the

*Client Confidential*

cheat software hook the game software's rendering functions. As seen in the image below, this commonly includes highlighted boxes that show the locations of other players' Guardians, even when the cheating player's Guardians should not be able to see them.



121. The ability to know the location of other players' Guardians when they should be hidden from sight provides a clear and significant advantage to the cheating player. The cheater gains the element of surprise over the non-cheating player and has the ability to shoot first, which is crucial in a first-person shooter.

122. Cheats may also manipulate the client to simulate user inputs, or even perform game actions directly. The aimbot functionality provided by the AimJunkies *Destiny 2* cheat appears to read the positions of other players or NPC enemies from the client's game state data, and then automatically moves the player's Guardian to aim perfectly at the target's head for a guaranteed headshot critical hit.

123. More specifically, the aimbot functionality appears to read the relative locational data of opposing Guardians from the game client's data on the current game state, and then uses this data to determine what mouse movements would be required for the cheater to register a headshot critical hit on their target. The cheat uses this data to tell the cheater's computer that this movement has been made as a simulated input, separate from the cheater's own mouse movements. The computer receives this instruction from trusted system functions, and therefore passes this instruction to the game client as the cheater's legitimate input. The game client, trusting these instructions from the computer, receives this input and performs the corresponding actions.

124. Again, this cheat appears to operate by reading data from the *Destiny 2* memory and accordingly manipulating the user's device.

125. Aiming is a game skill typically honed over the course of years. It is one of the fundamental ways *Destiny 2* players compete with one another. Skilled players can perform incredibly precise movements to hit difficult shots, but players using aimbots can obtain perfect accuracy with the click of a mouse. By removing the skill element from this core game mechanic, cheaters degrade the competitive spirit that draws many players to *Destiny 2*.

*Client Confidential*

## AimJunkies Loader Dynamic Analysis and Reverse-Engineering

126. Over the week of November 14, 2022, I and members of Unit 221B's offensive engineering team performed dynamic malware analysis on the AimJunkies loader. This analysis included examination of the loader's behavior during and after the installation process detailed above, as well as partial reverse-engineering.

127. The AimJunkies loader, also known as the OverDose loader, is a 32-bit Windows Portable Executable file (or PE, with file extension .exe). This PE is packed using the UPX packer,[30] an open source utility designed to reduce PE file size and obfuscate program code from the casual observer. Although UPX has legitimate uses, it is commonly seen in the context of malware executables.



128. The AimJunkies loader PE appears to be arbitrarily assigned a random string of characters as its filename on download, resulting in each user having a differently named, yet functionally identical, file. The version of the loader collected by Unit 221B on September 15, 2022, uses the name **wfDaEuMgRU.exe,** with an accompanying configuration file **wfDaEuMgRU.cfg**.



129. I attempted loader installation in both a malware analysis sandbox virtual machine as well as direct hardware on a quarantined device. Despite multiple attempts and different system configurations, I was unable to install the AimJunkies loader within the sandbox environment.

---

[30] https://upx.github.io/

*Client Confidential*

Later analysis revealed that the loader uses Windows system hooks to check for the presence of a virtual machine, killing loader processes if one is detected. Such obfuscation methods are common in malware distributions and serve to frustrate attempts to unpack and reverse-engineer the program in question. I successfully installed the AimJunkies loader directly onto the home system of a quarantined device, allowing for further dynamic analysis of the PE.

130. As noted in the installation instructions, the AimJunkies loader must be run with administrative privileges. Administrator permissions are required to alter the Windows Registry entries, disable antivirus and protection features, and simulate user input using Windows system hooks. These functions are required by the AimJunkies loader to function. Administrator-level permissions are required to interact with other administrator-level programs and core system functions. Running the loader with this level of privilege acts as a protective measure to prevent the loader from being flagged, quarantined, and removed as malware by basic system protections.



131. The loader appears to be written in the C++ programming language. It launches two processes in sequence. In this context, a process or thread may be considered as an execution path of the original code to launch the software. One of these processes appears to be designed as a trap to stymie debugging and reverse-engineering attempts. If the original PE is run to completion while loaded within a debugger, the debugger will observe this first process as completed well before the second. If that happens, the debugger will consider the entire program terminated at this completion point. Meanwhile, the second process continues to run unobserved by the debugging utility.

132. This type of obfuscation is referred to as an "escape-based" technique. It is intended to frustrate debugging and reverse-engineering attempts. The loader appears to use a common evasion technique of setting "int 3" as a "debugger trap."[31] This assembly instruction causes a program exception which is ignored when a debugger is not present, but creates a terminal breakpoint when the software is run through a debugger.

133. An example of this "trap" may be seen in the image below captured from the unpacked Aimjunkies loader as observed in a debugging application. Inclusion of the line "int 3," annotated by the debugging software as "Trap to Debugger," forces an error within the debugging application, as displayed by the red highlight text following this instruction.

---

[31] https://anti-debug.checkpoint.com/techniques/assembly.html

*Client Confidential*



```
sub_5F1FB2 proc near
pop     edi
pop     edi
int     3                  ; Trap to Debugger
jmp     near ptr byte_5F3692
sub_5F1FB2 endp ; sp-analysis failed
```

134. On execution, this second process installs and initializes the AimJunkies loader, prompting the user for their AimJunkies credentials. These credentials are verified against the AimJunkies server, after which the user is presented with a menu of options for available cheats. The window title for the loader is an random string, which changes on each execution and appears to be randomly generated to prevent program signature detection

135. Upon execution of this second process, the AimJunkies loader uses a technique known as "DLL side-loading"[32] to inject itself into the Microsoft Internet Explorer application. Although Microsoft has transitioned their browser offering from Internet Explorer to the newer Microsoft Edge, Internet Explorer remains a standard application packaged alongside relatively recent installations of Microsoft Windows. Microsoft officially ended support for Internet Explorer on June 15, 2022,[33] which means it will no longer receive regular maintenance or security patches. Software in this state is commonly exploited by malware to take advantage of the trusted nature of the software to disguise malicious activity, as appears to be the case with the AimJunkies loader.

136. The AimJunkies loader appears to use an architecture-based circumvention method in this process to further avoid debugging and other reverse-engineering efforts. As previously noted,

---

[32] https://attack.mitre.org/techniques/T1574/002/
[33] https://support.microsoft.com/en-us/microsoft-edge/make-the-switch-to-microsoft-edge-a6f7173e-e84a-36a3-9728-3df20ade9b3c#:~:text=Support%20for%20Internet%20Explorer%2011%20has%20ended%20on%20June%2015%2C%202022&text=Microsoft%20Edge%20is%20the%20faster.to%20know%20with%20Internet%20Explorer.

*Client Confidential*

the AimJunkies loader is a 32-bit PE application; the Internet Explorer instance exploited by the loader is also a 32-bit application. Injection of 32-bit code into a trusted application space allows for hiding execution and memory loading within the injected application. By using iexplore.exe as the application to inject into, it complicates reverse engineering as it forces the engineer to sift through Internet Explorer's application along with identifying the injected code.

137. After execution and hijacking of the Internet Explorer process, the AimJunkies loader displays as a legitimate "iexplore.exe" process on the user's system. This technique is likely the root cause of many of the Virustotal detections for this file. After finalizing injection, the loader calls multiple standard Windows system libraries. It uses these to create the user interface, open connections between the user's device and the AimJunkies backend, and support system calls that allow installation and continued modification of the system based on specific cheat requirements.



138. These system calls suggest the loader software conducts most of the activities associated with the cheat such as the aimbot or ESP features advertised by AimJunkies. Game-specific cheat files likely direct the loader to the memory spaces used by a game such as *Destiny 2* during operation, allowing the loader to illegitimately read game state data from memory. However, as the AimJunkies *Destiny 2* cheat is unavailable on the AimJunkies store and has not been provided by AimJunkies for analysis, this conclusion is a theory based on observable evidence.

139. Once the application is closed, an unauthenticated instance of the loader appears to leave no trace on the user's device aside from the initially downloaded executable. However, configuration changes made by the user to their antivirus, firewall, and user account control settings remain and represent a significant vulnerability to the affected device.

140. Therefore, the AimJunkies loader is not overtly destructive, but allows for the download of unknown applications that have full administrator privileges and complete control of the infected device, its system libraries, and its executables. By hijacking the Internet Explorer application, the loader actively attempts to hide itself from the operating system and frustrate attempts to reverse-engineer, unpack, or debug the loader executable.

## Game Product Devaluation

141. The presence of cheaters within a game environment poisons the well for legitimate players and devalues the larger ecosystem built up around an online live-service multiplayer game such as *Destiny 2*.

142. The presence of cheaters within this ecosystem has other knock-on effects. Cheaters produce negative reactions from the community on social media and discourage content creators from featuring the game on streams and recorded video. This negative reaction also disincentivizes developers from community interaction, which in turn leads to angrier fans. The social media feedback loop becomes a vicious circle.

*Client Confidential*

143. *Destiny 2*'s success is defined by aspirational and difficult content, or "endgame" content, that players are intended to enjoy through hundreds or thousands of hours to come. This content is accessed typically by players who have invested significant amounts of time and money in their characters, and who frequently have worked hard to improve their skill at the game. Cheating allows players to skip this investment, immediately becoming more successful than any other player.

144. Even where a cheat developer's customers only make up a small fraction of the game's player community, their effect on the community is significant. For instance, in a live-service online multiplayer game like *Destiny 2*, retention of invested players is paramount for Bungie. Competitive PvP and other endgame activities concentrate invested players at the highest levels, making it nearly inevitable that players who have invested the most time for skill building within the game will encounter cheaters more frequently than the rest of the player community. If these players are blocked from completing endgame activities by constant interactions with cheaters, they will choose to invest their time and money elsewhere. Those high-level players are often a large driving force of the popularity of a game, and when they leave a game, its popularity (including player count and social media presence) drops as well.

145. Cheating has also given rise to cottage industries built around online games by third parties, which may collectively be referred to as "boosting services." Boosting services provide a shortcut to success by fraudulently logging into another player's account and playing on their behalf, or else transferring items to a player in exchange for real-world money. The scale of these boosting services is enabled by access to cheats, which allow these boosters to provide returns to their customers rapidly and move on to the next order. In its purest form, paying for a boosting service is paying for someone else to cheat for you.

146. Unlike casual cheat users, boosting service operators have a financial incentive to play Destiny 2 using cheat software constantly. Common goals of boosting service operators include such tasks as leveling a character rapidly to have it prepared for endgame activity for the account owner; or "farming" repeatable activities, such as the endgame PVP mode "Trials of Osiris," to acquire in-game titles (like "Flawless") or rare "loot." The prevalence of boosting services increases the likelihood that legitimate players will encounter and will be negatively impacted by cheat software users.

147. When legitimate players of *Destiny 2* are forced into interactions with cheaters of any variety, the game quickly begins to lose value for them. The highest tiers of play and reward become inaccessible, and continue to grow more inaccessible as players avoid the game out of fear and disgust when they encounter cheaters. Unimpeded cheat software represents a fundamental shift in the end-state of the game, with spiraling consequences that threaten the health of the game itself, causing harm to Bungie.

*Client Confidential*

# Conclusion

148. Bungie's *Destiny 2* game is buoyed by an active and engaged player community that participates in organic social media marketing and thrives on content from creators who promote *Destiny 2* to them and for them.

149. This engagement relies upon the healthy and fair in-game environment Bungie provides, an environment which ensures that player success is defined by skill and dedication to the game. Bungie has a clear security commitment to their players to maintain this environment.

150. The presence of cheaters within this environment damages Bungie and devalues the game for everyone involved. Fans are unhappy, unhappy fans discourage content creators from featuring the game, and developers are less likely to engage with the community.

151. Cheaters seek to "pay-to-win," bypassing skill-building and time investment by purchasing unauthorized third-party software to ensure their success.

152. Cheat software threatens users. Vendors instruct users to disable security features or otherwise block them from interacting with their software, laying them open to attacks by viruses, trojans, and malware. A wide array of security providers detected the AimJunkies cheat loader as potential malware.

153. Cheat software appears to interact with the *Destiny 2* game client in unauthorized ways to provide cheaters competitive advantages against legitimate players.

154. Dynamic and static analysis conducted on the AimJunkies loader reveals malicious and problematic behavior on the part of the loader that represents a clear and present danger to users of AimJunkies cheats. While not malware in and of itself, the loader makes use of multiple evasion and circumvention techniques most commonly seen in malware executables.

155. The continued presence of cheaters in the *Destiny 2* game environment devalues the game by preventing legitimate players from achieving endgame goals that reflect their personal investments of time and energy and money. Dissatisfied players will leave *Destiny 2* and spend their time and money elsewhere, with Bungie.

Steven Guris

31

# EXHIBIT 7
# FILED UNDER SEAL

# EXHIBIT 8
# FILED UNDER SEAL

# EXHIBIT 9
# FILED UNDER SEAL

# EXHIBIT 10
# FILED UNDER SEAL

# EXHIBIT 11
# FILED UNDER SEAL

# EXHIBIT 12
# FILED UNDER SEAL

**Note:  Due to the large size of this native excel file, this exhibit has been manually filed.**

# EXHIBIT 13



yahoo!mail Search your mailbox Dave Jensen Account Info Go Sign Out Home

destiny 2 | Contacts | Notepad | Calendar | Switch to the newest Yahoo Mail

Compose

Inbox 999+
Drafts 3
Sent
Archive
Spam
Trash

Folders Edit Hide
+ New folder
**destiny 2** 5

Compose

Delete Spam Actions Apply

d7958@ymail.com/destiny 2

**AimJunkies - Red Dead Redemption 2 Feature Update | WoT Blitz Release**

**AimJunkies** <admin@aimjunkies.com> Nov 15, 2019 at 2:19 PM
To: Springspecials <d7958@ymail.com>
Print Raw message

View in Browser

Twitter YouTube Facebook

Home | Forums | Cheats

# RED DEAD REDEMPTION 2 FEATURE UPDATE

- Added God Mode
- Added Horse God Mode
- Added Unlimited Stamina
- Added Unlimited Horse Stamina
- Added Anti Hogtie

MORE INFO HERE

# RECENT RELEASES

## World of Tanks Blitz

Safely roll through the maps with full player ESP to dominate the battlefield and secure objectives. Never miss a shot with a deadly aimbot with prediction.

MORE INFO HERE

## APEX Legends

APEX Legends is finally released with a full aimbot with no recoil along side full player ESP. Don't need an aimbot? We have you covered there as well with an ESP only version of the cheat.

MORE INFO HERE

Switch to DIRECTV STREAM
Sponsored by DIRECTV STREAM

# UPCOMING CHEATS



DESTINY 2                FIVEM                MINECRAFT

## TRUSTED CHEATS

PLANTS VS ZOMBIES                VERMINTIDE 2

Unsubscribe

© 2019 AimJunkies

↩  ↩↩  →          🗑 Delete   🛡 Spam   [ Actions ▾ ]   [ Apply ]     ⌃  ⌄

# EXHIBIT 14





yahoo!mail
Search your mailbox
Dave Jensen | Account Info | Go | Sign Out | Home
destiny 2 | Contacts | Notepad | Calendar
Switch to the newest Yahoo Mail
Compose
Inbox 999+
Drafts 3
Sent
Archive
Spam
Trash
Folders Edit Hide
+ New folder
destiny 2 5
Compose
Delete | Spam | Actions | Apply

d7958@ymail.com/destiny 2

**AimJunkies - Destiny 2 Cheat Released | 12 Days of Christmas Event Coming Dec 21st**

**AimJunkies** <admin@aimjunkies.com>
To: Springspecials <d7958@ymail.com>

Dec 17, 2019 at 11:10 AM

Print Raw message

View in Browser

Home | Forums | Cheats

# DESTINY 2 CHEAT RELEASED

Full Player and NPC ESP cheat released now.

For a limited time subscribe to the ESP Only cheat and get upgraded to the full aimbot cheat for free when it is released in the near future.

MORE INFO HERE

# 12 DAYS OF CHRISTMAS EVENT STARTS DEC 21ST

MORE INFO HERE

# OTHER RECENT RELEASES

## GTFO

Know where everything is and keep yourself protected with features like god mode, unlimited ammo, aimbot, key esp, medkit esp, and more!

## DARKSIDERS GENESIS

Handle all your enemies with ease with features like a full aimbot, ESP, god mode, unlimited

Switch to DIRECTV STREAM
Sponsored by DIRECTV STREAM

coins, souls, potions, keys, and more!

## UPCOMING CHEATS

| DESTINY 2 AIMBOT | HALO REACH | MINECRAFT |
| PAYDAY 2 | WORLD OF TANKS | WORLD OF WARSHIPS |

## TRUSTED CHEATS

Unsubscribe

© 2019 AimJunkies

# EXHIBIT 15

yahoo!mail

Search your Mailbox

Dave Jensen    Account Info    Go    Sign Out    Home

destiny 2 | Contacts | Notepad | Calendar        Switch to the newest Yahoo Mail

Compose

Inbox 999+
Drafts 3
Sent
Archive
Spam
Trash

Folders    Edit    Hide
+ New folder
destiny 2    5

Compose

Delete    Spam    Actions    Apply

d7958@ymail.com/destiny 2

**AimJunkies - 12 Days of Christmas Event - Free CSGO Cheat | Destiny 2 Aimbot Released**

AimJunkies <admin@aimjunkies.com>
To: Springspecials <d7958@ymail.com>

Dec 23, 2019 at 8:55 PM

Print    Raw message

View in Browser

Your Deal Summary Page Book

Home | Forums | Cheats

# 12 DAYS OF CHRISTMAS SALE
🎅🎄 NEW FREE CHEAT AND SALE DAILY 🎄
🎅

Every day a new cheat will be free to all subscribers for 24 hours. Along with this cheat being free, it will be discounted handsomely. The coupon code for 25% off is

## AJCOOKIES19

## TODAY'S JOLLY FREE CHEAT IS

## OTHER RECENT RELEASES

## DESTINY 2 FULL CHEAT

The full cheat with aimbot is now released. Pair it with the full player and NPC ESP along side OPK to tear your way through raids and missions.

MORE INFO HERE

GTFO

Switch to DIRECTV STREAM
Sponsored by DIRECTV STREAM



Handle all your enemies with ease with features like a full aimbot, ESP, god mode, key esp and more!

## UPCOMING CHEATS

HALO REACH

RISK OF RAIN 2

MINECRAFT

WORLD OF TANKS

WORLD OF WARSHIPS

PAYDAY 2

## TRUSTED CHEATS

Unsubscribe

© 2019 AimJunkies

# EXHIBIT 16



# AimJunkies
8,042 Tweets

**Follow**

AimJunkies @AimJunkies · Nov 11
#destiny2 🐉 back online for the expansion :)

AimJunkies @AimJunkies · Nov 11
What if Lockdown Browser wasn't so locked anymore? #lockdownbroswer

https://twitter.com/AimJunkies    POUND
1:34:51 PM 12/2/2020

BUNGIE_WDWA_0000608

# EXHIBIT 17



-Custom NPC Esp Color Sliders

TELEPORT
-Teleport to other players
-Teleport to other Npc's

OPK
-Teleport Npc's to your crosshair

MISC
-Custom Crosshair

SETTINGS
-Save
-Load

**Anti Cheats**
- Custom



Screenshots:



Videos:

*Last edited by Silent; 03-20-2020 at 10:56 AM.*

BUNGIE_WDWA_0000604



Post Thanks / Like - 57 Thanks

Mythicals, Ole, fireballs, Naterion, Marquez, tribal386, Arkitec, Studevery, blackweed, TheGreatKai, Keanu777, d2only, turnloy, m3rrcy, oumaxs, FrozenSkies, KingGeesta, Occupay, McTadger, ayo2000, BigDoggo, yorkypoo, crimas194, RoGProX, spazim90, wzb824, RamenX, tomm27, maxl, Ikoridoto, Prismatic, Vitaly88, rEy, smufi, nolifegamer, Herpjerp, Swiito, Keule81, zdxS232, r4zorr1tch, tata01, Viruxx, Rare, ibadger, billy1970, zmfpdlwl144, JuiceSword, deezhax, Scromb, DruidDeng, Homebrew King, lr3x, shou, DigDug503, mxdtty, Monstar7, Shadez thanked for this post

Thank for this post

Quick Navigation   ⌄ Available Cheats and Purchase Information | Top

## Tags for this Thread

cheats, engine, game, information, version
View Tag Cloud

## Posting Permissions

You may not post new threads
You may not post replies
You may not post attachments
You may not edit your posts

**BB code** is On
**Smilies** are On
**[IMG]** code is On
**[VIDEO]** code is On
HTML code is Off

**Forum Rules**

– AJ

AimJunkies  Archive  Top

All times are GMT -7. The time now is 02:43 PM.

Powered by vBulletin®
Copyright © 2020 vBulletin Solutions, Inc. All rights reserved.

Parts of this site powered by vBulletin Mods & Addons from DragonByte Technologies Ltd. (Details)
© 2020 AimJunkies

https://forum.aimjunkies.com/f124/destiny-2-cheat-information-120587/
2:43:58 PM 12/2/2020
POUND

BUNGIE_WDWA_0000605

# EXHIBIT 18
# FILED UNDER SEAL

# EXHIBIT 19

Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

------------------------------------------------------------

BUNGIE, INC.,

                    Plaintiff,

    vs.                              No.  2:21-cv-811-TSZ

                                     (PORTION OF TRANSCRIPT

AIMJUNKIES.COM; PHOENIX              MARKED CONFIDENTIAL)

DIGITAL GROUP, LLC; DAVID

SCHAEFER; JORDAN GREEN;

JEFFREY CONWAY; and

JAMES MAY,

                    Defendants.

------------------------------------------------------------

VIDEO DEPOSITION OF JEFFREY CONWAY

------------------------------------------------------------

          BE IT REMEMBERED that on the 5th day of
April, 2023, at the hour of 9:00 a.m., the video deposition
of JEFFREY CONWAY, via Zoom video conference, was taken at
the request of the Plaintiff, before Caryn E. Winters
Keller, CRR-RPR-CCR-CSR, Washington CCR No. 2496, Idaho CSR
No. 237, at Seattle, Washington, pursuant to the Federal
Rules of Civil Procedure.

          APPEARANCES ON FOLLOWING PAGE

Job No.: 971998-A

Bungie, Inc. vs Aimjunkies.com, et al.                    Jeffrey Conway 04/05/2023

Page 2

```
 1   A P P E A R A N C E S:
 2   FOR THE PLAINTIFF:
     (Via Zoom)
 3
     PERKINS COIE
 4   By:  Jacob P. Dini
              Attorney at Law
 5   1201 Third Avenue, Suite 4900
     Seattle, Washington 99101-3099
 6
     FOR THE DEFENDANTS:
 7   (Via Zoom)
 8   MANN LAW GROUP
     By:  Philip R. Mann
 9         Attorney at Law
     403 Madison Avenue N, Suite 240
10   Bainbridge Island, Washington 98110
11   ALSO PRESENT:
12   Scott Norton, videographer
     James Barker, Bungie in-house counsel
13
14
15
16
17
18
19
20
21
22
23
24                              *  *  *  *  *
25
```

Page 3

1                           I N D E X

2      WITNESS:  JEFFREY CONWAY

3      EXAMINATION:

4      By Mr. Dini - Page No. 5

5      EXHIBITS MARKED:

6      Exhibit No. 80 - Marked at Page No. 22

            AimJunkies.com terms of service

7

8

9                               *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    VIDEOGRAPHER:  Good morning, everyone.  Here

2       begins the remote deposition of Jeffrey Conway in the matter

3       of Bungie, Inc. versus AimJunkies.com, et al.

4                    This case is in the United States District

5       Court, Western District of Washington at Seattle.  This case

6       number is 2:21-cv-811-TS0Z.

7                    Today's date is Wednesday, April 5th, 2023.

8       The current time is 9:00 a.m. Pacific time.

9                    This is a remote deposition through Zoom video

10      conferencing.  The videographer is Scott Norton, appearing

11      on behalf of Centex Litigation Services.

12                   Would counsel please introduce yourselves and

13      state whom you represent?

14                   MR. DINI:  Good morning.  My name is Jacob

15      Dini, representing the plaintiff Bungie, Inc.  I'm joined by

16      Bungie's in-house counsel, James Barker.

17                   MR. MANN:  Good morning.  This is Philip Mann.

18      I'm on behalf of Mr. Conway, as well as all the remaining

19      defendants in this case.

20                   VIDEOGRAPHER:  Thank you both very much.  Our

21      reporter today is Caryn Winters Keller with Centex.  Would

22      the reporter please swear in the witness?

23                        JEFFREY CONWAY,

24                        was sworn under oath.

25                   THE WITNESS:  Yes, I do.

Page 5

1                      EXAMINATION

2     Q    (By Mr. Dini)  Okay.  Good morning, Mr. Conway.  I

3  know you've done this before.  You were deposed in

4  connection with the arbitration proceeding between these

5  same two parties, right?

6     A    Yes.

7     Q    And that was in October of 2022?

8     A    Yes, I believe so.

9     Q    Now, I know back then we went through the rules for

10 depositions, but I think it's helpful just to have a brief

11 refresher at the top here too.

12            So we once again have a court reporter that's

13 going to be taking down everything we say verbatim, so I ask

14 that you please answer all questions verbally, even if it's

15 just with a "yes" or a "no."  I'd ask you not to use phrases

16 like "uh-huh" or "huh-uh" or non-verbal answers like a nod

17 or a shake of the head, as those are difficult to record,

18 and it's important that we have a clear record.

19            Does that make sense to you?

20    A    Yes.

21    Q    In the same vein, let's also try and talk one at a

22 time.  I will let you finish your answer before I ask

23 another question, or I'll do my best, and I ask that you

24 also do your best and please wait for me to finish asking my

25 question before you start to answer.  Do you understand

Bungie, Inc. vs Aimjunkies.com, et al.                    Jeffrey Conway 04/05/2023

                                                                    Page  17

1       Q    Have you ever heard the name Bob Hahn before?

2       A    Yes.

3       Q    Who is Bob Hahn?

4       A    Bob Hahn was our lawyer that set up the LLC.

5       Q    Did Mr. Hahn assist with the authoring of the

6    AimJunkies.com terms of service?

7       A    I do not know.

8       Q    When did you first meet Bob Hahn?

9                 MR. MANN:  Object to the form of the question.

10      Q    (By Mr. Dini)  You can answer.

11                MR. MANN:  You can answer.

12      A    I do not know when we formed -- I guess when we

13   formed the LLC.

14      Q    (By Mr. Dini)  Do you know where Mr. Hahn worked?

15      A    San Jose, I believe.

16      Q    Who introduced you to Bob Hahn?

17                MR. MANN:  Object to the form of the question.

18      Q    (By Mr. Dini)  I'll ask the question again.  Who

19   introduced you to Bob Hahn?

20      A    Dave Schaefer.

21      Q    When was the last time you talked to Bob Hahn?

22                MR. MANN:  Object to the form.  Go ahead and

23   answer, if you can.

24      A    I do not remember.  I do not know.

25      Q    (By Mr. Dini)  Did you talk to Bob Hahn after the LL

Page 18

```
 1    -- after Phoenix Digital Group was set up as an LLC?

 2    A   No.

 3    Q   So the last time you talked to Bob Hahn was when

 4    Phoenix Digital Group, LLC was set up?

 5    A   Yes.

 6    Q   Okay.  So you had no involvement in the drafting of

 7    the AimJunkies.com terms of service; is that right?

 8    A   Correct, yes.

 9    Q   Did David Schaefer tell you about the AimJunkies.com

10    terms of service?

11    A   No.

12    Q   How did you find out about them then, the terms of

13    service?

14    A   It was known that you had to agree to the terms of

15    service to be registered on-site.

16    Q   Did you ever -- so when you say "registered on-site,"

17    do you mean registered on AimJunkies.com?

18    A   Yes.

19    Q   What does it mean to register on AimJunkies.com?

20    A   You register as a member of the site.

21    Q   Did you register as a member of the AimJunkies.com

22    website?

23    A   Did I?

24    Q   Yes?

25    A   No.
```

Page 19

1    Q    Do you know how a user of the AimJunkies.com website

2    would have interacted with the terms of service on the

3    AimJunkies.com website?

4              MR. MANN:   Object to the form.  Go ahead and

5    answer.

6    A    No.

7    Q    (By Mr. Dini)  Do you know where on the

8    AimJunkies.com website the terms of service were posted?

9    A    Exactly where, no, I do not.

10   Q    Do you have a general idea of where?

11   A    I would assume -- I can only assume it was on the

12   forums somewhere.

13   Q    Anywhere else besides the forums?

14   A    I'm not aware.

15   Q    Was there any -- ever any discussion among members of

16   Phoenix Digital Group about the terms of service?

17   A    Specifically, no, I do not remember any.

18   Q    So you, Jordan Green, and David Schaefer never

19   discussed the terms of service?

20   A    No.

21   Q    Were ever -- were any changes ever made to the

22   AimJunkies.com terms of service?

23   A    I do not know.

24   Q    Who was responsible for updating the AimJunkies.com

25   terms of service?

Bungie, Inc. vs Aimjunkies.com, et al.                    Jeffrey Conway 04/05/2023

Page 24

1   STATE OF WASHINGTON )

                      :  ss:   REPORTER'S CERTIFICATE
2   COUNTY OF SPOKANE   )

3            I, Caryn E. Winters Keller, a certified court

4   reporter in and for the states of Washington and Idaho,

5   do hereby certify:

6            That the foregoing video deposition of JEFFREY

7   CONWAY, via Zoom video conference, was taken on the date and

8   at the time and place as shown on Page 1 hereto;

9            That the witness was sworn upon their oath to

10  tell the truth, the whole truth and nothing but the

11  truth, and did thereafter make answers as appear herein.

12           That the foregoing is a true and correct

13  transcription of my shorthand notes of the requested

14  deposition transcribed by me or under my direction;

15                That the witness waived reading and

16  signing.

17                WITNESS my hand this 17th day of April,

18  2023.

19

                 _____
20               CARYN E. WINTERS KELLER, CRR, RPR

                 WA CCR No. 2496, ID CSR No. 237
21  (This transcript and billing have been prepared/submitted

    for final preparation and delivery in accordance with all
22  Washington state laws, rules and regulations, including WAC

    308-14-130, WAC 308-14-135, RCW 18-35, and applicable Court
23  Rules regulating formatting and equal terms requirements.

    Alterations, changes, fees or charges that violate any of
24  these provisions are not authorized by me and are not at my

    direction or with my knowledge.)

25

# EXHIBIT 20



**archive.today**
webpage capture

Saved from https://web.archive.org/web/20200518213339/https://cheats-hacks-aimbot.a    search
no other snapshots from this url

Original https://cheats-hacks-aimbot.aimjunkies.com/destiny-2/
no other snapshots from this url

All snapshots from host archive.org
from host cheats-hacks-aimbot.aimjunkies.com

18 Jun 2021 05:02:29 UTC

18 May 2020 21:33:39 UTC

Webpage | Screenshot

share    download .zip    report bug or abuse    donate

Home    Forums    Cheats    Packages ˅    Purchase ˅    Q

# Destiny 2

DESTINY 2

## Destiny 2 Hacks

**Buy Now**

$34.95 – 1 Month

PLATFORM: 7, 8.1, 10

**EXHIBIT 37**
**D. Schaefer**
**10/28/2022**
Tami Lynn Vondran
CRR, RMR, CCR# 2157

Videos & Screenshots    Features    Overview    Description

## Destiny 2 Hack Features

Destiny 2 Aimbot

Land all your shots with a
deadly aimbot

Destiny 2 Item ESP

Find all the best weapons
and armor with item ESP.

Destiny 2 Aimbot
Player/NPC ESP

Stay three steps ahead of
your foes with player/NPC
esp

Destiny 2 No Recoil

Stay locked onto your
enemies without recoil
knocking you off target



## Videos & Screenshots

## Hack Features

**Aimbot:**

-Aim at enemy players
-Aim fov slider
-Aim fov circle
-Aim button selection
-Smooth aim slider

**ESP:**

-Player Name Esp
-Player Box Esp
-Player Health Esp
-Player Snapline Esp
-Friendly Player Esp
-Player Glow Hack
-Custom Esp view distance slider

**Miscellaneous:**

MISC
-Custom crosshair selection
-Remove Recoil

## Overview

**Hack Information**

Released: October, 2019

**Game Information**

Developer: Bungie

Publisher: Bungie

Engine: Bungie Proprietary Engine

## Description

Destiny 2 is an online-only multiplayer first-person shooter video game developed by Bungie. It was released for PlayStation 4 and Xbox One on September 6, 2017, followed by a Microsoft Windows version the following month.[1][2] The game was published by Activision until early 2019, when Bungie acquired the publishing rights to the franchise. It is the sequel to 2014's Destiny and its subsequent expansions. Set in a "mythic science fiction" world, the game features a multiplayer "shared-world" environment with elements of role-playing games. Like the original, activities in Destiny 2 are divided among player versus environment (PvE) and player versus player (PvP) game types. In addition to normal story missions, PvE features three-player "strikes" and six-player raids. A free roam patrol mode is also available for each planet and features public events as well as new activities not featured in the original. These new activities have an emphasis on exploration of the planets and interactions with non-player characters (NPCs); the original Destiny only featured NPCs in social spaces. PvP features objective-based modes, as well as traditional deathmatch game modes.

Players assume the role of a Guardian, protectors of Earth's last safe city as they wield a power called Light to protect the Last City from different alien races. One of these races, the Cabal, led by the warlord Dominus Ghaul, infiltrate the Last City and strips all Guardians of their Light. The player sets out on a journey to regain their Light and find a way to defeat Ghaul and his Red Legion army and take back the Last City. Like the original Destiny, the game features expansion packs which further the story and adds new content and missions. Year One of Destiny 2 featured two small expansions, Curse of Osiris in December 2017 and Warmind in May 2018. A third, large expansion, Forsaken, was released in September 2018, beginning Year Two with an overhaul on gameplay. The base game and the first three expansions were packaged into Destiny 2: Forsaken Legendary Collection. An annual pass was also available alongside this release, containing three premium content drops for Year Two. Year Three will begin with the large expansion, Shadowkeep, scheduled for October 2019 as a standalone release, not requiring the previous expansions to play. Alongside the expansion will be a version of Destiny 2 called "New Light", a free-to-play re-release of Destiny 2 and the first two expansions.

© 2020 AimJunkies

# EXHIBIT 21



BUNGIE_WDWA_0000324

# EXHIBIT 22

d7958@ymail.com/destiny 2

## AimJunkies - 12 Days of Christmas Event - Free GMOD Cheat | Destiny 2 Aimbot Released

**AimJunkies** <admin@aimjunkies.com>
To: Springspecials <d7958@ymail.com>

Dec 25, 2019 at 8:30 PM

Print    Raw message

View in Browser

Home | Forums | Cheats

## 12 DAYS OF CHRISTMAS SALE
🎅🎄 NEW FREE CHEAT AND SALE DAILY 🎄
🎅

Every day a new cheat will be free to all subscribers for 24 hours. Along with this cheat being free, it will be discounted handsomely. The coupon code for 25% off is

## AJCOOKIES19

## TODAY'S JOLLY FREE CHEAT IS

## OTHER RECENT RELEASES

## DESTINY 2 FULL CHEAT

The full cheat with aimbot is now released. Pair it with the full player and NPC ESP along side OPK to tear your way through raids and missions.

MORE INFO HERE

GTFO

Handle all your enemies with ease with features like a full aimbot, ESP, god mode, key esp and more!

---

## UPCOMING CHEATS

| | | |
|---|---|---|
| HALO REACH | RISK OF RAIN 2 | MINECRAFT |
| PAYDAY 2 | WORLD OF TANKS | WORLD OF WARSHIPS |

---

## TRUSTED CHEATS

---

Unsubscribe

© 2019 AimJunkies

# EXHIBIT 23



yahoo!mail

Search your mailbox 🔍                                    Dave Jensen    Account Info ▾    Go    Sign Out    Home

| destiny 2 | Contacts | Notepad | Calendar |                    Switch to the newest Yahoo Mail

Compose

◀ ◀◀ ▶    🗑 Delete    ⊘ Spam    Actions ▾    Apply    ▲ ▼ ✕

Inbox                999+
Drafts                   3
Sent
Archive
Spam                  🗑
Trash                   🗑

Folders      Edit  Hide
+ New folder
destiny 2            4

Compose

d7958@ymail.com/destiny 2

**AimJunkies - 12 Days of Christmas Event - Free Sea of Thieves Cheat | Destiny 2 Aimbot Released**

AimJunkies <admin@aimjunkies.com>          Dec 28, 2019 at 9:20 PM
To: Springspecials <d7958@ymail.com>

Print    Raw message

View in Browser

You Tube Twitter Instagram YouTube Google+ Facebook

Home | Forums | Cheats

# 12 DAYS OF CHRISTMAS SALE
## 🎅 🎄 NEW FREE CHEAT AND SALE DAILY 🎄
🎅

Every day a new cheat will be free to all subscribers for 24 hours. Along with this cheat being free, it will be discounted handsomely. The coupon code for 25% off is

## AJCOOKIES19

## TODAY'S JOLLY FREE CHEAT IS

# OTHER RECENT RELEASES

# DESTINY 2 FULL CHEAT

The full cheat with aimbot is now released. Pair it with the full player and NPC ESP along side OPK to tear your way through raids and missions.

MORE INFO HERE

GTFO

THE KARDASHIANS
NOW STREAMING
Plans start at $6.99/month.
START YOUR FREE TRIAL
Terms apply.
hulu



Handle all your enemies with ease with features like a full aimbot, ESP, god mode, key esp and more!

## UPCOMING CHEATS

HALO REACH

RISK OF RAIN 2

MINECRAFT

WORLD OF TANKS

WORLD OF WARSHIPS

PAYDAY 2

## TRUSTED CHEATS

APEX LEGENDS

PLANTS VS ZOMBIES

VERMINTIDE 2

APEX LEGENDS

Unsubscribe

© 2019 AimJunkies

# EXHIBIT 24





yahoo!mail Search your mailbox Dave Jensen Account Info Go Sign Out Home

destiny 2 | Contacts | Notepad | Calendar

Switch to the newest Yahoo Mail

Compose

Inbox 999+
Drafts 3
Sent
Archive
Spam
Trash

Folders Edit Hide

+ New folder

**destiny 2**

Compose

Delete Spam Actions Apply

d7958@ymail.com/destiny 2

**AimJunkies - New Cheat Release - Project Winter**

**AimJunkies** <admin@aimjunkies.com>
To: Springspecials <d7958@ymail.com>

Jan 3, 2020 at 8:24 PM

Print Raw message

View in Browser

CustomYouTubeTwitterCustomFacebook

Home | Forums | Cheats

# PROJECT WINTER RELEASED

Always know who the traitors are and remain safe with traitor ESP. Get stuck in a tight situation? Run away with speed hack that is easy to turn up and down at the push of a button.

MORE INFO HERE

# OTHER RECENT RELEASES

## DESTINY 2

Run your way through the raids and know where all the waves are coming from, or dominate PVP with full player and NPC ESP along side a deadly aimbot.

## GTFO

Know where everything is and keep yourself protected with features like god mode, unlimited ammo, aimbot, key esp, medkit esp, and more!

# UPCOMING CHEATS

RISK OF RAIN 2

HALO: REACH

WORLD OF WARSHIPS

RISK OF RAIN 2

HALO REACH

WORLD OF WARSHIPS

PAYDAY 2

WORLD OF TANKS

PAYDAY 2

WORLD OF TANKS

# TRUSTED CHEATS

APEX LEGENDS

PLANTS VS ZOMBIES

VERMINTIDE 2

APEX LEGENDS

Unsubscribe

© 2020 AimJunkies

# EXHIBIT 25
# REDACTED



**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| **BUNGIE, INC.** | **EXPERT REPORT OF DREW E. VOTH**<br>**November 21, 2022** |
| **Plaintiff,** | |
| **v.** | **Case No.: 2:21-cv-811** |
| **AIMJUNKIES.COM; PHOENIX DIGITAL GROUP LLC; JEFFREY CONWAY; DAVID SCHAEFER; JORDAN GREEN; and JAMES MAY** | |
| **Defendants.** | |

HIGHLY CONFIDENTIAL

*Expert Report of Drew E. Voth*

## Table of Contents

I. Nature of Involvement ........................................................................................................... 3

II. Summary of Opinions .......................................................................................................... 3

III. Credentials and Compensation ........................................................................................... 3

IV. Facts, Data, and Other Information Considered ................................................................. 5

V. Basis for Opinions ............................................................................................................... 5

    V.1. Background and Parties ................................................................................................ 5

    V.2 Operative Matter .......................................................................................................... 9

    V.3 Bungie's Claimed Intellectual Property ....................................................................... 9

    V.4 Remedy Calculations ................................................................................................. 10

VI. Conclusion ........................................................................................................................ 12

## Exhibits and Schedules

Schedules

Exhibit 1  Curriculum Vitae, including Testimony, Speeches, and Publications of Drew E. Voth

Exhibit 2  Documents Considered

*Expert Report of Drew E. Voth*

## I. Nature of Involvement

1.      I have been engaged as a damages expert on behalf of Bungie, Inc. ( "Bungie" or "Plaintiff") in this matter versus AimJunkies.com ("AimJunkies"), Phoenix Digital Group LLC ("Phoenix"), Jeffrey Conway, David Schaefer, Jordan Green, and James May (or collectively, "Defendants") to provide my opinions on economic damages in this matter.

2.      I understand that Plaintiff has alleged that Defendants are liable for the following claimed causes of action: Copyright Infringement, 17 U.S.C. § 501; Trademark Infringement, 15 U.S.C. § 1114; and False Designation of Origin, 15 U.S.C. § 1125(a).

3.      I offer no opinions on liability, and have necessarily assumed liability for purposes of any damages calculations.

## II. Summary of Opinions

4.      In the event that Defendants are found liable, based on my analysis, education, training, experience, and review of various evidence as discussed throughout this report and the accompanying schedules, I have calculated Defendants' sales revenues of alleged infringing Destiny 2 products totaling $43,210.  I understand it is Defendants' burden to prove any deductions of cost from this sales revenue measure in the calculation of Defendants' profits.

5.      I reserve the right to update and or amend my opinions based on additional information I receive subsequent to this disclosure.

## III. Credentials and Compensation

6.      I am a Senior Director with Alvarez & Marsal Valuation Services, LLC ("A&M") in Seattle, Washington. A&M is a U.S. member firm of Alvarez & Marsal Holdings LLC,

*Expert Report of Drew E. Voth*

a global tax and business advisory organization. With offices in 30 countries, including 27 offices in the United States, the employees of member and affiliated firms provide tax and advisory services to private and public clients around the world. My practice includes valuation, litigation expert witness services, and investigative services. Damages calculations and other forms of litigation support services are a part of this practice. Over the past 30 years, I have testified in arbitration, at trial, and in depositions on a variety of damages matters; I have authored writings and continuing education courses on damages topics, including co-authoring the book *Calculating Damages in Intellectual Property Matters, 4th Ed.*, at the request of the American Institute of Certified Public Accountants; and I have delivered speeches on various economic and damages topics. I hold an honors degree in Economics and I am a Certified Public Accountant certified in financial forensics and licensed in Washington, a Certified Valuation Analyst, a Certified Fraud Examiner, and a Certified Insolvency and Reorganization Advisor certified in distressed business valuation. I am a member of the American Institute of Certified Public Accountants, the Association of Certified Fraud Examiners, the Association of Insolvency Advisors, the National Association of Certified Valuation Analysts, and the Licensing Executives Society. I have been retained as an expert on numerous occasions to address commercial damages across a wide variety of industries, including the software and gaming industries. My curriculum vitae including all prior speeches and publications in the last 10 years, and testimony within the last four years is included as Exhibit 1 of this report.

7.      My firm is being compensated for our involvement in this matter based upon our hourly billing rates. A&M charges clients for my time at an hourly rate of $550, and rates for staff working at my direction range from $250 - $900. My firm's fee is not contingent upon the outcome of this matter.

*Expert Report of Drew E. Voth*

**IV. Facts, Data, and Other Information Considered**

8.      My opinions in this matter are based upon my judgment, training, education, and expertise in financial and damages analyses, my analysis, as well as my assessment of documents that have been provided to me, as shown in attached Exhibit 2, or otherwise referenced in this report. In some cases, where only a portion of a document might be cited in this report, I reserve the right to rely on the entire document. I may present or utilize portions of this report and/or the documents I have considered as demonstratives in support of testimony.

**V. Basis for Opinions**

**V.1. Background and Parties[1]**

9.      Bungie is a Delaware corporation with its principal place of business at 550 106th Avenue NE, Suite 207, Bellevue, Washington, 98004-5088.

10.     Bungie is the owner of the popular Destiny franchise including Destiny 2, a successful shared-world first-person action video game. Destiny (2014) and Destiny 2 (2017) and its expansions (2018, 2019, 2020 and ongoing) have been persistent recipients or nominees for rewards worldwide since their release. Destiny, Destiny 2, and its expansions have met with commercial success due in part to their persistent multiplayer features, matchmaking, cooperative Player vs. Environment (PvE) and Player vs. Player (PvP) modes, and in-game rewards. Such rewards include items, seals, and titles that are obtainable by players through skillful gameplay and that are visible to other players, this visibility being an important aspect of the social, always-online nature of the games.

---

[1] Information per the Amended Complaint with Jury Demand ("Complaint"), dated May 19, 2022, unless otherwise noted.

*Expert Report of Drew E. Voth*

11.     The franchise launched in September 2014 with the release of Destiny. In Destiny, players are Guardians of the last safe city on Earth, protecting humanity from aliens and combatting the looming threat of the Darkness, an ongoing threat to humanity. Destiny has a large community of players. Since its release in 2014, Destiny attracted more than 10 million players worldwide. Post-launch, Bungie supported the growth of Destiny and the Destiny community by selling downloadable content ("DLC") expansions with new content and in-game events that offered challenges, new game modes, and rewards for its players.

12.     The most recent game in the Destiny franchise, Destiny 2, was released in September 2017 and builds on the success of the original game. Destiny 2 is now a free-to-play game with paid expansions, continually refreshed DLC, and a player base estimated over 30 million players. As with the original Destiny, Bungie continues to offer new DLC post-launch in Destiny 2 with three major expansions and substantial seasonal releases, including the most recent expansion, Destiny 2: Beyond Light, which allows players to harness new powers and explore a new frontier, Europa.

13.     Defendants maintain a website offering video game "mod" and "cheat" products which give the users of those software products advantages in various video games.[2] Defendants developed, advertised, used, and distributed a software cheat that purported to give players an unfair advantage in Destiny 2. Defendants are alleged to be infringing Bungie's intellectual property rights, circumventing technological measures protecting access to Destiny 2, and breaching and inducing other players to breach Bungie's Limited Software License Agreement ("LSLA").  Some of Bungie's substantive claims are being litigated in a separate JAMS arbitration, in which I have also been retained and have also submitted a report.

---

[2] https://www.aimjunkies.com/available-cheats accessed September 13, 2022.

*Expert Report of Drew E. Voth*

14.     Cheaters are alleged to be harmful to the continued commercial success of Destiny 2. As a free-to-play game, Destiny 2's commercial success is dependent upon continued player engagement, including the purchase of DLC and Destiny 2 expansions. When cheating occurs, or when there is a perception that players are cheating, then non-cheating players may become frustrated that cheaters obtain the same rewards and stop playing and purchasing Plaintiff's paid products. I have noted examples of Twitter comments supporting Plaintiff's position such as:[3]



- **PFCfan** @PFCfan2 · Aug 11
  Replying to @DestinyBulletn
  Hurting the game doesn't mean hurting sales? Playing against cheaters is a bad experience, it really ruins pvp games, which on the whole is really fun.



- **AsunaYukki234** @zeldadungeon234 · Aug 11
  Replying to @DestinyBulletn
  Cheaters ruin games pvp games and all

15.     I understand Plaintiff's expert, Mr. Steven Guris, will opine that cheats such as those offered by Defendants are harmful to companies like Bungie.

16.     Defendants are alleged to have created, advertised, sold, and distributed cheat software, including for Destiny 2. Defendants advertised and sold their cheats through their website, AimJunkies.com. Defendants' sold their cheat, "Destiny 2 Cheat," for $34.95/month in most cases. An example of Defendants' offer to sell the cheat-at-issue from AimJunkies' website is shown below:

---

[3] Taken from a Twitter thread at
https://twitter.com/DestinyBulletn/status/1557495414550568961?ref_src=twsrc%5Etfw on September 13, 2022.

*Expert Report of Drew E. Voth*



17.     As of December 4, 2020, Phoenix Digital was listed as the seller of the Destiny 2 cheat software purchased through AimJunkies.

18.     Destiny 2 players who purchase and deploy Defendants' cheat may be given an unfair advantage over non-cheating Destiny 2 players. For example, Defendants' "Destiny 2 Aimbot" claims to automatically aim at enemy players without requiring input from the cheat user; the "Destiny 2 No Recoil" purports to eliminate recoil from weapons, allowing the user to stay locked on to his/her enemies; and the "ESP" feature purportedly allows the cheat user to see players and items through walls, which non-cheating players cannot do.

*Expert Report of Drew E. Voth*

### V.2 Operative Matter

19.     On June 15, 2021, Bungie filed an initial complaint in Federal Court in Seattle alleging copyright infringement (17 U.S.C. § 501 *et seq.*, trademark infringement (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), and other causes of action. Bungie filed the Demand for Arbitration in this matter on February 10, 2022, referring all claims except the intellectual property infringement claims to arbitration.  Bungie filed its amended complaint in this action on May 19, 2022.

20.     Defendants allegedly infringed Bungie's copyrights and trademarks, circumventing technological measures protecting access to Destiny 2, and breaching and inducing other players to breach Bungie's Limited Software License Agreement.[4]

### V.3 Bungie's Claimed Intellectual Property

21.     I understand that Bungie has asserted the following intellectual property in relation to this matter:

Copyrights

| Title | Type | Registration No. | Date of 1st Publication | Expiration Date of Registration |
|---|---|---|---|---|
| Destiny 2 | Code (Literary Work) | TX 8-933-655 | September 9, 2017 | September 9, 2112 |
| Destiny 2: Beyond Light | Code (Literary Work) | TX 8-933-658 | November 10, 2020 | November 10, 2115 |
| Destiny 2 | Audiovisual | PA 2-282-670 | September 9, 2017 | September 9, 2112 |
| Destiny 2: Beyond Light | Audiovisual | PA 2-280-030 | November 10, 2020 | November 10, 2115 |

---

[4] Per the Complaint.

*Expert Report of Drew E. Voth*

Trademarks

Bungie owns multiple trademarks associated with the Destiny franchise including but not limited to DESTINY, DESTINY (& design), DESTINY 2, DESTINY 2: LIGHTFALL, DESTINY 2: BEYOND LIGHT, and DESTINY 2: THE WITCH QUEEN (the "DESTINY Marks").

22.     Bungie began using the DESTINY and DESTINY (& design) marks in commerce at least as early as February 1, 2013. Since their first use, Bungie has continually used those marks in connection with video game software.

23.     Bungie also owns United States Patent and Trademark Office ("USPTO") Registration No. 4,321,315 for the DESTINY (& design) mark:



24.     Bungie also has pending applications for DESTINY 2: LIGHTFALL (Serial No. 88/955,399), DESTINY 2: BEYOND LIGHT (Serial No. 88/955,392), and DESTINY 2: THE WITCH QUEEN (Serial No. 88/955,395).

*LSLA*

**V.4 Remedy Calculations**

25.     I have calculated compensatory damages in this matter in the form of Defendants' profits. In calculating Defendants' profits, I understand it is Plaintiff's burden to prove

*Expert Report of Drew E. Voth*

Defendants' sales, and that it is Defendants' burden to prove any deductible costs. Based on my analysis of Defendants' financial data, I have calculated that Defendants' sales relating to Destiny 2 products have been $43,210 as follows:



26.    In response to a subpoena issued by Bungie, PayPal produced PayPal payment system data for various products in the files titled PP_WDWA_0000154.xlsx,[5] PP_WDWA_0000149.xlsx, PP_WDWA_0000157.xlsx, and Stripe payment system data for various products in the file titled PDG0101.xlsx.[6] Based on my analysis of the data in these files, I have summarized the payment data related only to the Destiny 2 products as shown in Schedules 1 through 4, excluding sales data for other products not specifically identified as being related to Destiny 2. Where transaction type information in the data suggested potential refunds or credits, in order to be conservative I have deducted those amounts from claimed sales, even though such amounts were not represented in the data as negative numbers which would normally be expected. Such refunds or credits were found in the "amount_refunded" column of data within the Stripe data, and within the

---

[5] I note this file contains the same information as another document produced in connection with the Arbitration titled PayPal0000034.xlsx.

[6] I note that Defendants' supplemental response to Interrogatory 7 refers to this data as being responsive to Claimant's request to "identify all bank accounts, financial accounts, payment processor accounts, or any other source(s) of funds or accounts owned by Phoenix Digital that are or have been used to process and/or store funds related the sale of the Cheat Software."

*Expert Report of Drew E. Voth*

"transaction type" column of data within the PayPal data, for transaction types "Payment Refund" or "Payment Reversal."

27.     Sales from the PayPal data span the time period from December 2019 through May 2020. The time period covered by the Stripe data is not apparent in the data provided, and I have assumed the Destiny 2 sales data contained therein is within the damages period.

28.     As each sale I have included in my calculations were contained within Defendants' sales data explicitly showing Destiny 2 as the product sold, and I have reviewed AimJunkies.com's website screenshots such as the one shown previously which explicitly associated Destiny 2 with the cheat at issue, I have reasonably assumed that Plaintiffs will establish any legally required nexus between Defendants' sales and Plaintiff's asserted claims.

## VI. Conclusion

29.     Based on my work as discussed in this report, in the event that Defendants are found liable, based on my analysis, education, training, experience, and review of various evidence as discussed throughout this report and the accompanying schedules, Defendants' sales revenues of alleged infringing Destiny 2 products total $43,210.

30.     I understand discovery is ongoing and I reserve the right to update my analyses and opinions should any new information be received. For example, I understand that Defendants' website lists cryptocurrency, specifically Bitcoin, as an avenue for purchasing cheat software, and I understand that Defendants' may have included a Destiny 2 product as part of a bundle of other cheats (so-called "Overdose" package). My review did not include an accounting of cryptocurrency purchases or sales of any Overdose packages, and I reserve the right to modify my opinion if those data become available.

HIGHLY CONFIDENTIAL

*Expert Report of Drew E. Voth*

I declare under penalty of perjury of the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Drew E. Voth



# Drew E. Voth

CPA/CFF, CIRA/CDBV, CFE, CVA



### Senior Director, Advisory Services

As a Senior Director in Alvarez and Marsal's valuation and litigation support practice, Mr. Voth brings significant financial consulting experience to his clients in the areas of forensic accounting, valuation, reorganization, and expert witness testimony.

### Experience

Mr. Voth brings his 30 years of experience in accounting, finance, valuation, economics and statistics to bear on earnings evaluations, reasonable royalty studies, valuations, damages studies, licensing, and other areas. He has testified in deposition and/or trial in a variety of matters including intellectual property infringement, class action, defamation, employment, investigation, and breach of contract matters.

Notable engagements include: prevailing testimony in the oft-cited copyright infringement indirect damages matter Mackie v. Reiser, 296 F.3d 909 (9th Cir. 2002); a no-damage ruling in an underlying patent infringement legal malpractice claim in excess of a billion dollars; testimony in multiple class action matters; and multimillion dollar awards in various matters including breach of contract and theft of trade secret matters.

Mr. Voth has provided consulting to clients in many industries, including consumer products, aerospace, hospitality, telecommunications, gaming, computer software, computer hardware, bio-pharma, medical specialty products, retail, manufacturing, natural resources and others.

A past member of the AICPA's FVS Damages Task Force, Mr. Voth co-authored the practice aid book *Calculating Damages in Intellectual Property Disputes*, *4th edition*.

### Professional qualifications and memberships

- Certified Public Accountant
- Certified Insolvency and Restructuring Advisor, Certified in Distressed Business Valuation
- Certified Valuation Analyst
- Certified Fraud Examiner
- Member of Assoc. of Certified Fraud Examiners
- Member of Assoc. of Insolvency Advisors
- Member of National Association of Certified Valuators and Analysts
- Member of the AICPA, Certified in Financial Forensics
- Member of the Licensing Executives Society
- Member WA State Patent Law Association
- Past Treasurer, Habitat for Humanity, San Gabriel Chapter, and ArtsWest

### Education/Former Firms

Mr. Voth holds an honors degree in economics from Pomona College.  Former firms: PwC, Arthur Andersen, KPMG, FTI, Grant Thornton

### Contact details

1111 3rd Avenue, Suite 2450
Seattle, WA  98101
206.664.8954 Direct
206.948.6962 Mobile
drew.voth@alvarezandmarsal.com



# Drew E. Voth
# Trial Testimony (clients underlined)

U.S. District Court, Central District of California
  Vital Pharmaceuticals, Inc. d/b/a Bang Energy, and JHO Intellectual Property Holdings, LLC v.
  PhD Marketing, Inc. et al.

Superior Court of the State of Washington in and for King County
  Providence Health & Services v. Atigeo Corporation

U.S. District Court, Middle District of Florida at Orlando
  National Products, Inc. v. High Gear Specialties, Inc.

Franklin County Superior Court, Washington
  Hilt Investment Holdings, LLC and Northwest Motorsport, Inc. v. J. Dudley LLC, Bulldog Motors,
  LLC, and Frank and Julie Lindstrom

Pierce County Superior Court, Washington
  Conmed, Inc. v. Pierce County

U.S. District Court, Anchorage Alaska
  Anthony Henry v. Municipality of Anchorage, Anchorage Police Department, and Mark Mew

U.S. District Court, Western District of Washington at Seattle
  Eko Brands, LLC. v. Adrian Rivera Maynez Enterprises, Inc. and Adrian Rivera

U.S. District Court, Wester District of Washington at Seattle
  National Products, Inc. v. Arkon Resources, Inc.

U.S. District Court, District of Oregon, Eugene Division
  Omnigen Research, LLC and Prince Agri Products, Inc. v. Yongqiang Wang, Yan Zheng and
  Bioshen

U.S. District Court, Northwestern Division, North Dakota
  Energy Heating, LLC and Rocky Mountain Oilfield Services, LLC v. Heat On The Fly, LLC and
  Super Heaters North Dakota, LLC

U.S. District Court, Western Washington
  Pacific Bioscience Laboratories, Inc. v. Nutra Luxe et al.



Washington County, Oregon
   Ivey Imaging, LLC v. Jackie Reeder and Vertis, Inc.

State District Court, Idaho
   Arnzen v. Fisher Broadcasting


# Arbitration Testimony (clients underlined)

Arbitration, NP4019, ACS 19-02
   International Brotherhood of Electrical Workers Local 1547 v. Alaska Communications

Arbitration, Los Angeles
   Orange Bang, Inc., et al. v. Vital Pharmaceuticals, Inc. d/b/a VPX Sports

Arbitration, International Chamber of Commerce, International Court of Arbitration
   Kabushiki Kaisha Too Marker Products, Inc. v. Imagination International, Inc. and John Darland

Arbitration, Chicago, Illinois
   Wedi Corp. v. Brian Wright and Sound Product Sales, L.L.C.

Arbitration, Seattle, Washington
   Northwest Motorsport, Inc. v. Sunset Chevrolet, Inc., Sunset Trucks, Inc. and Phillip Mitchell

Arbitration, Seattle, Washington
   Paula's Choice, LLC v. Paula's Choice (Australia) Pty, Ltd.

Arbitration, Seattle, Washington
   Avanti Markets, Inc. v. Certefi, Inc.

# Deposition Testimony (clients underlined)

U.S. District Court, Western District of Texas, Waco Division
   Arruda, et al. v. Curves International, Inc., et al.

U.S. District Court, Western District of Wisconsin
   National Products, Inc. v. ProClip USA, Inc. and Brodit AB

U.S. District Court, Central District of California
   Vital Pharmaceuticals, Inc. d/b/a Bang Energy, and JHO Intellectual Property Holdings, LLC v.
   PhD Marketing, Inc. et al.



Superior Court of the State of Washington in and for King County
    <u>Providence Health & Services</u> v. Atigeo Corporation

U.S. District Court, Western District of Washington at Seattle
    Mountaineers Foundation v. <u>The Mountaineers</u>

U.S. District Court, Northern District of California, San Francisco Division
    Atari Interactive, Inc. v. <u>Teespring, Inc.</u>

Arbitration, Los Angeles
    Orange Bang, Inc., et al. v. <u>Vital Pharmaceuticals, Inc. d/b/a VPX Sports</u>

U.S. District Court, Central District of California
    Monster Energy Company, et al. v. <u>Vital Pharmaceuticals, Inc. d/b/a VPX Sports, a Florida Corporation; and Jack H. Owoc, a.k.a. Jack Owoc, an individual</u>

U.S. District Court, Western District of Washington at Seattle
    Philips North America LLC v. <u>Summit Imaging, Inc. and Lawrence Nguyen</u>

Arbitration, Seattle Washington
    Brian Simmons v. <u>Kevin Britton-Simmons and Todd Britton-Simmons</u>

U.S. District Court, Western District of Washington at Seattle
    Corus Realty Holdings, Inc. v. <u>Zillow Group, Inc., Zillow, Inc., and Trulia, LLC</u>

U.S. District Court, Northern District of California
    Primus Group, Inc. v. <u>Institute for Environmental Health, Inc.</u>

U.S. District Court, Western District of Washington at Seattle
    Phytelligence, Inc. v. <u>Washington State University</u>

U.S. District Court, District of Oregon
    Leupold & Stevens, Inc. v. <u>Lightforce USA, Inc., d/b/a Nightforce Optics and Nightforce USA</u>

Superior Court of Washington for King County
    <u>Conmed LLC f/k/a Conmed, Inc.</u> v.  Pierce County

Franklin County Superior Court, Washington
    <u>Hilt Investment Holdings, LLC and Northwest Motorsport, Inc.</u> v. J. Dudley LLC, Bulldog Motors, LLC, and Frank and Julie Lindstrom

U.S. District Court, Central District of California at Santa Ana
    <u>National Products, Inc.</u> v.  Arkon Resources, Inc.



U.S. District Court, Central District of California at Santa Ana
   <u>National Products, Inc.</u> v.  Wireless Accessories Solutions, Inc. (Patent matter)

U.S. District Court, Central District of California at Santa Ana
   <u>National Products, Inc.</u> v.  Wireless Accessories Solutions, Inc. (Trademark matter)

U.S. District Court, Middle District of Florida at Orlando
   <u>National Products, Inc.</u> v.  High Gear Specialties, Inc.

U.S. District Court, Western District of Washington at Seattle
   <u>National Products, Inc.</u> v.  Bracketron, Inc.

Superior Court of Washington, Pierce County
   <u>Northwest Motorsport, Inc.</u> v. Sunset Chevrolet, Inc., Sunset Truck, Inc., and Phillip Mitchell

U.S. District Court, Western Washington
   <u>Talking Rain Beverage Company, Inc.</u> v. DS Services of America, Inc.

U.S. District Court, Anchorage Alaska
   Anthony Henry v. <u>Municipality of Anchorage, Anchorage Police Department, and Mark Mew</u>

U.S. District Court, Western Washington
   Tefere Abebe Bikila, et al. v. <u>Vibram USA, Inc., et al.</u>

U.S. District Court, Western Washington
   <u>Microban Systems, Inc. and Microban Liquids, LLC</u> v. Skagit Northwest Holdings, Inc., II Rep-Z, Inc. dba ProRestore Products; and Dri-Eaz Products, Inc

Arbitration, Seattle, Washington
   <u>Northwest Motorsport, Inc.</u> v. Sunset Chevrolet, Inc., Sunset Trucks, Inc. and Phillip Mitchell

U.S. District Court, Western Washington
   <u>Juli Adams</u> v. The Hartz Mountain Corporation

Arbitration, Seattle, Washington
   <u>Paula's Choice, LLC</u> v. Paula's Choice (Australia) Pty, Ltd.



U.S. District Court, Northwestern Division, North Dakota
    <u>Energy Heating, LLC and Rocky Mountain Oilfield Services, LLC</u> v. Heat On The Fly, LLC and
    Super Heaters North Dakota, LLC


U.S. District Court, Central District of California, Western Division
    Grupo Bimbo, S.A.B. De C.V.; and Barcel USA, LLC, v. <u>Snak-King Corp.;</u> and The Trustee of the
    Levin Family 2010 Irrevocable Gift Trust


Bonneville County, Idaho
    Melaleuca, Inc. and Frank L. VanderSloot v. <u>The Foundation for National Progress</u> et al.


U.S. District Court, Western Washington
    Jack Mackie v. <u>Bonnie Rieser and Seattle Symphony Orchestra</u>



Drew E. Voth

**Publications**

Calculating Damages in Intellectual Property Disputes, 4th Edition, 2019, published by the American Institute of Certified Public Accounts and the Chartered Institute for Management Accountants

Posts on https://amonsocial.alvarezandmarsal.com/:
- Supreme Courts Sides with Google over Oracle in Copyright Dispute, 4/12/2021
- Supreme Court Settles Circuit Split on Trademark Damages, 9/29/2020
- Covid-19 Has Exposed Massive Fraud Weaknesses, 9/27/2020
- SCOTUS to Settle 10-Year, $8.8 Billion Copyright Battle Between Google and Oracle, 12/19/2019
- Supreme Court to Settle Circuit Split on Trademark Damages, 10/22/2019
- Defend Trade Secrets Act, 10/3/2019
- Changing Patent Rules, 9/17/2019
- New IP Damages Book, 9/6/2019

Misapplication of Gordon Growth Model Can Lead to Undervaluing, *Business Valuation Resources, Business Valuation Update*, May 2015

Intellectual Property Licenses and Bankruptcy:  The Latest Word, *American Bar Association's Business Law Today*, August 2014

Apportionment of Intellectual Property Value – Where Economic Theory Meets Legal Practice, The Federal Lawyer, Oct/Nov 2013

The Clear Decision in Uniloc Needs Clarification, *les Nouvelles*, March 2013

Anatomy of a Record-Setting $1.17 Billion Patent Verdict, *Action Matters Update*, January 2013

Recent Entire Market Value Rule Opinions Impact Patent Valuation, *les Nouvelles*, September 2011

Delaware Chancery Court Update, *Business Valuation Monitor*, May 2011

Patent Damages Apportionment and the Cornell Case, Website of William Carleton Counselor @ Law, www.wac6.com, October 2010

Recent Court Opinions Impact Patent Valuation, *Business Valuation Monitor*, September 2010



## Drew E. Voth

### **Speeches**

Annual Economic Damages Case Law Update, AICPA, October 2020

Calculating Damages in Intellectual Property Disputes: New Guidance, Business Valuation Resources, August 2019

Economic Damages Update – Reasonable Certainty, Lost Profits and Intellectual Property, AICPA, May 2019

Strategic Intellectual Property Commercialization, University of Washington School of Law, Seattle, WA, ongoing

Current Issues in IP Litigation, American Institute of CPAs Forensic and Valuation Services Conference, Nashville TN, November 2016

Techniques for IP Valuation and How Recent Challenges in US Law Affect Valuations, Licensing Executives Society, Vancouver B.C. Chapter, May 2016

IP value – techniques, recent court decisions, and the impact of proposed USPTO changes, Licensing Executives Society, Seattle WA Chapter, January 2016

Pricing IP – The Cost of a License or Damages, Washington State Bar Association 10th Annual IP Licensing Seminar, May 2015

Patent Infringement Reasonable Royalty Damages Strategies in Light of Recent Federal Circuit Decisions, The Knowledge Congress, October 2013

Accounting for Lawyers, K&L Gates, July 2013

AICPA Expert Witness Skills Workshop, July 2013

Kirkland Institute for Trial Advocacy, Kirkland & Ellis, March 2013

IP in Divorce: Dividing Patents, Copyrights, and Trademarks, Business Valuation Resources, May 2012

Intellectual Property and Other Intangibles:  A Practical Approach to Assigning Value, Tech America, November 2011

Understanding the Recent Bankruptcy Court Decision Regarding Intellectual Property Rights of Licensees from Foreign Owners, The Knowledge Congress, September 2011

Roundtable on Patent and Trademark Damages:  Fundamentals and Emerging Trends, King County Bar Association, June 2011

Valuation 101, Miller Nash, May 2011

Business Valuation and Damages, Microsoft, May 2011

Sea Change In Patent Damages, Licensing Executives Society, Seattle Chapter, April 2011

**Exhibit 2: Documents Considered**

2022-11-10 Order on MTD.pdf
Amended Complaint with Jury Demand.pdf
Complaint With Jury Demand.pdf
Defendants Answer and Counterclaims.pdf
2022-02-10 Bungie_s Demand for Arbitration.PDF
2022-06-22 Respondents Response to Demand for Arbitration.PDF
2022-07-28 Proposed Protective Order (JAMS).PDF
2022-09-02 Phoenix Digital Supplemental Response 1st ROGs.PDF

PDG0101.csv
PP_WDWA_0000149.xlsx
PP_WDWA_0000154.xlsx
PP_WDWA_0000157.xlsx
PayPal0000034 [Confidential].xlsx

2022-10-19 Conway deposition and exhibits
2022-10-28 Schaefer deposition and exhibits

2020.12.02 aimjunkies.com - Forums - Destiny 2 Aimbot - purchase.pdf
2020.12.02 aimjunkies.com - Forums - Destiny 2 Aimbot.pdf
AimJunkies website 2022Sep13.pdf

# EXHIBIT 26
# FILED UNDER SEAL

# EXHIBIT 27

```
 1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
 2                          AT SEATTLE

 3    _____

 4    BUNGIE, INC.,                   )
                                                    ┌─────────────────┐
 5             Plaintiff,             )             │ CERTIFIED COPY  │
                                                    └─────────────────┘
 6       vs.                          )  No. 2:21-cv-811-TSZ

 7    AIMJUNKIES.COM; PHOENIX         )

 8    DIGITAL GROUP, LLC; DAVID       )

 9    SCHAEFER; JORDAN GREEN;         )

10    JEFFREY CONWAY; and JAMES       )

11    MAY,                            )

12             Defendants.            )

13    _____

14    VIDEO RECORDED 30(B)(6) DEPOSITION UPON ORAL EXAMINATION

15              OF PHOENIX DIGITAL GROUP, LLC

16                  BY DAVID SCHAEFER

17    _____

18                      6:02 P.M.

19                  MARCH 20, 2023

20        WITNESS LOCATED AT:  UNDISCLOSED LOCATION

21

22

23

24    REPORTED BY:  BETSY E. DECATER, RPR, CCR 3109

25    JOB NO.: 971984
```

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

```
                                                            Page 2
  1                  A P P E A R A N C E S

  2

  3   FOR THE PLAINTIFF:

  4       CHRISTIAN W. MARCELO
          Perkins Coie LLP
  5       1201 Third Avenue
          Suite 4900
  6       Seattle, Washington 98101-3099
          (206) 359-8000
  7       cmarcelo@perkinscoie.com

  8

  9   FOR THE DEFENDANTS:

 10       PHILIP P. MANN
          Mann Law Group
 11       403 Madison Avenue North
          Suite 240
 12       Bainbridge Island, Washington 98110
          (206) 855-8839
 13       phil@mannlawgroup.com

 14

 15   ALSO PRESENT:   SCOTT NORTON, Videographer
                      JAMES BARKER
 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

```
                                                              Page 3
  1                        I N D E X

  2

  3    EXAMINATION BY:                            PAGE(S)

  4       MR. MARCELO                             5

  5

  6

  7    EXHIBITS FOR IDENTIFICATION                PAGE

  8
       Exhibit 60  Counterclaim Exhibit E         13
  9
       Exhibit 61  Screen Shot AimJunkies
 10                Website 3/19/23                36

 11    Exhibit 62  Notice of Deposition           74

 12    Exhibit 63  Notice of Deposition           75

 13    Exhibit 64  Phoenix Digital's Supplemental
                   Responses to Interrogatory 10  78
 14
       Exhibit 65  Exhibit 5 to Bungie's
 15                Amended Complaint              101

 16    Exhibit 66  Screen Shot of AimJunkies
                   Website with Post
 17                Dated 3/19/23                  118

 18

 19

 20

 21

 22

 23

 24

 25
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 4

```
 1                      MARCH 20, 2023

 2                         6:02 P.M.

 3                         --oOo--

 4

 5            VIDEOGRAPHER:  Good evening, everyone.  Here

 6    begins the remote deposition of Phoenix Group, LLC,

 7    pursuant FRCP 30(b)(6).  This is in the matter of

 8    Bungie, Inc. versus AimJunkies.com, et al.  This case is

 9    in the United States District Court, Western District of

10    Washington at Seattle.  Case number is 2:21-cv-811-TSZ.

11            Today's date is Monday, March 20th, 2023.  The

12    current time is 6:02 p.m. Pacific time.  This is a

13    remote deposition through Zoom video conferencing.  The

14    videographer is Scott Norton, here on behalf Centex

15    Litigation Services.  Would counsel please introduce

16    yourselves and state whom you represent?

17            MR. MARCELO:  Christian Marcelo for

18    Plaintiff, Bungie.  I'm joined by James Barker, general

19    counsel for Bungie.

20            MR. MANN:  And I am Philip Mann.  I'm here

21    on behalf of all Defendants, in particular Phoenix

22    Digital for this particular 30(b)(6) deposition.

23            VIDEOGRAPHER:  Thank you all very much.  Our

24    reporter today is of Betsy Decater with Centex.  Will

25    the reporter please swear in the witness.
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

```
                                                        Page 5
 1                        DAVID SCHAEFER,

 2       sworn as a witness by the Certified Court Reporter,

 3                     testified as follows:

 4

 5                        EXAMINATION

 6   BY MR. MARCELO:

 7       A.  Now, is this the personal or the 30(b)(6)?

 8       Q.  This is the 30(b)(6) deposition of Phoenix

 9   Digital.  My hope is that we will get everything done in

10   this one deposition.  But we can always shift over to

11   the other deposition after if we need to.

12           Mr. Schaefer, you've been through this deposition

13   process before, right?

14       A.  Yes.

15       Q.  You were deposed in connection with the

16   arbitration?

17       A.  Yes.

18       Q.  Okay.  So same general rules apply.  I'm going to

19   kind of go through them again.  Remember to talk one at

20   a time, wait for me to finish the question before you

21   start answering.  If something's unclear, ask me, I'll

22   try to make the question more clear.  No nonverbal

23   answers.  We'll need answers on the record.  Okay?

24       A.  Yes.

25       Q.  And especially in video chats we tend to start
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 17

```
 1      A.  We are going to visit this one more time.  If you
 2  feel the need to continue to try to take another bite at
 3  the apple, I will end this deposition and you can take
 4  it up with Judge Zilly and we'll show Judge Zilly the
 5  video.  All right.  And we'll see if you're following
 6  the guidelines that he laid out.
 7      Q.  So, Mr. Schaefer, do you recall --
 8      A.  Now, are we going to play by the rules of the
 9  game or are we going to do it Christian's way?
10      Q.  Mr. Schaefer, do you recall the name of the
11  attorney who drafted the terms of service?
12      A.  Bob Hahn.
13      Q.  When did Mr. Hahn draft the terms of service?
14      A.  The year that the corporation was formed.
15      Q.  When was that?
16      A.  I don't remember.
17      Q.  Do you recall roughly what year?
18      A.  You already have that information.
19      Q.  Mr. Schaefer, do you recall roughly what year
20  Phoenix Digital was formed?
21      A.  No, I do not remember.
22      Q.  Did anyone assist Mr. Hahn in drafting the terms
23  of service?
24      A.  I have no idea.
25      Q.  Did anyone from Phoenix Digital assist Mr. Hahn
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 18

1    in drafting the terms of service?

2        A.  I have no idea.

3        Q.  I'm going to go to page 4 of Exhibit 60.  You see

4    this paragraph that starts "You shall not copy,

5    distribute, reproduce"?

6        A.  Yes, I see that.

7        Q.  And it says, "You shall not copy, distribute,

8    reproduce or display or use any part of our software

9    except as expressly authorized herein."  Right?

10       A.  Yes.

11       Q.  What does our software refer to?

12       A.  The product that we sell.

13       Q.  And specifically what does -- what does that

14   mean?

15       A.  We don't make product.  And I'm not going to go

16   over this again because we've already gone over this

17   again, Christian.  This is your last chance.  All right?

18   Go there again where I have to go over it again and this

19   deposition is done.  Do you understand me?

20       Q.  Mr. Schaefer, what does our software refer to?

21       A.  This deposition is -- our software is a product

22   that we sell.  We have contractors that make our product

23   for us.  We sell that product.  We do not make any

24   product in house, none.

25       Q.  And what products are you referring to?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 19

 1      A.  The product that the AimJunkies website sold.

 2      Q.  And that includes cheat software?

 3      A.  Yes.

 4      Q.  Anything else?

 5      A.  I don't remember.

 6      Q.  You don't recall anything else that falls under

 7   the category of our software in the terms of service?

 8      A.  No, I do not remember.

 9      Q.  Under Proper Use of Our Services, it says, "Our

10   services include the use of private software, provided

11   by AimJunkies."  What does our services refer to in

12   that?

13      A.  Just exactly what it says.

14      Q.  What services offered by Phoenix Digital are

15   included in the terms of service covered by the word

16   "our services"?

17      A.  I guess that would include the website, that

18   would include the loader, anything -- any service that

19   we provided to our customers.

20      Q.  Website, loader and any other services.  Any

21   other services come to mind?

22      A.  No.

23      Q.  Okay.  So just the website and loader?

24      A.  Yeah.  That's all that's on my tip of my tongue

25   at this point.

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 20

1      Q.  Let's go to page 5 of the privacy policy.  You

2  see at the bottom where it says "Privacy Policy, What

3  Information Do We Collect?"

4      A.  Yes.

5      Q.  And what is your understanding of what this

6  privacy policy identifies?

7      A.  I don't understand the question.

8      Q.  Sure.  That privacy policy lists information that

9  Phoenix Digital collects, right?

10     A.  Yes.

11     Q.  And if we scroll down a page to page 6 of Exhibit

12  60, it says, "We collect information when you use our

13  services.  When you use our software, we collect

14  information to identify the devices used.  We collect

15  information that allows us to diagnose and improve our

16  software," right?

17     A.  Okay.

18     Q.  And it says, "We collect records of use of our

19  website and services," right?

20     A.  Okay.

21     Q.  What is it referring to when it says "we collect

22  records of use of our website and services"?

23     A.  I don't know.

24     Q.  Do you know what records Phoenix Digital

25  collected regarding it's AimJunkies website and

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 24

```
 1   we've had -- I don't know even know why I'm revisiting

 2   this again.  As I told you before, Christian, we've had

 3   our website dumped several times and had our product

 4   distributed on other websites.  This was a deterrent

 5   from that happening.

 6       Q.  Were the terms of service available on the

 7   AimJunkies.com website?

 8       A.  Yes.

 9       Q.  When did --

10       A.  You could not -- you could not purchase a

11   subscription without approving this.

12       Q.  When did Phoenix Digital launch the AimJunkies

13   website?

14       A.  I don't remember.

15       Q.  Was the terms of service on the website the day

16   it was launched?

17       A.  Yes.

18       Q.  Who added the terms of service to the AimJunkies

19   website?

20       A.  I did.

21       Q.  Describe that process.

22       A.  It's a WordPress page.  You copy/paste.

23       Q.  Where -- where are the terms of service available

24   on the website?

25       A.  I don't remember.  I know there was a tab where
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 25

1   you could click on it, and I also know that you could

2   not purchase without seeing this page and clicking "I

3   agree."  In fact, this -- this page came from the actual

4   website page.  This didn't come from the place where you

5   went through it; otherwise, it would have the tab on the

6   bottom to approve.

7       Q.  Let me try to break that down.  You had said

8   there was a tab where you could get to the terms of

9   service; is that right?

10      A.  If I remember correctly, yes.  Don't -- I -- I

11  should say I don't know for sure because, to be honest

12  with you, I don't remember.  But there was a web page

13  that had this on it and it was the same identical one

14  that you had to click through when you purchased a

15  subscription.

16      Q.  Okay.  But to back up, there was two locations,

17  right, you were talking about one was the click through

18  to purchase?

19      A.  Yes.

20      Q.  And the other was somewhere on the website

21  without actually having to purchase anything you could

22  see the terms of service?

23      A.  Yes.  And that -- the lawyer told us to do it

24  that way.

25      Q.  Mr. Hahn?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 26

1    A.  Yes.

2    Q.  Was there any attorneys other than Mr. Hahn that

3    ever worked in connection with the terms of service?

4    A.  No.

5    Q.  Have there ever been any changes to the terms of

6    service since they were first implemented?

7    A.  Not that I'm aware of.

8    Q.  Who would have the ability to change the terms of

9    service at Phoenix Digital?

10   A.  Me.

11   Q.  Anyone else?

12   A.  Not that I'm aware of.

13   Q.  Not Mr. Green or Mr. Conway?

14   A.  Well, Mr. Conway doesn't have the knowledge to be

15   able to do it.  And Mr. Green probably could, but that

16   wasn't his domain so he didn't touch it.

17   Q.  Understood.  So it sounds like they might have

18   been able to, but in Mr. Conway's case he

19   technologically wasn't able to; is that right?

20   A.  Well, I don't think he could even log into the

21   back end of the website.  I don't think he had the

22   ability.

23   Q.  And could Mr. Green log --

24   A.  He was too busy making cheats, Christian.

25   Q.  Could Mr. Green log into the back end of the

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 29

```
 1   you just remind me of where Phoenix Digital got this
 2   document?
 3       A.  No.  I don't remember now.
 4       Q.  You don't remember where Phoenix Digital got this
 5   document?
 6       A.  I think I told you earlier I don't remember now.
 7              MR. MANN:  This document is the terms of
 8   service that he said he got from his lawyer, Mr. Hahn.
 9   Can we grow up?
10              MR. MARCELO:  Mr. Mann --
11              MR. MANN:  Answer the question.  Mr.
12   Christian, can we go up and act like professionals?
13              MR. MARCELO:  Yeah.  And I'm trying to get
14   an answer to a question which is where --
15       A.  You already asked the question and I already
16   answered it.
17       Q.  (BY MR. MARCELO)  Understood.  You don't recall
18   where you got this document from?
19       A.  Oh, my God.  Ask another question.
20              MR. MANN:  Dave, just tell him you got it
21   from your lawyer.
22       A.  I got it from my lawyer.
23              MR. MANN:  You already said that.  I mean,
24   is that an accurate answer?  Is that a truthful answer,
25   you got it from your lawyer?
```

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 30

```
 1               THE WITNESS:  Yes.  I got it from Bob Hahn.

 2               MR. MANN:  Can we move on, Christian?

 3       Q.  (BY MR. MARCELO)  And what I'm wondering is this

 4  specific file, the -- the 2020 AimJunkies terms of

 5  service, when it was produced was it saved on a personal

 6  computer, this version?

 7       A.  God.  No.

 8       Q.  It wasn't still on the AimJunkies website, right?

 9       A.  No.

10       Q.  Because the current one would be 2023 now, right?

11       A.  No.

12       Q.  Either way this terms of service wasn't printed

13  from the current AimJunkies website, right?

14       A.  No.

15       Q.  So when you got this document to produce to

16  Bungie, where did it come from?

17       A.  I don't remember.

18       Q.  Who saved this 2020 version of the terms of

19  service?

20       A.  The website saved the 2020 version.

21       Q.  So this is archived on the AimJunkies website?

22       A.  It was archived on the AimJunkies website.

23       Q.  When was it archived on the AimJunkies website?

24       A.  In 2020.

25       Q.  Is that archive still there?
```

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 31

1     A.  I have no idea.

2     Q.  When did Phoenix Digital pull this document off

3   of the archive of the AimJunkies website?

4     A.  I don't remember.

5     Q.  Was it after this litigation began?

6     A.  I don't remember.

7     Q.  So there's a chance it was before the litigation

8   began you had just pulled a copy?

9     A.  I didn't say that.  Don't put words in my mouth.

10    Q.  I'm asking you a question, Mr. Schaefer.

11    A.  I don't remember.

12    Q.  Why wasn't the 2019 version archived?

13    A.  The 2019 and the 2020 versions were archived on

14  Wayback Machine.

15    Q.  So is this version, Exhibit 60, from the Wayback

16  Machine?

17    A.  I don't remember.

18    Q.  Well, somebody had to pull this document from

19  somewhere, right?

20    A.  No.  It's probably like our tax statements and

21  our filings with the court, they're all lies.  None of

22  this is real.  We're just a bunch of liars, and you guys

23  are the only straight-up guys.

24    Q.  Mr. Schaefer, who pulled this document, Exhibit

25  60, the 2020 AimJunkies terms of service?  Who collected

Bungie, Inc. vs Aimjunkies.com, et al.      30(b)(6) David Schaefer 03/20/2023

Page 32

1    that document?

2        A.  Oh, my God.  I don't remember.

3        Q.  When was it collected?

4        A.  I don't remember.

5        Q.  And to be clear, there's no current versions of

6    the 2019, 2018, 2017 terms of service, right?

7        A.  I have no idea.  How would -- you sell a car and

8    a year later you're asking me what's in the fucking

9    ashtray.

10       Q.  No, Mr. Schaefer, what I'm asking you is how come

11   you have this very specific document, the 2020 terms of

12   service, when you sold the car and didn't keep any other

13   piece except for this?

14       A.  Oh, my God.  Did I say that?

15            MR. MANN:  Objection to the form.  I mean,

16   what is a current -- what is a current version of a 2019

17   document.  It's self-contradictory.  The questions are

18   ridiculous.

19       A.  Christian, what's the relevance of what the 2019

20   looked like anyway?

21       Q.  (BY MR. MARCELO)  Did Mr. Green collect this

22   document, Exhibit 60?

23       A.  No.  He doesn't have any access to that.

24       Q.  Did Mr. Conway collect this document, Exhibit 60?

25       A.  No.  He doesn't have any access to it.

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 33

1      Q.  Did Mr. May collect this document, Exhibit 60?

2      A.  He's got 50 of them.

3      Q.  So are you saying that Mr. May is the person that

4   collected this document to be produced?

5      A.  Oh, my God.  You're asking a

6   sub-fucking-contractor who made cheats whether or not he

7   had access to the website.  Come on, Christian.

8      Q.  Mr. Schaefer, I'm going to repeat the question

9   because we need an answer on the record.  If you're

10  being sarcastic or making a joke --

11     A.  I'm being sarcastic because you're asking stupid

12  questions.

13          MR. MANN:  And I want to raise an objection

14  at this point, objection to the form of the question.

15  You know that Mr. May is not --

16          THE WITNESS:  Barker, this is what you're

17  paying for.  I hope you get your monies worth.

18          MR. MANN:  Mr. May is not an officer,

19  director, owner, employee of Phoenix Digital.  We've

20  already established that.  He has no connection with

21  Phoenix Digital, other than from time -- other than from

22  time to time he has produced cheats.  He would not have

23  access to this.  You know that, Christian.  This that

24  been asked and answered on at least three different

25  occasions.  Again, the questions are ridiculous.

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 35

```
 1     A.  He doesn't have access.

 2            MR. MANN:  Mr. Schaefer, go ahead and answer

 3     that question yes or no.  It's a yes or no question.

 4     A.  He doesn't have access.

 5            MR. MANN:  It's a yes or no question.  Give

 6     Mr. Marcelo an answer to his yes or no question.

 7     Q.  (BY MR. MARCELO)  I'm going to repeat the

 8     question so the record's clear.  Did Mr. May collect

 9     this document, Exhibit 60, to be produced in this

10     litigation?

11     A.  No.

12            MR. MANN:  Good.  We're making progress.

13            THE WITNESS:  You're welcome.

14     A.  Wouldn't your time be better spent asking

15     relevant questions than to try to put me in a pickle.

16            MR. MANN:  Let Mr. Barker see what he's

17     getting for his money.

18            THE WITNESS:  Yeah.  He's getting his

19     money's worth here.  James, I'd keep going -- James, I

20     would keep going.  You're going to get your money's

21     worth here.

22     Q.  (BY MR. MARCELO)  Mr. Schaefer, did you collect

23     this document?

24            MR. MANN:  Again, that's a yes or no.

25     Q.  (BY MR. MARCELO)  You don't recall if you were
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 36

1    the one that collected this?

2        A.  No.

3        Q.  So I want to walk through when a user of the

4    AimJunkies website would encounter the terms of service.

5    I know we talked about queue high level times, right?

6    That was somewhere on the actual website and when

7    purchasing a product on AimJunkies, right?

8        A.  That is correct.

9             MR. MARCELO:  I'm going to drop into the

10   chat what will be marked as Exhibit 61.

11             (Deposition Exhibit No. 61 was marked for

12        identification.)

13       Q.  (BY MR. MARCELO)  I will share my screen.  Mr.

14   Schaefer, do you see Exhibit 61?

15       A.  Yes.

16       Q.  Now, this is a screen shot from the AimJunkies

17   website with the timestamp March 19, 2023, yesterday.

18   You see that?

19       A.  Okay.

20       Q.  If we scroll to the bottom, it says "Terms of

21   Service, February 2023, Blome Entertainment," right?

22       A.  Okay.

23       Q.  Is that where the terms of service was located in

24   2020 on the AimJunkies website?

25       A.  No.  No.

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 37

1      Q.  It was located somewhere else?

2      A.  Yes.

3      Q.  And you don't recall where it was on the website

4    though?

5      A.  No, I don't remember.  Bob Hahn told us that we

6    had to have it in both places, you had to have it in a

7    click on the website and you had to have it on a click

8    through when you purchase.  That's what we were told,

9    and that's what we did.

10     Q.  Up here on the first page, there's a couple of

11   different tabs, home, forms, cheats, packages, purchase.

12   You see that?

13     A.  Yes.

14     Q.  Was there a separate tab for the terms of service

15   in 2020?

16     A.  I do not remember.

17     Q.  Okay.  So there was a place you could find the

18   terms of service on the AimJunkies website and then you

19   also said you would encounter it when a consumer

20   purchases a good from AimJunkies website, right?

21     A.  That is correct.

22     Q.  Walk me through the process -- a consumer goes to

23   AimJunkies, buys a cheat.  Walk me through the process

24   of when they would encounter the terms of service.

25     A.  I don't remember if they encountered it before

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 38

 1    they were sent to the payment processor or if they

 2    encountered it after.  I believe they encountered it

 3    before they were sent to the payment processor.

 4       Q.  Okay.  I want to take a step back.  A consumer

 5    goes to AimJunkies website, right, and finds a cheat

 6    they want.  Okay?

 7       A.  Yes.

 8       Q.  When they -- how do they select that cheat to buy

 9    it?

10       A.  There was a list of products that you could

11    purchase, and you would select the product that you want

12    to purchase.

13       Q.  Okay.  They select that product.  When they

14    select, does the terms of service pop up?

15       A.  Yes.

16       Q.  On the initial selection of the product is when

17    it pops up?

18       A.  I -- I -- I've already answered that question,

19    and I said I don't remember if it was you selected the

20    product and purchased and then did the terms of service

21    or if you did the terms of service and then were sent to

22    purchase.  I don't remember that, which step was which.

23       Q.  Okay.  And I'm trying to narrow it down between

24    those two where -- where it falls in the process.

25       A.  I don't remember.  All I know -- all I remember

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 39

1    is that there was absolutely no way that you could

2    purchase one of those products without agreeing to the

3    terms of service.

4        **Q.  And but the two ways you mentioned would be you**

5    **either select the product and then the terms of service**

6    **pops up, or you select the product, press purchase and**

7    **then the terms of service would pop up?**

8        A.  No.  You would go purchase -- if it was after the

9    purchase, then you would be sent to the payment

10   processor.  You would pay for the product, and then you

11   would come back and you had to agree to the terms of

12   service.  One or the other.  I don't remember which way

13   it was.

14       **Q.  I see.  The question is whether it occurred**

15   **before or after you pay for the cheat itself?**

16       A.  I don't remember.

17       **Q.  Right.  But that's what --**

18       A.  You could not --

19       **Q.  -- I'm trying to clarify what you were saying.**

20       A.  You could not access the product without agreeing

21   to terms of service.  You would never get access to

22   anything without agreeing to the terms of service.

23       **Q.  When the terms of service -- we're saying the**

24   **terms of service popped up, walk me through what**

25   **actually happens on the user's screen.**

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 40

1      A.  The terms of service pops up and you had to

2  scroll to the bottom and hit "I agree."

3      Q.  And that's what I'm wondering.  So when we say

4  pops up, it opens a new window --

5      A.  Page.

6      Q.  -- on the screen?

7      A.  Yeah.  It opens a new page.

8      Q.  And then the user has to actually scroll all the

9  way to the bottom of it?

10     A.  Yes.  Yes.  You could not get around it without

11 hitting accept.

12     Q.  Did Phoenix Digital keep a record of what

13 accounts accepted the terms of service?

14     A.  Every one of them had to accept the terms of

15 service.  There was no need to keep records.

16     Q.  What about a user that created an account but

17 didn't purchase anything?

18     A.  No, you did not have to agree to the terms of

19 service if you didn't purchase anything.

20     Q.  And so that's what I'm wondering is did Phoenix

21 Digital keep a record of users that actually accepted

22 the terms of service?

23     A.  I don't remember.

24     Q.  If it had kept a record of that, where would that

25 be located?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 41

1          A.   I don't know.   I mean, they had to of been on the

2     website somewhere.   But I know -- I know there was no

3     specific log of people who accepted terms of service

4     because anybody who purchased -- it -- it eliminated

5     having to have that going on.   You would have had to of

6     built something to do that and I didn't build anything

7     to do that.

8          Q.   **That's what I'm wondering is whether there was**

9     **something built into the website that tracked which**

10    **users accepted the terms of service?**

11         A.   No.   The only thing that I built was so that

12    after the purchase went on, or before -- I don't

13    remember which was -- which -- you know, because it's

14    been a while, if it happened before or after -- but

15    there was no way that anybody could purchase a cheat

16    without agreeing to the terms of service, you know,

17    nobody could ever have access to the product without

18    agreeing to the terms of service first.

19         Q.   **And Phoenix Digital alleges that Bungie accepted**

20    **the terms of service, right?**

21         A.   Everybody that purchased accepted the terms of

22    service.   Bungie said in court that they purchased the

23    cheat.   And if they purchased the cheat, then they

24    accepted the terms of service.

25         Q.   **Is there any other basis or any other evidence of**

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 42

1    Bungie accepting the terms of service other than what

2    you just said?

3       A.  What do you mean?

4       Q.  Is there any record of Bungie accepting the terms

5    of service?

6       A.  Is there any record of David Schaefer accepting

7    Bungie's terms of service?  Is there any record of Jeff

8    Conway accepting Bungie's terms of service?  Is there

9    any record of James May accepting Bungie's terms of

10   service?  Is there any record of Phoenix Digital Group,

11   LLC, accepting Bungie's terms of service?

12      Q.  Mr. Schaefer, I'll just redirect you to my

13   question.  Is there any record of Bungie --

14      A.  I just answered it.

15      Q.  Mr. Schaefer, are there any records of Bungie

16   accepting Phoenix Digital's terms of service?

17                MR. MANN:  Object to the form of the

18   question.

19      A.  I'm still waiting for you to show me my accepting

20   your terms of service or anybody else in our group.

21      Q.  (BY MR. MARCELO)  Mr. Schaefer, I'm going to need

22   an answer.

23      A.  Including Jeff Conway.

24      Q.  Are there any records showing that Bungie agreed

25   to Phoenix Digital's terms of service?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 43

1                    MR. MANN:   You mean other than the records

2      that are in the possession of Bungie?

3          Q.   (BY MR. MARCELO)   Mr. Schaefer, what was your

4      answer to the question of whether --

5          A.   The answer to the question is no.

6          Q.   And who -- how many times did Bungie accept

7      Phoenix Digital's terms of service?

8          A.   If they purchased once, then they agreed to it

9      once.   Every time you purchased, you had to agree.

10         Q.   Does Phoenix Digital allege that Bungie agreed to

11     the terms of service more than once?

12         A.   No.   We're not a -- I don't think they purchased

13     more than once, if I -- if I remember correctly.   And

14     another thing too, if you take a look in them terms of

15     service, it says that you can't go in there and purchase

16     under an alias also.   And if you look at PayPal's terms

17     of service, it's against PayPal's rules to use a fake

18     name like you guys did when you purchased it.   So not

19     only did you violate our terms of service, you violated

20     PayPal's terms of service.   Are you aware of that, Mr.

21     Barker?

22         Q.   So walk me through how Phoenix Digital alleges

23     that Bungie accepted its terms of service.

24         A.   Bungie accepted what?

25         Q.   Walk me through how Phoenix Digital alleges that

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 44

1   Bungie accepted and agreed to Phoenix Digital's terms of

2   service?

3                MR. MANN:  And I will remind the witness at

4   this point we do not have to play around with any of the

5   faking the names.  If you remember the names of the

6   person who did it, just say it.  We're -- enough of

7   this.  We're not going to sit here and try and protect

8   the guilty by using fake names.

9       Q.  (BY MR. MARCELO)  So, again, walk me through --

10      A.  Bungie testified that they had their agent

11  purchase the cheat.

12      Q.  Who set up the process on the AimJunkies website

13  of making accepting the terms of service a requirement?

14      A.  I did.

15      Q.  And so you were the one that, you know, wrote the

16  website in a way that whenever you purchased the product

17  you had to accept the terms of service?

18      A.  Yes.  It's called an API.

19      Q.  What's called an API?

20      A.  The application to do that.

21      Q.  And that API, it only required that someone

22  actually accept the terms of service before they

23  purchased it, but it doesn't actually collect any

24  information about that person that accepts it?

25      A.  No.

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 45

1     Q.  Phoenix Digital alleges that Bungie breached

2  Phoenix Digital's terms of service, right?

3     A.  Yes.

4     Q.  Okay.  Explain each way that Phoenix Digital

5  alleges Bungie breached the Phoenix Digital terms of

6  service.

7     A.  Not only did they purchase the software and

8  disassemble it, they purchased the software and used it.

9     Q.  Okay.  So they breached by disassembling the

10  software?

11     A.  Yes.

12     Q.  And they breached it by using the software?

13     A.  Yes.

14     Q.  Any other ways?

15     A.  Not that I can think of at the moment.

16     Q.  And this was one of the topics in the deposition

17  notice, right, was the ways that Phoenix Digital alleges

18  that Bungie breached the terms of service?

19     A.  Yes.

20     Q.  Okay.  How -- how exactly did Bungie disassemble

21  the software?

22     A.  I don't know.  I'm not Bungie.

23     Q.  Okay.  Let me back up actually.  When you say

24  disassemble and use the software, what software are you

25  referring to?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 46

```
 1      A.  The cheat and the loader.

 2      Q.  Okay.  So what did Bungie disassemble?

 3      A.  I'm not a technical person.

 4      Q.  Does Phoenix Digital allege that Bungie

 5  disassembled the cheat?

 6      A.  Yes.

 7      Q.  Does Phoenix Digital allege that Bungie

 8  disassembled the cheat loader?

 9      A.  Yes.

10      Q.  And what about -- you said the other way that

11  Phoenix Digital alleges Bungie breached was by using the

12  software.  Did Phoenix Digital allege that Bungie used

13  the cheat?

14      A.  Yeah.  I believe it's -- I believe there's

15  some -- I'd have to -- Phil, if you want bring up the

16  terms of service, we can probably find where it

17  explicitly says where companies of your type are not at

18  liberty to purchase or use it.

19      Q.  (BY MR. MARCELO)  And when you said "companies of

20  your type," what do you mean?

21      A.  You know, any corporate entity.

22      Q.  Oh, a corporate entity is not allowed to use

23  AimJunkies --

24      A.  Yeah.  I believe it's in the terms of service.

25  We'd have to take a look.  I don't remember.  I believe
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 47

```
 1    there's something in there in that department, but I
 2    don't have in it front of me right now so I can't dig it
 3    out.
 4        Q.  You have it as Exhibit 60.  That was sent over.
 5        A.  Yeah.  How do I bring that up?
 6        Q.  You should be able to open it from the chat.  And
 7    I will -- I'll share the screen actually.  I'd like to
 8    walk through this.
 9        A.  Yeah, let's walk through it.
10        Q.  So I'm pulling back up Exhibit 60.  This is
11    Counterclaim Exhibit E.  Do you see that?
12        A.  Okay.  All right.  Just leave it right there a
13    minute.  Now, like I said, this was posted on the
14    website not only when you had to purchase and it says
15    right here "By accessing our website, you agree to the
16    terms of service and privacy policy."  So you had --
17    you, as a user, had access to this terms of service and
18    it clearly says what your responsibilities are.
19        Q.  And what I'm focused on here is what -- to
20    identify each way that Phoenix Digital alleges Bungie
21    breached --
22        A.  I'm working my way down --
23        Q.  Mr. Schaefer, let me finish the question.  I'm
24    wondering each way that Phoenix Digital alleges Bungie
25    breached these terms of service?
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 48

```
 1        A.  I'm working down it.  Like I said, it clearly
 2   says here whether you purchase or not, by accessing the
 3   website you're agreeing to the terms of service and
 4   privacy policy.  That's the first item.  All right.
 5   Scroll on.  Next page.  "You shall not copy, distribute,
 6   reproduce or display any use of our software except as
 7   expressly authorized herein."
 8        Q.  And, Mr. Schaefer, what -- which of those does
 9   Phoenix Digital allege that Bungie did?
10        A.  They distributed it between themselves in the
11   business and they displayed it.
12        Q.  When you say "they distributed it between
13   themselves in the business," what do you mean?
14        A.  The person that purchased it wasn't the only
15   person that opened it up.  That was your guy said that
16   that happened.
17        Q.  And then you said they display it.  How do Bungie
18   display it in breach of --
19        A.  Your guys said that they opened it up and checked
20   to see how it works.
21        Q.  And that's how they breached the terms of service
22   by displaying it?
23        A.  Let's keep going.
24        Q.  Mr. Schaefer, I'm asking you how --
25        A.  Yes.
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 49

1      Q.  What is Phoenix Digital's allegation regarding

2   how Bungie breached the terms of service by displaying

3   the cheat software?

4      A.  Let's scroll down two paragraphs.  "Unless

5   explicitly authorized by AimJunkies, our services and

6   our software may not be sold, resold, leased, rented,

7   leased, distributed, transferred or used in any

8   commercial way."  What is commercial way --

9      Q.  We'll get there in a second.  Mr. Schaefer, but

10  I'm still -- I just need an answer to the question

11  regarding the display.

12              MR. MANN:  Objection.  He already answered

13  your question.

14      A.  It was used in a commercial way.

15              MR. MANN:  And I object to you arguing with

16  the witness.  He answered your question.

17      Q.  (BY MR. MARCELO)  I'm going to ask back the

18  question again so that I have a clean answer.  What ways

19  is Phoenix Digital alleging that Bungie displayed the

20  cheat software that breached the terms of service?

21              MR. MANN:  Asked and answered.

22      A.  Yes.

23              MR. MANN:  Go ahead and answer again.  Let's

24  play the game here.

25      A.  Your -- what do you call that, a 301(b)(6) or

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 50

1    whatever, the want-a-be expert said that you guys got it

2    from the guy that purchased it and you opened it up and

3    took a look at it.

4        Q.  (BY MR. MARCELO)  Okay.

5        A.  Also, also, our expert has looked at the AEO that

6    was provided and has provided us reports showing that

7    you guys did more than just look at it.

8             MR. MANN:  I'll caution you, Mr. Schaefer.

9    Don't get into any of that stuff.  That's a

10   non-testifying expert, so I'll caution you not to talk

11   about that.

12       Q.  (BY MR. MARCELO)  Mr. Schaefer, any other ways

13   Phoenix Digital alleges Bungie breached Phoenix

14   Digital's terms of service?

15       A.  Two paragraphs down it says that it was used in a

16   commercial way, and it's not to be used in any

17   commercial way.

18       Q.  And what exactly was the commercial way Bungie

19   used the cheat software?

20       A.  Your expert stated that they fired it up so they

21   could see how it worked.  A representative of Bungie who

22   said that they used it to see how it works, that's a

23   commercial way.

24       Q.  Can you explain that to me?  What do you mean

25   that is a commercial way?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 51

 1     A.  Was it used for personal use?

 2     Q.  So any use that's not personal use is commercial

 3  use?

 4     A.  100 percent.

 5     Q.  Any other ways that Phoenix Digital alleges

 6  Bungie breached the Phoenix Digital terms of service?

 7     A.  Let's go to the next paragraph, "You shall not

 8  modify, hack, decompile, disassemble, reverse engineer,

 9  derive source code or create derivative works of our

10  software in part or in whole.  You shall not transfer

11  our software or display the software's object code on

12  any computer screen or to make any hard copy memory

13  dumps of the software's object code."  We allege you did

14  that.

15     Q.  And when you say "we allege you did that," which

16  of those actions that you just read --

17     A.  All of the above.

18     Q.  Mr. Schaefer, just let me finish the question.

19         Which of those actions that you just read does

20  Phoenix Digital allege Bungie did?

21     A.  All of the above.

22     Q.  So Phoenix Digital alleges that Bungie modified

23  the cheat software?

24            MR. MANN:  Asked and answered.

25     Q.  (BY MR. MARCELO)  Is that right?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 52

```
 1     A.  Yes.

 2               MR. MANN:  Go ahead.

 3     Q.  (BY MR. MARCELO)  In what ways did Bungie modify

 4   the cheat software?

 5     A.  They did not use it in the way it was delivered.

 6     Q.  Any other way that Phoenix Digital alleges Bungie

 7   modified the cheat software?  Mr. Schaefer?

 8     A.  No, not at this time.

 9     Q.  And did -- does Phoenix Digital allege that

10   Bungie modified the AimJunkies cheat loader?

11     A.  Yes.

12     Q.  How?

13     A.  They decompiled it.  That's not how it was

14   delivered.  It was not delivered decompiled.

15     Q.  And I see that two actions later, but I'm

16   wondering on the modify.  Are you saying that by

17   decompiling it that was also modification?

18     A.  Yes.

19     Q.  Any other basis?

20     A.  No, not at this time.

21     Q.  How did Bungie hack the cheat software or cheat

22   loader?

23     A.  I don't know.  Ask your 30(b)(6).

24     Q.  Does Phoenix Digital have any allegation of how

25   Bungie hacked the cheat software or cheat loader?
```

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 53

 1     A.  You've already given it to us.

 2     Q.  Mr. Schaefer, I'm wondering if Phoenix Digital

 3  knows of any way at all that Bungie hacked the cheat

 4  software or cheat loader?

 5     A.  What's your definition of hacked?

 6     Q.  Well, these are Phoenix Digital's terms of

 7  service, and what does Phoenix Digital mean by hack

 8  here?

 9     A.  That can be interpreted widely.

10     Q.  What do you understand it to mean here?

11     A.  Any -- even opening it up is hacking it.

12     Q.  And you're saying even opening up the cheat

13  loader is hacking it?

14     A.  Yeah.  Anything beyond just the proper use of it

15  is -- fits into that category.

16     Q.  And so what ways did Bungie hack the cheat loader

17  or cheat software?

18     A.  I already answered that question.

19     Q.  I'm not sure I heard the answer.

20     A.  I'm not sure I'm going to tell you again.  Have

21  them read it back to you.

22     Q.  So, Mr. Schaefer, what ways did Bungie hack the

23  cheat software or cheat loader?

24     A.  I already answered that question.

25     Q.  And what was the answer?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 54

1      A.  I don't remember.  You'll have to go back and

2    look in the record.

3      Q.  **Do you recall any ways that Bungie hacked the**

4    **cheat software or cheat loader?**

5      A.  I already answered that question.  You know, this

6    wouldn't take eight hours if you quit asking the same

7    questions over and over and over and think you're going

8    to get a different answer.

9      Q.  **Well, I'm going to ask this one again because I'm**

10   **not sure I got an answer to this.  In what ways did**

11   **Bungie hack the cheat software or cheat lowered?**

12     A.  And, again, I will say ask them to replay the

13   record and you will have your answer because I've

14   already answered that question.

15     Q.  **What ways did Bungie decompile the chief software**

16   **and chief loader?**

17     A.  I can't tell you that specifically because it's

18   AEO.

19     Q.  **What do you mean by that?**

20     A.  Just exactly what I said.

21     Q.  **Why can't you tell me what ways Phoenix Digital**

22   **alleges that Bungie decompiled the cheat loader or cheat**

23   **software?**

24     A.  If you want to cut it loose from AEO, I'll be

25   happy to take a look at it and tell you.

Bungie, Inc. vs Aimjunkies.com, et al.         30(b)(6) David Schaefer 03/20/2023

Page 62

 1   Phoenix Digital's counterclaims?

 2                MR. MANN:  Object to the form.

 3     A.  I'm not answering any more questions, Christian,

 4   until we finish the question of going down the terms of

 5   service.  We got a --

 6                MR. MANN:  No, no, no --

 7     Q.  (BY MR. MARCELO)  This is not your deposition.

 8                MR. MANN:  Mr. Schaefer, Mr. Schaefer, play

 9   along with Mr. Marcelo.  It's his -- he can ask whatever

10   ridiculous questions he wants.  Play along with him.  Go

11   ahead.  Let's not take the bait on that.  Go ahead and

12   answer his questions.

13     Q.  (BY MR. MARCELO)  So I'm going to ask it again.

14          Mr. Schaefer, is Phoenix Digital alleging that

15   Bungie breached Phoenix Digital's terms of service in

16   any way not identified in Bungie's counterclaims?

17                MR. MANN:  Object to the form.

18     A.  I don't know.  Until we're done with discovery, I

19   don't know.

20     Q.  (BY MR. MARCELO)  Currently, as discovery sits,

21   are there any other ways, other than that's outside --

22     A.  Excuse me?

23     Q.  Currently as discovery sits, are there any other

24   ways other than identified in Phoenix Digital's

25   counterclaims that Phoenix Digital is alleging that

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 63

1    Bungie breached Phoenix Digital's terms of service?

2        A.  I do not know.

3        Q.  The next part you said Bungie breached was

4    creating a derivative of work of our software, right?

5        A.  Yes.

6        Q.  How did Bungie create the derivative work?

7        A.  Any -- anything beyond the original packaging,

8    how it was put together, is a derivative work.  That's

9    you guy's story, ain't it?

10       Q.  And so how exactly did Bungie create a derivative

11   work?

12       A.  When you opened up our software, you created a

13   derivative work.

14       Q.  Any other way?

15       A.  I don't know.  Too early to tell.

16       Q.  Is Phoenix Digital alleging that Bungie

17   transmitted Phoenix Digital's software?

18       A.  Yes.

19       Q.  How?

20       A.  Through your -- through discovery you provided

21   documentation showing you transmitted it.

22       Q.  Does Phoenix Digital allege that Bungie displayed

23   the software object code on any computer screen?

24       A.  I do not know at this point.  It's too early.

25       Q.  But currently as you sit, you don't know of an

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 64

1   instance where Bungie displayed the software object code

2   on a computer screen?

3      A.  I'm not saying yes or no.  That's all AEO and to

4   be determined.

5      Q.  Well, what I'm wondering is there current

6   knowledge as you sit here today?

7      A.  I cannot answer that question.

8      Q.  You cannot answer or you don't know the answer to

9   it?

10     A.  I do not know the answer to that question at this

11  point in time.  It's premature.

12     Q.  Does Phoenix Digital know if Bungie made a hard

13  copy memory dump of the software's object code?

14     A.  I do not know at this point in time.

15     Q.  Any other ways that Phoenix Digital alleges

16  Bungie breached its terms of service?

17     A.  "Any explicit and intentional misuse of our

18  services or our software may re -- may result in legal

19  action being investigated.  You agree that the use of

20  this software is explicitly intended for offline use or

21  single-player use and not intended for live game player

22  versus player or tournaments.  Any use beyond" -- scroll

23  down -- "is forbidden and AimJunkies is not legally

24  liable."

25     Q.  And so where it says "explicit intentional

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 80

1    fit into this category.

2       **Q.  Okay.  Mr. Schaefer, I have two things down so**

3    **far.  Claims that Phoenix Digital copied software and**

4    **claims that Phoenix Digital circumvented anti-cheat**

5    **software.  Are there any other in court claims that**

6    **Phoenix Digital is alleging harmed Phoenix Digital?**

7                MR. MANN:  I'm going to raise an objection.

8    It doesn't matter what Mr. Marcelo wrote down.  It

9    matters what the record reflects Mr. Schaefer testified

10   to.  With that objection, please continue.

11      **Q.  (BY MR. MARCELO)  Mr. Schaefer, any other**

12   **in-court claims that Phoenix Digital's alleging harmed**

13   **Phoenix Digital?**

14      A.  Yes.

15      **Q.  What are they?**

16      A.  Your 30(b)(6) respondent claimed that they only

17   looked at software that was attached to the game, the

18   game process.  Your evidence clearly shows that they

19   went way above and beyond that and went onto the user's

20   computer and gathered additional information, which is a

21   direct lie to what your 30(b)(6) respondent said, Mr.

22   Kaiser.

23        Mr. Kaiser also said in his 30(b)(6) that all

24   they did was started it up and took a look at it, when

25   the AEO from our guy says that they went beyond that.  I

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 81

1  guess I should have made an even -- I should have made a

2  list of everything.  What was the original question?

3  And I'll see if I can think of a couple more because I'm

4  sure they're there because there was about 30 of them

5  that you got away with there.

6      Q.  Are there any other in-court claims that Phoenix

7  Digital is alleging harmed Phoenix Digital as a result

8  of Bungie's breach of contract?

9      A.  Well, as I said before, our loss of sales, you

10  know, loss of revenue, loss of trust in the community,

11  you know.

12      Q.  And did those stem from the filing of the

13  complaint?

14      A.  Yes.

15      Q.  And then anything else that was filed in the

16  case?

17      A.  Yes.

18      Q.  When you refer to outside of court, claims made

19  outside of the court, what claims is that referring to?

20      A.  I don't have the answer for that.  I'd need to

21  confer with my counsel first.

22      Q.  But sitting here right now, you can't recall what

23  the outside court claims would be?

24      A.  I can't answer that question at this time.

25      Q.  So is it -- these are claims made in and outside

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 82

 1    of court, those are what damaged Phoenix Digital?

 2       A.  Yes.  Good for -- how about your lead attorney

 3    says it's good for business to go after cheat sites?

 4    That's a quote from him.  Even though you don't have any

 5    evidence and you've testified in court that you have no

 6    evidence, that you just believe that we must be doing

 7    something nefarious there.  Because you haven't

 8    presented a single shred of evidence in either court,

 9    whether -- whether it's the arbitration or whether it's

10    this federal, not one single shred of evidence that what

11    we've done is illegal.

12       Q.  Okay.  And the claims here that -- both the

13    claims made inside and outside of court, are there any

14    other basis for Phoenix Digital's alleged damages?

15       A.  The others that I've listed off before.

16       Q.  Negative press, loss of trust, loss of market

17    share?

18       A.  Loss of revenue, loss of site valuation.

19       Q.  And what I'm wondering is, those are all a result

20    of the public filing and public discussion of this case?

21       A.  Yes.

22       Q.  Okay.  Let's talk about the legal fees.  Now, it

23    says "Phoenix Digital's legal fees and expenses in

24    defending the false accusations against it stand, at

25    present, at at least $206,116.05," right?

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 83

```
 1    A.  Yes.

 2    Q.  Do those legal fees include time spent on the

 3    arbitration?

 4    A.  I don't know.  You'd have to sort that out with

 5    Phil.

 6         MR. MANN:  And for the record, Mr. Marcelo, I

 7    assume you got the -- at your request, I provided you

 8    with copies of our invoices.  So you should have

 9    received those yesterday.  Did you get those?

10              MR. MARCELO:  Yes, I did.  Thank you.

11              MR. MANN:  Well, then those documents say

12    what they say and your answer can be determined by

13    reference to those billing records.

14    Q.  (BY MR. MARCELO)  Mr. Schaefer, was --

15              MR. MANN:  And just so there's no mystery,

16    yes, that includes both actions.

17    Q.  (BY MR. MARCELO)  Mr. Schaefer, who is paying the

18    legal fees?

19    A.  The plaintiff -- I mean, excuse me, the

20    defendants.

21              MR. MANN:  I wish that were the case.

22              THE WITNESS:  Yeah, no shit.

23    Q.  (BY MR. MARCELO)  And what I'm wondering is, is

24    Phoenix Digital paying all of the legal fees for all the

25    defendants?
```

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 84

1      A.  Phoenix Digital is paying none of the legal fees

2    for none of the defendants because they don't have any

3    revenue to pay fees.

4      **Q.  So who is paying the legal fees, then?**

5      A.  The individuals when they're financially capable.

6    And at this point that's not happening real fast.  But,

7    hey, I keep pushing.

8      **Q.  And so do these legal fees then include charges**

9    **for Mr. May as well?**

10     A.  I can't speak for Mr. May.

11     **Q.  You don't know one way or another whether the**

12   **legal fees claimed as damages here include legal fees**

13   **for Mr. May?**

14     A.  No, they do not.  I can only speak -- I'm

15   30(b)(6) and I can only speak for Phoenix Digital.  His

16   would be on top of this.

17     **Q.  Let's scroll back up for a second to the second**

18   **sentence, "Such damages include but are not limited to**

19   **investigating and responding to inaccurate and factually**

20   **baseless claims."  Would you agree if the claims were**

21   **accurate, then there wouldn't be damages to Phoenix**

22   **Digital?**

23     A.  I don't understand the question.

24     **Q.  Yeah.  Let me phrase it a different way.**

25         **If the claims made by Bungie were accurate,**

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 85

1    Phoenix Digital isn't alleging that Bungie would be

2    liable for asserting those claims, right?

3        A.  You can assert until the cows come home, but you

4    ought to have some evidence to back it up.  No, it was

5    your 30(b)(6) guy that said we don't have any evidence,

6    we just believe.

7        Q.  What I'm asking here is where it says "inaccurate

8    and factually baseless claims," if the claims are

9    accurate, is it Phoenix Digital's position that Bungie

10   would still be liable for these damages?

11       A.  I don't know.  I'm not a lawyer.

12       Q.  Let's talk about the valuation of AimJunkies.

13       A.  Yes.

14       Q.  Okay.  So in the supplemental response exhibit --

15   sorry, what exhibit is this?

16            THE COURT REPORTER:  I believe it's 64.

17            MR. MARCELO:  Thank you.

18       Q.  (BY MR. MARCELO)  Mr. Schaefer, in Exhibit 64,

19   supplemental response, it says, "The value of the

20   AimJunkies website declined from a high of $6,384,000 in

21   2019," right?

22       A.  Yes.

23       Q.  Where did the valuation of $6,384,000 come from?

24       A.  It came from a times revenue method of

25   calculating based on the federal tax returns.

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 86

1    Q.  Explain to me what a times revenue calculation
2    is.
3    A.  I'll read it to you.  "Under the times revenue
4    business valuation method, a stream of revenues
5    generated over a certain period of time is applied to a
6    multiplier which depends on the industry and economic
7    environment."
8    Q.  And where are you reading that from?
9    A.  Investopia.  Investopedia, excuse me.
10   Q.  Who came up with this valuation?
11   A.  I did.
12   Q.  And how did you come up with it for 2019
13   specifically?  What inputs did you use?
14   A.  I used the federal tax return, like I've already
15   said.
16   Q.  And so the -- you used the revenue for Phoenix
17   Digital in 2019?
18   A.  Yes.
19   Q.  Do you have any educational background in
20   providing valuations of companies?
21   A.  What was the question?
22   Q.  Do you have any educational background in
23   providing valuations of companies?
24   A.  I don't understand the question.
25   Q.  Would you say you're an expert at providing

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 87

1   **valuations of companies?**

2       A.  I wouldn't say I'm an expert.

3       Q.  **Is there any other factors you considered in**

4   **determining the value of the AimJunkies website?**

5       A.  No.

6       Q.  **Were there any offers to purchase the AimJunkies**

7   **website in 2019?**

8       A.  Yes.

9       Q.  **From who?**

10      A.  Banek.

11      Q.  **How much did he offer to purchase the website**

12  **for?**

13      A.  I don't remember.

14      Q.  **You remember the conversation with him --**

15      A.  Yeah.  We've already covered all of this before,

16  Christian.  I'm not going to go down this path again.

17      Q.  **I'm going to keep asking about these because**

18  **these are your specific damages.  The conversation with**

19  **Mr. Banek about purchasing the AimJunkies website, that**

20  **was in 2019?**

21      A.  I believe so.  We sent -- if you remember

22  correctly, we sent a response to what's his name down in

23  LA and told him that we had sold it because we had it

24  sold.

25      Q.  **And do you remember roughly how much Mr. Banek**

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 88

 1    agreed to pay for the AimJunkies website?

 2        A.  I do not remember.

 3        Q.  Was it over one million?

 4        A.  I do not remember.

 5        Q.  And I'm just asking you if you remember if it was

 6    over a million dollars or not?

 7        A.  I'm not going to commit to a number because I do

 8    not remember what it was.

 9        Q.  Was anyone else involved in the conversation with

10    Mr. Banek about purchasing the website?

11        A.  No.

12        Q.  Any notes or writing evidencing that

13    conversation?

14        A.  No.

15        Q.  And it's just conversation between you and Mr.

16    Banek?

17        A.  Yes.

18        Q.  Who called who regarding that sale?

19        A.  Nobody called anybody.

20        Q.  How did you communicate around the sale?

21        A.  We've already covered all of this.

22        Q.  Mr. Schaefer, how did you communicate regarding

23    this sale?

24        A.  I don't remember.

25        Q.  And you don't remember if the sale -- the

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 96

1    Digital know if it's predominantly male purchases of the

2    Destiny 2 cheats?

3        A.  Never did the demographics.

4        Q.  And what about the age range of the consumers of

5    the cheats?

6        A.  8 to 80, deaf, dumb and crazy.

7              MR. MANN:  At this point -- Mr. Marcelo, at

8    this point, I have no objection, do we want to switch

9    into a personal deposition or do you want to --

10             THE WITNESS:  It sounds like we're there

11   already.

12             MR. MANN:  Well, and I just want to make

13   sure that we're -- that it's clear just as a matter of

14   form.  I'll be happy to go into a personal deposition.

15   It's your deposition, Christian.  How do you want to

16   work it?  Continue with 30(b)(6) or slide into something

17   different?  What's your preference?

18             MR. MARCELO:  I think this is fine how

19   we're -- how we're going.  I was asking about Phoenix

20   Digital's customer base.

21             MR. MANN:  Okay.  Then if Mr. Schaefer's

22   testifying to his own personal knowledge and we

23   understand that, that's fine.

24       A.  Well, that's why I say I don't know.  Next

25   question.

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 97

1          MR. MARCELO:  I think now's probably a good

2     time to take a break because I'm sure that Betsy would

3     love a break.

4          VIDEOGRAPHER:  The time 8:03 p.m.  We're now

5     off the record.

6          (Recess taken.)

7          VIDEOGRAPHER:  The time is 8:39 p.m.  We are

8     back on the record.

9     Q.  (BY MR. MARCELO)  Mr. Schaefer, you understand

10    you're still under oath?

11    A.  Yes.

12    Q.  Let's go back for a second to Exhibit 60, the

13    terms of service for Phoenix Digital.  What evidence

14    does Phoenix Digital have that that terms of service was

15    on the website in January of 2020?

16    A.  I'd have to think about that answer.  I don't

17    have an answer for that right now.  I know what the

18    facts are.  I don't have to guess.  I don't have to

19    surmise.  It's been on the site for years, and you can

20    ask anybody that's dealing with the site, whether it's

21    Jordan or Jeff or James or whoever, anybody you want to

22    bring in, and they're going to tell you all the same

23    thing because they know that's been there from day one.

24          MR. MANN:  And I'll state for the record

25    that testimony under oath is in fact evidence.

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 98

1      Q.   (BY MR. MARCELO)   And, Mr. Schaefer, all I'm

2    asking is what evidence is there, whether it's

3    testimony, whether it's documents --

4      A.   Testimony.   I gave -- I gave you the documents

5    that are on the site.   To be honest with you, your

6    people have been there.   Is it the same one that's on

7    there now as what was there before?   You tell me.

8      Q.   When you say you gave the documents on the site,

9    what documents are you referring to?

10     A.   The one that you've got here in -- on the record.

11     Q.   Right.   Are there any other documents related to

12   this 2020 terms of service that Phoenix Digital

13   produced?

14     A.   They're as accessible as what yours are from

15   2019.

16     Q.   Mr. Schaefer, I want to focus on Phoenix

17   Digital's terms of service, if there's any other records

18   of that 2020 terms of service being on the AimJunkies

19   website in January of 2020?

20     A.   Not that I'm aware of unless it's on Wayback or

21   something like Wayback.

22     Q.   And you referenced an expert earlier, and I don't

23   want to get into anything privileged, I'm just wondering

24   if that expert is expected to testify in this trial?

25     A.   I can't tell you at this point.

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 99

 1      Q.   You don't know one way or another?

 2      A.   We will have expert this time.

 3      Q.   You will have a testify -- the answer is you will

 4   have a testifying --

 5                MR. MANN:  At this point, wait, I'm going to

 6   object.  This is getting into attorney work product

 7   matters and attorney-client privilege.  Mr. Schaefer,

 8   you do not have to answer any questions regarding the

 9   strategy that you're going to follow based on advice

10   that you may or may not have received from your counsel.

11                MR. MARCELO:  And I -- Mr. Mann, let me know

12   if you disagree.  I think with this specific question of

13   whether the expert that was referred to is intended to

14   be a testifying expert, just one way or another is not

15   privileged.

16                MR. MANN:  Did you say is intended to?

17                MR. MARCELO:  Right.  The expert --

18                MR. MANN:  No.  No.  If you're talking -- if

19   you're talking -- if you're asking about what our

20   intentions are, what procedures we intend to follow in

21   the course of this litigation, you are asking for

22   attorney work product.  We are not obliged to tell you

23   what our strategy is, what our intentions are and how

24   we're going to handle this litigation.  That is

25   privileged.  You do not have to answer.

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 103

```
 1     A.  You never put the dates in that filing.  You

 2  conveniently left them out.

 3     Q.  Mr. Schaefer, I'm asking whether Phoenix Digital

 4  is contending that Bungie's copyright registrations are

 5  invalid?

 6     A.  I answered the question.

 7     Q.  Was it a yes or a no?

 8     A.  How can -- ask the question again.

 9     Q.  Is Phoenix Digital contending that Bungie's

10  copyright registrations are invalid?

11     A.  Yes.

12     Q.  Based on what?

13     A.  They were acquired after we stopped selling the

14  cheat.

15     Q.  Any other basis?

16     A.  None at this time.

17     Q.  You had testified --

18          MR. MANN:  And I will point out for the

19  record that Mr. Schaefer is not an expert on the law and

20  he is expressing his lay opinions on -- or his lay

21  beliefs on these things.

22          THE WITNESS:  That is correct.

23     Q.  (BY MR. MARCELO)  You testified at an earlier

24  deposition that you had made the decision to sell the

25  Destiny 2 cheat, right?
```

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 104

 1     A.  Yes.

 2     Q.  Is it safe to say that when you made that

 3  decision you knew what Destiny 2 was?

 4     A.  What do you mean what Destiny 2 was?

 5     Q.  You knew Destiny 2 was a video game at the time

 6  you made the decision to sell that cheat?

 7     A.  Yes.

 8     Q.  And you knew it was an online multi-player game?

 9     A.  Yes.

10     Q.  And you knew that the Destiny 2 cheat --

11     A.  I knew that it was a single player and I knew

12  that it was an online player game.  And as you saw in

13  our terms of service, we sell for single player.

14     Q.  And you knew the Destiny 2 cheat was designed to

15  and meant to be used in connection with the Destiny 2

16  video game, right?

17     A.  Off line, yes.

18     Q.  And Bungie is not associated with the Destiny 2

19  cheat, right?

20     A.  No.  And we never claimed they are.

21     Q.  Bungie didn't sponsor the Destiny 2 cheat?

22     A.  And we never claimed they did.

23     Q.  Is that a no?

24     A.  We never claimed they did.

25     Q.  And I'm just asking a yes or no question.  Did

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 105

1    Bungie ever sponsor the Destiny 2 cheat?

2        A.  No.

3        Q.  Did Bungie ever authorize the Destiny 2 cheat?

4        A.  We never claimed they did.

5        Q.  And, again, it's a yes or no question.  Did

6    Bungie ever authorize the Destiny 2 cheat?

7        A.  We didn't ask them for their permission to do our

8    own independent software.

9        Q.  And when Phoenix Digital was distributing the

10   cheat, they didn't think it was authorized by Bungie,

11   right?

12       A.  No.  We knew it wasn't authorized by Bungie.

13   It's fair use.

14       Q.  Phoenix Digital has various developers for

15   cheats, right?

16       A.  Yes.

17       Q.  And those developers let Phoenix Digital know

18   what they're working on?

19       A.  Have we not visited this already, Christian?

20       Q.  Well, let me lay some foundation for some

21   questions.  And the question I have to you is:  Do those

22   developers let Phoenix Digital know what they're working

23   on?

24       A.  Where's the foundation?  You just said you were

25   going to lay a foundation and you asked the same

Bungie, Inc. vs Aimjunkies.com, et al.          30(b)(6) David Schaefer 03/20/2023

Page 106

```
 1  question again.

 2      Q.  This -- this is foundation, Mr. Schaefer.

 3      A.  No, that's not foundation.  That's the same

 4  question you asked me just with two different words in

 5  it.  Try again.

 6      Q.  Mr. Schaefer -- Mr. Schaefer, do the developers

 7  let Phoenix Digital know what cheats they're working on?

 8      A.  Again, we have already covered this in a previous

 9  deposition.

10      Q.  Are you refusing to answer that question?

11              THE WITNESS:  Phil.

12              MR. MANN:  Well, I'm going to say I think

13  this is going over the same ground.  You know, it will

14  help our claim for attorney's fees to say that they were

15  wasting time and so forth and why not go ahead and

16  answer it again.  You've already explained how Phoenix

17  Digital works ad nauseam.  Say it again.  Some people

18  are apparently hard of hearing.

19              THE WITNESS:  No.  He's trying to catch me

20  in a lie.

21      Q.  (BY MR. MARCELO)  Mr. Schaefer, do the developers

22  let Phoenix Digital know what they're working on?

23              MR. MANN:  I'm going to object to

24  foundation.  First of all, it's -- you know, that the

25  developers --
```

Page 108

1    refusing to answer the question of whether Phoenix

2    Digital's developers inform Phoenix Digital of what

3    cheats they're working on?

4        A.  I don't remember.

5        Q.  Do you recall if they sometimes let Phoenix

6    Digital know what cheats they're working on?

7        A.  I don't remember.

8        Q.  Specifically as to the Destiny 2 cheat, Mr. May

9    told you he was working on a cheat for Destiny 2, right?

10       A.  No.

11       Q.  Mr. Banek informed Phoenix Digital he was

12   developing a cheat for the Destiny 2, right?

13       A.  Yes.

14       Q.  Did any other developers inform Phoenix Digital

15   they were developing a cheat for Destiny 2?

16       A.  No.

17           MR. MANN:  And, obviously, Mr. Marcelo knows

18   this because he's already asked these questions before,

19   but that's another matter.

20       Q.  (BY MR. MARCELO) Is Phoenix Digital currently

21   providing services for Mr. Banek?

22       A.  We process payments.  That's standalone from the

23   website.  That's all we're doing is processing payments

24   for him.

25           MR. MANN:  And, again, this is a matter of

Bungie, Inc. vs Aimjunkies.com, et al.        30(b)(6) David Schaefer 03/20/2023

Page 109

1   further inquiry previously.  This is in the record.  You

2   know it.

3        A.  No.  The status -- Phil --

4        Q.  (BY MR. MARCELO)  What I'm asking you is has --

5        A.  Hold on, Christian.  The status has changed.  The

6   last time you asked this question we were in the back

7   end of the website and processing payments.  That's --

8   that status has changed to where we're not in the

9   website in any way, shape or form.

10       Q.  And that is why we are asking these questions.

11       A.  And that's why I'm answering them.

12       Q.  Now, so Phoenix Digital processes payments for

13   AimJunkies.com right now, right?

14       A.  That is correct.

15       Q.  And is it the same process we discussed before

16   where if someone purchases a cheat it goes to a Phoenix

17   Digital account?

18       A.  Yes.

19       Q.  And then Phoenix Digital distributes that to a

20   cheat developer?

21       A.  And to Banek.

22       Q.  And then what portion does Phoenix Digital

23   retain?

24       A.  10 percent.

25       Q.  Does Mr. Banek still only accept payment in

Page 110

1   bitcoin?

2      A.  Yes.

3      Q.  And so is there still a Phoenix Digital bitcoin

4   wallet?

5      A.  There never was a Phoenix Digital bitcoin wallet.

6      Q.  What bitcoin wallet -- strike that.  Who owns the

7   bitcoin wallet that pays Mr. Banek?

8      A.  I don't remember.

9      Q.  But there is a bitcoin wallet that's operated by

10  Phoenix Digital that makes payments to Mr. Banek, right?

11     A.  I have to think about that.  I don't remember.

12     Q.  Well, how does Mr. Banek receive payment?

13     A.  Through bitcoin.

14     Q.  Who pays Mr. Banek?

15     A.  I pay Mr. Banek.

16     Q.  And how do you transfer bitcoin to Mr. Banek?

17     A.  Phoenix Digital doesn't have a wallet.  The

18  website has a wallet, I believe, and -- and I got to

19  think about that one a little bit.  I don't know whose

20  fucking wallet that is, but whatever.  This will be a

21  good one in court.

22     Q.  But there's a wallet that Phoenix Digital has

23  control of, right?

24     A.  Yes.

25     Q.  And it's used to pay Mr. Banek, right?

Page 129

1                    REPORTER'S CERTIFICATE

2      I, BETSY E. DECATER, the undersigned Certified Court

3  Reporter, pursuant to RCW 5.28.010 authorized to

4  administer oaths and affirmations in and for the State

5  of Washington, do hereby certify that the sworn

6  testimony and/or proceedings, a transcript of which is

7  attached, was given before me at the time and place

8  stated therein; that any and/or all witness(es) were

9  duly sworn to testify to the truth; that the sworn

10  testimony and/or proceedings were by me stenographically

11  recorded and transcribed under my supervision, to the

12  best of my ability; that the foregoing transcript

13  contains a full, true, and accurate record of all the

14  sworn testimony and/or proceedings given and occurring

15  at the time and place stated in the transcript; that a

16  review of which was requested; that I am in no way

17  related to any party to the matter, nor to any counsel,

18  nor do I have any financial interest in the event of the

19  cause.

20      WITNESS MY HAND and DIGITAL SIGNATURE this 27th day

21  of  March, 2023.

22

23  BETSY E. DECATER, RPR
    Washington Certified Court Reporter, CCR 3109
24

25

# EXHIBIT 28

```
                    UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF WASHINGTON
_____

BUNGIE, INC., a Delaware          )
corporation,                      )
                                  )
                                  )No.2:21-cv-0811 TSZ
                                  )
          Plaintiff,              )        VOL. I
                                  )      (Confidential)
     v.                           )
                                  )
AIMJUNKIES.COM, a business of     )
unknown classification; PHOENIX   )
DIGITAL GROUP LLC, an Arizona     )
limited liability company;        )
JEFFREY CONWAY, an individual;    )
DAVID SCHAEFER, an individual;    )
JORDAN GREEN, an individual; and  )
JAMES MAY, an individual,         )
                                  )
          Defendants.             )
_____

          ZOOM DEPOSITION UPON ORAL EXAMINATION
                            OF
                      EDWARD KAISER
_____


               Tuesday, October 4, 2022
                      8:59 a.m.
```

Reported.  By:  Deanna M. Ellis, CCR No. 2511

```
 1                         APPEARANCES

 2


 3    FOR PLAINTIFF:
                 WILLIAM RAVA
 4               JAKE DINI
                 Attorneys at Law,
 5               PERKINS COIE, LLP
                 1201 Third Avenue, Suite 4900
 6               Seattle, WA  98101
                 wrava@perkinscoie.com
 7               jdini@perkinscoie.com

 8
      ALSO PRESENT:
 9               JAMES BARKER
                 BUNGIE IN-HOUSE COUNSEL
10

11    FOR DEFENDANT:
                 PHILIP P. MANN
12               Attorney at Law
                 MANN LAW GROUP, PLLC
13               403 Madison Avenue North, Suite 240
                 Bainbridge Island, WA  98110
14               phil@mannlawgroup.com

15    ALSO PRESENT:
                 DAVID SCHAEFER
16               JORDAN GREEN

17
      COURT REPORTER:
18               DEANNA M. ELLIS, CCR
                 PUGET SOUND REPORTING
19               10116 36th Avenue Court Southwest, Suite 207
                 Tacoma, WA 98499
20

21    TECHNICAL ASSISTANT:
                 ANGELA ANDERS
22               PUGET SOUND REPORTING
                 10116 36th Avenue Court Southwest, Suite 207
23               Tacoma, WA 98499

24

25
```

```
                                                    Page 3
 1                                                  PAGE

 2                          I N D E X

 3

 4   EXAMINATION

 5   By Mr. Mann  ..................................    4

 6
     EXHIBIT INDEX
 7
     1    Kaiser Declaration in Support  ...........   234
 8   2    Bungie WDWA 0000409 .....................   234
     3    Exhibits to Amended Complaint ............   234
 9   4    Exhibits to Kaiser Declaration  ..........   234
     5    Bungie WDWA 0000414 .....................   234
10   6    Bungie WDWA 0000462 .....................   234

11
         (MARKED CONFIDENTIAL FOR ATTORNEYS EYES ONLY)
12
     PAGE/LINE TO PAGE/LINE
13
     28/13        37/16
14   43/11        47/19
     64/14        68/11
15   76/6         76/24
     85/5         91/20
16   171/20       182/7

17

18

19

20

21

22

23

24

25
```

Page 4

1          BE IT REMEMBERED that on Tuesday, October 4,

2     2022, at 8:59 a.m., the deposition of Edward Kaiser was

3     taken via Zoom, before Deanna M. Ellis, Certified Court

4     Reporter.

5          The following proceedings took place:

6                         *****

7                      EXAMINATION

8     BY MR. MANN:

9        Q.    Okay.  Good morning, Dr. Kaiser.  Nice to meet

10    you this morning.

11          As you know probably know, my name is Phil Mann.  I

12    represent the defendants in this lawsuit.  And we are

13    taking your deposition today, both as an individual

14    witness -- meaning, that we'll get into questions that

15    I'll ask you about your personal knowledge -- and later

16    on in the day we'll probably get into, so called,

17    30(b)(6) deposition, which means that we're hoping you

18    have done some investigation and can answer some

19    questions, what the company, Bungie, knows.  As I said,

20    we'll get into that probably later in the day.

21          Dr. Kaiser, have you ever had your deposition taken

22    before?

23                      MR. RAVA:  I'm sorry, we lost audio on

24    Mr. Mann.  At least, in the room here we did.

25                      MR. MANN:  Okay.  Can you hear me now?

1      A.    That refers to, in the Windows operating

2   system, the hard drive that that file is located on.

3         Sorry.  Let me correct myself.  The viral drive,

4   not necessarily a hard drive, but the resource that that

5   file is located on.

6      Q.    Now, if we look at that file path, c:/users,

7   doesn't that refer to it's on the C drive of a

8   particular machine?  It's in a first file name users.

9   The sub-file of that, user name James.  And it's located

10  on the desktop of James' computer.  Isn't that a fair

11  interpretation of what we're looking at in Column 3, Row

12  3 of this exhibit?

13     A.    No.

14     Q.    No?  What does that refer to?

15     A.    It refers to a file path.

16     Q.    And you have no idea what that file path might

17  be?

18     A.    I see the file path written in front of me.

19     Q.    And you've told me you have a Ph.D. in

20  computer technology.  Can you tell me what that file

21  path means?

22              MR. RAVA:  Object to the form.

23     A.    I did not tell you I have a Ph.D. in computer

24  technology.

25     Q.    Okay.  Do you understand how computer files

Page 124

1   are put together?  If you don't, that's fine, too.

2             MR. RAVA:  Object to the form.

3        A.   What do you mean, "put together"?

4        Q.   What I mean is does the c:\users\James\desktop

5   mean anything to you?

6        A.   There is some information contained there, but

7   no.  Otherwise, it doesn't mean anything to me.

8        Q.   But that does not tell you that is a -- that

9   appears on the desktop of James May's computer?

10       A.   May or may not.

11       Q.   It may or may not?  So you don't know.  So if

12  we get to trial and I start asking about this, you will

13  not be the man who's going to tell us what all this

14  means, correct?

15             MR. RAVA:  Object to form.

16       A.   I've told you what this means.

17       Q.   And, as I understand it, you say this does not

18  refer to the desktop on the C drive of Mr. May's

19  computer?

20             MR. RAVA:  Object to the form.

21       A.   This is a file path.  It is a string of

22  characters that describes the structure of folders and a

23  file name of a file that when executed attached to

24  Destiny 2.

25       Q.   Why would Bungie collect this data if they do

1  not know what to do with it or they don't know what it

2  means?

3       A.   As I told you earlier, this file attached to

4  Destiny 2 and was attempting to reverse engineer the

5  game.

6       Q.   Now, I understand the file was attempting to

7  reverse engineer the game.  So you do know what that

8  file does?

9       A.   A process was created when that file was run,

10  when it's reverse engineering the game.

11       Q.   Now, is that file located on Mr. May's

12  computer?

13       A.   I don't know.

14       Q.   Would the cheat software be resident on the

15  Bungie computers?

16       A.   No.

17       Q.   So if it's not on the Bungie computers, where

18  else could it be?

19       A.   It could be on a network device.  It could be

20  on a USB key.  There's lots of possibilities.

21       Q.   But those would be operated by Mr. May.  This

22  wouldn't be on a network device operated by Bungie,

23  would it?

24       A.   No.  Bungie is not in the market for making

25  cheat software, reverse engineering tools.

Page 126

1       Q.   Okay.  So if it's on a network device, it

2    would be on a network device operated by Mr. May?

3    Wouldn't that be the reasonable assumption?

4       A.   You could say that, I guess.

5       Q.   Okay.  And isn't it a fact, again, that Bungie

6    is collecting data that is resident on one or more

7    devices operated by Mr. May?

8       A.   Can you repeat the question, please.

9       Q.   Isn't it reasonable to assume that Bungie is

10   collecting data that is resident on one or more devices

11   that are being operated by Mr. May?

12      A.   No.

13      Q.   Well, you've already told me that they aren't

14   being operated by Bungie, correct?

15      A.   Correct.

16      Q.   Okay.  Who else could they be operated by?

17      A.   This machine in question could be operated by

18   any of the other named defendants, I suppose.

19      Q.   Even though it says James?

20      A.   Sure.

21      Q.   Now, let's go to the account ID that we see in

22   Column 1.  I won't read it off, but it stars out 4611

23   and it ends in 788.

24      Do you know what that account ID number refers to?

25      A.   I do not see an account ID that ends in 788.

Page 234

1

2                    C E R T I F I C A T E

3    STATE OF WASHINGTON)
                        )  ss
4    COUNTY OF SNOHOMISH)

5

6            I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to
     administer oaths and affirmations in and for the State
7    of Washington, do hereby certify:

8            That the foregoing deposition consisting of
     pages 1 through 235 of the testimony of each witness
9    named herein was taken stenographically before me and
     reduced to typed format under my direction;

10
             I further certify that according to CR 30(e)
11   the witness was given the opportunity to examine, read
     and sign the deposition after same was transcribed,
12   unless indicated in the record that review was waived;

13           I further certify all objections made at the
     time of said examination to my qualifications or manner
14   of taking the deposition or to the conduct of any party
     have been noted by me upon each said deposition;

15
             I further certify that I am not a relative or
16   employee of any such attorney or counsel, and that I am
     not financially interested in the action or the outcome
17   thereof;

18           I further certify that each witness before
     examination was by me duly sworn to testify the truth,
19   the whole truth, and nothing but the truth;

20           I further certify that the deposition, as
     transcribed, is a full, true and correct transcript of
21   the testimony, including questions and answers, and all
     objections, motions, and exceptions of counsel made and
22   taken at the time of the foregoing examination and was
     prepared pursuant to the Washington Administrative Code
23   308-14-135, the transcript preparation format
     guidelines;
24
             I further certify that I am sealing the
25   deposition in an envelope with the title of the above
     cause and the name of the witness visible, and I am
     cause and the name of the witness visible, and I am

Page 235

1   delivering the same to the appropriate authority;

2           I further advise you that as a matter of firm
    policy, the Stenographic notes of this transcript will
3   be destroyed three years from the date appearing on the
    Certificate unless notice is received otherwise from any
4   party or counsel hereto on or before said date;
            IN WITNESS WHEREOF, I have hereunto set my
5   hand and affixed my official seal this 19th day of
    October, 2022.

6

7                   _____
                    Deanna M. Ellis, CCR
8                   Washington State Certified
                    Court Reporter
9                   License No. 2511

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 29

THE HONORABLE THOMAS S. ZILLY

1
2
3
4
5
6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

7   BUNGIE, INC., a Delaware corporation,

8                     Plaintiff

9                                          Cause No. 2:21-cv-0811 TSZ

10                     v.                  **DEFENDANT PHOENIX
                                           DIGITAL GROUP LLC'S
11   AIMJUNKIES.COM, a business of unknown RESPONSES TO PLAINTIFF'S
     classification; PHOENIX DIGITAL GROUP INTERROGATORIES NOS.  2,
12   LLC, an Arizona limited liability company; 6 AND 7**
     JEFFREY CONWAY, an individual; DAVID
13   SCHAEFER, an individual; JORDAN GREEN,
     an individual; and JAMES MAY, an individual,
14
15                     Defendants.

16         Pursuant to Federal Rule of Civil Procedure 26, 33 AND 34, Defendant Phoenix

17   Digital Group LLC ("Phoenix Digital") hereby supplements its responses to Plaintiff Bungie,

18   Interrogatories Nos. 2, 6 and 7 as follows:

19

20                              **GENERAL OBJECTIONS**

21         Phoenix Digital's General Objections set out in its RESPONSES TO PLAINTIFF'S

22   FIRST SET OF INTERROGATORIES NOS.  1-7 served July 25, 2022 are incorporated as

23   if set out fully herein.

24
25
26
27
28

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                    Page 1

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone: 206.436.0900

**SUPPLEMENTAL RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 2**:

Describe all facts concerning Phoenix Digital's decision to create, develop, and sell the Cheat Software, including but not limited to the person(s) involved in those decisions and the reason Phoenix Digital decided to sell the Cheat Software.

**RESPONSE:**

Phoenix Digital does not create, develop or sell the "Cheat Software" but instead distributes products created by others.  Answering further, Phoenix Digital identifies David Schaefer.

**SUPPLEMENTAL RESPONSE:**

Phoenix Digital never made a decision to create, develop or sell the "Cheat Software." Instead, Phoenix Digital, through the Aimjunkies.com website, helps distribute the products developed, created, sold and delivered by others.

David Schaefer made the decision, on or about December 19, 2019, to help distribute the products at issue here.  David Schaefer made the decision, on or about November 12, 2020 to no longer help distribute the products at issue here.  The initial decision to help distribute the products at issue here was made to expand Phoenix Digital's line of offered products.  The decision to no longer help distribute the products at issue here was to voluntarily comply with Plaintiff Bungie, Inc.'s  November 4, 2020 demand (received by Phoenix Digital on or about November 10, 2020) that Phoenix Digital stop distributing the products at issue here.

**INTERROGATORY NO. 6**:

Describe all facts relating to how Phoenix Digital "allows the customer to access the third-party developer's computer server and download the [Cheat Software] directly from the third-party developer," as described in paragraph 5 of the Declaration of David Schaefer in Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. No. 39-1), including but not

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                                    Page 2

MANN LAW GROUP PLLC
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1    limited information sufficient to identify and/or locate (e.g., IP address or website URL) each

2    server where the Cheat Software is/was hosted, and how Phoenix Digital enabled the

3    connection between the purchaser and third-party developers' computer servers.

4          **RESPONSE:**

5          After accessing the AimJunkies.com website, customers wishing to obtain a product

6    will, after placing an order, be directed and connected with the third-party developers

7    computer server, which then downloads the product directly to the customer's computer

8    without passing through any Phoenix Digital computer.  Furthermore, it is believed that the

9    answer to this interrogatory can be ascertained from records and documents already in the

10   possession of Bungie.  To the extent this interrogatory requests, "information sufficient to

11   identify and/or locate (e.g., IP address or website URL) each server where the Cheat Software

12   is/was hosted," Phoenix Digital objects to this Interrogatory as being irrelevant to any of the

13   issues before the Court in this case and as calling for personal information not relevant to any

14   issue before the Court in this matter.

15         **SUPPLEMENTAL RESPONSE:**

16         After further review, the answer above is slightly in error in that, after placing an

17   order, the customer is directed and connected with the third-party developer's computer

18   server, which then passes the product through a Phoenix Digital computer to the customer's

19   computer.

20         As of May 5, 2022, Phoenix Digital no longer owns the Aimjunkics.com website and

21   has no access to information regarding the identity or location of each server where the

22   relevant products were hosted.  Nor does Phoenix Digital have any records in this regard.

23         **INTERROGATORY NO. 7**:

24         Identify all bank accounts, financial accounts, payment processor accounts, or any

25   other source(s) of funds or accounts owned by Phoenix Digital that are or have been used to

26   process  and/or store funds related the sale of the Cheat Software.

27

28

Phoenix Digital Response to First Set of ROGS            Page 3
Cause No. 21-CV-0811-TSZ

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone: 206.436.0900

1

**RESPONSE:**

2

     Phoenix Digital objects to this Interrogatory as being irrelevant to any of the issues

3

before the Court in this case and as calling for personal information not relevant to any issue

4

before the Court in this matter.

5

**SUPPLEMENTAL RESPONSE:**

6

     The answer to this Interrogatory may be ascertained form the records produced by

7

PayPal in response to Plaintiff Bungie, Inc.'s subpoena dated June 23, 2022 and from the

8

Stripe records produced in Phoenix Digital's supplemental responses to Bungies Requests for

9

Documents served contemporaneously herewith.  Answering further, Phonix Digital states:

10

     PayPal.

11

     Stripe.

12

     Dated September 2, 2022.

13

                                     */s/ Philip P. Mann*

14

                                     Philip P. Mann, WSBA No: 28860

15

                                     **Mann Law Group PLLC**

16

                                     403 Madison Ave. N. Ste. 240
                                     Bainbridge Island, Washington  98110

17

                                     Phone (206) 436-0900
                                     phil@mannlawgroup.com

18

                                     Attorneys for Defendants

19

20

21

22

23

24

25

26

27

28

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ

Page 4

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

**Verification**

**AS TO SUPPLEMENTAL RESPONSES TO INTERROGATORIES 2, 6 AND 7:**

David Schaefer, being duly sworn, deposes and says that he is the President of Phoenix Digital Group LLC, Defendant in the above-captioned action, that he has read the foregoing responses by him subscribed, that said responses were prepared with the assistance of counsel upon which he has relied and is based on his experiences and knowledge, and that subject to said limitations, the responses are true, correct and complete to the best of his information and belief.

DATED this 2nd day of September, 2022.

_____
David Schaefer

**AS TO OBJECTIONS:**

*/s/ Philip P. Mann*
Philip P. Mann

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                    Page 5

Mann Law Group PLLC
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2022, I caused the foregoing document to be electronically mailed to counsel of record as follows:

WRava@perkinscoie.com

JDini@perkinscoie.com

CMarcelo@perkinscoie.com

<p style="text-align:center"><i>s/ Philip P. Mann</i></p>

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ

Page 6

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

# EXHIBIT 30



BUNGIE_WDWA_0001395



## Hack Features

**Aimbot:**

-Aim at enemy players
-Aim fov slider
-Aim fov circle
-Aim button selection
-Smooth aim slider

**ESP:**

-Player Name Esp
-Player Box Esp
-Player Health Esp
-Player Snapline Esp
-Friendly Player Esp
-Player Glow Hack
-Custom Esp view distance slider

**Miscellaneous:**

MISC
-Custom crosshair selection
-Remove Recoil

## Overview

**Hack Information**

Released: October, 2019

**Game Information**

Developer: Bungie

Publisher: Bungie

Engine: Bungie Proprietary Engine

## Description

BUNGIE_WDWA_0001396

Destiny 2 is an online-only multiplayer first-person shooter video game developed by Bungie. It was released for PlayStation 4 and Xbox One on September 6, 2017, followed by a Microsoft Windows version the following month.[1][2] The game was published by Activision until early 2019, when Bungie acquired the publishing rights to the franchise. It is the sequel to 2014's Destiny and its subsequent expansions. Set in a "mythic science fiction" world, the game features a multiplayer "shared-world" environment with elements of role-playing games. Like the original, activities in Destiny 2 are divided among player versus environment (PvE) and player versus player (PvP) game types. In addition to normal story missions, PvE features three-player "strikes" and six-player raids. A free roam patrol mode is also available for each planet and features public events as well as new activities not featured in the original. These new activities have an emphasis on exploration of the planets and interactions with non-player characters (NPCs); the original Destiny only featured NPCs in social spaces. PvP features objective-based modes, as well as traditional deathmatch game modes.

Players assume the role of a Guardian, protectors of Earth's last safe city as they wield a power called Light to protect the Last City from different alien races. One of these races, the Cabal, led by the warlord Dominus Ghaul, infiltrate the Last City and strips all Guardians of their Light. The player sets out on a journey to regain their Light and find a way to defeat Ghaul and his Red Legion army and take back the Last City. Like the original Destiny, the game features expansion packs which further the story and adds new content and missions. Year One of Destiny 2 featured two small expansions, Curse of Osiris in December 2017 and Warmind in May 2018. A third, large expansion, Forsaken, was released in September 2018, beginning Year Two with an overhaul on gameplay. The base game and the first three expansions were packaged into Destiny 2: Forsaken Legendary Collection. An annual pass was also available alongside this release, containing three premium content drops for Year Two. Year Three will begin with the large expansion, Shadowkeep, scheduled for October 2019 as a standalone release, not requiring the previous expansions to play. Alongside the expansion will be a version of Destiny 2 called "New Light", a free-to-play re-release of Destiny 2 and the first two expansions. wikipedia

© 2020 AimJunkies

BUNGIE_WDWA_0001397

# EXHIBIT 31

1              IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
2                         AT SEATTLE

3 BUNGIE, INC.                )
                              )
4       Plaintiff,            )         CERTIFIED COPY
                              )
5 vs.                         ) CASE NO. 2:21-cv-811-TSZ
                              )
6 AIMJUNKIES.COM; PHOENIX     )
   DIGITAL GROUP LLC; DAVID   )
7 SCHAEFER; JORDAN GREEN;     )
   JEFFREY CONWAY; and JAMES  )
8 MAY,                        )
                              )
9       Defendants.           )

10

11

12           ORAL VIDEOTAPED ZOOM DEPOSITION

13                       JAMES MAY

14                    March 23, 2023

15

16      ORAL VIDEOTAPED ZOOM DEPOSITION OF JAMES MAY,

17 produced as a witness at the instance of the Plaintiff

18 and duly sworn, was taken in the above-styled and

19 numbered cause on the 23rd day of March, 2023, from

20 7:58 a.m. to 11:45 a.m., via Zoom, before Debra K.

21 Zebert, Registered Professional Reporter, reported by

22 computerized stenotype machine, pursuant to the Federal

23 Rules of Civil Procedure and the provisions stated on

24 the record or attached hereto.

25 Job No.: 971992

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

```
                                                              Page 2
 1                        APPEARANCES

 2

 3 FOR PLAINTIFF:

 4      Jacob Dini, Esquire
        PERKINS COIE, LLP
 5      1201 Third Avenue, Suite 4900
        Seattle, Washington  98101
 6      206.359.8000
        JDini@perkinscoie.com
 7
   FOR DEFENDANT, JAMES MAY:
 8
        Philip P. Mann, Esquire
 9      MANN LAW GROUP PLLC
        403 Madison Avenue, North, Suite 240
10      Bainbridge Island, Washington  98110
        206.855.8839
11      phil@mannlawgroup.com

12
   ALSO PRESENT:
13
        Scott Norton, Videographer
14      James Barker, In-house Counsel, Bungie, Inc.
        Ed Kaiser, PhD
15

16

17

18

19

20

21

22

23

24

25
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

```
 1                        INDEX

 2                                              PAGE

 3 JAMES MAY
```

```
 4 Examination by Mr. Dini .........................4
   Signature Page  ...............................175
 5 Signature Page - No Changes  ..................178
   Court Reporter's Certificate ..................179
 6
```

```
 7                      EXHIBITS

 8
```

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 70 | PDX02 | 16 |
| 71 | Defendants' Answer and Amended Counterclaims | 42 |
| 72 | Defendant James May's Supplemental Response to Plaintiff's Interrogatory No. 8 | 67 |
| 73 | Invoice | 102 |
| 74 | Counterclaim Exhibit D | 160 |
| 75 | Counterclaim Exhibit B | 172 |

```
16

17

18

19

20

21

22

23

24

25
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 4

1                        THE VIDEOGRAPHER:  Good morning, everyone.
2 Here begins the remote deposition of James May in the
3 matter of Bungie, Inc. versus AimJunkies.com et al.
4 This case is in the United States District Court,
5 Western District of Washington, at Seattle.  The case
6 number is 2:21-CV-811-TFZ.  Today's date is Thursday,
7 March 23rd, 2023, and the current time is 7:58 a.m.
8 Pacific time.
9                        This is a remote deposition through Zoom
10 videoconferencing.  Our videographer is Scott Norton,
11 appearing on behalf of Centext Litigation Services.
12 Would counsel please introduce yourselves, state whom
13 you represent.
14                        MR. DINI:  My name is Jacob Dini.  I'm
15 counsel for Bungie.  I'm also joined today by in-house
16 counsel, James Barker -- or in-house counsel for Bungie.
17                        MR. MANN:  My name is Philip Mann.  I'm
18 here on behalf of Mr. May.
19                        THE VIDEOGRAPHER:  Thank you both.  Our
20 reporter today is Kathy Zebert, with Centext.  Would the
21 reporter please swear in our witness.
22                              JAMES MAY,
23 having been first duly sworn, testified as follows:
24                                 ***
25                              EXAMINATION

Page 5

1 BY MR. DINI:

2      Q.   Okay.  Good morning, Mr. May.

3      A.   Good --

4      Q.   I know you've --

5      A.   -- morning.

6      Q.   I know you've done this before.  You were

7 deposed in connection with the arbitration proceeding

8 between these parties too, right?

9      A.   Yes.

10     Q.   Okay.  I know Mr. Marcelo went through the

11 deposition rules during that deposition too, but I think

12 it's helpful for both of us just to have a brief

13 refresher at the top here too.

14     A.   Definitely.

15     Q.   Yeah.  So we, again, have a court reporter,

16 Ms. Kathy Zebert.  So I ask that you please answer all

17 questions verbally even if it's just a "yes" or a "no."

18 I'm going to ask you not to use sort of sounds like

19 "uh-huh" or "nuh-uh," because those are difficult to

20 record accurately.  And please avoid any nonverbal

21 answers like a nod or a shake of the head.  We need a

22 clear record in this case.  Do you --

23     A.   Gotcha.

24     Q.   -- understand that?

25     A.   Yeah.

Bungie, Inc. vs Aimjunkies.com, et al.                      James May 03/23/2023

Page 8

1 **contractor relationships with any other company since**

2 **October of 2022?**

3     A.    Let me rephrase that.  Sorry.  I started

4 working for -- since October, right, of this year?

5     **Q.    Since October -- yeah, your last deposition.**

6     A.    Yeah.  In -- the end of January, I started

7 working for DoorDash.

8     **Q.    Any other company --**

9     A.    It has nothing to do with this, but, yeah.

10 Sorry.

11    **Q.    Oh, no.  Sorry.  Any other companies besides**

12 **DoorDash that you've worked for since your last**

13 **deposition?  I'm sorry.  I didn't hear that answer.**

14              MR. DINI:  Is anyone else having audio

15 issues?

16              THE VIDEOGRAPHER:  Yes.

17              MR. MANN:  Yeah.  I'm not hearing -- I'm

18 not hearing Mr. May either.

19              THE VIDEOGRAPHER:  He went out.  I think

20 he was just going to plug in.

21    A.    Is it working now?

22 BY MR. DINI:

23    **Q.    Yes, now it is.**

24    A.    That was weird.

25    **Q.    No problem.  I'll reask the question.**

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 9

 1    A.   Okay.

 2    Q.   Other than DoorDash, have you worked for any

 3 other companies since your last deposition in October of

 4 2022?

 5    A.   No, I have not.

 6    Q.   Okay.  Are you still working for DoorDash?

 7    A.   Yes.

 8    Q.   Is -- is that why we have to end the deposition

 9 at 5:00 p.m. Eastern time today?

10    A.   Yes.

11    Q.   Okay.  Got it.  You say you still work or you

12 still are an independent contractor for the website

13 AimJunkies.com.  Did I hear that right?

14    A.   Yes.

15    Q.   What do you do for AimJunkies.com still?

16    A.   I still do the same thing I did before; making

17 cheats and stuff like that that.  Yeah, still the exact

18 same thing.

19    Q.   So you're still making cheats for

20 AimJunkies.com?

21    A.   Yeah.

22    Q.   How are you paid by AimJunkies.com?

23    A.   I get paid through Bitcoin.

24         MR. MANN:  I'm going to raise an objection

25 at this point, because I don't see what this has to do

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 with the counterclaims, and this seems like we're going

2 over familiar ground.  Continue, but I want to make that

3 for the record.  I'll permit this for a while, but this

4 is not going to be a complete redo of the deposition

5 that has already been taken.  I would ask that it be

6 confined to the counterclaim issues that are properly

7 the subject matter for this deposition.  Please go

8 ahead.

9 BY MR. DINI:

**10     Q.    Mr. May, I'll ask you the question again.  How**

**11 are you paid by AimJunkies.com?**

12     A.    Through Bitcoin.

**13     Q.    Are you paid through any other methods by**

**14 AimJunkies.com other than Bitcoin?**

15     A.    No.

**16     Q.    Who pays you from AimJunkies.com?**

17     A.    It's still coming from -- I still think they're

18 handling the payments.  I'm not a hundred percent sure

19 on that, but I believe Dave Schaefer is still handling

20 the payments.

**21     Q.    So you're still being paid by David Schaefer**

**22 for your work in connection with AimJunkies.com?**

23     A.    I believe they're the payment provider, like

24 they handle the payments for them.  I'm not a hundred

25 percent sure, but I believe so.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1    A.    I've been instructed by my lawyer not to answer

2 this.  Sorry.

3    **Q.    So are you refusing to answer that question**

4 **based on the instruction of counsel?**

5    A.    Yes.

6    **Q.    Okay.**

7              MR. MANN:  This is a fishing expedition.

8 It's got nothing to do with the issues in this case.

9 It's got nothing to do with Bungie.  Mr. May has said

10 it's got nothing to do with Bungie.  This is just a

11 fishing expedition.  And, again, that's the basis for my

12 instruction not to answer.

13 BY MR. DINI:

14   **Q.    Mr. May, are you currently developing any**

15 **cheats for Destiny 2?**

16   A.    No.

17   **Q.    Are you currently developing any cheats for any**

18 **Bungie -- any video games developed by Bungie?**

19   A.    No.

20   **Q.    Mr. May, can you please list all of the files**

21 **that you allege that Bungie accessed that form the basis**

22 **of your counterclaims in this case?**

23   A.    All the files that are listed in the documents

24 you guys provided are the ones that I know were accessed

25 by Bungie and admitted they were accessed by Bungie

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 15

1 through Kaiser.  As to the rest of them, I'm sure there

2 were others accessed, but I can't say for sure as of

3 right now.

4      Q.   Okay.  When you say the documents that were

5 produced by Bungie, which documents are you referring

6 to?

7      A.   I believe it was documents 4 -- it was 406, I

8 think, and 3-something, the one with the dossier or

9 whatever that -- it was called a dossier or something

10 like that -- on me.

11             MR. MANN:  And for the record, I'll

12 reflect that those are exhibits attached to our amended

13 counterclaim so there's no misunderstanding what these

14 things are.

15 BY MR. DINI:

16      Q.   So Mr. May, the documents that inform you

17 which -- which files that you allege that Bungie

18 accessed are those that are attached to your amended

19 counterclaims?

20      A.   Yes, correct.

21      Q.   And those are Bungie_WDWA_000409; is that

22 right?

23      A.   If that's the one with the list of all the

24 files and paths and everything, yes.

25      Q.   Okay.  And then you also said that there were

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

1 other -- you thought there were other files that Bungie

2 accessed?

3     A.   Until I get that information from them, I can't

4 say for sure, but I believe there were.

5     Q.   Why do you believe that there were other files

6 other than that mentioned in -- or other than those

7 listed in the documents attached to your amended

8 complaint that Bungie accessed?

9     A.   Because if they were able to access those

10 files, they could have accessed anything on my computer.

11     Q.   Any other reasons why you think Bungie accessed

12 any other files other than those listed in the documents

13 attached to your amended complaint?

14     A.   Right now, it's just I believe they have, but I

15 can't say for sure right now.

16     Q.   Okay.  I'm dropping into the chat an exhibit.

17 It's labeled PDX02.  We'll call this Exhibit 70.

18               (Exhibit 70 marked.)

19     A.   Okay.

20 BY MR. DINI:

21     Q.   Mr. May, are you able to open up that document?

22     A.   I'm checking now.  I can -- well, maybe.  Hold

23 on.

24     Q.   If not, I can -- I'm going to share my screen

25 anyways, and I can show you the document.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 17

1      A.    Yeah.  I don't think it'll let me open it on

2 this.  Yeah.

3      Q.    Okay.

4      A.    Thank you for sharing it.

5      Q.    Mr. May, can you see my screen?

6      A.    Yes.

7      Q.    Okay.  I'm showing you Exhibit 70.  This is the

8 Excel -- I'll tell you that this is the Excel version of

9 Bungie_WDWA_000409.  That's the Bates number for this

10 document.  It's the Excel version of one of the exhibits

11 attached to your amended counterclaims.  Does that -- do

12 you agree with that?

13     A.    Yes.

14     Q.    Have you seen this document before?

15     A.    Yeah.

16     Q.    And so this is one of the documents from which

17 you base your allegation that Bungie accessed files on

18 your computer, correct?

19     A.    Correct.

20     Q.    So all the files listed here in Column 3 are

21 files that you allege that Bungie accessed; is that

22 right?

23     A.    Can you scroll down a little bit?  Yes,

24 correct.

25     Q.    Okay.  I want to talk about a few of these

Page 18

1 files.

2     A.    Okay.

3     Q.    So at the top here, this is Row 3 of

4 Exhibit 70.  I'm looking at Column 3, also called Column

5 C here.  Do you see that?

6     A.    Yes.

7     Q.    File name there ends -- it's a file path in

8 that column, Column C, Row 3 of Exhibit 70?

9     A.    Yep.

10    Q.    That file path leads to a file titled

11 blah64.exe?

12    A.    Yep.

13    Q.    What does blah64.exe do?

14    A.    It's a reverse engineering tool created by me.

15 A version of it is.

16    Q.    Okay.  You said it was created by you?

17    A.    Uh-huh.

18    Q.    Did you write any of the code for this file?

19    A.    Yes.

20    Q.    What part of the code did you write?

21    A.    I wrote the memory modifications on reading

22 memory and changing the way it reads memory.  I -- let's

23 see here.  I fixed a major memory leak in it.  I

24 modified the windows, and so that way, it can't be --

25 like so the window's hidden and stuff.  I've made

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 22

 1 is the base -- the original code for it and modified it

 2 over the years and changed a lot of things inside of it,

 3 yes.

 4     Q.   Okay.  And which version of ReClass was this?

 5 You said it was 2015?

 6     A.   I believe this was the 2015 version of it, yes.

 7     Q.   Okay.  Does that GitHub repository for the 2015

 8 version of ReClass still exist?

 9     A.   It might.  I'm not sure.

10     Q.   When you acquired -- when you downloaded

11 ReClass from GitHub, before you made your modifications

12 to this file, did you enter into any signed written

13 agreement transferring ownership of the copyright in

14 that ReClass file to you?

15     A.   It was freeware for anybody.  There -- anybody

16 could change anything without having to have a copyright

17 to it from the original developer.

18     Q.   Okay.  So just getting back to my question, did

19 you enter into any signed written agreement transferring

20 ownership of the copyright in ReClass to you when you

21 downloaded it originally before making modifications?

22             MR. MANN:  And that's a yes-or-no

23 question.

24     A.   Okay.  So did I enter -- let me -- so you're

25 asking if I entered into any signed or written agreement

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 23

1 transferring ownership, right?

2 BY MR. DINI:

3     Q.   Of the file on which you based blah64.exe when

4 you first downloaded it, correct.

5     A.   No.  I never entered into any written transfer

6 or signed anything, no.

7     Q.   Do you allege to own copyrights in blah64.exe?

8     A.   I -- I allege to have made that version.

9     Q.   So I'll -- do you allege to own copyrights in

10 blah64.exe?

11    A.   I created that version.

12    Q.   It's -- I want you to focus on the question

13 that I'm asking here.

14    A.   Okay.

15    Q.   Do you allege to own copyrights in the file

16 blah64.exe?

17    A.   I believe, in creating my own version of it, I

18 do own a copyright in that.

19    Q.   Are there any other reasons why you think

20 you -- are there any other reasons why you claim

21 copyright ownership other than that you created

22 modifications to that file?

23    A.   No.

24    Q.   You said earlier that it wasn't originally

25 named blah64.exe.  What was it originally named?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 24

1     A.    It was probably reclass2015.exe or something of

2 that sort.  I don't remember the exact name, but it was

3 probably something like that.

**4     Q.    Why did you change the name to blah64.exe?**

5     A.    Just because it -- like a lot of -- like if a

6 game checks for certain names and files, then it's just

7 better just to change it.  So that way, if they have a

8 simple check for a name like ReClass -- because it's a

9 common program out there.  And if you have that name,

10 some games check for it.  So it's just easier to rename

11 it and not have to worry about that.

**12     Q.    Had you used a file named ReClass in connection**

**13 with your investigation or development of cheat software**

**14 before?**

15    A.    I don't understand that question.  What do you

16 mean?

**17    Q.    Had you used a file named ReClass, like in the**

**18 file name, when you were developing cheat software?**

19    A.    Oh, yes, I have.

**20    Q.    And had you been banned for using a file by**

**21 that name before?**

22    A.    I probably have, but I wasn't sure if that was

23 the cause of it, which is why I changed the name, just

24 to see.

**25    Q.    Okay.  Was the file blah64.exe signed?**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

```
 1      Q.    Okay.  I filtered it down by Column 3 to those

 2 columns that reference a file named Cheat Engine.

 3      A.    Uh-huh.

 4      Q.    So we're looking at Row 76 of Exhibit 70.  Do

 5 you see Column C there --

 6      A.    Yes.

 7      Q.    -- of Row 76?

 8      A.    Yes, correct, yep.

 9      Q.    Does that look like a file path to a file

10 that's named cheatengine-x86_64.exe?

11      A.    Yes.

12      Q.    What does this file do?

13      A.    That's a public reverse engineering tool that

14 can help you reverse engineer games, basically, yeah.

15      Q.    Did you write any of the code for

16 cheatengine-x86_64.exe?

17      A.    No.

18      Q.    Did you modify any of the code for

19 cheatengine-x86_64.exe?

20      A.    No.

21      Q.    Where did you get this file from?

22      A.    Just downloaded right off Cheat Engine's

23 website.  They have a website you can just directly

24 download it off of.

25      Q.    What is the website where you downloaded
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 28

1  cheatengine-x86_64.exe?

2      A.   I just Googled Cheat Engine.  I believe -- it

3  might be cheatengine.net or something.  I don't

4  remember.

5      Q.   Okay.  Do you allege to own copyrights in this

6  file --

7      A.   No.

8      Q.   -- cheatengine-x86 --

9      A.   Sorry.

10     Q.   -- _64.exe?

11     A.   No.  Sorry.  I didn't mean to interrupt you.

12     Q.   That's okay.  I'll just ask the question again

13  to make sure we get a clear record on that.  Do you

14  claim to own copyright in the file

15  cheatengine-x86_64.exe?

16     A.   No.

17     Q.   Were you banned or kicked from Destiny 2 while

18  attempting to use this file, Cheat Engine, on

19  November 11th, 2020?

20     A.   I was probably banned, but I was never kicked

21  out of the game for it.  I was probably banned later on,

22  because when I was messing with the game, it wouldn't

23  ban me right away.  It would take like 30 minutes to an

24  hour before it would actually ban me.

25     Q.   So were you able to use this file,

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 29

1 cheatengine-86x [sic] -- I'm not going to say the whole

2 name.  I'll just refer to it as Cheat Engine.  Were you

3 able --

4     A.    Okay.

5     Q.    -- to use this file for about a half an hour to

6 an hour before you were banned from the game?

7     A.    Yes.

8     Q.    Is it common, when using publicly available

9 tools like Cheat Engine against video games, to get

10 detected or banned by the video game?

11    A.    Most games will detect it.  Like a lot of them

12 won't ban you.  They'll just keep you from using it.

13 But some will ban you, yes.

14    Q.    Why do you think that is, when you're using

15 these publicly available tools, that video games ban

16 them?

17    A.    Because, I mean, people are always looking for

18 ways to modify, like, or -- or find things in a game.

19 Like say you -- there's a game you want to get -- I

20 mean, they -- they're even using single-player games

21 too.  Like if you want -- need coins and you want to add

22 more coins to a game, say -- and you find the address by

23 searching for a value, and then when it changes, you

24 hit -- search for the next value, and that's how you

25 find the address.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 33

1   Q.   Were there any other modifications that you

2 made to reclass.net.exe?

3   A.   I'm sure there were.  I just can't recall them

4 off the top of my head.

5   Q.   So you can't tell me right now whether there

6 were -- what those other modifications were that you

7 made to reclass.net.exe other on those I just listed?

8   A.   Not off the top of my head.  I'm sure there

9 were others, though.

10   Q.   As with blah64.exe, did you base

11 reclass.net.exe off of any particular file, or did you

12 start from scratch?

13   A.   Based it off of the newer version that they had

14 created also for this and basically made it into my own

15 version, yes.

16   Q.   Where did you acquire that newer version of

17 reclass.net.exe?

18   A.   GitHub, but I believe they have a website now,

19 also, that links you to their GitHub, but I'm not

20 exactly sure what that website is.

21   Q.   Do you have any -- any guess what the name of

22 the website is?

23   A.   No, I do not.  If you Google it, it comes up

24 right away.  So I don't remember what the exact website

25 is.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 34

1    Q.   Do you know who the author of the GitHub file

2 was?

3    A.   Gosh, what was his name?  I can't recall right

4 now.  I know who it is.  I just can't recall his name.

5 Just by his GitHub name.

6    Q.   Do you know if the GitHub repository for

7 reclass.net.exe, the base file, not your modified one --

8 is that one still up on GitHub?

9    A.   Yeah, it should be.  And it's probably been

10 updated since that version.  I haven't -- like I just

11 modified the version I downloaded back whenever that

12 was.  It was probably, gosh, 2019, '18, somewhere, that

13 I downloaded the original.

14    Q.   When you downloaded the original

15 reclass.net.exe from GitHub, did you enter into any

16 signed written agreement transferring ownership of the

17 copyright in that file to you?

18    A.   No.

19    Q.   Do you allege to own copyrights in

20 reclass.net.exe shown in Row 70 of Exhibit 70?

21    A.   Yes, by the modifications that I made, yes.

22    Q.   Are there any other reasons why you claim

23 ownership -- copyright ownership in that file other than

24 the modifications that you made?

25    A.   No.

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

1    Q.   Were you banned from Destiny 2 while attempting

2 to use the file named reclass.net.exe?

3    A.   I'm not sure -- I'm sure I was, but I'm not a

4 hundred percent sure.  All I see in the column is that

5 it says reverse engineering tool attached.  I'm not sure

6 if that was the reason I was banned or if it was a log

7 on their part.  I'm not sure.

8    Q.   It looks like you only tried to use

9 reclass.net.exe against Destiny 2 once, on

10 November 11th, 2020.  Why not try using it again?

11   A.   It -- I did use it again.  It's just under a

12 different name.  I believe it was "renamedreclass."  I

13 was just changing the name.

14   Q.   Why did you change the name?

15   A.   Like I explained before, sometimes they detect

16 the name of the -- or the name.  I wasn't sure if I was

17 detected or not, but after figuring all this out, I

18 learned that I was hardware banned from the beginning by

19 Bungie.  So it didn't matter if these programs were

20 running or not.  I was banned automatically.

21   Q.   Did you think, at the time, that the name of

22 the file might have been why you were banned for using

23 it?

24   A.   It could have been.  I mean, it always crosses

25 my mind, but I'm never sure.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 39

1      Q.    You wrote the entire source code for

2 reclasskernel64.sys?

3      A.    I believe I did, yes.

4      Q.    Did you acquire any components from publicly

5 available sources?

6      A.    I mean, I'm not -- I wouldn't say I'm really

7 skilled in kernel.  So, of course, I look around the

8 Internet to figure out on how to do things, but, yes,

9 that was written by me.

10     Q.    How did you write the code for

11 reclasskernel64.sys?

12     A.    In C++ --

13            MR. MANN:  Object to the form of the

14 question.  Go ahead and answer, if you can.

15 BY MR. DINI:

16     Q.    How did you write the code for

17 reclasskernel64.sys?

18     A.    I mean, I don't know how to explain how I wrote

19 the code.  I just wrote code for it.  I mean, yeah.  I

20 couldn't tell you exact code without looking at the

21 source, but I wrote that -- I wrote that probably, what,

22 2019, something like that.

23     Q.    Did you use any tools or APIs to write the code

24 for reclasskernel64.sys?

25     A.    I used Visual Studio to write it.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 40

1      Q.    How does Visual Studio work?

2      A.    Basically, you put in the code, compile it,

3 choose what type you want.  If it's a driver, set it up

4 to -- to write code for drivers or DLLs, which is

5 dynamic link libraries, executable files.  You could --

6 just depends on what you're doing, and there's a lot

7 that Visual Studio has to offer.  They even provide the

8 SDKs for writing drivers and -- and other programs.

9      Q.    Do you use any Windows API functions to write

10 the code for reclasskernel65.sys?

11     A.    Oh, I'm sure I did.  I'm sure there's a lot of

12 kernel APIs in there and stuff used.

13     Q.    Did you grab any information off the Internet

14 to put together this driver, reclasskernel64.sys?

15     A.    I researched things, but all the code is

16 original in there.

17     Q.    So do you allege to own copyrights in this

18 file?

19     A.    Yes.

20     Q.    Tell me every reason why you claim copyright

21 ownership in reclasskernel64.sys.

22            MR. MANN:  Object to the form.

23     A.    I --

24            THE WITNESS:  Sorry.

25            MR. MANN:  Go ahead.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 41

1      A.    I created it.

2 BY MR. DINI:

3      Q.    Any other reasons why you claim copyright

4 ownership in this file?

5      A.    No.

6      Q.    Was this file signed?

7      A.    Yes, it was signed.

8      Q.    By who?

9      A.    By Phoenix Digital.

10      Q.    Why was it signed by Phoenix Digital?

11      A.    Because without using test-signing mode, I

12 couldn't open this or run a kernel program without

13 having it signed.  So I asked Phoenix Digital if they

14 would mind signing for me, and they said sure.

15      Q.    And why did you have to have the file signed in

16 order for it to work?

17      A.    Because you can't run it -- it won't allow you

18 to run it unless it's signed.  Anything you do with

19 kernel, loading drivers, unless you're in test-signing

20 mode -- test-signing mode -- you can't run it.  And if

21 you're in test-signing mode, the anti-cheats won't let

22 you load a driver that's not signed either.

23      Q.    Okay.  I'm going to stop sharing Exhibit 70 for

24 now.  I'm dropping into the chat another exhibit.  The

25 file title here starts with 2022-11-21.  Oh, I didn't --

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 42

1 trying to --

2      A.   It won't --

3      Q.   Yeah, it does not want to cooperate.  Let's

4 see.  Well, I'm going to go ahead and just share my

5 screen now, and I'll get it to send in the chat at some

6 point.

7      A.   Okay.

8      Q.   I'll troubleshoot later.  Let me just make sure

9 I'm sharing the right screen.  All right.  So I'm going

10 to show you what we'll call Exhibit 71.  This -- do you

11 recognize this?

12     A.   Yes, I do.

13               (Exhibit 71 marked.)

14 BY MR. DINI:

15     Q.   Okay.  You recognize this as your and your

16 codefendants' answer and amended counterclaims?

17     A.   Yes.

18     Q.   Okay.  I want to scroll down to a particular

19 paragraph here, Paragraph 19 of your amended

20 counterclaims.  It goes from the bottom of Page 13 to

21 the top of Page 14.  Do you see that?

22     A.   Yes, I do.

23     Q.   In this paragraph, you make allegations related

24 to randomly named dot SYS files from the document we

25 were just talking about, Exhibit 70 --

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 44

```
 1 is --

 2     A.    Oh.

 3     Q.    -- mentioned in Paragraph 19 of your amended

 4 counterclaims.

 5     A.    Yeah, okay.  Sorry.  I got -- I'm on track now.

 6 Gotcha.  Okay.  That file, from what I understand, is a

 7 file that was generated when you load the loader.  Or

 8 like -- so basically, that file is on your computer till

 9 you restart your computer and then it's gone.  But

10 that's just what I've been told, that it was -- it's

11 generated by the loader.  It's the driver, I guess.

12     Q.    When you say "loader," what are you referring

13 to?

14     A.    The loader that was used to distribute cheat

15 software on AimJunkies.

16     Q.    So this is the loader that's available on

17 AimJunkies.com?

18     A.    I don't know if it's the current one or not, if

19 it still does that or not.  I'm not sure.  But back

20 then, they used to use a driver to -- to load it, to

21 hide it, and that was the one that would stay on.  I'm

22 assuming it's to hide it, at least.  I'm not sure, but

23 it's always loaded with the loader, and it's stored in

24 your Drive C, randomly named every time.

25     Q.    Okay.  So did you create this driver, these
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 45

1 randomly named dot SYS files that start with the hash

2 value 6E73?

3      A.   No, I did not create those.

4      Q.   Do you claim to own copyrights in those files?

5      A.   Not the randomly named ones, no.

6      Q.   So you don't claim to own copyrights in the

7 file that starts with the hash value 6E73A and ends in

8 3A04?

9      A.   No.  Those are not created by me.  So no, I do

10 not.

11      Q.   Okay.  So I want to go back to Exhibit 71, your

12 amended -- the amended counterclaims here.

13      A.   Okay.

14      Q.   Can you read Exhibit -- or can you read

15 Paragraph 19 of this Exhibit 71, your amended

16 counterclaims?  You can read it silently to yourself and

17 just let me know when you're done.

18      A.   Okay.  Yeah, I read it.

19      Q.   You see on the last sentence of Paragraph 19

20 here, after describing these randomly named dot SYS

21 files and identifying the hash value that starts with

22 6E73A, you say that -- you allege that you hold

23 copyrights in those files under 17 USC, Section 201.

24 You see that, right?

25      A.   Yeah.  That must have been misstated.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 46

1     Q.    So this was incorrect here in Paragraph 19?

2 You do not claim to own copyrights in those dot SYS

3 files?

4     A.    No, I do not --

5              MR. MANN:  Object, asked and answered.

6 I'm sorry.  Go ahead and answer it again.

7     A.    Yeah, I do not claim copyrights in those

8 randomly generated files.  It had to have been misstated

9 by accident.

10 BY MR. DINI:

11     Q.    Okay.  I want to talk about another paragraph

12 here in Exhibit 71, the amended counterclaims.

13     A.    Okay.

14     Q.    Paragraph 26.

15     A.    Okay.

16     Q.    In this paragraph, you make allegations

17 concerning a file named reclasskernel64.pdb; is that

18 right?

19     A.    Yep.

20     Q.    What's a dot PDB file?

21     A.    A program database file.

22     Q.    What does a program database file do?

23     A.    Stores information about the file and basically

24 helps debug if -- any issues you have.

25     Q.    How is a dot PDB made?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 47

1      A.   It's generated when you compile code, if you

2 choose to have one generated.

3      Q.   **Did you write any code related to the creation**

4 **of the dot PDB file?**

5      A.   It has all the code -- it has all the

6 information to the code that I wrote, so, yes.

7      Q.   **Did you write any code to create the dot PDB**

8 **file?**

9      A.   It's generated with the code that I wrote.

10     Q.   **Generated how?**

11     A.   By -- by Visual Studio.

12     Q.   **So Visual Studio automatically generates a dot**

13 **PDB file based on code you've written?**

14     A.   Yes.

15     Q.   **Do you claim to own copyrights in this**

16 **reclasskernel64.pdb file?**

17     A.   Yes, since it was the code I wrote.

18     Q.   **Can you tell me every reason why you claim to**

19 **own copyright ownership in reclasskernel64.pdb?**

20     A.   Because it was -- it has all the information of

21 the code I wrote inside of it.  So, yes, that is the

22 reason.

23               MR. DINI:  Okay.  I think now is a good

24 time for a break.  Why don't we break for five minutes?

25 Does that work?

Bungie, Inc. vs Aimjunkies.com, et al.                     James May 03/23/2023

Page 48

```
 1                 MR. MANN:  Sure.

 2                 THE VIDEOGRAPHER:  Okay.  The time is

 3 8:49 a.m.  We are off the record.

 4                 (Recess observed, 8:49-8:58 a.m.)

 5                 THE VIDEOGRAPHER:  The time is 8:58 a.m.,

 6 and we are on the record.

 7 BY MR. DINI:

 8     Q.   Okay.  Mr. May, welcome back.  We just talked

 9 about certain files that were listed in Bungie's Exhibit

10 No. -- or sorry -- Exhibit No. 70.  You say that you

11 modified -- you made modifications to blah64.exe,

12 reclass.net.exe and renamedreclass.exe; is that right?

13     A.   Correct.

14                 MR. DINI:  Could we spotlight Mr. May,

15 just so he stays on -- Scott?

16                 THE VIDEOGRAPHER:  Yes, of course.  One

17 moment.

18                 MR. DINI:  Awesome.  Thanks.

19 BY MR. DINI:

20     Q.   Okay.  Mr. May, do you still have a copy of the

21 source code for blah64.exe that includes the

22 modifications you made when you accessed Destiny 2 while

23 using it?

24     A.   I may, but I'm not sure on that one, for sure.

25     Q.   Where did you save that file when you had it?
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 56

1 because you could read the class data in Frostbite.  It
2 just depends on the game engine.

3          I mean, I wrote several things to make it
4 easier and better flow to output the code and just be
5 able to like put it -- like just copy the structure and
6 put it right in the cheat.  It would make it so much
7 easier that way.

**8     Q.   So am I understanding right that improving the**
**9 class structure improved the output that ReClass or**
**10 whatever the tool is that you're using -- it makes it**
**11 easier to read whatever it is you're trying to read?**

12     A.   It makes it easier to plug and play.  So if you
13 have a base set up for a cheat and -- like most games,
14 it's pretty easy -- like world to screen and a lot of
15 stuff simple.  So as long as you find the stuff, you --
16 it's like plug and play.  You can just be on your way.

**17     Q.   Okay.  And do you have to create specific --**
**18 Frostbite was one of the ones you mentioned?**

19     A.   Yes.

**20     Q.   Did you have to create an improved class**
**21 structure that was specific to Frostbite?**

22     A.   I just created a plug-in.  So basically if it
23 detected it was a Frostbite game because I'd have
24 signatures in there so I'd -- I would know.  And it
25 would automatically show the classes and everything and

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 57

1 output the classes, like the class names and their

2 variables and everything.

3    **Q.   So is Frostbite like a game engine, or is that**

4 **something different?**

5    A.   Yeah, it's a -- it's a game engine.

6    **Q.   Okay.  So did you have a specific class**

7 **structure, like, plug-in that you created for Destiny 2?**

8    A.   No.

9    **Q.   Did you try to create one that was specific to**

10 **Destiny 2?**

11   A.   No.  If I knew the game engine, I probably

12 would have, but I didn't have a clue on how it worked.

13   **Q.   Okay.  Okay.  So did you try to use any class**

14 **structure plug-ins while you were using this tool in**

15 **connection with Destiny 2?**

16   A.   No.  I didn't really make -- do anything --

17 none of the modifications I made -- these were all done

18 before Destiny 2, so they had nothing to do with

19 Destiny 2 itself.

20   **Q.   Got it.  Did you make any modifications to**

21 **blah64.exe that were specific to Destiny 2?**

22   A.   Nothing was specific to Destiny 2.  I might

23 have just renamed the actual file for Destiny 2, yeah,

24 but I believe all those other modifications in there

25 were already done before Destiny 2.

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 58

 1     Q.   Oh, so you renamed like the file itself; the
 2  executable file?

 3     A.   Yeah, yeah, correct.

 4     Q.   Oh, okay.  And why did you do that?  I'm not
 5  quite following.

 6     A.   It would be like I said before, that some
 7  anti-cheats check for the name of the executable that's
 8  running.

 9     Q.   Okay.

10     A.   So if it's ReClass.net and they're checking for
11  it, they'll kick you out of the game or at least log a
12  -- like -- like right now, I know Bungie did.  They had
13  a log file showing that I had used it, so yeah.

14     Q.   Okay.  And you renamed it before using it in
15  connection with Destiny 2, right?

16     A.   Oh, everything was pretty much done before
17  Destiny 2.  Nothing was done because of Destiny 2.

18     Q.   Got it.  Okay.  You mentioned some plug-ins
19  that you used in connection with at least blah64.exe;
20  was that right?

21     A.   Yes.

22     Q.   Okay.  What were the plug-ins that you used?

23     A.   I didn't use any plug-ins in the game.  I just
24  added plug-ins to the actual -- to the actual file, like
25  for other games and stuff.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 59

1    **Q.   Got it.**

2    A.   Like I said, none of this was due to Destiny 2.

3 All this stuff was done before.

4    **Q.   Okay.  So what were the plug-ins that you added**

5 **to blah64.exe -- and I get that it wasn't for Destiny**

6 **2 --**

7    A.   Yeah.

8    **Q.   -- but that you used like on that -- like what**

9 **were the plug-ins to blah64.exe that you had added by**

10 **the time you used it in connection with Destiny 2?**

11   A.   Like I said, I had a Frostbite plug-in in

12 there.

13   **Q.   Okay.**

14   A.   I believe another plug-in that was in there was

15 Unreal Engine.  I think it was for Unreal Engine 3, but

16 I can't recall if that was in that file or not.  I'd

17 have to look to make a hundred percent sure, but I did

18 have an Unreal Engine plug-in in that at the time.

19   **Q.   Did you find these plug-ins that you added to**

20 **blah64.exe -- were these things that you found online,**

21 **like on GitHub?**

22   A.   For blah64, no, because there -- I don't even

23 think there was a plug-in system available.  You had to

24 build it yourself --

25   **Q.   So did --**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 69

1 interrogatory as we sit here now?

2    A.    As of right now, no.

3    Q.    Okay.  This Interrogatory No. 8 from Bungie to

4 you asks you to describe each category of damages,

5 including calculations for those damages, right?

6    A.    Correct.

7    Q.    Your answer to this interrogatory identifies as

8 one category of damages the cost to purchase new

9 computers and drives, right?

10   A.    Yes.

11   Q.    It identifies another category of damages as

12 the time you spent reviewing files for indications of

13 compromise, cleaning the files and getting your new

14 computer set up, right?

15   A.    Yep.

16   Q.    It says here that you have incurred further

17 damages -- and I'm quoting here -- "further damages in

18 an amount to be determined at trial."  Do you see that

19 in the second-to-last sentence of your supplemental

20 answer?

21   A.    Yes.

22   Q.    What do these further damages refer to?

23   A.    Whatever damage is deemed by the Court.

24   Q.    Are you presenting to the Court any other

25 damages besides those two categories that we just listed

Bungie, Inc. vs Aimjunkies.com, et al.          James May 03/23/2023

Page 70

1 here?

2     A.    Could be.  I mean, there's still a long way to
3 go.

4     Q.    Are you aware of any other damages that you've
5 suffered other than those two categories listed here?

6     A.    That's to be determined later on, not by me.

7     Q.    I'm just asking what you're aware of, right --

8     A.    Oh, okay.  Gotcha.

9     Q.    Are you aware of any other damages right now
10 other than those that are listed in the supplemental
11 response?

12    A.    No.

13    Q.    So the cost to purchase a new computer and your
14 time spent assessing and remediating the harm are the
15 only categories of damages you're aware of right now?

16    A.    Correct.

17    Q.    Okay.  So I want to start -- I want to talk
18 about each of these two categories.  So let's start with
19 the time that you spent assessing and remediating the
20 harm.

21    A.    Okay.

22    Q.    You say here -- I'm not sure which sentence
23 this is, but it's the fair value of your time is at
24 least $75 per hour; is that right?

25    A.    Yeah, that's correct.

Page 71

```
 1    Q.    What is that fair value of your time based on?

 2    A.    Calling around to several places and doing a

 3 quick search on Google.  It averages anywhere between --

 4 for my field, anywhere between fifty to a hundred

 5 dollars an hour, from when I checked.  So I just took

 6 the middle ground and went 75 per hour.

 7    Q.    Okay.  So I'm looking at the sentence here that

 8 starts with, "The value of Mr. May's time is based."  Do

 9 you see that sentence?

10    A.    Yes.

11    Q.    Okay.  So it says, "The value of Mr. May's time

12 is based, in part, on a survey of prices charged by

13 computer technicians and consultants in the Dayton, Ohio

14 area."  And then the sentence goes on.

15    A.    Yes, correct.

16    Q.    Did I read that right?

17    A.    Yes.

18    Q.    So this phrase "in part," what else is the

19 value of your time based on other than that survey?

20    A.    That's what it's based on.

21    Q.    So it's only -- the value of your time is only

22 based on the survey?

23    A.    Yeah, I called around to find out what -- what

24 the average is around here, to find out what they're

25 getting paid.
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 72

 1      Q.    Okay.  So the only basis for the value of your

 2 time at $75 per hour is the survey of local Dayton, Ohio

 3 computer technicians and consultants?

 4      A.    Yes, correct.

 5      Q.    Okay.  Who conducted that survey?

 6      A.    I did.

 7      Q.    Did anyone else help you with that survey?

 8      A.    No.

 9      Q.    Have you ever conducted a survey before?

10      A.    No.

11      Q.    Have you ever taken any classes about surveys?

12      A.    No.

13      Q.    Have you gotten any trainings on how to do a

14 survey?

15      A.    No, no, no, I haven't.

16      Q.    Do you have any professional licenses that

17 certify you to take surveys?

18      A.    No.

19      Q.    Are you a survey expert?

20      A.    No.

21      Q.    So when was your survey conducted?

22      A.    I don't know the exact dates.  Gosh, it was

23 probably not long after I filed the counterclaim, is

24 when -- when I started doing the survey.

25      Q.    How long did it take you to complete the

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 73

1 survey?

2      A.   A couple days.  I called around to probably, I
3 don't know, seven or eight different places and kind of
4 got an average.

5      Q.   What are the names of those seven to eight
6 different places that you called?

7      A.   I don't remember.  I'd have to look on Google.
8 I just searched area -- area technicians and stuff and
9 called around to see what they charged.

10      Q.   Do you remember the names of any of the people
11 that you talked to?

12      A.   No.  This was quite a while ago.

13      Q.   Do you remember any of the names of the
14 companies that you talked to?

15      A.   No.

16      Q.   Do you remember any of the website addresses
17 for the companies that you surveyed?

18      A.   No.  I'd have to look on Google and find out.

19      Q.   Did you create any records of your survey?

20      A.   No.

21      Q.   Did you print out any website screenshots?

22      A.   No.  There was no point of doing it.  I just
23 called around.  I didn't think there was any more work
24 needed for it.

25      Q.   Did you make any notes of your conversations

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 74

1  with these folks?

2      A.    No.

3      Q.    Did you have any e-mail correspondence with any
4  of these technicians?

5      A.    No.

6      Q.    Did you have any text message correspondence
7  with any of these technicians?

8      A.    No.

9      Q.    Did you have any written correspondence with
10  any of the computer technicians or consultants that you
11  surveyed?

12      A.    No.

13      Q.    How did you survey them?

14      A.    I called and asked what their average was to
15  have these type of things done, and they told me, by the
16  hour, what they charge.

17      Q.    Did you have a set list of questions, standard
18  questions that you asked each one?

19      A.    I mean, I asked them like what technicians and
20  things get charged to have -- get these type of things
21  done, like checking files, see if things were
22  compromised.  And that's -- they just normally charge a
23  flat rate to look over these things --

24      Q.    Why did you --

25      A.    -- per hour, yeah.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 75

1      Q.   Why did you choose those -- the particular

2 companies or people that you did as -- to be members of

3 your survey?

4      A.   It was just a quick search of the Dayton area

5 to find out.  I mean, nothing more was done.

6      Q.   Did you check any of their qualifications?

7      A.   No.

8      Q.   Did you review any of their invoices?

9      A.   No.

10      Q.   Did you review any rate materials that they

11 provided?

12      A.   No.  I just asked them about their rate, and

13 that's what they told me.  I was just calling to get an

14 inquiry about it.  There was nothing else I needed.

15      Q.   Did you ever visit any of these computer

16 technicians or consultants in person?

17      A.   No.  Why leave when I can call on the phone?

18      Q.   Did you confirm that they even had a storefront

19 that existed?

20      A.   No, but they had websites.

21      Q.   Did you talk to any customers of any of these

22 computer technicians or consultants?

23      A.   No.

24      Q.   Did you confirm that these people even provided

25 the services that they claimed to provide?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 76

1    A.   There was no way to confirm.  I just called and

2 asked about their rate.

3    **Q.   So there's no way to confirm that the people**

4 **you surveyed to support your damages claim actually**

5 **provided the services that they claimed to provide?**

6    A.   They stated they provide it, and I asked what

7 their hour -- sorry -- hourly rate is, and that's what I

8 took.  I'm taking a person's word at this.  I mean, I'm

9 not signing up to get anything done through them.  I'm

10 just calling around to find out prices.

11   **Q.   Did you look to see if any of these companies**

12 **had a business license to do business in Dayton, Ohio?**

13   A.   No.  I didn't check any of that.

14   **Q.   Did you look to see if they had any licensures**

15 **-- licenses registered with the state to conduct any of**

16 **this work?**

17   A.   No.

18   **Q.   How did you determine their rates?**

19   A.   I asked them.

20        MR. MANN:  Objection, asked and answered

21 several times.

22 BY MR. DINI:

23   **Q.   How did you calculate the average rate?**

24   A.   Because everything was between fifty and a

25 hundred bucks an hour when I was talking to them.  So

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 77

1 the average is 75 bucks, right in the middle.

2    Q.    Have you ever worked as a computer technician?

3    A.    Well, I've done a lot of things on my own and

4 fixed a lot of things on my own.  So it doesn't matter

5 if I worked as a technician.  I think I know enough to

6 do this.  I've built computers all my life.  I've --

7 I've done all this stuff.

8    Q.    Mr. May, have you ever worked as a computer

9 technician?

10    A.    No.

11    Q.    Have you ever worked as a computer consultant?

12    A.    No.

13    Q.    Have you ever been paid to provide computer

14 technician services?

15    A.    No.

16    Q.    Have you ever been paid to provide computer

17 consulting services?

18    A.    No.

19    Q.    Have you ever set up new computers for others?

20    A.    Yes.

21    Q.    Did they pay you?

22    A.    No.

23    Q.    Have you ever scanned for viruses and malware

24 on the computers of other people?

25    A.    Yes.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1    Q.    Were you paid for that work?

2    A.    No.

3    Q.    How many times did you scan for viruses and

4 malware on others' computers?

5    A.    Probably about five different times for family.

6    Q.    Other than scanning for viruses and malware

7 five different times for family, did you do any

8 additional work scanning for viruses or malware on other

9 computers?

10    A.    No.

11    Q.    How many times did you set up new computers for

12 others?

13    A.    I can't give you an exact amount, but I've done

14 it for family members over the years when they bought

15 their own hardware and wanted me to put it together for

16 them to save money on cost.  I don't know; probably

17 about eight different times, maybe.

18    Q.    Have you ever received training on how to scan

19 for viruses and malware installed by others on a

20 computer?

21    A.    No.

22    Q.    Have you ever been trained in taking corrective

23 action against viruses and malware installed by others

24 on a computer?

25    A.    No.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 79

1    Q.   Have you ever received any education relating

2 to that topic?

3    A.   I mean, I don't recall if I had any classes or

4 not when I was in college.  I don't remember.

5    Q.   You don't remember if you had any -- sitting

6 here now, you don't recall taking any classes about

7 scanning for viruses and malware installed by others on

8 a computer?

9    A.   Yeah.  Right now, I do not recall.

10    Q.   Okay.  Okay.  You say in your answer here that

11 you -- and I'm highlighting this in the doc --

12 "reviewing files for indication of compromise."  You see

13 that in Exhibit No. 72?

14    A.   Correct.

15    Q.   What does that mean?

16    A.   Checking over files that -- and running scans

17 on the computer to see if anything was compromised.

18    Q.   What indications of compromise are you looking

19 for when you're conducting that review?

20    A.   It mean, there could be anything from like

21 spyware on the computer.  There could -- anything kernel

22 related that could be spying or creating compromise and

23 collecting information.  I mean, a lot of these

24 companies out there do it without anybody knowing.

25    Q.   Other than looking for spyware and

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 80

1 kernel-related spying, are there any other indications

2 of compromise that you looked for when conducting this

3 review of your files described in Interrogatory No. 8?

4    A.   I checked through like the registry and stuff

5 to see if there was traces left by Bungie and other

6 companies out there.  I was doing a full review over

7 everything when all this happened.

8    Q.   So other than looking for spyware and looking

9 for kernel-related spying and checking the registry, did

10 you do anything else to look for indications of

11 compromise?

12    A.   Yeah, I've run some antivirus programs too.

13    Q.   Anything else?

14    A.   Not that I can recall right now, no.

15    Q.   So when you reviewed files for indication of

16 compromise, all you did was look for spyware,

17 kernel-related spying, checking the registry and running

18 antivirus software; is that right?

19              MR. MANN:  Objection -- objection.

20 Mischaracterizes testimony.  Go ahead and answer.

21    A.   Sorry.  Could you repeat that again?

22 BY MR. DINI:

23    Q.   So when you were reviewing files -- when you

24 were reviewing files for indications of compromise, you

25 looked for spyware, kernel-related spying, checked the

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 86

1 the ones produced by Bungie.

2    Q.    How were those files compromised?

3    A.    Because it accessed them.

4    Q.    Were those files modified at all by Bungie?

5    A.    I'm not sure.

6    Q.    Did you observe any indications of

7 compromise -- did you observe any modification of those

8 files caused by Bungie?

9    A.    I know Bungie had to have copied them or

10 downloaded them to be able to have those hashes and to

11 get that information that they had.

12    Q.    But getting back to my question, did you

13 observe any indication that Bungie modified those files

14 during your --

15    A.    Oh, did they modify them?  Sorry.  No, I didn't

16 see anything that they modified them, no.

17    Q.    Were you -- were those files damaged at all?

18    A.    They were not damaged.

19    Q.    Were you ever unable to use any of those files

20 because of Bungie's access?

21    A.    No.

22    Q.    Were any of those files corrupted as a result

23 of Bungie's access?

24    A.    No.

25    Q.    Were any of the files that you allege Bungie

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 87

1 accessed in a different condition than they were prior

2 to Bungie's alleged access?

3     A.   No.

4     Q.   How long did it take for you to review those

5 files for indications of compromise?

6     A.   Total work was probably 40 hours over

7 everything, but that was with the -- working on the

8 computer, getting it set up and everything.  So the

9 exact hours, I can't remember off the top of my head for

10 what it took to go over -- it was probably about -- I'd

11 say probably about 25 hours or so, just reviewing that.

12 And then setting up the computer and everything would

13 cause the excess of 40 hours.

14     Q.   Did you keep any records of the time you spent

15 doing that work?

16     A.   No.

17     Q.   You also say -- well, actually, which files did

18 you review for indications of compromise on your

19 computer?

20     A.   I scanned and reviewed everything.

21     Q.   When you say "everything," do you mean every

22 file on your computer's hard drive?

23     A.   Yes, correct, all -- all the drives that I

24 have.

25     Q.   What are all of the drives that you have?

Page 88

1    A.   Well, I've got probably like five different

2 drives; just one external drive that I keep all my work

3 stuff on.

**4    Q.   Can you identify those five drives?**

5    A.   They're labeled A, B, C, D and so on.  I

6 mean --

**7    Q.   Are they --**

8    A.   Sorry, sorry.  No, it's not A, B.  It's C, D,

9 E, F, G -- it's, yeah, I think, H.

**10    Q.   What is drive C used for?**

11    A.   That's my main drive, my operating system

12 drive.

**13    Q.   Is that on your old computer, the one that you**

**14 used prior to purchasing the one in May 2022?**

15    A.   Yes.

**16    Q.   What about the D drive?  What is that?**

17    A.   Games.

**18    Q.   Is that on your old computer as well, from**

**19 prior to May 2022?**

20    A.   Yes, it was.

**21    Q.   What is your F drive?**

22    A.   That's -- all those were games, except for my

23 external drive.

**24    Q.   So was F -- the F drive, was that a games**

**25 drive?**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 92

```
 1 drive --
 2     A.   I believe that --
 3     Q.   -- from your old computer?
 4     A.   Sorry.  I believe that was the external drive.
 5     Q.   That was --
 6     A.   I believe it was -- I believe it was named G.
 7     Q.   What was stored on your external G drive?
 8     A.   All development files for a lot of my work and
 9 other things.  I even back up my tax information on
10 there too, just as back up.
11     Q.   So is your tax info on the C drive or the G
12 drive?
13     A.   It's on both.
14     Q.   Got it.  When you say doc -- when you say all
15 dev files for work are on your G drive, what do you mean
16 by that?
17     A.   Any of the files that like I use for creating
18 cheats or -- or -- or the cheat files.
19     Q.   Did you create any files that are on the G
20 drive?
21     A.   Yes, lots of them.
22     Q.   Do you allege that Bungie accessed any of those
23 files on your G drive?
24     A.   I'm saying that they probably did, but I don't
25 have any proof of it yet.
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 93

1     Q.    So you have no evidence that Bungie accessed

2 any files on your G drive?

3     A.    Just the ones that are reported in that

4 document.

5     Q.    By "that," you mean Bungie 409?

6     A.    Yes, correct.

7     Q.    Those are the only documents from -- those are

8 the only files from your G drive that you have evidence

9 were accessed by Bungie?

10    A.    That I have evidence for, yes, but I believe

11 that there was more.

12    Q.    What is your belief based on?

13    A.    Because when you can get that kind of access to

14 those files, you can get access to anything else on the

15 PC.

16    Q.    What's stored on your H drive?

17    A.    Probably games.  I mean, the only -- everything

18 else is games except for the external drive.

19    Q.    Any files on the H drive that you created?

20    A.    I mean, only -- the only way it would be H

21 drive is if it -- sometimes, it'll change from G to H,

22 depending on the drive when I plug in the external.

23 Like it -- it changes them around sometimes.  It renames

24 them when I plug in the external drive.  So sometimes,

25 it could be the H, or it could be the G.  Just depends

Page 94

1 on when I plug it in.  It reorders the drive sometimes.

2     Q.   So I guess, getting back to my question, then,

3 are there any files stored on the H drive that are files

4 you created?

5     A.   No, not -- it would be the same thing on the

6 external drive.  So whatever that drive shows up for the

7 external drive is where all those files are.  The other

8 drives have nothing to do with anything I created.

9     Q.   Okay.  Do you still have access to the C, D, F,

10 G, and H drives from your old computer prior to May

11 2022?

12     A.   It's all been cleaned since then, since I moved

13 over to the new PC.

14     Q.   So is that a no, you don't have access to those

15 files anymore?

16     A.   No, because I cleaned everything and wiped

17 everything when all this was going on.  The only thing I

18 have are all the files on my external drive still that

19 were developed and everything.

20     Q.   So you still have the G drive files?

21     A.   Yes.

22     Q.   But the C, D, F and H drives from your old

23 computer prior to May 2022 have all been wiped?

24     A.   Yes, I cleaned the whole PC, the whole thing.

25     Q.   So the files that were on the C, D, F and H

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

 1    Q.   Okay.  So tell me about the computer that

 2 Bungie accessed.  What kind of computer was it?

 3    A.   It was an older computer than this.  It was

 4 also an AMD Ryzen.  I think it was the first Ryzen that

 5 came out.  It was -- I can't remember if it was an

 6 8-core at the time.  I don't remember the exact model,

 7 but it when Ryzen first started -- AMD started going to

 8 the new Ryzen processors, so whatever year that was.

 9         That was -- it was -- the old one was the

10 previous one I built from the ground up.  And it had --

11 gosh, what was it?  I think it was a 1080 for a video

12 card, for NVIDIA.  I don't remember how much RAM was on

13 there.  It was probably a lot more than 32.  I don't

14 recall, but I -- like I said, I had like five drives on

15 there, including the external --

16    Q.   Did you have an --

17    A.   -- on the old one.

18    Q.   Did you have an SSD on the old one?

19    A.   I believe there was an m.2 drive on the old

20 one, too, and an SSD.

21    Q.   So there was an m.2 drive?  Is that the right

22 terminology; m.2 drive?

23    A.   Yeah.

24    Q.   On the old computer?

25    A.   Yeah.

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 108

1     Q.    And there was an SSD on the old computer?

2     A.    Yeah.

3     Q.    Okay.  Did that include -- did the old computer

4  have a motherboard?

5     A.    Yeah.  I don't remember what the motherboard

6  was, but it did.

7     Q.    How many monitors did you have for your old

8  computer?

9     A.    Three.

10    Q.    Did you have a keyboard for that old computer?

11    A.    Yes.

12    Q.    Did you have a mouse for that old computer?

13    A.    Yes.

14    Q.    Okay.  So we've talked about the processor, the

15  video card, RAM, the m.2, the SSD, a motherboard, three

16  monitors, a keyboard and a mouse for your old computer.

17  Are there any parts that I'm missing; like major parts

18  that I'm missing of your old computer?

19              MR. MANN:  Objection to form.

20    A.    Oh, I mean, it always comes with a power

21  supply.  I mean, what else do you want?  I mean --

22  BY MR. DINI:

23    Q.    You tell me.  You tell me if there's any other

24  major components of the computer there that I'm missing.

25  You're the -- you're the computer guy.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 109

1      A.    Okay.  Gotcha.  And obviously, you always have

2 to have power supply, motherboard, drives, graphics

3 card.  What else?  Trying to make sure I cover

4 everything.  The RAM.  You already got that, though.

5      Q.    Yep.  Anything else?

6      A.    No, because it had a built-in ethernet port on

7 there, so --

8      Q.    Okay.  So did you have any reason to believe

9 that Bungie accessed the processor, the AMD Ryzen

10 first-gen processor that you had on that old computer?

11     A.    They could have.  I'm not sure.

12     Q.    Why did you think they could have?

13     A.    Because they had access to everything else.

14     Q.    Was there any damage to your AMD Ryzen

15 first-gen processor on that old computer?

16     A.    I'm not sure.

17     Q.    Did you find any indications of damage on that

18 old processor?

19     A.    I'm not sure.

20     Q.    You're not sure whether you found damage on

21 that old processor?

22     A.    I didn't check, but it was definitely running a

23 lot slower than it was.  The processor felt like it was

24 going bad, and power supply felt like it was going bad,

25 but that could just be a faulty power supply, because it

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 110

1 was --

2      Q.   You --

3      A.   Sorry.  Go ahead.

4      Q.   No.  Go ahead.  You finish your answer.  I

5 apologize.

6      A.   Okay.  Because it was not supplying enough

7 power to all three monitors anymore.  It could have just

8 been a power supply issue, but I'm not sure.  Or a --

9      Q.   Did you --

10     A.   -- faulty video card.  Sorry.

11     Q.   Did you --

12     A.   It could have been a faulty --

13     Q.   Did you check your AMD Ryzen processor in your

14 old computer for any indication of compromise by Bungie?

15     A.   No.

16     Q.   Was your AMD Ryzen first-gen processor in your

17 old computer corrupted?

18     A.   I don't think it was corrupted, no.

19     Q.   Were you ever unable to use that processor?

20     A.   No.

21     Q.   Do you still have that processor?

22     A.   It's still in the computer, yes.

23     Q.   Do you still have your old computer?

24     A.   Do I still have the older computer?  Yes.  It's

25 just wiped.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

 1     Q.    When did you buy that -- that computer?

 2     A.    The parts for it and everything?  Gosh,

 3 whenever the new Ryzen processor came out.  I had

 4 preordered it years ago.  So that was probably pre-2019,

 5 so maybe 2018 or 2017.

 6     Q.    Okay.  So you bought the old computer and all

 7 of the parts in it in 2017 and 2018?

 8     A.    It was probably around then, whenever the new

 9 Ryzen came out.  I upgraded from what I had before,

10 which was an old AMD processor.  I don't recall what it

11 was before Ryzen came out.

12     Q.    Okay.  You said that you had an NVIDIA 1080

13 video card in your old computer, right?

14     A.    Yes.

15     Q.    Did you have any reason to believe that Bungie

16 accessed that 1080 video card?

17     A.    No.

18     Q.    Was there any damage to the 1080 video card as

19 a result of Bungie's alleged access?

20     A.    I don't believe so.

21     Q.    Was that video card ever corrupted?

22     A.    Corrupted, like not operating properly?  I

23 mean, it could have just been something it was -- that

24 on its own, but I'm not sure, because it had issues

25 supplying all three monitors.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 112

1    Q.   Were you unable to use the video card after --

2 were you ever unable to use the video card?

3    A.   Oh, no.

4    Q.   Okay.  Did you have any reason to believe

5 Bungie's access affected the performance of your video

6 card?

7    A.   I mean, I can't speculate on that one.  I don't

8 know.  Depending on what they -- I mean, if they scanned

9 the computer, I mean, it could have performance issues

10 on the video card, if they did something I -- I wasn't

11 aware of.

12    Q.   Well, I'm asking you if you're aware of any

13 compromise to your video card that were caused by

14 Bungie.

15    A.   I'm saying it could have happened, but I'm not

16 sure.

17    Q.   Did you review your video card to determine

18 whether it had been accessed by Bungie?

19    A.   I mean, there's no really [sic] way to review

20 it other than the performance.

21    Q.   So did you review your video card to determine

22 whether it had been accessed by Bungie?

23    A.   No.

24    Q.   Okay.  You said you had more than -- you had

25 some RAM on that old computer, right?

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 113

```
 1    A.   Yes.

 2    Q.   Did you have any reason to believe that Bungie

 3 accessed the RAM?

 4    A.   They could have accessed the memory on the

 5 computer, yes.

 6    Q.   Did you have reason to believe that Bungie

 7 accessed it?

 8    A.   I believe they accessed the memory, yes.

 9    Q.   Why?

10    A.   Because they had to access the memory to get

11 files off the computer.

12    Q.   Was there any damage to your memory --

13    A.   No.

14    Q.   -- as a result of Bungie's access?

15    A.   No.

16    Q.   Were you unable to use the memory because of

17 Bungie's access?

18    A.   No.

19    Q.   Do you have any reason to believe that Bungie's

20 access of the memory affected the performance of that

21 memory?

22    A.   I can't speculate if it did or not.  It could

23 have, but I'm not sure.

24    Q.   I'm asking if you had any reason to believe it

25 did or not.
```

Bungie, Inc. vs Aimjunkies.com, et al.                 James May 03/23/2023

Page 114

1    A.   I'm not sure.

2    Q.   You're not sure whether you have a reason to
3 believe?

4    A.   I'm not sure.

5    Q.   Okay.  Do you still have that -- that RAM that
6 you had from your old computer?

7    A.   Yes, all the components from the old computer
8 are still the same and in that computer.

9    Q.   Okay.  You mentioned there was an m.2 drive
10 from your old computer.  Did you have any reason to
11 believe that Bungie accessed any data or files on that
12 drive?

13   A.   It's possible they accessed it.

14   Q.   Do you have reason to believe that they
15 accessed the --

16   A.   I'm not sure.

17   Q.    -- m.2 drive?

18   A.   I'm saying it's possible that could have
19 accessed it.  I don't know as of right now what they
20 accessed.

21   Q.   So you don't know whether Bungie accessed the
22 m.2 drive?

23   A.   It's quite possible they could have accessed
24 everything on that computer.

25   Q.   I'm -- I'm not asking what's possible.  I'm

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 asking what evidence or -- what reason to believe you

2 have [sic] that it accessed the drive.

3      A.   I believe --

4                MR. MANN:  You mean the evidence that

5 Bungie hasn't provided to us yet?  Come on.

6                MR. DINI:  This is -- this is Mr. May's

7 deposition, Phil, not your deposition.  So --

8                MR. MANN:  No.  Listen, listen.  Bungie

9 knows exactly what it does.  You're trying to hide it,

10 and it's unfair to say we can't prove it because you're

11 hiding it.  But continue.

12 BY MR. DINI:

13      Q.   Mr. May, did --

14      A.   Could you repeat the question?  Sorry.

15      Q.   Mr. May, do you have reason to believe that

16 Bungie accessed the m.2 drive on your -- on your old

17 computer?

18      A.   I believe they did.

19      Q.   What is that based on?

20      A.   My belief.

21      Q.   What is your belief based on?

22      A.   The files they accessed already.

23      Q.   So because Bungie accessed some files --

24 because you believe Bungie accessed some files, you

25 believe that it accessed the m.2 drive?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 116

 1    A.   Yeah --

 2              MR. MANN:  Bungie -- Bungie admitted to

 3  some files.  Come on.  Let's ask proper questions.

 4              MR. DINI:  Phil, that is not --

 5              MR. MANN:  Bungie --

 6              MR. DINI:  -- your deposition.  This is --

 7              MR. MANN:  -- admitted --

 8              MR. DINI:  -- James May's deposition.

 9              MR. MANN:  I understand, but it's --

10              MR. DINI:  You're not testifying today.

11              MR. MANN:  -- my job to help defend my --

12  it's my job to help my client and keep you from

13  misleading him and mischaracterizing facts.  And please

14  continue.

15  BY MR. DINI:

16    Q.   Was there any damage to your m.2 drive?

17    A.   I don't believe so, no.

18    Q.   Were you ever unable to use your m.2 drive

19  after Bungie accessed it?

20    A.   No.

21    Q.   Was the performance of your m.2 drive affected

22  after Bungie accessed it?

23    A.   I'm not sure, as I didn't check it.  So I'm not

24  sure.

25    Q.   Did you check whether the m.2 drive had been

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 117

1 accessed by Bungie?

2     A.    I believe it was accessed by Bungie.

3     Q.    Did you check to -- did you check to see if

4 there were any indications that the m.2 drive had been

5 accessed by Bungie?

6     A.    I believe they accessed it just based on the

7 files -- or the documents provided.

8     Q.    So I'm going to direct you again back to my

9 question.  My question was, did you check the m.2 drive

10 to see if it was accessed by Bungie?

11     A.    I didn't need to check it because it was

12 already provided in the documents -- on one of the

13 documents showing they accessed the C drive, which was

14 the m.2 drive.

15     Q.    So you didn't check it?

16               MR. MANN:  Objection, asked and answered.

17 BY MR. DINI:

18     Q.    You can answer.

19     A.    I already answered the question.

20     Q.    Was the answer to your question that -- my

21 question that you did not check the m.2 drive to see if

22 it had been accessed by Bungie?

23               MR. MANN:  Object to the form of the

24 question.  What does it mean, "check the m.2 drive"?

25 BY MR. DINI:

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 119

1 compromised.

2      Q.    So you did not check it?

3      A.    I didn't have to.  It was already given to me

4 in the documents.

5      Q.    Okay.  You said your old computer had an SSD

6 drive; is that right?

7      A.    Yes.

8      Q.    Did you have any reason to believe that Bungie

9 accessed the SSD drive?

10     A.    They could have accessed it, but I'm not sure.

11     Q.    So you don't know whether Bungie accessed the

12 SSD drive?

13     A.    They could have accessed any files on the

14 computer.  I'm just saying I don't have the information

15 to confirm that they didn't or didn't yet.

16     Q.    Did you check for indications of compromise in

17 the SSD drive after Bungie -- after you allege that

18 Bungie accessed your computer?

19     A.    In the D drive?  I didn't have any -- you're

20 talking about D drive, right.

21     Q.    The SSD drive.

22     A.    Oh, sorry.  SSD drive, which I believe was the

23 D drive, which is -- sorry.  I'll -- just to point that

24 out.  I didn't see anything on the document relating to

25 the D drive.  So no, I did not check anything, but it's

Bungie, Inc. vs Aimjunkies.com, et al.                      James May 03/23/2023

Page 120

1 possible that they could have checked other things on

2 the D drive.

3     Q.    Were you ever unable to use the SSD drive after

4 Bungie accessed it?

5     A.    No.

6     Q.    Was the performance of the SSD drive affected

7 at all after you allege that Bungie accessed it?

8     A.    I don't believe so.

9     Q.    Was the SSD drive one of the drives that you

10 cleaned that we talked about earlier?

11    A.    Yes.  All of the drives were cleaned.

12    Q.    And that includes the m.2 drive?  You wiped --

13 you cleaned that drive, right?

14    A.    Yes, that was the C drive.

15    Q.    And to clarify, "clean" means you wiped the

16 entire hard drives, right?

17    A.    Yes.

18    Q.    All right.  Your old computer had a

19 motherboard, right?

20    A.    Yes.

21    Q.    Do you have any reason to believe that Bungie

22 accessed the motherboard of your old computer?

23    A.    No.

24    Q.    Was there any damage to the motherboard as a

25 result of Bungie's alleged access?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 121

```
 1     A.    No.

 2     Q.    Were you ever -- were you ever unable to use

 3 the motherboard after Bungie accessed it?

 4     A.    No.

 5     Q.    Do you still have that motherboard?

 6     A.    Yes.

 7     Q.    Did you check the motherboard for indications

 8 of compromise after Bungie allegedly accessed it?

 9     A.    No.

10     Q.    You said you had three monitors in [sic] your

11 old computer, right?

12     A.    Correct.

13     Q.    Did you have any reason to believe Bungie

14 accessed any of your three monitors?

15     A.    I'm not sure on that one, if they did or not,

16 but I don't have any evidence, no.

17     Q.    Did you check any of your three monitors to --

18 for any indications of compromise after Bungie allegedly

19 accessed your computer?

20     A.    No.

21     Q.    Were your monitors -- were you ever unable to

22 use your monitors as a result of Bungie's alleged

23 access?

24     A.    No.

25     Q.    Do you still have those monitors?
```

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 122

1    A.    No.

2    Q.    What did you do with them?

3    A.    When I got the new monitors, I got rid of the

4 old ones.   They were way out of date and old.

5    Q.    Did you throw them away?

6    A.    Yes.

7    Q.    You mentioned you had a keyboard as part of

8 your old computer.  Did you have any reason to believe

9 that Bungie accessed your keyboard?

10    A.    No.

11    Q.    Was there any damage to your keyboard as a

12 result of Bungie's alleged access to your computer?

13    A.    No.

14    Q.    Were you ever unable to use your keyboard after

15 Bungie accessed your -- allegedly accessed your

16 computer?

17    A.    No.

18    Q.    Do you still have that keyboard?

19    A.    I'm not sure.  I might still have that

20 keyboard.

21    Q.    Okay.  What about the mouse?  You said that you

22 had a mouse as part of your old computer.  Did you have

23 any reason to believe that Bungie accessed your mouse?

24            MR. MANN:  Object to the --

25    A.    No.

Bungie, Inc. vs Aimjunkies.com, et al.                 James May 03/23/2023

Page 123

```
 1                    MR. MANN:  -- form.  What does access a
 2 mouse mean?
 3                    MR. DINI:  I'm asking James May that.
 4                    MR. MANN:  Okay.  Mr. May, do you
 5 understand that?  What is --
 6                    THE WITNESS:  Yeah, they're asking --
 7                    (Simultaneous crosstalk.)
 8                    MR. MANN:  -- the mouse?
 9                    THE WITNESS:  Yeah, they're asking if
10 they -- like basically -- I don't know, Phil, how to
11 explain it to you, but basically, if they ever --
12                    MR. MANN:  Go ahead and answer the
13 question.
14                    THE WITNESS:  -- got on the computer and
15 accessed the mouse physically or like remotely, if --
16 yeah, is what he's basically asking; if they ever
17 accessed it remotely or something like that.
18 BY MR. DINI:
19      Q.   So did you have any reason to believe that
20 Bungie accessed your mouse?
21      A.   I do not believe so.
22      Q.   Was there any damage to your mouse as a result
23 of Bungie's alleged access to your computer?
24      A.   No.
25      Q.   Were you ever unable to use your mouse after
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 124

1 Bungie allegedly accessed your computer?

2     A.    Sorry.  Can you repeat that one more time?

3     Q.    Were you ever unable to use your mouse after

4 Bungie allegedly accessed your computer?

5     A.    Yes, I was able to use it.

6     Q.    Okay.  Do you still have that mouse?

7     A.    Probably not.

8     Q.    What happened to it?

9     A.    It was bad, so I got rid of it.

10     Q.    Okay.  The last component we talked about of

11 your old computer was the power supply.  Did you have

12 any reason to believe that Bungie accessed your power

13 supply?

14     A.    No.

15     Q.    Okay.  Was there any damage to your power

16 supply as a result of Bungie's alleged access to your

17 computer?

18     A.    No.

19     Q.    Were you unable to use your power supply after

20 Bungie allegedly accessed your computer?

21     A.    No.

22     Q.    Okay.  You also claim that your external hard

23 drive was accessed by Bungie; is that right?

24     A.    Yes.

25     Q.    Did you have any reason to believe that Bungie

Page 125

1 accessed your external hard drive?

2    A.   Yes.

3    Q.   What was that based on?

4    A.   The documents that were provided by Bungie.

5    Q.   Anything else?

6    A.   They could have accessed anything on that drive

7 just -- other than the files if they were able to access

8 that file -- or those files.  They could have poked

9 around any file they wanted to on that drive.

10    Q.   Was there any damage to your external hard

11 drive as a result of Bungie's alleged access to it?

12    A.   No.

13    Q.   Were you ever unable to use that external hard

14 drive after Bungie accessed it?

15    A.   No.

16    Q.   Do you have any reason to believe that Bungie's

17 access to your -- alleged access to your hard drive

18 affected the performance of that hard drive?

19    A.   No.

20    Q.   Do you still have that hard drive?

21    A.   Yes.

22    Q.   Are the files on that external hard drive that

23 you allege Bungie accessed in the same condition that

24 they were after Bungie allegedly accessed them?

25    A.   I believe so.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 126

1    Q.   Have you modified any of the files on that hard

2  drive in the time since Bungie allegedly accessed the

3  hard drive?

4    A.   Yes, I've modified other files, but not the

5  ones that I produced to Bungie.

6    Q.   So, Mr. May, why did you get new hardware if

7  there was nothing wrong with the old hardware, as a

8  result of Bungie's alleged access?

9    A.   Because they could track my old hardware

10 easily.  Anybody can.  It was out there for anybody to

11 see through this whole thing.

12   Q.   Did you find any indications that Bungie was

13 tracking any of your hardware on the computer itself?

14   A.   They said they had hardware ID -- hardware

15 ID-banned me, so they were definitely tracking my

16 hardware.

17   Q.   Did that hardware apply to your monitor?

18   A.   Yes.

19   Q.   So you believe that Bungie was -- was tracking

20 your -- excuse me.  So you believe that Bungie was

21 monitoring your hardware -- or your -- your monitor?

22   A.   I believe that Bungie was monitoring any

23 hardware, as a lot of companies do.  They monitor

24 hardware.

25   Q.   Okay.  Mr. May, can you please identify every

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 127

1 technological measure that you allege Bungie

2 circumvented to access your computer?

3    A.   Yeah, sure.  They got around the firewall by

4 already being on my computer when the game was loaded.

5 I had a VPN on.  I mean, I had several passwords on my

6 work folders.

7    Q.   Any others besides firewall, VPN and passwords?

8    A.   Firewalls, VPN, passwords.  I can't think of

9 any others off the top of my head.

10    Q.   So the only technological measures that you

11 allege Bungie circumvented in accessing your computer

12 are firewalls, VPN and passwords?

13    A.   Correct.  Those are the ones I believe right

14 now.  There could be -- well, I don't know of any other

15 technological measures right now that I had in place.

16 So I believe that's it.

17    Q.   Do you -- that was going to be my next

18 question.  Do you have any technological measures other

19 than those three that protect access to your computer?

20    A.   I believe those are the only ones.

21    Q.   Do you have any technological measures other

22 than firewalls, VPNs or passwords that protect any files

23 or folders on your computer?

24    A.   Yes, I have passwords for my work folders.

25    Q.   Okay.  So -- but that's encompassed within the

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 128

1 passwords we just talked about, right?

2    A.   Oh, yeah.  Sorry.  Repeat the question again,

3 then.  Sorry.

4    Q.   So other than firewalls, VPNs and passwords, do

5 you have any technological measures that protect access

6 to your files or folders on your computer?

7    A.   No.

8    Q.   And were these the technological measures --

9 were these technological measures in place when you

10 allege that Bungie accessed your computer?

11    A.   Yes, they were.

12    Q.   Okay.  Let's start with the firewall.  How does

13 a firewall work?

14    A.   Firewall, you can control traffic coming in and

15 out and block certain traffic coming in and out from

16 ports.  You can do multiple different things with a

17 firewall; allowing certain ports to be available for

18 certain things.

19    Q.   Okay.  Do you have more than one firewall?

20    A.   Yes, I do.

21    Q.   Did you have more than one firewall when you

22 allege that Bungie accessed your computer?

23    A.   Yes.

24    Q.   How many firewalls did you have?

25    A.   Two.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 129

1     Q.    What were those two firewalls?

2     A.    I've got one on my router and then one on

3 Windows, the Windows firewall.

4     Q.    What does the router firewall do?

5     A.    It can do multiple things.  Just depends on how

6 you set it up.  You can control, like I said, any kind

7 of traffic coming in and out -- anyone in and out.  You

8 can give only access to certain ports or IP addresses.

9 It can do a lot of things on there to prevent unwanted

10 access.

11     Q.    How did you have your router firewall set up

12 during the time that you allege Bungie accessed your

13 computer?

14     A.    I had a notification whether to basically --

15 let's see how to put this -- first, I want to make sure

16 I got the question right.  Can you repeat it one more

17 time?  Sorry.

18     Q.    Yeah.  How did you have the router firewall

19 configured when you allege that Bungie accessed your

20 computer?

21     A.    Oh, okay.  Gotcha.  All incoming traffic was

22 set to a certain port and only to this PC.  Everything

23 else was all Wi-Fi and so it was all set up for the

24 physical port on this -- or on the old computer, and so

25 I could control who accesses it and who doesn't.

Bungie, Inc. vs Aimjunkies.com, et al.                           James May 03/23/2023

1    Q.   Did you ever prohibit a program from bypassing

2 your firewall?

3    A.   Before, yes, I've had people try -- well, not

4 programs.  People were trying to access the firewall.

5 I've had DDoS attacks and I've had to block them.

6    Q.   Did Bungie DDoS attack you?

7    A.   I can't say who DDoS'd me, but I've been DDoS'd

8 a lot.  I -- I don't know how to -- several people

9 DDoS'd me.  I can't prove who they are or know who they

10 are.

11    Q.   Okay.  Did you ever grant programs permission

12 to pass through the router firewall?

13    A.   Did I ever grant?  It depends on the program.

14    Q.   Did you ever grant any video game software

15 permission to pass through your firewall?

16    A.   I mean, most games, they just -- they just load

17 up and they're allowed past on a certain port, and if

18 they try to access anything else, usually it's denied

19 automatically, but basically, everything goes through

20 one port and has to go through that.

21    Q.   So help me understand that a little bit.  Mean,

22 so generally, when you play video games, some of those

23 video games connect to the Internet, right?

24    A.   Yes, correct.

25    Q.   Okay.  So does that mean that some traffic

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 related to video game software has to go through your

2 router if it connects to the Internet?

3      A.   Yeah, right.

4      Q.   And sometimes, information leaves your computer

5 and goes out through the router, right?

6      A.   Yes.

7      Q.   And sometimes, information comes from outside

8 your computer through the router into your computer,

9 right?

10      A.   Yes.

11      Q.   Okay.  So you -- and so you understand, for

12 online video games, sometimes information from the

13 server for the video game comes in through that port,

14 right?

15      A.   Yes, correct.

16      Q.   Did you allow any level of access for Destiny 2

17 to go through the router port -- firewall --

18      A.   I don't --

19      Q.   -- through the router firewall?

20      A.   I don't recall at this point, but they would

21 had to have had some access for me to be able to play it

22 online.

23      Q.   Did you play Destiny 2 online?

24      A.   I'm assuming it was online.  I connected to

25 their main starting area.  I don't know if it was

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 132

1 considered online or offline or what it was then.

2    Q.   So did you connect to Bungie's servers when you

3 downloaded and played Destiny 2 online?

4    A.   I downloaded it from Steam, the game.

5    Q.   Okay.  Did you ever grant Destiny 2 permission

6 to bypass your firewall?

7    A.   I don't recall.

8    Q.   So you don't know whether or not you granted

9 Destiny 2 permission to bypass your firewall?

10   A.   I don't recall.  I'm sure they had to have --

11 if they did, they had limited permissions just to be

12 able to play the game online, but there's -- yeah, you

13 can grant them some permissions.  So I probably did, to

14 be able to play it.

15   Q.   So you probably granted at least some

16 permissions to Destiny 2 to access your computer?

17   A.   Probably, yes.

18   Q.   Okay.  And that was through your firewall?

19   A.   They would have had to have gone through the

20 firewall, yes, to -- for me to be able to play it, if it

21 was online, yes.

22   Q.   Okay.  What about the Windows firewall?  How

23 does the Windows firewall work?  And specifically, how

24 is that different from how the router firewall works?

25   A.   Basically, the Windows firewall has less, I

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 don't know, interaction, more -- less permissions than

2 the -- than the -- than the router firewall.  It --

3 basically, it's a lot more simple.  You can basically

4 accept or deny.  It'll come up and say, do you want to

5 allow access to this?  And it'll say "public" or

6 "private," and I always select "private."

7    Q.   **What's the difference between public and**

8 **private?**

9    A.   Private, they can only access certain things,

10 and then private -- or, I mean -- sorry.  Private, they

11 can only access certain things; and public, they have a

12 more wide open of what they can basically access on the

13 computer.

14    Q.   **Do you configure the firewall such that when**

15 **you select "private" -- like I guess -- I guess, can**

16 **you -- can you customly set up what "private" means when**

17 **you grant that private access?**

18    A.   I'm not sure if there was options for it.  I've

19 always just selected "private" on there every time.

20    Q.   **Okay.  And what is your understanding of what**

21 **the private setting allows files that you give that**

22 **access to, to access?**

23    A.   Limited access on what they're allowed access

24 to on the computer.

25    Q.   **What does that mean?  Like what parts of your**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 computer could they access if you grant them --

2     A.   It --

3     Q.   -- that access?

4     A.   Well, there's ways around it, obviously, but

5 they could access anything that's running within the

6 game or on the main -- or within their process.

7     Q.   So if you granted a program private access

8 through the Windows firewall, they could access the --

9 the game process and anything that connected to the game

10 process?

11     A.   Yes.

12     Q.   Okay.  When you downloaded Destiny 2, did you

13 allow it access through the Windows firewall at any

14 level?

15     A.   Yes, probably.  I would have had to have, to be

16 able to play it.

17     Q.   What level of access would you have granted

18 Destiny 2 when you downloaded it to your Windows

19 firewall?

20     A.   Private, so that way, they couldn't access

21 much.

22     Q.   Okay.  If you had selected "public," what would

23 public have granted access to?

24     A.   A lot more.  They could have done a -- easily

25 done a lot more, but their traffic, they could have

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 135

1 pretty much got around anything, trafficwise.

2      Q.   So that means they could have accessed anything

3 on your computer if it was -- if you selected "public"?

4      A.   Yeah, but it's also the same thing as private

5 also.  I mean, they could have -- once they have a

6 process running, they could accessed anything on the

7 computer if they wanted to.

8      Q.   And is that regardless of which firewall

9 setting you choose, or is that dependent on the firewall

10 setting you choose?

11      A.   It's regardless.  Any program like that can

12 access anything on the computer, even without your

13 knowledge.

14      Q.   Once it's been downloaded onto your computer?

15      A.   Yes, it's -- they -- they can access anything

16 they want to while it's running.

17      Q.   Is that common knowledge?

18      A.   Yeah.

19      Q.   You've known that since you started working in

20 computers?

21      A.   Yeah.  Any developer, if they wanted to, they

22 could -- if they have access and you download their

23 program, they could do anything they want to on that

24 computer, as long as they have access to it.  If you

25 have to run a program as administrator or anything like

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 136

1 that, yeah.

2      Q.   Okay.  I want to talk about the VPN now.

3      A.   Okay.

4      Q.   What's a VPN?

5      A.   VPN gives you, basically, a different IP

6 address and, basically, a private network.

7      Q.   How does that protect access to your computer,

8 to have a VPN?

9      A.   So they're not directly -- they're being

10 rerouted.  They're not getting access directly to my IP

11 address --

12      Q.   So it --

13      A.   -- or --

14      Q.   -- restricts access to your IP address?

15      A.   Yes, and it changes my location.  They -- yeah.

16      Q.   Does it restrict access to anything else

17 besides your IP address and location?

18      A.   It might.  I'm not that technical with VPNs.

19      Q.   So you don't know whether or not VPNs protect

20 any other access other than to your IP address and

21 location, right?

22      A.   Correct.

23      Q.   Okay.  Did you have a VPN set up when you

24 allege that Bungie accessed your computer?

25      A.   Yeah, I've had a VPN set up for years.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1    Q.   How did you -- what company -- or what provider

2 did you use for your VPN at that time?

3    A.   Windscribe.

4    Q.   Windscribe?

5    A.   Yes.

6    Q.   Okay.  Is that a subscription or free?

7    A.   Subscription.

8    Q.   And that was the one you used the entire time

9 during the period where you allege that Bungie accessed

10 your computer?

11   A.   Yes.

12   Q.   Did you -- did you ever grant Destiny 2

13 permission to bypass the VPN and get to your true IP

14 address?

15   A.   No.

16   Q.   Is it possible to grant someone true access to

17 your true IP address through the VPN?

18   A.   I don't believe so.  As long as you have VPN

19 running, they can't access it.

20   Q.   Okay.  And then I want to talk about passwords.

21 Where -- what were all of the places where you had

22 passwords set up on your old computer?

23   A.   On my external drive.

24   Q.   Did you have passwords anywhere else on your

25 old computer other than your external drive?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 138

1      A.    Windows log-in and any -- any program that I

2 logged in to.

3      Q.    Okay.  So let's take those one by one.

4      A.    Okay.

5      Q.    So Windows log-in, that's like when you --

6 that's when you boot up your computer, right, and log in

7 as a new user?

8      A.    Yes.

9      Q.    Okay.  So that's one layer of passwords, right?

10     A.    Yes.

11     Q.    Okay.  And there's only one password there,

12 correct?

13     A.    Yes.

14     Q.    And it's a one-time log-in?  Once you log in,

15 you're in until you log out?

16     A.    Yes.

17     Q.    Okay.  And you had that -- you had a password

18 set up the entire time during the time period when

19 Bungie allegedly accessed your computer?

20     A.    Yes.

21     Q.    Okay.  And then you said you had a password on

22 your external hard drive, right?

23     A.    Yes.

24     Q.    How did that work?

25     A.    Basically, I had a password on the folders.  So

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 139

1 I was the only one that had password to access them, and

2 I'd rotate them every couple months.

3     Q.   Okay.  So each folder on your external hard

4 drive had a different password?

5     A.   My work files.

6     Q.   Okay.  So each -- oh.  Each folder that had

7 work files on your external hard drive had a different

8 password?

9     A.   So basically, it was my whole external drive,

10 yes.  I had it --

11    Q.   Okay.

12    A.   -- as password protected, yeah.

13    Q.   Was it -- okay.  Did you have any passwords to

14 open a file in particular, or was it just the folders

15 that had the password protection?

16    A.   Just the folder, the main folder to open

17 everything.

18    Q.   Okay.  And then you -- there was a third

19 password that you mentioned in the layer of passwords.

20 It was on programs or something like that.  What was

21 the -- what was the other password protection that you

22 had on your computer?

23    A.   Oh, I was just talking about logging in to

24 like, say, Steam or any other --

25    Q.   Oh, okay.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 140

 1     A.    Yeah, like --

 2     Q.    Okay.  So these are to log in to third-party

 3 platforms or something like that?

 4     A.    Yeah, exactly, yes.

 5     Q.    Okay.  Got it.  Got it.  That makes sense.  Any

 6 other passwords that would restrict access to your

 7 computer?

 8     A.    I don't believe so, no.

 9     Q.    Okay.  And these were all the technological

10 measures that you had in place to protect access to your

11 computer and personal -- or work hard drive -- external

12 work hard drive during the time period when Bungie

13 allegedly accessed your computer?

14     A.    Yes.

15     Q.    Okay.  How exactly did Bungie circumvent -- how

16 exactly do you allege that Bungie circumvented the

17 firewall?

18     A.    I mean, they already had access while the game

19 was open.  They could get around anything, because once

20 you give them permission -- I don't remember or recall

21 if you had to run as administrative privileges or not

22 for Bungie, but any program like that saw that they had

23 multiple different things that they ran in the

24 background.  They collected data, and they could have

25 accessed anything they wanted to after seeing that.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 141

1    Q.   So once Destiny 2 was downloaded on the

2 computer, it could access anything on your computer that

3 it wanted?

4    A.   While it was running.

5    Q.   While it was running?

6    A.   Yes.

7    Q.   And you downloaded Destiny 2 onto your

8 computer?

9    A.   Yes.

10    Q.   And you knew that it could access anything on

11 your computer once you downloaded it?

12    A.   I was not aware of that, at the time when I

13 downloaded it.

14    Q.   So how did -- I guess, how did Bungie

15 circumvent the firewall particularly?  How did it get

16 around the firewall?

17    A.   By running the game and having access.  While

18 the game was running, they could get around anything.

19 They wouldn't have to ask for permission from the

20 firewall, once it was already running, to download files

21 or access files.

22    Q.   So it never actually had to circumvent the

23 firewall?

24    A.   Once it's running, you're already circumventing

25 it, because you're -- already have access, and you're

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 142

1 downloading things you're not supposed to.

2    **Q.    I'm just trying to figure out how it got around**

3 **the firewall.**

4    A.    That's what I'm trying to figure out from

5 Bungie.

6    **Q.    And what you're saying is that it -- you just**

7 **download it onto your computer, and the act of**

8 **downloading, it got -- by the act of downloading it onto**

9 **your computer, it got around your firewall?**

10    A.    By the act of it running on the computer.

11 While it was running, they could have gotten around

12 anything they wanted to.  It already gets past the

13 firewall when it's running.

14    **Q.    Oh.  So it never even had to circumvent the**

15 **firewall?**

16    A.    In my eyes, it did circumvent the firewall,

17 because they downloaded things while the firewall was

18 running.

19    **Q.    So how -- I guess, explain to me how, in your**

20 **eyes, it circumvented the firewall if it never had to**

21 **actually go around the firewall.**

22    A.    Because the firewall is running --

23             MR. MANN:  Objection.  Mischaracterizes

24 prior testimony, asked and answered.  Object to the

25 form.  Go ahead.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 143

1 BY MR. DINI:

**2     Q.     You can answer.**

3     A.    The program's already running, so therein, it

4 already gets around the firewall.  So they could access

5 anything they wanted to.

**6     Q.     So is the act of you downloading Destiny 2 onto**

**7 your computer, is that the circumvention?**

8     A.    Running the game and them being able to

9 download anything they want to, they're circumventing

10 everything.

**11     Q.     Do you allege that Bungie -- is it your**

**12 allegation that Bungie hacked in to your computer?**

13     A.    I believe they -- they were able to grab files

14 off of my computer while the game was running, yes.

**15     Q.     Is it your allegation that Bungie decrypted**

**16 or -- decrypted your firewall?**

17     A.    I'm saying they got around it.  I'm not saying

18 they decrypted it.  I'm saying they got around it by

19 having it running and they were able to already grab

20 everything.

**21     Q.     How did they get around the firewall?**

22     A.    The game's running.  They didn't have to

23 request access again.  They could access anything they

24 want to.

**25     Q.     Because you downloaded the file onto your**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 144

1 computer?

2    A.   No.  Because the program was running, they

3 could access anything they want to.

4    **Q.   Okay.  So I'm just trying to understand what**

5 **your allegation is that Bungie circumvented**

6 **technological measures.  What -- what was the act of**

7 **circumvention?  What did they circumvent?  How did they**

8 **circumvent?**

9              MR. MANN:  Asked and answered multiple

10 times.  Go ahead.

11    A.   Once the game is running, they're already

12 circumventing it, because they don't have to ask again.

13 BY MR. DINI:

14    **Q.   What did they ask -- what do you mean, ask**

15 **again?  When did they ask the first time?**

16    A.   Well, in the beginning, when you first run it,

17 like I said, if you have to access a multiplayer game,

18 you have to give them some kind of access to be able to

19 play it.  But once it's running -- I didn't know that

20 they'd be accessing all the stuff they did after seeing

21 this.  I would have denied them right away.

22    **Q.   Got it.  Okay.  So is it your allegation that**

23 **Bungie -- Bungie's circumvention was misleading you**

24 **about which -- which -- what information it would be**

25 **collecting?**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 145

1    A.    Oh, a hundred percent, they were misleading on

2 what information they were collecting.

3    Q.    Is that -- is that the basis of the

4 circumvention claim?

5    A.    I'm saying that they got around it and that

6 they got any kind of files they wanted while the game

7 was running.  They could have gotten anything.

8    Q.    They got around it based on an alleged

9 misrepresentation they made to you?  Is that how they

10 got around the firewall?

11    A.    They misrepresented a lot of people in what

12 they collect and don't collect.

13    Q.    Okay.  And so that's the circumvention, is the

14 misrepresentation?

15    A.    I would say that's part of it, yes.

16    Q.    Are there other parts of the circumvention?

17    A.    I mean, they still got around the firewall,

18 like I said.

19    Q.    Okay.  So did Bungie decrypt any encrypted

20 content on your computer?

21    A.    No, because it was already open.

22    Q.    Okay.  Did Bungie -- is it your allegation that

23 Bungie removed any technological measures from your

24 computer -- technological protection measures from your

25 computer?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 146

1      A.    Like, they got around them.  I wouldn't say

2 they removed them.  They --

3      **Q.    Okay.  So they --**

4      A.    -- avoided them.

5      **Q.    They didn't remove them?**

6      A.    They removed files, but not technological

7 measures.

8      **Q.    Okay.  Did --**

9      A.    They got around them.

10     **Q.    Did they deactivate any technological**

11 **protection measures on your computer?**

12     A.    No.

13     **Q.    Okay.  Did it impair any technological measures**

14 **on your computer?**

15     A.    What do you mean by "impair"?

16     **Q.    Did it impede the function of any of the**

17 **technological measures in place on your computer?**

18     A.    I'm not sure how to answer that question.

19     **Q.    Did it cause any of your technological measures**

20 **to malfunction?**

21     A.    Oh, to malfunction?  No.  They just got around

22 them.

23     **Q.    Okay.  So did Bungie avoid any technological**

24 **measures on your computer?**

25     A.    Yes, they avoided them.  They got around them.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 147

1      Q.    How did it avoid or bypass the technological

2 measures on your computer?

3      A.    That's for them to tell me, how they got around

4 it.

5      Q.    I'm asking you what -- what is your belief?

6 What is your allegation that -- how Bungie avoided or

7 bypassed the technological measures?

8      A.    I'm not sure.  That's what I'm waiting for them

9 to tell me, how they got around it.

10     Q.    How did -- what is your allegation about how

11 Bungie avoided the firewall?

12     A.    I already explained that.

13     Q.    What is your allegation for how Bungie avoided

14 the VPN?

15     A.    They didn't have to -- they just got around it.

16 They didn't get my actual IP address.

17     Q.    Okay.  So they didn't actually get around --

18 they didn't avoid the VPN.  They never defeated the VPN;

19 is that right?

20     A.    I don't believe they actually got my real IP

21 address, no.

22     Q.    Okay.  So how did Bungie avoid your passwords?

23     A.    The files were already open as the game was

24 running.  It was already -- the -- the file was already

25 open and running on my computer, like the -- the

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 148

1 Explorer was.  It was already -- the password was

2 already entered.

3      Q.    Who entered the password?

4      A.    I entered the password on the computer, so --

5      Q.    Who was running the process on your computer

6 after you entered the password?

7      A.    Who was running the process?

8      Q.    That was a bad question.  Let me -- let me

9 rephrase.

10     A.    Okay.

11     Q.    So the password protects access to files on

12 your computer, right?

13     A.    Yes.

14     Q.    And did you run -- after you entered the

15 passwords, while the Destiny 2 process was running, did

16 you run those programs that were protected by the

17 passwords on your computer?

18     A.    I ran the programs, yes, and then I closed the

19 window afterwards.

20     Q.    Okay.  So did Bungie ever circumvent the

21 password?

22     A.    I mean, some of those things were never even

23 run and they had access to them, so, yes.

24     Q.    Okay.  Which ones were not running that Bungie

25 had access to?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 149

1    A.   The driver was never actually loaded where they

2 could have seen it.

3    **Q.   What driver are you referring to?**

4    A.   The ReClass kernel.

5    **Q.   Okay.  That's reclasskernel64.sys?**

6    A.   Yes, as it never touches the Destiny process.

7    **Q.   Where -- where is it operating, or what is it**

8 **-- what else -- what is it touching if it's not touching**

9 **the Destiny 2 process?**

10   A.   It's Windows.

11   **Q.   So it's in a -- in a separate memory space, or**

12 **where is it?**

13   A.   Yes.

14   **Q.   Okay.  All right.  I think now is a good time**

15 **for a break.**

16   A.   Okay.

17        MR. DINI:  Why don't we take another ten

18 minutes?  Is that okay?

19        MR. MANN:  Sounds good.

20        THE VIDEOGRAPHER:  Time is 11 a.m.  We're

21 now off the record.

22        (Recess observed, 11:00-11:12 a.m.)

23        THE VIDEOGRAPHER:  Time is 11:12 a.m., and

24 we are back on the record.

25 BY MR. DINI:

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 150

1    Q.   Okay.  Mr. May, I want to go back to

2 Exhibit No. 70, if I could.  So let me pull that up

3 here.  I'll share my screen.

4    A.   Okay.

5    Q.   Okay.  You see Exhibit 70?

6    A.   Yes, I do.

7    Q.   Okay.  So as we talked about earlier, this is a

8 list of all the times that you were banned from Destiny

9 2, right?

10    A.   If that's all the bans, then, yes.  I only see

11 "played on soft banned device."  So I don't know if

12 these were actual bans, but these were logs from them.

13 So like --

14    Q.   Okay.

15    A.   So I'm not sure if these were actual --

16 considered bans or just things they logged.

17    Q.   Okay.  So these were at least instances in

18 which you accessed Destiny 2, right?

19    A.   I believe so, yes.

20    Q.   Okay.  So during each of the events here listed

21 in this Exhibit 70, Destiny 2 was running on your

22 computer, right?

23    A.   For them to get a log like this, yes.

24    Q.   You were using Destiny 2 on your computer

25 during each of the events listed in this Exhibit 70?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 151

 1     A.   Yes.

 2     Q.   During each of the events listed in Exhibit 70,

 3 while Destiny 2 was running on your computer, you had

 4 also opened the files listed in Column 3, right?

 5     A.   Oh.  That I had running?  Yes.

 6     Q.   Okay.  This Exhibit 70 shows that you accessed

 7 Destiny 2 at least 102 times, right?

 8     A.   Is that what it says?

 9     Q.   I'll scroll down here to the bottom.

10     A.   At least 102, yes.

11     Q.   At that time, why did you think you were

12 repeatedly getting banned from Destiny 2?

13     A.   I kind of figured I was hardware banned.

14     Q.   Any other reasons?

15     A.   No, not really.

16     Q.   Why did you keep attempting to access Destiny

17 2, say, after the first 50 times you were banned?

18     A.   Because I was interested in the game engine.  I

19 didn't care if I was getting banned.

20     Q.   Why were you interested in the game engine?

21     A.   I like to see how game engines work, all there

22 was to it on this.

23     Q.   You do anything differently each time you

24 accessed Destiny 2, as shown in this Exhibit 70, to try

25 to not get banned?

Bungie, Inc. vs Aimjunkies.com, et al.                     James May 03/23/2023

 1      A.    I mean, I changed the name of -- or I loaded

 2 another ReClass.  Same thing, changed the name.  That

 3 was it.  Changed the name of it -- name of the file.  So

 4 I kind of figured I was already hardware banned anyways,

 5 because I would get banned without loading anything when

 6 I'd go into the game.

 7      Q.    So one of the things you did, though, was

 8 change the names of the files you were using at the same

 9 time you were using Destiny 2?

10      A.    Yes.

11      Q.    Okay.  You develop cheat software for Phoenix

12 Digital, right?

13      A.    Yes.

14      Q.    When you had fully developed the cheat

15 software, how did you deliver it to Phoenix Digital?

16      A.    I uploaded it --

17            MR. MANN:  Whoa, whoa, whoa.  Time out,

18 time out, time out.  What does have to do with the

19 counterclaims?  What does this have to do with copyright

20 infringement, and why do you need to go over questions

21 that were asked in earlier depositions?

22            MR. DINI:  I'm laying some foundation

23 here, Phil.  I'm just trying to get to my point.

24            MR. MANN:  Okay.  Well --

25            MR. DINI:  I don't have to -- I don't have

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 153

1 to explain that to you.  I can ask my questions and --

2 and get my answers.  But your objections are to form,

3 and that's it at this point.

4              MR. MANN:  Well, no.  This also goes to

5 what Judge Zilly said is the proper scope of these

6 depositions.  Now, again, I'm going to -- I'll let you

7 go into this, but we're not going to have a three-hour

8 do-over on depositions -- testimony that's already been

9 taken.  Please continue.

10 BY MR. DINI:

11     Q.   When you had fully developed the cheat software

12 for Phoenix Digital, how did you deliver it to Phoenix

13 Digital?

14     A.   First, let me specify I never developed a

15 Destiny 2 cheat software, but all other software, I

16 uploaded it from the front page.  There's an upload

17 button.

18     Q.   And when you say "the front page," what --

19 front page of what?

20     A.   AimJunkies.

21     Q.   AimJunkies.com?

22     A.   Yes.

23     Q.   Some of your cheats that you developed for

24 Phoenix Digital were eventually sold on AimJunkies.com,

25 right?

Page 155

1    Q.   When you say "Dave," do you mean David

2 Schaefer?

3    A.   Yes.

4    Q.   Do you know of anyone else that could pull down

5 a cheat once you uploaded it to AimJunkies.com?

6    A.   Well, I'm assuming it's the -- whoever is the

7 current owner of the website now can do it.

8    Q.   Do you know who the current owner of the

9 website is right now?

10    A.   I've been told it's Banek, but I've never had

11 any contact with him.

12    Q.   Been told by who?

13    A.   Dave and all this litigation going on, is how I

14 found out about it.

15    Q.   Prior to this lawsuit, had you ever seen the

16 AimJunkies.com terms of service?

17    A.   Yes.

18    Q.   When?

19    A.   On the website.

20    Q.   When did you see the AimJunkies terms of

21 service on the website?

22    A.   I don't know.  It's been on there for many

23 years.

24    Q.   When was the first time you remember seeing the

25 AimJunkies.com terms of service on the website?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 156

1    A.   I don't recall.  It was years ago.  It was a

2 long time ago.

3    Q.   Can you give me a ballpark?

4    A.   I don't know.  Probably about -- I want to say

5 it was probably -- gosh, I don't even know.  I'm just

6 speculating here.  Maybe 2017.

7    Q.   Had you ever read the AimJunkies.com terms of

8 service prior to this lawsuit?

9    A.   Not really.

10    Q.   Where on the AimJunkies.com website did you

11 encounter the terms of service?

12    A.   It was on the forums.

13    Q.   Was there a particular forum post that had the

14 terms of service, or where was it on the forums?

15    A.   It was posted on the forums under terms of

16 service.

17    Q.   So there was a particular forum thread titled

18 "Terms of Service"?

19    A.   From what I recall, there was at one point.  I

20 don't know how it is now.

21    Q.   Did you click on that forum thread, ever?

22    A.   I believe everyone was required to at one

23 point.

24    Q.   When were you required to click on that forum

25 post titled "Terms of Service" on the AimJunkies

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 157

1 website?

2    A.   I -- I personally clicked on it myself, but

3 I've been told when you buy a cheat, that you have to

4 accept it, but I've never had to buy a cheat.

5    Q.   So were you ever required to click on the

6 AimJunkies terms of service in connection with the

7 AimJunkies.com website?

8    A.   I was not required to click on it, but I did

9 check on it.

10    Q.   But you never read it?

11    A.   No.

12    Q.   Did you ever purchase a cheat through

13 AimJunkies.com?

14    A.   No.

15    Q.   Did you ever go through the purchase process of

16 a cheat on AimJunkies.com?

17    A.   No.

18    Q.   Did you ever see the purchase flow of a cheat

19 software on AimJunkies.com that included the link to the

20 terms of service?

21    A.   No.

22    Q.   Were you ever told that AimJunkies.com's terms

23 of service would apply to cheat software provided by you

24 to Phoenix Digital?

25    A.   I have no idea.  The terms of service were

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 158

1 never discussed with me.  I'm just a provider.  So it

2 really doesn't have anything to do with me.

3     **Q.   Were you aware that a terms of service would**

4 **apply to your cheat software sold through**

5 **AimJunkies.com?**

6     A.   I'm assuming it would, if they had a terms of

7 service.

8     **Q.   I'm asking --**

9     A.   I never read it -- sorry.  I never read it.  So

10 I was not aware, no.

11     **Q.   Okay.  You said that you had used cheat**

12 **software offered on AimJunkies.com before, though,**

13 **right?**

14     A.   Yes.

15     **Q.   You used the AimJunkies.com loader software,**

16 **right?**

17     A.   Yes.

18     **Q.   You testified earlier, in connection with a**

19 **different program, that once a program is downloaded**

20 **onto your computer and running, it can access anything**

21 **on your computer, right?**

22     A.   Oh, any program in general?  Yeah, it's

23 possible it can.

24     **Q.   Yeah.  Does that include the AimJunkies.com**

25 **loader once it's on your computer?**

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 160

 1    A.    Yes.

 2    Q.    Okay.  One second.  I want to pull that

 3 document up just so I make sure that we're on the same

 4 page.

 5    A.    Gotcha.

 6    Q.    One moment, please.  Okay.  Here we go.  I've

 7 got it.  The computer is a little slow.  Okay.  I'm

 8 uploading this to the chat.  This is going to be

 9 Exhibit No. 74.  Nope, it's not letting me -- I will

10 e-mail it separately.  For now, I will show it to you.

11                 (Exhibit 74 marked.)

12    A.    They won't cooperate today.

13 BY MR. DINI:

14    Q.    Yeah, I know.  I'm having technical

15 difficulties.  So, here, I'll share my screen.  Okay.

16 This is Exhibit D to your amended counterclaims, Docket

17 No. 72-4.  You see on the bottom right of Page 2, it

18 says, "Bungie_WDWA_0000367."  You see that?

19    A.    Yes.

20    Q.    Okay.  Is this the other document you're

21 referring to?

22    A.    Yep.

23    Q.    Okay.  So under the notes section here, the

24 second main bullet point, it says, "Running

25 reclasskernel64.sys," right?

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 161

```
 1    A.   Yes.
 2    Q.   Is that the same reclasskernel64.sys from
 3 Exhibit 70 that we were talking about earlier?
 4    A.   Yes.
 5    Q.   And then the file path below that ends with the
 6 file reclasskernel64.pdb; is that right?
 7    A.   Yes, correct.
 8    Q.   Okay.  And is that the same reclasskernel64.pdb
 9 we talked about in connection with your amended
10 counterclaims allegation earlier today?
11    A.   Yes.
12    Q.   Okay.  So this document Exhibit 74 identified
13 by Bungie's document 367, this doesn't identify any
14 other documents -- other files of yours in addition to
15 those from 409?  There's no new -- new files in this
16 document, right?
17    A.   I don't recall if the PDB was in 409.  Was it?
18    Q.   Okay.  That's -- that's fair.  We can check.
19 No.  Okay.  So the PDB file is the only one that's new
20 in Exhibit 74, right?
21    A.   Yes, correct.
22    Q.   Okay.  And we've already talked about that
23 one --
24    A.   Yes.
25    Q.   -- have we not?  Okay.  Okay.  So when you say
```

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 162

1 they were -- that those -- that the files in this

2 document, Exhibit 74, and Exhibit 70 were compromised,

3 you mean that your understanding is that Bungie

4 downloaded copies of those files; made copes of those

5 files?

6    A.   Yes, the only way they could have gotten that

7 string for the PDB was having physical access to that

8 file.

9    Q.   Okay.  That's -- that's what you mean by

10 "compromised," is they copied the file?

11   A.   They copied the reclasskernel64.sys, and that

12 string is inside of the .SYS file.  So the only way they

13 were able to see that string was by having a copy of the

14 driver.

15   Q.   Okay.  So you know that they copied

16 reclasskernel64.sys because you see this file path for

17 reclasskernel64.pdb?

18   A.   Yes.

19   Q.   Okay.  So that's reclasskernel64.sys.  I do

20 want to talk about, then, some of these other files

21 here.  So blah64.exe, how do you -- do you allege that

22 Bungie copied that file too?

23   A.   Yes.

24   Q.   What is the basis of that allegation?

25   A.   They have hashes for everything.  They would

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 done here, but I want to take one more five-minute break

2 just to double-check my notes here.  So let's go ahead

3 and do that.

4            MR. MANN:  No problem.  Thank you.

5            THE VIDEOGRAPHER:  Time is 11:34 a.m.

6 We're now off record.

7            (Recess observed, 11:34-11:40 a.m.)

8            THE VIDEOGRAPHER:  Time is 11:40 a.m., and

9 we are back on the record.

10 BY MR. DINI:

11    Q.   Okay.  Mr. May, when reclass.net.exe and

12 renamedreclass.exe got kernel-level access to a

13 computer's memory, based on the driver that you use, did

14 that grant it access to memory that it otherwise would

15 not have otherwise been able to access?

16    A.   The normal ReClass program?

17    Q.   No, the one that you modified to get kernel

18 access.

19    A.   Which is -- I created the plug-in to give me

20 kernel access, to access any memory.

21    Q.   And so would that give you access to additional

22 memory that you otherwise wouldn't have been able to

23 access with, say, the normal ReClass tool?

24    A.   Well, I didn't have any issues with Destiny.  I

25 could access any memory within Destiny from the normal

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

1 ReClass tool.  But, yes.  Let me answer the question.

2 Sorry.

**3      Q.    Yeah.**

4      A.    You could access -- let's say BattlEye and

5 stuff, they restrict memory at the kernel level.  This

6 would allow me to read memory at the kernel level, same

7 as them, and be able to access it.

**8      Q.    Got it.  Okay.  And then just -- when a file is**

**9 signed, when there's a signature attached to that file,**

**10 does that -- what does that mean?  Does it mean**

**11 anything?  Like does it mean it's passed some certain**

**12 verification, or there's some recognition that it comes**

**13 attached with that signature?  What does that mean**

**14 exactly?**

15      A.    Windows recognizes it as a legitimate file

16 signed by a legitimate company.

**17      Q.    Got it.  Okay.  And then finally, you said that**

**18 you're -- the reason you got a new device is because you**

**19 realized that your device had been compromised and that**

**20 Bungie knew which -- what device was yours, right?**

21      A.    I built -- yeah, I was hardware banned, so I

22 knew it was compromised, which -- the reason I had to

23 get a whole new computer, because the hardware was

24 already compromised, and who knows if they were sending

25 that information out to other developers to track my

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 172

1 hardware.

2     Q.    Now, you recall when you downloaded and played

3 Destiny for the first time, you agreed to Bungie's LSLA.

4 You don't dispute that, right?

5     A.    I don't dispute that.

6     Q.    Okay.  You also don't dispute that you -- as

7 part of agreeing to the LSLA, you agreed to the privacy

8 policy; is that correct?

9     A.    I agreed to the privacy policy along with that

10 because it was included, yes.

11     Q.    Okay.  Okay.  I am showing you what we'll mark

12 as Bungie's Exhibit 75.

13                    (Exhibit 75 marked.)

14 BY MR. DINI:

15     Q.    This is Exhibit B to your amended

16 counterclaims.  Do you see that?

17     A.    Yes.

18     Q.    Okay.  This is the privacy policy that you

19 attached to your amended counterclaims -- Bungie's

20 privacy policy you attached to the amended

21 counterclaims?

22     A.    Yes.

23     Q.    Okay.  If we scroll down here to -- we're in

24 Section 2, "Information We Collect" and "Information We

25 Automatically Collect" -- so this is Section 2,

Bungie, Inc. vs Aimjunkies.com, et al.                James May 03/23/2023

Page 173

1 Subsection B.  We're on the bottom of Page 4 of

2 Exhibit 75.  It says -- one of sections here is "Device

3 Data," right?

4      A.    Yes.

5      Q.    All right.  So this is Bungie disclosing to you

6 that it collects device data, right?

7      A.    Which would be the hardware information,

8 devices on the hardware, yes.

9      Q.    Exactly.  So when it says it collects your

10 device ID, it's referring -- you knew that Bungie was

11 collecting your device ID, right?

12     A.    Most -- most companies collect hardware data

13 these days.  So I -- like I said, in the beginning, I

14 never read it in the beginning.  But after -- once this

15 lawsuit started, I did.  So yes, I -- it's standard

16 practice among the industry now to collect hardware

17 data.

18     Q.    And it was standard practice when you accepted

19 this privacy policy, right?

20     A.    Yeah, just for my device ID.

21     Q.    Right.  And so you knew that Bungie attributed

22 a particular device to you, right?

23     A.    Yes.

24            MR. DINI:  Okay.  I have no further

25 questions at this time, Phil.

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

 1                    MR. MANN:  Okay.  We have no

 2 cross-examination, and we will reserve signature.

 3                    THE VIDEOGRAPHER:  Kathy, do you need

 4 anything else on the record?

 5                    THE COURT REPORTER:  No.  I'll ask for

 6 production of transcripts when we go off.

 7                    THE VIDEOGRAPHER:  Counsel Mann, no video

 8 again?

 9                    MR. MANN:  No.  Again, we're not

10 requesting a transcript.  We are not requesting a video.

11 If that changes, we will let you know, but we do not

12 want one automatically.

13                    THE VIDEOGRAPHER:  Okay.  Then --

14                    THE WITNESS:  Oh, Jake, I want to thank

15 you for being very professional, too, in this.  Thank

16 you.  I'm just saying, honestly.

17                    MR. DINI:  Thanks, Mr. May.  I appreciate

18 that.

19                    MR. MANN:  Uh-huh.  Thank you.

20                    THE VIDEOGRAPHER:  I'll go ahead and take

21 us off the record.  The time is 11:45 a.m.  We're now

22 off the record.

23                    (Signature reserved.)

24                    (Deposition concluded at 11:45 a.m.)

25

Bungie, Inc. vs Aimjunkies.com, et al.                    James May 03/23/2023

Page 178

1                    REPORTER'S CERTIFICATE

2        ORAL VIDEOTAPED ZOOM DEPOSITION OF JAMES MAY

3                        March 23, 2023

4

5        I, the undersigned Registered Professional Reporter,

6   certify that the facts stated in the foregoing pages are

7   true and correct.

8        I further certify that I am neither attorney or

9   counsel for, related to, nor employed by any parties to

10  the action in which this testimony is taken and,

11  further, that I am not a relative or employee of any

12  counsel employed by the parties hereto or financially

13  interested in the action.

14        SUBSCRIBED AND SWORN TO under my hand on this the

15  28th day of March, 2023

16

17

18

19

20

21                        _____
                          Debra K. Zebert, BS, RPR, CSR
                          RPR No. 839015
22                        Expiration:  12/31/23

23

24

25

# EXHIBIT 32

## Swifty (AimJunkies)
Friday, September 21, 2018    8:23 AM

### Identification

| | |
|---|---|
| Real Name | James May |
| Aliases | Swifty, Swiftly<br>jjmay899<br>Sycore, sycone |
| Username<br>Computer | James<br>DESKTOP-14RNIQL |
| Location | Dayton, Ohio |
| Address | (tied via email via<br>https://www.usphonebook.com/james-may/UUzlAzYTO4 czN1gJN3gJMzETN3MzR)<br><br>2217 Polo Park Dr<br>Dayton, OH<br>45439-3268 |
| DOB | |
| Emails | james.q3abc@gmail.com (verified) |

### Tags
•

### Activities
- Reverse Engineering
- Cheat Engine
- IDA
- Cheat Development

### Media Profiles
- https://myspace.com/swiftlovesnappy

### Profile Images
site
[img]

### Recent IPs
- 67.219.146.74
- 67.219.146.72
- 174.97.110.18
- 67.219.146.77

### Active Accounts

| Account ID | Tag | Ban Reason | Email | Notes |
|---|---|---|---|---|
| | | | | |

### Banned Accounts

| Account ID | Tag | Ban Reason | Email | Notes |
|---|---|---|---|---|
| 4611686018498316514 | Swifty | | james.q3abc@gmail.com | |

### Device IDs
-- AAAAAAAAAAAAAAAAAAAAAAAAAAAAAAA BBBBBBBBBBBBBBBBBBBBBBBBBBBBBB CCCCCCCCCCCCCCCCCCCCCCCCCCCCCC DDDDDDDDDDDDDDDDDDDDDDDDDDDDDD EEEEEEEEEEEEEEEEEEEEEEEEEEEEEE
02 CBBF42A46SA8A4BE9FFE725F09B80AFD 2ECCABCCCA73B6DCBEF3C7F7D01F2528 383343ED0E741889595910303AD7D9E2 55FBB25CDA0711E9B5E26045C89A5458 F8CC9BCB772EFD79BAA71915E9A0F976
02 CBBF42A46SA8A4BE9FFE725F09B80AFD E4C75AEE914F37ED13A3A2E01C3DC7 383343ED0E741889595910303AD7D9E2 55FBB25CDA0711E9B5E26045C89A5458 F8CC9BCB772EFD79BAA71915E9A0F976
02 CBBF42A46SA8A4BE9FFE725F09B80AFD F7FD31D1A4AC7B1218D5F3F8E4F471FF 383343ED0E741889595910303AD7D9E2 55FBB25CDA0711E9B5E26045C89A5458 F8CC9BCB772EFD79BAA71915E9A0F976
02 CBBF42A46SA8A4BE9FFE725F09B80AFD 6B5F7C13BEEA11E9AAE7B06E6F6E0963 383343ED0E741889595910303AD7D9E2 55FBB25CDA0711E9B5E26045C89A5458 F8CC9BCB772EFD79BAA71915E9A0F976

### Tickets
- TT Machines: 8A83A649CDD44D, 77B8DF03B02519
- http://tickettrack/Ticket/Ticket.aspx?id=Tiger&id=118663444 (overlay)

### Notes
Shows additional proof Swifty and James are tied:
https://steamidfinder.com/lookup/76561198003342345/

Running reclasskernel64.sys
C:\Users\James\Desktop\ReClass.NET-KernelPlugin-master\bin\ReClassKernel64.pdb
Signed by "Phoenix Digital Group LLC" which is associated with AimJunkies

COD cheat development tied via email:
https://forum.mombotcheats.com/archive/index.php?t-215.html&__cf_chl_jschl_tk__=af5d679acc38520eda31385166644850c5279d9e-1614637127-0-AcIZ1WhW7j54B5NhwG7EB3Kd|hFclIv9CwaeBiR5RdOct1Bsg7ANU9X_Yyh7KbnPuPd6CfeI0Z0dKJuFM_GwxxpDbFbdS4IrnOm48PrxfMEvn1pWx_x1QLDrYE_rIMHcsqDmc8ICSiQawlDtzE0nf_sJBPoVENAswUKUhTpF1O_ssbJFFbFg1rHEsHdpNsR2xF_leibZaGa_GOAA-eHI0S_sLIsLcs-Fs-LbUvSW3tbq1mbH34dla3LxR8z69SiGSD6ozWffvFQ-0ncGJxepV7OcH53u78bepucROOGIrn4Je-uHxL18cfieEHqXNEUsNN2TW2mRnVf3BOex2A

Above post references this youtube channel (which appears to belong to associate or alternate persona "berlske" which also posted in the above thread):
- https://www.youtube.com/user/berlsko91/videos
- Video description references to AimJunkies

BUNGIE_WDWA_0000367

# EXHIBIT 33

THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BUNGIE, INC., a Delaware corporation,<br><br>Plaintiff<br><br>v.<br><br>AIMJUNKIES.COM, a business of unknown classification; PHOENIX DIGITAL GROUP LLC, an Arizona limited liability company; JEFFREY CONWAY, an individual; DAVID SCHAEFER, an individual; JORDAN GREEN, an individual; and JAMES MAY, an individual,<br><br>Defendants. | Cause No. 2:21-cv-0811 TSZ<br><br>**DEFENDANT JAMES MAY'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 8** |

Pursuant to Federal Rule of Civil Procedure 26, 33 and 34, Defendant James May ("Mr. May") hereby supplements his response to Plaintiff Bungie's Interrogatory No.8 as follows:

### GENERAL OBJECTIONS

Mr. May's General Objections set out in his RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES NOS. 6-8 served March 3, 2023 are incorporated as if set out fully herein.

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ

Page 1

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA 98110
Phone: 206.436.0900

1

**SUPPLEMENTAL RESPONSE**

2

3   **INTERROGATORY NO. 8**:

4   Calculate and provide the basis for each category of your alleged damages, specifying

5   how you reached those calculations, including but not limited to the fair value of your time.

6   **RESPONSE:**

7   See paragraphs 35 and 36 of Mr. May's Amended Counterclaim filed November 21,

8   2022.

9   **SUPPLEMENTAL RESPONSE:**

10   Mr. May's damages suffered as a result of Bungie's unauthorized access to and

11   retrieval of Mr. May's confidential and private computer files include, but are not limited to,

12   his spending in excess of $2702 to purchase new computers and drives, and spending in

13   excess of 40 hours reviewing files for indication of compromise, cleaning such files when

14   detected,  and getting the new computer set up and ready for work, all incurred at the fair

15   value of his time of at least $75 per hour.   The value of Mr. May's time is based, in part, on a

16   survey of prices charged by computer technicians and consultants in the Dayton, Ohio area for

17   services rendered in setting up new computers, scanning for viruses and malware installed by

18   others and taking corrective action.  Mr. May has incurred further damages in an amount to be

19   determined at trial.  Mr. May may supplement this answer as discovery continues and more

20   information is brought to his attention.

21   Dated March 14, 2023.

22   _/s/ Philip P. Mann_
     Philip P. Mann, WSBA No: 28860

23   **Mann Law Group PLLC**
     403 Madison Ave. N. Ste. 240

24   Bainbridge Island, Washington  98110
     Phone (206) 436-0900

25   phil@mannlawgroup.com
     Attorneys for Defendants

26

27

28

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Phoenix Digital Response to First Set of ROGS
Cause No. 21-CV-0811-TSZ                          Page 3

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

**Verification**

2

3                             **AS TO SUPPLEMENTAL RESPONSE:**

4        James May, being duly sworn, deposes and says that he is one of the Defendants in the

5 above-captioned action, that he has read the foregoing response by him subscribed, that said

6 response was prepared with the assistance of counsel upon which he has relied and is based

7 on his experiences and knowledge, and that subject to said limitations, the response is true,

8 correct and complete to the best of his information and belief.

9

10        DATED this 14th day of March, 2023.

11

12

13                                         James May

14      **AS TO OBJECTIONS:**

15

16                               /s/ *Philip P. Mann*

17                               Philip P. Mann

18

19

20

21

22

23

24

25

26

27

28

Mᴀɴɴ Lᴀᴡ Gʀᴏᴜᴘ ᴘʟʟᴄ
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

1

## <u>CERTIFICATE OF SERVICE</u>

2

3       I hereby certify that on March 14, 2023, I caused the foregoing document to be

4    electronically mailed to counsel of record as follows:

5    WRava@perkinscoie.com

6

7    JDini@perkinscoie.com

8    CMarcelo@perkinscoie.com

9
                                                    *s/ Philip P. Mann*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mann Law Group pllc
403 Madison Ave. N. Ste. 240
Seattle, WA  98110
Phone:  206.436.0900

# EXHIBIT 34

# Terms of Service

---

# AimJunkies Terms of Service

We reserve the right to change these Terms of Services at any time, without notification or otherwise. It is your responsibility to be aware of any changes.

# Access to our Services

By accessing our website, you are agreeing to our Terms of Service and Privacy Policy.

We are granting you use of our Services. This does not grant you ownership or otherwise of any Service offered here. We may terminate your access to our Services at any time for any reason.

By using our Services, you understand that we may send you account status notifications, announcements and other messages and information. You may opt out of some of these.

## Your Account

In order to acquire a Subscription or use our Service, an account is required. You are responsible for all activity that happens with your account. Violation of our Terms of Service or any other rules or policies may result in the termination of your account.

Please keep your account and password to yourself. Do not share your password or use your password on other websites or services.

# Subscriptions

## Purchasing

By making a purchase through this website, you agree to the following:

– that you are over the age of 18 or have the permission of someone over the age
of 18 that can purchase on your behalf
– to authorize funds to be charged via the payment processor chosen at checkout
– that you will not attempt to transfer your subscription to someone else
– that, in order to maintain access to our Services, you will pay any fees incurred

## Recurring Subscriptions

A recurring subscription is a profile created that will automatically charge your
chosen payment method at a given interval.
If you purchase a recurring subscription, it is your responsibility to cancel the
recurring subscription profile when you no longer want the subscription.

## Refunds and Chargebacks

Refunds are not granted for non-availability or non-access to purchased
subscriptions and products. Any refunds issued are at the sole discretion of the
website administration.

If a chargeback or dispute is filed by your account for any reason, we reserve the
right to block your access to this website and ban any payment method that you
have used. Accounts with a chargeback or dispute may be automatically banned or
blocked from having access to our Services.

A chargeback or dispute ban may be lifted by the site administration upon
repayment of a reversed subscription and fees as decided by the site
administration.

## Subscription Extensions

Extensions to subscriptions are automatically granted when a subscription is listed
as non-available. Additional subscription extensions are at the discretion of the site
administration.

## Subscription Modifications

Typically, subscription modifications and changes are permitted as follows:

– one subscription change per purchased subscription

– subscription may be changed for one at an equal or lesser value

All subscription changes or modifications are at the discretion of the site administration.

# Proper Use of our Services

Our Services include the use of private software, provided by AimJunkies. These Services must be used in the proper way. Failure to use these Services in the proper way may result in the termination of your Account or access to our Services.

You shall not copy, distribute, reproduce, or display, or use any part of our software except as expressly authorized herein.

You are allowed to download and use our software on one computer. This use may be transferred to another computer with the proper documented authorization, but may only be used on one computer at a time. Our software will be locked to your computer with the use of hardware identification.

Unless explicitly authorized by AimJunkies, our Services and our software may not be sold, resold, leased, rented, licensed, distributed, transferred, or used in any commercial way.

You shall not modify, hack, decompile, disassemble, reverse engineer, derive source code, or create derivative works of our software, in part or in whole. You shall not transmit our software or display the software's object code on any computer screen or to make any hard copy memory dumps of the software's object code.

You shall not remove, disable, or circumvent proprietary messages, notices, or labels within our software.

Any explicit and intentional misuse of our Services or our software may result in legal action being investigated.

You agree that the use of this software is explicitly intended for offline use or single player use and not intended for live game PvP or tournaments. Any use beyond

that is forbidden and AimJunkies is not legally liable.

U.S. federal law treats the unauthorized uploading, downloading, or sharing of copyrighted material as a serious offense that carries serious consequences. Any AimJunkies computer software account holder who infringes copyright laws risks a lawsuit by the copyright holder; this includes AimJunkies software. You shall not export our software in violation of any applicable laws or regulations of the United States government.

## Disclaimer and Liability

Our Services and software are provide "as is." We provide no warranty in any shape or form for the use of our Services. We are not responsible for any action or consequence as a result of using our Services.

## Additional Information

If you feel that your user experience was not up to your expectations in any way, please feel free to email us at admin@aimjunkies.com. All correspondence will be looked into.

### Copyright Protection

Our website complies to the fullest extent with 17 U.S.C. § 512 and the Digital Millennium Copyright Act ("DMCA"). It is within our policy and rights to respond accordingly to any infringement notices, as well as take any and all appropriate actions under the Digital Millennium Copyright Act ("DMCA") and any other applicable property laws.

# PRIVACY POLICY

## What information do we collect?

We collect information that you give to us. This includes information such as your email address when you create an account.

We collect information when you use our services. When you use our software, we collect information to identify the devices used. We collect information that allows us to diagnose and improve our software.

We collect records of use of our website and services.

We DO NOT collect sensitive financial information, such as credit card numbers. Payment processing is provided by third-party services. As a result, we do not directly access or store your sensitive financial information.

# What do we do with this information?

We use this information to provide access to our Services, as well as improve them.

# How do we share this information?

The information we collect may be accessed by affiliates and partners of our website.

We do not sell, trade or otherwise transfer private information to other outside parties, except in cases where we believe it is appropriate to comply with the law, enforce our Terms of Service and other policies, or protect ours or others rights, property, or safety.

Non-identifying and non-personal aggregate information may be provided to other parties for marketing, advertising, or other uses.

# FAIR USE ACT DISCLAIMER

Under section 107 of the Copyright Act of 1976, allowance is made for "fair use" for purposes such as criticism, comment, news reporting, teaching, scholarship, education and research.

Fair use is a use permitted by copyright statute that might otherwise be infringing.

Fair use is a doctrine in the United States copyright law that allows limited use of copyrighted material without requiring permission from the rights holders, such as commentary, criticism, news reporting, research, teaching or scholarship. It provides for the legal, non-licensed citation or incorporation of copyrighted material in another author's work under a four-factor balancing test.

Terms of Service

© 2020 AimJunkies

# EXHIBIT 35

THE HONORABLE THOMAS S. ZILLY

1

2

3

4

5          UNITED  STATES  DISTRICT  COURT
       FOR THE WESTERN  DISTRICT  OF WASHINGTON

6

7    BUNGIE,  INC.,  a Delaware corporation,

8                                              Plaintiff        Cause No. 2:21-cv-0811 TSZ

9                                                              **DEFENDANT  PHOENIX
                                    v.                         DIGITAL GROUP LLC'S**
10                                                             **SUPPLEMENTAL   RESPONSE**
                                                               **TO PLAINTIFF'S**
11   AIMJUNKIES.COM,  a business of unknown                    **INTERROGATORY  NO. 10**
     classification; PHOENIX DIGITAL  GROUP
12   LLC, an Arizona limited liability company;
     JEFFREY CONWAY,  an individual; DAVID
13   SCHAEFER,  an individual; JORDAN GREEN,
     an individual; and JAMES MAY, an individual,
14
                                          Defendants.
15

16        Pursuant to Federal Rule of Civil Procedure 26, 33 and 34, Defendant Phoenix Digital

17   Group LLC ("Phoenix Digital") hereby supplements its response to Plaintiff Bungie, Inc.'s

18   Interrogatory No. 10  as follows:

19

20                            **GENERAL OBJECTIONS**

21        Phoenix Digital's General Objections set out in its RESPONSES TO PLAINTIFF'S

22   SECOND  SET  OF  INTERROGATORIES  NOS.   8-10  served  March  3, 2023  are

23   incorporated as if set out fully herein.

24

25

26

27

28

1

2

**SUPPLEMENTAL RESPONSE**

<u>**INTERROGATORY NO. 10**</u>:

3    Calculate and provide the basis for each category of Phoenix Digital's alleged damages,

4 specifying how Phoenix Digital reached those calculations.

5    **RESPONSE:**

6    See Paragraph 75 of Phoenix Digital's of First Amended Counterclaim.  Phoenix Digital

7 will supplement its answer to this interrogatory as more information becomes avaialabel.

8    **SUPPLEMENTAL RESPONSE:**

9    Bungie's breach of the express terms of the Phoenix Digital Terms of Service has caused

10 and is continuing to cause harm and damage to Phoenix Digital.  Such damages include but are

11 not limited to investigating and responding to inaccurate and factually baseless claims by

12 Bungie, both in and outside of court, that Phoenix Digital has engaged in unlawful conduct

13 when it has not, which accusations have diminished the fair market value of Phoenix Digital's

14 "aimjunkies" website, resulting in Phoenix Digital's sale of the website at a price lower than

15 that that would have been realized had Bungie not breached the applicable Terms of Service

16 and not made false and harmful accusations against Phoenix Digital and its Officers and

17 Directors.

18    Phoenix Digital' legal fees and expenses in defending the false accusations against it

19 stand, at present, at at least $206,116.50 and are expected to climb as the case continues.

20    The value of the "aimjunkies.com" website declined from a high of $6,384,000 in 2019

21 before Bungie's lawsuit was filed to $1,920,000 in 2021 when the lawsuit was filed and

22 Bungie's allegations against Phoenix Digital became public, ultimately falling to $7000 when

23 the website was sold for that amount in May, 2022.

24    Dated March 15, 2023.

25    */s/ Philip P. Mann*

26    Philip P. Mann, WSBA No: 28860
   **Mann Law Group PLLC**

27    403 Madison Ave. N. Ste. 240
   Bainbridge Island, Washington  98110

28

Phoenix Digital Supplemental Response to
Interrogatory No. 10                    Page 2
Cause No. 21-CV-0811-TSZ

MANN LAW GROUP PLLC
403 Madison Ave. N. Ste. 240
Bainbridge Island WA  98110
Phone:  206.436.0900

Phone (206) 436-0900
phil@mannlawgroup.com
Attorneys for Defendants

Phoenix Digital Supplemental Response to
Interrogatory No. 10
Cause No. 21-CV-0811-TSZ

Page 3

MANN LAW GROUP PLLC
403 Madison Ave. N. Ste. 240
Bainbridge Island WA  98110
Phone:  206.436.0900

**Verification**

**AS TO RESPONSES TO INTERROGATORIES:**

David Schaefer, being duly sworn, deposes and says that he is the President of Phoenix Digital Group LLC, Defendant in the above-captioned action, that he has read the foregoing response by him subscribed, that said response was prepared with the assistance of counsel upon which he has relied and is based on his experiences and knowledge, and that subject to said limitations, the response is are true, correct and complete to the best of his information and belief.

DATED this 15th day of March, 2023.

_____
David Schaefer

**AS TO OBJECTIONS:**

_/s/ Philip P. Mann_
Philip P. Mann

Phoenix Digital Supplemental Response to
Interrogatory No. 10                    Page 4
Cause No. 21-CV-0811-TSZ

MANN LAW GROUP PLLC
403 Madison Ave. N. Ste. 240
Bainbridge Island WA  98110
Phone:  206.436.0900

1

## <u>CERTIFICATE OF SERVICE</u>

2

3    I hereby certify that on March 15, 2023, I caused the foregoing document to be

4 electronically mailed to counsel of record as follows:

5 WRava@perkinscoie.com

6

7 JDini@perkinscoie.com

8 CMarcelo@perkinscoie.com

9                                                                   *s/ Philip P. Mann*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mann Law Group PLLC
403 Madison Ave. N. Ste. 240
Bainbridge Island WA  98110
Phone:  206.436.0900

# EXHIBIT 36
# REDACTED



**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| **BUNGIE, INC.** | **SUPPLEMENTAL EXPERT REPORT OF DREW E. VOTH** |
| **Plaintiff,** | **April 21, 2023** |
| **v.** | **Case No.: 2:21-cv-811** |
| **AIMJUNKIES.COM; PHOENIX DIGITAL GROUP LLC; JEFFREY CONWAY; DAVID SCHAEFER; JORDAN GREEN; and JAMES MAY** | |
| **Defendants.** | |

*Supplemental Expert Report of Drew E. Voth*

## Table of Contents

I. Nature of Involvement ................................................................................................................. 3

II. Summary of Supplemental Opinions ....................................................................................... 4

III. Basis for Supplemental Opinions .......................................................................................... 5

    III.1 Phoenix Tax Returns ......................................................................................................... 5

    III.2 Defendants' Counterclaims ............................................................................................... 6

IV. Conclusion ............................................................................................................................ 10

## Exhibits

Exhibit 1   Curriculum Vitae, including Testimony, Speeches, and Publications of Drew E. Voth

Exhibit 2   Documents Considered

*Supplemental Expert Report of Drew E. Voth*

## I. Nature of Involvement

1.      I have been engaged as a damages expert on behalf of Bungie, Inc. ("Bungie" or "Plaintiff") in this matter versus AimJunkies.com ("AimJunkies"), Phoenix Digital Group LLC ("Phoenix"), Jeffrey Conway, David Schaefer, Jordan Green, and James May (or collectively, "Defendants") to provide my opinions on economic damages in this matter.

2.      I submitted an initial report in this matter on November 21, 2022 ("Initial Report") in which I expressed my opinion that the evidence made available to me at that time showed Defendants' sales revenue of alleged infringing Destiny 2 products totaled $43,210.  That opinion has not changed.  Since my Initial Report, additional discovery has taken place and new documents have been provided to me, including some Phoenix tax returns and the deposition of David Schaefer, both in his individual capacity and as Phoenix's 30(b)(6) witness in this federal court matter.  Based on this new information, Bungie's counsel has requested that I submit this supplemental report to address this new information and certain aspects of Phoenix's counterclaims.

3.      My Initial Report opinion and analyses have not changed, and I incorporate the Initial Report herein by reference.  My Initial Report includes sections on my credentials, compensation, background of the case, and other sections compliant with F.R.C.P. 26(a)(2) that I do not repeat herein.

4.      I offer no opinions on liability, and have necessarily assumed liability for purposes of any damages calculations.

5.      My opinions in this matter are based upon my judgment, training, education, and expertise in financial and damages analyses, my analysis, as well as my assessment of documents that have been provided to me, as shown in attached Exhibit 2, or otherwise referenced in this report. In some cases, where only a portion of a document might be cited in this report, I reserve the right to rely on the entire document. I may present or

*Supplemental Expert Report of Drew E. Voth*

utilize portions of this report and/or the documents I have considered as demonstratives in support of testimony.

## II. Summary of Supplemental Opinions

6.      Phoenix has produced tax returns for 2019 and 2020.  These tax returns appear to contain errors and, regardless, do not contain sufficient detail from which to allocate any costs to the sales revenue earned from Destiny 2 sales by Defendants.

7.      Defendants' counterclaims apparently include a damages theory that the June 16, 2021 filing of Plaintiff's initial complaint in this matter has caused them harm in the form of lost customer trust, lost market share, lost sales, and lost business value due to alleged false claims made therein.[1]  Mr. Schaefer calculated Defendants' damages claim, which is described as, "The value of the 'aimjunkies.com' website declined from a high of $6,384,000 in 2019 before Bungie's lawsuit was filed to $1,920,000 in 2021 when the lawsuit was filed and Bungie's allegations against Phoenix Digital became public, ultimately falling to $7,000 when the website was sold for that amount in May, 2022."[2] Based on my analysis, Defendants' counterclaim damages calculation is not supported by the data provided in this case, was not prepared in accordance with accepted valuation standards, and is counterfactual to Defendants' own financial data and other publicly available data.

8.      I reserve the right to update and/or amend my opinions based on additional information I receive subsequent to this disclosure.

---

[1] 30(b)(6) Deposition of Phoenix Digital Group, LLC, pp. 76-77, and Defendant Phoenix Digital Group, LLC's Supplemental Response to Plaintiff's Interrogatory No. 10.
[2] 30(b)(6) Deposition of Phoenix Digital Group, LLC, pp. 85-91, and Defendant Phoenix Digital Group, LLC's Supplemental Response to Plaintiff's Interrogatory No. 10.

*Supplemental Expert Report of Drew E. Voth*

## III. Basis for Supplemental Opinions

### III.1 Phoenix Tax Returns

9.      As I discussed in my Initial Report, I understand it is Defendants' burden to prove any deductible costs from relevant sales in the determination of Defendants' profits relating to sales of Destiny 2 products.  Based on my analysis of Phoenix's tax returns for 2019 and 2020,[3] which I understand were the only tax returns produced, it is not possible to isolate any particular costs to Destiny 2 products, as no individual products are separately reported in Phoenix's consolidated tax return cost data.

10.      In addition, the cost information that is reported in Phoenix's tax returns appears erroneous based on the ratio of Cost of Goods Sold to Gross Sales, as shown in the table below:



11.      As shown above, in 2019 Phoenix reported Cost of Goods Sold amounts that were ██ of Gross Sales, while in 2020 this ratio increased to ██ of Gross Sales.  In my experience, this inconsistency suggests an error in the data provided by Phoenix to its tax

---

[3] PDG00097-98.

*Supplemental Expert Report of Drew E. Voth*

preparer.  At the least, I am not aware of any evidence of any changes in Phoenix's underlying operations that would yield such a drastic change.

### III.2 Defendants' Counterclaims

12.     Defendants' counterclaims apparently include a damages theory that the filing of Plaintiff's initial complaint in this matter has caused them harm in the form of lost trust, lost market share, lost sales, and lost business value due to alleged false claims made therein.[4]  Mr. Schaefer calculated Defendants' damages claim, which is described as, "The value of the 'aimjunkies.com' website declined from a high of $6,384,000 in 2019 before Bungie's lawsuit was filed to $1,920,000 in 2021 when the lawsuit was filed and Bungie's allegations against Phoenix Digital became public, ultimately falling to $7,000 when the website was sold for that amount in May, 2022."[5]

13.     Based on my analyses, Mr. Schaefer's valuation is not performed using accepted valuation methods, is inadequately supported, and is counterfactual to Phoenix's own financial data and other publicly available data, which Mr. Schaefer did not analyze.

14.     Mr. Schaefer testified that, while he is not a valuation expert, he calculated the 2019 and 2021 values above by multiplying Phoenix's sales revenue by the same sales revenue multiplier.  For example, although he did not state what that multiplier was, where he obtained it, nor why it would be applicable in any way to Phoenix,[6] 2019 sales from Phoenix's tax return of ███████ equals the claimed value of $6.4 million when multiplied by a multiplier of ██ sales.  Dividing the 2021 claimed value of $1,920,000 by an █ multiplier suggests the sales base used in Mr. Schaefer's calculation was about ████████.

---

[4] 30(b)(6) Deposition of Phoenix Digital Group, LLC, pp. 76-77, and Defendant Phoenix Digital Group, LLC's Supplemental Response to Plaintiff's Interrogatory No. 10.
[5] 30(b)(6) Deposition of Phoenix Digital Group, LLC, pp. 85-91, and Defendant Phoenix Digital Group, LLC's Supplemental Response to Plaintiff's Interrogatory No. 10.
[6] 30(b)(6) Deposition of Phoenix Digital Group, LLC, p. 89.

*Supplemental Expert Report of Drew E. Voth*

Phoenix has not produced any financial data supporting a ███████ annual revenue figure at any time for the year 2021.  As a valuation expert with over 30 years of experience in valuing businesses, it is my opinion that Mr. Schaefer's valuation method is not accepted, is incorrect, and would not be expected to yield reasonable or reliable valuation results for various reasons that I discuss below.

15.     First, multiplying sales revenue by an appropriate sales revenue multiple is only one step in a properly performed valuation.  A valuation according to accepted standards would include numerous other steps, such as identifying the standard of value, the premise of value, the valuation dates, and potentially other valuation approaches and methods, to name a few.[7]  A simple multiplication of sales revenue by a multiple of sales revenue would not take into account many potential valuation adjustments, such as excess cash, debt, working capital, or others that would likely impact the ultimate value conclusion.

16.     Second, because Mr. Schaefer did not explain his valuation multiple, including its numeric value, where he obtained it, nor why its source would be applicable to Phoenix, it is inadequately supported, and it is not possible for me or anyone to evaluate it.  Further, a quick search of the BVR DealStats transaction database[8] yields sales multiples as low as 0.15x sales revenue for "gaming software" or "software distribution" transactions, and an average of 1.63x, both far below the apparent █ multiple used by Mr. Schaefer.

17.     Third, it is unlikely that the valuation multiple would remain unchanged between Mr. Schaefer's valuation dates in 2019 and 2021.  Valuation multiples typically change

---

[7] See, for example, the Professional Standards published by the National Association of Certified Valuators and Analysts® (NACVA®) (NACVA_Professional_Standards_Incl_Review_Stnds_Effective_6-1-17_Final.pdf).

[8] This is a subscription service that valuation experts commonly rely on for deal data.

*Supplemental Expert Report of Drew E. Voth*

over time based on myriad factors, such as transactions taking place around the valuation dates and macroeconomic factors that impact expected future operating results as of the valuation dates.   As Mr. Schaefer has made no attempt to evaluate any economic differences that might impact the valuation multiple he used at disparate valuation dates over a year apart, his analysis is insufficient and unreliable.   One very impactful event that took place between Mr. Schafer's valuation dates is the Covid-19 Pandemic.   Even Mr. Schaefer agrees that Covid-19 should impact valuations associated with his industry, yet he makes no attempt to evaluate the Pandemic's impact on his selected sales revenue multiple.[9]

18.     For these reasons, Mr. Schaefer's valuation method is not accepted under standard valuation practice.

19.     Next, Mr. Schaefer's valuation method is inadequately supported because one of his valuation dates appears to be June 2021, when the initial complaint was filed by Plaintiff, yet Phoenix has produced no sales revenue data as of June 2021 (or more specifically, for the period over the 12-months-ending June 2021) to which a sales revenue multiple might be applied as part of a valuation of the Phoenix business.   Therefore, it is unclear what data Mr. Schaefer is using for his 2021 value.

20.     Further, the June 2021 initial complaint filed by Plaintiff included many allegations of which Defendants have already been found liable in arbitration.[10]   Mr. Schaefer's valuations of Phoenix do not take into account that Phoenix's value may have declined due to allegations that were made public in the initial complaint for which Defendants have already been found liable, versus those allegations that have yet to be adjudicated, including Defendants' counterclaims.   As Mr. Schaefer cannot separate the potential

---

[9] 30(b)(6) Deposition of Phoenix Digital Group, LLC, p. 90.
[10] Final Award, JAMS Arbitration No. 5160000075, filed February 16, 2023.

*Supplemental Expert Report of Drew E. Voth*

impacts of the various claims made in the initial complaint that form the basis for his calculations, his calculations are inadequately supported, speculative, and unreliable.

21.     In addition, neither Mr. Schaefer nor Defendants have provided any direct evidence that any disclosures in Plaintiff's initial complaint caused any potential customers to avoid Phoenix.   Therefore, without any such evidence of causation, Defendants' counterclaim appears  speculative and unsupported.

22.     Next, Mr. Schaefer's attribution of Phoenix's declining revenue to Plaintiff's actions are contradicted in Phoenix's  own data and by publicly available evidence for at least the three reasons discussed in the following paragraphs.

23.     First, as shown previously in the table containing Phoenix's revenue for 2019 and 2020, Phoenix's revenue was already declining significantly prior to the filing of the initial complaint in this matter.  As shown previously, Phoenix's revenue had already fallen from almost ███████ per year in 2019 to about ███████ per year in 2020, well before the June 2021 initial complaint to which Mr. Schaefer attributed Phoenix's decline in value. As Phoenix was already exhibiting a 34 percent declining revenue trend prior to June 2021, it is clear that factors other than Plaintiff's complaint were causing Phoenix's revenue declines.

24.     Second, publicly available website traffic data from SEMRush[11] also shows that traffic to Phoenix's aimjunkies.com website had already declined significantly prior to the filing of the June 2021 initial complaint, as shown below:

---

[11] SEMRush is a widely used service established in 2008 that offers internet traffic data.

*Supplemental Expert Report of Drew E. Voth*



25.     This SEMRush data further shows that factors other than Plaintiff's initial complaint were causing declines in Defendants' business before the complaint was filed. As Mr. Schaefer testified that he/Phoenix did not know the customer base for its cheats, it is apparent that Mr. Schaefer has no basis to attribute any decline in Phoenix's business to any Plaintiff actions versus any other event.[12]

26.     Finally, Mr. Schaefer testified that the loss of Phoenix's ability to sell Destiny 2 cheats was not relevant, and minimal, to its damages claim.[13]   As Plaintiff's claims concerned Defendants' Destiny 2 cheats, if the loss of the ability to sell Destiny 2 cheats had only a minimal impact on Phoenix's business, it is not plausible that Phoenix's total business value would be impacted by the loss of Destiny 2 cheat sales.

### IV. Conclusion

27.     Based on my work as discussed in this supplemental report, Defendants' tax returns appear to contain errors and, regardless, do not contain sufficient detail from which to allocate any costs to the sales revenue earned from Destiny 2 sales by Defendants.

---

[12] 30(b)(6) Deposition of Phoenix Digital Group, LLC, pp. 95-96.
[13] Ibid., p. 92.

*Supplemental Expert Report of Drew E. Voth*

28.     Defendants' counterclaim is speculative, unreliable, not supported by the data provided in this case, was not prepared in accordance with accepted valuation or accounting standards, and is counterfactual to Defendants' own financial data and other publicly available data.

I declare under penalty of perjury of the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Drew E. Voth



# Drew E. Voth

CPA/CFF, CIRA/CDBV, CFE, CVA



### Senior Director, Advisory Services

As a Senior Director in Alvarez and Marsal's valuation and litigation support practice, Mr. Voth brings significant financial consulting experience to his clients in the areas of forensic accounting, valuation, reorganization, and expert witness testimony.

### Experience

Mr. Voth brings his 30+ years of experience in accounting, finance, valuation, economics and statistics to bear on earnings evaluations, reasonable royalty studies, valuations, damages studies, licensing, and other areas. He has testified in deposition and/or trial in a variety of matters including intellectual property infringement, class action, defamation, employment, investigation, and breach of contract matters.

Notable engagements include: prevailing testimony in the oft-cited copyright infringement indirect damages matter Mackie v. Reiser, 296 F.3d 909 (9th Cir. 2002); a no-damage ruling in an underlying patent infringement legal malpractice claim in excess of a billion dollars; testimony in multiple class action matters; and multimillion dollar awards in various matters including breach of contract and theft of trade secret matters.

Mr. Voth has provided consulting to clients in many industries, including consumer products, aerospace, hospitality, telecommunications, gaming, computer software, computer hardware, bio-pharma, medical specialty products, retail, manufacturing, natural resources and others.

A past member of the AICPA's FVS Damages Task Force, Mr. Voth co-authored the practice aid book *Calculating Damages in Intellectual Property Disputes*, *4th edition*.

### Professional qualifications and memberships

- Certified Public Accountant
- Certified Insolvency and Restructuring Advisor, Certified in Distressed Business Valuation
- Certified Valuation Analyst
- Certified Fraud Examiner
- Member of Assoc. of Certified Fraud Examiners
- Member of Assoc. of Insolvency Advisors
- Member of National Association of Certified Valuators and Analysts
- Member of the AICPA, Certified in Financial Forensics
- Member of the Licensing Executives Society
- Member WA State Patent Law Association
- Past Treasurer, Habitat for Humanity, San Gabriel Chapter, and ArtsWest

### Education/Former Firms

Mr. Voth holds an honors degree in economics from Pomona College.  Former firms: PwC, Arthur Andersen, KPMG, FTI, Grant Thornton

### Contact details

1111 3rd Avenue, Suite 2450
Seattle, WA  98101
206.664.8954 Direct
206.948.6962 Mobile
drew.voth@alvarezandmarsal.com



# Drew E. Voth
## Trial Testimony (clients underlined)

Superior Court of the State of Washington in and for King County
    Draper Machine Works v. <u>Dorsey & Whitney LLP</u>

U.S. District Court, Central District of California
    Monster Energy Company, et al. v. <u>Vital Pharmaceuticals, Inc. d/b/a VPX Sports, a Florida Corporation; and Jack H. Owoc, a.k.a. Jack Owoc, an individual</u>

U.S. District Court, Central District of California
    <u>Vital Pharmaceuticals, Inc. d/b/a Bang Energy, and JHO Intellectual Property Holdings, LLC</u> v. PhD Marketing, Inc. et al.

Superior Court of the State of Washington in and for King County
    <u>Providence Health & Services</u> v. Atigeo Corporation

U.S. District Court, Middle District of Florida at Orlando
    <u>National Products, Inc.</u> v.  High Gear Specialties, Inc.

Franklin County Superior Court, Washington
    <u>Hilt Investment Holdings, LLC and Northwest Motorsport, Inc.</u> v. J. Dudley LLC, Bulldog Motors, LLC, and Frank and Julie Lindstrom

Pierce County Superior Court, Washington
    <u>Conmed, Inc.</u> v. Pierce County

U.S. District Court, Anchorage Alaska
    Anthony Henry v. <u>Municipality of Anchorage, Anchorage Police Department, and Mark Mew</u>

U.S. District Court, Western District of Washington at Seattle
    <u>Eko Brands, LLC.</u> v.  Adrian Rivera Maynez Enterprises, Inc. and Adrian Rivera

U.S. District Court, Wester District of Washington at Seattle
    <u>National Products, Inc.</u> v.  Arkon Resources, Inc.

U.S. District Court, District of Oregon, Eugene Division
    <u>Omnigen Research, LLC and Prince Agri Products, Inc.</u> v. Yongqiang Wang, Yan Zheng and Bioshen



U.S. District Court, Northwestern Division, North Dakota
    Energy Heating, LLC and Rocky Mountain Oilfield Services, LLC v. Heat On The Fly, LLC and
    Super Heaters North Dakota, LLC

U.S. District Court, Western Washington
    Pacific Bioscience Laboratories, Inc. v. Nutra Luxe et al.

Washington County, Oregon
    Ivey Imaging, LLC v. Jackie Reeder and Vertis, Inc.

State District Court, Idaho
    Arnzen v. Fisher Broadcasting

## Arbitration Testimony (clients underlined)

Arbitration, Seattle Washington
    Jacob Davis v. Alpha Genesis, LLC, Matthew Dyson, Damon Shelton, and Stephen Ciccarelli

Arbitration, Seattle, Washington
    Bungie, Inc. v. Aimjunkies.com, et al.

Arbitration, NP4019, ACS 19-02
    International Brotherhood of Electrical Workers Local 1547 v. Alaska Communications

Arbitration, Los Angeles
    Orange Bang, Inc., et al. v. Vital Pharmaceuticals, Inc. d/b/a VPX Sports

Arbitration, International Chamber of Commerce, International Court of Arbitration
    Kabushiki Kaisha Too Marker Products, Inc. v. Imagination International, Inc. and John Darland

Arbitration, Chicago, Illinois
    Wedi Corp. v. Brian Wright and Sound Product Sales, L.L.C.

Arbitration, Seattle, Washington
    Northwest Motorsport, Inc. v. Sunset Chevrolet, Inc., Sunset Trucks, Inc. and Phillip Mitchell

Arbitration, Seattle, Washington
    Paula's Choice, LLC v. Paula's Choice (Australia) Pty, Ltd.



Arbitration, Seattle, Washington
Avanti Markets, Inc. v. <u>Certefi, Inc.</u>

# Deposition Testimony (clients underlined)

Arbitration, Seattle Washington
<u>Jacob Davis</u> v. Alpha Genesis, LLC, Matthew Dyson, Damon Shelton, and Stephen Ciccarelli

U.S. District Court, Western District of Texas, Waco Division
Arruda, et al. v. <u>Curves International, Inc., et al.</u>

Superior Court of the State of Washington in and for King County
Draper Machine Works v. <u>Dorsey & Whitney LLP</u>

U.S. District Court, Western District of Wisconsin
<u>National Products, Inc.</u> v. ProClip USA, Inc. and Brodit AB

U.S. District Court, Central District of California
<u>Vital Pharmaceuticals, Inc. d/b/a Bang Energy, and JHO Intellectual Property Holdings, LLC</u> v. PhD Marketing, Inc. et al.

Superior Court of the State of Washington in and for King County
<u>Providence Health & Services</u> v. Atigeo Corporation

U.S. District Court, Western District of Washington at Seattle
Mountaineers Foundation v. <u>The Mountaineers</u>

U.S. District Court, Northern District of California, San Francisco Division
Atari Interactive, Inc. v. <u>Teespring, Inc.</u>

Arbitration, Los Angeles
Orange Bang, Inc., et al. v. <u>Vital Pharmaceuticals, Inc. d/b/a VPX Sports</u>

U.S. District Court, Central District of California
Monster Energy Company, et al. v. <u>Vital Pharmaceuticals, Inc. d/b/a VPX Sports, a Florida Corporation; and Jack H. Owoc, a.k.a. Jack Owoc, an individual</u>

U.S. District Court, Western District of Washington at Seattle
Philips North America LLC v. <u>Summit Imaging, Inc. and Lawrence Nguyen</u>

Arbitration, Seattle Washington
Brian Simmons v. <u>Kevin Britton-Simmons and Todd Britton-Simmons</u>



U.S. District Court, Western District of Washington at Seattle
    Corus Realty Holdings, Inc. v. <u>Zillow Group, Inc., Zillow, Inc., and Trulia, LLC</u>

U.S. District Court, Northern District of California
    Primus Group, Inc. v. <u>Institute for Environmental Health, Inc.</u>

U.S. District Court, Western District of Washington at Seattle
    Phytelligence, Inc. v. <u>Washington State University</u>

U.S. District Court, District of Oregon
    Leupold & Stevens, Inc. v. <u>Lightforce USA, Inc., d/b/a Nightforce Optics and Nightforce USA</u>

Superior Court of Washington for King County
    <u>Conmed LLC f/k/a Conmed, Inc.</u> v.  Pierce County

Franklin County Superior Court, Washington
    <u>Hilt Investment Holdings, LLC and Northwest Motorsport, Inc.</u> v. J. Dudley LLC, Bulldog Motors, LLC, and Frank and Julie Lindstrom

U.S. District Court, Central District of California at Santa Ana
    <u>National Products, Inc.</u> v.  Arkon Resources, Inc.

U.S. District Court, Central District of California at Santa Ana
    <u>National Products, Inc.</u> v.  Wireless Accessories Solutions, Inc. (Patent matter)

U.S. District Court, Central District of California at Santa Ana
    <u>National Products, Inc.</u> v.  Wireless Accessories Solutions, Inc. (Trademark matter)

U.S. District Court, Middle District of Florida at Orlando
    <u>National Products, Inc.</u> v.  High Gear Specialties, Inc.

U.S. District Court, Western District of Washington at Seattle
    <u>National Products, Inc.</u> v.  Bracketron, Inc.

Superior Court of Washington, Pierce County
    <u>Northwest Motorsport, Inc.</u> v. Sunset Chevrolet, Inc., Sunset Truck, Inc., and Phillip Mitchell

U.S. District Court, Western Washington
    <u>Talking Rain Beverage Company, Inc.</u> v. DS Services of America, Inc.

U.S. District Court, Anchorage Alaska
    Anthony Henry v. <u>Municipality of Anchorage, Anchorage Police Department, and Mark Mew</u>



# Drew E. Voth

## **Publications**

Calculating Damages in Intellectual Property Disputes, 4th Edition, 2019, published by the American Institute of Certified Public Accounts and the Chartered Institute for Management Accountants

Posts on https://amonsocial.alvarezandmarsal.com/:
- Supreme Courts Sides with Google over Oracle in Copyright Dispute, 4/12/2021
- Supreme Court Settles Circuit Split on Trademark Damages, 9/29/2020
- Covid-19 Has Exposed Massive Fraud Weaknesses, 9/27/2020
- SCOTUS to Settle 10-Year, $8.8 Billion Copyright Battle Between Google and Oracle, 12/19/2019
- Supreme Court to Settle Circuit Split on Trademark Damages, 10/22/2019
- Defend Trade Secrets Act, 10/3/2019
- Changing Patent Rules, 9/17/2019
- New IP Damages Book, 9/6/2019

Misapplication of Gordon Growth Model Can Lead to Undervaluing, *Business Valuation Resources, Business Valuation Update*, May 2015

Intellectual Property Licenses and Bankruptcy:  The Latest Word, *American Bar Association's Business Law Today*, August 2014

Apportionment of Intellectual Property Value – Where Economic Theory Meets Legal Practice, The Federal Lawyer, Oct/Nov 2013

The Clear Decision in Uniloc Needs Clarification, *les Nouvelles*, March 2013

Anatomy of a Record-Setting $1.17 Billion Patent Verdict, *Action Matters Update*, January 2013

Recent Entire Market Value Rule Opinions Impact Patent Valuation, *les Nouvelles*, September 2011

Delaware Chancery Court Update, *Business Valuation Monitor*, May 2011

Patent Damages Apportionment and the Cornell Case, Website of William Carleton Counselor @ Law, www.wac6.com, October 2010

Recent Court Opinions Impact Patent Valuation, *Business Valuation Monitor*, September 2010



## Drew E. Voth

**Speeches**

Annual Economic Damages Case Law Update, AICPA, October 2020

Calculating Damages in Intellectual Property Disputes: New Guidance, Business Valuation Resources, August 2019

Economic Damages Update – Reasonable Certainty, Lost Profits and Intellectual Property, AICPA, May 2019

Strategic Intellectual Property Commercialization, University of Washington School of Law, Seattle, WA, ongoing

Current Issues in IP Litigation, American Institute of CPAs Forensic and Valuation Services Conference, Nashville TN, November 2016

Techniques for IP Valuation and How Recent Challenges in US Law Affect Valuations, Licensing Executives Society, Vancouver B.C. Chapter, May 2016

IP value – techniques, recent court decisions, and the impact of proposed USPTO changes, Licensing Executives Society, Seattle WA Chapter, January 2016

Pricing IP – The Cost of a License or Damages, Washington State Bar Association 10th Annual IP Licensing Seminar, May 2015

Patent Infringement Reasonable Royalty Damages Strategies in Light of Recent Federal Circuit Decisions, The Knowledge Congress, October 2013

Accounting for Lawyers, K&L Gates, July 2013

AICPA Expert Witness Skills Workshop, July 2013

Kirkland Institute for Trial Advocacy, Kirkland & Ellis, March 2013

IP in Divorce: Dividing Patents, Copyrights, and Trademarks, Business Valuation Resources, May 2012

Intellectual Property and Other Intangibles:  A Practical Approach to Assigning Value, Tech America, November 2011

Understanding the Recent Bankruptcy Court Decision Regarding Intellectual Property Rights of Licensees from Foreign Owners, The Knowledge Congress, September 2011

Roundtable on Patent and Trademark Damages:  Fundamentals and Emerging Trends, King County Bar Association, June 2011

Valuation 101, Miller Nash, May 2011

Business Valuation and Damages, Microsoft, May 2011

Sea Change In Patent Damages, Licensing Executives Society, Seattle Chapter, April 2011

## Exhibit 2: Documents Considered

2022-11-10 Order on MTD.pdf
Amended Complaint with Jury Demand.pdf
Complaint With Jury Demand.pdf
Defendants Answer and Counterclaims.pdf
2022-02-10 Bungie_s Demand for Arbitration.PDF
2022-06-22 Respondents Response to Demand for Arbitration.PDF
2022-07-28 Proposed Protective Order (JAMS).PDF
2022-09-02 Phoenix Digital Supplemental Response 1st ROGs.PDF

PDG0101.csv
PP_WDWA_0000149.xlsx
PP_WDWA_0000154.xlsx
PP_WDWA_0000157.xlsx
PayPal0000034 [Confidential].xlsx

2022-10-19 Conway deposition and exhibits
2022-10-28 Schaefer deposition and exhibits

2020.12.02 aimjunkies.com - Forums - Destiny 2 Aimbot - purchase.pdf
2020.12.02 aimjunkies.com - Forums - Destiny 2 Aimbot.pdf
AimJunkies website 2022Sep13.pdf

### New Documents Received After Initial Report

Arbitration Award\Attachments # (1) Exhibit A.pdf
Arbitration Award\Attachments # (2) Exhibit B)(Rava, William).pdf
Arbitration Award\Attachments # (2) Proposed Judgment) Noting Date 332023, (Rava, William).pdf
Arbitration Award\DECLARATION of William C. Rava filed by Plaintiff Bungie Inc re [88] MOTION to Confirm Arbitration.pdf
Arbitration Award\MOTION to Confirm Arbitration Award and Direct Entry of Judgment , filed by Plaintiff Bungie Inc..pdf
Arbitration Award\OriginalNotice.pdf

2022-10-19 Conway deposition and exhibits
2022-10-28 Schaefer deposition and exhibits

2022-11-21 (072) AMENDED ANSWER to [63] Answer to Amended Complaint, Counterclaim, with Jury Demand , Amended COUNTERCLAIM By James May an~1.PDF
2023-02-17 (090) ANSWER to [72] Amended Answer to Complaint, Counterclaim, (Amended Counterclaims) and Affirmative Defenses by Bungie Inc.~1.PDF
PDI Supplemental Response Rog 10.pdf

NACVA_Professional_Standards_Incl_Review_Stnds_Effective_6-1-17_Final.pdf

PDG0097.pdf
PDG0098.pdf