# EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
 2                      AT SEATTLE

 3
   BUNGIE, INC.,
 4
        Plaintiff,                    ┌─────────────────┐
 5                                    │ CERTIFIED COPY  │
   vs.                          No. 2:21-cv-811-TSZ
 6                                    └─────────────────┘
   AIMJUNKIES.COM; PHOENIX DIGITAL
 7 GROUP LLC; DAVID SCHAEFER;
   JORDAN GREEN; JEFFREY CONWAY;
 8 and JAMES MAY,

 9      Defendants.
   _____/
10

11

12

13       VIDEOTAPED DEPOSITION OF BRAD LAPORTE
                (via Zoom videoconference)
14

15

16 DATE:                 September 28, 2023

17 TIME:                 7:33 a.m. - 1:52 p.m., PST

18 LOCATION OF WITNESS:  Juno Beach, Florida

19 TAKEN BY              Deborah Carmela Dew, FPR
                         Notary Public, State of Florida
20

21

22

23

24

25 JOB NO.:              1020122
```

BRAD LAPORTE - 09/28/2023

```
 1   A P P E A R A N C E S :

 2

     FOR THE PLAINTIFF:  (via Zoom videoconference)
 3
            JACOB P. DINI, ESQUIRE
 4          Perkins Coie LLP
            1201 Third Avenue
 5          Suite 4900
            Seattle, Washington 98101
 6          206.359.8000
            jdini@perkinscoie.com
 7

 8   FOR THE DEFENDANTS:  (via Zoom videoconference)

 9          PHILIP P. MANN, ESQUIRE
            Mann Law Group PLLC
10          403 Madison Avenue North
            Suite 240
11          Bainbridge Island, Washington 98110
            206.855.8839
12          phil@mannlawgroup.com

13
     Also Present via Zoom videoconference:
14
            Sean Lykken, CLVS, Videographer
15          James Barker, In-house counsel, Bungie, Inc.
            David Schaefer
16          Jordan Green
            Ed Kaiser, PhD
17

18

19

20

21

22

23

24

25
```

BRAD LAPORTE - 09/28/2023

```
                                                          Page 3
 1                      I N D E X

 2

 3   WITNESS                                               PAGE

 4   BRAD LAPORTE

 5       Direct Examination by Mr. Dini                      5

 6

 7   CERTIFICATE OF OATH                                    191
     CERTIFICATE OF REPORTER                                192
 8   ERRATA PAGES                                       193-194

 9

10                    E X H I B I T S

11   PLAINTIFF'S           DESCRIPTION                     PAGE

12   Exhibit 1    (Expert Report of Brad LaPorte)           10

13   Exhibit 2    (Tool ReClass digest)                     41

14   Exhibit 3    (Expert Report of Scott A. Kraemer)       97

15   Exhibit 4    (Memory dump of notepad.exe)             117

16   Exhibit 5    (Bates 0000410 - document reviewed       132
                   in preparing Brad LaPorte's expert
17                 opinion)

18   Exhibit 6    (Microsoft Process Monitor)              157

19   Exhibit 7    (Excel Spreadsheet)                      176

20   Exhibit 8    (Counterclaim Exhibit D)                 184

21

22                  S T I P U L A T I O N S

23       It is hereby stipulated, by and between counsel for

24   the respective parties and the witness, that the reading

25   and signing of this deposition is hereby reserved.
```

BRAD LAPORTE - 09/28/2023

1              P R O C E E D I N G S

2         THE VIDEOGRAPHER:  This is the deposition of

3    Brad LaPorte in the matter of Bungie Inc., versus

4    Aimjunkies.com, et al, in the U.S. District Court,

5    Western District of Washington at Seattle.  Case

6    number is 2:21-cv-811-TSZ.

7         Today's date is September 28th, 2023, and the

8    time is 7:33 Pacific.  This deposition is taking

9    place remotely and was noticed by Jacob Dini.

10        Video operator today is Sean Lykken of Central

11   Court Reporting.  Address is 1700 7th Avenue, Suite

12   2100, Seattle, Washington 98101.  Phone number is

13   206-682-5896.

14        The court reporter today is Deborah Carmela Dew

15   on behalf of Central Court Reporting.  The reporter

16   will swear in the witness, but first would the

17   attorneys voice identify themselves and state whom

18   they represent and any other persons appearing with

19   them starting with the Plaintiff.

20        MR. DINI:  Yeah, good morning.  My name is Jacob

21   Dini with the law firm Perkins Coie.  I'm counsel for

22   Plaintiff, Bungie Inc., and I'm joined by Bungie's

23   In-house counsel, James Barker.

24        MR. MANN:  And my name is Philip Mann.  I'm with

25   the Mann Law Group on Bainbridge Island, Washington.

BRAD LAPORTE - 09/28/2023

Page 5

1      I represent all the Defendants in this action.

2            THE REPORTER:  Mr. LaPorte, would you please

3      raise your right hand to be sworn?

4  AND THEREUPON,

5                      BRAD LAPORTE

6  having been first duly sworn, testified as follows:

7            THE WITNESS:  I do.

8            THE REPORTER:  Thank you.

9                    DIRECT EXAMINATION

10  BY MR. DINI:

11      Q.   Okay.  Good morning, Mr. LaPorte.  As I said, my

12  name is Jacob Dini.  I'm counsel for Plaintiff in this

13  case, which is Bungie.  Thank you for agreeing to attend

14  remotely today.

15           Have you been deposed before?

16      A.   Yes, I have.

17      Q.   How many times have you been deposed before?

18      A.   This will be the third time in deposition.

19      Q.   Okay.  And when were the other two depositions?

20      A.   I -- so one was earlier this year, I believe it

21  was in March.  And then the other time was last year.  I

22  don't recall the month, but I did provide the actual date,

23  I just didn't commit them to memory.

24      Q.   Okay.  Have you been deposed remotely before?

25      A.   Yes, I have.

BRAD LAPORTE - 09/28/2023

Page 64

1   to your opinions here?

2       A.   So analysts cover, research analysts and

3   different influencers cover every facet of the market, to

4   include everything that we've been discussing.  So those

5   clients that I work with, helping them navigate that

6   market of individuals that oversee and influence decisions

7   that are made in that area.

8           So Gartner covers and different influencers

9   cover everything across the sun, to include how video

10  games are created, how they're used, to include software

11  in general, and specifically even things like SBOM, or

12  software bill of materials, which is basically an analysis

13  of what soft -- what is actually comprised in software.

14      Q.   I want to move down to the next paragraph here,

15  par -- the second full paragraph on page 4 of Exhibit 1,

16  which is your expert report.  You say that you're an

17  expert in the following topics:  digital forensics,

18  incident response, penetration testing, reverse

19  engineering, intrusion analysis, and malware analysis.

20          Did I read that right?

21      A.   That's correct.

22      Q.   I think you've used the term "digital forensics"

23  a couple of times that we've been talking so far.  What

24  does dig -- digital forensics mean exactly?

25      A.   Yeah.  So providing -- can we just -- so

Page 65

1    providing forensic analysis of different devices.  So

2    looking at the system and processes of a Windows, Mac,

3    Linux device or similar, smartphone systems and different

4    even to the extent of IOT devices and operational

5    technology devices.

6            Looking at the underlying systems and code to

7    provide analysis or insights into whatever use case that

8    you're trying to implement.

9        Q.   Did you conduct digital forensics as part of

10   creating or coming to your opinions in this case?

11       A.   Not as in pertinent of this case.

12       Q.   So you -- so you didn't perform digital

13   forensics in this case?

14       A.   What I provided was -- or my opinions are

15   derived from my own past experience and reviewing the

16   documents that were provided to me.

17       Q.   And as part of doing that, did you perform any

18   digital forensics?

19       A.   I used my own experience to provide my opinions

20   on the matter, which falls within the realm of the

21   underlying concepts of digital forensics.  I did not use

22   digital forensics tools or conduct any civic analysis

23   outside of reading the material.

24       Q.   So you didn't conduct an analysis as part of

25   preparing your report in today's case other than reading

BRAD LAPORTE - 09/28/2023

Page 66

1    the materials provided.

2          A.   And my own experience.

3          Q.   And you relied on your own experience.

4          A.   Correct.

5          Q.   Okay.  So you didn't perform a digital forensics

6    analysis.

7          A.   Correct.

8          Q.   The next one here says incident response.  I

9    think you've mentioned that a few times before.  What does

10   incident response mean?

11         A.   Yeah.  So this is the actions that are -- that

12   take place after a security incident is detected, and

13   there are certain best practices.  And typically an

14   organization has a standard operating procedure on how

15   they conduct this in terms of detecting and remediating

16   and responding to an incident that might occur.

17         Q.   Did you -- did your experience with incident

18   response inform any of your opinions in this case?

19         A.   I provided my -- it was included in the

20   expertise that I had that provided to the report that was

21   written.

22         Q.   How is your incident response experience helpful

23   in preparing this report?

24         A.   Primarily the underlying understanding of how

25   Windows systems operate and how one would go about and

Page 67

1  conducting -- understanding how the overall -- the overall

2  ways that information is gathered and -- and analyzed.

3      Q.   And how is that particularly relevant to your

4  opinions in this case?

5      A.   Analyzing the documents and taking -- evaluating

6  and reading the documents, it did leverage my past

7  experiences with how incident response works and how that

8  connects to digital forensics.

9      Q.   When you're conducting an incident response, is

10  there a process you go to or some sort of methods that you

11  rely on to determine how to respond to an incident?

12      A.   There's a lot of different best practices that

13  are associated with it.  There's -- there are a lot of

14  different ways to implement a certain response, but there

15  are some best practices around it.

16      Q.   Did you rely on any of those best practices in

17  coming to your opinions in this case?

18      A.   I -- yes, I did.

19      Q.   Which ones?

20      A.   We would have to go through the report to answer

21  that properly.

22      Q.   Looking at page 7 of your expert report, when

23  you were discussing Bungie WDWA 0000368, did you rely on

24  any best practices for incident response to come to your

25  opinion here?

Page 99

1  procedures around incident response and digital forensics

2  and some of the other core concepts that we talked about

3  in the first part of this deposition.

4      Q.  Did you attempt to duplicate the analysis

5  conducted by Mr. Kraemer or were you just trying to verify

6  the conclusions he came to?

7      A.  I verified the conclusions that he came to.

8      Q.  Okay.  Did you talk to Mr. Kraemer at all about

9  the -- about his expert opinions?

10      A.  I did not.

11      Q.  Did you communicate through any means with

12  Mr. Kraemer to validate any of his expert opinions?

13      A.  I did not.

14      Q.  Did you communicate through an intermediary?

15  For example, did you provide questions to someone who then

16  gave questions to Mr. Kraemer?

17      A.  I had no questions.

18      Q.  Okay.  So you didn't talk to Mr. Kraemer at all

19  about the methodology through which he arrived at his

20  opinions?

21      A.  I did not.

22      Q.  Did you talk to Mr. Kraemer about how he arrived

23  at his opinions at all?

24      A.  It was very clear through the report I did

25  not -- it did not require communication with Mr. Kraemer.

BRAD LAPORTE - 09/28/2023

Page 100

1        Q.    Did you determine whether any of Mr. Kraemer's

2    opinions expressed in his report were not valid?

3        A.    Yes.

4        Q.    Were any of his opinions not valid?

5        A.    I don't know if it -- it would classify as an

6    opinion, but there -- there was two -- two items that I

7    identified that I wasn't able to find any information on.

8        Q.    What were those two items?

9        A.    One is I was not able to -- so this is page 8 of

10   my report, excuse me.

11       Q.    Uh-huh.

12       A.    The date, I wasn't able to find a reference to

13   the date of March 8th, or 2022/03/08, but I was able to

14   find what appeared to be the correct date of 2022/09/15.

15       Q.    You said there was another invalid opinion that

16   Mr. Kraemer expressed.  What was that?

17       A.    It was not necessarily an opinion, but in the

18   Kraemer report there is a mention that --

19       Q.    We're talking about Exhibit 3 of Mr. Kraemer's

20   report?

21       A.    Hold on one second, please.  Yes, that one.  On

22   page 5, third sentence from the bottom.

23       Q.    What does it start with?

24       A.    "These drivers are utility tools used by Phoenix

25   Digital Group."  There's no evidence in any of the

BRAD LAPORTE - 09/28/2023

Page 101

1   documentation that was provided that mapped any drivers

2   that were mapped to any utility tools by Phoenix Digital

3   Group.

4            I did not mention it in my report because I

5   figured the information was moot and not really relevant,

6   but those are the two items that I did not agree with in

7   his report.

8        Q.   Okay.  So just to clarify, you disagree with the

9   third sentence in the last paragraph on page 5 of Exhibit

10  3, Mr. Kraemer's report, "These drivers are utility tools

11  used by Phoenix Digital Group"?

12            MR. MANN:  Object to the form.

13            THE WITNESS:  Correct.

14  BY MR. DINI:

15       Q.   What was the answer?

16       A.   Correct.

17       Q.   And you also, turning back to your report,

18  Exhibit 1, page 8, the fourth paragraph, the first couple

19  sentences there highlight --

20       A.   Uh-huh.

21       Q.   -- a difference between your opinion and

22  Mr. Kraemer's opinion.

23       A.   Specifically the date was different.  But once

24  again, I think it's moot.

25       Q.   Other than these two issues, are your expert

BRAD LAPORTE - 09/28/2023

Page 102

```
 1   opinions the same as those offered by Mr. Kraemer?

 2        A.   That's correct.

 3        Q.   Are they exactly the same?

 4        A.   Can you clarify "exactly"?

 5        Q.   Do they differ in any respect from Mr. Kraemer's

 6   other than the two instances that we identified already?

 7        A.   I will respond by saying I agree with everything

 8   else that is in the Kraemer report.

 9        Q.   Do you have any opinions in your expert report,

10   other than those two that we already talked about, that

11   are in addition to those expressed by Mr. Kraemer?  In

12   other words, did you add any new opinions to your expert

13   report not included in Mr. Kraemer's?

14        A.   No, I did not add any additional information to

15   the -- this case.

16        Q.   That's a no, you did not add any new opinions to

17   Mr. Kraemer's opinions in this case?

18        A.   That's correct.

19        Q.   Okay.  Let's turn to the second issue here that

20   you were asked to investigate.  The second issue, if we're

21   looking back at page 5 of your expert report in Exhibit 1,

22   it says, "whether forensic evidence appears to support the

23   conclusion that Plaintiff, Bungie, Inc., reverse

24   engineered, decompiled and/or otherwise analyzed a certain

25   loader software product distributed by Phoenix Digital."
```

Page 180

1   with my statement and my report.  My response to that is

2   he has not reviewed my report and, therefore, I would not

3   have an opinion of what I've stated.

4       **Q.   Can you point to me where, if anywhere, in Mr.**

5   **Kraemer's report he expressed the same opinion that we**

6   **just discussed in your report on page 8 about Mr. Guris'**

7   **analysis?**

8       A.   Mr. Kraemer agreed, yeah, and I agree that

9   Virus -- the first statement of this paragraph that

10  contained VirusTotal shows this file to contain no

11  detected malware or flagged for malicious content that a

12  specific driver or file was to be submitted to VirusTotal

13  on the specific date.

14          I clarified the dates, and then really I

15  wanted -- I'm pointing out the obvious in the statement

16  that the way that Mr. Guris obtained this file, it's, for

17  one, it was owned by a different entity at this date.

18          So the file, if you map up the dates of these

19  two -- so there is -- when this document was taken is a

20  different date than the date of when the zip file was

21  done, the analysis was done.

22      **Q.   So I'm not asking you number one.**

23      A.   What?

24      **Q.   No, go ahead.  Finish your answer.  I apologize.**

25      A.   Item number one is we agree on the VirusTotal

BRAD LAPORTE - 09/28/2023

1   results.  Number two is that this Exhibit 409, the date of

2   the scan I believe is a different date than when this file

3   was taken, which was 2000 -- September 15th, 2022.

4          And then the other aspect is that when this zip

5   file was taken, it was not identified how it was taken,

6   where it was taken, the exact location.  I did not receive

7   a copy of the zip file to inspect its contents.  So where

8   it came from, you know, what website he actually --

9   Mr. Guris went to and what exact zip file was taken from

10  that could not be verified.

11         The other thing is the owner of it is an entity

12  out of the Ukraine that currently owns that website on the

13  date that he took this zip file.

14     Q.   Okay.  So I understand that that is your expert

15  opinion that you are asserting now.  My question is where

16  in Mr. Kraemer's expert report is that same opinion

17  expressed, if anywhere?

18         And I'm talking about, to clarify, the part of

19  the opinion that says, "It is my expert opinion that there

20  is no way to provide any definitive evidence or

21  conclusion" all the way through the end of that paragraph.

22  That's what I want you to point me in Mr. Kraemer's

23  report, if anywhere.

24     A.   One second.  The -- Mr. Kraemer doesn't

25  specifically address Mr. Guris' process and the way that

BRAD LAPORTE - 09/28/2023

Page 182

1   he goes about that.  And that might be due to the fact

2   that he doesn't have an extensive digital forensics

3   background in terms of process and change of -- basically

4   maintaining control over how files are obtained and

5   analyzed and that's -- so that is one item.

6           And for whatever reason, he did not identify or

7   match up the -- the dates between these two sources.  So

8   the zip file analysis that was identified in the Guris

9   expert report and then the specific file that was produced

10  are from different time frames.

11      Q.   And the zip file analysis that you offer an

12  expert opinion on in your report on page 8, the fourth

13  paragraph, that second half of that paragraph is not an

14  opinion that Mr. Kraemer expressed in his report, is it?

15      A.   Not explicit.

16      Q.   Or implicitly.

17      A.   I don't know under -- Mr. Kraemer is not here to

18  comment on that, and I would state that it is -- give me a

19  moment.  My response is that Mr. Kraemer most likely

20  didn't know.  And he didn't review my expert report and,

21  therefore, couldn't provide this level of insight.

22          He was more focused on the other elements that

23  he mentions in his report and did not address this in his

24  report.

25      Q.   Mr. LaPorte, I want to look at the third

BRAD LAPORTE - 09/28/2023

Page 183

1   paragraph here on page 8, specifically the second

2   sentence.  It says, "There's no way to know from Exhibit C

3   what these files contain or what their purpose may be."

4   Did I read that right?

5        A.   Correct.

6        Q.   Okay.  I want to go back now to Exhibit 7, which

7   is Bungie WDWA 0000409.  We talked earlier about your

8   familiarity with certain reverse engineering tools,

9   including ReClass, right?

10       A.   That's correct.

11       Q.   You've heard of ReClass, correct?

12       A.   Correct.

13       Q.   It's a pretty popular reverse engineering tool?

14       A.   Correct.

15       Q.   It's publically available on GitHub?

16       A.   That's correct.

17       Q.   If we look at row three of Exhibit 7 here, in

18   the file name it says ReClass, right?

19       A.   Correct.

20       Q.   Same with row four and row five, we got the name

21   ReClass?

22       A.   Can you Zoom in, please?

23       Q.   Yes.  Does that help?

24       A.   Yes, thank you.  Row four and five, yes,

25   correct.

Page 184

1          Q.   Okay.  Scrolling down a little further, rows 32

2    and 33 we see the -- the file name there as renamed to

3    ReClass.  You see that?

4          A.   Correct.

5          Q.   So from that information, is it -- isn't it

6    possible to determine what that system driver is being

7    used for, that's being used for reverse engineering?

8          A.   Not from this document.

9          Q.   Why not?

10         A.   It doesn't have enough information.

11         Q.   What more information would you need?

12         A.   Specifically what's happening and more -- you'd

13   have to do further analysis.

14         Q.   Okay.  Let's talk about another document.  I'll

15   drop what we'll mark as Exhibit 8 into the chat.  Okay,

16   open that one up.

17              (Plaintiff's Exhibit 8 marked.)

18   BY MR. DINI:

19         Q.   Mr. LaPorte, do you recognize this document,

20   Exhibit 8?

21         A.   One moment.  Yes, this is Counterclaim Exhibit

22   D.

23         Q.   At the bottom of page 2 it has a Bates number,

24   Bungie WDWA 0000367, is that right?

25         A.   One second, I -- I can barely read that.

BRAD LAPORTE - 09/28/2023

1       Q.   Oh, yeah.  It's at the -- it's at the bottom of

2    the second page.  It's the biggest text on the page.

3       A.   I'm sorry, repeat your question.  What am I

4    looking for?

5       Q.   At the bottom of page 2 of Exhibit 8 it says

6    "Bungie WDWA 0000367."

7       A.   Oh, yes.

8       Q.   Okay, great.

9       A.   Sorry.

10      Q.   Yeah.  How is this document relevant to your

11   opinions?

12      A.   Basically in here it references Aimjunkies'

13   binaries were found.

14      Q.   Where does it say that?

15      A.   Oh, sorry, that's from 409.  One second, please.

16      Q.   Mr. LaPorte, are you unsure how this document is

17   relevant to your expert opinion?

18      A.   I just need a moment to review this again.  This

19   document, which it was provided to me with the

20   understanding that it was from Bungie, specifically in

21   here it has mentions to the C drives to Mr. May's desktop

22   and then specifically having the ReClass.net kernel log-in

23   reverse engineering tool.

24           And this basically, this file identifies and

25   shows that there was a -- this tool was used when combi --

Page 186

1    when compiling the reclasskernel64.systeminternals file.

2    And I agree with Mr. Kraemer that this driver, you know,

3    wouldn't be attached necessarily in the game and it could

4    be located under other means.

5              It's not exactly explained in this document,

6    which I mention in the report, which is why it took me a

7    second to review this again.

8         Q.   You don't know what means were used to acquire

9    that information, do you?

10        A.   I do not because it's not disclosed how this

11   information was gathered.

12        Q.   Okay.  I want to refer back to Exhibit 1, which

13   is your report pages 5 and 6.  Pages 5 and 6 of your

14   report you list about 28 documents here that you reviewed

15   in connection with your analysis of this matter, is that

16   right?

17        A.   That's correct.

18        Q.   And we talked about your opinions with respect

19   to the Amended Answer and Amended Counterclaims, number

20   five, Bungie WDWA 368, number six, number 409, number

21   seven, number eight, number 21, 22, 23, and then you

22   mentioned the expert report of Steven Guris, right?

23        A.   Correct.

24        Q.   Okay.  Other than those documents that we

25   specifically discussed today and that I just listed, do

Page 187

1  you have any opinions about what any of the other

2  documents listed here show?

3       A.   No, not that I submitted in the report.  That's

4  why I didn't mention it.

5       Q.   Okay.  So you don't have any opinions about any

6  of the documents other than those that we specifically

7  discussed today and that I just listed in my question

8  previously?

9       A.   That's correct.

10           MR. DINI:  Okay.  I want to take five minutes.

11      I think we're close to being done here, but let's

12      take a five-minute break just to tie up some loose

13      ends.  If we can, go off the record.

14           THE VIDEOGRAPHER:  This will end file five in

15      the depo -- or file six in the deposition of Brad

16      LaPorte.  Off the record at 1:41.

17           (Recess taken from 1:14 p.m. to 1:48 p.m.)

18           THE VIDEOGRAPHER:  This begin files seven in the

19      deposition of Brad LaPorte.  Back on the record

20      1:48.

21  BY MR. DINI:

22       Q.   Okay.  Just a couple quick questions,

23  Mr. LaPorte.  I want to focus back again on Exhibit 1,

24  which I'm sharing my screen with you now, the discussion

25  of VirusTotal on page 8.

BRAD LAPORTE - 09/28/2023

Page 191

1                       CERTIFICATE OF OATH

2

    STATE OF FLORIDA      )
3                         )
    COUNTY OF PALM BEACH  )

4

5            I, Deborah Carmela Dew, FPR, Court Reporter and

6    Notary Public, State of Florida, certify that BRAD LAPORTE

7    appeared remotely before me via Zoom videoconference,

8    produced identification, and was duly sworn on the 28th

9    day of September, 2023.

10           Witness my hand this 2nd day

11   of October, 2023.

12

13

14

15

16           Deborah Carmela Dew, FPR
             Notary Public, State of Florida
17           Commission No.:  HH125890
             Expires:  August 21, 2025
18

19

20   PERSONALLY KNOWN_____
     OR PRODUCED IDENTIFICATION XXXXX
21   TYPE OF IDENTIFICATION PRODUCED:  Driver's License

22

23

24

25

BRAD LAPORTE - 09/28/2023

Page 192

1                        CERTIFICATE OF REPORTER

2

   STATE OF FLORIDA      )
3                        )
   COUNTY OF ST. LUCIE )

4

5            I, Deborah Carmela Dew, Florida Professional

6    Reporter, do hereby certify that I was authorized to and

7    did remotely stenographically report the videotaped

8    deposition of BRAD LAPORTE; that a review of the

9    transcript was requested; and that the foregoing

10   transcript, pages 1 through 190 is a true record of my

11   stenographic notes.

12           I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel or counsel connected with the action,

16   nor am I financially interested in the action.

17           DATED this 2nd day of October, 2023.

18

19

20

21   _____

     Deborah Carmela Dew,
22   Florida Professional Reporter

23

24

25