# EXHIBIT 4

# In the Matter Of:

Bungie, Inc. vs Aimjunkies.com, et al.

## BRAD LAPORTE

*September 28, 2023*

*Job Number: 1020122*

1                     UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
2                              AT SEATTLE

3
     BUNGIE, INC.,
4
          Plaintiff,
5
     vs.                              No. 2:21-cv-811-TSZ
6
     AIMJUNKIES.COM; PHOENIX DIGITAL
7    GROUP LLC; DAVID SCHAEFER;
     JORDAN GREEN; JEFFREY CONWAY;
8    and JAMES MAY,

9          Defendants.
     _____/
10

11

12

13          VIDEOTAPED DEPOSITION OF BRAD LAPORTE
                 (via Zoom videoconference)
14

15

16   DATE:                 September 28, 2023

17   TIME:                 7:33 a.m. - 1:52 p.m., PST

18   LOCATION OF WITNESS:  Juno Beach, Florida

19   TAKEN BY              Deborah Carmela Dew, FPR
                           Notary Public, State of Florida
20

21

22

23

24

25   JOB NO.:              1020122

CERTIFIED COPY

BRAD LAPORTE - 09/28/2023

Page 2

```
 1   A P P E A R A N C E S :

 2

     FOR THE PLAINTIFF:   (via Zoom videoconference)
 3
           JACOB P. DINI, ESQUIRE
 4         Perkins Coie LLP
           1201 Third Avenue
 5         Suite 4900
           Seattle, Washington 98101
 6         206.359.8000
           jdini@perkinscoie.com
 7

 8   FOR THE DEFENDANTS:   (via Zoom videoconference)

 9         PHILIP P. MANN, ESQUIRE
           Mann Law Group PLLC
10         403 Madison Avenue North
           Suite 240
11         Bainbridge Island, Washington 98110
           206.855.8839
12         phil@mannlawgroup.com

13
     Also Present via Zoom videoconference:
14
           Sean Lykken, CLVS, Videographer
15         James Barker, In-house counsel, Bungie, Inc.
           David Schaefer
16         Jordan Green
           Ed Kaiser, PhD
17

18

19

20

21

22

23

24

25
```

BRAD LAPORTE - 09/28/2023

```
                                                        Page 3
 1                       I N D E X

 2

 3   WITNESS                                         PAGE

 4   BRAD LAPORTE

 5       Direct Examination by Mr. Dini                5

 6

 7   CERTIFICATE OF OATH                               191
     CERTIFICATE OF REPORTER                           192
 8   ERRATA PAGES                                  193-194

 9

10                     E X H I B I T S

11   PLAINTIFF'S           DESCRIPTION              PAGE

12   Exhibit 1     (Expert Report of Brad LaPorte)     10

13   Exhibit 2     (Tool ReClass digest)               41

14   Exhibit 3     (Expert Report of Scott A. Kraemer) 97

15   Exhibit 4     (Memory dump of notepad.exe)        117

16   Exhibit 5     (Bates 0000410 - document reviewed  132
                    in preparing Brad LaPorte's expert
17                  opinion)

18   Exhibit 6     (Microsoft Process Monitor)         157

19   Exhibit 7     (Excel Spreadsheet)                 176

20   Exhibit 8     (Counterclaim Exhibit D)            184

21

22                 S T I P U L A T I O N S

23       It is hereby stipulated, by and between counsel for

24   the respective parties and the witness, that the reading

25   and signing of this deposition is hereby reserved.
```

BRAD LAPORTE - 09/28/2023

```
 1            P R O C E E D I N G S

 2        THE VIDEOGRAPHER:  This is the deposition of

 3   Brad LaPorte in the matter of Bungie Inc., versus

 4   Aimjunkies.com, et al, in the U.S. District Court,

 5   Western District of Washington at Seattle.  Case

 6   number is 2:21-cv-811-TSZ.

 7        Today's date is September 28th, 2023, and the

 8   time is 7:33 Pacific.  This deposition is taking

 9   place remotely and was noticed by Jacob Dini.

10        Video operator today is Sean Lykken of Central

11   Court Reporting.  Address is 1700 7th Avenue, Suite

12   2100, Seattle, Washington 98101.  Phone number is

13   206-682-5896.

14        The court reporter today is Deborah Carmela Dew

15   on behalf of Central Court Reporting.  The reporter

16   will swear in the witness, but first would the

17   attorneys voice identify themselves and state whom

18   they represent and any other persons appearing with

19   them starting with the Plaintiff.

20        MR. DINI:  Yeah, good morning.  My name is Jacob

21   Dini with the law firm Perkins Coie.  I'm counsel for

22   Plaintiff, Bungie Inc., and I'm joined by Bungie's

23   In-house counsel, James Barker.

24        MR. MANN:  And my name is Philip Mann.  I'm with

25   the Mann Law Group on Bainbridge Island, Washington.
```

Page 5

1          I represent all the Defendants in this action.

2               THE REPORTER:  Mr. LaPorte, would you please

3          raise your right hand to be sworn?

4    AND THEREUPON,

5                              BRAD LAPORTE

6    having been first duly sworn, testified as follows:

7               THE WITNESS:  I do.

8               THE REPORTER:  Thank you.

9                         DIRECT EXAMINATION

10   BY MR. DINI:

11        Q.   Okay.  Good morning, Mr. LaPorte.  As I said, my

12   name is Jacob Dini.  I'm counsel for Plaintiff in this

13   case, which is Bungie.  Thank you for agreeing to attend

14   remotely today.

15             Have you been deposed before?

16        A.   Yes, I have.

17        Q.   How many times have you been deposed before?

18        A.   This will be the third time in deposition.

19        Q.   Okay.  And when were the other two depositions?

20        A.   I -- so one was earlier this year, I believe it

21   was in March.  And then the other time was last year.  I

22   don't recall the month, but I did provide the actual date,

23   I just didn't commit them to memory.

24        Q.   Okay.  Have you been deposed remotely before?

25        A.   Yes, I have.

BRAD LAPORTE - 09/28/2023

1    A.   I cert -- I certainly have provided an expert

2    report --

3    **Q.   And deposition.**

4    A.   -- and deposition, and deposition.  That is an

5    incorrect statement.

6    **Q.   Okay.**

7    A.   I'm not sure how that got in there, so I

8    apologize.

9    **Q.   That's okay.  So I want to talk a little bit**

10   **about this case now.**

11          **When did you first meet any of the Defendants in**

12   **this case?**

13   A.   It was August 14th.

14   **Q.   Of 2023?**

15   A.   Correct.

16   **Q.   Who did you meet?**

17   A.   I connected with David Schaefer.

18   **Q.   Any of the other Defendants?**

19   A.   No.

20   **Q.   Did you meet Jordan Green?**

21   A.   No.

22   **Q.   Have you met Jordan Green?**

23   A.   No.

24   **Q.   Have you met Jeffrey Conway?**

25   A.   No.

BRAD LAPORTE - 09/28/2023

Page 86

```
 1        Q.   Have you met James May?

 2        A.   No.

 3        Q.   How did you meet Mr. Schaefer?

 4        A.   He reached out to me via telephone.

 5        Q.   When were you formally engaged to offer your --

 6   the expert opinions and your report?

 7        A.   I believe it was shortly after that.  I don't

 8   remember the exact timeline.  It's actually on my invoice

 9   I believe I submitted it.

10        Q.   Okay.

11        A.   But I don't know the exact date, but shortly

12   after this.

13        Q.   So sometime in August 2023?

14        A.   Yeah, that same week.

15        Q.   Who specifically engaged you?

16        A.   David Schaefer.

17        Q.   Were you engaged by James May to provide any

18   opinions at all?

19        A.   No.

20        Q.   What hourly rate are you billing at in this

21   matter?

22        A.   $600 per hour.

23        Q.   Have you invoiced Mr. Schaefer for your work?

24        A.   I did.

25        Q.   How much have you charged to Defendants to date
```

Page 87

1   in this case?

2       A.   I don't know the exact amount off the top of my

3   head.  Approximately $22,000, I believe --

4       Q.   Have you been paid --

5       A.   -- and change.

6       Q.   Have you been paid for that work yet?

7       A.   I have.

8       Q.   When were you paid?

9       A.   Recently.  A few days ago, I think last week

10  maybe.

11      Q.   Were you paid the full approximately $22,000

12  amount?

13      A.   That's correct.

14      Q.   Who paid you?

15      A.   David Schaefer.

16      Q.   And through what method were you paid?

17      A.   Via credit card through my invoicing system.

18      Q.   Okay.  Did you talk to anyone at Phoenix Digital

19  Group or Defendants about their Destiny 2 cheat software

20  sold on Aimjunkies.com?

21      A.   I only spoke to David Schaefer, and it was about

22  opining on this case.  Can you clarify your question so I

23  can answer it properly?

24      Q.   Yeah.  Are you aware that Defendants have sold

25  cheat software for Bungie's Destiny 2 video game on the

1   software that was described, for simplicity I'll just

2   reference the Guris report.

3           The way that that software operated would

4   typically be something that an organization might want to

5   block if they did care and that was on a corporate

6   computer.

7       Q.   What does it mean "on a corporate computer"?

8       A.   If it's a corporate-owned device, something

9   that's going to connect to a corporation's entities.

10      Q.   A corporation entities --

11      A.   Software.  So if a corporation has a device,

12  it's a company-owned device that would have oversight on

13  that system because it's company property and it was

14  modified in that way and they did care and it was against

15  their acceptable use policy, then some corrective actions

16  might take place or -- or be recommended.

17      Q.   Have you ever played Destiny 2?

18      A.   I have not.

19      Q.   Have you ever downloaded Destiny 2?

20      A.   I have not.

21      Q.   Have you ever downloaded any expansions for

22  Destiny 2?

23      A.   I have not.

24      Q.   Have you ever gone through the installation

25  process for installing Destiny 2?

BRAD LAPORTE - 09/28/2023

Page 91

```
 1        A.    I have not.

 2        Q.    Have you ever seen what sort of permissions it

 3   asks for from a user during installation?

 4        A.    I have not.

 5        Q.    Have your ever looked at the object code for

 6   Destiny 2?

 7        A.    I have not.

 8        Q.    Have you ever looked at the source code for

 9   Destiny 2?

10        A.    I have not.

11        Q.    Have you ever examined the Destiny 2 process and

12   memory of a user's computer?

13        A.    I have not.

14        Q.    Did you ever download Destiny 2 and analyze how

15   it operated or worked on a user's computer?

16        A.    I have not.

17        Q.    Have you ever used Destiny 2 or observed Destiny

18   2 to confirm whether it accesses files on a user's

19   computer?

20        A.    I have not.

21        Q.    Have you ever analyzed Destiny 2 to determine

22   whether it circumvents any technological protection

23   measures when it's on a user's computer?

24        A.    I have not.

25        Q.    I want to turn back to Exhibit 1 here, which is
```

BRAD LAPORTE - 09/28/2023

Page 92

1   a copy of your expert report.

2           Are all of your opinions that you have in this

3   case articulated in this report?

4       A.   I believe so.

5       Q.   You believe so or you know so?

6       A.   I know so.

7       Q.   Okay.  Do you have any opinions related to this

8   case that are not expressed in this expert report?

9       A.   No.

10      Q.   So you would agree that this report is a

11  complete description of your opinions?

12      A.   That is correct.

13      Q.   Were you asked to offer any opinions about the

14  Destiny 2 cheat software sold by Aimjunkies.com?

15      A.   I was not.

16      Q.   Do you have any expert opinions about how the

17  Defendants' Destiny 2 cheat software sold on

18  Aimjunkies.com operates?

19          MR. MANN:  Object to the form of the question.

20          THE WITNESS:  I do not.

21  BY MR. DINI:

22      Q.   Do you have any expert opinions about how the

23  Defendants' Destiny 2 cheat software sold on

24  Aimjunkies.com could operate?

25          MR. MANN:  Object to the form of the question.

BRAD LAPORTE - 09/28/2023

Page 93

1                 THE WITNESS:  I do not.

2    BY MR. DINI:

3        Q.    Do you have any expert opinion about how the

4    Defendants' cheat loader that was distributed on

5    Aimjunkies.com functions?

6                 MR. MANN:  Object to the form of the question.

7                 THE WITNESS:  I do not.

8    BY MR. DINI:

9        Q.    Do you have any expert opinions about how the

10   Defendants' cheat loader that was distributed on

11   Aimjunkies.com could function?

12                MR. MANN:  Object to the form of the question;

13        calls for speculation.

14                THE WITNESS:  I do not.

15   BY MR. DINI:

16       Q.    Were you asked to provide any opinions, any

17   expert opinions regarding whether Bungie breached the

18   Aimjunkies.com terms of service in connection with this

19   case?

20       A.    I do not.

21       Q.    Were you asked to provide any opin -- expert

22   opinions regarding whether Mr. May consented to Bungie's

23   purported access of files on his computer?

24       A.    I was not.

25       Q.    Were you asked --

Page 94

1       A.   I'm sorry, can you strike that?  Can you repeat

2   the question?

3       Q.   Yeah.  Were you asked to provide any expert

4   opinions regarding whether Mr. May consented to Bungie's

5   purported access of files on his computer?

6       A.   No.

7       Q.   Were you asked to provide any expert opinions

8   regarding whether Bungie circumvented any of Mr. May's

9   technological protection measures to access any files on

10  his computer?

11      A.   Can you repeat the question?

12      Q.   Yeah.  Were you asked to provide any expert

13  opinions regarding whether Bungie circumvented any of Mr.

14  May's technological protection measures to access any

15  files on his computer?

16      A.   No.

17      Q.   Mr. LaPorte, would you say that your expert

18  report in this case is accurate and that it accurately

19  reflects your opinions in this case?

20      A.   That's correct.

21      Q.   Sitting here now, are there any errors in your

22  expert report that you think -- that we need to -- excuse

23  me.

24           Sitting here now, are there any errors that you

25  need to fix in your expert report before we start talking

Page 95

1   about it?

2        A.   Just the one that we identified.

3        Q.   Okay.  You would agree that it's important that

4   your expert report is accurate, right?

5        A.   Understood, yes.

6        Q.   You would agree that it's important that your

7   expert report is complete, right?

8        A.   That's correct.

9        Q.   You took your time making this report, right?

10       A.   That's correct.

11       Q.   You wrote it carefully?

12       A.   I did.

13       Q.   And you reviewed it carefully?

14       A.   That's correct.

15       Q.   Okay.  I think now is a good time for a quick

16   break, maybe five, ten minutes, come back at 10:07.

17            MR. MANN:  That sounds good to me.

18            THE VIDEOGRAPHER:  This will end file two in the

19       deposition of Brad LaPorte.  Off the record at 10:00

20       o'clock.

21            (Recess taken from 10:00 a.m. to 10:10 a.m.)

22            THE VIDEOGRAPHER:  This will begin file three in

23       the deposition of Brad LaPorte.  Back on the record

24       at 10:10.

25   BY MR. DINI:

Page 165

1          be more clear than that.

2     BY MR. DINI:

3          Q.   So is it something like has -- can see the space

4     where the files are, is that maybe another way to put it?

5          A.   Well, the -- the system is only accessible to

6     Mr. May, it's his property.  And any kind of access to any

7     files, any system, any information whatsoever that -- that

8     on -- that is on that device by nature should not be

9     accessible.  So in -- it's anything regarding that.

10         Q.   Would "access" mean that someone at -- someone

11    at Bungie is opening entire directories and sort of

12    thumbing through files on the computer or --

13         A.   Correct.  One would not be able to do that

14    unless you had full access to the system.

15         Q.   Did you arrive at an opinion on this issue

16    whether Bungie appears from the evidence to have accessed

17    certain private files on the computer of James May?

18         A.   Yes, and it's stated in my report.

19         Q.   What is that opinion?

20         A.   Yeah.  In the documents that I reviewed, it was

21    apparent that access to Mr. May's system did -- was

22    obtained.

23         Q.   Access by who?

24         A.   That attribution is -- is -- was something I was

25    not able to discern.

Page 166

1        Q.   So you weren't able to the determine whether

2   Bungie accessed Mr. May's computer private -- private

3   files on Mr. May's computer?

4        A.   That's correct.

5        Q.   So you can't say for sure whether -- whether

6   Bungie accessed private files on Mr. May's computer.

7        A.   That's correct.

8        Q.   Are there -- in coming to these opinions, did

9   you ever talk to Mr. May?

10       A.   No.

11       Q.   Did you ever look at Mr. May's computer that

12   he -- was allegedly accessed?

13       A.   No.

14       Q.   Did you ever remotely access his computer that

15   was allegedly accessed?

16       A.   No.

17       Q.   Do you know what kind of computer he was

18   running?

19       A.   He was running a Windows machine.

20       Q.   Do you know what the spec -- specifications of

21   that machine are?

22       A.   That was not something I was necessarily

23   thinking of when I was -- I don't recall.

24       Q.   What sort -- do you know what sort of

25   protections, if any, he had in place to protect access to

BRAD LAPORTE - 09/28/2023

Page 167

1   his computer?

2        A.   He would typically have a -- a password

3   protected access to the system and having Windows Defender

4   running by default at a minimum.

5        Q.   How do you know that?

6        A.   Because it's out-of-box configuration when

7   setting up a new system.  So he would have to disable

8   those features, which is -- he would have to have a bona

9   fide reason to do that, which no normal -- it wouldn't be

10  a reasonable thing to consider that someone would do that.

11       Q.   Do you know whether Mr. May altered those

12  standard settings on his computer?

13       A.   I do not.

14       Q.   Do you know what files, if any, on Mr. May's

15  computer were private?

16       A.   If it was on his local disk on his system, that

17  would be the property of Mr. May.

18       Q.   Do you know if any of his files were stored

19  differently than non-private files?

20       A.   On his system they would -- anything that's on

21  the physical device, he would own that property.

22       Q.   What documents, if any, support your opinion

23  that Mr. May's files were accessed by someone?

24       A.   Exhibit C.  Exhibit C is the answer.

25       Q.   Any other documents?

BRAD LAPORTE - 09/28/2023

Page 191

1                          CERTIFICATE OF OATH

2

   STATE OF FLORIDA       )
3                          )
   COUNTY OF PALM BEACH  )

4

5          I, Deborah Carmela Dew, FPR, Court Reporter and

6   Notary Public, State of Florida, certify that BRAD LAPORTE

7   appeared remotely before me via Zoom videoconference,

8   produced identification, and was duly sworn on the 28th

9   day of September, 2023.

10          Witness my hand this 2nd day

11   of October, 2023.

12

13

14

15

16         Deborah Carmela Dew, FPR
           Notary Public, State of Florida
17         Commission No.:  HH125890
           Expires:  August 21, 2025
18

19

20   PERSONALLY KNOWN_____
     OR PRODUCED IDENTIFICATION XXXXX
21   TYPE OF IDENTIFICATION PRODUCED:  Driver's License

22

23

24

25

BRAD LAPORTE - 09/28/2023

Page 192

1                    CERTIFICATE OF REPORTER

2

STATE OF FLORIDA      )
3                       )
COUNTY OF ST. LUCIE )

4

5            I, Deborah Carmela Dew, Florida Professional

6    Reporter, do hereby certify that I was authorized to and

7    did remotely stenographically report the videotaped

8    deposition of BRAD LAPORTE; that a review of the

9    transcript was requested; and that the foregoing

10   transcript, pages 1 through 190 is a true record of my

11   stenographic notes.

12           I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel or counsel connected with the action,

16   nor am I financially interested in the action.

17           DATED this 2nd day of October, 2023.

18

19

20

21   _____

     Deborah Carmela Dew,
22   Florida Professional Reporter

23

24

25