THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BUNGIE, INC.,

                Plaintiff,

      v.

AIMJUNKIES.COM; PHOENIX DIGITAL
GROUP, LLC; DAVID SCHAEFER; JORDAN
GREEN; JEFFREY CONWAY; and JAMES
MAY,

                Defendants.

No. 2:21-cv-00811

PLAINTIFF BUNGIE, INC.'S TRIAL
BRIEF

BUNGIE'S TRIAL BRIEF
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

**Table of Contents**

Page

I.      STATEMENT OF THE CASE ................................................................................ 1

II.     STATEMENT OF EVIDENCE ............................................................................. 2

        A.      Bungie and *Destiny 2* ........................................................................... 2

        B.      Defendants' History of Cheat Development ......................................... 3

        C.      Defendants Developed the Cheat Software .......................................... 4

        D.      How the Cheat Software Operates ....................................................... 5

                1.      The ESP Cheat Feature ............................................................. 5

                2.      The AIMBOT Cheat Feature .................................................... 7

                3.      The One Position Kill Cheat Feature ....................................... 7

                4.      The Cheat Loader ..................................................................... 7

        E.      Defendants Profited from their Malicious Conduct and Harmed Bungie.............. 8

        F.      May's DMCA Counterclaim ................................................................. 8

III.    LEGAL ISSUES .................................................................................................. 10

        A.      Bungie's Copyright Infringement Claims ........................................... 10

                1.      Bungie will prove all essential elements of its direct copyright
                        infringement claim. ................................................................. 10

                2.      Bungie will prove all essential elements of its contributory
                        copyright infringement claim................................................... 13

                3.      Bungie will prove all essential elements of its vicarious copyright
                        infringement claim. ................................................................. 13

        B.      May's DMCA Counterclaim Fails ....................................................... 14

                1.      None of the files Bungie allegedly accessed were works protected
                        by copyright. ............................................................................ 15

                2.      Bungie did not circumvent May's technological measures ...... 16

                3.      May consented to Bungie's access .......................................... 17

IV.     EVIDENTIARY ISSUES .................................................................................... 18

BUNGIE'S TRIAL BRIEF – i
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

V.    DAMAGES AND INJUNCTIVE RELIEF ........................................................ 18

    A.    Bungie Is Entitled to At Least $43,210 in Damages ................................. 18

    B.    Bungie Is Entitled to a Permanent Injunction ........................................ 19

    C.    Bungie Is Entitled to Its Attorneys' Fees and Costs ............................... 20

    D.    May Is Not Entitled to Any Relief on His Counterclaim ........................ 20

VI.   CONCLUSION ........................................................................................... 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Plaintiff Bungie, Inc. ("Bungie" or "Plaintiff") respectfully submits this trial brief:

2    **I.      STATEMENT OF THE CASE**

3    Bungie asserted nine claims against Defendants for their development and sale of cheat

4    software for Bungie's *Destiny 2* and *Destiny 2: Beyond Light*[1] video games ("Cheat Software").

5    Dkt. Nos. 1, 34.  This Court referred six claims to arbitration, where arbitrator Judge Ronald Cox

6    (Ret.) found Defendants liable for circumventing technological measures and trafficking in

7    circumvention technology in violation of the DMCA, breach of contract, tortious interference, and

8    violation of the Washington Consumer Protection Act, and awarded Bungie damages and

9    injunctive relief.  Dkt. No. 89-1 ("Final Award").  This Court confirmed the arbitration award on

10   June 13, 2023.  Dkt. No. 140.

11   Binding factual findings from the confirmed Final Award, and facts admitted by both

12   parties in this case, significantly narrow the issues for trial.  These binding factual findings and

13   admitted facts include, but are not limited to:

14   - Bungie owns copyrights in *Destiny 2* and *Destiny 2: Beyond Light*;

15   - Defendant James May reverse engineered *Destiny 2* to develop the cheat software

16     for *Destiny 2* that the remaining Defendants sold on AimJunkies.com (the "Cheat

17     Software");

18   - May did so in concert with and for the benefit of the other Defendants;

19   - Defendants Schaefer, Green, and Conway were equal 1/3 owners in Defendant

20     Phoenix Digital Group, LLC, which distributed the Cheat Software through

21     AimJunkies.com; and

22   - To operate, the Cheat Software necessarily creates (a) unauthorized copies of

23     *Destiny 2* code, and (b) unauthorized derivative works based on *Destiny 2*.

24

25

26   [1] Unless otherwise specified, *Destiny 2* and *Destiny 2: Beyond Light* shall be referred to collectively as "*Destiny 2*."

BUNGIE'S TRIAL BRIEF – 1
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

Based on these facts—which are stipulated or have binding preclusive effect in this case—very little remains to be found at trial to find Defendants liable on Bungie's only remaining claim for copyright infringement.[2]   Bungie asserts three theories of copyright infringement: direct, contributory, and vicarious.  Bungie seeks at least $43,210 in damages in connection with this claim, as well as Bungie's reasonable attorneys' fees and costs, and permanent injunctive relief.

May asserted four counterclaims and Phoenix Digital also asserted a counterclaim; the Court dismissed all except one with prejudice on summary judgment.  Dkt. No. 201.  May's one remaining counterclaims alleges that Bungie violated the anticircumvention provision of the Digital Millennium Copyright Act (17 U.S.C. § 1201) ("DMCA").

## II.    STATEMENT OF EVIDENCE

### A.    Bungie and *Destiny 2*

*Destiny 2* is a successful shared-world first-person shooter video game.  Originally released in September 2017, *Destiny 2* is now free-to-play and enjoyed by an estimated player base of over 30 million players.  Bungie released *Destiny 2: Beyond Light*, one of its paid expansions, on November 10, 2020.  Bungie owns all rights, title, and interest in the copyrights in *Destiny 2* including its computer software and the audiovisual works that software creates, which are the subject of four U.S. copyright registrations.  TX 1-4.

Among other things, Bungie's copyrighted computer software consists of data structures that correspond to certain attributes of *Destiny 2*, including, for example, player positioning (the locations of players and non-player characters) and rendering (code that determines what players see from their characters' position).  The data structures provide a precise layout for individual pieces of data stored and organized in a computer's memory, so that the game functions as intended.  Bungie's copyrighted computer software for *Destiny 2* includes what is commonly referred to as the *Destiny 2* "game engine."

---

[2] Bungie has elected not to pursue its trademark infringement or false designation of origin claims at trial.

BUNGIE'S TRIAL BRIEF – 2
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

Bungie will rely on two technical experts at trial—Steven Guris and Edward Kaiser, Ph.D. Mr. Guris has a B.S. in software engineering, is the Director of Threat Investigations at Unit 221B, a cybersecurity firm, and has extensive experience with *Destiny 2*. He will testify regarding his analysis Defendants' Cheat Software loader and the irreparable harm inflicted by the Cheat Software on Bungie.

Dr. Kaiser has a Bachelor of Applied Science in Computer Engineering and a Ph.D. in Computer Science, Network Security and is an Engineering Lead and head of Bungie's Product Security Team. He has substantial experience, including in connection with his doctoral thesis, identifying, investigating, and implementing fixes to stop cheaters and other bad actors in *Destiny 2*. Dr. Kaiser also wrote portions of the code for *Destiny 2*, including code that interacts with player inputs and player and combatant positioning data structures, and is intimately familiar with the game and its operation.

**B.    Defendants' History of Cheat Development**

In 2012, David Schaefer, Jeffrey Conway, and Jordan Green formed and became equal 1/3 owners of Phoenix Digital Group LLC (collectively referred to as the "Phoenix Digital Defendants"). Phoenix Digital's sole business purpose was to develop and sell cheats for video games from websites, including Aimjunkies.com. Although each had full control and authority to manage Phoenix Digital (TX 21 (Phoenix Digital LLC Agreement) ¶ 4.3), generally Conway managed finances, Green performed engineering work (including testing and verifying cheats), and Schaefer acted as the general business manager. Schaefer directed almost all of Phoenix Digital's actions. Indeed, Conway has testified that he acted at Schaefer's command, "blindly" and without "exceris[ing] [] independent thought[.]" Schaefer personally controlled every aspect of the cheat sales—communicating with developers, deciding whether to sell a cheat, allocating profits from sales, and deciding when to stop selling a cheat. Bungie will demonstrate that Defendant James May developed cheats for Phoenix Digital and shared in profits from Phoenix Digital's sales. Mr. May will testify that, at all relevant times, May had no other income and

BUNGIE'S TRIAL BRIEF – 3
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1   distributed cheats he developed only through Phoenix Digital and its websites, including

2   AimJunkies.com.

3           For cheats developed by May and sold through AimJunkies.com, Schaefer, Conway,

4   Green, and May each shared the profits. May received 50%, and Schafer, Conway, and Green

5   split the remaining 50% evenly. Those profits were substantial: Defendants sold nearly $1 million

6   in cheats *from 2019 - 2020 alone*.

7   **C.   Defendants Developed the Cheat Software**

8           The evidence will show that Defendants developed the Cheat Software throughout 2019.

9   In or around October 2019, May began reverse engineering *Destiny 2* using a variety of tools,

10  including Phoenix Digital's "in-house tool" that it provided to cheat developers and that was

11  digitally signed by Phoenix Digital with credentials provided by Schaefer. *See* TX 138. May will

12  admit that he was reverse engineering *Destiny 2* in order to help develop a cheat for *Destiny 2*.

13          Bungie will present evidence that Defendants continually updated the Cheat Software,

14  releasing at least three versions. In November 2019, Phoenix Digital announced it would soon be

15  releasing a cheat for *Destiny 2*. TX 72.002 (Phoenix Digital promotional email). On or around

16  December 17, 2019, Phoenix Digital released its first version with an "Extra-Sensory Perception"

17  ("ESP") feature, allowing cheaters to see through walls. TX 72.010 (Defendants' promotional

18  email). A few days later, December 23, 2019, Phoenix Digital released a second "full" version of

19  the Cheat Software with new features such as "AIMBOT," and "One Position Kill" ("OPK"). TX

20  72.012. About one year later, on November 11, 2020, Phoenix Digital released a third version of

21  the Cheat Software for use with Bungie's new expansion, *Destiny 2: Beyond Light*. TX 112 (Tweet

22  announcing release of updated Cheat Software). Despite Bungie banning him on numerous

23  occasions, May assisted with all of these versions, repeatedly connected reverse engineering tools

24  to *Destiny 2* from October to May 2021, circumventing *Destiny 2*'s technological protections on

25  at least 100 separate occasions that Bungie detected. TX 138.

26

BUNGIE'S TRIAL BRIEF – 4
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

**D.    How the Cheat Software Operates**

Defendants' Cheat Software gives cheaters an unfair advantage by adding unauthorized features, including ESP, AIMBOT, and OPK.  Defendants admit that the Cheat Software includes these features and what they do (e.g., see through walls).  Defendants otherwise claim to not know how the Cheat Software and its loader operates.  Only Bungie's experts, Dr. Kaiser and Mr. Guris, can and will testify about how the software operates, and Defendants did not and cannot refute this testimony.

**1.    The ESP Cheat Feature**

The ESP feature allows cheaters to see the location of other players and non-player characters, including through solid walls.  As illustrated in the screenshots below, the Cheat Software displays a box around the other players with their names and distance from the cheater.

**Normal Player's View**



**Player's View Using Defendants' Cheat Software**



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Dr. Kaiser will testify regarding how the developer of the Cheat Software infringed Bungie's copyrights and violated the LSLA, including by accessing a local copy of the client software of Destiny 2 to reverse engineer it, copying code, and making derivative works.  Mr. May will confirm that he did, in fact, accessed and reverse engineered *Destiny 2* many times.

Dr. Kaiser will testify regarding how the Cheat Software itself necessarily infringes in order to function.  In order to display player locations, the Cheat Software must copy and modify Bungie's copyrighted computer software.  In particular, to enable the ESP feature, Defendants copied the code related to the data structures for player positioning and rendering and reverse engineered that code.[3]  Defendants then incorporated derivatives of the copied code into the Cheat Software.  When in use, the Cheat Software creates a modified version of the visual display.  Cheaters run a copy of *Destiny 2* on their computers while also running a copy of the Cheat Software; the Cheat Software injects its code into (*i.e.*, runs its software code inside) the *Destiny 2* game engine; the injected code extracts the normally-inaccessible data about player positioning and manipulates the rendering data; and the Cheat Software then utilizes the game's camera and display functions to display the boxes and player information to the cheaters.

Each time Bungie updated its code, Defendants updated their Cheat Software to enable its functionality with the updated code, creating new copies of the data structures and software code and incorporating them into the updated Cheat Software.  At a minimum, Defendants updated their Cheat Software (a) on or around December 23, 2019 when they released the "full" version of the cheat (TX 72.012) and (b) on or around November 11, 2020 when they released a version for the *Destiny 2: Beyond Light* expansion (TX 112).

---

[3] Bungie employs measures to obfuscate this code from would-be attackers with a form of encryption that could not have been broken but for Defendants' copying and reverse engineering against that code.

BUNGIE'S TRIAL BRIEF – 6
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

### 2.      The AIMBOT Cheat Feature

Accuracy is also an essential skill in a first-person shooter game like *Destiny 2*. The AIMBOT feature allows cheaters to aim weapons automatically and accurately (*i.e.*, without movement of the mouse and/or controller joystick), also providing a hugely unfair advantage.

Dr. Kaiser will explain that, as with the ESP feature, to provide the AIMBOT feature, Defendants copied the code related to the data structures for player positioning (*i.e.*, the target at which the player aims their weapon), reverse engineered the *Destiny 2* software code that calculates the angle deltas for mouse movements (*i.e.*, software code used to calculate how far the weapon cursor moves in *Destiny 2* in response to inputs), and then incorporated code derived from the copies into the Cheat Software. The Cheat Software also injects code into the game engine that allow the AIMBOT feature to function. And, like the ESP feature, Defendants made additional copies of Bungie's software code to keep the AIMBOT feature working with the updated versions of *Destiny 2*.

### 3.      The One Position Kill Cheat Feature

The OPK feature shortcuts *Destiny 2*'s skill-based combat progression by allowing cheaters to move other players and characters to a single position so that the cheater can damage them all at once. Like the Cheat Software's other features, to enable OPK, Defendants copied the code related to the data structures for player positioning and combatant positioning to permit reverse engineering; incorporated cheat code derived from the copied code into the Cheat Software; and injected that cheat code that modifies player input data structures and functionalities into *Destiny 2* on the cheaters' computers. Similarly, Defendants updated the Cheat Software to reflect Bungie's updates to *Destiny 2*.

### 4.      The Cheat Loader

Cheat Software users must also download a loader from AimJunkies.com. As Mr. Guris will explain, the cheat loader—a third party product that Defendants distributed with the purchase of the Cheat Software—injects the Cheat Software into the *Destiny 2* process, allowing the cheat

BUNGIE'S TRIAL BRIEF – 7
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1  to operate within and modify *Destiny 2*.  Each cheater had to download Defendants' loader.  Like

2  malware, Defendants' loader requires extremely broad access to the cheater's computer to operate.

3  Defendants' loader also circumvented Bungie's copyright protections by injecting code into the

4  *Destiny 2* process.

5  **E.    Defendants Profited from their Malicious Conduct and Harmed Bungie**

6          Due to Defendants' spoliation, the true number of Cheat Software sales cannot be known.

7  But from the records that Defendants did not destroy and those produced by third parties,

8  Defendants sold a minimum of 1,406 copies of the Cheat Software, totaling over $43,210 in sales.

9  Each Defendant received a portion of the Cheat Software revenue.

10          In addition to profiting from their actions, Defendants' Cheat Software also directly harmed

11  Bungie.  Mr. Guris will testify regarding his opinions that cheaters poison the experience for

12  legitimate players and devalue the larger ecosystem built around an online live-service multiplayer

13  game such as *Destiny 2*, where retention of invested players is paramount.  Even a small number

14  of cheaters drives away retained players and drops the popularity of a game among new players.

15          Here, Bungie's *Destiny 2* player base has been harmed by Defendants' conduct.  Bungie

16  recorded more than 6,000 complaints about players using the Cheat Software and spent millions

17  of dollars combatting cheaters and cheat developers such as Defendants in order to protect its

18  player base.  TX 136.

19  **F.    May's DMCA Counterclaim**

20          May alleges that Bungie circumvented technological protections on his computer to access

21  certain files.  May admits to and was found liable for violating the DMCA anti-circumvention

22  provision by reverse engineering *Destiny 2*.  Dr. Kaiser will testify that when May connected

23  reverse engineering tools to the *Destiny 2* process, or ran processes on his computer at the same

24  time as *Destiny 2*, the *Destiny 2* process obtained metadata (e.g., file headers containing file path

25  information) and recorded an MD5 hash—a string of numbers and letters that serves as a unique

26  identifier or digital watermark—of those tools and programs that May was using.  Incredibly, May

BUNGIE'S TRIAL BRIEF – 8
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1   now asserts that Bungie's discovery of **his** reverse engineering—which was held to violate the

2   DMCA anti-circumvention provision—somehow shows that **Bungie** circumvented May's

3   technological protections.  The conduct of which May complains, however, was simply the *Destiny*

4   *2* process identifying malicious programs that were connected or running parallel to it, like May's

5   reverse engineering tools.

6       May will admit that he also agreed to Bungie's collection of this data by accepting Bungie's

7   Limited Software License Agreement ("LSLA") which incorporates by reference Bungie's

8   Privacy Policy.  TX 20 (LSLA); TX 205 (Bungie's Privacy Policy).  May will also admit that he

9   changed the names of reverse engineering files on his computer, on the assumption that those file

10  names could be detected by video game developers.  By agreeing to the Privacy Policy, May

11  consented to Bungie "collect[ing] Personal Information about you and your use of the Bungie

12  Services via automated means, such as through cookies, web beacons and similar technologies,"

13  including information such as, but not limited to:

14  - Bungie Services Use Data, including information about your use of the Bungie

15    Services, the pages and content that you view, the referring and existing pages, your

16    access times, the links you click, and other actions taken within the Bungie

17    Services.

18  - Device Data, including information regarding your device, such as device type,

19    operating system type, browser type, device regional and language settings, IP

20    address, and device ID (such as IDFA or AAID).

21  TX 205 at 4.  This information is collected by Bungie to, among other reasons, "prevent

22  fraudulent use of the Bungie Services," "enforce our Terms of Use [and] our legal rights," and

23  "prevent or address potential or actual injury or interference with our rights, property, operations,

24  users or others who may be harmed or may suffer loss or damage."  *Id.* at 6.  To collect data that

25  is helpful in preventing fraudulent uses of the Bungie Services and in protecting Bungie's

26  intellectual property rights, *Destiny 2* detects potentially malicious processes that can interfere

BUNGIE'S TRIAL BRIEF – 9
(No. 2:21-cv-00811)

164335632.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    with *Destiny 2*, such as cheat software or reverse engineering tools, computes an MD5 hash of the

2    corresponding files as a unique file-identifier, and reports the MD5 hash to Bungie, if queried.

### III.    LEGAL ISSUES

### A.    Bungie's Copyright Infringement Claims

Bungie asserts three theories for copyright infringement: (1) Defendants directly infringed

Bungie's copyrights in *Destiny 2* in their development and distribution of the Cheat Software; (2)

Defendants contributorily infringed when they distributed the Cheat Software; and (3) Defendants

vicariously infringed when they distributed the Cheat Software.   The evidence will show that

Defendants are liable under all three theories, and Bungie is entitled to recover at least $43,210 in

damages.

### 1.    Bungie will prove all essential elements of its direct copyright infringement claim.

Bungie must prove two elements to succeed on its direct copyright infringement claim:

(1) ownership of the infringed material and (2) that Defendants violated at least one exclusive right

granted to copyright holders under 17 U.S.C. § 106.  *Disney Enters., Inc. v. VidAngel, Inc.*, 869

F.3d 848, 856 (9th Cir. 2017).  A copyright owner's exclusive rights include the rights to reproduce

the copyrighted work, prepare derivative works based on the copyrighted work, and distribute

copies of the copyrighted work.  17 U.S.C. § 106(1)–(4).

The first element is stipulated for trial.  Bungie owns four copyright registrations covering

the *Destiny 2* computer software code and audiovisual works that Defendants infringed.  TX 1-4.

These registrations protect the entirety of the computer software code and audiovisual components

of the *Destiny 2* video game and the *Destiny 2: Beyond Light* expansion.  *Id.*  Bungie thus owns

the infringed materials.  *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th

Cir. 2011) (a copyright registration is prima facie evidence of the validity of the copyright).

BUNGIE'S TRIAL BRIEF – 10
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

As Dr. Kaiser will explain, the evidence will also show that Defendants violated Bungie's exclusive rights to reproduce, prepare derivative works from, and distribute copies of its copyrighted works.

**First,** to create the Cheat Software, Defendants copied *Destiny 2* twice. Defendants copied certain portions of copyrighted software code from *Destiny 2*, reverse engineered against that code to develop derivative cheat code, and incorporated that unauthorized derivative code into the Cheat Software. Specifically, Defendants copied the data structures that correspond to player and combatant positioning; and reverse-engineered the code dedicated to the game's rendering and calculation of angle deltas for mouse movement; and incorporated a derivative of Bungie's software code into the Cheat Software. Dr. Kaiser will explain how the Cheat Software's ESP, AIMBOT, and OPK features could not function without this copied and reverse engineered code, and Defendants could not have successfully reverse engineered against Bungie's code except by experimentation against an unauthorized copy. That copying infringes Bungie's copyrights. *See Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1161 (C.D. Cal. 2018) ("The act of downloading and storing the pages and code of a website qualifies as making a 'copy' under the Copyright Act . . . ."). And, in order to create the Cheat Software, Defendants also downloaded copies of the entirety of *Destiny 2* software code onto their computers. Defendants did so *after* breaching LSLA, meaning that their license to access *Destiny 2* was terminated. Each download of *Destiny 2* after their LSLA was terminated was thus unlicensed, and each copy was an infringement.

Moreover, when Defendants updated the Cheat Software to ensure compatibility with *Destiny 2* code updates, Defendants copied Bungie's updated code. Therefore, Defendants infringed Bungie's exclusive right to copy or reproduce its copyrighted *Destiny 2* code, which is alone sufficient for Bungie to prevail on its copyright infringement claim.

**Second,** as has been conclusively determined at the arbitration proceeding, the Cheat Software creates derivative works of *Destiny 2* when it operates. This includes derivative works

BUNGIE'S TRIAL BRIEF – 11
(No. 2:21-cv-00811)

164335632.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1   based on the software code and the audiovisual works.  Adding new features to a video game

2   infringes the right to create derivative works.  *See Micro Star v. Formgen Inc.*, 154 F.3d 1107,

3   1112 (9th Cir. 1998) (levels of computer game burned onto a CD disk were derivative works in

4   part because the levels manipulated the game code to create an altered visual display); *Dun &*

5   *Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 208 (3d Cir. 2002); *Take-*

6   *Two Interactive Software, Inc. v. Zipperer*, No. 18 Civ. 2608, 2018 WL 4347796, at *8 (S.D.N.Y.

7   Aug. 16, 2018) (granting preliminary injunction where cheat developer created an alternative

8   version of plaintiff's video game with "added elements that allow its users to use features not

9   available" in the original game).

10   Here, the Cheat Software injects code into *Destiny 2*, including into the player positioning

11   and player input data structures; the cheat code then manipulates those structures to create modified

12   versions of the *Destiny 2* software code, i.e., derivative works based on the *Destiny 2* software

13   code.  The Cheat Software also creates modified audiovisual displays when the ESP feature draws

14   boxes around *Destiny 2* characters and displays information about those characters.  These are also

15   unauthorized derivative works of the *Destiny 2* audiovisual copyrighted works.

16   **Third and finally**, Defendants infringed Bungie's exclusive right to distribute copies of

17   *Destiny 2*.  As discussed above, Defendants sold more than 1,400 copies of the Cheat Software,

18   which incorporated copies of code derived from Bungie's copyrighted code.  Each sale of the

19   Cheat Software violated Bungie's distribution right.  *See Nexon Am., Inc. v. S.H.*, No. CV 10-9689

20   (JCx), 2011 WL 13217951, at *4 (C.D. Cal. Dec. 13, 2011) (holding that defendant distributed

21   infringing cheat software, which was a modified version plaintiff's video game software, by

22   uploading it to a website where it was then downloaded by users); *see* TX 156.003 (Phoenix

23   Digital's Supp. Resp. to ROG 6) (stating that the Cheat Software passes through a Phoenix Digital

24   computer to the customer's computer).

25

26

BUNGIE'S TRIAL BRIEF – 12
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1

2

### 2. Bungie will prove all essential elements of its contributory copyright infringement claim.

To be liable for contributory infringement, (1) the defendant must have knowledge of direct infringement; and (2) either induce, cause, or materially contribute to the infringing conduct. *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013). "[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability." *ALS Scan, Inc. v. Cloudflare, Inc.*, No. CV 16-5051 (AFMx), 2018 WL 11350606, at *9 (C.D. Cal. Mar. 13, 2018) (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)).

That the Defendants' customers directly infringed Bungie's copyrights cannot be challenged because, as Judge Cox found, "[t]o operate, the cheats necessarily create unauthorized copies of the *Destiny 2* code and unauthorized derivative works." TX 167.023 (Final Award). Defendants sold more than 1,400 copies of their Cheat Software. And Defendants are aware of the resulting infringement by their customers. TX 72 (advertising features of the Cheat Software on AimJunkies.com); TX 53 (AimJunkies.com website *Destiny 2* cheat information page); *see also* TX 67 (AimJunkies.com announcement looking for cheat developers with the "ability to reverse engineer" video games and knowledge of "anti-cheating strategies"). Defendants will also testify that they were the direct cause of and encouraged that infringement. *See, e.g.*, TX 72 (promotional emails). But for Defendants' creation, advertising, and sale of the Cheat Software, the cheaters' infringement would not have occurred. Defendants therefore induced, caused, or materially contributed to the infringing conduct "by advertising and making the [Cheat Software] available for download on [their] website." *Nintendo of Am., Inc. v. Storman*, No. CV 19-7818 (RAOx), 2021 WL 4780329, at *4 (C.D. Cal. Aug. 5, 2021) (defendant contributorily infringed by distributing infringing copies of video games on his website).

### 3. Bungie will prove all essential elements of its vicarious copyright infringement claim.

Liability for vicarious copyright infringement extends to a defendant who "has the right and ability to supervise the infringing activity and also has a direct financial interest in such

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1   activities." *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (quoting

2   *Fonovisa*, 76 F.3d at 262).  A financial interest exists where "the availability of infringing material

3   acts as a draw for customers." *Nintendo of Am.*, 2021 WL 4780329, at *4.  "A defendant 'exercises

4   control over a direct infringer when he has both a legal right to stop or limit the directly infringing

5   conduct, as well as the practical ability to do so.'" *Broad. Music, Inc. v. Benchley Ventures, Inc.*,

6   131 F. Supp. 3d 1097, 1103 (W.D. Wash. 2015) (quoting *Perfect 10, Inc. v. Amazon, Inc.*, 508

7   F.3d 1146, 1173 (9th Cir. 2007)).

8        Bungie will satisfy both elements.  Defendants admit that they have both the right and

9   practical ability to control their customers' infringement.  Schaefer concedes he made the decision

10  to sell the Cheat Software and had the ability and authority to turn the Cheat Software "off" so it

11  could not be used.  In addition, Defendants admit to a direct financial interest in the Cheat

12  Software—generating more than $43,000 in sales from the Cheat Software.  And, as advertised by

13  the Defendants, the primary attraction of the Cheat Software were the features ESP, AIMBOT,

14  and OPK, which individually and together infringe Bungie's copyrights.  TX 72 (promotional

15  emails).  Therefore, Defendants are vicariously liable for the cheaters' infringement.

16  **B.     May's DMCA Counterclaim Fails**

17       James May asserts a single counterclaim against Bungie under the DMCA, claiming that

18  Bungie hacked May's computer when it detected May circumventing Bungie's technological

19  protection measures to create the Cheat Software for *Destiny 2*.  The evidence will show that May's

20  counterclaim fails for multiple reasons.  Under the DMCA, May must prove by a preponderance

21  of the evidence that (1) he employs technological measures that effectively control access, (2) to

22  May's works that are protected by copyright, and that (3) Bungie circumvented those technological

23  measures.  17 U.S.C. § 1201(a)(1)(A).  May cannot meet this burden.

24

25

26

BUNGIE'S TRIAL BRIEF – 14
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

   **1. None of the files Bungie allegedly accessed were works protected by copyright.**

  First, the evidence will show that May does not own any works that are protected by copyright.  "To the extent the [plaintiff's software] is not a 'work protected under [the copyright statute,]' . . . the DMCA necessarily would not protect it."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 550 (6th Cir. 2004) (second alteration in original).  May identifies four copyrighted works as protected by technological measures: blah64.exe, reclass.net.exe (a/k/a renamedreclass.exe), reclasskernel.sys, and reclasskernel64.pdb.  The parties have stipulated to the fact that May has not registered these works.

  "In the DMCA context, where a party has not registered its work, the absence of registration 'makes it difficult for [a counterclaimant] to succeed on [his] DMCA claim, which is dependent on proof of a valid copyright.'"  *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-726, 2013 WL 4409434, at *17 (E.D.N.Y. Aug. 2, 2013) (quoting *Jagex Ltd. v. Impulse Software*, 750 F. Supp. 2d 228, 237 (D. Mass. 2010)).  In *Point 4 Data Corp.*, "because plaintiffs [did] not have a registered copyright in the [software allegedly accessed by the defendant], the Court [needed to] examine whether plaintiffs [had] adduced sufficient evidence to establish a genuine issue of fact with respect to the copyrightability of their [s]oftware."  *Id.*  This is because "not every element [of computer software], whether literal or nonliteral, is automatically entitled to protection," but is instead subject to at least three doctrines that "define (and limit) the scope of copyright protection," namely, "the exclusion of functional elements, the merger doctrine[,] and *the scenes a faire* doctrine."  *Id.* at *18 (internal footnotes omitted).  "Thus, for computer software to merit copyright protection, **it is not enough for the party claiming protection to show that it independently created a certain number of lines of code**.  On the contrary, the Court must undertake a highly complex analysis that typically requires expert evidence."  *Id.* (emphasis added).  Thus, that court granted the defendant's motion for summary

1   judgment because "the evidence remaining in the record [was] not sufficient to create an issue of

2   fact with respect to the copyrightability of the [s]oftware [at issue]." *Id.* at *20.

3        This case is highly similar to *Point 4 Data*.  May claims to own copyrights in four files,

4   relying exclusively on his assertion that he created the files or added functionality thereto.  But the

5   evidence will show that May's claim to copyright protection is unsupported by any other evidence.

6   He will testify that he has no copyright registrations; he offers no expert opinions on the issue; and

7   he has failed to demonstrate whether any portion(s) of his code overcome the functionality, merger,

8   and/or *scenes a faire* doctrines.  May cannot meet this element of his DMCA claim to show that

9   his works are protected by copyright.

10       ### 2.    Bungie did not circumvent May's technological measures

11       The  evidence  will  also  show  that  May's  DMCA  claim  fails  because  Bungie  did  not

12   "circumvent" any of May's technological measures.   "'[C]ircumvent a technological measure'

13   means to descramble a scrambled work, to decrypt an encrypted work, or otherwise avoid, bypass,

14   remove,  deactivate,  or  impair  a  technological  measure,  without  the  authority  of  the  copyright

15   owner."  17 U.S.C. § 1201(a)(3)(A).   As relevant here, May claims to employ two types of

16   technological measures: two firewalls (one associated with his router, one on his computer) and

17   two layers of passwords (one to log onto his machine, another that protects his work files).   And

18   May asserts two circumvention "theories": (1) that Bungie allegedly misled May regarding what

19   information Bungie would collect from him, thus bypassing May's technological measures, and

20   (2) that Bungie "avoided" May's technological measures, although May cannot explain how

21   Bungie did so.

22       May's  first  theory  fails  for  two  reasons.   As  a  threshold  matter,  "misleading"  is  not

23   circumvention under the DMCA:  "using deception to gain access to copyrighted material is not

24   the type of 'circumvention' that Congress intended to combat in passing the DMCA."  *Dish*

25   *Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452, 464 (E.D.N.Y. 2012) (denying plaintiff

26   leave to file second amended complaint with DMCA claim in which plaintiff alleged defendant

BUNGIE'S TRIAL BRIEF – 16
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

obtained access to decrypted signals through "fraud and deceit"); *see, e.g.*, *Adobe Sys. Inc. v. A & S Elecs., Inc.*, No. C 15-2288, 2015 WL 13022288, at *8 (N.D. Cal. Aug. 19, 2015) (granting motion to dismiss DMCA claim where only alleged act of circumvention was unauthorized distribution of otherwise genuine software license keys); *TLS Grp., S.A. v. NuCloud Glob., Inc.*, No. 15-CV-00533, 2016 WL 1562910, at *9 (D. Utah Apr. 18, 2016). Thus, Bungie's alleged "deceit and subterfuge," is not actionable. And in any event, there was no misrepresentation about the information Bungie collected from May.

May's second theory—the unexplained "avoiding" of his technological measures—fails by his own admissions. The evidence will show that May downloaded Bungie's *Destiny 2* video game onto his computer. When he did so, May granted *Destiny 2* permissions sufficient to access his computer through both of his firewalls, including "private access" through his Windows Firewall, broad access to the processes running at the same time as *Destiny 2*, and in particular to processes that attached to the *Destiny 2* game. When May granted *Destiny 2* this access, he knew that it can access anything on May's computer while *Destiny 2* is running. Thus, because May gave Bungie permission, it never had to circumvent any of May's firewalls. Bungie similarly never avoided May's passwords. May downloaded *Destiny 2* onto his computer, and so Bungie could not have "avoided" May's Windows login password. As to his password-protected work files, May had already opened and begun running them while *Destiny 2* was running, so again Bungie did not avoid those passwords. Bungie did not circumvent May's technological protection measures, and Bungie's motion should be granted.

### 3. May consented to Bungie's access

Because May authorized Bungie to access his computer and view or obtain certain information, his DMCA claim fails.

Here, Bungie will demonstrate that May expressly authorized Bungie's access to his computer when he accepted Bungie's Privacy Policy. Under the Privacy Policy, Bungie is authorized to collect device data necessary to prevent fraudulent or malicious activity, including

BUNGIE'S TRIAL BRIEF – 17
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1   files open and information about processes operating on a user's device while using *Destiny 2*.  TX

2   205.  May alleges that Bungie accessed only the files listed in the documents attached to his

3   amended counterclaims.  TX 138.  But Bungie detected these files only because May opened them

4   while running *Destiny 2*, and while he was reverse engineering *Destiny 2*.  Bungie collected

5   precisely what the Privacy Policy disclosed: information about May's device and his use of

6   Bungie's services to detect fraudulent and infringing conduct.

7        May's conduct reinforces his consent.  To avoid getting banned from *Destiny 2* while using

8   his reverse engineering tools, May changed the names of the files he was using **because he knew**

9   **Destiny 2 could read them**.  Indeed, May admits that for at least one of his files, he "might have

10  just renamed the actual file for *Destiny 2*" because "some anti-cheats check for the name of the

11  executable that's running."  May consented to *Destiny 2*'s alleged accessing of his files, and so his

12  DMCA claim must fail.

## IV.    EVIDENTIARY ISSUES

14       Bungie has raised its significant evidentiary issues in its Motion in Limine (Dkt. No. 205),

15  and has further objected to specific trial exhibits intended to be offered by Defendants, as explained

16  in the Proposed Pretrial Order.

## V.    DAMAGES AND INJUNCTIVE RELIEF

18  **A.    Bungie Is Entitled to At Least $43,210 in Damages**

19       An infringer is liable for either "(1) the copyright owner's actual damages and any

20  additional profits of the infringer, or (2) statutory damages."  17 U.S.C. § 504(a).  Here, Bungie

21  has elected to pursue the former.  In calculating these damages, Bungie is "entitled to recover the

22  actual damages suffered by [Bungie] as a result of the infringement, and any profits of

23  [Defendants] that are attributable to the infringement and are not taken into account in computing

24  the actual damages."  17 U.S.C. § 504(b).  Bungie is required to present proof only of Defendants'

25  gross revenue, and Defendants must profit their deductible expenses and elements of profits

26  attributable to factors other than their infringement.  *Id.*

BUNGIE'S TRIAL BRIEF – 18
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Here, Defendants' total profits from the Cheat Software are unknown because Defendants

2    deleted financial records relating to the sales of the Cheat Software and website records that would

3    show the number of copies of the Cheat Software sold.  Dkt. No. 216.  From the limited records

4    that Defendants produced and that Bungie obtained from third parties, Defendants sold at least

5    1,406 copies of the Cheat Software, totaling over $43,210 in sales.  But Defendants' true revenue

6    and profits are a mystery—even to Defendants.  Defendants themselves have represented different

7    amounts in revenue generated from the sales of Cheat Software throughout this litigation.  TX 145

8    (Dkt. No. 28-5) ("During the entire life of the products [Bungie] refers to as 'cheat software,'

9    overall sales of the products were $27,748.00 and Phoenix Digital Group's gross profits on these

10   sales amounted to $13,874.").  Because Defendants intentionally deleted evidence that would show

11   the total volume of sales and gross revenues from the Cheat Software, the jury may presume that

12   this evidence was unfavorable to Defendants, and Bungie requests $43,210 in total damages owed

13   to Defendants' profits.

14   **B.    Bungie Is Entitled to a Permanent Injunction**

15   A permanent injunction is available under the Copyright Act.  *See* 17 U.S.C. § 502(a).

16   Courts apply a four-factor test in determining whether to grant an injunction.  *eBay Inc. v.*

17   *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Microsoft Corp. v. Buy More, Inc*., 136 F. Supp.

18   3d 1148, 1158 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476 (9th Cir. 2017).  Specifically, courts

19   examine whether (1) the plaintiff has suffered irreparable injury; (2) there is an adequate remedy

20   at law; (3) a remedy in equity is warranted, considering the balance of hardships between the

21   plaintiff and the defendant; and (4) it is in the public's interest to issue the injunction.  *Id.*  Each

22   factor weighs in favor of an injunction.

23   Moreover, Defendants' distribution of the Cheat Software has caused Bungie irreparable

24   harm for which there is no adequate remedy at law to its game community and player base. As Mr.

25   Guris will explain, the presence of cheaters within the *Destiny 2* game environment damages

26   Bungie, poisons the well for players and content creators, and creates an unsustainable and unsafe

BUNGIE'S TRIAL BRIEF – 19
(No. 2:21-cv-00811)

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

1    environment for legitimate players.  The third and fourth factors likewise support granting a

2    permanent injunction.  The balance of hardship favors an injunction where, as here, the injunction

3    would merely prohibit Defendants from infringing Bungie's copyrights.  *Microsoft Corp.*, 136 F.

4    Supp. 3d at 1158 (citing *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir.

5    1986)).  Moreover, Defendants assert they have sold AimJunkies.com and no longer distribute the

6    Cheat Software; thus, an injunction does not cause them any prejudice.  However, the threat of

7    Defendants continuing to sell the Cheat Software—or to develop a new cheat for *Destiny 2*—

8    remains highly likely without an injunction.  May continues to develop cheats for Phoenix Digital,

9    and Phoenix Digital continues to be involved with the AimJunkies website.  Finally, the public

10   interest is served by upholding the rights provided under the Copyright Act.  *Sennheiser*, 2013 WL

11   3811775, at *11; *Buy More, Inc*., 136 F. Supp. 3d at 1159.

12   **C.**    **Bungie Is Entitled to Its Attorneys' Fees and Costs**

13          The Copyright Act also authorizes an award of reasonable costs and attorneys' fees to the

14   prevailing party.  17 U.S.C. § 505.  Such an award is warranted under the circumstances here.  A

15   court may "freely award fees" to the prevailing party as long as it "seek[s] to promote the

16   Copyright Act's objectives," which is designed to encourage plaintiffs to act to protect their

17   copyrights.  *Hist. Rsch. v. Cabral*, 80 F.3d 377, 378-79 (9th Cir. 1996) (citing *Fogerty v. Fantasy,*

18   *Inc.*, 510 U.S. 517 (1994)).  Willful infringement is not a prerequisite for an of award of attorneys'

19   fees, and attorneys' fees are generally awarded to a prevailing plaintiff as a matter of course.  *Frank*

20   *Music Corp. v. Metro-Goldwyn Mayer Inc.*, 886 F.2d 1545, 1556 (9th Cir. 1989).  Bungie should

21   also recover its attorneys' fees on May's DMCA counterclaim, which permits the court to award

22   reasonable attorneys' fees to the prevailing party.  17 U.S.C. § 1203(b)(5).

23   **D.**    **May Is Not Entitled to Any Relief on His Counterclaim**

24          In the unlikely event May prevails on his DMCA claim, he should recover little, if any,

25   damages.  The DMCA authorizes the court to award the claimant's actual damages or statutory

26   damages.  17 U.S.C. § 1203(c)(1).  If the claimant requests actual damages, the court may award

BUNGIE'S TRIAL BRIEF – 20
(No. 2:21-cv-00811)

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

164335632.2

"his actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and not taken into account in computing actual damages."  17 U.S.C. § 1203(c)(2).  If the claimant elects statutory damages, the court may award anywhere from $200 up to $2,500 per act of circumvention, "as the court considers just."   17 U.S.C. § 1203(c)(3)(A).  Among other factors that may be considered in setting statutory damages, the statutory damages should bear a plausible relationship to the actual damages suffered by the party. *Craigslist, Inc. v. Doe 1*, No. C09-4739 SI (BZ), 2011 WL 1897423, at *5 (N.D. Cal. Apr. 25, 2011).

Here, May "evidence" of his actual damages is highly suspect and, in any event, the actual damages he claims to have suffered are minimal.  May claims that as a result of Bungie's access to his computer he spent $2,702 to purchase new computers and drives, and spent in excess of 40 hours reviewing his files for indications of compromise, valued at $75 per hour.  But May readily admits that none of his computer components that he replaced were actually damaged or corrupted by Bungie.  May also did not record (contemporaneously or otherwise) the supposed 40 hours he spent reviewing files, and his $75 per hour valuation of his time is based on his own undocumented telephonic "survey" of seven or eight unidentified computer technicians and consultants in Ohio. And even if May's evidence of harm is to be believed, it amounts to $5,702 in "harm."  Any award of actual or statutory damages should be limited to no more than the actual harm May alleges to have suffered.

## VI.    CONCLUSION

For the reasons discussed above, the evidence to be presented at trial will show that Bungie is entitled to recover at least $43,210 on its copyright infringement claims, in addition to Bungie's attorneys' fees and costs and injunctive relief against Defendants.  The evidence presented at trial will also show that Bungie is not liable for violation of the DMCA, as alleged by James May.

BUNGIE'S TRIAL BRIEF – 21
(No. 2:21-cv-00811)

164335632.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1

Dated: November 9, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

By: _s/Jacob P. Dini_
William C. Rava, Bar No. 29948
Christian W. Marcelo, Bar No. 51193
Jacob P. Dini, Bar No. 54115
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000
WRava@perkinscoie.com
CMarcelo@perkinscoie.com
JDini@perkinscoie.com

BUNGIE'S TRIAL BRIEF – 22
(No. 2:21-cv-00811)

164335632.2