1              UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3   _____

4   BUNGIE, INC.,            )
                             )

5             Plaintiff,   ) C21-00811-TSZ
                             )

6   v.                    ) SEATTLE, WASHINGTON
                             )

7   AIMJUNKIES.COM, PHOENIX   ) November 17, 2023
   DIGITAL GROUP, LLC; DAVID  )

8   SCHAEFER;JORDAN GREEN;    ) 10:00 a.m.
   JEFFREY CONWAY; and JAMES  )

9   MAY,                  ) Pretrial
                             ) Conference

10           Defendants.   )

11   _____

12          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE THOMAS S. ZILLY

13           UNITED STATES DISTRICT JUDGE

14   _____

15

16   APPEARANCES:

17

18   For the Plaintiff:    William C. Rava
                         Jacob P. Dini

19                   Christian W. Marcelo
                         Perkins Coie

20                   1201 3rd Avenue
                         Suite 4900

21                   Seattle, WA 98101-3099

22

23   For the Defendant:    Philip P. Mann
                         Mann Law Group PLLC

                         403 Madison Avenue North

24                   Suite 240
                         Bainbridge Island, WA 98110

25

1          THE CLERK:  We're here on the matter of Bungie

2    Incorporated versus AimJunkies.com, case C21-811, assigned to

3    this court.

4       Counsel, will you please rise and make your appearances

5    for the record?

6          MR. RAVA:  William Rava from Perkins Coie, on behalf

7    of plaintiff.

8          THE COURT:  Good morning, counsel.

9          MR. MARCELO:  Christian Marcelo on behalf of

10   plaintiff.

11         MR. DINI:  Jacob Dini on behalf of plaintiff.

12         THE COURT:  All right.  And you have a client

13   representative.  Do you want to identify that person for the

14   record?

15         MR. RAVA:  Yes.  We are joined by James Barker, who

16   is the senior corporate counsel at Sony Interactive

17   Entertainment.

18         THE COURT:  All right.  Thank you.  Welcome.

19         MR. MANN:  Good morning, Your Honor, I'm Phillip Mann

20   on behalf of the defendants.

21         THE COURT:  Good morning, Mr. Mann.

22         MR. MANN:  Thank you.

23         THE COURT:  It looks like you're outnumbered today.

24         MR. MANN:  Apparently I am.  But I can handle it.

25         THE COURT:  This is a pretrial conference in the

 1   matter of this case.  Normally I would -- pre-COVID, we would

 2   always hold these in chambers, in the conference room,

 3   informally, without a court reporter.  But these are not

 4   normal times and COVID is still with us all.  And so we're

 5   doing it here.  And there will be some issues that we'll be

 6   discussing and making some rulings on.  And as a result,

 7   we'll have a court reporter to take down everything that we

 8   do.  We'll also have minutes that will summarize any action

 9   that we've taken.

10      This is the pretrial conference.  We're holding it a

11   little early, just because of travel plans next week.  But

12   the case is set for trial on December 4th.  We've ordered a

13   jury and we'll be picking that jury remotely and we'll be

14   trying the case in person.  That's the plan.

15      All right.  I have made myself an agenda to try and

16   capture the issues that we've got on the table this morning,

17   before we get to the pretrial order itself and the procedures

18   for trial, which we will discuss as well.

19      But what I wanted to take up first is, we entered an

20   order, Docket 242, dealing with the motion to strike the

21   expert testimony of Brad LaPorte; that motion was Docket 199.

22   When we entered our order on November 15th, I deferred, in

23   part, on that matter, questioning whether and to what extent

24   LaPorte had anything to testify about in connection with the

25   counterclaim of the defendant.

 1    And that being the case, I'm wondering, Mr. Mann, maybe

 2   you could go first and tell me -- because we're a little bit

 3   informal, you can talk sitting down and from your places

 4   where you're sitting.

 5         MR. MANN:  Thank you, Your Honor.  I'll be happy to

 6   address the issue.  With the court's dismissal of three out

 7   of the four counterclaims, much of what Mr. LaPorte is going

 8   to testify to is moot.  So we're not seeking to bring in any

 9   of that.

10    With respect to Mr. May's counterclaim.  Basically, if I

11   may paraphrase the counterclaim, Mr. May is saying that even

12   though I permitted Bungie to gain access to certain files on

13   my computer, they went beyond what I authorized.  They looked

14   at files that don't relate to the Destiny 2 game.  So what

15   we're saying is that even though he did grant Bungie limited

16   access to his computer, he did not grant them the access that

17   they actually took.  And they looked into his computer,

18   beyond where they were supposed to go.

19         THE COURT:  Let me ask you a question.  Is LaPorte's

20   testimony limited to the counterclaim?

21         MR. MANN:  It is, Your Honor.

22         THE COURT:  I read his deposition transcript excerpts

23   that were provided by the plaintiff, and he seems to say that

24   he doesn't have any opinions.

25         MR. MANN:  No.  What he's doing, he was confirming

1    Scott Kraemer's report, the earlier expert that withdrew.

2    And Mr. LaPorte's actual expert report does address the

3    counterclaim of Mr. May.  Specifically, it's the -- where he

4    talks about -- let me see if I can find this.  This is on

5    Page 8 of his report, where he addresses the system drivers.

6        Now, the significance of that is what he's saying is --

7    and I'm not sure if this is really an issue or not, and,

8    frankly, it may not require expert testimony.  It depends on

9    what Bungie tries to argue.

10       What we are saying is Bungie accessed systems drivers on

11   Mr. May's computer.  And what Mr. LaPorte is saying is that

12   those system drivers don't relate to the game.  So that's the

13   evidence that they looked beyond what they were authorized to

14   look at.

15       Now, Mr. May can say the same thing.  They're his files.

16   And he, perhaps, as a lay witness, can say:  Hey, I know what

17   that stuff is, that doesn't relate to the game.  So in that

18   sense, if Mr. May is permitted to testify that he knows what

19   the file is and can tell us what it is, Mr. LaPorte's

20   testimony may be redundant.

21       On the other hand, if Bungie, for whatever reason says:

22   Mr. May you can't testify to that, then Mr. LaPorte will come

23   in and say:  Well, these files, in my opinion, do not relate

24   to the Destiny 2 game; and, therefore, were not within the

25   authorized purview of Bungie when they looked at Mr. May's

 1  computer.

 2      So in a nutshell, that is what Mr. LaPorte is going to

 3  say.  And as I said, if we don't have a dispute on that, and

 4  if Mr. May can testify to that, perhaps we don't need

 5  Mr. LaPorte's testimony.  But I'm sort of

 6  belt-and-suspendering this, Your Honor.

 7          THE COURT:  Does plaintiff want to be heard on the

 8  matter?

 9          MR. DINI:  Yes, Your Honor.  Jacob Dini for Bungie.

10          THE COURT:  Just for the court's benefit, identify

11  yourself if you're going to be switching off, so the record

12  is clear who's speaking.  Go ahead.

13          MR. DINI:  Yes, Your Honor.

14      Jacob Dini, for Bungie.  Mr. LaPorte admitted, during his

15  deposition, that the opinions he was asked to provide had

16  nothing to do with circumvention of technological protection,

17  measures.  Mr. LaPorte's report does not mention any

18  technological-protection measures that were employed by

19  Mr. May, or how or if Bungie circumvented any

20  technological-protection measures by Mr. May.

21      In addition, opposing counsel referenced that Mr. May

22  granted specific authorization to access certain information

23  and whether Bungie exceeded the scope of that authorization.

24  If I may direct Your Honor to other excerpts of Mr. LaPorte's

25  testimony that were filed on Docket 214-1.

1          THE COURT:  Just a minute.  Okay.  200-1?

2          MR. DINI:  214-1.  This is Page 93 of Mr. LaPorte's

3    deposition testimony.

4          THE COURT:  You gave me his deposition transcript in

5    Exhibit 3, so Docket 200-3.

6          MR. DINI:  Your Honor, we also submitted other

7    portions of his deposition transcript on 214-1.

8          THE COURT:  All right.  I don't have that in front of

9    me.  So can you show me on the screen?

10          MR. DINI:  Yes, Your Honor.

11      Your Honor, this is on Docket 214-1.  This is

12    Mr. LaPorte's deposition testimony, Page 93, lines 21 to 24.

13    He was asked, "Were you asked to provide any opinion, expert

14    opinions regarding whether Mr. May consented to Bungie's

15    purported access to files on his computer?"  His answer was,

16    "I was not."

17          THE COURT:  But that wouldn't be a -- he couldn't

18    testify as an expert about that anyway.

19          MR. DINI:  Correct, Your Honor.  So Mr. LaPorte also

20    can't testify about whether Bungie exceeded the scope of

21    Mr. May's authorized access, which is what defendants seem to

22    be intending to offer him for.

23          THE COURT:  Well, I'm having trouble -- I don't see

24    anything in his report, which I have as Docket No. 200-2,

25    which was his report.  And then his -- I had the deposition

1   excerpts, which are found in the record at Docket 200-3.  And

2   the bottom line is, he's saying that he doesn't have any

3   opinion on matters which Mr. Mann is now suggesting he be

4   allowed to testify.

5       I don't see, Mr. Mann, anything that he's got in his

6   report, and didn't say he -- he wasn't asked to do anything

7   about.  I don't see anything that he's got left to testify

8   about.

9            MR. MANN:  Okay, Your Honor.  I'll be happy to

10  address that.  If we look at Docket 202-2, Page 8.

11           THE COURT:  Just a moment.

12           MR. MANN:  Certainly, Your Honor.

13           THE COURT:  All right.  Go ahead.

14           MR. MANN:  The first paragraph where it says,

15  "Systems drivers."

16           THE COURT:  What page are you on?

17           MR. MANN:  I'm on Page 8 of Mr. LaPorte's report.

18           THE COURT:  All right.  Thank you.

19           MR. MANN:  I'll point you specifically to what we're

20  relying on, whether it does the trick or not, will remain to

21  be seen.  But we're not trying to hide anything.  It says,

22  "Systems drivers are loaded into" --

23           THE COURT:  Where are you?  You're at Page 8 at the

24  top?

25           MR. MANN:  No, Your Honor.  There's a bold heading

1   that says, "System drivers," it's the second paragraph on

2   Page 8.

3            THE COURT:  Page 8 -- 8 is the bottom number?

4            MR. MANN:  Yes, it is.

5        And just to make sure we're reading the same thing, mine

6   says, "Systems drivers.  The expert report from Mr. Kraemer."

7            THE COURT:  Okay.  I see it.

8            MR. MANN:  Okay.  If you look to the right-hand side

9   of the third line that begins, "Systems drivers."  So,

10  "System drivers are located into a computer system" --

11           THE COURT:  Wait, read it correctly.  Not "located,"

12  but "loaded."

13           MR. MANN:  Sorry, Your Honor.  Let me put my glasses

14  on.

15           THE COURT:  That would be helpful.

16           MR. MANN:  I apologize, Your Honor.  "System drivers

17  are loaded into a computer system's kernel, specifically

18  Mr. May's system, and not attached to the game.  There is no

19  way to confirm that the system drivers contained cheat codes

20  for Destiny 2 or any other cheat program."

21       The significance --

22           THE COURT:  That's not dealing with the counterclaim,

23  is it?

24           MR. MANN:  It is, Your Honor.  Because it is showing

25  -- they would have two defenses to the counterclaim.  The

1    first defense is that everything we looked at is related to

2    the game.  So what Mr. LaPorte is saying, "No, that is not

3    true.  Not everything that Bungie looked at is related to the

4    game."

5        The systems drivers, in Mr. LaPorte's opinion, are not

6    attached to the game, to use his direct language.  So that

7    goes to issue number one, did Bungie look at something that

8    was not attached to the game?

9        Then there's going to be a separate legal issue, you know,

10   this may be a matter of contract interpretation.  The second

11   defense Bungie would have is, even if that is not attached to

12   the game, we were nevertheless permitted to look at that,

13   under the terms of the applicable terms of service.  And we

14   are not offering Mr. LaPorte to opine on that.  As I said,

15   that's probably a legal issue.

16        THE COURT:  It certainly is a legal issue.  And I

17   would not allow him to testify about it.

18        MR. MANN:  Nor would we put him up, for that reason,

19   Judge.

20       So what Mr. LaPorte is testifying to is a very narrow

21   issue.  He's saying those systems drivers that Bungie

22   accessed are not attached to the game, they're not related to

23   the game.  And as I mentioned earlier, Mr. May can say the

24   same thing.  At this point we're just concerned if somebody

25   says:  Well, that's expert testimony, Mr. May can't testify

1  to that; then Mr. LaPorte can come in and say -- and can

2  confirm it.  If Mr. May can testify to the same effect,

3  without an objection, we perhaps -- we probably don't need

4  Mr. LaPorte.

5      As I said, I'm just concerned about if there are any

6  evidentiary objections at trial, I want to be able to say,

7  yes, we have an expert that can come in and make this narrow

8  but necessary point.

9          THE COURT:  All right.  I'm going to -- with respect

10  to the deferred portion of the motion to strike expert, I

11  will permit LaPorte to testify, consistent with my order,

12  242, but his testimony will be limited to the counterclaim.

13  And I think it may not be necessary, but I'm not going to

14  strike it at this point.

15      So with respect to the balance of that total motion, then,

16  Docket 199, with respect to what I deferred, I'm going to

17  deny the motion to strike the witness's testimony, consistent

18  with my order on how I limited him before.

19          MR. MANN:  Yes, Judge.  We understand the limits and

20  have no intention of going beyond them.

21          THE COURT:  All right.  I think that takes care of

22  the first item on my list of things I wanted to discuss with

23  you.

24      The next deferred portion of the plaintiff's motion in

25  limine, that I deferred, was what was referred to as 1.4,

1    plaintiff's motion to instruct the jury that the arbitration

2    awards was designed to circumvent the protections and

3    designed to circumvent protections, by injecting a code.  And

4    I know that the arbiter, in his award, dealt with that.

5        The question that I had to deal with in this motion, seems

6    to me, was whether or not the jury should be instructed on

7    that, whether Judge Cox's ruling in the arbitration award

8    hearing was something that would be issue-precluded in this

9    case.  I'm not satisfied that it is.  But I'll hear from

10   plaintiffs on why I should so instruct the jury.

11        MR. RAVA:  Yes, Your Honor, William Rava from Perkins

12   Coie, on behalf of plaintiffs, addressing this issue.

13        With respect to the issue of the preclusion element, I

14   don't think there is any question, that the question of

15   the --

16        THE COURT:  Keep your voice up, please.

17        MR. RAVA:  I don't think there's any question, Your

18   Honor, that this issue was actually litigated, nor do I think

19   there's any question that it was critical or necessary to

20   Judge Cox's findings.  If you look on page --

21        THE COURT:  Well, I'm -- it doesn't matter whether it

22   was critical to his findings.  It's whether it's an issue

23   that we've got here.  What the cheat sheet was designed to do

24   or circumvent, is really not an issue, as I see it.  The

25   question is whether it did circumvent and interfere with --

1    and the way you've worded this motion language, to use the

2    words:  Was designed to circumvent the protections in place

3    -- I'm paraphrasing -- and designed to circumvent protections

4    by injecting a code, doesn't really matter, does it?  I mean,

5    your only claim left is one of infringement.  Did they

6    infringe?  And I don't see those facts as being relevant.  I

7    mean, they may come in as how it was accomplished.  But

8    that's not -- you don't need that.  What you need is to prove

9    that there was infringement.

10       So I'm going to abide by my -- well, I didn't rule, I took

11   it under advisement.  But I'm going to deny the plaintiff's

12   motion to instruct -- and this is plaintiff's motion in

13   limine, Docket 204, Item 1.4 -- and I'm going to deny that,

14   and we'll go on from there.

15       I know that the plaintiff has moved to reconsider.  It was

16   filed just this morning.  Mr. Mann, you may not have seen it

17   yet.

18            MR. MANN:  I did see it, Judge.

19            THE COURT:  It's Docket 243.  And I'm not going to

20   try and address it today.  It was just filed this morning, I

21   believe.  But I am going to, I think, ask you to provide a

22   response to their motion, 243.  I'm going to suggest or ask

23   you to file it by next Wednesday.

24            MR. MANN:  Certainly, Judge.  We can do that.

25            THE COURT:  And it shouldn't exceed the length of the

 1  motion itself, which is eight pages, I believe.  And so we'll

 2  -- I'm not going to attempt to address that today.  I think I

 3  got it right.  But they've moved, and I haven't had a chance

 4  to really study it.  I did read it.  But I'll give you an

 5  opportunity to respond to it.

 6        MR. MANN:  Okay.  Thank you, Judge.  We'll have our

 7  response in.

 8        THE COURT:  All right.

 9     So the next issue is dealing with -- and, again, we're

10  dealing with deferred portions of the motion in limine,

11  Docket 204.  And this was Item B-9, I believe.  And it was

12  plaintiff's motion to preclude any identifying information as

13  to the identity of the witness, who was referred to as "John

14  Doe."

15     Now, the parties didn't direct me to, and I didn't review

16  until just today, the previous motion, which dealt with -- it

17  was Docket 116, on the same subject matter.  And in

18  connection with that, the plaintiffs filed Doe's declaration,

19  which is 118.

20     Now, two things.  I've noted that, first, those -- Doe did

21  testify at the arbitration.  And by agreement, his identity

22  was not disclosed, apparently, during the arbitration.  Is

23  that right?

24        MR. MANN:  That's my recollection.  I believe that's

25  correct, Your Honor.

1        THE COURT:  And Doe has filed a declaration in this

2    case earlier, and, of course -- I'm sorry I hadn't really

3    focused on it, we've got a lot of filings in this case.  But

4    I did read Docket 118 this morning, it is Doe's declaration

5    in support of his not being identified.

6      I'm satisfied that there's good reason for not necessarily

7    identifying his identity.  Obviously I know it, because I

8    read his declaration.

9        MR. MANN:  I know it as well.

10       THE COURT:  You know it as well.  I don't see the

11   need for it.  And I've read what he says, and the plaintiff's

12   discussion of what Mr. Schaefer may have said in his

13   depositions; which is somewhat troubling, frankly.

14     Here's what I'm going to do.  We're going to proceed to

15   trial and when he testifies he will be identified as "John

16   Doe."  I will explain to the jury why that is so.  When his

17   testimony is done, I would entertain a motion by you to have

18   his name disclosed.  And if there's some reason, from his

19   testimony, which comes out, then I may reconsider my ruling.

20   But I think we should proceed on the basis that he will not

21   be -- his identity will not be disclosed.  And I'll be very

22   reluctant to change that ruling.

23     But I think in fairness, it depends a little bit on what

24   he says.  Apparently, it wasn't necessary in the arbitration.

25   Presumably, he's not going to have a lot different to say in

1    this case.  Maybe less.  But in any event, I see no -- and if

2    you persuade me, we'll take a sidebar, or discuss it outside

3    the presence of the jury.  And if I think they need to know

4    his actual name to consider the testimony we've heard at

5    trial, then we'll sort it out then.

6         MR. MANN:  If I may comment, Your Honor.  My concern

7    is not so much keeping his identity secret.  We have done

8    that.  I took his deposition, with my clients present, and we

9    avoided using his name.  Frankly, this is the first time this

10   has ever come up, in nearly 40 years of litigation trial

11   practice.  I was just sort of concerned, are we going to

12   clear the courtroom?  Do my clients have to go out somewhere

13   else?

14       But it sounds like my understanding is, we're just going

15   to have him testify, like any other witness.  We just -- I

16   just refer to him as "Mr. Doe."  I don't see any serious

17   problem with that.  My concerns were just more of

18   procedurally how do we handle this, in an otherwise open

19   trial?

20        THE COURT:  Well, it sounds like you have no

21   objection to how I'm going to proceed.

22        MR. MANN:  Certainly not.  And, frankly, I'm not sure

23   that the need to get his name out will come up.  I'd like to

24   reserve that option, if it does come up.  But, frankly, I

25   don't see that becoming an issue.

1       THE COURT:  All right.  So that will be my ruling

2   with respect to that portion of the plaintiff's motion in

3   limine.  And so I think we have dealt with all of the

4   plaintiff's motion in limine, Docket 204.

5       MR. DINI:  Your Honor, may I have just a brief

6   clarifying point on that order, if I may?

7       THE COURT:  Which order?

8       MR. DINI:  The one that Your Honor just referenced,

9   the "John Doe" name.  Part of plaintiff's request is that

10  Mr. Doe's name be redacted, or -- redacted from any

11  documents, or if there's any portions of transcripts that are

12  filed that reference John Doe's name, that those also be

13  redacted so they're not in the record.

14      THE COURT:  I think his declaration is under seal.

15      MR. DINI:  Correct.

16      THE COURT:  And, I mean, that declaration has been

17  sealed.

18      MR. DINI:  Correct.

19      THE COURT:  So I don't understand what you're saying.

20  He's going to identify himself as John Doe.  And so what more

21  are you asking?

22      MR. DINI:  If there's trial exhibits that contain

23  John Doe's name on them, we ask that name be redacted.

24      THE COURT:  Well, are there trial exhibits that

25  you're proposing that would have his name?

1           MR. DINI:  I believe there is at least one, Your

2     Honor, yes.

3           THE COURT:  Well, then, work with Mr. Mann and redact

4     it.

5           MR. DINI:  Yes, Your Honor.

6           THE COURT:  The court clerk raises a good question.

7     That is, we need to ask the jurors, in voir dire, whether

8     they know any of the witnesses.  How do we do that with using

9     a "John Doe" name?

10           MR. DINI:  Your Honor, one suggestion is perhaps

11     beginning with a more general reference, so:  Does anybody in

12     the jury know any Bungie employees?  And then work from

13     there.  And then if the answer is "no," then they obviously

14     don't know John Doe.

15           THE COURT:  That would certainly be a general

16     question we would ask.  We'll sort it out.

17        But in any event, for purposes of the motion in limine,

18     that deferred item is -- the motion to preclude identifying

19     information is granted.

20        All right.  Now, I want to refer now to the deferred

21     portion of the defendant's motions in limine, which is Docket

22     212.  We deferred a couple of items there, by our minute

23     order.  Again, the minute order is the same minute order that

24     we entered, Docket 241.

25        And the first one there is Defendant's 2-A.  And I'm just

1  going to refer to it -- it's the defendant's motion to

2  preclude testimony or evidence referencing pretrial discovery

3  matters, including motions for sanctions and sanction awards.

4      Now, with respect to the first part of that deferred item,

5  testimony or evidence referencing pretrial discovery matters,

6  I think, clearly, I need to grant that.  The question -- the

7  problem is, it's broader.  And it includes motions for

8  sanctions and sanction awards.

9      Now, we've had a separate order that deals with spoliation

10  of evidence.  And we're going to give a spoliation

11  instruction.  So I think that that portion of the deferred

12  motion needs to be denied.

13          MR. MANN:  Certainly, Judge.  If I may clarify.

14  We're aware of your motion on the spoliation.  We're aware

15  that the court said you will instruct the jury.  We're not

16  asking for reconsideration.  We accept that.  We can live

17  with it.  And if my motion was unclear, I'd like to clarify

18  it now.

19      We're not trying to say, no, as to the spoliation, we're

20  just saying all the other stuff should stay out.

21          THE COURT:  All right.  Well, then, just for the

22  record, again, the defendant's motion to preclude the

23  testimony or evidence referencing pretrial discovery matters

24  is granted.  The court denies the motion, to the extent it

25  seeks to exclude motions or sanctions, consistent with my

1  spoliation order that we've previously filed.

2          MR. MANN:  That is fine with us.  We don't object to

3  that.

4          THE COURT:  Thank you, Mr. Mann.

5      The next item on the deferred portion was item -- this is,

6  again, for the record, it was the defendant's motion in

7  limine, Docket 212, Item B-5.  And it was whether and to what

8  extent to preclude late-disclosed experts.  And this relates

9  to the substitution, if you will, of a witness, Hodgson --

10 I'm going to spell it, for the record, H-O-D-G-S-O-N -- who

11 was apparently in the accounting department of the Bungie

12 organization, left the company last summer, I think summer of

13 2023.  And the plaintiff is seeking to have Mr. Buckmiller

14 replace him.

15     Now, Buckmiller was only disclosed in the pretrial

16 statement that was provided, which is obviously late.  And

17 the witness's testimony, even Hodgson's disclosure earlier

18 dealt with what is described as the "financial impact" of

19 Bungie's harm, which is quite broad.

20     So the question is, what is the plaintiff seeking to have

21 this witness testify about?  I mean, you have a right to get

22 the profits of the defendant, to the extent you can prove it,

23 and any actual harm to the plaintiff.  So what is the actual

24 harm that you're going to be asking the jury to award?  I

25 mean, how is that quantified in dollars?  That's what we talk

1  about here is dollars.  Unless you want some crypto coins.

2    What's the witness going to say?  Give me an offer of

3  proof.

4        MR. MARCELO:  Certainly, Your Honor.  This is

5  Christian Marcelo from Perkins Coie, for plaintiff.

6    Mr. Buckmiller, there's no dispute as to the timing of

7  when he was disclosed.  We disclosed Mr. Buckmiller soon

8  after we learned that Mr. Hodgson had left Bungie.

9        THE COURT:  Let me just throw out another problem I'm

10  having with this witness.  He's not there at the company

11  until the summer of 2023; is that right?

12        MR. MARCELO:  Let me confirm when he started, Your

13  Honor.  Mr. Buckmiller was at Bungie before the events of

14  this trial.  The reason he was disclosed was because

15  Mr. Hodgson, who also was present, left a few months ago,

16  after close of discovery.

17        THE COURT:  All right.  But my question is, can you

18  represent to the court that this replacement witness was

19  actually working for Bungie during the period that you claim

20  there was infringement?

21        MR. MARCELO:  Yes, Your Honor.

22        THE COURT:  All right.  So give me a -- generally,

23  what he's going to say.

24        MR. MARCELO:  Certainly.

25    Mr. Buckmiller will be able to testify about the damage

1    cheats generally cause to the game, including the loss of

2    player base.  But also the expenditures Bungie has made in

3    fighting and preventing cheats.

4              THE COURT:  There's two categories, then.  One is the

5    harm that Bungie -- is he going to be able to quantify that?

6              MR. MARCELO:  Your Honor, he will quantify the amount

7    that Bungie has spent in fighting cheats.

8              THE COURT:  So that's the second.  And what is that

9    amount?

10             MR. MARCELO:  The amount, I believe, is north of

11   $2 million, as disclosed previously in the motion for summary

12   judgment.  But to be clear, that amount is regarding cheats

13   in Bungie for Destiny 2, generally.

14        So part of --

15             THE COURT:  But how -- has that been disclosed to the

16   defendant?  How does he know -- how does the defendant know

17   how this $2 million is arrived at?

18             MR. MARCELO:  Well, defendants, to be clear, did not

19   depose Mr. Hodgson.

20             THE COURT:  That was not my question.  How is your

21   witness going to be able to come up with $2 million?

22             MR. MARCELO:  Mr. Buckmiller will be able to testify

23   that in fighting cheats within Destiny 2, that's the

24   expenditures that Bungie has spent.

25             THE COURT:  And does that include attorneys' fees.

1          MR. MARCELO:  I would have to check with my client,

2    Your Honor.

3          THE COURT:  You're here a couple weeks before trial,

4    and you can't explain to me, and you haven't explained to the

5    defense, what this harm is, or how it's quantified.  How can

6    I permit it to go forward?  Have you given anything to the

7    defendant, in the way of breaking down this harm, that you're

8    claiming somehow that your client was harmed?  I guess that's

9    the word you're using, so I'll use it.

10          MR. MARCELO:  The information has been provided, both

11   during arbitration testimony and in Bungie's motion for

12   summary judgment, regarding -- to be clear, Bungie here is

13   seeking the profits from defendants.

14          THE COURT:  All right.  And I understand that.  What

15   I'm trying to understand is what other actual damages, if

16   any, you're claiming, other than attorneys' fees -- which I'm

17   going to get to in a little while -- or costs of litigation?

18   Is there anything else?

19          MR. MARCELO:  Your Honor, Bungie is not seeking a

20   specific dollar amount for damages that it suffered.

21          THE COURT:  Well, then, we don't need the witness, do

22   we?  What else is he going to say?

23          MR. MARCELO:  One of defendant's repeated defenses,

24   or theories of this case, is that Bungie is pursuing

25   defendants, for no other reason, than to send a message to

1    the public regarding cheats.

2            THE COURT:  Well, even if defense is allowed to do

3    that, how is it -- you can't have your -- this witness come

4    in and throw out numbers, if you haven't disclosed those

5    numbers to the defense.

6            MR. MARCELO:  Your Honor, we have provided what

7    defendants have asked for or what they asked at depositions.

8            THE COURT:  Well, that's not -- I mean, but you're

9    asking me to allow you to substitute a witness at the last

10   minute.  And you can't tell me, basically, what the witness

11   is going to say.

12           MR. MARCELO:  Your Honor, the witness will testify

13   regarding the amount Bungie expended in fighting cheats and

14   preventing cheats.

15           THE COURT:  Fine.  Tell me what, in substance, he's

16   going to say.

17           MR. MARCELO:  Your Honor, my understanding is that he

18   will testify that Bungie spent north of $2 million.

19           THE COURT:  Okay.  Fine.  Tell me what the $2 million

20   is for.

21           MR. MARCELO:  To identify cheats.  Bungie has a --

22           THE COURT:  Well, it has to relate to the defendant,

23   doesn't it?

24           MR. MARCELO:  Yes, Your Honor.  And the AimJunkies'

25   cheat is one of several cheats that Bungie has protected its

 1   game against.  And it has an entire team, the GST team, to

 2   prevent and fight against those cheats.  And AimJunkies, the

 3   cheat, was one of the primary cheats identified and

 4   investigated by that team.

 5          THE COURT:  And how do you allocate between this

 6   defendant and this one claim that you have left, and other

 7   defendants not here that you may have pursued?

 8          MR. MARCELO:  Your Honor, Bungie is not seeking a

 9   specific dollar amount for -- to allocate, to attempt to

10   allocate:  This is how much we spent against AimJunkies.  The

11   evidence goes to the general harm that Bungie suffered.  And

12   as a rebuttal to defendant's claim that this litigation is

13   somehow unfairly singling out AimJunkies, or defendants.

14          THE COURT:  Well, I mean, if we get that kind of a

15   defense testimony, then maybe this witness conceivably could

16   have some relevance, as a rebuttal witness.  But if you're

17   not seeking actual damages, I think that's what you said, and

18   you're only seeking to recover the profits of the defendant,

19   then I think I have to exclude this witness as a plaintiff's

20   witness, subject to reconsidering as a rebuttal.

21          MR. MARCELO:  Your Honor, we understand that.  And I

22   believe that is -- was the intention, as well, if defendants

23   did not raise any type of issue that made Mr. Buckmiller's

24   testimony relevant, then Mr. Buckmiller would likely not be

25   called.

1           THE COURT:  Well, to be clear, I'm also saying now

2   that you're not going to be able to have this witness, at any

3   time, even as a rebuttal witness, testify about harm, other

4   than in general, the company has spent money to fight off

5   people who infringe your products.

6       But, you know, you can't ask for attorneys' fees to the

7   jury.  You can't ask for costs.  You get those if you

8   prevail.  You don't get them from the jury.  You understand

9   that?

10          MR. MARCELO:  Yes, Your Honor.

11          THE COURT:  And I think what I'm also going to ask

12  you to do, I know that the defense didn't choose to depose

13  Mr. Hodgson, but this is a new person who had a different job

14  during the infringement period, and it's not entirely clear

15  to me whether his work allowed him to -- what his background

16  and how he could have relevant information.

17      So I think what you need to do is, number one, if you wish

18  to continue to have him on your witness list, make an offer

19  of proof, written offer of proof, and file it by next

20  Wednesday, as to what the witness would say.  And depending

21  on what that offer of proof says, I may entertain Mr. Mann's

22  request to have his deposition taken the week before trial,

23  or during trial.

24      Now, let me ask you one other -- and this is kind of a

25  related question -- where is Mr. Hodgson?  He doesn't work

1  for you anymore, but why can't -- why do you have to

2  substitute witnesses?

3      MR. MARCELO:  Yes, Your Honor.  Understood.  We, for

4  the purposes of this case, because Mr. Buckmiller was

5  identified as an expert witness, we were maintaining -- and

6  Mr. Hodgson was identified as an expert witness -- we were

7  maintaining -- as they were employees of Bungie.  So we

8  wanted to maintain that the employee of Bungie here would be

9  the expert witness on damages.

10      THE COURT:  He's a former employee.  You could have

11  him come in.  Why do we have to substitute witnesses?  I

12  mean, he's alive.  He's somewhere.  You could call him if you

13  wanted, couldn't you?

14      MR. MARCELO:  I believe so, Your Honor.

15      THE COURT:  Well, why should we even let you

16  substitute witnesses at this late date?  I mean, why isn't

17  the witness you disclosed available to testify, if there's

18  anything that your offer of proof is going to allow to be

19  testified?  He's available as a witness, right?

20      MR. MARCELO:  We can certainly confirm with him.  We

21  have not confirmed that he is still in Washington, and/or

22  available on the trial dates.  But we can certainly confirm

23  with him.

24      THE COURT:  Well, I mean, even before you made the

25  motion to substitute, why didn't you seek that out?  You

1  disclosed him.  You didn't disclose the new person.  It seems

2  to me that the person you disclosed is your witness; isn't

3  it?

4          MR. MARCELO:  Understood, Your Honor.

5          THE COURT:  I mean, having gone through all of this,

6  it sounds to me like this witness isn't going to have

7  anything relevant to say -- and I would assume you're going

8  to have other representatives of the company testify.  I mean

9  obviously, to the extent the company is enforcing its

10  copyrights, it's harmed by going out and having to do that.

11      But if there's no monetary or quantification of that, it

12  doesn't seem to me that either of these witnesses probably

13  should testify.

14      But in any event, I think you need to explore whether or

15  not -- and if the witness -- if your first witness is out

16  there, it seems to me he's the one you disclosed, unless

17  there's some agreement.  Would you agree, Mr. Mann, that the

18  new witness can testify, if he's got anything to say?

19          MR. MANN:  Certainly not, Your Honor.  We will not

20  agree to that.  We were caught off guard.  I'd just like to

21  point out, there was never a motion filed to substitute.  I

22  first learned about this when we got the initial suggestion

23  for the pretrial conference.  Unlike us, where we made a

24  formal motion to bring Mr. LaPorte in, in place of

25  Mr. Kraemer, Bungie never made any sort of motion or asked

1  for permission to substitute.  This came as a complete

2  surprise.

3          THE COURT:  Well, I'm not buying that argument,

4  because you didn't do anything to find out what the first

5  witness was going to say.  I assume you didn't take a

6  deposition.

7          MR. MANN:  No.

8          THE COURT:  And you didn't, by interrogatory, ask

9  what is this witness going to say.  So you're really in the

10 same position today as you were when they disclosed the first

11 expert.  You didn't do anything.

12         MR. MANN:  Well, I don't have an unlimited budget,

13 I'm afraid, Your Honor.

14         THE COURT:  I understand.  I understand.  All right.

15    Well, I'm going to ask for the offer of proof.  And I'm

16 going to ask you to identify -- and in the offer of proof, if

17 you're going to have the new witness, you better tell me why

18 the old witness is unavailable.  Otherwise, I think I need to

19 stay with the old witness.

20         MR. MARCELO:  Thank you, Your Honor.

21         THE COURT:  There's some challenge to this by the

22 defense.

23    Well, for the record, I guess I'm going to just defer, to

24 trial, whether the plaintiff can substitute Mr. Buckmiller,

25 and whether or not he's got anything valid to say.  And we'll

1  sort it out at trial.

2      If you make a decision that you're not going to call

3  either of these witnesses, or you make a decision that you're

4  still intending to call the replacement, then obviously

5  notify Mr. Mann and the court as soon as possible.

6          MR. MARCELO:  Yes, Your Honor.  Thank you.

7          THE COURT:  Well, by next week.  So if I allow it to

8  go forward, Mr. Mann will have an opportunity to depose the

9  witness, if he wants to.

10     All right.  We're back to the deferred portions of the

11 motions in limine, Docket 212.  And we're talking now about

12 Item C-7, or Item 7, defendant's motion to exclude reference

13 to or admission of plaintiff's source code not produced in

14 discovery.

15     It's not clear to me what was disclosed and what wasn't

16 disclosed, and what's left of this motion.

17         MR. MANN:  Certainly, Your Honor.  If I may address

18 that.  I apologize, again, for being unclear.

19     Actually, this is a very simple matter, and it's probably

20 the law anyway.  In a nutshell, they said -- they're accusing

21 us of copying their copyrighted source code.  So we said:

22 Okay, produce to us the source code you think is copied.

23 They produced some of their source code, but not all of their

24 source code.  So this is just a very simple:  If you didn't

25 produce it to us before, you can't rely on it at trial.  I

1    don't think that's a controversial statement.  That's all we

2    were trying to do with this motion in limine.

3        Basically what they produced to us, by way of source code,

4    that's what they have to rely on at trial.  No fair coming in

5    saying:  We have this additional source code we forgot to

6    produce.  Simple as that, Judge.

7            THE COURT:  Well, life is never quite that simple,

8    Mr. Mann, particularly when you get into source codes.

9    They're pretty confidential, obviously.  And it's not clear

10   to me that you need the source code in order to defend the

11   one claim that's left.  Your clients, or some of your clients

12   don't really dispute that somehow either they or someone else

13   -- I know you contend it wasn't Mr. May -- but created, I'm

14   going to call it, a "cheat," and advertised and sold it.  And

15   the question really is whether it infringed their --

16           MR. MANN:  Exactly.

17           THE COURT:  -- copyright.

18           MR. MANN:  That's the sole issue in the plaintiff's

19   case.  We admit that we distributed the cheat software.  We

20   admit what it does.  What we don't admit is it violated their

21   copyright.  What we're saying is there's no proof, there's no

22   evidence that the cheat software copied any of their

23   copyrighted materials.

24       Now, their copyright goes to their source code.  So we're

25   basically --

1          THE COURT:  Without producing the source code, their

2    witnesses are going to, I assume, based on what I've read,

3    testify that you can't do it without copying the program.

4          MR. MANN:  That is what they're going to say.  I

5    mean, we're going to have a fight on that and they're going

6    to be subject to cross examination.  Our position is this is

7    a thinly disguised way of saying, we're guessing.  But what I

8    want to see, what I would like to see -- and, frankly, I hope

9    we don't see it is:  Here's our source code.  Here is your

10   program.  These two sections of code are identical.  Those

11   were copied.  If they could show that, this would be an

12   open-and-shut case.

13       I don't think they can do that and that's why we're

14   challenging them to say, you know, can you point to any

15   source code that you say is copied and show a one-to-one

16   correspondence?  They can't do that, which is fine with me.

17   I'd be in trouble if they could.  But that was the intent of

18   bringing the source code in.

19       And all I'm saying, as I said, I don't think this really

20   is a controversial issue, it's -- you know, in every trial,

21   if you didn't produce it in discovery, you can't use it at

22   trial.  That's all we're saying here.  They produced some

23   source code.  I don't want them coming in at the last minute

24   saying:  Here's some additional source code.

25          THE COURT:  All right.  What's the plaintiff's

1    response to that?

2         MR. MARCELO:  Yes, Your Honor.  This is Christian

3    Marcelo, from Perkins Coie, again.

4       It may be two ships passing in the night here.  Plaintiff

5    never alleged a copying of the source code, both -- in each

6    discovery response, plaintiff made clear that what is being

7    copied was the object code.  And Your Honor may stop me if

8    you already know this, but source code is the human readable

9    version; object code, same code, but computer readable.

10        THE COURT:  I understand.  Maybe it is two ships

11   passing in the night.  But don't I have to -- the motion was

12   to exclude reference to plaintiff's source code not produced

13   in discovery.  Don't I have to grant that?

14        MR. MARCELO:  Your Honor, as we mentioned in response

15   to the motion in limine, we don't disagree with -- and Bungie

16   does not intend to introduce source code that it did not

17   produce.

18        THE COURT:  Well, then, there's no objection.  I'm

19   going to grant the motion.  Thank you for making it easy for

20   me.  All right.

21      Can the parties agree on the number of copies of cheat

22   software sold by defendants?  I know the defendants seem to

23   have said less than 1,500, I think, copies.  And the

24   plaintiffs have got a 1,300-and-something number.  I mean, is

25   there -- is that something you can agree to?

1          MR. RAVA:  Your Honor, William Rava from Perkins

2     Coie.

3          THE COURT:  I know who everyone is now and I think

4     the court reporter does.

5          MR. RAVA:  Thank you, Your Honor.  I think it's

6     unlikely we can agree, because our position is, as you know,

7     that the evidence of the sales was deleted from multiple

8     locations.  It was deleted from the website.

9          THE COURT:  I'm familiar with all of that.

10          MR. RAVA:  So we only know that 1,300 number that we

11     got from third-party subpoenas, from Stripe and PayPal.  So

12     from our perspective, we don't know if the sales through

13     Bitcoin, or through other payment processors, or other ways

14     that we didn't learn about, because of the deletion, make

15     that number significantly more than the 1,500 that Mr. Mann

16     is willing to agree to.

17          THE COURT:  Well, but how does -- I'm going to give a

18     spoliation instruction.  And it's going to tell the jury that

19     I've found that they deleted important, relevant materials

20     that shouldn't have been deleted.  And they should assume

21     that they deleted it because it was bad.  But where does the

22     jury go from there?  I mean, it seems to me that if you can't

23     give them a number -- and I don't know how that's going to

24     help you, particularly.  I mean, could they conclude, with

25     that spoliation instruction, that there was 3,000.  I mean,

1   nobody is going to have any guidance there, are they?

2        MR. RAVA:  From a numerical perspective, that's

3   likely the case, Your Honor.  There will not be strict

4   guidance.  But we could -- the arguments that we will likely

5   put forward, with respect to the spoliation, is that there

6   were multiple other payment processors that were channeling.

7   And we have the 1,300 number -- or whatever the number is,

8   that we've been talking about -- from two of them.

9        And there are, for example, three other channels through

10  which sales could have been made and accounted for and paid

11  for.  So we can make sort of a proportionality argument, Your

12  Honor.  If you assume that the same -- if you assume, ladies

13  and gentlemen of the jury, that there are sales made in equal

14  numbers through Bitcoin, and other deleted and spoliated

15  means, then the number could be substantially more than the

16  1,300.

17       THE COURT:  Doesn't that mean -- isn't that really

18  speculation?  I mean, my damage instruction is going to say:

19  You can't speculate.  You --

20       MR. RAVA:  It's extrapolation from existing evidence.

21       THE COURT:  I think we can end this discussion,

22  because apparently the parties cannot agree.

23       You've got two motions to seal that are pending, 226 and

24  232.  And I'm going to grant those motions.  But I have to

25  say that, in looking at the record in this case, I'm

1    overwhelmed by the number of documents that are filed under

2    seal and not available to the public.  And I understand that

3    when people have designated these as confidential, the other

4    moving party, when they want to refer to it, have got to make

5    this motion to seal.  And, of course, the other opposing

6    party likes that, because they are the ones that designated

7    it, whether or not it should have been sealed.

8        All I can tell you is I'm going to be very reluctant to

9    continue to seal things, and I'm going to ask you really to

10   look at the docket and see if we can't unseal some of these,

11   because the public -- there's been a lot of interest in this

12   case.  And we have a public trial coming up.  And we have a

13   public record, that's half hidden from the public.  And

14   that's unfortunate.  I don't think I've had a case recently

15   where I've had so many things sealed.

16       And, frankly, some of them just don't need to be sealed.

17   You sealed the pretrial order that you filed, because

18   attached to it was a deposition which was sealed.  I'm not

19   going to attach that deposition to the pretrial order I sign.

20   And, you know, I don't -- I can't comprehend why you attached

21   a deposition, or excerpts to a deposition, to a pretrial

22   order that you're proposing.  We never do that.

23            MR. MANN:  I agree.

24            THE COURT:  All right.  Enough of that.

25       Well, I think I'm ready to go to the pretrial order.  And

1    maybe we should just take about a ten-minute recess.  And

2    then we'll come back and we'll deal with the pretrial order,

3    and procedures.  And the Madame Court Reporter will, I think,

4    be able to sit and listen.  And then if we get to a point

5    where we make a ruling, I'll tell her to tune back in.

6         But let's take ten minutes, and then we'll get back at it.

7    We'll be in recess.

8                        (Recess.)

9         THE COURT:  My law clerk pointed out that I skipped

10   over one issue that I deferred on, the plaintiff's motion in

11   limine.  And that was with regard to the withdrawal of

12   Kraemer and the replacement by LaPorte.  I think that's kind

13   of moot, as a result of my ruling on LaPorte.  Does either

14   side have any quarrel with that?

15        MR. MANN:  No, Your Honor, now that my understanding

16   is that LaPorte is going to be able to testify.  And, again,

17   with that, we don't need Mr. Kraemer.  So we have no

18   objection to that motion.

19        THE COURT:  So that will just be stricken as moot,

20   that particular -- which is, I think it's 2.3 of the

21   plaintiff's motion in limine, Docket 204.

22        All right.  So let's talk about the pretrial order.

23                  (Discussion off the record.)

24        MR. MANN:  I have a housekeeping matter I'd like to

25   put on the record, if I may.  This court ordered us to --

1        THE COURT:  You want to put something on the record?

2        MR. MANN:  I have a check here, I want to tender it

3    to Bungie's counsel.  And I'd like that on the record.

4      Your Honor, on October 31st of this year, the court

5    ordered the defendants to pay Bungie $12,500 for various

6    forms of sanctions and attorneys' fees.  I have a check here,

7    dated today, payable to Bungie, Inc., in the amount of

8    $12,500.  I would like to formally tender it to Mr. Rava, in

9    satisfaction of the court's order.

10       THE COURT:  All right.  The record will reflect that

11   you've handed a check, but it won't reflect whether it's

12   cashable.

13       MR. MANN:  If it doesn't clear, I have some

14   explaining to do.

15       MR. RAVA:  No comment, Your Honor.

16       MR. MANN:  It's drawn on my operating account.

17       THE COURT:  Anything else from either side?

18       MR. RAVA:  We have a handful of logistics, or

19   housekeeping issues, relating to, I guess, permission to

20   bring in equipment, like a printer.

21       THE COURT:  Work it out with the clerk.

22       MR. RAVA:  Same for food and lunch.

23       THE COURT:  Food, you have to do a letter and I'll

24   sign it.  Just give me the names of the people that are

25   bringing food in.  And we've got two conference rooms.  So

 1  you each can have a conference room.

 2      What else?

 3          MR. RAVA:  We'll work with the clerk on the timing on

 4  that.  We'd like to get that done, if possible, the week

 5  before the start of -- the Friday before the start of the

 6  trial.  But we can have that discussion.

 7      I guess the other question was, we can talk to the court

 8  reporter about the availability of dailies.

 9      Thank you.

10          THE COURT:  Do you really need dailies?  From our

11  standpoint, it may require a second court reporter.  And

12  we're really slammed on the number of court reporters we

13  have.  But --

14              (Discussion off the record.)

15          THE COURT:  Okay.

16      So what I'm hearing, and if you don't understand what I

17  say, talk to the source; the court reporter.  But I have a

18  screen, and it streams the testimony and everything that's

19  said on the record.  You can have that.  Or you can have a

20  smooth rough, at the end of the day.  I think you maybe get

21  it in two or three hours of the time we close; and you pay

22  for that.

23      Or if you want the dailies, that's more complicated, more

24  expensive, and may not be available, just because of our

25  court reporters and who is in use.

1    So think about what -- and talk to the court reporter

2  about the various costs, and take it from there.

3         MR. RAVA:  Thank you, Your Honor.  It does sound like

4  the smooth rough is probably sufficient.

5         THE COURT:  Now, the only difference with the smooth

6  rough is, you can't really quote from it.  But you can, in

7  your closing arguments, you can tell the jury what you think

8  the witness said.  And you can be -- you can rely on the

9  smooth rough, but you just can't tell them it's the

10  transcript.

11         MR. RAVA:  Understood, Your Honor.

12         THE COURT:  But the smooth rough is awfully good and

13  they serve your needs.  All right.

14    Anything else?

15         MR. MANN:  Yes, Your Honor.  Another thing I'd like

16  to raise is -- this is in connection with Mr. LaPorte's

17  deposition.  The issue came up quickly, and I don't have time

18  to do it through a formal motion, so I thought I'd try to

19  raise it here, if the court is willing to entertain it.

20    It's basically the payment of Mr. LaPorte's bill for

21  appearing at the deposition.  He submitted a bill.  Bungie

22  refused to pay the bill, in part, because we owed Bungie

23  money.  I think we've taken care of that now.

24    But it does put us in a bind, because if Mr. LaPorte does

25  not get paid, he may not be available.

1    So I don't know if that's something we want to consider

2  now.

3          THE COURT:  I'm sorry.  Back up and start over again.

4  I don't quite understand.  Why don't you give me a little

5  more explanation.

6          MR. MANN:  Certainly.

7    When the court allowed us to substitute Mr. LaPorte, the

8  court said that Mr. LaPorte would have to sit for a

9  deposition.  He did that.  According to the rules, he is

10  entitled to be paid by Bungie for the reasonable cost of his

11  appearing for a deposition.  So he submitted a bill to

12  Bungie, that Bungie has declined to pay.

13          THE COURT:  Well, why -- do you have that option to

14  decline to pay?

15          MR. MARCELO:  Your Honor, as we let Mr. Mann know,

16  the bill that was submitted by Mr. LaPorte was far outside

17  the bounds of reasonable.  It included 21 hours of prep time,

18  as well as two hours of transcript-review time.  75 percent

19  of it was not related to the deposition itself.  And so it is

20  defendant's burden to prove the reasonableness of its expert

21  fees.

22    So we let Mr. Mann know that we were willing to confer

23  regarding that issue.

24          THE COURT:  Well, I think you should confer.  It

25  seems to me the time of the deposition is one thing.  But a

1  lot of preparation?  I don't know.  You work it out.  I mean,

2  if not, I guess you're going to have to make whatever motion

3  you make.

4       MR. MANN:  We'll do that, Your Honor.  I wasn't

5  aware -- the last I heard was them refusing to pay at all

6  because they said we owed them money for attorneys' fees, and

7  so forth.  So if there's a change, I'll be happy to discuss

8  it with plaintiff's counsel.  And, hopefully, we won't bother

9  the court.

10      THE COURT:  Yeah.  All right.

11  Okay.  Anything else?

12      MR. RAVA:  Yes, Your Honor.  One last question on the

13  number of, I guess, trial days, and amount.

14      THE COURT:  Yes.

15      MR. RAVA:  And the parties' timing.

16      THE COURT:  Excellent.  Thank you for sending up that

17  note.  Because I am going to put you on a trial clock, and we

18  are going to keep track of time.  And we're going to tell you

19  every day how much you've used and how much you have left.

20      The trial clock works this way, and that is that if you're

21  -- well, for voir dire, when I'm doing the voir dire, I'm

22  going to divide the time.  There's no free time here in this

23  court.  When you're asking questions, it's your time.  When

24  you're asking questions, it's your time.  If you're

25  questioning a witness, it's your time.  And if you're -- if

1    you're asking questions on cross, it's your time.

2        So then the question is, well, how much time do we allot?

3    Well, I was hoping we could try this case in four days.  I

4    usually say five-hour days are what we -- if we get more than

5    five hours, that's great.  But what if I said 12 hours per

6    side to try the case?

7        So worse comes to worse, that's five days.  But I think it

8    ought to be tried in five days, don't you?

9            MR. RAVA:  Yes, Your Honor.

10           MR. MANN:  Certainly, Judge.  I prefer not to keep

11   the jury over the weekend, if we can avoid it.

12           THE COURT:  Well, yeah.  And, of course, they have to

13   deliberate.  So even if we end it -- and I need to tell them,

14   when they come in, how much time.  You know, I mean, if it's

15   a three-week trial, there's going to be lots of hands going

16   up saying they can't be here.  So I'm going to say it's a

17   four- to five-day trial, in my voir dire, when I talk to

18   them.  But for purposes of a clock, let's put -- any

19   objection to 12 hours per side?

20           MR. MANN:  Not at all, Your Honor.  I like fast

21   trials.

22           THE COURT:  How about ten?  Do you want to go down a

23   little bit?

24       All right.  Let's do it, 12 hours.

25           MR. MANN:  Do a speed trial.

1    THE COURT:  All right.  But I'm happy that you were

2  -- we're all reminded to address that, because I usually make

3  sure I do.

4      All right.  Anything else?

5         MR. MANN:  Not for defendants.

6         MR. RAVA:  Not for Bungie either, Your Honor.

7         THE COURT:  Well, have a good Thanksgiving, folks.

8      And, you know, this case ought to settle.  I'm happy to

9  try it, but I don't see that much is going to be

10  accomplished.  I mean, whatever verdict you get, you're not

11  probably going to collect.  I don't know.  Maybe there's some

12  millionaires out there on the defense side.  I don't know

13  what their personal -- but it just seems like you've got a

14  big judgment already.  Anyway, enough said.

15      Have a nice Thanksgiving.  And, obviously, advise us as

16  soon as possible if it settles.  Otherwise, we'll see you in

17  a couple weeks.

18         MR. RAVA:  Thank you, Your Honor.  You too.

19         MR. MANN:  Thank you, Your Honor.

20             (Adjourned.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript from

5     the record of proceedings in the above-entitled matter.

6

7

8

9     /s/ Debbie Zurn

10    DEBBIE ZURN
      COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25