THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BUNGIE, INC.,

                Plaintiff,

v.

AIMJUNKIES.COM; PHOENIX
DIGITAL GROUP LLC; DAVID
SCHAEFER; JORDAN GREEN;
JEFFREY CONWAY; and JAMES MAY,

                Defendants.

No. 2:21-cv-811-TSZ

DECLARATION OF CHRISTIAN
MARCELO ISO BUNGIE'S OPPOSITION
TO DEFENDANTS' MOTION TO
COMPEL PAYMENT OF EXPERT
WITNESS DEPOSITION FEE

I, Christian Marcelo, declare as follows:

1.      I am an attorney at Perkins Coie LLP, and counsel in this action for Plaintiff Bungie, Inc. ("Bungie" or "Plaintiff"). I have personal knowledge of the facts stated herein.

2.      Attached to this declaration are true and correct copies of the following documents:

    a.  **Exhibit 1:** A copy of the August 28, 2023 report authored by Brad LaPorte as provided to Bungie.

    b.  **Exhibit 2:** Excerpts from the transcript of the September 28, 2023 deposition of Brad LaPorte.

    c.  **Exhibit 3:** Excerpts from the transcript of the November 18, 2023 Pretrial Conference.

    d.  **Exhibit 4:** Emails between counsel for Defendants and Bungie.

MARCELO DECL.
(No. 2:21-cv-811-TSZ) – 1

165018885.3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1

2          I declare under penalty of perjury under the laws of the United States that the foregoing is

3    true and correct.

4

5          Executed this 8th day of January, 2024.

6                                              */s/ Christian W. Marcelo*
                                               Christian W. Marcelo
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MARCELO DECL.
(No. 2:21-cv-811-TSZ) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

165018885.3

Exhibit 1

THE HONORABLE THOMAS S. ZILLY

IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
WASHINGTON


BUNGIE, INC., a Delaware corporation,
Plaintiff

v.

AIMJUNKIES.COM, a business of unknown classification; PHOENIX DIGITAL GROUP
LLC, an Arizona limited liability company; JEFFREY CONWAY, an individual; DAVID
SCHAEFER, an individual; JORDAN GREEN, an individual; and JAMES MAY, an
individual,
Defendants.

Case no. 2:21-cv-811-TSZ


Expert Report of Mr. Brad A. LaPorte

**Table of Contents**

I.     **INTRODUCTION**                                       **2**

      A.    PROFESSIONAL QUALIFICATIONS AND EXPERTISE      2

      B.    SCOPE OF ENGAGEMENT                            4

      C.    INFORMATION CONSIDERED                       5

      D.    SUMMARY OF OPINIONS                         6

      E.    PRIOR CASES                                     9

I.     **INTRODUCTION**

A.   **PROFESSIONAL QUALIFICATIONS AND EXPERTISE**

I am an information security and IT consultant and currently serve as owner of High Tide Advisors. High Tide Advisors is based in Juno Beach, Florida, and is a boutique consulting firm created to help software companies create and execute go-to-market strategies. I operate out of Juno Beach, FL, and Portsmouth, RI. Among other things, High Tide Advisors provides consulting, research, and analysis services to information security and technology companies in the areas of product positioning and messaging, product-led growth strategies and execution, business development and partnerships, and sales strategy and execution.  In addition, I am an Advisor with Lionfish Tech Advisors. Lionfish Tech Advisors is incorporated out of Delaware, and I operate out of Juno Beach, FL, and Portsmouth, RI.  I provide strategic development and Go-To-Market consulting and advisory services to market-leading cybersecurity firms, merger and acquisition consulting, startup fundraising consulting, and business development services.  I also volunteer for the Department of Defense as the Cyber Range Co-lead for Cyber Yankee, one of the largest annual joint cyber training exercises in the U.S. supporting the Department of Homeland Security (DHS), Federal Bureau of Investigation (FBI), Federal Energy Regulatory Commission (FERC), ISO New England (ISO-NE), and all branches of the U.S. Military. I am responsible for designing, implementing, operating, and maintaining a realistic multi-domain virtual training environment with adversarial emulation to simulate and evaluate joint force operational readiness for real-world cyber intrusion campaigns. As part of this role, I coordinate across department leadership on critical milestones and deliverables.

I have 18 years of experience as a consultant in the cybersecurity industry, spanning various industry segments. Prior to forming High Tide Advisors, I served as a

2

high-ranking Gartner Research Analyst, including but not limited to the following specialties: (i) Security Information and Event Management ("SIEM"), (ii) Security Orchestration, Automation, and Response ("SOAR"), (iii) Threat and Exposure Management, (iv) Vulnerability Management, (v) Pen Testing, (vi) Cloud Security, (v) Managed Security Service Provider ("MSSP"), (vi) Managed Detection and Response ("MDR"), (vii) endpoint protection platforms/endpoint detection and response ("EPP/EDR"), (viii) Extended Detection & Response ("XDR"), (ix) Threat Intelligence, (x) Digital Risk Protection ("DRP"), (xi) Social Media Protection, (xii) Attack Surface Management ("ASM"), (xiii) Digital Forensics and Incident Response ("DFIR"). I was credited with creating several market categories at Gartner, including ASM, DRP, XDR, Auto-Pen Testing, Pen Testing as a Service, and Auto-Red Teaming. I was the lead author of the Magic Quadrant and Critical Capabilities for Endpoint Protection Platforms, Gartner Market Guide for Threat Intelligence, Market Guide for EDR, and two Ransomware publications. I personally covered hundreds of vendors and solutions at Gartner. Likewise, my consulting work has covered all segments of the information security industry. It has involved research and analysis concerning buyer personas, market size segments, and geographies for all vendors in this space.

In addition to the above consulting and research experience, I have approximately 20 years of experience working as an IT and Information Security Leader.  I pioneered many solutions in multiple roles for the past 14 years. This experience includes roles with corporations such as  Dell Secureworks, IBM, Acquia, and Kasada, as well as a veteran of the U.S. Army.  While at Dell, I launched the first-ever MDR service and Managed EDR service in 2014, as well as the first commercially available on-premise hardware appliance.

Additionally, I led the growth of the top 2 Managed Security Service Providers (MSSPs) and MDR, providers Dell Secureworks and IBM, to where they are today, as recognized by Gartner Magic Quadrant, Forrester Wave, and IDC MarketScape reports, to where they are today.

I have applied my skills in these areas to serve as a consultant on various matters ranging from marketing research analysis to specific go-to-market strategies for information security and IT companies.  I have also worked with end-users seeking to select vendors for cybersecurity solutions and services.

Throughout my career, I have frequently been called upon to assess the effectiveness of go-to-market programs or to develop and deliver quantitative marketing research projects.  I have conducted over 50 speaking engagements and written over 60 pieces

of content, as documented in Exhibit 2. This equates to approximately 1-2 publications a week for my clients.

Some broad examples of how I have been retained as a consultant that is relevant to this project are described here. I provide strategic development and Go-to-Market strategy design services where I help develop, review, test, and refine specific strategies to bring clients' products to market. I provide analyst relations and influencer engagement strategy, which includes developing plans to achieve specific goals from relationships with analysts and influencers. I provide product strategy and development, including providing guidance, writing, reviews, and strategy brainstorming for the following product management activities, pitch and briefing coaching, messaging guidance, customer and market target, persona development, pitch deck development, product roadmap development, product marketing materials development, as well as how to navigate the complex world of analyst relations.  As needed, project deliverables and services that are mutually agreed upon for the contract term.

I am an expert in digital forensics and incident response, penetration testing (Black, Grey, White), reverse engineering (static, dynamic), intrusion analysis, malware analysis, and I have had similar experience throughout my entire career. My CV explains my experience in the US military, working at top MSSP providers Dell SecureWorks and IBM, being a top research analyst at Gartner, product leader at Acquia, a web hosting company, and an executive at Kasada, a bot mitigation company. Gaming companies were customers of Dell, IBM, Gartner, Acquia, and Kasada. I am an industry expert in multiple attack vector techniques, including but not limited to malware exploits, RAT, RCE, credential stuffing and account takeover (ATO) attacks, binary exploitation, memory exploits, and many other applicable tactics and techniques. The majority of my experience is overseeing experts in a managerial role, a practitioner, a product management role (building and delivering services and products), and advisory and consulting roles.

I received a Bachelor of Science degree in Business Management from the University of Rhode Island in 2006.  In 2016, I received a Masters in Business Administration from Ithaca College.  At the time of this report, I have not provided an expert report, deposition, or trial testimony in U.S. litigation.  A complete list of my prior publications and presentations can be found in my *curriculum vitae*, which is appended to this report as **Exhibit 1,** as well as my LinkedIn profile located here - https://www.linkedin.com/in/brad-laporte/.

## B.   SCOPE OF ENGAGEMENT

On or about August 14, 2023[date], I was engaged by Defendants Phoenix Digital Group LLC ("Phoenix Digital") and David Schaefer ("Mr. Schaefer") to examine and opine on issues with regard to the matter styled Bungie, Inc. v. AIMJUNKIES.COM, et al., W.D. WA case no. 2:21-cv-811-TSZ. Specifically, I was asked to review documents and potentially write one or more reports and/or declarations and to testify as an expert witness in this action with regard to the Counter Claims made by Phoenix Digital and Mr. Schaefer in this matter concerning (1) the validity of Expert Report of Scott A. Kraemer ("Mr. Kraemer); and (2) whether forensic evidence appears to support the conclusion that Plaintiff Bungie, Inc. ("Bungie") reverse engineered, de-compiled and/or otherwise analyzed a certain "loader" software product distributed by Phoenix Digital; and (3) whether Bungie appears from the evidence I reviewed to have accessed certain private files on the computer of James May ("Mr. May").

I am billing for my work for the current assignment at my customary hourly rate of $600/hr.  No part of my compensation is contingent on the outcome of this litigation or the nature of the opinions I render.

## C.  INFORMATION CONSIDERED

In preparing this report, I have reviewed information from a variety of sources. These include, for example, (a) documents filed with the Court by the parties; (b) documents produced by the parties; (c) deposition testimony; (d) information from publicly available sources; and (e) information from industry subscription sources. In addition, I have relied on my experience and training in the cybersecurity/information security field, as well as my professional consulting experience in the specific industries related to those involved in this matter.

A complete list of the materials I have reviewed in connection with my analysis of this matter is listed below:

01_Amended Answer and Amended Counterclaims (Nov 21, 2022)
02_Bungie Privacy Policy (Ex B)
03_BUNGIE_WDWA_0000002 (Highly Confidential)
04_BUNGIE_WDWA_0000251 (Highly Confidential)
05_BUNGIE_WDWA_0000368 (Highly Confidential)
06_BUNGIE_WDWA_0000409
07_BUNGIE_WDWA_0000410 (Highly Confidential)
08_BUNGIE_WDWA_0000412_Highly Confidential – Attorney Eyes' Only
09_BUNGIE_WDWA_0000483
10_BUNGIE_WDWA_0000488

11_BUNGIE_WDWA_0000493
12_BUNGIE_WDWA_0000497
13_BUNGIE_WDWA_0000518
14_BUNGIE_WDWA_0000522
15_BUNGIE_WDWA_0000525
16_BUNGIE_WDWA_0000528
17_BUNGIE_WDWA_0000536
18_BUNGIE_WDWA_0000551
19_BUNGIE_WDWA_0000552
20_BUNGIE_WDWA_0000597
21_Exhibit C
22_Exhibit D
23_Expert Report of Scott A. Kraemer
24_FINAL - Steven Guris Expert Witness Report (Federal)
25_Limited Software License Agreement (Ex A)
26_Phoenix (Aimjunkies) Terms of Service (Ex E)
27_BUNGIE_WDWA_0000416 (Highly Confidential)
28_BUNGIE_WDWA_0000421 (Highly Confidential)

I anticipate using some of the documents referenced above, as well as other documents that have been or may be produced during the course of this action or as a result of my analysis, to support my testimony at deposition and at trial in this action. Also, I may use representations, charts, and graphs based on these documents or other demonstrative materials.

It is my understanding that fact discovery in this matter is ongoing as of the date that I submit this report. I reserve the right to revise my opinions and supplement this report based on information that has not yet been produced in this matter, if necessary. This could include additional deposition testimony and documents that have not yet been produced or any other new documents or information that become available during the course of this matter.

## D.   SUMMARY OF OPINIONS

I am basing my opinion solely on the contents of the documents provided and my knowledge as to what these documents reasonably demonstrate, show, and mean from a technical standpoint.

With respect to certain of the documents that have been provided in this matter, my conclusions and basis for my conclusions are as set out below:

**BUNGIE_WDWA_0000368.** The Export Report of Mr. Kraemer is correct in that this document appears to be a memory dump of notepad.exe. It is also correct that the primary way to produce a document like this would be to utilize a tool or debugger to dump the contents of it. There are a multitude of free and readily available tools online that could be used to conduct this activity. The Kraemer Export Report states that this is a document prepared and produced by Bungie, which is stated in other documents I have reviewed, which includes Exhibit D and 01_Amended Answer and Amended Counterclaims (Nov 21, 2022). I agree with Mr. Kraemer that only Bungie would be able to state where this document originated from and what tool was used to produce this document.

**BUNGIE_WDWA_0000410.** The Export Report from Mr. Kraemer is correct in that this document discusses obtaining the cheat methodology and how to initiate setting up the cheat loader. This document also specifies attempts to detect it, as made apparent in part from the quote below: "Stage 1: The clear sign would be the IP connections 172.67.73.48 and 104.26.1.138. To establish these HTTPS connections the cheat loader first injects itself into notepad.exe". This sentence gives the IP addresses of where the cheat communicates with. The Expert Report from Mr. Kraemer is correct in that in order to get these IP addresses, either a tool for monitoring network traffic from a PC using the AimJunkies Cheat Loader and subsequent Notepad process must have been used, or the Cheat Loader/or Notepad was decompiled. Mr. Kraemer is correct in stating that this information is not freely available and would only be determined by conducting digital forensics on the device.

**BUNGIE_WDWA_0000412**. The Expert Report from Mr. Kraemer is correct in stating that this document shows that Bungie ran a tool called Process Monitor to the notepad process to monitor its Process and Thread activity and dumped the activity to a CSV file. Mr. Kraemer is correct in his Expert Report, where he states that this is an attempt to find out what AimJunkies Cheat is doing. More on Process Monitor can be found on Microsoft's website here - https://learn.microsoft.com/en-us/sysinternals/downloads/procmon.

**MD5 Hash.** The Expert Report from Mr. Kraemer is correct in stating that an MD5 Hash was located on all of the Mr. James Files that were found. Mr. Kraemer is correct in stating that in the Exhibit C Document \??\g:\work files\reclass\x64\plugins\reclasskernel64.sys (8D98DB3A27112A9C92558FF90A1D6206) g:\work files\reclass\x64\reclass.net.exe (360B1FE16603C1106CD8DEF992846B1B) has 32 length Numbers and Letters in Parenthesis and are MD5 Hashes.

7

I agree with Mr. Kraemer, and it is also my expert opinion that the technological evidence showed Bungie searched and found files and used an MD5 Hash Generator to access James May's Files to Generate the Hash. An example of a tool is located here - https://www.md5hashgenerator.com/. The MD5 Tool/API they used read the full contents of the file to generate and produce the hash values.

**System Drivers.** The Expert Report from Mr. Kraemer is correct in stating that the System Drivers found in Exhibit C Example \??\g:\work files\reclass\x64\plugins \reclasskernel64.sys (8D98DB3A27112A9C92558FF90A1D6206) System Drivers are loaded into a computer system's Kernel, specifically Mr. May's system, and not attached to the game. There is no way to confirm that the system drivers contain cheat codes for Destiny 2 or any other cheat program.

Given Mr. May's involvement with AimJunkies, it would be expected that he would have binaries and files with the name 'AimJunkies.' There is no way to know from Exhibit C what these files contain or what their purpose may be.

The Expert Report from Mr. Kraemer states that VirusTotal.com shows this file to contain no detected malware or being flagged for malicious content and that this specific driver file was first submitted to VirusTotal.com on 2022-03-08. This information is located in the Expert Report of Mr. Steven Guris. I could not find a reference to the date of 2022-03-08, but I was able to find a date of 2022-09-15. It is my expert opinion that there is no way to provide any definitive evidence or conclusion to the results of this analysis conducted by Mr. Guris. Since the file was a .zip file and the origin and validity of the file that was uploaded can not be verified, there is no way to confirm whether this file is, in fact, the property of the Defendant, who the actual owner is, or if it is in any way malicious.

**Exhibit D to Amended Counterclaims.** The Expert Report from Mr. Kraemer and 01_Amended Answer and Amended Counterclaims (Nov 21, 2022) states that Bungie found "(C:\Users\james\Desktop\ReClass.NET-KernelPlugin-master\bin \ReClassKernel64.pdb)." I agree with Mr. Kraemer that this file is a symbols / Debug file used when compiling ReClassKern64.sys. I also agree with Mr. Kraemer that a system driver would never be attached to the game and was apparently located by other means undertaken by Bungie, which is not explained in Exhibit D or BUNGIE_WDWA_0000409.XLSX by column identification "AimJunkies binary found." It is my opinion Bungie searched for and accessed these private files and system drivers outside of the Destiny 2 game directory structure and into personal space.

## E.    PRIOR CASES

1.  Civil Action No. Case No. 2:21-cv-03362

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

RED CANARY, INC., Plaintiff, v. MAGNARI, INC. DBA RED CANARI, Defendant.

2.  Civil Division Docket No. 953-10-19 Cncv

IN THE UNITED STATES SUPERIOR COURT FOR THE STATE OF VERMONT.

BLACKBERRY CORPORATION, AND CYLANCE INC. (d/b/a BLACKBERRY CYLANCE), Plaintiffs, v. CHRIS COULTER, and SENTINEL LABS, INC. (d/b/a SENTINELONE and SENTINELONE.COM), Defendants.

3.  Case no. 2019-016333-CA-01

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ALEXANDER OTAOLA, Plaintiff v. DESCEMER BUENO, Defendent.

**Signed by Expert Witness:**

Brad LaPorte

8-28-2023

Date

Exhibit 2

```
1                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
2                             AT SEATTLE

3

   BUNGIE, INC.,
4
        Plaintiff,                        ┌─────────────────┐
5                                         │  CERTIFIED COPY │
   vs.                          No. 2:21-cv-811-TSZ
6                                         └─────────────────┘
   AIMJUNKIES.COM; PHOENIX DIGITAL
7  GROUP LLC; DAVID SCHAEFER;
   JORDAN GREEN; JEFFREY CONWAY;
8  and JAMES MAY,

9       Defendants.
   _____/
10

11

12

13           VIDEOTAPED DEPOSITION OF BRAD LAPORTE
                  (via Zoom videoconference)
14

15

16  DATE:               September 28, 2023

17  TIME:               7:33 a.m. - 1:52 p.m., PST

18  LOCATION OF WITNESS:  Juno Beach, Florida

19  TAKEN BY            Deborah Carmela Dew, FPR
                        Notary Public, State of Florida
20

21

22

23

24

25  JOB NO.:            1020122
```

BRAD LAPORTE - 09/28/2023

Page 62

1  that High Tide Advisors provides or is it subsumed within
2  or vice-versa?
3     A.  Yeah.  High Tide Advisors is my own LLC.  I work
4  with Lionfish Tech Advisors as a contractor, so it's a
5  1099 relationship.
6     Q.  Got it.
7     A.  And I use both companies for branding purposes
8  for different reasons.  Primarily smaller projects and
9  expert witness work I typically done -- do under my High
10 Tide Advisor brand, and then other work I typically do
11 under Lionfish.
12    Q.  Okay.  I want to turn back to your report here.
13 I'm going to reshare Exhibit 1, which is a copy of your
14 report.  I want to talk about page 4, the first full
15 paragraph here it starts with, "Some broad examples of how
16 I have been retained as a consultant that is relevant to
17 this project are described here."
18        When you're talking about "this project," are
19 you talking about the -- the purpose for which you were
20 retained by Defendants in this case?
21    A.  That's correct.
22    Q.  Okay.  The next sentence here, it says, "I
23 provide strategic development and go-to-market strategy
24 design services where I help develop, review, test, and
25 refine specific strategy to bring clients' products to

Page 63

1  market."
2        How does that -- how is that experience relevant
3  to your opinions here in this case?
4     A.  Specifically some of the clients that I have are
5  managed security service providers and managed detection
6  response providers that provide digital forensics and
7  incident response capabilities.  And then I also support
8  video game customers and basically design services and
9  products to support those entities, and then also products
10 that -- that provide that.
11        In addition, some of the clients that I have
12 are -- they provide cybersecurity solutions around Windows
13 systems and specifically code, software code protections.
14    Q.  Have you worked with companies that develop or
15 sell cheat software for video games before?
16    A.  I have not.
17    Q.  Why not?
18    A.  That opportunity has never been presented to me.
19    Q.  Would you take that opportunity if you had it?
20    A.  I would have to understand what the use case
21 was.
22    Q.  I want to look at the next sentence here, it
23 says, "I provide analyst relations and influencer
24 engagement strategy."
25        How does that -- how is that experience relevant

Page 64

1  to your opinions here?
2     A.  So analysts cover, research analysts and
3  different influencers cover every facet of the market, to
4  include everything that we've been discussing.  So those
5  clients that I work with, helping them navigate that
6  market of individuals that oversee and influence decisions
7  that are made in that area.
8        So Gartner covers and different influencers
9  cover everything across the sun, to include how video
10 games are created, how they're used, to include software
11 in general, and specifically even things like SBOM, or
12 software bill of materials, which is basically an analysis
13 of what soft -- what is actually comprised in software.
14    Q.  I want to move down to the next paragraph here,
15 par -- the second full paragraph on page 4 of Exhibit 1,
16 which is your expert report.  You say that you're an
17 expert in the following topics:  digital forensics,
18 incident response, penetration testing, reverse
19 engineering, intrusion analysis, and malware analysis.
20        Did I read that right?
21    A.  That's correct.
22    Q.  I think you've used the term "digital forensics"
23 a couple of times that we've been talking so far.  What
24 does dig -- digital forensics mean exactly?
25    A.  Yeah.  So providing -- can we just -- so

Page 65

1  providing forensic analysis of different devices.  So
2  looking at the system and processes of a Windows, Mac,
3  Linux device or similar, smartphone systems and different
4  even to the extent of IOT devices and operational
5  technology devices.
6        Looking at the underlying systems and code to
7  provide analysis or insights into whatever use case that
8  you're trying to implement.
9     Q.  Did you conduct digital forensics as part of
10 creating or coming to your opinions in this case?
11    A.  Not as in pertinent of this case.
12    Q.  So you -- so you didn't perform digital
13 forensics in this case?
14    A.  What I provided was -- or my opinions are
15 derived from my own past experience and reviewing the
16 documents that were provided to me.
17    Q.  And as part of doing that, did you perform any
18 digital forensics?
19    A.  I used my own experience to provide my opinions
20 on the matter, which falls within the realm of the
21 underlying concepts of digital forensics.  I did not use
22 digital forensics tools or conduct any civic analysis
23 outside of reading the material.
24    Q.  So you didn't conduct an analysis as part of
25 preparing your report in today's case other than reading

BRAD LAPORTE - 09/28/2023

Page 66

1  the materials provided.
2       A.   And my own experience.
3       Q.   And you relied on your own experience.
4       A.   Correct.
5       Q.   Okay.  So you didn't perform a digital forensics
6  analysis.
7       A.   Correct.
8       Q.   The next one here says incident response.  I
9  think you've mentioned that a few times before.  What does
10  incident response mean?
11      A.   Yeah.  So this is the actions that are -- that
12  take place after a security incident is detected, and
13  there are certain best practices.  And typically an
14  organization has a standard operating procedure on how
15  they conduct this in terms of detecting and remediating
16  and responding to an incident that might occur.
17      Q.   Did you -- did your experience with incident
18  response inform any of your opinions in this case?
19      A.   I provided my -- it was included in the
20  expertise that I had that provided to the report that was
21  written.
22      Q.   How is your incident response experience helpful
23  in preparing this report?
24      A.   Primarily the underlying understanding of how
25  Windows systems operate and how one would go about and

Page 67

1  conducting -- understanding how the overall -- the overall
2  ways that information is gathered and -- and analyzed.
3       Q.   And how is that particularly relevant to your
4  opinions in this case?
5       A.   Analyzing the documents and taking -- evaluating
6  and reading the documents, it did leverage my past
7  experiences with how incident response works and how that
8  connects to digital forensics.
9       Q.   When you're conducting an incident response, is
10  there a process you go to or some sort of methods that you
11  rely on to determine how to respond to an incident?
12      A.   There's a lot of different best practices that
13  are associated with it.  There's -- there are a lot of
14  different ways to implement a certain response, but there
15  are some best practices around it.
16      Q.   Did you rely on any of those best practices in
17  coming to your opinions in this case?
18      A.   I -- yes, I did.
19      Q.   Which ones?
20      A.   We would have to go through the report to answer
21  that properly.
22      Q.   Looking at page 7 of your expert report, when
23  you were discussing Bungie WDWA 0000368, did you rely on
24  any best practices for incident response to come to your
25  opinion here?

Page 68

1       A.   I'm sorry which -- which one?
2       Q.   I'm looking at page 7 of your expert report at
3  the very first paragraph at the top with Bungie WDWA 368.
4       A.   Yes.
5       Q.   What best practices did you rely on for -- for
6  incident response?
7       A.   Specifically walking through the memory dump of
8  notepad.exe, this is an execution process.  So as part of
9  an incident response, you would do an investigation and
10  this would be a typical tactic that would be identified as
11  part of this.
12      Q.   So creating a document like Bungie WDWA 368
13  would be a typical incident response practice in your
14  experience?
15      A.   That's correct.
16      Q.   There's nothing unusual about a video game
17  company doing that?
18      A.   I don't understand your question.
19      Q.   We'll come back to that.
20           I want to back up to page 4 here focusing on the
21  second paragraph.  After incident response, you talk about
22  penetration testing and then in parenthesis it has black,
23  grey and white.  What's penetration testing?
24      A.   Yep.  So penetration testing is doing any kind
25  of analysis on an organization.  So the scope can be very

Page 69

1  broad or it can be very in-depth.
2           Typically you're looking for vulnerabilities
3  within either a device or a set of devices or it might be
4  a certain sub of codes.  So it might be like all the
5  Apache servers in your data center might be a scope or it
6  might be Python coding language or it might be whatever
7  that is in terms of whatever the scope of the engagement
8  is.
9       Q.   Did you perform any penetration testing in
10  preparation -- in preparing your opinions in this case?
11      A.   Not in relation to this case.
12      Q.   Okay.  The next one says reverse engineering,
13  and then in parenthesis static and dynamic.
14           What does reverse engineering mean?
15      A.   Reverse engineering is basically decompiling or
16  debugging a specifically -- typically software and
17  sometimes doing a code analysis to determine the behaviors
18  of the underlying code.
19           So when you're looking at a piece of code, you
20  don't necessarily know what the code is meant to do and --
21  and how it's supposed to operate.  So doing a reverse
22  engineering, which using hundreds of different tools that
23  are readily available on the Internet, you could leverage
24  any one of those and it doesn't really require a heavy
25  amount of skill to -- to do that.

BRAD LAPORTE - 09/28/2023

Page 86

```
1       Q.   Have you met James May?
2    A.   No.
3       Q.   How did you meet Mr. Schaefer?
4    A.   He reached out to me via telephone.
5       Q.   When were you formally engaged to offer your --
6  the expert opinions and your report?
7    A.   I believe it was shortly after that.  I don't
8  remember the exact timeline.  It's actually on my invoice
9  I believe I submitted it.
10      Q.   Okay.
11   A.   But I don't know the exact date, but shortly
12 after this.
13      Q.   So sometime in August 2023?
14   A.   Yeah, that same week.
15      Q.   Who specifically engaged you?
16   A.   David Schaefer.
17      Q.   Were you engaged by James May to provide any
18 opinions at all?
19   A.   No.
20      Q.   What hourly rate are you billing at in this
21 matter?
22   A.   $600 per hour.
23      Q.   Have you invoiced Mr. Schaefer for your work?
24   A.   I did.
25      Q.   How much have you charged to Defendants to date
```

Page 87

```
1  in this case?
2       A.   I don't know the exact amount off the top of my
3  head.  Approximately $22,000, I believe --
4       Q.   Have you been paid --
5    A.   -- and change.
6       Q.   Have you been paid for that work yet?
7    A.   I have.
8       Q.   When were you paid?
9    A.   Recently.  A few days ago, I think last week
10 maybe.
11      Q.   Were you paid the full approximately $22,000
12 amount?
13   A.   That's correct.
14      Q.   Who paid you?
15   A.   David Schaefer.
16      Q.   And through what method were you paid?
17   A.   Via credit card through my invoicing system.
18      Q.   Okay.  Did you talk to anyone at Phoenix Digital
19 Group or Defendants about their Destiny 2 cheat software
20 sold on Aimjunkies.com?
21   A.   I only spoke to David Schaefer, and it was about
22 opining on this case.  Can you clarify your question so I
23 can answer it properly?
24      Q.   Yeah.  Are you aware that Defendants have sold
25 cheat software for Bungie's Destiny 2 video game on the
```

Page 88

```
1  website Aimjunkies.com?
2    A.   I'm aware that David Schaefer is associated with
3  Phoenix Digital and they used to be, I believe, some kind
4  of relation to Aimjunkies.  That's all I know at this --
5  regarding this case.
6       Q.   So you -- you did not know that Defendants sold
7  Destiny 2 -- cheat software for Bungie's Destiny 2 video
8  game on Aimjunkies.com?
9         MR. MANN:  Object to the form of the question.
10 BY MR. DINI:
11      Q.   You can answer.
12   A.   That wasn't a scope for what I reviewed in
13 the -- the form of this case.
14      Q.   Were you aware that Defendants also distributed
15 cheat loader software that was associated with the Destiny
16 2 cheat software on Aimjunkies.com?
17        MR. MANN:  Same objection.
18        THE WITNESS:  That wasn't --
19 BY MR. DINI:
20      Q.   You can answer.
21   A.   That wasn't a scope of anything that I reviewed
22 as part of this case.
23      Q.   Do you know how the -- how Defendant's Destiny 2
24 cheat two software that was sold on Aimjunkies.com works?
25        MR. MANN:  Object to the form of the question.
```

Page 89

```
1        THE WITNESS:  I -- I do.  I didn't commit it to
2    memory, but what I understand is what was provided in
3    the documentation that was provided and part of this
4    case.
5  BY MR. DINI:
6       Q.   What is your understanding of how the Destiny 2
7  cheat software works?
8    A.   At a high level, there's a loader that needs to
9  be installed on the user's computer and then an executable
10 is run that allows that to communicate back with a server
11 that basically provides control mechanisms to execute that
12 software.
13      Q.   How did you become aware of that function?
14   A.   Just reviewing it through primarily the Guris
15 expert report, which was provided to me.  Guris is his
16 name, correction.  And then just general information from
17 the case files I was provided.
18      Q.   Is it fair to describe the Destiny 2 cheat
19 software sold by Defendants on Aimjunkies.com as the types
20 of -- a type of unwanted software that your video game
21 clients might ask you to come up with detections for?
22        MR. MANN:  Object to the form of the question.
23 BY MR. DINI:
24      Q.   You can answer.
25   A.   The -- they're -- regarding explicitly the
```

BRAD LAPORTE - 09/28/2023

Page 94

```
1    A.   I'm sorry, can you strike that?  Can you repeat
2  the question?
3    Q.   Yeah.  Were you asked to provide any expert
4  opinions regarding whether Mr. May consented to Bungie's
5  purported access of files on his computer?
6    A.   No.
7    Q.   Were you asked to provide any expert opinions
8  regarding whether Bungie circumvented any of Mr. May's
9  technological protection measures to access any files on
10 his computer?
11   A.   Can you repeat the question?
12   Q.   Yeah.  Were you asked to provide any expert
13 opinions regarding whether Bungie circumvented any of Mr.
14 May's technological protection measures to access any
15 files on his computer?
16   A.   No.
17   Q.   Mr. LaPorte, would you say that your expert
18 report in this case is accurate and that it accurately
19 reflects your opinions in this case?
20   A.   That's correct.
21   Q.   Sitting here now, are there any errors in your
22 expert report that you think -- that we need to -- excuse
23 me.
24        Sitting here now, are there any errors that you
25 need to fix in your expert report before we start talking
```

Page 95

```
1  about it?
2    A.   Just the one that we identified.
3    Q.   Okay.  You would agree that it's important that
4  your expert report is accurate, right?
5    A.   Understood, yes.
6    Q.   You would agree that it's important that your
7  expert report is complete, right?
8    A.   That's correct.
9    Q.   You took your time making this report, right?
10   A.   That's correct.
11   Q.   You wrote it carefully?
12   A.   I did.
13   Q.   And you reviewed it carefully?
14   A.   That's correct.
15   Q.   Okay.  I think now is a good time for a quick
16 break, maybe five, ten minutes, come back at 10:07.
17        MR. MANN:  That sounds good to me.
18        THE VIDEOGRAPHER:  This will end file two in the
19   deposition of Brad LaPorte.  Off the record at 10:00
20   o'clock.
21        (Recess taken from 10:00 a.m. to 10:10 a.m.)
22        THE VIDEOGRAPHER:  This will begin file three in
23   the deposition of Brad LaPorte.  Back on the record
24   at 10:10.
25 BY MR. DINI:
```

Page 96

```
1    Q.   Okay.  Welcome back, Mr. LaPorte.  We were just
2  getting into your report, so let me bring that up here.
3  That's Exhibit 1.  I'm looking at the bottom of page 4 to
4  the top of page 5, this is the section titled "Scope of
5  Engagement."  You see that section?
6    A.   That's correct.
7    Q.   Okay.  And you were asked to look into three --
8  or provide testimony as an expert witness concerning three
9  separate issues.  I'm looking at the bottom half of that
10 paragraph on page 5.  Do you see that?
11   A.   Yes.
12   Q.   Okay.  So the three issues that you were asked
13 to testify were one, the validity of expert report of
14 Scott A. Kraemer; two, whether forensic evidence appears
15 to support the conclusion that Plaintiff, Bungie, Inc.,
16 reversed engineered, decompiled, and/or otherwise analyzed
17 a certain "loader" software product distributed by Phoenix
18 Digital; and three, whether Bungie appears from the
19 evidence I reviewed to have accessed certain private files
20 on the computer of James May."
21        Are those -- did I read that correctly?
22   A.   That's correct.
23   Q.   Are those the only three issues you were asked
24 to provide expert testimony on?
25   A.   That's correct.
```

Page 97

```
1    Q.   You were not asked to provide expert testimony
2  on any other issues in this case?
3    A.   That's correct.
4    Q.   And these are the only issues for which you have
5  expert opinions, correct?
6    A.   That's correct.
7    Q.   Okay.  Let's talk about the first one, the
8  validity of expert report of Scott A. Kraemer.  I'm
9  dropping into the chat what we'll mark as Exhibit 3, if I
10 can find the chat here, and then I will pull that up as
11 well.
12        (Plaintiff's Exhibit 3 marked.)
13 BY MR. DINI:
14   Q.   Okay.  Mr. LaPorte, have you seen Exhibit 3
15 before?
16   A.   Yes.
17   Q.   What is Exhibit 3?
18   A.   The expert report of Scott A. Kraemer.
19   Q.   When you refer to the Kraemer Report or
20 Mr. Kraemer in your expert report, Exhibit 1, is this what
21 you are referring to, Exhibit 3?
22   A.   That's -- that's correct.
23   Q.   Okay.  Turning back to Exhibit 1 here and issue
24 number one, the validity of expert report of Scott A.
25 Kraemer, what do you mean by the validity of Mr. Kraemer's
```

BRAD LAPORTE - 09/28/2023

Page 166

1   Q.   So you weren't able to the determine whether
2   Bungie accessed Mr. May's computer private -- private
3   files on Mr. May's computer?
4       A.   That's correct.
5       Q.   So you can't say for sure whether -- whether
6   Bungie accessed private files on Mr. May's computer.
7       A.   That's correct.
8       Q.   Are there -- in coming to these opinions, did
9   you ever talk to Mr. May?
10      A.   No.
11      Q.   Did you ever look at Mr. May's computer that
12  he -- was allegedly accessed?
13      A.   No.
14      Q.   Did you ever remotely access his computer that
15  was allegedly accessed?
16      A.   No.
17      Q.   Do you know what kind of computer he was
18  running?
19      A.   He was running a Windows machine.
20      Q.   Do you know what the spec -- specifications of
21  that machine are?
22      A.   That was not something I was necessarily
23  thinking of when I was -- I don't recall.
24      Q.   What sort -- do you know what sort of
25  protections, if any, he had in place to protect access to

Page 167

1   his computer?
2       A.   He would typically have a -- a password
3   protected access to the system and having Windows Defender
4   running by default at a minimum.
5       Q.   How do you know that?
6       A.   Because it's out-of-box configuration when
7   setting up a new system.  So he would have to disable
8   those features, which is -- he would have to have a bona
9   fide reason to do that, which no normal -- it wouldn't be
10  a reasonable thing to consider that someone would do that.
11      Q.   Do you know whether Mr. May altered those
12  standard settings on his computer?
13      A.   I do not.
14      Q.   Do you know what files, if any, on Mr. May's
15  computer were private?
16      A.   If it was on his local disk on his system, that
17  would be the property of Mr. May.
18      Q.   Do you know if any of his files were stored
19  differently than non-private files?
20      A.   On his system they would -- anything that's on
21  the physical device, he would own that property.
22      Q.   What documents, if any, support your opinion
23  that Mr. May's files were accessed by someone?
24      A.   Exhibit C.  Exhibit C is the answer.
25      Q.   Any other documents?

Page 168

1       A.   One moment.
2       Q.   Mr. LaPorte, what document are you reviewing
3   right now?
4       A.   I'm looking at the report.
5       Q.   Exhibit 1, your report?
6       A.   Correct.  It's only Exhibit C.
7       Q.   Okay.  So only Exhibit C to Defendants' Amended
8   Answer and Counterclaim supports your opinion that Mr.
9   May's files were accessed by someone?
10      A.   That is correct.
11      Q.   Okay.  I want to talk about page 8 of your
12  report.
13      A.   Okay.
14      Q.   I believe that's where there's some discussion
15  of Exhibit C specifically as to the -- the MD5 Hash is the
16  first paragraph there.  It says here that you agree with
17  Mr. Kraemer, "and it is also my expert opinion that the
18  technological evidence showed Bungie searched and found
19  files and used an MD5 Hash Generator to access James May's
20  files to generate the hash."
21           So is it your testimony that that attribution to
22  Bungie is incorrect?
23      A.   It -- correct.  It would be whoever produced
24  that document.  It was -- when I reviewed Exhibit C, it
25  was my understanding that that was provided by Bungie.  So

Page 169

1   it was either Bungie or they know who actually produced
2   that file.
3       Q.   What's an MD5 Hash?
4       A.   So MD5 is a method -- it stands for Message
5   Digest algorithm.  So it's basically a way of providing a
6   data integrity for -- typically for encrypting data.  So
7   it's used very heavily for passwords and basically
8   compressing data.
9            So if you have a password or you're basically
10  trying to compress data on the back ends, that is
11  effectively what would -- you would use an MD5 for.
12      Q.   MD5 --
13           THE VIDEOGRAPHER:  Just real quick, this is the
14      videographer.  The reporter is asking that we resolve
15      some audio issues.  Can we go off the record?
16           MR. DINI:  Yes, please.
17           THE VIDEOGRAPHER:  All right.  This will end
18      file five in the deposition of Brad LaPorte.  Off the
19      record at 1:03.
20           (Discussion off the record.)
21           THE VIDEOGRAPHER:  This will begin file six in
22      the deposition of Brad LaPorte.  Back on the record
23      at 1:05.
24  BY MR. DINI:
25      Q.   Okay.  So we were talking about MD5 Hashes,

BRAD LAPORTE - 09/28/2023

---

Page 190

1     THE WITNESS:  I apologize, it's been a long day.
2  Yes, I would like to review the transcript.
3     THE REPORTER:  Okay.  So I'll get your -- once
4  we're completely off the record, I'll get your email
5  address.  Everything's done digitally nowadays.
6     MR. DINI:  Yeah.  I'd like to order a copy of
7  the transcript.  What's the turnaround time on a
8  rush?  Sorry, a rush.
9     THE REPORTER:  You want it rushed?  When do you
10  need it?
11     MR. DINI:  Early next week would be great.
12     THE REPORTER:  Okay.  Like Tuesday?
13     MR. DINI:  Yeah, Monday or Tuesday.
14     THE REPORTER:  All right.
15     MR. MANN:  And the Defendant will not, I repeat,
16  will not be ordering a copy of the transcript at this
17  time.
18     (The deposition concluded at 1:52 p.m., PST)
19
20
21
22
23
24
25

---

Page 191

1                    CERTIFICATE OF OATH
2
   STATE OF FLORIDA        )
3                          )
   COUNTY OF PALM BEACH    )
4
5          I, Deborah Carmela Dew, FPR, Court Reporter and
6  Notary Public, State of Florida, certify that BRAD LAPORTE
7  appeared remotely before me via Zoom videoconference,
8  produced identification, and was duly sworn on the 28th
9  day of September, 2023.
10          Witness my hand this 2nd day
11  of October, 2023.
12
13
14
15          *Deborah Carmela Dew*
                _____
16          Deborah Carmela Dew, FPR
            Notary Public, State of Florida
17          Commission No.:  HH125890
            Expires:  August 21, 2025
18
19
20  PERSONALLY KNOWN_____
    OR PRODUCED IDENTIFICATION XXXXX
21  TYPE OF IDENTIFICATION PRODUCED:  Driver's License
22
23
24
25

---

Page 192

1                    CERTIFICATE OF REPORTER
2
   STATE OF FLORIDA     )
3                       )
   COUNTY OF ST. LUCIE  )
4
5          I, Deborah Carmela Dew, Florida Professional
6  Reporter, do hereby certify that I was authorized to and
7  did remotely stenographically report the videotaped
8  deposition of BRAD LAPORTE; that a review of the
9  transcript was requested; and that the foregoing
10  transcript, pages 1 through 190 is a true record of my
11  stenographic notes.
12          I FURTHER CERTIFY that I am not a relative,
13  employee, or attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorney or counsel or counsel connected with the action,
16  nor am I financially interested in the action.
17          DATED this 2nd day of October, 2023.
18
19
20          *Deborah Carmela Dew*
               _____
21          Deborah Carmela Dew,
22          Florida Professional Reporter
23
24
25

---

Page 193

1                         ERRATA SHEET
2
3          I, BRAD LAPORTE, declare under penalty of
4  perjury that I have read the foregoing 190 pages of my
5  testimony taken remotely on September 28, 2023, and the
6  same is a true record of the testimony given by me with
7  the following exceptions:
8
9  Page  Line  Should Read              Reason for Change
10  ____  ____  _____     _____
11  ____  ____  _____     _____
12  ____  ____  _____     _____
13  ____  ____  _____     _____
14  ____  ____  _____     _____
15  ____  ____  _____     _____
16  ____  ____  _____     _____
17  ____  ____  _____     _____
18  ____  ____  _____     _____
19  ____  ____  _____     _____
20  ____  ____  _____     _____
21  ____  ____  _____     _____
22  ____  ____  _____     _____
23  ____  ____  _____     _____
24  ____  ____  _____     _____
25  ____  ____  _____     _____

---

Exhibit 3

```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4    BUNGIE, INC.,                    )
                                       )
 5                    Plaintiff,       )  C21-00811-TSZ
                                       )
 6    v.                               )  SEATTLE, WASHINGTON
                                       )
 7    AIMJUNKIES.COM, PHOENIX          )  November 17, 2023
      DIGITAL GROUP, LLC; DAVID        )
 8    SCHAEFER;JORDAN GREEN;           )  10:00 a.m.
      JEFFREY CONWAY; and JAMES        )
 9    MAY,                             )  Pretrial
                                       )  Conference
10                    Defendants.      )

11    _____

12              VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE THOMAS S. ZILLY
13              UNITED STATES DISTRICT JUDGE
      _____

14


15
      APPEARANCES:
16


17


18    For the Plaintiff:      William C. Rava
                              Jacob P. Dini
19                            Christian W. Marcelo
                              Perkins Coie
20                            1201 3rd Avenue
                              Suite 4900
21                            Seattle, WA 98101-3099

22
      For the Defendant:      Philip P. Mann
23                            Mann Law Group PLLC
                              403 Madison Avenue North
24                            Suite 240
                              Bainbridge Island, WA 98110

25
```

1          THE CLERK:  We're here on the matter of Bungie

2   Incorporated versus AimJunkies.com, case C21-811, assigned to

3   this court.

4      Counsel, will you please rise and make your appearances

5   for the record?

6          MR. RAVA:  William Rava from Perkins Coie, on behalf

7   of plaintiff.

8          THE COURT:  Good morning, counsel.

9          MR. MARCELO:  Christian Marcelo on behalf of

10  plaintiff.

11         MR. DINI:  Jacob Dini on behalf of plaintiff.

12         THE COURT:  All right.  And you have a client

13  representative.  Do you want to identify that person for the

14  record?

15         MR. RAVA:  Yes.  We are joined by James Barker, who

16  is the senior corporate counsel at Sony Interactive

17  Entertainment.

18         THE COURT:  All right.  Thank you.  Welcome.

19         MR. MANN:  Good morning, Your Honor, I'm Phillip Mann

20  on behalf of the defendants.

21         THE COURT:  Good morning, Mr. Mann.

22         MR. MANN:  Thank you.

23         THE COURT:  It looks like you're outnumbered today.

24         MR. MANN:  Apparently I am.  But I can handle it.

25         THE COURT:  This is a pretrial conference in the

1    matter of this case.  Normally I would -- pre-COVID, we would

2    always hold these in chambers, in the conference room,

3    informally, without a court reporter.  But these are not

4    normal times and COVID is still with us all.  And so we're

5    doing it here.  And there will be some issues that we'll be

6    discussing and making some rulings on.  And as a result,

7    we'll have a court reporter to take down everything that we

8    do.  We'll also have minutes that will summarize any action

9    that we've taken.

10        This is the pretrial conference.  We're holding it a

11   little early, just because of travel plans next week.  But

12   the case is set for trial on December 4th.  We've ordered a

13   jury and we'll be picking that jury remotely and we'll be

14   trying the case in person.  That's the plan.

15        All right.  I have made myself an agenda to try and

16   capture the issues that we've got on the table this morning,

17   before we get to the pretrial order itself and the procedures

18   for trial, which we will discuss as well.

19        But what I wanted to take up first is, we entered an

20   order, Docket 242, dealing with the motion to strike the

21   expert testimony of Brad LaPorte; that motion was Docket 199.

22   When we entered our order on November 15th, I deferred, in

23   part, on that matter, questioning whether and to what extent

24   LaPorte had anything to testify about in connection with the

25   counterclaim of the defendant.

1    And that being the case, I'm wondering, Mr. Mann, maybe

2    you could go first and tell me -- because we're a little bit

3    informal, you can talk sitting down and from your places

4    where you're sitting.

5         MR. MANN:  Thank you, Your Honor.  I'll be happy to

6    address the issue.  With the court's dismissal of three out

7    of the four counterclaims, much of what Mr. LaPorte is going

8    to testify to is moot.  So we're not seeking to bring in any

9    of that.

10    With respect to Mr. May's counterclaim.  Basically, if I

11    may paraphrase the counterclaim, Mr. May is saying that even

12    though I permitted Bungie to gain access to certain files on

13    my computer, they went beyond what I authorized.  They looked

14    at files that don't relate to the Destiny 2 game.  So what

15    we're saying is that even though he did grant Bungie limited

16    access to his computer, he did not grant them the access that

17    they actually took.  And they looked into his computer,

18    beyond where they were supposed to go.

19         THE COURT:  Let me ask you a question.  Is LaPorte's

20    testimony limited to the counterclaim?

21         MR. MANN:  It is, Your Honor.

22         THE COURT:  I read his deposition transcript excerpts

23    that were provided by the plaintiff, and he seems to say that

24    he doesn't have any opinions.

25         MR. MANN:  No.  What he's doing, he was confirming

1    Scott Kraemer's report, the earlier expert that withdrew.

2    And Mr. LaPorte's actual expert report does address the

3    counterclaim of Mr. May.  Specifically, it's the -- where he

4    talks about -- let me see if I can find this.  This is on

5    Page 8 of his report, where he addresses the system drivers.

6         Now, the significance of that is what he's saying is --

7    and I'm not sure if this is really an issue or not, and,

8    frankly, it may not require expert testimony.  It depends on

9    what Bungie tries to argue.

10         What we are saying is Bungie accessed systems drivers on

11   Mr. May's computer.  And what Mr. LaPorte is saying is that

12   those system drivers don't relate to the game.  So that's the

13   evidence that they looked beyond what they were authorized to

14   look at.

15         Now, Mr. May can say the same thing.  They're his files.

16   And he, perhaps, as a lay witness, can say:  Hey, I know what

17   that stuff is, that doesn't relate to the game.  So in that

18   sense, if Mr. May is permitted to testify that he knows what

19   the file is and can tell us what it is, Mr. LaPorte's

20   testimony may be redundant.

21         On the other hand, if Bungie, for whatever reason says:

22   Mr. May you can't testify to that, then Mr. LaPorte will come

23   in and say:  Well, these files, in my opinion, do not relate

24   to the Destiny 2 game; and, therefore, were not within the

25   authorized purview of Bungie when they looked at Mr. May's

1    computer.

2        So in a nutshell, that is what Mr. LaPorte is going to

3    say.   And as I said, if we don't have a dispute on that, and

4    if Mr. May can testify to that, perhaps we don't need

5    Mr. LaPorte's testimony.   But I'm sort of

6    belt-and-suspendering this, Your Honor.

7            THE COURT:   Does plaintiff want to be heard on the

8    matter?

9            MR. DINI:   Yes, Your Honor.   Jacob Dini for Bungie.

10           THE COURT:   Just for the court's benefit, identify

11   yourself if you're going to be switching off, so the record

12   is clear who's speaking.   Go ahead.

13           MR. DINI:   Yes, Your Honor.

14   Jacob Dini, for Bungie.   Mr. LaPorte admitted, during his

15   deposition, that the opinions he was asked to provide had

16   nothing to do with circumvention of technological protection,

17   measures.   Mr. LaPorte's report does not mention any

18   technological-protection measures that were employed by

19   Mr. May, or how or if Bungie circumvented any

20   technological-protection measures by Mr. May.

21       In addition, opposing counsel referenced that Mr. May

22   granted specific authorization to access certain information

23   and whether Bungie exceeded the scope of that authorization.

24   If I may direct Your Honor to other excerpts of Mr. LaPorte's

25   testimony that were filed on Docket 214-1.

```
 1              THE COURT:  Just a minute.  Okay.  200-1?
 2              MR. DINI:  214-1.  This is Page 93 of Mr. LaPorte's
 3    deposition testimony.
 4              THE COURT:  You gave me his deposition transcript in
 5    Exhibit 3, so Docket 200-3.
 6              MR. DINI:  Your Honor, we also submitted other
 7    portions of his deposition transcript on 214-1.
 8              THE COURT:  All right.  I don't have that in front of
 9    me.  So can you show me on the screen?
10              MR. DINI:  Yes, Your Honor.
11          Your Honor, this is on Docket 214-1.  This is
12    Mr. LaPorte's deposition testimony, Page 93, lines 21 to 24.
13    He was asked, "Were you asked to provide any opinion, expert
14    opinions regarding whether Mr. May consented to Bungie's
15    purported access to files on his computer?"  His answer was,
16    "I was not."
17              THE COURT:  But that wouldn't be a -- he couldn't
18    testify as an expert about that anyway.
19              MR. DINI:  Correct, Your Honor.  So Mr. LaPorte also
20    can't testify about whether Bungie exceeded the scope of
21    Mr. May's authorized access, which is what defendants seem to
22    be intending to offer him for.
23              THE COURT:  Well, I'm having trouble -- I don't see
24    anything in his report, which I have as Docket No. 200-2,
25    which was his report.  And then his -- I had the deposition
```

1    excerpts, which are found in the record at Docket 200-3.  And

2    the bottom line is, he's saying that he doesn't have any

3    opinion on matters which Mr. Mann is now suggesting he be

4    allowed to testify.

5        I don't see, Mr. Mann, anything that he's got in his

6    report, and didn't say he -- he wasn't asked to do anything

7    about.  I don't see anything that he's got left to testify

8    about.

9            MR. MANN:  Okay, Your Honor.  I'll be happy to

10   address that.  If we look at Docket 202-2, Page 8.

11           THE COURT:  Just a moment.

12           MR. MANN:  Certainly, Your Honor.

13           THE COURT:  All right.  Go ahead.

14           MR. MANN:  The first paragraph where it says,

15   "Systems drivers."

16           THE COURT:  What page are you on?

17           MR. MANN:  I'm on Page 8 of Mr. LaPorte's report.

18           THE COURT:  All right.  Thank you.

19           MR. MANN:  I'll point you specifically to what we're

20   relying on, whether it does the trick or not, will remain to

21   be seen.  But we're not trying to hide anything.  It says,

22   "Systems drivers are loaded into" --

23           THE COURT:  Where are you?  You're at Page 8 at the

24   top?

25           MR. MANN:  No, Your Honor.  There's a bold heading

1   that says, "System drivers," it's the second paragraph on

2   Page 8.

3           THE COURT:  Page 8 -- 8 is the bottom number?

4           MR. MANN:  Yes, it is.

5       And just to make sure we're reading the same thing, mine

6   says, "Systems drivers.  The expert report from Mr. Kraemer."

7           THE COURT:  Okay.  I see it.

8           MR. MANN:  Okay.  If you look to the right-hand side

9   of the third line that begins, "Systems drivers."  So,

10  "System drivers are located into a computer system" --

11          THE COURT:  Wait, read it correctly.  Not "located,"

12  but "loaded."

13          MR. MANN:  Sorry, Your Honor.  Let me put my glasses

14  on.

15          THE COURT:  That would be helpful.

16          MR. MANN:  I apologize, Your Honor.  "System drivers

17  are loaded into a computer system's kernel, specifically

18  Mr. May's system, and not attached to the game.  There is no

19  way to confirm that the system drivers contained cheat codes

20  for Destiny 2 or any other cheat program."

21      The significance --

22          THE COURT:  That's not dealing with the counterclaim,

23  is it?

24          MR. MANN:  It is, Your Honor.  Because it is showing

25  -- they would have two defenses to the counterclaim.  The

1    first defense is that everything we looked at is related to

2    the game.  So what Mr. LaPorte is saying, "No, that is not

3    true.  Not everything that Bungie looked at is related to the

4    game."

5        The systems drivers, in Mr. LaPorte's opinion, are not

6    attached to the game, to use his direct language.  So that

7    goes to issue number one, did Bungie look at something that

8    was not attached to the game?

9        Then there's going to be a separate legal issue, you know,

10   this may be a matter of contract interpretation.  The second

11   defense Bungie would have is, even if that is not attached to

12   the game, we were nevertheless permitted to look at that,

13   under the terms of the applicable terms of service.  And we

14   are not offering Mr. LaPorte to opine on that.  As I said,

15   that's probably a legal issue.

16        THE COURT:  It certainly is a legal issue.  And I

17   would not allow him to testify about it.

18        MR. MANN:  Nor would we put him up, for that reason,

19   Judge.

20        So what Mr. LaPorte is testifying to is a very narrow

21   issue.  He's saying those systems drivers that Bungie

22   accessed are not attached to the game, they're not related to

23   the game.  And as I mentioned earlier, Mr. May can say the

24   same thing.  At this point we're just concerned if somebody

25   says:  Well, that's expert testimony, Mr. May can't testify

1    to that; then Mr. LaPorte can come in and say -- and can

2    confirm it.  If Mr. May can testify to the same effect,

3    without an objection, we perhaps -- we probably don't need

4    Mr. LaPorte.

5        As I said, I'm just concerned about if there are any

6    evidentiary objections at trial, I want to be able to say,

7    yes, we have an expert that can come in and make this narrow

8    but necessary point.

9            THE COURT:  All right.  I'm going to -- with respect

10   to the deferred portion of the motion to strike expert, I

11   will permit LaPorte to testify, consistent with my order,

12   242, but his testimony will be limited to the counterclaim.

13   And I think it may not be necessary, but I'm not going to

14   strike it at this point.

15       So with respect to the balance of that total motion, then,

16   Docket 199, with respect to what I deferred, I'm going to

17   deny the motion to strike the witness's testimony, consistent

18   with my order on how I limited him before.

19           MR. MANN:  Yes, Judge.  We understand the limits and

20   have no intention of going beyond them.

21           THE COURT:  All right.  I think that takes care of

22   the first item on my list of things I wanted to discuss with

23   you.

24       The next deferred portion of the plaintiff's motion in

25   limine, that I deferred, was what was referred to as 1.4,

```
 1              C E R T I F I C A T E

 2

 3

 4      I certify that the foregoing is a correct transcript from

 5   the record of proceedings in the above-entitled matter.

 6

 7

 8

 9   /s/ Debbie Zurn

10   DEBBIE ZURN
     COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 4

| | |
|---|---|
| **From:** | Rava, William C. (SEA) |
| **To:** | Phil Mann |
| **Cc:** | Marcelo, Christian W. (SEA); Dini, Jacob (SEA) |
| **Subject:** | RE: La Porte Deposition Invoice |
| **Date:** | Monday, December 11, 2023 4:14:39 PM |

Phil,

As we've discussed, among other things, we do not believe that Mr. LaPorte is entitled to his fees expended in preparation of the deposition (21 hours) or reviewing his transcript after (2 hours). *See, e.g., The Eclipse Group LLP v. Target Corp.*, 2017 WL 5885544, *3-*5 (S.D. Cal. 2017) (denying request for two hours of preparation time for deposition); *Rock River Commc'ns, Inc. v. Universal Music Grp.*, 276 F.R.D. 633, 635-37 (C.D. Cal. 2011) (denying request to recover expert fees for seven hours a deposition preparation time and transcript review).  Notably, Mr. LaPorte did not even submit an errata.  Moreover, Mr. LaPorte's claim that he spent 21 hours preparing for a deposition regarding his seven-page report is far from reasonable.  That's further reinforced by the fact that all but a single paragraph of the report was excluded or found to be irrelevant in light of the dismissed claims.

Additionally, for any amount owed by Bungie for Mr. LaPorte's deposition, an offset should be applied against the amount Defendants owe to Bungie from the partial judgment entered by the Court for $4,396,222.  *See Tibble v. Edison Int'l*, No. CV 07-5359 SVW AGRX, 2011 WL 3759927, at *3 (C.D. Cal. Aug. 22, 2011), *aff'd*, 520 F. App'x 499 (9th Cir. 2013).

In an effort to resolve this, Bungie is willing to pay the fees requested for Mr. LaPorte's deposition, a total of $4,200.  Bungie otherwise reserves the right to seek an offset for this amount or any other amount owed to Defendants.

Will

**William Rava | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.6338
F. +1.206.359.7338
E. WRava@perkinscoie.com

**From:** Phil Mann <phil@mannlawgroup.com>
**Sent:** Monday, December 11, 2023 11:07 AM
**To:** Rava, William C. (SEA) <WRava@perkinscoie.com>
**Cc:** Marcelo, Christian W. (SEA) <CMarcelo@perkinscoie.com>; Dini, Jacob (SEA) <JDini@perkinscoie.com>
**Subject:** La Porte Deposition Invoice

Hello Will,

I want to follow up on the still unpaid invoice of Defendants' Expert, Brad LaPorte, for time spent preparing and appearing for his deposition on September 28, 2023.

We previously offered to reduce his overall bill by 50% but never heard back from you on that.  That offer is now withdrawn and we believe Mr. LaPorte is entitled to receive the

entirety of the bill he submitted to you.  This is based on the following:

Mr. LaPorte spent approximately 21 hours preparing for what was previously stated by Bungie to be up to an eight hour deposition.  Courts have repeatedly held that a three-to-one ratio between time spent preparing for an expert deposition and actual time of the deposition is reasonable and subject to compensation by the party taking the deposition.  One of the first cases that illustrates the point of the 3-to1 ratio is *L.G. Elec. U.S.A., Inc. v. Whirlpool Corp.*, No. 08-C-0242, 2011 WL 5008425, at * 5 (N.D. Ill. Oct. 20, 2011).

In that case, the Defendant suggested as an alternative that the court adopt the approach applied by some courts leading up to this point in time, pursuant to which a ratio of three hours of preparation time to one hour of deposition time is deemed reasonable in complex cases. The rule of thumb provides at least a fair measure of reasonableness in an area subject to a "great risk of abuse," if not carefully monitored. The court ruled that given the inadequacy of the time records presented by plaintiffs' experts and the apparently arbitrary amounts of time claimed for "deposition preparation," it was found that the 3-to-1 ratio applied in the Northern District of Illinois and other courts provides a fair and reasonable approximation of the time that an expert witness should have expended in this case. This case has been used as a past practice example since it was ruled.

This 3-to-1 ratio rule is not limited to a specific district or jurisdiction but is used by a number of district courts across the United States. Some courts even adopt a higher ratio than three-to-one on a case by case basis. The rule of thumb provides a fair measure of reasonableness in an area that is susceptible to abuse. Hence, in the absence of specific time records, the 3-to-1 ratio rule can provide a fair and reasonable approximation of the time that an expert witness should have expended on a case.

In the present case, Mr. LaPorte was asked to review hundreds of pages across 28 documents. As you know, this case is very technical and complex as well as high profile. Indeed, Bungie requested a full day session amounting to 8 total hours with a start time of 730am PT.

In order properly to prepare for his deposition and uphold his reputation as an expert, it required 21 hours to prepare for what was indicated to be a full eight hour deposition.  Indeed, this is below the 3-to-1 ratio of 24 hours which would be the reasonable expectation. Even with this amount of preparation, Bungie still filed an unsuccessful motion to strike his testimony and prevent him from testifying at trial.  These actions by Bungie suggest that, if anything, Mr. LaPorte should have spent *more* time preparing for his deposition rather than less.

Against this backdrop, we now formally demand that Bungie immediately pay Mr. LaPorte's long outstanding bill immediately and in full.

Best Regards,

Phil