```
              UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

BUNGIE, INC., a Delaware corporation,  )
                                       )
                        Plaintiff,     ) CASE NO. C21-00881-TSZ
v.                                     )
                                       ) Seattle, Washington
PHOENIX DIGITAL GROUP LLC, an          )
Arizona limited liability company;     ) May 22, 2024
JEFFREY CONWAY, an individual;         ) 9:00 a.m.
DAVID SCHAEFER, an individual;         )
JORDAN GREEN, an individual; and       ) JURY TRIAL, DAY 3 of 5
JAMES MAY, an individual,              )
                                       )
                        Defendants.    )
                                       )
_____


              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE THOMAS S. ZILLY
              UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:      WILLIAM C. RAVA
                          JACOB P. DINI
                          CHRISTIAN W. MARCELO
                          Perkins Coie
                          1201 3rd Avenue, Suite 4900
                          Seattle, WA 98101-3099


  For the Defendants:     PHILIP P. MANN
                          Mann Law Group PLLC
                          403 Madison Avenue North, Suite 240
                          Bainbridge Island, WA 98110


  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Official Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          nancy_bauer@wawd.uscourts.gov
```

```
 1                          PROCEEDINGS
 2     _____

 3              THE FOLLOWING PROCEEDINGS WERE HELD
               IN THE PRESENCE OF THE JURY:

 4        THE COURT:  Good morning, ladies and gentlemen.  Please be

 5   seated.

 6        You may proceed.

 7                          JAMES MAY,
               having been previously sworn, testified as follows:
 8

 9                    DIRECT EXAMINATION (cont'd)

10   BY MR. MARCELO:

11   Q.   Mr. May, good morning.

12   A.   Good morning.

13   Q.   Now, you're still under oath.  You understand that?

14   A.   Yes, correct.

15   Q.   I'm going to do a little housekeeping.

16        MR. MARCELO:  Mr. Blackburn, please pull up Exhibit 15.

17   Q.   (By Mr. Marcelo)  We went over this document yesterday.

18   A.   Yes.

19   Q.   Exhibit 15 shows payments to you from Phoenix Digital,

20   right?

21   A.   Yes.

22        MR. MARCELO:  Plaintiff moves to enter into evidence

23   Exhibit 15.

24        MR. MANN:  No objection, Your Honor.

25        THE COURT:  It will be admitted.
```

1          (Plaintiff Exhibit 15 admitted.)

2   Q.  (By Mr. Marcelo)  Mr. May, yesterday we had talked about a

3   paper trail, right, and how there is no paper trail between you

4   and Phoenix Digital; do you recall that?

5   A.   I don't remember anything about a paper trail yesterday.

6   Q.   Well, you don't have a written contract with Phoenix

7   Digital?

8   A.   No, there's no written contract.

9   Q.   No emails between you and Phoenix Digital?

10  A.   No.  We never communicated via email.

11  Q.   Right.  There's no paper trail between you and Phoenix

12  Digital.

13  A.   Apparently not.

14  Q.   You've worked for other legitimate businesses, like

15  DoorDash?

16  A.   Yes.

17  Q.   You had an agreement with DoorDash?

18  A.   Yes.

19  Q.   Communications with DoorDash?

20  A.   I did not have any communications specifically with any

21  employee at DoorDash, no.

22  Q.   You get records from DoorDash, though, payments, stuff like

23  that?

24  A.   It's all in the app.

25  Q.   Right.  But it's a written record in the app.

1    A.    In the app, I don't know how long it stays there.  I don't

2    know the timing or whatever, yeah.

3    Q.    You're aware that legitimate businesses have records, they

4    keep records.

5                MR. MANN:  Your Honor, I object to the

6    characterization or implication that Phoenix Digital is not a

7    legitimate business.

8                THE COURT:  Overruled.  You may answer.

9                THE WITNESS:  Could you repeat the question?

10   Q.    (By Mr. Marcelo)  You'd agree legitimate businesses keep

11   records.

12   A.    I have no idea what legitimate businesses do, as I've never

13   owned a business.

14   Q.    You don't own a business?

15   A.    I do not own a licensed business.  Like, it's nothing

16   registered, no.

17   Q.    Mr. May, why is there no paper trail between you and

18   Phoenix Digital?

19   A.    You have payments to me from Phoenix Digital through

20   PayPal.

21   Q.    Why do you guys keep no written communications?

22   A.    I'm not sure.  It's just how I've always been told things

23   are done.

24   Q.    You have a business relationship in which you were paid

25   $700,000, and there's no written communications between you and

1    Phoenix Digital?

2    A.    No.  I just got paid through PayPal at the beginning, and

3    that's how much I got paid.

4    Q.    Let's walk through how the *Destiny 2* cheat software is

5    used.  You had testified --

6           THE COURT:  Are you done with this exhibit, counsel?

7           MR. MARCELO:  Yes, I am.

8           THE COURT:  Why don't you take it down.

9           MR. MARCELO:  Mr. Blackburn, thank you.  Thank you,

10   Your Honor.

11   Q.    (By Mr. Marcelo)  You've used the *Destiny 2* cheat software

12   before?

13   A.    Once or twice, yes.

14   Q.    And you're aware that Phoenix Digital distributed that

15   software.

16   A.    Yes.

17   Q.    Phoenix Digital also had a cheat loader?

18   A.    Yes.

19   Q.    They gave you a copy of the loader?

20   A.    Yes.

21   Q.    And they did that --

22   A.    Oh, I'm sorry.  Let me specify.

23         I only had the same copy that any other customer would

24   have.

25   Q.    Right.  But they gave you the loader and the cheat software

1    because it's part of the business exchange, right?  You provide

2    cheats to them; they give you access to all their cheats.

3    A.    Yes, correct.

4    Q.    And you can't use the *Destiny 2* cheat software without a

5    cheat loader.

6    A.    Correct.

7    Q.    So I just want to walk, step by step, how you actually use

8    the *Destiny 2* cheat in the *Destiny 2* game.  Okay?

9    A.    Okay.

10    Q.    Okay.  First step, you open *Destiny 2.*

11    A.    Correct.

12    Q.    Then you open the cheat loader?

13    A.    Correct.

14    Q.    Within the cheat loader, there's a drop-down menu of all

15    the cheats that you subscribe to or purchased, right?

16    A.    Yeah, and then you'd select *"Destiny 2"* in the options

17    there.

18    Q.    Right, there's a drop-down, and *Destiny 2* would be one of

19    them?

20    A.    Yes.

21    Q.    And when you selected, it injects it into the *Destiny 2*

22    game.

23    A.    I don't know how that works, the injection part of it, but,

24    theoretically, if you hit "load cheat" on there, but I called it

25    "inject" before.

1    Q.    You refer to it as "loading" or "injecting"?

2    A.    Yeah.

3    Q.    And all of the cheats you developed for Phoenix Digital use

4    DLL injectors.

5    A.    Yes.

6    Q.    You never gave Phoenix Digital a cheat, ever, that didn't

7    use DLL injection.

8    A.    No, I did not.

9    Q.    Okay.  After the cheat is injected, you can use the

10   software in *Destiny 2*, right?

11   A.    Yes.

12   Q.    So that's getting the cheat loaded.  Let's talk about your

13   testing of the cheat.

14   A.    I was playing just like any other customer would.  I

15   wouldn't reporting anything to anybody about -- I was just

16   seeing how it worked.

17   Q.    Okay.  I want to walk through that.

18         So it's December 2019 when you first tested.

19   A.    Sounds about right, yeah.

20   Q.    And you were checking, you know, does this cheat work.

21   A.    Yes -- well, I wasn't checking if it works.  I wanted to

22   try it out for my own benefit, just to see how things worked in

23   it.

24   Q.    Sure.  And so you tested the cheat features that it comes

25   with.

1    A.    I tried the cheat features, yes.

2    Q.    Right.  The ESP feature is one of them?

3    A.    Yes.

4    Q.    What happened when you used the ESP feature?

5    A.    Depending on the options.  It just depends on what option

6    it is.

7    Q.    Well, you used the feature in 2019, December of 2019.

8    A.    Yes, but there's more than one option under ESP.

9    Q.    It showed boxes around the various characters in the game?

10   A.    Yes.

11           MR. MARCELO:  Mr. Blackburn, if you could pull up

12   Exhibit 29.  This has already been admitted.  And publish to the

13   jury page 2.  If you'd zoom in on the first image.

14   Q.    (By Mr. Marcelo)  The red boxes we just described with ESP,

15   that's what it looked like in *Destiny 2*, something like that?

16   A.    Yeah, I would assume that would be it, yes.

17   Q.    And you played *Destiny 2* before?

18   A.    I really didn't play it.  I just messed, like, in the

19   starting area, trying to figure out the game, like I stated

20   before.

21   Q.    Oh, okay.  You didn't actually play *Destiny 2*, the game.

22   You just opened it up?

23   A.    I opened it up, and I got into the tutorial area.  That was

24   it.

25   Q.    And reverse engineered it?

1    A.    I attempted to, yes.

2    Q.    But that was the ESP aimbot.  That allowed you to

3    automatically aim, right?

4    A.    Aimbot makes you automatically aim at a player, yes.

5    Q.    Yeah.  So when you shoot, it hits the character -- it aims

6    for you so it hits the right character?

7    A.    Yes.

8    Q.    And when you tested the cheat, that feature worked.

9    A.    When I tried the cheat, I recall that it did aim at the

10   non-player characters in the testing area, yes.

11         Sorry.  Could you repeat the question again just so I can

12   get it right?

13                        (The court reporter read back.)

14   A.    So when I tested it, yes, that feature did work, yes.

15   Q.    Jumping back:  Same with ESP, when you tested it, the ESP

16   feature worked?

17   A.    Correct.

18   Q.    And then there was a teleport feature you tested?

19   A.    Yes.

20   Q.    And it functioned?

21   A.    Yes.

22   Q.    And it would teleport your character to the location of

23   other characters?

24   A.    Other non-player, both characters or any position in the

25   world that you wanted to it go to, I guess.

1    Q.    Yeah, but it will teleport you.

2    A.    Yes.

3    Q.    So, you know, you agree with Dr. Kaiser, for instance, that

4    the ESP feature draws red boxes.

5    A.    Yes.

6    Q.    You agree with Dr. Kaiser that the aimbot aims your weapon.

7    A.    It aims your character, yes, toward the player or a

8    non-player character.

9    Q.    Let's move on to just how you -- you're a cheat

10    developer -- develop cheats.

11    A.    Yes.

12    Q.    You developed many cheats?

13    A.    Yes.

14    Q.    All for Phoenix Digital?

15    A.    Yes.

16    Q.    Okay.  First step, you reverse engineer the game, right?

17    A.    Yes.

18    Q.    When you reverse engineer the game, you use a

19    reverse-engineering tool.

20    A.    Yes.

21    Q.    And that's software that helps you look at the game code.

22    A.    It helps you look at the memory running the game, yes.

23    Q.    Right.  That's machine code behind the game.

24    A.    Yes.

25    Q.    And you use tools such as ReClass.  That's a

1    reverse-engineering tool?

2    A.    Correct.

3    Q.    It's commonly known in the cheat community as a

4    "reverse-engineering tool"?

5    A.    Yes.

6    Q.    And you've used ReClass and tools like it to make cheats?

7    A.    Correct.

8    Q.    Okay.  Let's focus on the ReClass tool.  That's the primary

9    tool you use to make cheats, right?

10   A.    Yes.

11   Q.    And the ReClass tool, when you attached it to a video game

12   to look at the code, it outputs the code for you.

13   A.    It outputs the memory in, like, 1s and 0s.

14   Q.    It outputs the code in a way that you can copy the

15   structure and put it right into a cheat.

16              MR. MANN:  Your Honor, objection.  This

17   mischaracterizes the witness's testimony.  He never said it

18   outputs the code.

19              THE COURT:  I'll overrule the objection.  State the

20   question so we have it.

21              MR. MARCELO:  Sure.

22   Q.    (By Mr. Marcelo)  You had said "memory" and agree that

23   that's machine code?

24   A.    I would say that it's memory running on your game at

25   runtime -- or running on your computer at runtime.

1  Q.  Okay, and you would characterize that as machine code?

2  A.  I would characterize it as memory currently running on your

3  computer at that time.

4  Q.  Isn't it your words that the ReClass tool outputs the code

5  of a video game?

6  A.  It outputs the memory so you can see what's running.

7  Q.  And didn't you testify that it outputs the code so you

8  could copy the structure and put it right in the cheat?

9  A.  So you can view the structure and find information in that

10  structure, yes.

11  Q.  Mr. May, you recall testifying at a deposition in this

12  case?

13  A.  Yes.

14  Q.  On March 23rd of 2023?

15  A.  I don't remember the exact date.

16  Q.  And, Mr. May, you had talked before about the ReClass tool,

17  right?

18  A.  Correct.

19  Q.  You had made modifications to that tool so that --

20  A.  Correct -- sorry.  Go ahead.

21  Q.  You had made modifications to the tool so that it would

22  make it easier and better flow to output the code and just be

23  able to put it into the cheat, right?

24  A.  That is not correct.  I made modifications so I could read

25  the memory of the game easier.

1    Q.    Let's see what you said at your deposition.

2    A.    All right.

3    Q.    Now, you took an oath at your deposition?

4    A.    Correct.

5    Q.    To tell the truth?

6    A.    Yes.

7    Q.    Same oath you took in this courtroom?

8    A.    Yes.

9          MR. MARCELO:  Counsel, this would be page 56, lines 3

10   through 7, of Mr. May's March 23rd, 2023 deposition.

11

12   Q.    (By Mr. Marcelo)  "QUESTION:  So am I understanding right

13   that improving the class structure improved the output that

14   ReClass, or whatever tool it is that you're using, it makes it

15   easier to read whatever it is you're trying to read?"

16   A.    Correct.  You took that out of context, as it was

17   referring --

18   Q.    Mr. May --

19         THE COURT:  Just a moment, counsel.  I don't

20   understand the text you have up.  Let's see the question.

21         MR. MARCELO:  Yes.  Apologies.  Mr. Blackburn, if you

22   could pull up page 56, lines 8 through 16, of his March 23rd,

23   2023, deposition.

24         That's the correct portion, Your Honor.  I'll just read the

25   answer.

1      THE COURT:  No, read the question and the answer,

2   please.

3   Q.   (By Mr. Marcelo)  "QUESTION:  So am I understanding right

4   that improving the class structure improved the output that

5   ReClass, or whatever the tool is that you're using, it makes it

6   easier to read whatever it is you're trying to read?

7      "ANSWER:  It makes it easier to plug and play.  So if you

8   have a base set up for a cheat, like most games, it's pretty

9   easy, like, world to screen and a lot of stuff simple.  So as

10   long as you find that stuff, it's like plug and play, you can

11   just be on your way."

12      And immediately before that, Mr. May, same page, page 56,

13   lines 3 through 7, you wrote --

14      THE COURT:  Well, let's get the question.

15      MR. MARCELO:  Your Honor, if I may?  The question --

16   the answer here is the relevant portion.  If you would like me

17   to read the entire portion of the transcript, I can.

18      THE COURT:  Well, this is, apparently, an answer, is

19   it?

20      MR. MARCELO:  Sorry.  Say it again?

21      THE COURT:  What's on the screen now is just an

22   answer.

23      MR. MARCELO:  Yes, Your Honor.

24      THE COURT:  I need to see and the jury needs to see --

25   if you're going to put the answer up, you need to put the

1    question up.

2           MR. MARCELO:  Yes, sir.

3        Mr. Blackburn, if you could put up page 55, 17, through

4    56/7.

5    Q.   (By Mr. Marcelo) "QUESTION:  Okay.  Tell me more about

6    that.  What does that mean "to improve the class structure,' I

7    guess?

8        "ANSWER:  The output, in the way it did class structures,

9    was terrible.  You couldn't modify or write any, like, comments

10   or things next to it.  So I wrote in code that you could.  It

11   would have a better flow to it and help it be easier to read.

12   Like, say, if you're reverse engineering a game, say, like

13   *Frostbite*, it will output, like, class names and everything next

14   to it, because you could read the class data in *Frostbite*.  It

15   just depends on the game engine."

16       Then you continue:  "I mean, I wrote several things to make

17   it easier and better flow to output the code and just be able

18   to, like, put it -- like, just copy the structure and put it

19   right in the cheat.  It would make it so much easier that way."

20       Those are your words?

21   A.   Yes.

22   Q.   You used the ReClass tool so, as you said, you could plug

23   and play?

24   A.   I used the ReClass tool so I could modify the plug-ins and

25   create plug-ins to make it easier to plug and play.  I had no

 1  idea what the variables were in those structures.  It was more

 2  guess and check.

 3  Q.   Right.  And all I was asking is, as you just said, I

 4  believe, is that you did it so it's easier to plug and play?

 5  A.   Yes, correct.

 6  Q.   And when you make a cheat, you can make it in as little as

 7  two hours?

 8  A.   It depends on the game, but I have, yes.

 9  Q.   Once you've made a cheat, you check to make sure the cheat

10  works?

11  A.   Yes.

12  Q.   And when a video game is updated, you'll check to make sure

13  the cheat still works?

14  A.   Correct.

15  Q.   And if you need to fix something because the video game was

16  updated, the code changed, you'll go back and reverse engineer

17  again?

18  A.   Correct.

19  Q.   Because you need to see the code and make sure whatever

20  changes were made didn't break the cheat.

21  A.   If the cheat is broken, I would go back and fix what the

22  issue was, yes.

23  Q.   Mr. May, you'd agree -- let me restate that.

24       You agreed to the limited software license agreement for

25  *Destiny 2.*

1  A.   Come to find out, I had.  While opening the game, it

2  automatically makes you -- I just clicked right through,

3  originally, but, yes, I'd come to learn that I did accept it,

4  yes.

5  Q.   Okay.  You did accept it?

6  A.   Yes.

7  Q.   You know that that LSLA prevents reverse engineering

8  *Destiny 2*?

9  A.   Correct.

10       MR. MANN:  Your Honor, I have a relevance objection.

11  Again, there is no claim in this lawsuit that Mr. May has

12  breached any contract with Bungie.  I don't understand what the

13  relevance of this is.

14       THE COURT:  Overruled.  You may answer.

15       THE WITNESS:  Sorry.  Could you repeat that?

16  Q.   (By Mr. Marcelo)  Sure.

17       You know that the LSLA prohibits you from reverse

18  engineering *Destiny 2*.

19  A.   Correct.

20  Q.   But you did reverse engineer *Destiny 2*.

21  A.   I attempted to.

22  Q.   You attached reverse-engineering tools to it.

23  A.   Yeah, that means I attempted to.  It doesn't mean I was

24  able to reverse anything.

25  Q.   Mr. May, you attached reverse-engineering tools to

1    *Destiny 2.*

2    A.    Yes.

3    Q.    You saw the code output.

4    A.    I saw code.  I don't know what that output was.

5    Q.    You attached reverse engineering dozens of times.

6              MR. MANN:  Asked and answered, Your Honor.

7              THE COURT:  Just a moment.  You get to ask it once and

8    get an answer.

9              MR. MARCELO:  I can move on to a different --

10             THE COURT:  You're arguing with the witness.  Ask a

11   question.

12   Q.    (By Mr. Marcelo)  Your reverse-engineering efforts, they

13   lasted for months?

14   A.    Whenever I was bored and had free time, I would go back and

15   try to reverse engineer the game again, because I wanted to see

16   how the game worked.

17   Q.    It lasted for months?

18   A.    On and off for months.  If I was bored, I'd go work on it

19   again, yes.

20   Q.    For over a year?

21   A.    Possibly over a year, yeah.

22             MR. MARCELO:  Mr. Blackburn, if you could pull up

23   Exhibit 56.  This has been previously admitted, and you may

24   publish to the jury.

25   Q.    (By Mr. Marcelo)  Mr. May, you recognize Exhibit 56?

1    A.    I do.

2    Q.    It shows the history of you being banned from *Destiny 2?*

3    A.    Yes.

4    Q.    If you look at row 3, column 3, there's a file path --

5             MR. MARCELO:  And, Mr. Blackburn, if you could

6    highlight it and blow it up.

7    Q.    (By Mr. Marcelo)  It ends in "blah64.exe"; do you see that?

8    A.    Yes.

9    Q.    Blah64.exe is under a folder called "ReClass."

10   A.    Correct.

11   Q.    It's a reverse-engineering tool.

12   A.    Yes.

13   Q.    It's the ReClass; you just renamed it "blah64."

14   A.    Correct.

15   Q.    And it's one of the tools you used and attached to

16   *Destiny 2.*

17   A.    Yes.

18             MR. MARCELO:  Mr. Blackburn, if you'd go out to

19   column 5.

20   Q.    (By Mr. Marcelo)  There's a date.  It says October 2nd,

21   2019; do you see that?

22   A.    Yes, I do.

23   Q.    That's the day that you attached the blah64

24   reverse-engineering tool to *Destiny 2?*

25   A.    If the date's correct, then, yes.

1  Q.   Let's go all the way down to row 75 at column 3.

2       Again, column C, you'll see blah64.exe; do you see that?

3  A.   Which column, sorry?

4  Q.   This is row 75, column 3.

5  A.   Yeah, I see that now, yes.

6            MR. MARCELO:  Okay.  And, Mr. Blackburn, if you'd go

7  out to the date.

8  Q.   (By Mr. Marcelo)  The date to the right, November 11th,

9  2020?

10 A.   Okay.

11 Q.   That's the date that you were attaching that

12 reverse-engineering tool again to *Destiny 2*?

13 A.   The logs say so, so, yes.

14 Q.   Okay.  You don't dispute that you attached the

15 reverse-engineering tool to *Destiny 2* on that day?

16 A.   No.

17 Q.   That's the day after *Destiny 2*: *Beyond Light* expansion came

18 out?

19 A.   I have no idea when that came out.

20 Q.   Now, everywhere on this chart that we see blah64.exe,

21 that's another time that you attached a reverse-engineering tool

22 *Destiny 2*?

23 A.   Yes.

24 Q.   Okay.

25           MR. MARCELO:  And so, Mr. Blackburn, for instance, if

1  you could just close out that, and highlight row 4, column 3,

2  and zoom out.

3  Q.    (By Mr. Marcelo)  And row 8, column C; row 10; row 12; 16;

4  18; all of those, everywhere else on this chart, that you

5  attaching a reverse-engineering tool to *Destiny 2.*

6  A.    Yes.

7  Q.    You used other reverse-engineering tools as well?

8  A.    Yes.

9  Q.    One of them on this chart is renamed "ReClass"?

10 A.    Yes.

11 Q.    Another one is just "ReClass.exe"?

12 A.    I don't remember that name, but it's possible, yes.

13 Q.    You used a reverse-engineering tool called "Cheat Engine"?

14 A.    Yes.

15 Q.    You would get kicked out of the game while you were reverse

16 engineering?

17 A.    Yeah.

18 Q.    But you'd get, roughly, 30 minutes to an hour of time

19 before you got kicked out.

20 A.    Yeah, it really depended, yes.

21 Q.    That's each time, right?  You'd attach a tool, you'd get 30

22 minutes to an hour, and then it kicks you out?

23 A.    Correct.

24 Q.    You thought -- you know, you were getting kicked out; you

25 thought you were getting detected.

1    A.    I assumed so.

2    Q.    And you were trying to do stuff to make sure you weren't

3    detected, right?

4    A.    I didn't do anything different.  I just loaded another

5    program and hoped that it wouldn't kick me for it.

6    Q.    That's all I'm saying.  You used, for instance, a different

7    reverse-engineering tool, hoping, Maybe I won't be detected if I

8    use this one.

9    A.    Yes.

10   Q.    You would rename the reverse-engineering tool, thinking,

11   Maybe I won't be detected if I rename it.

12   A.    Yes, just in case it was looking for a certain name.

13   Q.    You would use a new driver, hoping, Okay, maybe if I use

14   this, I won't be detected.

15   A.    If I did load another driver, yes.

16   Q.    And the thought was, If I use it, I won't be detected.

17   A.    It was an assumption, maybe a possibility.  I wasn't sure

18   what was going on.

19   Q.    When you repeatedly were trying to not be detected reverse

20   engineering a game where you agreed not to, did you think you

21   were doing something wrong?

22   A.    No.

23   Q.    And then if we go to row 101, column C, there is a file

24   with string of characters ending with w4ai.sys; do you see that?

25   A.    Yes.

1    Q.    That's a randomly generated file name for the AimJunkies'

2    cheat loader.

3    A.    For the loader, yes.

4    Q.    All of the files in Exhibit 56 that's been identified

5    relate to either reverse engineering or the AimJunkies' cheat

6    loader.

7    A.    That file is loaded no matter what.  It stays on your

8    computer.  That file is loaded no matter what game cheat you're

9    using.  So I could have opened *Destiny 2*, and that's already in

10   that drive.  And so they were checking for any file by that

11   hash, the MD5 hash you have right there, they flagged me for

12   something that you accused me of that I didn't do.

13   Q.    Mr. May, my question was, simply, all the files listed in

14   56 relate to either reverse engineering or the cheat loader.

15   A.    I would say that's a component of the cheat loader.

16   Q.    Okay.  All the files in Exhibit 56 relate to either reverse

17   engineering or a component of the cheat loader.

18   A.    Yes.

19   Q.    And you had the cheat loader on your computer at some

20   point?

21   A.    Yes.

22   Q.    You deleted it?

23   A.    Yes.

24   Q.    You didn't produce it?

25   A.    No.  I didn't have a copy of that one from that time.

1   Q.    Were you aware of any of the other defendants deleting

2   evidence?

3   A.    No.

4   Q.    But you had wiped your computer?

5   A.    I wiped my system.

6   Q.    Including your computer?

7   A.    My system on the computer.  I didn't wipe every single

8   drive.

9   Q.    But you wiped several hard drives?

10  A.    I wiped the main system off of the computer.

11  Q.    You wiped several hard drives?

12  A.    That had the system on it.

13  Q.    And when you wiped it, what you mean is you removed

14  everything from the hard drives in the computer.

15  A.    After I had already moved everything, all my work files and

16  everything to the new computer, I reformatted the old computer,

17  as anyone would if they suspected they'd been compromised.

18  Q.    Mr. May, what I'm asking is:  When you wiped your hard

19  drive in your computer, you removed everything on it so nothing

20  was left on there.

21  A.    I formatted the whole computer.

22          MR. MARCELO:  Mr. Blackburn, if you could play a clip

23  from defendant's deposition.  This is his March 23, 2023,

24  deposition, page 96, lines 10 through 19.

25                      (Video is played.)

1    MR. MARCELO:  Okay.  Thank you.  Nothing further at

2    this time.

3        THE COURT:  Cross of the witness?

4        MR. MANN:  Certainly, Your Honor.

5    Your Honor, I understand I may cross the witness with

6    respect to the testimony we heard here.  I would like to reserve

7    the right to call Mr. May as part of our case-in-chief.

8        THE COURT:  Certainly.

9        MR. MANN:  Thank you.

10                    CROSS-EXAMINATION

11   BY MR. MANN:

12   Q.   I want to clarify some of the testimony here.  I want to

13   make sure we get things absolutely down here so the jury

14   understands what exactly your relationship is to Phoenix

15   Digital.

16       Are you an employee of Phoenix Digital?

17   A.   I am not.

18   Q.   Were you ever been an employee of Phoenix Digital?

19   A.   I was not.

20   Q.   Are you a founder of Phoenix Digital?

21   A.   I am not.

22   Q.   Are you a partner in Phoenix Digital?

23   A.   I am not.

24   Q.   Okay.  When you get paid -- what was your relationship --

25   what was your understanding of the relationship with Phoenix

1    Digital with respect to how you get paid?

2    A.    So I was -- I'm a contractor --

3    Q.    Uh-huh.

4    A.    -- so the agreement was, of the sales of my cheat, I would

5    get 50 percent of that -- of that cost.

6    Q.    Of the gross?

7    A.    I'm not sure what "gross" means or --

8    Q.    Well, I mean, if you sell -- if Phoenix Digital sells a

9    cheat for $40, would you get $20?

10   A.    I would assume I would get whatever is after the fees from,

11   like, the company or -- or not the company, the -- but, yes, I

12   would get half of -- so if -- yes, I would get half of whatever

13   the cheat was, yes.

14   Q.    You wouldn't get half of Phoenix Digital's profits,

15   correct?

16   A.    No, that is correct, I would not.

17   Q.    I believe there was some testimony earlier.  I wanted to

18   make sure we're absolutely crystal clear.

19        You get 50 percent of the gross?

20        MR. MARCELO:  Objection; leading.

21        THE COURT:  Overruled.  You may answer.

22   A.    Yes.

23   Q.    (By Mr. Mann)  You don't get 50 percent of Phoenix

24   Digital's profits, correct?

25   A.    No, I don't get any of their profits.

1    Q.    Good.

2          Now, who is responsible for paying taxes?

3          Let me put it a different way.

4          Does Phoenix Digital withhold taxes for you?

5    A.    No, I'm responsible for that.

6    Q.    Does Phoenix Digital withhold social security taxes for

7    you?

8    A.    No, I'm responsible for that.

9    Q.    Does Phoenix Digital provide medical benefits for you?

10   A.    No.

11   Q.    Does Phoenix Digital provide an office for you?

12   A.    No.

13   Q.    Where would you work?

14   A.    I work in my home office at home.

15   Q.    Okay.  Now, did Mr. Schaefer ever call you up and say,

16   Mr. May, I'd like you today to do this and that?

17   A.    No.

18   Q.    Did anybody at Phoenix Digital tell you what hours you

19   needed to work?

20   A.    No.

21   Q.    Did you have to ask Phoenix Digital whether you could take

22   a week off to go on vacation?

23   A.    No.

24   Q.    Thank you.

25          Now let's get down to the cheat software that is actually

1    at issue in this lawsuit.

2        Did you create the *Destiny 2* cheat software that was

3    distributed by Phoenix Digital?

4    A.    I did not.

5    Q.    Did you create or did you attempt to create a cheat for the

6    *Destiny 2* game at one point?

7    A.    I attempted to, yes.

8    Q.    Okay.  Why did you attempt to do that?

9    A.    I was interested in how the engine worked.

10   Q.    And what did you do?  We heard some testimony about you

11   attached --

12   A.    ReClass.

13   Q.    You attached ReClass.

14       Were you able to complete a successful *Destiny 2* cheat?

15   A.    I was not.

16   Q.    And why was that?

17   A.    Because they banned me over and over again.  I wasn't able

18   to reverse engineer anything.

19   Q.    Did Mr. Schaefer, or anyone else at Phoenix Digital, ever

20   ask you to develop a cheat for *Destiny 2*?

21   A.    They did not.

22   Q.    Okay.  And the other thing, I believe there was some

23   testimony that Mr. Schaefer would tell you or you needed to ask

24   permission to create a cheat.

25       Did you ever have to ask permission to create a cheat from

1    Phoenix Digital?

2    A.    I would create my own cheat, and then I would see if there

3    was another developer, because the site only allows one cheat

4    per developer.

5    Q.    How many cheats have you created over the years?

6    A.    It's been several.  I couldn't give you an exact count.

7    Q.    Give me rough.  More than 10?

8    A.    Yes, more than 10.

9    Q.    More than 50?

10   A.    It could be around 50 now, yes.

11   Q.    Okay.  And how many cheats are actually successful?

12   A.    Eight to 12, maybe.

13   Q.    Is this sort of like a songwriter, you write 100 songs, and

14   maybe one or two become hits?

15   A.    I would say that's a fair assessment.

16   Q.    Okay.  The money you made from Phoenix Digital -- and,

17   incidentally, they point to $600,000.  Do you know over what

18   period of time that was paid?

19   A.    It was over many years.

20   Q.    Okay.  So what does it average out to, maybe $50,000 a

21   year, $60-?

22   A.    It probably does.

23   Q.    Okay.  You don't own any vacation properties on the French

24   Riviera or anything, do you?

25   A.    I don't own any properties, besides my house, no.

1  Q.    Thank you.

2        MR. MANN:  Now, if we could punch up Exhibit 15, and

3  page 01.  Again, this is admitted into evidence.  Everybody's

4  seen this.

5        Okay.  If we can get to the dates, I want to look at the

6  dates prior to December 2019, when the *Destiny 2* cheat

7  distributed by Phoenix Digital was first distributed.  Okay.  So

8  it looks like August 3 of 2019.

9  Q.    (By Mr. Mann)  Now, what was your -- how much money did you

10  receive from Phoenix Digital, according to this document?

11  A.    $4,811.68.

12  Q.    Okay.  And if we look at the next page, it's September 1,

13  2019, prior to the introduction of the *Destiny 2* cheat; what was

14  your gross receipts on that?

15  A.    $5,792.42.

16  Q.    Okay.  So if we look at October of 2019, again, before the

17  *Destiny 2* cheat that is at issue here was introduced; what did

18  you receive?

19  A.    $7,997.77.

20  Q.    And let's look at November.  Again, before the *Destiny 2*

21  cheat was introduced, what did you receive?

22  A.    $4,792.99.

23  Q.    And then let's look, finally, at December 1.  Admittedly,

24  that's the first day of December.  I don't know whether the

25  cheat was introduced at that point or not, but what were your

1   receipts on December 1st?

2   A.    $4,049.05.

3   Q.    Okay.

4         So is it true or is it not true -- let me ask you:  Did

5   your receipts take a significant increase once the *Destiny 2*

6   cheat was introduced?

7   A.    No.

8   Q.    It was more or less what we see here, steady income?

9   A.    Yes.

10  Q.    And it remained the same pattern both before and after the

11  *Destiny 2* cheat was introduced?

12  A.    Cheats always go up and down in sales, so you never know

13  what your revenues are going to be.

14  Q.    Okay.  To the best of your knowledge, have you ever been

15  paid one dime of the money that Phoenix Digital received from

16  distributing the *Destiny 2* cheat that is at issue here?

17  A.    No, I've never been paid one dime of the *Destiny 2* cheat.

18  Q.    There was some talk that -- I believe they tried to put

19  words in your mouth that you were testing the cheat.  Let's get

20  into --

21             MR. MARCELO:  Objection, Your Honor.

22             MR. MANN:  Okay.  I'll rephrase.

23  Q.    (By Mr. May)  There was some testimony that you used the

24  *Destiny 2* cheat that was distributed by Phoenix Digital; do you

25  recall that?

1  A.    Yes.

2  Q.    Okay.  Did you, in fact, use the *Destiny 2* cheat?

3  A.    Once or twice, as I testified, yes.

4  Q.    Okay.  And what was your purpose in doing so?

5  A.    I wanted to see how it worked.  It wasn't anything like I

6  was trying to report back to anybody saying this is how this

7  works and all that stuff.  It was for my own use, to see how it

8  worked.

9  Q.    Did David Schaefer ever call you up and say, James, I'd

10 like you to test out our new *Destiny 2* cheat?

11 A.    No, he did not.

12 Q.    Did anybody at Phoenix Digital ask you to use the *Destiny 2*

13 cheat that Phoenix Digital was distributing?

14 A.    No.

15 Q.    Okay.  After you used the Phoenix Digital cheat, did you

16 report back to them in any way, shape, or form?

17 A.    I did not.

18 Q.    Did you ever go back to them and say, Hey, I don't like

19 this, so let's change this?

20 A.    I did not.

21 Q.    Did you provide any feedback whatsoever to Phoenix Digital

22 regarding the *Destiny 2* cheat that Phoenix Digital was

23 distributing?

24 A.    I did not.

25 Q.    Have you ever seen the source code for the *Destiny 2* game?

1    A.    The *Destiny 2* game, no, I have not.

2    Q.    Have you ever seen the object code for the *Destiny 2* game?

3    A.    I would say the object code is already on the computer when

4    you download the game.

5    Q.    But you don't see that, do you?

6    A.    When you're running ReClass, you would see the code that's

7    running in the game.

8    Q.    Did you copy any of that code?

9    A.    No, I did not.

10   Q.    Okay.  Now, there's some testimony here that you wiped your

11   hard drives.  I'd like to get into exactly what you did.

12         When did you take the action you specified about changing

13   your computer?

14   A.    Once I got the new computer, I wiped the old one after I

15   copied everything over, because I suspected --

16   Q.    Well, let me back up a little bit.  I don't mean to

17   interrupt.  But let's get the circumstance -- let's get the

18   timing, when you did this and why you did this.  Let's start

19   with when you did it.

20   A.    Okay.  When did I wipe the computer?

21   Q.    Yes.

22   A.    After I received the new computer.

23   Q.    Well, why'd you get a new computer?

24   A.    Because I'd felt that it could possibly have been

25   compromised.

1    Q.    And what led you to feel that you'd been compromised?

2    A.    It was running slower, and sometimes I would get random

3    blue screens.

4    Q.    And was that something new?

5    A.    Yes.  It was not going on before that.

6    Q.    Okay.  And then what did you do?  After you had these

7    suspicions, what did you do?

8    A.    I bought a new computer.

9    Q.    And then after you bought the new computer, what did you

10   do?

11   A.    I wiped the old computer after I copied over all my work

12   files from the old computer.

13   Q.    Okay.  Now, those files that we saw in that exhibit -- I

14   forget the number -- the 56, with the green screen, all those

15   files, did you preserve those files?

16   A.    I did.

17   Q.    Tell me what you did to preserve them.

18   A.    I had them on my external hard drive.

19   Q.    And you did this before you wiped the original computer?

20   A.    Correct.

21   Q.    Okay.  Have you been requested to produce those files?

22   A.    Yes.

23   Q.    Have you produced those files?

24   A.    I did.

25   Q.    Are those files, to the best of your knowledge, exactly the

1    same files that were on your computer before you wiped it?

2    A.    They're 100 percent the same files.

3    Q.    So what exactly got wiped when you wiped the computer?

4    A.    The Windows operating system.

5    Q.    So you took the Windows operating system off of the old

6    computer, because why?  Why'd you do that?

7    A.    I took it off because it could have been compromised, and I

8    wanted to get back to a clean slate.

9    Q.    Okay.  Again, but the actual files, the ones that we see on

10   that green sheet -- Exhibit 56, I believe it is -- you preserved

11   those?

12   A.    Yes, they were all preserved.

13   Q.    Did you make any changes to those files?

14   A.    No.

15   Q.    Did you produce those files?

16   A.    I did.

17   Q.    Do you believe that those files that you produced are exact

18   copies of what was on the computer before?

19   A.    They are exact copies.

20          MR. MANN:  If I can have a moment, please, Your Honor?

21          THE COURT:  Certainly.

22          MR. MANN:  Thank you, Your Honor.  I have no further

23   questions.

24          THE COURT:  Redirect?

25          MR. MARCELO:  Briefly.

1                      REDIRECT EXAMINATION

2    BY MR. MARCELO:

3    Q.   Mr. May, just a few items.  Let's talk about the PayPal

4    payments.

5         You worked for Phoenix Digital since 2014?

6    A.   2013, 2014, somewhere around there.

7    Q.   PayPal payments to you stopped in 2020?

8    A.   Around there, probably, yes.

9    Q.   So the amount, the $670,000, that's from 2013 to 2020?

10   A.   Yes.

11   Q.   You testified about whether you asked Mr. Schaefer before

12   you develop a cheat; do you recall that?

13   A.   I would say I would ask him if there was a cheat already

14   available for that game before I would try to develop a game for

15   that.

16   Q.   Right.  To decide what game to develop a cheat for, you

17   would ask Mr. Schaefer first?

18   A.   I would ask to see if there was already a cheat for it so I

19   can decide if I would want to develop a cheat for that game.  If

20   there was already somebody else who had a cheat, then I would

21   not even spend my time on it.

22   Q.   You don't want to waste your time, obviously, if there's

23   already one out there?

24   A.   Yes, if there's already one out there.

25   Q.   Okay.

1          Your wiping of your computer, that was in May of 2022?

2    A.    That sounds about right.

3    Q.    That's a year after this litigation began?

4    A.    Yes.

5    Q.    You preserved your reversing-engineer tools?

6    A.    Yes.

7    Q.    Nothing else, though?

8    A.    I preserved every file that was in that document.

9    Q.    Right.  And as we discussed, those files are either --

10   relates to reverse engineering --

11   A.    Yes.

12   Q.    -- or components of the AimJunkies' loader?

13   A.    Yes.

14   Q.    No other files were preserved; that's what I'm asking.

15   A.    I preserved all of my work files.

16             MR. MARCELO:  Nothing further.  Thank you.

17             THE COURT:  Anything further?

18             MR. MANN:  No recross, Your Honor.

19             THE COURT:  All right.  You can step down.

20        Let me just explain to the jury.

21        Because Mr. May is a defendant, he'll be called in the

22   defendant's case, at some point.  He has a counterclaim against

23   the plaintiff.  You'll hear that testimony later in the trial.

24        You may step down.

25             THE WITNESS:  Thank you, sir.

 1          THE COURT:  Are we ready for the next witness?

 2          MR. DINI:  Your Honor, the next witness is defendant

 3   Jeffrey Conway, and I believe he's attending remotely, so it's

 4   time to set up the cameras.

 5          THE COURT:  We're going to take a break now, ladies

 6   and gentlemen.  We're going to set up the equipment and get it

 7   organized so we can hear this witness's testimony remotely.

 8   It's probably going to take us five or ten minutes to do that.

 9   You might as well be in the jury room as opposed to sitting here

10   watching us do it.  So we'll have you back in here as soon as

11   we're all set up.

12      The jury is excused and may leave and go to the jury room.

13   We'll be in recess until we get the witness on the screen.

14          (Court in recess 9:47 a.m. to 10:01 a.m.)

15          THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:
16

17          THE COURT:  Mr. Conway, this is Judge Zilly.  Can you

18   hear me, sir?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  All right.  The clerk is going to

21   administer an oath to you.

22          THE CLERK:  Please raise your right hand.

23                      JEFFREY CONWAY,
         having been first duly sworn, testified as follows:
24

25          THE CLERK:  Please state your name for the record, and

```
 1  spell it for the court reporter.

 2           THE WITNESS:  Jeffrey Rory Conway; C-o-n-w-a-y.

 3           THE COURT:  We're getting a little feedback on your

 4  answer.  Is there anything you can do to help us?

 5           THE WITNESS:  Hold on.

 6           THE WITNESS:  My name is Jeffrey Rory Conway;

 7  C-o-n-w-a-y.

 8           THE COURT:  Thank you, Mr. Conway.  That's much

 9  better.

10        Can you tell us your present location?

11           THE WITNESS:  I'm at my home in Phoenix.

12           THE COURT:  We need an address, can you give us your

13  home address?

14           THE WITNESS:  7931 East Hubble Street, Scottsdale,

15  Arizona.

16           THE COURT:  All right.  Thank you, sir.

17           THE WITNESS:  You're welcome.

18           THE COURT:  You may inquire, counsel.

19                          DIRECT EXAMINATION

20  BY MR. DINI:

21  Q.   Good afternoon, Mr. Conway.

22  A.   Good afternoon, sir.

23  Q.   Mr. Conway, you were a member of Phoenix Digital Group LLC

24  when it was originally formed, right?

25  A.   Yes.
```

 1  Q.   You entered into an LLC agreement with your other members,

 2  David Schaefer and Jordan Green, at that time?

 3  A.   Yes.

 4          MR. DINI:  Mr. Blackburn, can we pull up Exhibit 12,

 5  which is a stipulated exhibit?

 6  Q.   (By Mr. Dini)  Mr. Conway, do you see this Exhibit 12 on

 7  your screen?

 8  A.   Yes.

 9  Q.   This is a copy of the LLC agreement you entered into with

10  David Schaefer and Jordan Green?

11  A.   Yes, it looks like it.

12          MR. DINI:  Mr. Blackburn, if we can please go to page

13  35 of this exhibit.

14  Q.   (By Mr. Dini)  Mr. Conway, that's your digital signature on

15  page 5 of Exhibit 12, correct?

16  A.   Yes.

17  Q.   If we go to page 6 of Exhibit 12, focusing on paragraph

18  4.1A, we're going to blow this up to make it easier for you to

19  see, Mr. Conway.

20          Mr. Conway, can you see that okay?

21  A.   Yes.

22  Q.   I'm going to read the highlighted portion of this

23  paragraph.  It says, "The managers shall have full, complete,

24  and exclusive authority, power, and discretion to manage and

25  control the business, property, and affairs of the company, to

1  make all decision regarding those matters, and to perform any

2  and all other acts or activities customary or incident to the

3  management of the company's business, property, and affairs."

4      Did I read that right?

5  A.   Yes.

6  Q.   As a manager for Phoenix Digital, you had this authority,

7  correct?

8  A.   Yes.

9  Q.   Was that a "yes," Mr. Conway?  Mr. Conway, was that a

10 "yes," that you had this authority as a manager of Phoenix

11 Digital?

12 A.   Yes, correct.

13         THE COURT:  Counsel, can you give us a date on

14 document?  We haven't seen it.

15         MR. DINI:  Yes, Your Honor.  Let's see.

16      If we could please go to page 2 of Exhibit 12.

17 Q.   (By Mr. Dini)  The first paragraph there, if we could blow

18 that up.  It says, "This limited liability company agreement is

19 made and entered into as of the 29th day of January 2016 by and

20 between Jeffrey Conway, David Schaefer, and Jordan Green."

21      Did I read that right, Mr. Conway?

22 A.   Yes, sir.

23 Q.   Mr. Conway, one of your responsibilities as a managing

24 member of Phoenix Digital was to pay the bills for the company,

25 right?

1    A.    Yes, sir.

2    Q.    You were in charge of the finances?

3    A.    Yes, sir.

4    Q.    Even though you were responsible for the finances, David

5    Schaefer told you who to pay, right?

6    A.    Yes, sir.

7    Q.    As a member responsible for the finances, you also set up

8    the payment systems that Phoenix Digital used for payment

9    processing on its cheat websites, correct?

10   A.    Yes, sir.

11   Q.    I want to talk about some of those accounts.

12         You created and managed PayPal accounts for Phoenix

13   Digital, right?

14   A.    Yes, sir.

15   Q.    You set up a PayPal account for the website aimjunkies.com?

16   A.    Yes, sir.

17   Q.    You set up a PayPal account for the website

18   virtual-advantage.com?

19   A.    Yes, sir.

20   Q.    And you also set up a PayPal account under the name

21   velocitycheats.com; do I have that right?

22   A.    Yes, sir.

23   Q.    And, finally, there was a fourth PayPal account that you

24   set up, and this was the one that you used to pay the bills for

25   Phoenix Digital; do I have that right?

1    A.    Yes, yes, sir.

2    Q.    I want to talk about the PayPal accounts for the individual

3    websites first.

4          Mr. Conway, do you have the box that we sent to you earlier

5    this week nearby?

6    A.    I have.

7    Q.    Is that a "yes," you have it near you?

8    A.    Yes, sir.

9    Q.    Can you please open that box and take out the materials

10   from the envelope?  We sent you some of the exhibits ahead of

11   time because of the difficulty of sharing some stuff over Zoom.

12   A.    Okay.  I have it open.

13   Q.    Yeah.  Can you go to the binder, please, that has your name

14   on it?

15   A.    I missed that.  Say that again.

16   Q.    Can you please open the binder that's inside that folder?

17   A.    Yes, sir.

18   Q.    And if you could go to numbered tab 16?

19         MR. DINI:  For the record, this is -- Mr. Conway is

20   looking at a copy of Trial Exhibit 16.

21   A.    Yes, sir.

22   Q.    (By Mr. Dini)  Mr. Conway, if you look at the top left of

23   Exhibit 16, it says "PayPal."

24   A.    Yes.

25   Q.    This is a PayPal account that you created?

1    A.    Yes, sir.

2    Q.    Under the user info section in the top left, it says your

3    name, "Jeffrey Conway"?

4    A.    Yeah.

5    Q.    Below that, under the "credit card statement name," it says

6    "AimJunkies"?

7    A.    Credit card statement?  Hold on, please.

8    Q.    It says "credit card statement name, AimJunkies."  It's

9    below your name, three boxes below.

10   A.    Yes.

11   Q.    Do you see that?

12   A.    Yes, sir.

13   Q.    This is the PayPal account that you created for the

14   AimJunkies' website to accept payments through PayPal for the

15   cheat software purchased on that website?

16   A.    Yes, sir.

17   Q.    This would include the *Destiny 2* cheat software sold by

18   Phoenix Digital on the AimJunkies' website?

19   A.    Yes.

20        MR. DINI:  Bungie moves to admit Exhibit 16 in

21   evidence.

22        MR. MANN:  No objection, Your Honor.

23        THE COURT:  It will be admitted.

24             (Plaintiff Exhibit 16 admitted.)

25        MR. DINI:  If we could please share that on the screen

1   and focus on the financials section.

2   Q.   (By Mr. Dini)  Mr. Conway, this says that the total amount

3   received in this PayPal account is $6,228,793.46; is that right?

4   A.   Yes.  That's what it says.

5   Q.   And this was the PayPal account used by Phoenix Digital to

6   accept payments for cheat software on aimjunkies.com, including

7   the *Destiny 2* cheat software, right?

8   A.   Yes, sir.

9   Q.   Mr. Conway, if you could please go to tab 20 of your

10  binder.

11          MR. DINI:  We can take down this exhibit,

12  Mr. Blackburn.

13  Q.   (By Mr. Dini)  Do you have Exhibit 20 in front of you,

14  Mr. Conway?

15  A.   Yes, sir.

16  Q.   This is another PayPal account information sheet, right?

17  A.   Yes, sir.

18  Q.   In the top left, it says, under user info, "J. Conway."

19  That's referring to you, right?

20  A.   Yes, sir.

21  Q.   You set up this PayPal account for Phoenix Digital?

22  A.   Yes, sir.

23  Q.   If we go to the business info section, which is the table

24  below user info, under the URL row, it says

25  www.virtual-advantage.net; is that right?

1    A.    Yes, sir.

2    Q.    That's another website owned by Phoenix Digital?

3    A.    Yes, sir.

4    Q.    That website was used to sell cheat software, including

5    *Destiny 2* cheat software sold by Phoenix Digital, right?

6    A.    I do not believe -- I cannot remember if *Destiny 2* was even

7    sold on that site.

8    Q.    But that was a website that Phoenix Digital used to sell

9    cheat software, right?

10   A.    Yes, sir.

11   Q.    And, Mr. Conway, I want to clarify.  This PayPal account

12   was used to process payments made through Virtual Advantage for

13   the *Destiny 2* cheat software; is that right?

14   A.    I believe *Destiny 2* was sold on Virtual Advantage.  I

15   might be wrong.  I'm not 100 percent sure.

16   Q.    But you believe the *Destiny 2* cheat software was sold on

17   virtual-advantage.com; did I hear that correctly?

18   A.    No, sir, I do (inaudible) Virtual Advantage.

19           THE CLERK:  Counsel, he's cutting out.

20           MR. DINI:  You're cutting out.

21   A.    I do not believe it was sold on Virtual Advantage.  I do

22   not have recollection of that.

23   Q.    (By Mr. Dini)  Mr. Conway, do you have a copy of the

24   spiral-bound notebook that we sent to you also in the manila

25   folder?

1    A.    Yes, sir.

2    Q.    Do you remember providing sworn testimony on December 20th,

3    2022?

4    A.    Say again, please.

5    Q.    Do you remember providing sworn testimony under oath on

6    December 20th, 2022?

7    A.    You broke up there.  Say that again.

8    Q.    Do you remember providing sworn testimony on December 20th,

9    2022?

10   A.    The arbitration hearing?  Yes.

11   Q.    You gave that testimony under oath?

12         Mr. Conway, did you give that testimony under oath?

13   A.    Yes.

14   Q.    It's the same oath that you swore to today?

15   A.    Yes, sir.

16   Q.    I'd like to direct you, if you could, to the tab labeled

17   "December 20th, 2022," and go to page 34, lines 7 through 9.

18   A.    Which page?

19   Q.    Page 34, lines 7 through 9.  It's shown on the screen here.

20   Can you see that?

21   A.    Yes, sir.

22   Q.    I'm going to read that for you.

23         "QUESTION:  Virtual-Advantage was a website that sold cheat

24   software titled '*Destiny 2* VIP access,' correct?

25         "ANSWER:  I believe so, yes."

1        Did I read that correctly?

2   A.    Yes, sir.

3              MR. DINI:  Your Honor, Bungie moves at this time to

4   admit Exhibit 20 into evidence.

5              MR. MANN:  No objection, Your Honor.

6              THE COURT:  It will be admitted.

7                    (Plaintiff Exhibit 20 admitted.)

8              MR. DINI:  If we could please share Exhibit 20 on the

9   screen.

10  Q.    (By Mr. Dini)  If we go to the financial section under the

11  total amounts received, that says $494,547.17, right?

12  A.    Yes.

13  Q.    That's the amount that came into this PayPal account that

14  was associated with Virtual-Advantage, right?

15  A.    Yes, sir.

16  Q.    Mr. Conway, if you could please move to Exhibit 27 in your

17  binder.

18  A.    Twenty-seven?

19  Q.    Yes, 27.

20  A.    Yes, sir, I've got it.

21  Q.    This is another account information sheet for a PayPal

22  account that you created; is that right?

23  A.    Yes, sir.

24  Q.    In the top left is your name, "Jeff Conway"?

25  A.    Yes, sir.

1    Q.   And in the business info section, there is an URL that says

2    velocitycheats.com, right?

3    A.   Yes, sir.

4    Q.   You set up this PayPal account?

5    A.   Yes, sir.

6    Q.   And it was used to accept payments for cheat software sold

7    by Phoenix Digital, right?

8    A.   Yes, sir.

9            MR. DINI:  Bungie moves to admit Exhibit 27.

10           MR. MANN:  No objection.

11           THE COURT:  It will be admitted.

12           MR. DINI:  If we could publish that to the jury,

13   please.

14               (Plaintiff Exhibit 27 admitted.)

15   Q.   (By Mr. Dini)  Mr. Conway, under the total amount received

16   under the financials section, this says $79,944.64?

17   A.   Yes, sir.

18   Q.   Mr. Conway, I'm going to ask you to open up another --

19   actually, not yet.

20       If you could please go to tab 22 in your binder.

21   A.   Yes, sir.

22   Q.   And the top left of Exhibit 22, it says your name again,

23   "Jeff Conway"?

24   A.   Yes, sir.

25   Q.   This is a PayPal account information sheet for a PayPal

1  account you created?

2  A.    Yes, sir.

3  Q.    Under the business info name, that says "Netnoobs"?

4  A.    Yes, sir.

5  Q.    And the email address above that is

6  phoenixdigitalgroup2012@gmail.com?

7  A.    Yes, sir.

8  Q.    This is the information sheet for the PayPal account that

9  you used to pay Phoenix Digital's bills, right?

10 A.    Yes, sir.

11 Q.    You also used this account to make manager payments to

12 yourself and the other managers of Phoenix Digital, right?

13 A.    Yes, sir.

14          MR. DINI:  Bungie moves to admit Exhibit 22.

15          MR. MANN:  No objection, Your Honor.

16          MR. DINI:  If we could publish this to the jury.

17          THE COURT:  It will be admitted, and you may publish.

18              (Plaintiff Exhibit 22 admitted.)

19 Q.    (By Mr. Dini)  Mr. Conway, looking at the financials

20 section total amount received, that's $5,996,990.27, right?

21 A.    Yes, sir.

22 Q.    That's the amount of money that came in to this Phoenix

23 Digital account used to pay the bills?

24 A.    Yes, sir.

25 Q.    Now, as we just went over the first three exhibits we

1    discussed, those were PayPal accounts that were associated with

2    Phoenix Digital's websites that sold cheat software, right?

3    A.    Yes, sir.

4    Q.    You would take the money from those accounts, and you would

5    put it into this account that we just talked about, right?

6    A.    Yes, sir.

7    Q.    And then you would use this account --

8            Mr. Dini:  And if we could pull the exhibit up again,

9    Mr. Blackburn.

10   Q.    (By Mr. Dini)  You would use this account to then pay

11   Phoenix Digital's bills, right?

12   A.    Yes, sir.

13   Q.    And you would use it to pay the managers of Phoenix

14   Digital, yourself, David Schaefer, and Jordan Green?

15   A.    Yes, sir.

16   Q.    And the money that was pushed into this account from the

17   websites included revenue from the sales of the *Destiny 2* cheat

18   software, right?

19   A.    Yes, sir.

20   Q.    And so that money from the *Destiny 2* cheat software sales

21   was used to pay the members of Phoenix Digital, correct?

22   A.    Yes, sir.

23   Q.    Mr. Conway, you remember that we talked about a spreadsheet

24   associated with this account, right?

25   A.    When did we talk about that?

1    Q.   The last time we talked -- when we talked in December of

2    2022, I walked through a spreadsheet with you, right?

3    A.   I do not recall.  I'm sorry.

4    Q.   Do you recall PayPal tracks the individual transactions

5    associated with each PayPal account?

6    A.   Yes.

7    Q.   And it lists those transactions in a spreadsheet?

8    A.   Yes, I assume so.

9         MR. DINI:  And if we could pull up Exhibit 22 again,

10   please.

11        THE WITNESS:  Which tab do you want me to look at?

12   I'm sorry?

13        MR. DINI:  Oh, sorry.  I'm pulling it up for you.

14   Q.   (By Mr. Dini)  Exhibit 22, you see the account number in

15   the top right-hand corner?

16   A.   Yes, sir.

17   Q.   That account number is also on the spreadsheet with the

18   individual transactions, right?

19   A.   If you say so, yes, sir.

20        MR. DINI:  Your Honor, at this time, Bungie moves to

21   admit Exhibit 23, which is the transactional spreadsheet

22   associated with this PayPal account that includes the

23   information we just discussed with Mr. Conway.

24        MR. MANN:  I'm sorry.  I don't have a copy of it.  If

25   I may review it?

1          MR. DINI:  Exhibit 23 is a native Excel spreadsheet.

2          MR. MANN:  And if I may ask, what does it purport

3    to --

4          MR. DINI:  It's a list out of the individual

5    transactions associated with this Exhibit 22 PayPal account.

6          MR. MANN:  Your Honor, we have no objection.

7          THE COURT:  Admitted.

8                (Plaintiff Exhibit 23 admitted.)

9          MR. DINI:  Mr. Blackburn, if you could please pull up

10   Exhibit 23.

11   Q.   (By Mr. Dini)  Mr. Conway, this is the transaction

12   spreadsheet associated with the account that you used to pay

13   Phoenix Digital's bills and to pay the managers, correct?

14   A.   Yes, looks like it.

15   Q.   You would pay the manager draws to yourself, David

16   Schaefer, and Jordan Green on a monthly basis, right?

17   A.   Yes, sir.

18   Q.   I want to look at an example of one of those monthly draws.

19         MR. MARCELO:  Mr. Blackburn, if we could please go to

20   rows 43 to 46 of Exhibit 23, and highlight those.

21   Q.   (By Mr. Marcelo)  Let's start at the top with rows 43 and

22   44.  These are two payments that were made on August 3rd, 2019?

23   A.   Yes, sir.

24   Q.   And the two payments add up to $5,804.22.  Do you see that?

25   A.   Yes, sir.

1   Q.   If we look at column AL, those payments were made to Robin

2   Conway and Jeff Conway?

3   A.   Yes.

4   Q.   That's you and your wife, correct?

5   A.   Yes, sir.

6   Q.   So that's your manager draw from August 3rd, 2019, right?

7   A.   Yes, sir.

8   Q.   Now, if we look at row 45 of this Exhibit 23, this shows

9   another payment on August 3rd, 2019.

10        Is that a "yes"?

11  A.   Yes, sir.

12  Q.   And the amount of that payment was $5,804.22, right?

13  A.   Yes, sir.

14  Q.   That one's made to someone called "Lisa's Repair"?

15  A.   Yes, sir.

16  Q.   It's the exact same amount that was paid to you and Robin

17  Conway, right, combined?

18  A.   Yes, sir.

19  Q.   And if you look at the row below that, row 46, that is also

20  a payment on August 3rd of 2019 of $5,804.22, right?

21  A.   Yes, sir.

22  Q.   And that payment was made to Jordan Green?

23  A.   Yes, sir.

24  Q.   That's Jordan Green's manager draw, right?

25  A.   Yes, sir.

1  Q.    Now, you and David Schaefer and Jordan Green were the only

2  managers of Phoenix Digital?

3  A.    Yes, sir.

4  Q.    So by process of elimination, the Lisa's Repair payment was

5  David Schaefer's manager draw, wasn't it?

6  A.    Yes.  I was asked to use that account to deposit it.

7  Q.    To deposit Mr. Schaefer's manager draw, right?

8  A.    Yes, sir.

9  Q.    I want to look at another example on rows 515 through 517.

10        Now, row 515 shows a payment made on May 1st, 2020, of

11  $5,216.92, right?

12  A.    Yes, sir.

13  Q.    That payment was made to your wife, Robin Conway, right?

14  A.    Yes, sir.

15  Q.    So that's your manager payment?

16  A.    Yes, sir.

17  Q.    The next one on row 516, that was another payment made on

18  the same day of the same amount to Lisa's Repair, right?

19  A.    Yes, sir.

20  Q.    So that's David Schaefer's manager draw.

21  A.    Yes, sir.

22  Q.    And the one below that is also on the same day, also the

23  same amount, and this one is made to Cascade Vinyls.

24  A.    Yes, sir.

25  Q.    So process of elimination again, that payment was made

1    to -- that must have been Jordan Green's manager payment, right?

2    A.   Yes, sir.

3    Q.   Mr. Conway, you also used this account to make payments to

4    Phoenix Digital's cheat developers, right?

5    A.   Yes, sir.

6    Q.   One of those developers was James May?

7    A.   Yes, sir.

8    Q.   And you used this account to make payments to James May,

9    this Netnoobs account to make payments to James May, right?

10   A.   Yes, sir.

11   Q.   Mr. Conway, have you ever spoken to someone named Andreas

12   Banek?

13   A.   No, sir.

14   Q.   Have you ever sent any emails to someone named Andreas

15   Banek?

16   A.   Say that again.

17   Q.   Have you ever sent any emails to someone named Andreas

18   Banek?

19   A.   I do not remember, no.

20   Q.   Have you ever communicated with Andreas Banek?

21   A.   You're breaking up a little bit.  I apologize.

22         MR. DINI:  If we could please take this exhibit down.

23   Q.   (By Mr. Dini)  Have you ever communicated with Andreas

24   Banek?

25   A.   Communicated?

1   Q.   With someone named Andreas Banek.

2   A.   I don't remember ever communicating with (inaudible).

3   Q.   You don't remember ever communicating with Andreas Banek?

4   A.   (Inaudible) again.

5   Q.   You don't remember ever communicating with someone named

6   Andreas Banek?

7   A.   No, sir.

8   Q.   Shifting gears a little bit, Mr. Conway, you received a

9   cease and desist letter in connection with the *Destiny 2* cheat

10  software in November of 2020, right?

11  A.   Yes, sir.

12  Q.   Mr. Conway, if you could go to tab 42 in your binder.

13  A.   Yes, sir.

14  Q.   Do you see that?

15  A.   Yes, sir.

16  Q.   Is that a copy of the November 2020 letter that you

17  received regarding the *Destiny 2* cheat software?

18  A.   It looks like it, yes, sir.

19        MR. DINI:  If we could please pull up Exhibit 42,

20  which its admissibility has been stipulated.

21  Q.   (By Mr. Dini)  Mr. Conway, this is a letter from Bungie's

22  legal counsel at the time, right?

23  A.   Yes, sir.

24  Q.   If we could focus on page 1, second full paragraph.  The

25  second sentence of this paragraph -- I'm going to read this for

1    you -- it says, "Specifically, we understand that you, through a

2    company called Phoenix Digital Group LLC, are operating a

3    service called AimJunkies that offers various cheats intended to

4    be used with *Destiny 2*."

5        Did I read that right?

6    A.    Yes, sir.

7    Q.    I want to go to the last full paragraph -- the last

8    paragraph on page 1.

9        It reads, "Moreover, the foregoing activities are unlawful

10   and violate the limited software license agreement, LSLA, that

11   you entered into with Bungie, and may further constitute

12   copyright infringement, both direct and contributory."

13       Did I read that right?

14   A.    Yes, sir.

15   Q.    When you received this letter from Bungie's legal counsel,

16   you sent pictures of it to David Schaefer?

17   A.    Yes, sir.

18   Q.    You also talked to David Schaefer about this letter, right?

19   A.    Yes, sir, I believe we did.

20   Q.    And you sent -- did you send a written response to Bungie's

21   November 4th, 2020, cease and desist letter?

22   A.    No, sir.

23   Q.    You did not send a response to this letter?

24   A.    I do not recall sending any letter back, no.

25           MR. DINI:  If we can please pull up Exhibit 47, which

1  is a stipulated exhibit, and go to page 2.

2  Q.   (By Mr. Dini)  Mr. Conway, the date on this letter is

3  November 20th, 2020.

4  A.   Yes, sir.

5  Q.   And if we scroll down to the bottom, that's your name,

6  "Jeff Conway," right?

7  A.   Yes, sir.

8  Q.   So you sent this letter to Bungie's counsel in response to

9  the November 4th, 2020, letter, right?

10  A.   Yes, it appears I did.

11  Q.   Now, Mr. Conway, did you write this letter yourself?

12  A.   No, sir, I did not.

13  Q.   If you didn't write it, then who did write the letter?

14  A.   Mr. Schaefer provide me with that letter.

15  Q.   You said that Mr. Schaefer provided you with this letter?

16  A.   Yes, sir.

17  Q.   His name is not on this letter, though, is it?

18  A.   No, sir.

19  Q.   You sent this letter to Bungie's counsel that you didn't

20  write because David Schaefer told you to?

21  A.   Yes, sir.

22  Q.   I want to focus on what's written in this letter.  If we

23  can focus on the first paragraph of this letter.  The third

24  sentence starts with "the referenced sites."

25       Mr. Conway, when you sent this letter, did you know what

1    "the referenced sites" meant?

2    A.    Honestly, I'm assuming it was the other sites that we owned

3    at Phoenix Digital.

4    Q.    And those were AimJunkies, right?

5    A.    AimJunkies.

6    Q.    And the Virtual-Advantage site we talked about earlier,

7    too, right?

8    A.    I believe so, yes.

9    Q.    The sentence says, "The referenced sites were sold to

10    Phoenix Digital Group LLC, and Phoenix Digital Group, in turn,

11    sold them to callofdutyhacks.ru site owners sometime ago."  Did

12    I read that right?

13    A.    Yes, sir.

14    Q.    Mr. Conway, this letter was sent in November of 2020?

15    A.    Yes, sir.

16    Q.    And this is saying here that AimJunkies and

17    Virtual-Advantage were sold to different owners, other than

18    Phoenix Digital, sometime before that?

19    A.    Yes, sir, that's what it says.

20    Q.    Had you heard of callofdutyhacks.ru when you sent this

21    letter?

22    A.    Yes, I was aware of that, yes.

23    Q.    Did you know that the websites had been sold?

24    A.    No, sir, I was not.

25    Q.    So you sent this letter with information on it that you

1    were not aware of just because David Schaefer told you to send

2    it?

3    A.    Yes, sir.

4    Q.    I want to go back to Exhibit 42, please, and I want to

5    focus on page 2, the second-to-last paragraph that starts with

6    "in that regard."  I'm going to read this for you.

7          "In that regard, note that, under applicable law, you are

8    required to maintain any and all electronic or hard-copy

9    documents, communications, and electronic data and information

10   which may be relevant to Bungie's claims."

11         Did I read that first part of the sentence correctly?

12   A.    Yes, sir.

13   Q.    This is what Bungie's legal counsel said in a letter to you

14   in November of 2020?

15   A.    Yes.

16   Q.    Some of the information listed here that you were asked to

17   preserve, that included hard drives?

18   A.    Okay, yes, sir.

19   Q.    It included databases?

20   A.    Yes, sir.

21   Q.    It included web pages, right?

22   A.    I believe it's stating it.  I didn't have any copies of web

23   pages.

24   Q.    But this is what the letter asked you to preserve, right?

25   A.    Yes, sir.

1  Q.   If you look at the last sentence of this paragraph, it

2  says --

3  A.   Show me, please.

4  Q.   We'll highlight it.

5       "Failure to abide by these requirements may result in

6  penalties against you and form the basis of legal claims for

7  spoliation."

8       Did I read that right?

9  A.   Yes, sir.

10 Q.   After you received this letter from Bungie's counsel in

11 November 2020, you sent pictures of it to David Schaefer, right?

12 A.   Yes, sir.

13 Q.   Mr. Conway, in addition to PayPal, you also set up other

14 payment processor accounts, right?

15 A.   Yes, sir.

16 Q.   If we could please pull up Exhibit 30, which is a

17 stipulated exhibit.

18      Mr. Conway, this is a screenshot of the AimJunkies'

19 website, right?

20 A.   It appears to be, yes.

21 Q.   It's titled "subscription information for *Destiny 2* VIP

22 access."  Do you see that at the top?

23 A.   Yes, sir.

24 Q.   If we scroll down, it says "subscription options," $34.95

25 for a one-month subscription?

 1   A.    Yes, sir.

 2   Q.    And then below that it's got payment methods, right?

 3   A.    Yes, sir.

 4   Q.    These are the ways that AimJunkies' users could pay for the

 5   *Destiny 2* cheat software, right?

 6   A.    I believe so.

 7   Q.    Mr. Conway, you set up a PaymentWall account for Phoenix

 8   Digital, right?

 9   A.    Yes, sir.

10   Q.    After you received Bungie's November 2020 cease and desist

11   letter, you still had access to PaymentWall's records, right?

12   A.    Their website, yes.

13   Q.    Looking at the payment processors below that, you see they

14   all they have, in parentheses after them, "Payssion"?

15         Was that a "yes"?

16   A.    Yes, sir.

17   Q.    And all that means is that Payssion is the main payment

18   processor that processes any payments made through Alipay, QIWI,

19   or WebMoney, right?

20   A.    Yes, sir.

21   Q.    You set up that account?

22   A.    Yes, sir.

23   Q.    And you had access to the Payssion records, even after you

24   received Bungie's November 2020 cease and desist letter, right?

25   A.    Yes, I believe so, yes.

1    Q.    Mr. Conway, the AimJunkies' website recorded when

2    particular actions for cheat software were made, right?

3    A.    Yes.

4    Q.    The AimJunkies' website could report how many people

5    purchased the *Destiny 2* cheat software through that website,

6    right?

7    A.    Yes, sir.

8    Q.    And you, David Schaefer, or Jordan Green could have pulled

9    the report of the number of *Destiny 2* cheat software purchasers,

10   right?

11          MR. MANN:  Objection, Your Honor.  It doesn't specify

12   a particular time frame.

13          THE COURT:  Why don't you rephrase, counsel.

14   Q.    (By Mr. Dini)  Mr. Conway, when you were a managing member

15   of Phoenix Digital, up through March of 2021, is that when you

16   were no longer a managing member?

17   A.    Yes, sir, I believe that's correct.

18   Q.    Before that, prior to that, you, David Schaefer, or Jordan

19   Green could have pulled the report of the number of *Destiny 2*

20   cheat software purchasers, right?

21   A.    Yes, sir.

22   Q.    That was a "yes"?

23   A.    Yes, sir.

24          MR. DINI:  No further questions at this time.

25          THE COURT:  Cross of the witness?

1      MR. MANN:  Yes, Your Honor, just a short cross.

2                    CROSS-EXAMINATION

3   BY MR. MANN:

4   Q.    Good morning, Mr. Conway.  Can you hear me okay?

5   A.    Good morning.  Yes, I can.

6   Q.    Okay.  Thank you.

7         Mr. Conway, you have the paper exhibits that Mr. Dini

8   showed you at the beginning of his examination.  Let's look at

9   Exhibit 22.

10         MR. MANN:  Is it possible to put the first page of

11  Exhibit 22 up on the screen?

12  A.    Yes, sir.

13  Q.    (By Mr. Mann)  Okay.  Now, if you look at "account info,"

14  see where it says --

15  A.    Yes, sir.

16  Q.    -- see where it says "time created"?

17  A.    Yes, sir.

18  Q.    Okay.  Do you see the date that this file -- or this

19  account was created was May 26, 2012.  Did I read that

20  correctly?

21  A.    Yes, sir.

22  Q.    And you'll agree with me that May 26, 2012, is before

23  December 2019, correct?

24  A.    Yes, sir.

25  Q.    Let's take a look at Exhibit 20, if we may.  Do you have

1    that in front of you, sir?

2            MR. MANN:  And if we could see that one on the screen,

3    please.  That would be Trial Exhibit 20, the first page.

4        And if we can zoom in a little bit on account info.

5    Q.   (Mr. Mann)  Mr. Conway, it says "time created August 19,

6    2011," correct?

7    A.   Yes, sir.

8    Q.   And, again, August 19, 2011, is before December 2019,

9    correct?

10   A.   Yes, sir.

11   Q.   And let's take a look at -- a little bit out of order

12   here -- Exhibit 16, first page of Exhibit 16, please.

13       Again focusing in on the time that this was created, it

14   says "July 10, 2009," correct?

15   A.   Yes, sir.

16   Q.   And, again, you'll agree with me that July 10, 2009, is

17   before December 2019?

18   A.   Yes, sir.

19   Q.   And, finally, I don't know whether we addressed 27.  Let's

20   put 27 up for the sake of completeness, the first page.

21       And again zooming in, this one is a little closer to 2019.

22   It says it was created February 11, 2017, correct?

23   A.   Yes, sir.

24   Q.   And this says the total amount received was $79,944.64; is

25   that correct?

1   A.    Yes, sir.

2   Q.    You would agree with me that's a number substantially less

3   than $6 million?

4   A.    Yes, sir.

5   Q.    Thank you.

6         Now, if you could put up Exhibit 42, the cease and desist

7   letter, first page.  We'll go to the last paragraph and zoom in

8   on that.

9         Let me -- a little background question:  Have you ever

10  played *Destiny 2?*

11  A.    No, sir.

12  Q.    You've never signed up to play *Destiny 2?*

13  A.    No, sir.

14  Q.    Okay.  So it says right here that "the foregoing activities

15  are unlawful and violate the limited software license agreement

16  that you entered into with Bungie."

17        Question for you, Mr. Conway, is:  Did you ever enter into

18  any limited software license agreement with Bungie?

19  A.    No, sir.

20  Q.    So when you saw this statement in the cease and desist

21  letter, did you believe that they were telling you the truth?

22  A.    No, sir.

23  Q.    Would that be a reason not to believe anything else that

24  they may be saying in the letter?

25  A.    Yes, sir.

 1          MR. MANN:  Your Honor, I have no further questions.

 2          THE COURT:  Redirect?

 3          MR. DINI:  No redirect, Your Honor.

 4          THE COURT:  I think we're finished with the testimony.

 5   Thank you, sir, for participating.  You may unplug and go about

 6   your day.  Have a nice day.

 7          THE WITNESS:  Thank you, Your Honor.

 8          THE COURT:  All right.  Are we ready for another

 9   witness?  Why don't we all take a stand-up-and-stretch moment

10   while we find the witness.

11                         DREW VOTH,
            having been first duly sworn, testified as follows:
12

13          THE CLERK:  Please state your name for the record, and

14   spell it for the court reporter.

15          THE WITNESS:  Drew Voth; V-o-t-h.

16          THE COURT:  We need an address for the record.

17          THE WITNESS:  6532 California Avenue Southwest, Suite

18   393, Seattle, Washington 98136.

19          THE COURT:  Thank you, sir.  You may inquire.

20                      DIRECT EXAMINATION

21   BY MR. RAVA:

22   Q.   Good morning, Mr. Voth.

23   A.   Good morning.

24   Q.   What do you do for a living?

25   A.   I'm forensic accountant, so I do damages witness expert

1    work, as well as valuation and other types of economic

2    consulting.

3    Q.    How long have you been doing this, Mr. Voth?

4    A.    Over 30 years.

5    Q.    Have you been retained by Bungie in this case to form an

6    opinion on damages?

7    A.    Yes.

8         MR. VOTH:  I'd ask Mr. Blackburn to please pull up

9    Exhibit 74, which has been stipulated and can be published.

10   Q.    (By Mr. Voth)  Mr. Voth, is this a copy of your CV?

11   A.    Yes.

12   Q.    Is it a current copy of your CV?

13   A.    Very close.  I think I may have testified once or twice

14   since this was produced, and my address has changed.

15   Q.    Do you still work at A&M?

16   A.    No, I do not.

17   Q.    Where do you currently work, Mr. Voth?

18   A.    I work at Peak Consulting and Analytics.  I'm the

19   president.  It's a business that I started, founded for myself,

20   earlier this year.

21   Q.    How long had you been at A&M before you founded Peak

22   Consulting?

23   A.    About 12 years.

24   Q.    All right.  I'd like to talk, just very briefly, Mr. Voth,

25   about your educational experience.  Tell me about your

1    educational background, please.

2    A.    I have a bachelor's of arts with honors in economics from

3    Pomona College, and I've taken various other courses at various

4    other institutions over the years, including MBA courses at the

5    University of Chicago, as well as continuing education courses

6    at the University of California, as well as various other

7    courses at various other places that I take every year to

8    maintain my various professional licenses.

9    Q.    What are those professional licenses, Mr. Voth?

10   A.    I'm a certified public accountant.  I'm certified in

11   financial forensics.  I'm a certified fraud examiner.  I'm a

12   certified valuation analyst, among others.

13   Q.    What does it mean to be a certified -- well, the CFF, what

14   is that one?

15   A.    That's certified in financial forensics.  That's a body of

16   coursework offered by the American Institute of Certified Public

17   Accountants for forensic accountants.  That helps them

18   understand various issues, especially damages types of claims

19   that are presented in the courtroom.

20   Q.    Are you a member of any professional associations,

21   Mr. Voth?

22   A.    I am.  All of my professional licenses have professional

23   associations associated with them that I belong to.

24   Q.    Are you active in those associations?

25   A.    I've been active in various of them over the years,

1    including the American Institute of Certified Public

2    Accountants, where I've served in various capacities, as well as

3    the Licensing Executive Society, which is a society that is

4    focused on intellectual property licensing, and some others.

5    Q.    Have you taught any courses related to your field of work,

6    Mr. Voth?

7    A.    I have.  I've taught many courses over the years to

8    attorneys and accountants.  Continuing education types of course

9    are primarily what those involve, on damages issues, valuation

10   issues, and the like.

11   Q.    How about authoring any books or articles in the financial

12   or accounting field?

13   A.    Yes.  I've authored and coauthored many articles over the

14   years that have appeared in various publications, and I've

15   written the latest edition of the intellectual property damages

16   book for the American Institute of Certified Public Accountants.

17   So any of our 400,000-plus certified public accountants that

18   might be practicing in this area are expected to read that book.

19   Q.    Have you been retained in cases other than this to act as a

20   damages expert witness, Mr. Voth?

21   A.    Yes.  I've been working on 10 to 30 cases a year over the

22   course of my career, so that's well over several hundred cases

23   now.

24   Q.    About how many of those several hundred involve

25   infringement or copyright claims, Mr. Voth?

1  A.    I don't keep track specifically, but many.  Intellectual

2  property is my specialty.  That's why I've written the book on

3  the subject.  So it's been in the hundreds.

4  Q.    Is Bungie paying your work as a damages expert here,

5  Mr. Voth?

6  A.    Yes.

7  Q.    Is that typical to need to get paid to do any of the work

8  that you do?

9  A.    Yes.  I require all of my clients to pay me.

10  Q.    And is your payment in this case in any way dependent on

11  what you say or the results of this case?

12  A.    No, it's not.  I've been hired to provide an independent

13  opinion in this matter.

14  Q.    All right.

15      Mr. Voth, we've, I think, prepared some demonstratives that

16  are going to help us move through, I think, your analysis here

17  rather expeditiously, I hope.

18          MR. RAVA:  I'd ask Mr. Blackburn to please pull up

19  those demonstratives, and go to the next slide.

20  Q.    (By Mr. Rava)  Mr. Voth, what were you asked to do in this

21  case?

22  A.    To determine how much profit defendants earned from selling

23  the *Destiny 2* cheats.

24  Q.    And did you prepare a report in doing that analysis?

25  A.    Yes, I did.

1   Q.    And in that report, were there detailed schedules and other

2   information?

3   A.    Yes.  The schedules were spreadsheets and summaries of

4   those spreadsheets that were attached to my report, showing the

5   results of my analysis.

6   Q.    All right.  And did you rely on particular information that

7   you listed in that those reports as well?

8   A.    Yes.

9   Q.    What was in the opinion that you formed?  The next slide,

10  please.

11  A.    That defendants earned, conservatively, $43,210 in sales

12  revenues from selling the *Destiny 2* cheats, from the data that I

13  had access to.

14  Q.    What do you mean by "conservatively," Mr. Voth?

15  A.    We'll walk through some of the data pieces in some future

16  slides, but I focused on the data and only the line items that

17  *Destiny 2* was specifically shown to be the sold cheat.

18        So there were many other line items, many blank item titles

19  that I conservatively assumed were not related to *Destiny 2*,

20  even though *Destiny 2* may have been part of those sales.

21  Q.    To arrive at this $43,000 number here in this slide, did

22  you deduct any costs from the sales totals to arrive at that?

23  A.    No, I did not.

24  Q.    Why not?

25  A.    Well, no cost data specific to the *Destiny 2* product was

1   produced to me, so I had no data, no specific evidence to show

2   me what costs, if any, had been incurred specifically related to

3   the *Destiny 2* product.

4   Q.   What materials did you review to form this opinion?

5        We can move to the next slide, please.

6   A.   The primary source of the data was data that was produced

7   from PayPal and Stripe.  These are payment service providers

8   that showed specific payments that customers were making to

9   defendants for the *Destiny 2* cheats, as well as legal filings

10  and statements and pleadings from both parties, and my own

11  independent research focused on website and other financial

12  information that I could find on the Internet.

13  Q.   So what steps did you take to perform the analysis to

14  arrive at the $43,000 number, Mr. Voth?

15  A.   I was primarily focused on the spreadsheet data from PayPal

16  and Stripe and understanding the various information in those

17  particular files, which contained not only *Destiny 2* sales, but

18  sales for all sorts of other cheats the defendant was selling.

19       So I had to isolate the *Destiny 2* cheats from that data,

20  and in doing so, perform my analysis and provide subtotals of

21  that data, and then I removed refunds and credits.  So that data

22  also showed me that there were certain particular sales that

23  were, ultimately, refunded.  So I deducted those refunds from my

24  totals to arrive at a net total for the sales of the *Destiny 2*

25  products.

1   Q.   All right.  So, Mr. Voth, I'd like to talk about one of

2   those schedules, and just work through it rather slowly.

3           MR. RAVA:  So we'll go to Schedule 1, which is about

4   two slides down, Mr. Blackburn.

5   Q.   (By Mr. Rava)  Mr. Voth, can you please explain to the jury

6   what it is that's represented in this Schedule 1?

7   A.   Yeah.  So the top part of the schedule is an excerpt of one

8   of the PayPal spreadsheets that I received.  So, again, it's not

9   all of the data.  It's just a small excerpt to give you some

10  flavor for some of the columns that I was particularly focused

11  on.

12          And at the bottom of the spreadsheet -- excuse me -- the

13  slide, it shows a summary of the data in the totality of the

14  spreadsheet.

15  Q.   In the upper portion, can you describe where it is you saw

16  the indication that the sale -- any particular sale was related

17  to the *Destiny 2* cheat?

18  A.   Yeah.  So you can see that in the fourth column over, "item

19  title," you can see at the end of what's a very long string of

20  letters and numbers.  It says "*Destiny 2* VIP access."  So since

21  that is the only cheat that's listed for this particular item, I

22  assumed that it was a *Destiny 2* sale and included that in the

23  total of the sales that I've summarized here on this

24  spreadsheet.

25          So to the extent the item title did not specifically

1  reference *Destiny 2*, I excluded it.  To the extent the item

2  title was blank, for example, I also excluded that, and there

3  were over $450,000 in sales, for example, that were blank that I

4  just couldn't tell what they were related to.

5  Q.   So you didn't include those $450,000 of blanks in this

6  analysis?

7  A.   Correct.  I was conservative, and I excluded those from

8  this analysis.

9  Q.   All right.  Does this analysis represent, to your

10  understanding, data that was obtained from PayPal?

11  A.   Yes.  This particular file -- you see on the top from the

12  file name -- was a PayPal file.

13  Q.   Do you have a recollection, Mr. Voth, about the approximate

14  dates of that data from the PayPal?

15  A.   Well, from all three of the PayPal files I received, they

16  spanned from the dates of December 2019 through May of 2020.

17  Q.   All right.  Again, focusing back on this slide that we've

18  got here, Mr. Voth, what is happening at the bottom of this

19  slide, please?

20  A.   So at the bottom, I've summarized the transaction types

21  from the totality of the data, so not just the excerpt you see

22  above but from the entire file.  And from this, we can see how

23  much *Destiny 2* contributed to the file totals here.

24       So we see there were payments of $21,000 or so.  There were

25  also payments which were labeled as "cancellation of hold for

1  dispute resolution," so sometimes your credit card gets held up

2  but then is, ultimately, approved.  Those are also sales.

3      And then there were two types of refunds that I netted out.

4  One was called "the refund" and one was called "the reversal."

5  So I deducted those in my net total to arrive, from this

6  particular document, of -- $21,683 were indicated from this

7  particular document, on a net basis, for 706 transactions.

8  Q.   How many of these sorts of documents did you analyze,

9  Mr. Voth?

10  A.   There were an four spreadsheets.  There were three from

11  PayPal and one from Stripe.

12  Q.   All right.  So if we go to the next slide, is this the

13  Stripe data, Mr. Voth?

14  A.   Yes.  Again, it's an excerpt of that data shown in the top

15  half of this slide, and then at the bottom we see the summary of

16  the totality of the data.

17  Q.   And you used the same analytical methods as to the Stripe

18  data that you did in the PayPal data that we've already talked

19  about?

20  A.   Yes.  You see in the "product column," if *Destiny 2* was

21  listed, I included it in my total.  If some other product was

22  listed, I did not.

23  Q.   All right.  Let's go to the next slide.

24      What is reflected here, Mr. Voth?

25  A.   This is another one of the PayPal data excerpts.  So,

 1    again, I've got an excerpt up here at the top that shows some of

 2    the columns that I was particularly interested in from that

 3    data, and then at the bottom of this slide we have a summary.

 4    Q.    And the next slide looks to be another PayPal spreadsheet

 5    that you were provided; is that right?

 6    A.    Yes.

 7    Q.    And did you conduct a similar analysis there?

 8    A.    Yes.  This was the final PayPal file, and, again, we've got

 9    an excerpt of that data at the top, and then we've got a summary

10    of all of the data at the bottom.

11    Q.    I want to point you to the notation that you've made here

12    at the bottom, where you say, "note that these transactions were

13    not found on data in Schedule 1," what are you getting at there,

14    Mr. Voth?

15    A.    So I endeavored to ensure that the data between the PayPal

16    files was not duplicative, and that's what I meant here.  I

17    meant I tried to look up these transactions on the other data

18    files, since the dates were overlapping, but I confirmed that

19    they were not included from the other data.

20    Q.    So, again, you were trying to ensure there were no dupes in

21    the sales that you were actually counting?

22    A.    Right, no duplicates, that's right.

23    Q.    All right.  So let's go to the next slide.

24          What is represented here, Mr. Voth?

25    A.    This is a summary of those four files.  So it shows the net

1    amount of sales from each of the four files, and the total of

2    $43,210.

3    Q.    All right.  And that's based on how many transactions?

4    A.    1,406.

5    Q.    So Mr. Voth, what is your -- what's your ultimate takeaway

6    as to the profits that Phoenix Digital made from selling the

7    *Destiny 2* cheat?

8    A.    Well, I've concluded that their sales from a conservative

9    approach of, again, just isolating *Destiny 2* products and not

10   including anything else, such as blanks or other combination

11   products that may have also included a package that had

12   *Destiny 2*, if I exclude all of those other things and just look

13   at the products that said "*Destiny 2*" alone, we have $43,210 of

14   sales between the four files that I've analyzed.  And, again, in

15   terms of their profits, I haven't deducted any costs because,

16   again, I don't have specific cost data to the extent any were

17   incurred on the *Destiny 2* product.

18   Q.    Let's focus on the cost question, Mr. Voth.

19        Have you seen any evidence of cost attributable to the

20   *Destiny 2* cheat?

21   A.    No.

22   Q.    Have you seen any evidence that would suggest that there

23   are costs associated with the running of the operation or the

24   management of the website or anything like that?

25   A.    Well, I've read the deposition testimony that was produced

1    from defendants, individuals, and they claim that there were

2    some costs, but, again, as a certified fraud examiner, I don't

3    take anybody's word for it.  I like to see documents that

4    support those statements, and I have not seen any documents

5    supporting any specific *Destiny 2* costs.

6    Q.    Did you look at tax returns, Mr. Voth?

7    A.    Yes, of Phoenix.

8    Q.    From what years?

9    A.    I believe it was 2019 and 2020.

10         MR. RAVA:  Could you go to the next slide,

11   Mr. Blackburn?

12   Q.    (By Mr. Rava)  Mr. Voth, what did you see in those tax

13   returns relating to costs?

14   A.    Well, for one, there are no specific costs that relate to

15   *Destiny 2*.  All the tax returns show is a summary of total sales

16   and total costs.  And here, on this particular slide, I've

17   summarized what those gross sales were from the tax returns and

18   what the cost of goods sold were and what the resulting gross

19   profit would have been.

20         And you can see, from the ratio of costs to sales,

21   something is going on here in the tax return that doesn't appear

22   to be correct to me.  When we see vast changes in the

23   relationship of cost to sales, it usually suggests something is

24   wrong with the data, and that's, potentially, what we're seeing

25   here, because the ratio of costs to sales in 2019 was 82

 1  percent; the ratio of total costs to sales in 2020 was only five

 2  percent.

 3      So, again, even though these don't relate to *Destiny 2*

 4  specifically, the overall data that I was given from defendants

 5  appears to have some issues with it.

 6  Q.  Would you expect that data reflected in tax returns would

 7  be supported by underlying financial documentation, Mr. Voth?

 8  A.  I would expect that, yes.

 9  Q.  Would that be important to you if you were going to attempt

10  to attribute some costs to the revenue to get to a profit

11  number?

12  A.  I would, especially when we see changing relationships like

13  we do in this particular data in the tax return.  I'd want to

14  see underlying documents to understand why that's happening and

15  if it's correct.

16  Q.  Have you seen underlying documents?

17  A.  None have been produced to me, no.

18      MR. RAVA:  Mr. Blackburn, can you please pull up

19  Exhibit 30, which has been stipulated, and I think Mr. Conway

20  talked about.  Please highlight the payment method, the section

21  there.

22  Q.  (By Mr. Rava)  Mr. Voth, you said that you saw records from

23  PayPal and Stripe, correct?

24  A.  Yes.

25  Q.  Mr. Voth, did you see any payment records, or any records

1    at all, relating to sales of the *Destiny 2* cheat paid for with

2    Bitcoin?

3    A.    No, none were produced to me.

4    Q.    Did you see any payment records relating to sales of the

5    *Destiny 2* cheat through PaymentWall?

6    A.    No.

7    Q.    How about through any of the three websites that,

8    apparently, are operated by Payssion?

9    A.    No, I haven't seen any data from those sources.

10   Q.    How about E-check source data?

11   A.    No.

12            MR. RAVA:  Thank you, Mr. Voth.

13            THE COURT:  Cross of the witness?

14            MR. MANN:  Yes, short cross.

15                        CROSS-EXAMINATION

16   BY MR. MANN:

17   Q.    Good morning, Mr. Voth.  We know each other from the past.

18   I'd like to ask you a few questions.

19        Mr. Voth, the bottom line, though, is you filed an expert

20   report in this case, did you not?

21   A.    I did, yes.

22   Q.    And your expert opinion was, at the end of the day,

23   defendants' sales revenues of the alleged infringing *Destiny 2*

24   products total $43,210; is that correct?

25   A.    Yes, that's what I found.

1    Q.    Now, you also had mentioned the Phoenix Digital Group tax

2    records for the years 2019 and 2020, correct?

3    A.    Yes.

4    Q.    Those were, in fact, provided to you?

5    A.    Yes.

6    Q.    And you understand that those were the years during which

7    Phoenix Digital Group distributed the *Destiny 2* software,

8    correct?

9    A.    Well, those are the years that are reflected in the four

10   files I received, that's correct.

11   Q.    Okay.  Well, I don't know whether you know the actual

12   dates, and I don't mean to put you on the spot, but the tax

13   returns that you reviewed would have reflected Phoenix Digital's

14   sales activities for years 2019 and the years 2020, correct?

15   A.    They purport to, yes.

16   Q.    Sure.

17         And you, as a forensic expert in this area, do you tend to

18   find that tax returns are reliable?

19   A.    Well, I hope they are, but, again, if I see anomalies like

20   we saw here, that suggests there's an issue with them.

21   Q.    But you're aware that filing false tax returns is a serious

22   business, correct?

23   A.    Yes.

24   Q.    In fact, you can wind up in federal prison if you do it,

25   correct?

1    A.    Possible, yes.

2    Q.    So there's a very strong incentive not to falsify tax

3    records, correct?

4    A.    Yes.

5    Q.    Okay.  And you did, in fact, receive these tax records?

6    A.    Yes.

7    Q.    Thank you.

8          Now, have you heard -- did Bungie supply you with any

9    deposition testimony from David Schaefer?

10   A.    Yes, I believe so.

11   Q.    Did you take that into account in forming your opinion?

12   A.    Yes.

13   Q.    And your opinion is still that Phoenix Digital did not

14   incur any expenses whatsoever in distributing the *Destiny 2*

15   game?

16   A.    Yes.  As I mentioned, I did receive deposition testimony.

17   I believe it was from Schaefer, and also Mr. Conway, but, again,

18   I didn't receive any documentation that would support their

19   claims.

20   Q.    But you did hear that they say that they split 50/50, taken

21   right off the top and send it to the cheat developers?

22   A.    That sounds familiar.

23   Q.    And, basically, you're saying even though they said that

24   under oath, you're not going to take that into account in

25   forming your opinion, correct?

1   A.   Well, I certainly considered it, but, again, I'm not going

2   to take the word of somebody who sells cheats for a living, when

3   there are documents out there.  There must be documents out

4   there.  I want to see them.

5   Q.   So the fact that they're selling cheats for a living colors

6   your -- it affects how credible you believe them to be, correct?

7   A.   It does.

8   Q.   So you're less inclined to believe someone who, quote,

9   sells cheats for a living, unquote, than someone who does not,

10  correct?

11  A.   As a certified fraud examiner, I want to always see

12  documents that support somebody's claim, but in this case, I

13  think the bar is a little higher.

14  Q.   So in essence, you're making a credibility determination in

15  the course of forming your opinion, correct?

16  A.   Not necessarily.  I'm just saying that if I'm going to

17  perform any calculations, I want to perform it with data.

18  Q.   And the data you admit you heard was testimony under oath,

19  correct?

20  A.   I wouldn't necessarily call that "data."  I would call that

21  a "claim."

22  Q.   Now, you mentioned earlier that you reviewed some records.

23  I believe these were PayPal records that had blacked out.  There

24  were portions that were redacted.  There were black squares

25  covering up certain information.  Did I understand your

1   testimony on that?

2   A.   Certain data I did receive was redacted.  I'm not sure --

3   are you talking about blank item titles?

4   Q.   I'm talking about -- we've seen some of these PayPal

5   records that have big, black splotches on them.  Have you seen

6   those?

7   A.   I think so, yes.  I received multiple copies of the various

8   PayPal data, and some of the data that I've seen was not

9   redacted.

10  Q.   Okay.  Now, do you have any reason to believe that my

11  clients redacted any of that data?

12  A.   I'm not sure who redacted it.

13  Q.   Okay.  If I were to represent to you that those records

14  were obtained through subpoenas served on PayPal, and PayPal

15  itself placed those black documents -- or those big, black

16  boxes, would you have any reason to challenge my belief?

17  A.   No.  The Stripe data, I believe, had a Bates number

18  associated with Phoenix, however, which suggested to me it was

19  produced by Phoenix and not by Stripe itself.

20  Q.   Okay.  But, I mean, these requests were made.  But, I mean,

21  if you get these records from Stripe or you get them from

22  PayPal, and if they were blanked out or redacted by PayPal, do

23  you have any reason to believe that that's not the case?

24  A.   Again, I don't know who redacted them.

25          MR. MANN:  Can I have a moment, Your Honor?

1          THE COURT:  Certainly.

2          MR. MANN:  Thank you, Your Honor.  I have no further

3   questions.

4          THE COURT:  Any redirect?

5          MR. RAVA:  No, Your Honor.  Thank you, Mr. Voth.

6          THE COURT:  Thank you, sir.  You may step down.  Have

7   a nice day.

8      I'm not sure we took a normal recess.  Why don't we take

9   ten minutes.

10      Before we to do that, who is your next witness and how many

11   more witnesses do you have?

12          MR. RAVA:  Your Honor, our next witness is Jordan

13   Green, followed by Mr. Schaefer.

14          THE COURT:  All right.  Let's take ten.  We'll be in

15   recess for ten minutes.

16          (Court in recess 11:20 a.m. to 11:31 a.m.)

17          THE COURT:  Plaintiff may call their next witness.

18          MR. RAVA:  Plaintiffs call Jordan Green.

19                          JORDON GREEN,
          having been first duly sworn, testified as follows:
20

21          THE CLERK:  Please state your name for the record, and

22   spell it for the court reporter.

23          THE WITNESS:  My name is Jordan Green.

24          THE COURT:  We need an address for the record.

25          THE WITNESS:  929 Southeast 50th Avenue, Portland,

1   Oregon 97215.

2        THE COURT:  You may inquire.

3                    DIRECT EXAMINATION

4   BY MR. RAVA:

5   Q.   Good morning, Mr. Green.

6        In or around 2012, you were one of the founding members of

7   Phoenix Digital, correct?

8   A.   Yes.

9   Q.   And the other founding members were whom?

10  A.   Jeffrey Conway and David Schaefer.

11  Q.   Did you contribute some capital into the project at that

12  time?

13  A.   I did.

14  Q.   About how much?

15  A.   I believe it was $1,000.

16       MR. RAVA:  Mr. Blackburn, TX 12 which is stipulated,

17  and publish it.

18  Q.   (By Mr. Rava)  Mr. Green, is this the LLC agreements you

19  entered into with Mr. Conway and Mr. Schaefer?

20  A.   Yes.

21  Q.   And it is dated January 29, 2016, correct?

22  A.   Yes, it is.

23  Q.   Looking back at page 37 to Trial Exhibit 12.037, is this

24  your electronic signature, Mr. Green?

25  A.   Yes, it is.

1  Q.   Did you have a chance to review this document before you

2  signed it?

3  A.   Yes.

4  Q.   Did you review the document before you signed it?

5  A.   I believe I did.

6       MR. RAVA:  All right.  Let's look, Mr. Blackburn, at

7  page 7 of Exhibit 12.  Highlight 4.1A.

8  Q.   (By Mr. Rava)  Mr. Green, do you see this paragraph?

9  A.   Yes, I do.

10 Q.   And it gives you the full power of management over the

11 company, doesn't it?

12 A.   Yes.

13 Q.   Phoenix Digital, Mr. Green, was in the business of selling

14 video game cheats, correct?

15 A.   Yes.

16 Q.   From the aimjunkies.com website?

17 A.   Yes.

18 Q.   And a couple other websites, too, right.

19 A.   Yeah.

20 Q.   And those included velocitycheats.com, correct?

21 A.   Yeah, I believe so.

22 Q.   And there was one mombotcheats.com?

23 A.   Yes.

24 Q.   And virtual-advantage.com?

25 A.   I don't remember if that was a dot com or a dot net, but,

1    yes, there was a website called virtual-advantage.

2    Q.   In terms of your role and responsibilities at Phoenix

3    Digital, Mr. Green, you were primarily in charge of web hosting

4    and security?

5    A.   Yes.

6    Q.   What did that involve?

7    A.   So in order to host a website, you need some software to

8    actually put the website on.  That fell in my purview.  So I

9    maintained the operating system on the server, updates and

10   patches for that.  I maintain the Apache web server software,

11   the database software, and made sure that the server was

12   secured.

13   Q.   By "secured," you mean you were protecting the site from

14   attack?

15   A.   Yes.

16   Q.   Site security would be important to your business, right?

17   A.   Yeah, I would say that web server security would be

18   important to any company that hosts websites.

19   Q.   Because you need to be able to offer a stable and secure

20   product, right?

21   A.   Among other reasons, yes.

22   Q.   And you don't want people messing with your stuff?

23   A.   Yes.

24   Q.   On the AimJunkies' site, Mr. Green, there were individual

25   pages and forms for each of the cheats that you offered, right?

1    A.    Yes, I believe so.

2    Q.    Did you get paid for your work with Phoenix Digital,

3    Mr. Green?

4    A.    I did.

5    Q.    Typically on a monthly basis?

6    A.    Yeah.

7    Q.    Often through the PayPal account?

8    A.    For a time, yes.

9    Q.    And then after that -- after you were no longer getting

10   paid via PayPal, was it mostly in Bitcoin?

11   A.    I believe we switched to using bank transfers.

12   Q.    Using -- I'm sorry.  I didn't catch that.

13   A.    Bank transfers.

14   Q.    And what is that?

15   A.    Like an ACH or a wire transfer, something along those

16   lines.

17   Q.    Still on a monthly basis?

18   A.    Yes.

19   Q.    Did you get a yearly K-1 or other such tax document from

20   Phoenix Digital?

21   A.    I did.

22   Q.    For some period of time, Mr. Green, did Phoenix Digital

23   sell a cheat for *Destiny 2*?

24   A.    We did.

25   Q.    It was from approximately late 2019 to approximately late

1  2020 or early 2021?

2  A.    Yeah.

3  Q.    And there was a page or a forum on the AimJunkies' website

4  related to this cheat?

5  A.    I believe there was.

6  Q.    Were you aware, when it was being sold, that it was being

7  sold?

8  A.    I don't have any specific recollection of any specific

9  cheat being sold, but I may have been aware of it.  I don't

10  remember.

11       MR. RAVA:  Mr. Blackburn, can you please pull up

12  Exhibit 43?

13       This is an admitted exhibit.  It's been published for the

14  jury.

15  Q.    (By Mr. Rava)  Mr. Green, did you get a notice from Bungie

16  in November of 2020?

17  A.    No, I did not.

18  Q.    Do you see this email that's on the screen here?  This is

19  page 1 of Exhibit 43.

20  A.    I do.

21  Q.    Do you see the email address jgweb@hotmail.com?

22  A.    I do.

23  Q.    Is that an email address that you maintained in late 2020?

24  A.    No, it was not.

25  Q.    No?

1        Did you have a website -- I'm sorry -- an email address

2    admin@aimjunkies.com?

3    A.    I did not personally have an address admin@aimjunkies.com.

4    Q.    Did you have access to email address admin@aimjunkies.com?

5    A.    I don't specifically recall having access to that email

6    account, but the email account may have existed at that time.

7    Q.    Turning to page 2 of this exhibit.  At some point in time,

8    did you become aware that Bungie had sent a notice to Mr. Conway

9    and/or Mr. Schaefer, very similar to the ones shown here?

10   A.    I was aware there was a notice.

11   Q.    And were you aware that there was a notice in or about

12   November of 2020?

13   A.    I was aware that there was a notice in or about that time.

14   I'm not sure if I read it, though.

15   Q.    Have you read it since then?

16   A.    Yes.

17   Q.    With regard to the *Destiny 2* cheat, Mr. Green, you didn't

18   create it, did you?

19   A.    No, sir.

20   Q.    You never accessed it, did you?

21   A.    No.

22   Q.    You never loaded it?

23   A.    No.

24   Q.    You never used it?

25   A.    No.

1    Q.    You never played *Destiny 2*?

2    A.    I don't believe so.

3    Q.    And you never saw anyone use the *Destiny 2* cheat?

4    A.    If I saw the *Destiny 2* cheat in action, it was some sort of

5    recorded gameplay or something, like a YouTube video.

6    Q.    But you don't remember, one way or the other, if you saw?

7    A.    I don't remember if I saw it during that time period.

8    Q.    So you have no personal, direct experience with the *Destiny

9    2* cheat that is the subject of this case, do you?

10   A.    No, I do not.

11   Q.    You don't know how it works, do you?

12   A.    No.

13   Q.    In fact, you'd agree that no one at Phoenix Digital knows

14   how the *Destiny 2* cheat works; isn't that right?

15   A.    Yes, that would be correct.

16   Q.    Have you heard the name Andreas Banek before, Mr. Green?

17   A.    I have.

18   Q.    In what context?

19   A.    I was made aware of that name in the context of these

20   ongoing proceedings and around the sale of the website.

21   Q.    Have you ever had any contact with that person?

22   A.    Not directly, no.

23   Q.    Have you had indirect contact with that person?

24   A.    Something I may have said or contributed or something like

25   that may have been passed along, but not that I'm aware of.

1  Q.  I understand.

2      So you have never been on a phone call with someone

3  purporting to the Andreas Banek?

4  A.  No, sir.

5  Q.  You've never exchanged emails or texts or other electronic

6  messages to someone purporting to the Andreas Banek?

7  A.  No, sir.

8  Q.  Have you heard the name Warren Apenzeller before?

9  A.  I have.

10  Q.  In what context?

11  A.  I heard that in the context of this ongoing litigation.

12  Q.  Did someone named Warren Apenzeller, to your knowledge,

13  ever work at Phoenix Digital?

14  A.  I'm not sure.

15  Q.  You don't know one way or another?

16  A.  No, sir.

17  Q.  Did you ever have contact with someone named Warren

18  Apenzeller, ever?

19  A.  No.

20  Q.  Mr. Green, when did Phoenix Digital sell the aimjunkies.com

21  website?

22  A.  I believe it was last year.  I could have the date wrong,

23  but I believe it was, like -- I'm not sure of the exact date, to

24  be honest.

25  Q.  "Last year," meaning sometime in 2023, maybe?

1  A.    Maybe.  I'm not real sure.

2  Q.    Okay.  Were you involved in that sale?

3  A.    Not really.

4  Q.    In any way?

5  A.    Giving my thumbs-up when I was presented with the terms.

6  Q.    And what were those terms?

7  A.    I don't remember off the top of my head.  A couple of

8  details is that we were selling aimjunkies.com and a couple

9  other domain names and websites, and then there was -- I think

10 there was an amount we were going to be paid.

11 Q.    Was that amount $7,000 worth of Bitcoin?

12 A.    No.

13 Q.    What was that amount?

14 A.    The number 7,000 sounds familiar.  I believe it was $7,000.

15 Q.    Oh, yes.  I intending to say seven- -- were you paid in

16 U.S. currency?

17 A.    No.

18 Q.    How were you paid?

19 A.    I remember receiving at least one partial payment in

20 Bitcoin.  I don't recall the exact amount of that.

21 Q.    And did you receive half of the $7,000?

22 A.    I don't know the exact amount that I received.  My belief

23 is that I would have received half of the $7,000.

24 Q.    Because when you sold the website, at that period in time,

25 Mr. Conway had already exited the LLC, correct?

1    A.    Yes.

2    Q.    So it was just you and Mr. Schaefer remaining, correct?

3    A.    Yes.

4    Q.    So your expectation would have been you would have gotten

5    half of the proceeds of the sale?

6    A.    Yes.

7    Q.    You would agree that you didn't sell the website in 2020,

8    right?

9    A.    I would agree, yes.

10   Q.    So any statement that the website had been sold in 2020 or

11   before 2020, that would have not been true, correct?

12   A.    I don't believe that that sale went through, no.

13   Q.    So it would have been untrue that the website had been

14   sold?

15   A.    I believe that there were some discussion of selling the

16   website with a different party, but I'm not sure how far that

17   got, and I don't think it went through.

18   Q.    Well, you can't sell the same thing twice, can you?

19   A.    No, you cannot.

20   Q.    You couldn't have sold it in 2019 or 2020, and then sold it

21   again in 2023 or 2022, right?

22   A.    No, you cannot, but you can also be entertaining a sale

23   offer that ends up falling through.

24   Q.    Right, but that's not a sale.  The first one, the one that

25   fell through, that's not --

1  A.   My understanding is that transaction was not completed.

2       MR. RAVA:  I have nothing further, Your Honor.

3       THE COURT:  Cross of the witness?

4       MR. MANN:  Yes, Your Honor.  And again, Your Honor,

5  it's a brief cross.  I do intend to call Mr. Green as a

6  principal witness in our case-in-chief.

7       THE COURT:  Very well.

8                       CROSS-EXAMINATION

9  BY MR. MANN:

10 Q.   Mr. Green, you saw the cease and desist letter that was

11 Exhibit 43.  If I understand -- do you recall that exhibit that

12 Mr. Rava showed you just a few moments ago?

13 A.   I do.

14 Q.   Okay.  If I understand your testimony correctly, you never

15 received that cease and desist letter; is that correct?

16 A.   No, I did not.

17 Q.   And that's because the email address was wrong?

18 A.   Yeah.  So I just saw the header of the email, the exhibit

19 that was on the screen, and the email address that I was asked

20 about jgweb@hotmail.com, it's very, very similar to an address

21 that I do have, then and currently, but it is an incorrect email

22 address.

23 Q.   If you're one letter off, the email won't make it, correct?

24 A.   Essentially.  The email address need to be exact for it to

25 get delivered.

1  Q.  Okay.  Now, you did not create the *Destiny 2* cheat that is

2  at issue in this case, correct?

3  A.  That's correct.

4  Q.  Did you ever play the *Destiny 2* game?

5  A.  No, I do not believe so.

6  Q.  Did you ever open up a Bungie account?

7  A.  No.

8  Q.  Did you ever enter into the limited software license

9  agreement that Bungie showed us in this case?

10 A.  I don't believe so.  I believe that you would have to

11 create an account for *Destiny 2* to agree to that.

12 Q.  And you never created such an account?

13 A.  I don't believe so.

14 Q.  Did you receive 7,000 Bitcoins?

15 A.  I wish.

16 Q.  What would that translate into in actual American dollars?

17 A.  Somewhere in the range of $400 million.

18 Q.  And you did not receive $400 million for the sale of the

19 website, did you?

20 A.  No.

21 Q.  As far as you know, did anyone at Phoenix Digital receive

22 $400 million for the sale of the website?

23 A.  Not that I'm aware.

24     MR. MANN:  Okay.  Thank you, Mr. Green.

25 I have no further questions, Your Honor.

```
 1              THE COURT:  Any redirect?

 2              MR. RAVA:  No, Your Honor, no redirect.  Thank you,

 3    Mr. Green.

 4              THE COURT:  Thank you, sir.  You may step down.

 5         Call your next witness.

 6              MR. MARCELO:  Plaintiff calls David Schaefer.

 7                         DAVID SCHAEFER,
            having been first duly sworn, testified as follows:
 8

 9              THE CLERK:  Please state your name for the record.

10              THE WITNESS:  David Schaefer.  My address is 5669

11    Snell Avenue, San Jose, California.

12              THE COURT:  Spell "Schaefer" for the record.

13              THE WITNESS:  S-c-h-a-e-f-e-r.

14                        DIRECT EXAMINATION

15    BY MR. MARCELO:

16    Q.   Good morning, Mr. Schaefer.

17    A.   Good morning.

18    Q.   I think we have, at least, nine minutes left of "good

19    morning."

20         You'd agree you're one of the three founders of Phoenix

21    Digital?

22    A.   Absolutely.

23    Q.   And you act as, essentially, the CEO of Phoenix Digital?

24    A.   Yes.

25    Q.   The other two founders we heard from, that was Jordan Green
```

1    and Mr. Conway?

2    A.    That is correct.

3    Q.    And I don't -- I'm not going to put it on the screen, but

4    that agreement that we saw, you also agreed to it?

5    A.    Yes.

6          THE COURT:  These are stipulated facts in the pretrial

7    order, so I think we can move on.

8          MR. MARCELO:  Certainly.

9    Q.    (By Mr. Marcelo)  Phoenix Digital previously owned the

10   aimjunkies.com website?

11   A.    That is correct.

12   Q.    And you allege that it was sold in May of 2022?

13   A.    That is correct.

14   Q.    Prior to May of 2022, Phoenix Digital sold cheats for video

15   games and just cheats?

16   A.    That is correct.

17   Q.    And when you sold a cheat, the cheat developer would get 50

18   percent of the gross profit?

19   A.    Yes, that's correct.

20   Q.    And then the other 50 percent would be split between the

21   three founders of Phoenix Digital?

22   A.    After expenses were paid.

23   Q.    Now, we heard Mr. Conway testify earlier regarding some

24   payments to the Phoenix Digital managers, and then one payment

25   recurring to Lisa's Repair; do you recall that?

1    A.    Correct.

2    Q.    Those were your manager draw payments?

3    A.    Yes.

4    Q.    Now, Mr. Schaefer, I tried to get similar information from

5    you at your deposition, and you testified a little bit

6    differently.

7              THE COURT:  Well, just a moment.  If you're going to

8    impeach him, just go to the deposition and read the testimony.

9    Don't editorialize.

10             MR. MARCELO:  Understood, Your Honor.

11        We're going to play a clip that was designated in the

12   pretrial order.  This was from --

13   Q.    (By Mr. Marcelo)  You testified as Phoenix Digital's

14   corporate representative, right?

15   A.    Yes.

16   Q.    You were under oath, just as you are now?

17   A.    Yes.

18   Q.    And you were representing the company.

19   A.    Okay.

20   Q.    Is that right?

21   A.    Which deposition?

22   Q.    When you were deposed on October 31st, 2022, as a Phoenix

23   Digital corporate representative.

24   A.    Okay.

25   Q.    Okay.  We're going to play the video from lines 27/20

1    through 29/11.

2            MR. MARCELO:  Mr. Blackburn, please make sure to

3    publish it.

4                        (Video is played.)

5            THE COURT:  Turn this off.  Turn it off, please.

6      I see no reason to play this kind of video during a trial

7    without the court's permission.

8            MR. MARCELO:  And, Your Honor, if I may be heard?

9            THE COURT:  You may.

10           MR. MARCELO:  This was a clip that was designated in

11   the pretrial order, not objected to by defense counsel, and the

12   issue of a motion in limine, which was denied.  And the clip was

13   allowed to be played by Your Honor because credibility of the

14   witness was always at issue.

15           THE COURT:  Well, I don't know what I was thinking

16   when I allowed it, but go ahead and play the rest of it.

17           MR. MARCELO:  We'll stop the clip.  It's all right.

18   We'll move on.

19           THE COURT:  All right.  I think that would be a better

20   thing to do.

21           THE WITNESS:  Your Honor, will I have an opportunity

22   to put that in context?

23           THE COURT:  Your lawyer will get a chance to ask you

24   questions.

25           THE WITNESS:  Thank you.

1    Q.    (By Mr. Marcelo)  Your role at Phoenix Digital, you make

2    the major decisions there.

3    A.    That's correct.

4    Q.    You would choose which cheats Phoenix Digital sells?

5    A.    Yes.

6    Q.    And for the *Destiny 2* cheats, specifically, you made the

7    decision to sell that cheat?

8    A.    Yes.

9    Q.    And you're also the decision-maker of when to stop selling

10   a cheat?

11   A.    Yes.

12   Q.    Because, as you described it, you can just turn a cheat off

13   or on, right?

14   A.    Sometimes I would have to ask IT to do it.  I didn't spend

15   a whole lot of time on the website.  So if I would make a

16   communication to somebody that, you know, can we turn this off,

17   you know, whoever the staff member was I was dealing with, that

18   usually could be the person who could do it.

19   Q.    There's staff IT at Phoenix Digital?

20   A.    Yeah.

21   Q.    But you could ask them, Hey, turn this cheat off or turn

22   this cheat on?

23   A.    Yes, that's correct.

24   Q.    And when you turn a cheat off -- just to be clear -- it

25   just means it no longer appears in the cheat loader?

1  A.   That, I don't know.

2  Q.   But users can't --

3  A.   It's nonfunctional.

4  Q.   Right.  And users no longer -- let's say they bought a

5  subscription before, the cheat is turned off, they can't use the

6  cheat anymore?

7  A.   That is correct.

8  Q.   For the website database, there's a password for it.

9  A.   Okay.

10 Q.   And you and Mr. Green were the only ones with that

11 password, right?

12 A.   I don't think I ever had it.

13 Q.   You don't think you had a password for the website

14 database?

15 A.   I honestly don't remember.  You have to understand, I'm not

16 an IT guy, so I don't -- I have a fundamental knowledge of

17 what's going on, but I don't have an in-depth knowledge of

18 what's going on.

19      To answer your question, I really don't know if I have that

20 or not.  I probably never used it, if I did have it.  Let's put

21 it that way.

22 Q.   Okay.  No reason to dispute you could have --

23 A.   I could have had it.

24 Q.   You did create the website, didn't you?

25 A.   No.  As Mr. Green testified, he's the one that created the

1  website.

2  Q.   You didn't write HTML code for the website?

3  A.   No, never.  We didn't do anything in HTML in the first

4  place in there.

5           THE COURT:  Wait for questions.

6           THE WITNESS:  I'm sorry.

7  Q.   (By Mr. Marcelo)  You didn't create any portion of the

8  website?

9  A.   No.

10  Q.   When cheats were down for a long periods of time, you would

11  tell the developer, right, that they needed to fix the cheat?

12  A.   Yes, that's correct.

13  Q.   You'd tell them something, like, Hey, if you don't get this

14  cheat working, we'll get another one through the door?

15  A.   Those conversations have happened before.  We're there to

16  sell product.

17  Q.   Let's talk about James May.  Okay?

18       He developed video game cheats for Phoenix Digital?

19  A.   That is correct.

20  Q.   One of your more prolific cheat developers.

21  A.   I wouldn't necessarily say that.

22  Q.   He did develop a number of cheats for Phoenix Digital.

23  A.   Yes.

24  Q.   And he'd give the cheats he developed to Phoenix Digital.

25  A.   No.

1    Q.    He wouldn't upload the cheat to aimjunkies.com?

2    A.    He would upload DLLs, and he did it on the server that

3    handled the loader.  That was not on aimjunkies.com.

4    Q.    But he would upload the cheat through aimjunkies.com?

5    A.    No.  There was no -- can I -- do you want me to expand on

6    that, or no?

7    Q.    There's no question pending.

8    A.    All right.

9    Q.    You agreed with Mr. May that when one of his cheats would

10   be sold, he'd get 50 percent of the gross profits?

11   A.    Absolutely.

12   Q.    Phoenix Digital provided a driver for Mr. May's

13   reverse-engineering efforts, didn't it?

14   A.    That's difficult for me to speak to.  Again, I will tell

15   you that I'm not an IT guy.

16        And there was a conversation that there needed to be a

17   driver.  It wasn't directed at Mr. May.  It was directed at a

18   company level, that a driver needed to be formulated and

19   licensed by Microsoft for our engineers to use.  It was not

20   specific to the *Destiny 2* game, and I don't believe it was even

21   used on the *Destiny 2* game.  You would have to ask Mr. May about

22   that, because I wasn't involved in that.  But if my memory

23   serves me correctly, that Phoenix Digital driver was not used in

24   that game.

25   Q.    But you'd agree that you provided Mr. May with something

1    you refer to as a Phoenix Digital in-house tool?

2    A.    That is correct.  We provided that to all the engineers.

3    Q.    Right.  All the cheat developers got this in-house tool

4    that was connected to reverse engineering?

5    A.    I can't -- that would be a stretch.  I can't say that.

6    Q.    Because you don't know what the tool actually did, right?

7    A.    That is correct.  Like I said, all I knew is they said we

8    needed driver and we needed to go to Microsoft to get it

9    licensed, and that's what we did.

10   Q.    During the time Mr. May was reverse engineering *Destiny 2*,

11   you were aware he was attempted to develop a cheat for the game.

12   A.    I may have -- I don't know.  I -- how it works for me is,

13   developers will come through the pipeline and say, Hey, there's

14   product available.  And if nobody else is offering the product,

15   then we run with the product.

16       I don't remember if Mr. May came to me and said he was in

17   development or not.  I can tell you that he never came to me and

18   said he had a completed product.  That, I know.

19   Q.    Right.  But early 2020, Mr. May told you he was working on

20   a cheat for *Destiny 2*.

21   A.    I don't remember.

22   Q.    Mr. Schaefer, I'm going to pull up your testimony from

23   December 20th, 2022.  This is page 148, lines 15 through 17.

24       "QUESTION:  And Mr. May, in early 2020, told you he was

25   developing a cheat for *Destiny 2*, right?

1    "ANSWER:  Yes."

2  A.    Then that must have been what I said.

3  Q.    Okay.  Let's move on to the cheat software at issue.

4        No dispute *Destiny 2* sold the *Destiny 2* cheat software,

5  right?

6  A.    Absolutely.

7  Q.    And we mentioned that you had decided to start selling the

8  cheat.

9  A.    Yes.

10 Q.    Mr. Green never tried to stop you from selling that cheat.

11 A.    No.

12 Q.    Mr. Conway didn't say, We shouldn't sell that cheat.

13 A.    No.

14 Q.    Neither of them requested that you take the cheat down.

15 A.    No.

16 Q.    And Phoenix Digital paid the developer of the cheat

17 software.

18 A.    Yes.

19 Q.    Who developed the *Destiny 2* cheat software?

20 A.    Andreas Banek.

21 Q.    And where does Mr. Banek live?

22 A.    Well, that's a difficult answer.  Some of the answers I get

23 out of him say that he's in the Ukraine; other answers that I

24 get from him says he's in Russia.  And given the environment of

25 what's going on, and what was going on prior to the war, he has

1    just cause --

2         And in the business that we work in, there's not -- we

3    never interact face to face.  We never -- we'll be a

4    communication, you know, by TeamSpeak or whatever communication

5    portal we're doing, but --

6         And as these gentlemen at Bungie know, in the world of

7    games everything is very impersonal.  So just like in their

8    game, there's never any direct interaction.  It's always

9    indirect.  I never directly interacted with him, other than

10   through, you know, whether it was TeamSpeak or whatever it was.

11   So I never really knew where he was at.

12        He could have been in Portugal, for all I knew, and all I

13   care about in my world is, as long as the money is good.

14   Q.   So short version, you don't know where he lives?

15   A.   He's purported to live in either the Ukraine or Russia.

16   Q.   Got it.

17        When Mr. Banek was paid for the cheats he developed, he was

18   paid in Bitcoin?

19   A.   Yes.

20   Q.   Exclusively in Bitcoin?

21   A.   Yes.

22   Q.   And when he was paid, you would send him the payments,

23   right?

24   A.   Yes.

25   Q.   You were the one that had the exclusive control over paying

1    Bitcoin to Mr. Banek?

2    A.    Yes.

3    Q.    And similar for deciding how much to pay a cheat developer,

4    that was also yourself?

5    A.    Yes.

6    Q.    And you would track the sales of the cheat and determine

7    how much to pay the developer?

8    A.    Yes.

9    Q.    You wouldn't tell the developer -- right? -- Hey, we sold

10   1,500 copies of your game; it would just be, Here's -- or the

11   cheat -- Here's the amount.

12   A.    Well, they would inquire on a number of transactions.

13   Q.    Okay.  But they didn't get a written report?

14   A.    No.  No.

15         We -- our company has a very good reputation in the

16   industry.  There may be negative connotations spread by the

17   plaintiff about our business, but we actually run a real upright

18   business.  We file taxes just like everybody else.  We give

19   people tax documentation.  Everything is on the up and up,

20   contrary to popular belief.

21   Q.    Mr. May was testifying, a little bit, about how the cheat

22   itself worked, and I want to walk through the process of

23   purchasing the *Destiny 2* cheat from Phoenix Digital.  Okay?

24   A.    Okay.

25   Q.    So the first step to use the *Destiny 2* cheat, consumers

1  have to download a cheat loader?

2  A.    Not first thing, no.

3  Q.    But they do need to download the cheat loader to use the

4  *Destiny 2* cheat?

5  A.    That is correct.

6  Q.    And they download that loader from the aimjunkies.com

7  website?

8  A.    A link to that loader is on the AimJunkies' website.

9  Q.    The link to download it?

10  A.    Yes.  It's not housed on the AimJunkies' website.

11  Q.    And the loader wasn't created by Phoenix Digital?

12  A.    No.

13  Q.    It was somebody from Whitewater?

14  A.    That is correct.

15  Q.    Okay.  Phoenix Digital doesn't own the loader?

16  A.    No, we leased it.  That was part of our overhead.  We paid

17  him a percentage of the sales on that for the lease payment.

18  Q.    Phoenix Digital doesn't own the copyright to the loader?

19  A.    Not at all.

20  Q.    The Whitewater loader that we were just discussing, it was

21  used from 2019 up until May 2022, when the AimJunkies' website

22  was sold?

23  A.    That is correct.

24  Q.    Okay.  They've got the loader.  They need an account --

25  actually, let me step back.

1          To get the loader, they need an aimjunkies.com account?

2    A.    That is correct.

3    Q.    And then the consumer needs to purchase the *Destiny 2*

4    cheat?

5    A.    Yes.

6    Q.    And they can do that on aimjunkies.com?

7    A.    No.

8    Q.    They can't purchase the cheat on aimjunkies.com?

9    A.    Let me qualify that.  They can purchase the cheat.  It's

10   not processed on the aimjunkies.com.  I'm sorry.

11   Q.    Right.  And just to walk us through, when the consumer --

12   you know, they want the cheat.  They go to aimjunkies.com.

13   There's a checkout payment page, right?

14   A.    Buy button, yeah.

15   Q.    And they hit "buy" and enter whatever the payment stuff is?

16   A.    Right.  They're redirected to one of the payment

17   offshore -- you know, off-site payment processors.  So they

18   handle the payment processing, and we don't.  They just send us

19   a message back that's saying that this guy's payment has

20   cleared, he's good to go.

21   Q.    And then once they completed that process, in the loader --

22   you know, if they bought the *Destiny 2* software, the *Destiny 2*

23   cheat would appear in the loader?

24   A.    Yes.  Our website sends a communication to the loader

25   saying that they're approved, and that cheat appears in the

1  loader.

2  Q.    And then from there, you'd agree with how Mr. May described

3  it, how to use the cheat within the game, right?

4  A.    Excuse me?

5  Q.    You'd agree with Mr. May on how he described using the

6  cheat in the game?

7  A.    I don't recall what he said.

8  Q.    Yeah, let me clarify.

9        You launch the *Destiny 2* game?

10 A.    I've never played the game, so I don't know.

11 Q.    But to use a cheat through the loader, there's a drop-down

12 menu, right?

13 A.    That is correct.

14 Q.    And you just select the cheat you want to use.

15 A.    Yes.

16        THE COURT:  How much longer are you going to be,

17 counsel?

18        MR. MARCELO:  I have 30 minutes more.

19        THE COURT:  All right.  We might as well take our

20 lunch.  I thought you might finish earlier than that.

21     Ladies and gentlemen, we're going to take our noon recess,

22 but we're a little beyond noon, so we'll be in recess until

23 1:10.  Please be back by then, and we'll be in recess.

24        (Court in recess 12:10 p.m. to 1:10 p.m.)

25        THE FOLLOWING PROCEEDINGS WERE HELD
          OUTSIDE THE PRESENCE OF THE JURY:

 1

 2          THE COURT:  Is there a matter to discuss?

 3          MR. MARCELO:  Yes, Your Honor.  We have, hopefully, a

 4  very quick matter.  It relates to video clips being paid for

 5  the -- the depositions.  And I wanted to flag that.

 6      Additional clips with sometimes inappropriate language, we

 7  intend to be used, clips that were previously designated.

 8      And just as a brief history, these are clips in which

 9  either support spoliation or the sanctions for harassments at

10  deposition, but they also go directly to spoliation, and they've

11  already been a subject of motion in limine.

12          THE COURT:  Well, we haven't heard any testimony about

13  spoliation.  I mean, you played that clip.  It's in the record.

14  I don't know that additional language there is necessary.

15      If you get to spoliation and there's something that you

16  need to show his demeanor, we'll take it up.

17          MR. MARCELO:  Certainly.  And to be clear, we're not

18  planning to replay the clip.  Other clips were designated and

19  not objected, and it was a subject of a motion in limine that

20  was denied.

21          THE COURT:  So what are you asking?

22          MR. MARCELO:  The issue --

23          THE COURT:  You want him to hear him swear at you?

24          MR. MARCELO:  The issue we see is, if we have a clip

25  that was designated and intended to be played, and there's some

 1   suggestion that it's wrong to do so, it could harm, just, the

 2   impact of the clip --

 3              THE COURT:  I think you've made the point on the --

 4   you know, the defense may want to have it played in context to

 5   what was going on and why.

 6         So can we proceed?

 7              MR. MANN:  If I may speak, Your Honor?

 8              THE COURT:  Certainly.

 9              MR. MANN:  I'm confident that Mr. Schaefer will be

10   fully willing to admit what he did and didn't do.  So if they

11   ask him, "Did you delete these things?" I'm sure he's going to

12   admit what he did.  So no reason to show dramatics --

13              THE COURT:  There's no reason to impeach, only unless

14   they want to --

15              MR. MANN:  If he gives an incorrect answer, then have

16   at it, but let's ask the questions first.

17              MR. MARCELO:  And, Your Honor, that's just not how

18   Rule 32 operates.  Rule 32(a)(3) allows the use of a deposition

19   of a party or a party representative for any purpose whatsoever.

20              THE COURT:  So you brought out the earlier testimony.

21   Ultimately, the judge decides, and I'm telling you I don't want

22   to hear any more of that, unless it's because he has not

23   accurately answered something as we go along.

24              MR. MARCELO:  Understood, Your Honor.

25              THE COURT:  Let's bring in the jury.

1       THE FOLLOWING PROCEEDINGS WERE HELD
        IN THE PRESENCE OF THE JURY:
2

3               THE COURT:  You may continue, counsel.

4               MR. MARCELO:  Thank you.

5   Q.   (By Mr. Marcelo)  Now we're at afternoon, so good

6   afternoon, Mr. Schaefer.

7   A.   Good afternoon.

8   Q.   Earlier, before lunch, you testified you did not create the

9   aimjunkies.com website?

10  A.   That is correct.

11  Q.   And that's your testimony, you did not create it?

12  A.   That is correct.

13  Q.   Mr. Schaefer, we're going to go to your October 28th, 2022,

14  deposition.  This is page 21, line 13, through page 22, line 2.

15          "QUESTION:  What training do you have?

16          "ANSWER:  Oh, see, we all perk up here.  HTML.

17          "QUESTION:  Where did you receive your training for HTML?

18          "By myself.  Before there was WordPress, somebody had to

19  build a website, and that's how it was built, was in HTML.

20          "Have you built websites?

21          "Many.

22          "Did you build the aimjunkies.com website?

23          "Yes.

24          "Did anyone assist you in building that website?

25          "No.  It's WordPress."

1    Did I read that correctly?

2    A.    Yes, you read that correctly.

3    Q.    Right before lunch, we were talking about how the

4    AimJunkies' cheat works with the loader.

5    A.    Yes.

6    Q.    To use the cheat, a consumer selects the cheat and the

7    loader?

8    A.    I believe so, yes.  You have to understand, I've never used

9    the loader in my life, so I can't -- you know, besides what I

10   believe how it functions, I can't speak to it.  I haven't gamed

11   in over 12 years.

12   Q.    The loader uses DLL injection, though?

13   A.    Yeah, I believe in some cheats, yes.  I'm not sure about

14   all cheats.

15   Q.    When a consumer uses the *Destiny 2* cheat, the way it got to

16   the consumer, it passed from the developer's computer server,

17   right?

18   A.    Are you speaking about the *Destiny 2* game?

19   Q.    I am.

20   A.    Yes.

21   Q.    The *Destiny 2* cheat, to be clear.

22   A.    Yeah.  Would you like me to explain the path?

23   Q.    I'll get there.  Just --

24   A.    Okay.

25   Q.    I'll ask the question.  You can answer it.

David Schaefer - Direct by Mr. Marcelo          May 22, 2024

1    A.    Okay.

2    Q.    Okay.  *Destiny 2* cheat starts on the developer's server?

3    A.    Yes.

4    Q.    And passes through Phoenix Digital's computer?

5    A.    Yes.

6    Q.    And then it's passed to the consumer's computer?

7    A.    Yes.

8    Q.    Phoenix Digital promoted the *Destiny 2* cheat?

9    A.    I believe so.

10   Q.    Had some marketing and other advertisements for it?

11   A.    Yes.

12   Q.    For instance, emails that were sent to AimJunkies' users

13   that promoted, Hey, we've got a *Destiny 2* cheat?

14   A.    Yes.

15   Q.    You also used a Twitter account to promote the cheat?

16   A.    Yes.

17   Q.    Okay.  I want to walk through the promotional emails.

18   A.    Okay.

19   Q.    You would write the promotional emails?

20   A.    Yes.

21   Q.    And then you'd send them to the AimJunkies' members?

22   A.    Yes.  I believe there was one, maybe two, that Jason, the

23   person you deposed before, wrote one or two of them, if I

24   remember right.  I don't think I wrote every one of them.

25   Q.    Okay.  But the majority?

1    A.    Yeah, I'd say the majority is fair.

2            MR. MARCELO:  If you can pull up and not publish

3    Exhibit 38.

4    Q.    (By Mr. Marcelo)  Mr. Schaefer, on your screen there,

5    you'll see promotional emails.

6    A.    Yes.

7    Q.    These are the ones that you were just discussing, that you

8    wrote?

9    A.    Yes.

10           MR. MARCELO:  Plaintiff moves to enter into evidence

11   Exhibit 38.

12           MR. MANN:  No objection, Your Honor.

13           THE COURT:  It will be admitted.

14               (Plaintiff Exhibit 38 admitted.)

15           MR. MARCELO:  And permission to publish?

16   Q.    (By Mr. Marcelo)  Okay.  Let's go to page 10, so at the

17   bottom, it will say "Trial Exhibit 38.010."

18        This is one of the promotional emails for the *Destiny 2*

19   cheat?

20   A.    Uh-huh.

21   Q.    And you wrote this email?

22   A.    Yes.

23   Q.    Okay.  The date on the upper-right corner says, "December

24   17th, 2019"?

25   A.    Correct.

1   Q.   "Top promotion, *Destiny 2* cheat released"?

2   A.   Yes.

3   Q.   Underneath it, it states, "Full player and NPC ESP cheat

4   released now."  Do you see that?

5   A.   Yes.

6   Q.   And below that, it says, "For a limited time, subscribe to

7   the ESP-only cheat, and get upgraded to the full aimbot cheat

8   when it is released in the near future"?

9   A.   That is correct.

10  Q.   So around December 17th, 2019, the *Destiny 2* cheat is just

11  the ESP feature?

12  A.   Yeah, that's what it looks like.  I don't -- to be honest,

13  I don't remember the timeline on that.

14  Q.   But as it's noted in the email --

15  A.   Yes, yes.

16  Q.   And in the future, Phoenix Digital knows an updated cheat

17  is going to be released?

18  A.   Yes, because the pricing is adjusted for the added

19  features.

20  Q.   Right.  Added features, like OPK and aimbot?

21  A.   Yeah, I believe so.

22  Q.   Okay.  Let's go to page 12.  Another promotional email for

23  *Destiny 2* cheat.

24  A.   Okay.

25  Q.   And the date says December 23, 2019?

1  A.    Yes.

2  Q.    And this email says, "*Destiny 2* full cheat."  Do you see

3  that, "*Destiny 2* full cheat"?

4  A.    Yes.

5  Q.    And below it, it says, "The full cheat with aimbot is now

6  released.  Pair it with the full player and NPC ESP, alongside

7  OPK, to tear your way through raids and missions."  Right?

8  A.    That is correct.

9  Q.    That's another one of the promotional emails you wrote?

10 A.    That is correct.

11 Q.    And then we discussed the Twitter account.  Phoenix Digital

12 had a Twitter account?

13 A.    Yeah.

14 Q.    And you had control of the Twitter account?

15 A.    Yes.

16 Q.    That's @aimjunkies?

17 A.    Yes, I believe so.

18        MR. MARCELO:  Mr. Blackburn, if you can pull up

19 Exhibit 46.

20 Q.    (By Mr. Marcelo)  Mr. Schaefer, this is a tweet posted by

21 the @aimjunkies account?

22 A.    Yes.

23 Q.    And you wrote this tweet?

24 A.    Yes, I believe so.

25        MR. MARCELO:  Plaintiff moves to enter into evidence

1  Exhibit 46.

2          MR. MANN:  No objection, Your Honor.

3          THE COURT:  It will be admitted.

4              (Plaintiff Exhibit 46 admitted.)

5          MR. MARCELO:  Mr. Blackburn, if you can publish the

6  exhibit.

7  Q.   (By Mr. Marcelo)  Okay.  Let's go to the middle of the

8  page.  The caption for the tweet says, "Hashtag *Destiny 2* back

9  online for the expansion."

10 A.   Okay.

11 Q.   Do you see that?

12 A.   Yeah.

13 Q.   And this is a promotion for the *Destiny 2* cheat for the

14 *Destiny 2* expansion?

15 A.   That's correct.

16 Q.   And it's November 11th, 2020.

17 A.   Okay.

18 Q.   Is that right?  Is that --

19 A.   That seems correct.

20 Q.   Sorry.  We may have spoken over each other.

21     November 11th, 2020, that's when this was posted?

22 A.   Yes.

23 Q.   For the timeline, I believe there was testimony on turning

24 the *Destiny 2* cheat off.  That occurred in early 2021; is that

25 right?

1    A.    You mean after we received the cease and desist?

2    Q.    Right.  Whenever the cheat was turned off.  I'm asking for

3    the time frame.  Was that early 2021?

4    A.    Probably within a week after.  We had to first confirm that

5    the takedown notice was legitimate, because as we've received

6    illegitimate takedown notices before, as Bungie has experienced

7    themselves.  So you have to verify before you actually act on

8    that, and it took us about a week to verify that it was, and

9    that's when we discontinued it.

10   Q.    But you'd agree sales for the *Destiny 2* software continued

11   into the end of 2020, early 2021?

12   A.    To be honest, you'd have to show me the transaction detail.

13   Q.    Let's go to your deposition testimony from December 20th,

14   2022.  This is page 173, lines 1 through 11.

15        "QUESTION:  So Phoenix Digital was selling the *Destiny 2*

16   cheat at least from October 2020 through November 12th, 2020,

17   right?

18        "ANSWER:  I believe we sold it a little bit beyond that,

19   because there was some other payment processes, that it didn't

20   get shut off right away, but I believe within the next 30 days

21   everything was shut off.

22        "Okay.  So Phoenix Digital was selling the *Destiny 2*

23   software till, roughly, the end of 2020, right?

24        "ANSWER:  That's a fair thing to say.  It took us a while

25   to unwind it."

1    Does that refresh your memory?

2    A.    Yes.   Thank you.

3    Q.    And I'll speak slower when I read.

4          Let's talk about the sales of the *Destiny 2* cheat.

5    A.    Okay.

6    Q.    When buying the cheat, consumers can pay Phoenix Digital

7    using a number of payment processors.

8    A.    That is correct.

9    Q.    We went over those earlier with Mr. Conway, right?

10   A.    Yes.

11   Q.    They included Bitcoin?

12   A.    Yes.

13   Q.    PaymentWall?

14   A.    Yes.

15   Q.    Payssion?

16   A.    Yes.

17   Q.    PayPal?

18   A.    Yes.

19   Q.    And Stripe?

20   A.    Yes.   And I think there were some others listed on there,

21   if I -- I think there was E-check on there, also.

22   Q.    E-check, I think, Qiwi was listed.

23   A.    Yeah, that's all part of PaymentWall, if I remember right.

24   Q.    Right.   There's, like, sub payment processors, essentially?

25   A.    Yes.   When you go to PaymentWall, you get a suite.   You can

1  choose which of those you want to use.

2  Q.    Understood.

3           MR. MARCELO:  Mr. Blackburn, if you could pull up

4  Exhibit 63.  This is a stipulated exhibit, and you can publish

5  it.

6  Q.    (By Mr. Marcelo)  Mr. Schaefer, Exhibit 63, that's

7  defendant Phoenix Digital's responses to Bungie's

8  interrogatories in this case, right?

9  A.    I believe so.

10 Q.    You assisted with providing the information in them, right?

11 A.    That is correct.

12 Q.    You didn't lie in the them?

13 A.    No.

14 Q.    Let's go to page 3 of Interrogatory No. 7.  The question

15 asked, of Phoenix Digital, was to "identify all bank accounts,

16 financial accounts, payment processor accounts, or any other

17 sources of funds or accounts owned by Phoenix Digital that are

18 or have been used to process and/or store funds related to the

19 sale of the cheat software."  Right?

20 A.    Yes.

21 Q.    Let's look at Phoenix Digital's supplemental response at

22 the top of page 4.

23       Phoenix Digital responded, "The answer to this

24 interrogatory may be ascertained from the records produced by

25 PayPal in response to plaintiff Bungie's, Inc.'s subpoena dated

 1    June 23rd, 2022, and from the Stripe records produced in Phoenix

 2    Digital's supplemental responses to Bungie's requests for

 3    documents served contemporaneously herewith.  Answering further,

 4    Phoenix Digital states PayPal, Stripe."

 5         Did I read that right?

 6    A.   Yes.

 7    Q.   That response, it doesn't say "Payssion."

 8    A.   No, it does not.

 9    Q.   It doesn't say PaymentWall.

10    A.   We came forward after that point and offered, to the

11    plaintiff, to go to those sites and told them how to get ahold

12    of them, because we couldn't get the records to provide to them.

13    So we offered them the opportunity to go and get those records.

14    And we would have supported them to get the records.  They chose

15    not to get the records, and go down the path of accusing us of

16    spoliation in records.  That's what happened.

17         MR. MARCELO:  Objection, Your Honor; move to strike as

18    nonresponsive.  The question was simply whether it included the

19    word "PaymentWall."

20         THE COURT:  The answer will stand.

21    Q.   (By Mr. Marcelo)  Mr. Schaefer, the answer doesn't include

22    Payssion, PaymentWall, Bitcoin, Alipay, Qiwi, WebMoney, none of

23    those.

24    A.   None of those.

25    Q.   The only accounts, payment processors, funds identified in

1    this answer, PayPal and Stripe.

2    A.    That is correct.

3    Q.    Consumers purchase the cheat with Bitcoin, right?

4    A.    Yes.

5    Q.    No Bitcoin records showing the sales of the cheat were

6    produced, were they?

7    A.    Yes.

8    Q.    Yes what?

9    A.    Yes, there were records created.

10   Q.    Phoenix Digital did not produce any records of cheats being

11   sold using Bitcoin.

12   A.    We couldn't.

13   Q.    Let's pull up another exhibit, Exhibit 60.  This is also

14   stipulated to.

15         Exhibit 60 is a declaration you filed in this litigation,

16   right?

17   A.    Okay.

18   Q.    Is that correct?

19   A.    It appears to be, yes.

20         MR. MARCELO:  And, Mr. Blackburn, if you'd scroll to

21   the signature page.

22   A.    That's not it.

23   Q.    (By Mr. Marcelo)  Mr. Schaefer, underneath paragraph 9,

24   that's your signature?

25   A.    Yes.

1   Q.    And if you look at the first page, it says, "I, David

2   Schaefer, under penalty of perjury under the laws of the United

3   States, state and declare as follows."

4   A.    Yes.

5   Q.    You filed this January 10th, 2022, right?

6   A.    Okay.

7   Q.    And there's a date up at the top, the date it was filed.

8   Do you see that, January 10th, 2022?

9   A.    Yes.

10  Q.    Okay.  Let's go to paragraph 8, bottom of page 2 and top of

11  3.

12        You stated, "During the entire life of the products Bungie

13  refers to as 'cheat software,' overall sales of the products

14  were $27,748, and Phoenix Digital Group's gross profits on these

15  sales amounted to $13,874."

16        Do you see that?

17  A.    Yes.

18  Q.    That $27,748 number --

19  A.    Yes.

20  Q.    -- that was wrong?

21  A.    It eventually was found to be wrong, not because we

22  misstated or perjured ourselves in court.

23        After you subpoenaed the documents from PayPal, that number

24  changed.  We had no access to PayPal, so we could not give you a

25  number of what it was.  Once you got the access to PayPal, you

1  produced those documents to us, and we agreed to those numbers.

2  Q.   To be clear, I think I heard you say those numbers changed.

3  Were there sales after January 10th of 2022?

4  A.   No.  You're taking this out of context.

5       PayPal ran in parallel with Stripe.  And we gave you the

6  $27,748 because we had access to Stripe.  So when you asked us

7  to provide documentation, we gave you everything that we had.

8  And then we invited you to go to these other vendors and get the

9  documentation through subpoena.  You chose to go to PayPal and

10 get the documentation.  Once we received that documentation, we

11 verified your numbers and agreed to those numbers.  You chose

12 not to go to the rest of the vendors and get the documentation,

13 and accused us of spoliation.

14 Q.   Mr. Schaefer, I might have missed it.  Where is the

15 invitation in here to go look at the other payment processors?

16 A.   It's in the deposition later on.

17 Q.   Mr. Schaefer, in this deposition you submitted to the

18 court --

19 A.   We did not know a number at that time for PayPal.  We had

20 no idea.

21 Q.   Just let me finish the question.

22      When you finished this declaration, it only identified

23 payments through Stripe.

24 A.   That is correct.

25 Q.   Now, when you submitted the declaration, you knew that

1    consumers had purchased the cheats using PayPal, too.

2    A.    And we told you that.

3    Q.    Mr. Schaefer, the question is:  At the time you submitted

4    the declaration, you knew that customers had also purchased the

5    cheat --

6    A.    Yes.

7    Q.    -- using PayPal.

8    A.    Yes.

9    Q.    You knew consumers had purchased the cheat using Bitcoin.

10   A.    Yes.

11   Q.    You knew consumers had purchased the cheat with

12   PaymentWall.

13   A.    Exactly.

14   Q.    None of that information is in this declaration.

15   A.    We didn't have access to any of that information.

16   Q.    You had access to whether or not sales were made, right?

17   A.    I'm missing that.  What do you mean?

18   Q.    You knew that PayPal, Bitcoin, and PaymentWall had all been

19   used --

20   A.    Yes.

21   Q.    -- to purchase the cheat.

22   A.    Yes.

23            THE COURT:  You've got to wait for the question.

24            THE WITNESS:  I'll try.

25            MR. MARCELO:  It's tough because, normal conversation,

1    you'd want to jump in.

2          THE WITNESS:  Yeah, normal, yeah.

3    Q.   (By Mr. Marcelo)  Okay.  Let's talk about the total number

4    of sales for each cheat.

5          To determine that -- this is cheats in general -- you would

6    track the transactions of those sales?

7    A.   I don't understand.

8    Q.   Yeah.  To determine -- for the cheats sold at Phoenix

9    Digital, including the *Destiny 2* cheat, each month you'd make a

10   spreadsheet showing the monthly sales for that cheat.

11   A.   No.

12   Q.   Your testimony is that you did not create monthly

13   spreadsheets showing the total sales of each cheat.

14   A.   I don't remember.  I might have.  What did I testify?

15   Whatever I testified to, I'll agree to.  My memory is not good

16   on that.

17   Q.   No reason to dispute that, each month, you made a

18   spreadsheet tracking the sales of each cheat?

19   A.   If that's what I testified to, then that's what I did.

20   Q.   Let's go to your testimony.

21         MR. MARCELO:  Mr. Blackburn, if you'd play the clip

22   from Mr. Schaefer's October 28th, 2022, deposition, page 58,

23   lines 1 through 11.

24                         (Video is played.)

25   Q.   (By Mr. Marcelo)  That monthly spreadsheet, you shred it?

1  A.    Yes.

2  Q.    You got a shredder in your office, right?

3  A.    Yes.

4  Q.    That's where those financial records regarding the cheat

5  would go?

6  A.    Yeah.  I misstated, though, when I said I sent it to

7  Mr. Conway.  I didn't send it to Mr. Conway.  I just gave him

8  the numbers.

9  Q.    But you didn't misstate that you would shred them?

10  A.    No.

11  Q.    The process, shredding these financial records, that

12  continued up and through this litigation.

13  A.    Yes, because I knew we had originals on the website.  Those

14  are copies.

15  Q.    The shredding would continue up until the alleged sale of

16  the website in May of 2022?

17  A.    Yes, I shredded the copies.

18  Q.    When you say "copies," there were records on the website of

19  the sales?

20  A.    No.  The original records are all maintained by the payment

21  processors.

22        I've never been in a litigation before, so I didn't know

23  that if you made 55 copies of something and you shredded one of

24  them, that you're going to be in trouble for spoliation.  I

25  assumed, and you know what happens when you assume -- I assumed

1  that if the original was at the payment processor and if we

2  could get that information from the payment processor, there

3  would be no spoliation.  Much to my surprise, anything that you

4  destroy can be deemed spoliation by the plaintiff.

5  Q.    Mr. Schaefer, Phoenix Digital doesn't keep a written record

6  of its cheat developers?

7  A.    No.

8  Q.    You, Mr. Conway, and Mr. Green, no communications in

9  writing?

10 A.    No, never have.

11 Q.    You don't communicate with cheat developers in writing?

12 A.    No, never have.  That's not how the virtual world works.

13 Q.    Right.  No paper trail.

14 A.    Yeah.

15 Q.    Now, we saw a letter earlier regarding the cease and desist

16 letter, right?

17 A.    Yes.

18 Q.    That said preserve all documents?

19 A.    Yes.

20 Q.    Now, you would agree that, if you receive a letter like

21 that, you would preserve all documents?

22 A.    I didn't receive it; Mr. Conway received it.

23 Q.    Mr. Schaefer, you'd agree, if you received a letter like

24 that, you'd preserve all documents?

25 A.    I have to admit I didn't know I needed to preserve

 1    photocopies, or any kind of copy.  I thought -- like I said,

 2    since I've never been in a litigation before in my life, I

 3    thought the original documents would suffice.

 4          MR. MARCELO:  Mr. Blackburn, let's play the clip from

 5    Mr. Schaefer's deposition on October 28th, 2022.  This is page

 6    264, line 11, through 265, line 9.

 7                        (Video is played.)

 8    Q.   (By Mr. Marcelo)  Mr. Schaefer, now, I heard you testify

 9    that Mr. Conway received a letter from Bungie.

10    A.   Yes.

11    Q.   He showed you that letter on November 4th of 2020, right?

12    A.   I believe he sent me -- texted me a photocopy, maybe, or

13    told me about it.  I don't remember exactly.

14    Q.   Either way, you got a copy, November 4th, 2020?

15    A.   Okay.

16    Q.   Is that right?

17    A.   I don't know what date I got it, but, yes, I got it.

18         And you have to remember, this is four years ago, and my

19    memory is not like that.

20    Q.   Any reason to dispute that you received the letter

21    November 4th, 2020?

22    A.   What's the date on the letter?

23    Q.   November 4th, 2020.

24    A.   It would probably have been a couple of weeks after that.

25    Q.   Let's look at your testimony.

1    A.    Sure.

2    Q.    Mr. Schaefer, this is your testimony, December 20th, 2020,

3    page 183, line 25 through 184/6.

4          "QUESTION:  You did receive this letter, right?  Mr. Conway

5    gave it to you?

6          "ANSWER:  I didn't receive it from MSK.  Mr. Conway passed

7    his copy to me.

8          "QUESTION:  Phoenix Digital got the copy November 4th,

9    right?

10         "ANSWER:  I received a copy on November 4th."

11   A.    Thank you for clarifying that.

12   Q.    You'd agree the November 4th letter -- this is Exhibit 42 --

13   requested that you preserve all documents regarding the cheat

14   software?

15   A.    Yes.

16   Q.    You did not preserve all documents regarding the cheat

17   software, did you?

18   A.    What is -- what is regarded as all documents around cheat

19   software?  That's a rather wide term.

20   Q.    Let's go to page 2, the bottom paragraph that starts with,

21   "In that regard."

22         The letter requests that you preserve -- this is the third

23   line -- "hard drives, databases, web pages, server logs,

24   spreadsheets, programming code, correspondence, postage logs,

25   user chat messages, email and other electronic communications,

1  instant messages, word processing" -- it keeps going.  Do you

2  see that?

3  A.    Uh-huh.

4  Q.    You agree the letter requested that you preserve those

5  documents?

6  A.    Yes.

7  Q.    That included databases?

8  A.    Yes.

9  Q.    Web pages?

10  A.    Yes.

11  Q.    Server logs?

12  A.    Yes.

13  Q.    Spreadsheets?

14  A.    Yes.

15  Q.    It also states, near the bottom, "To the extent that you

16  engage in manual or automated deletion/destruction of emails,

17  you must forego doing so or disable any automated system that

18  you utilize."

19        Do you see that?

20  A.    Yes.

21  Q.    So, again, the November 4th letter did, in fact, direct you

22  to preserve all documents regarding the cheat software?

23            THE COURT:  You've made the point, counsel.

24            MR. MARCELO:  Thank you.

25  Q.    (By Mr. Marcelo)  In response to this letter, Mr. Conway

1    testified about another letter you sent in response, right?

2    A.   Yes, that's correct.

3              MR. MARCELO:  Mr. Blackburn, I believe that is

4    Exhibit 47.

5    Q.   (By Mr. Marcelo)  You wrote this letter?

6    A.   Yes, I did.

7    Q.   Mr. Conway didn't have input on what it said?

8    A.   No.

9    Q.   But it was sent back to Mr. Humphrey?

10   A.   Yes, because Mr. Conway was the one that was served with

11   the cease and desist, not me or Mr. Green, so I felt that it was

12   appropriate, since he was served, the response come from him.  I

13   hadn't been served.

14   Q.   "I regret to inform you that I no longer own aimjunkies.com

15   or any other sites you've named."

16        Do you see that?

17   A.   Yes.

18   Q.   And you wrote, "The referenced sites were sold to Phoenix

19   Digital Group LLC, and Phoenix Digital Group, in turn, sold them

20   to callofdutyhacks.ru site owners sometime ago."

21   A.   Yes.

22   Q.   Phoenix Digital still owned the AimJunkies' website in

23   2022, right?

24        Let me rephrase it.

25        As of April 20, 2022, Phoenix Digital owned the

1    AimJunkies --

2    A.    We took possession back over, yes.

3    Q.    You were still selling cheats from the aimjunkies.com

4    website?

5    A.    If you take possession of a property, then it's your right

6    to be able to sell product there, yes.

7    Q.    And, Mr. Schaefer, Phoenix Digital was still selling cheats

8    at November 20th, 2020, right?

9    A.    That's when the cease and desist was served?

10   Q.    That's when this letter was sent.

11   A.    Let me -- I'm a little confused here.

12   Q.    Sure.

13         November 20th, 2020, that's the date of this letter.

14   A.    Yeah, I'm trying to figure out where this has to do with

15   selling cheats.

16   Q.    Mr. Schaefer, I'm just asking you, November 20th, 2020,

17   Phoenix Digital was still selling cheats.

18   A.    No.  By the time this -- I believe -- my dates may not be,

19   you know, within days.

20         We had taken down the cheat when we received the cease and

21   desist letter.  We, first of all, took a couple -- few days and

22   verified that it was actually legitimate, because, like I said

23   earlier, even Bungie has been served with takedown notices.

24   It's just part of the business.  People try to fraud you.

25         So after we took the time to try and verify the legitimacy

 1    of that cease and desist letter, then we took the game down.

 2        There was a little time not on the Stripe or the PayPal,

 3    but on these other payment processors, where they processed a

 4    handful more transactions, and that was because they didn't get

 5    caught when it was time to shut everything off.  But we're

 6    talking about maybe five transactions.

 7    Q.    Let's set aside the *Destiny 2* cheat.

 8    A.    Okay.

 9    Q.    November 20, 2020, Phoenix Digital was still selling

10    cheats.

11    A.    We were at -- yes, I will go with that.

12    Q.    Thank you.

13        Now, the website -- you also, then, allege that the website

14    was sold again in May of 2022, right?

15    A.    Yes, it was.  This time, they finally came through with

16    money.

17    Q.    And, actually, let me back up.

18        After this November 20th, 2020, letter regarding this sale,

19    all the data on AimJunkies' website regarding the *Destiny 2*

20    cheat was deleted.

21    A.    No, it was deleted before that letter.  Like it said in

22    that cease and desist order -- all right.  Go ahead.

23    Q.    No, please continue.

24    A.    No, I'm -- no.  Go ahead.

25    Q.    So, Mr. Schaefer, after this letter was sent, all of the

1    data regarding the *Destiny 2* cheat was deleted from

2    aimjunkies.com, right?

3    A.    Oh, it was a good -- oh, folks.

4         Before that -- we have a rolling deletion, so before that

5    time of the cease and desist, it was automatically deleted.  We

6    don't do it manually.  It's done automatically.  And that did

7    not get turned off after we got the cease and desist, I will

8    admit that.  I made that mistake.

9         So when everything was on the website, after that point in

10   time, 90 days later, it was gone.

11   Q.    And so rolling automatic deletions that you didn't turn

12   off.  Those deletions included everything regarding the *Destiny

13   2* cheat software.

14   A.    No, they did not.  Not the complete package.  Only the last

15   month or so.  From November 20th, on, that's what was deleted.

16   Q.    You didn't preserve any data on the AimJunkies' website

17   regarding the *Destiny 2* cheat?

18   A.    I didn't feel I needed to.  We had hard copies at the

19   payment processors.

20        And it's obvious, when you guys went to the website and

21   copied all those web pages with the cheat features and all of

22   that, it was still up when you were there, it just wasn't for

23   sale.

24   Q.    Mr. Schaefer, I want to direct your attention to your

25   December 20th, 2022, testimony.  This is page 192, line 13

1    through 21.

2        "QUESTION:  Sure.  Sometime after sending this letter,

3    November 20, 2020, all of the data on the aimjunkies.com website

4    was deleted regarding the *Destiny 2* cheat, right?

5        "ANSWER:  Yeah.  It was probably -- the cheat was taken

6    down, you know, pretty much immediately.  It was probably within

7    the 90-day cycle that the cleanup, you know, cleaned itself up.

8    We didn't go in and manually delete anything."

9    A.    That's what I said.

10   Q.    Phoenix Digital didn't preserve a copy of the cheat loader

11   that was in use at that time.

12   A.    We didn't have possession of the cheat loader.  We couldn't

13   give you a copy of it.

14   Q.    Phoenix Digital didn't preserve a copy of the *Destiny 2*

15   cheat web page.

16   A.    You have a copy of that.

17   Q.    Mr. Schaefer, that's not the question I asked.

18        THE COURT:  Well, ask another question.

19   Q.    (By Mr. Marcelo)  Phoenix Digital did not preserve a copy

20   of the *Destiny 2* cheat web page, right?

21   A.    No.  We might have.  I don't remember.  I'd have to ask my

22   counsel if we put that into evidence, you know, in

23   interrogatories, or whatever they're called.

24   Q.    We can look at your testimony.

25   A.    Great.

1   Q.   We're going to look at your testimony from December 20th of

2   2022, lines 193/4 through 15.

3        "QUESTION:  You didn't preserve a copy of the cheat loader

4   you were using at that time, did you?

5        "ANSWER:  No.  It wasn't part of this litigation.

6        "You didn't preserve a copy of the *Destiny 2* cheat, did

7   you?

8        "We've never had possession of it.

9        "You didn't preserve a copy of the *Destiny 2* cheat web

10  page, did you?

11       "I believe that auto-deleted after the 90 days.

12       "You didn't preserve the forums related to the *Destiny 2*

13  cheat, did you?

14       "I believe that auto-deleted after 90 days."

15  A.   Those are all correct answers that I stand by.

16  Q.   Thank you.

17  A.   You have to understand --

18            THE COURT:  There's no question.

19            THE WITNESS:  I'm sorry.

20  Q.   (By Mr. Marcelo)  Okay.  Let's jump to this alleged sale in

21  May of 2022.

22  A.   Okay.

23  Q.   Now, you allege that it was sold to Andreas Banek?

24  A.   Yeah, and his partner.

25  Q.   The same one -- person that you allege created the

1    *Destiny 2* cheat issue?

2    A.    Yeah.  We've had quite a few business dealings together.

3    Q.    And it was sold for $7,000?

4    A.    That is correct.

5    Q.    You thought, in 2019, that the aimjunkies.com website was

6    worth over $6,300,000, didn't you?

7    A.    That's what it's been valued at with Internet -- you can go

8    to places on the Internet, and they'll value what your website

9    is worth, and that's where I went to to get that number.

10         We negotiated a number substantially less than that, but at

11   that time -- oh, I mean, at 2022, it was bargain basement.  When

12   we sold it the first time, it was substantially more than what

13   we sold for the $7,000, but given what these folks have done to

14   us, it killed the value of the website.

15   Q.    Even in 2021, you thought the website was worth almost

16   $2 million?

17   A.    That would be a fair assessment, yes.

18   Q.    And I heard you say these folks "killed the value of the

19   website."

20   A.    Yes.

21   Q.    So you stopped selling the *Destiny 2* cheat, and the website

22   drops from $6 million in value to $7,000?

23   A.    It had nothing to do with the cheat.  It had everything to

24   do with the plaintiff.

25   Q.    Now, this sale, May 2022, you didn't preserve any

1  information on the website before selling it, did you?

2  A.   No.  There wasn't anything left there.

3  Q.   Well, before the sale, you had access to the website

4  database.

5  A.   Like I said, I don't even know if I had the password to get

6  to the database.

7       Here we go.

8  Q.   Mr. Schaefer, we're going to your December 20th, 2022,

9  testimony.  This is page 195, line 18, through 196, line 4.

10      "QUESTION:  Yeah.  Before the sale of the AimJunkies'

11  website, you had access to the web database, right?

12      "ANSWER:  That is correct.

13      "QUESTION:  That's behind the scenes of the website, right?

14      "ANSWER:  Yes.

15      "After the sale, you can't access to database anymore,

16  right?

17      "That is correct."

18      That was your testimony?

19  A.   Yes.  I stand by that.

20  Q.   After the website sale, you no longer had access to the

21  cheat loader?

22  A.   That is correct.  The cheat loader that he put up was not

23  the cheat loader -- he put his own cheat loader up.  That's why

24  Mr. Guris's testimony is not relevant, because it wasn't the

25  same loader.

1    Q.    You're going to testify under oath that you know he put a

2    different loader up?

3    A.    Absolutely.

4    Q.    I want to look at your testimony from October 28, 2022.

5    This is page 106, line 15 through 24.

6          "QUESTION:  Was the Whitewater loader used in the time

7    period of 2019 through 2021?

8          "Yes.

9          "Is there a different loader than the Whitewater loader

10   used currently on AimJunkies?

11         "I do not.  I don't own the site.  I don't control it.

12         "And the sale was made in this year, 2022?

13         "I believe so.  Yes."

14   A.    I received information afterwards that changed that answer.

15   Q.    Mr. Schaefer, you had the opportunity to correct deposition

16   testimony.  Did you correct your deposition testimony?

17   A.    I'm sorry.  I did not.

18   Q.    Talked about the loss of access to the website database

19   after the alleged sale.  After the sale, you also no longer had

20   access to the cheat loader, right?

21   A.    I never had access to the cheat loader.

22   Q.    You no longer could turn on or off cheats?

23   A.    That's not access.  I mean, it is access, but it's, like, a

24   basic level.

25   Q.    But after the sale, you could no longer turn on or off

1    cheats?

2    A.    No.

3    Q.    Let's pull up Exhibit 52.  This is a stipulated exhibit.

4    Mr. Schaefer, it's an announcement, after this alleged sale,

5    that you posted, right?

6    A.    That is correct.

7    Q.    And you wrote this?

8    A.    Yes, I did.  Well, I plagiarized it.

9    Q.    You plagiarized it from Bungie's acquisition announcement.

10   A.    That is correct.

11   Q.    And the first sentence, you state, "The sale was to Blome

12   Entertainment."

13   A.    No, that's not what that says.  If you said "Blo-me," it

14   would have a hyphen in it.  That's "Blome Entertainment."

15   Q.    My apologies.  Blome Entertainment.

16         Now, as we discussed, you wrote this announcement just

17   copying a recent announcement Bungie had made?

18   A.    Yes.  I thought it was a nicely done announcement, and I

19   plugged in Phoenix Digital's name and I plugged in Banek's name

20   and his partners' in the appropriate places.

21   Q.    And that's why you copied Bungie's announcement?

22   A.    Yeah.  I thought it was a nice -- you know, why not?  The

23   bill of sale I got from the -- I plagiarized that from the

24   federal government, one of the websites of theirs.

25              MR. MARCELO:  Mr. Blackburn, we're going to have two

1   clips to play here; one is from Mr. Schaefer's testimony as

2   Phoenix Digital's corporate representative, on October 31st of

3   2022.  This is page 47, line 8, through page 48, line 9.

4                        (Video is played.)

5   Q.   (By Mr. Marcelo)  Mr. Schaefer, the reason you copied and

6   posted this is to try to make Bungie and its counsel run around

7   in circles and look like fools.  That's the real reason.

8   A.   No.  Actually, I made the press release to announce to the

9   gaming community that we had sold the site.

10       In the meantime, I thought it would be kind of funny to --

11   it was a prank.  I'll admit it was a prank.  Is anything I did

12   illegal?  No.  Did I do anything to insult anybody?  No.

13       Does anybody in the world, besides you guys, know that that

14   was from the Sony website?

15   Q.   Interesting point about insulting.  You didn't try to do

16   this to insult anybody?

17   A.   No, not at all.

18   Q.   And you didn't do it to try to make Bungie run around in

19   circles and look like fools?

20   A.   That's what I said.  I'll save you the time.  That is what

21   I said.  I could give you context behind that, but you probably

22   don't want to hear it.

23   Q.   Well, Mr. Schaefer, I don't want to hear just what you

24   said; I want to hear your testimony why you copy and pasted the

25   press release.

1    A.    Okay.  I'll tell you why.

2          When we were given -- they showed you -- it was, basically,

3    discovery.  They're asking for things from us, emails, letters,

4    stuff like that, and I can't remember what -- "interrogatories"

5    is one of the words for them, and I can't remember what the

6    other word is, but they're, basically, asking us for a bunch of

7    information.

8          And we started out in this exercise by being as compliant

9    as we possibly could.  Whatever we had, we would give them.

10         We, in turn, went to them and asked them to give us answers

11   to their interrogatories.  They did everything but give us

12   anything.  Every answer that they had said we didn't have a

13   legal right to have it.

14         So after you get beyond that point in time where we're

15   having to give and give and give and give, and they give us

16   nothing, you start getting really upset.

17         And then when we start doing deposition, we get 40, 50, 60

18   questions from one of their counsels about things that are not

19   relevant at all.  They're just digging to be -- they don't have

20   a case, and they're trying to find something to make a case.

21   That's really what this is about.  And it was very obvious to

22   everybody in the room what was going on.

23         So then I said, You know what?  If you guys want to have

24   something to dig about, something -- make something about much

25   ado about -- here, I'm going to throw you this.

1    So I copied their press release.  I plugged it in.  It is a

2  legitimate press release.  We have a legitimate bill of sale.

3  We presented that to them.  Everything is on the up and up,

4  transactions and all, and they still want to complain about it.

5    And that's what my problem is about this.  Can we be adults

6  in the room?  I mean, I said, Hey, yeah, I did it, I copied

7  that.  Now can we move on, please?

8  Q.    Well, let me show you what you said at your deposition.

9  This is your corporate deposition, again, October 31st, 2022,

10  page 50, lines 14, through 50/23.

11                    (Audio is played.)

12         THE COURT:  Counsel, it's time to ask another

13  question.

14         MR. MARCELO:  Yes, Your Honor.

15  Q.    (By Mr. Marcelo)  Now, we heard, just then, Warren

16  Apenzeller being referenced.

17  A.    That is correct.

18  Q.    Who is Warren Apenzeller?

19  A.    He is a former employee of the company.

20  Q.    If we go to Exhibit 52 again, and go to the bottom of the

21  exhibit, it lists Warren Apenzeller, Director of Global

22  Communications?

23  A.    Yes.

24  Q.    Was Mr. Apenzeller a friend of yours?

25  A.    He was one of my employees.

1  Q.   When this announcement was released, Mr. Apenzeller had

2  passed away already, right?

3  A.   That is correct.

4  Q.   But you chose to include him on this press release, right?

5  A.   Because he was the director of global communications before

6  he passed away, and that was sort of a tribute towards him.  And

7  I wanted to see how Mr. Dini would run around with that one.

8  Q.   So you included it because he was actually part of

9  AimJunkies?

10  A.   That is correct.

11  Q.   Let's see what you said at your deposition.  This is,

12  again, October 31st, 2022, page 106, 5 through 22.

13                    (Video is played.)

14  Q.   (By Mr. Marcelo)  Mr. Schaefer, after this alleged sale of

15  the website, Phoenix Digital continued to provide services for

16  aimjunkies.com?

17  A.   I provided services for Blome Entertainment.

18  Q.   You provided a number of services, right?

19  A.   Yes.  Transitioning a website of that scope doesn't happen

20  in five minutes.  Just like -- the plaintiffs figured that out

21  when it transitioned over from Activision to their taking over

22  the company.  This takes a period of time getting processes in

23  place for everything to work smoothly and the customers to have

24  a smooth transition.

25  Q.   And you'd agree that after the sale, the services Phoenix

1   Digital was still providing, Mr. Banek, the alleged --

2   A.   Yes.

3   Q.   -- purchaser, all he had to do was show up, and he'd get

4   paid?

5   A.   No, that was not the case.  It was a slow roll of bringing

6   his people in and getting them into place.

7        And here we go again.

8   Q.   Mr. Schaefer, I'm just asking if you would describe it as

9   Mr. Banek, all he'd have to do is show up.

10  A.   There was probably a month or two during that time where,

11  yeah, that did happen.  But, eventually, the migration started

12  taking place.  He didn't have people in place to handle it.  He

13  had enough staff to handle his website.  He didn't have enough

14  staff to handle three websites -- you know, an additional three

15  websites.  That takes some infrastructure.

16  Q.   Speaking of Mr. Banek, do you know if Mr. Banek works with

17  anyone to develop cheats?

18  A.   I have no idea.  We've never had that conversation.  I

19  don't have those conversations with engineers.

20  Q.   You don't know if he has a team that helps him develop

21  cheats?

22  A.   I highly doubt it.  None of these people do.

23  Q.   But you don't know one way or the other?

24          THE COURT:  He's already answered your question.

25          MR. MARCELO:  Thank you, Your Honor.

1          THE COURT:  Let's move on.  How much more are you

2    going to have with the witness?

3          MR. MARCELO:  I'm very close to being finished.

4    Q.   (By Mr. Marcelo)  When it comes to Mr. Banek, you're the

5    only one at Phoenix Digital who communicated with him?

6    A.   That is correct.

7    Q.   You're the only one that would pay him?

8    A.   That is correct.

9    Q.   And after you paid Mr. Banek, you would shred documents

10   regarding payments to Mr. Banek?

11   A.   If that's what you say I said, then that's what I said.

12   Q.   And you continued to do that throughout this litigation?

13   A.   What do you mean "throughout this litigation"?

14   Q.   You would shred Bitcoin information regarding Mr. Banek,

15   right?

16   A.   There never was any Bitcoin information regarding

17   Mr. Banek, other than -- I don't remember us ever sending money

18   to Mr. Banek.  I mean -- never mind.

19        I'm thinking -- I'm thinking sales.  Mr. Banek did two

20   things for us.  He sold product and he created product.  Okay?

21   So what I was just thinking about a minute ago is, when it comes

22   to sales of the product, did we ever send him money?  No.

23        The product that he made -- because on his side of

24   callofduty.ru, he sold product.  He sold some of AimJunkies'

25   product there.  So there was a two-way go on that.

1    I didn't mean to be misleading on that.

2    Q.   Yeah, and I'm just asking, when you pay Mr. Banek for the

3    cheats he developed --

4    A.   Yes.

5    Q.   -- you shred that information?

6    A.   Yes.

7    Q.   Okay.  And you continued that practice throughout this

8    litigation?

9    A.   Well, we shut it off, like I said, I believe, in November,

10   so those payments stopped.

11   Q.   Payments to Mr. Banek stopped entirely?

12   A.   No.  Payments stopped for that cheat.

13   Q.   And what I'm asking is, you shredded the financial

14   information, the payments to Mr. Banek, whether or not they're

15   about the cheat or not, up and through this litigation?

16   A.   We provided them to you.

17        MR. MARCELO:  Mr. Blackburn, if you could pull up

18   deposition transcript March 20th, 2023, page 124, line 16

19   through 25.  Just play that clip.  Actually, I'll just read it.

20   It will be quicker.

21   Q.   (By Mr. Marcelo)  "QUESTION:  Mr. Schaefer, you understand

22   that you're still under oath?

23        "ANSWER:  Yes.

24        "Let's talk about the Bitcoin payments to Mr. Banek.

25   Previously you testified, in October, that after you would make

1    payments to Mr. Banek, you would shred his Bitcoin wallet ID,

2    right?

3         ANSWER:  Yes.

4         "Have you continued that practice since that time?

5         "Yes."

6    A.    That is correct.

7         Now, are you gonna --

8              THE COURT:  There's no question.

9              THE WITNESS:  Sorry.

10   Q.    (By Mr. Marcelo)  Last Exhibit, Exhibit 49 is a stipulated

11   exhibit.  Exhibit 49 is an email from you to Bungie's CEO, sent

12   August 26th, 2021.

13   A.    This was a settlement communication.

14             THE COURT:  Let's take it down from the jury.  It's

15   not admitted at this point?

16             THE CLERK:  Your Honor, it is stipulated.

17             THE WITNESS:  It was a settlement communication.

18             THE COURT:  What's the number?

19             THE CLERK:  No. 49.

20             THE COURT:  All right.  Just a moment.

21        Why don't you take it step by step and identify the

22   document.

23             MR. MARCELO:  Certainly.  And, Your Honor, do you mean

24   as in lay foundation for the document?

25             THE COURT:  Yes.

1          MR. MARCELO:  Okay.

2     Q.   (By Mr. Marcelo)  Mr. Schaefer, this is an email you wrote

3     to Bungie's CEO, August 26, 2021; is that right?

4     A.   Yes.

5     Q.   And if we scroll to the bottom of this email, that's your

6     name, "David Schaefer"?

7     A.   Yes, and my phone number.

8     Q.   You sent this email a month or so after litigation had

9     began?

10    A.   Yes.

11         THE COURT:  It's a stipulated exhibit, so you can

12    inquire about it.

13         MR. MARCELO:  Yes, Your Honor.

14         Please publish this to the jury.

15    Q.   (By Mr. Marcelo)  Let's go to the first paragraph.

16         You write, "My name is David Schaefer.  I'm being

17    litigated, along with my partners as a group, by Will Rava at

18    Perkins Coie.  I understand Mr. Rava is a fine, young man and

19    very motivated to do right for his clients, 'yourself.'

20    what Mr. Rava doesn't understand is there is repercussions to

21    what he is doing."

22         Did I read that right?

23         THE COURT:  It says what it says, counsel.  You don't

24    have to ask him what it says.

25         MR. MARCELO:  Thank you, Your Honor.

1  A.    I stand by everything that this says.

2         THE COURT:  There's no question in front of you.

3  Q.    (By Mr. Marcelo)  Mr. Schaefer, you're suggesting there is

4  repercussions for what Mr. Rava is doing?

5  A.    That is correct.  There's repercussions for what we're

6  doing right now.

7  Q.    In the next paragraph, you state, "Last month, we were

8  served a lawsuit, and at that point, provided documentation to

9  him.  We stopped selling the cheat and financials for it."

10        Now, "the financials for it," that's referring to the

11  $27,000 --

12  A.    That's the only thing we had access to at that time.  We

13  gave them everything that we had access to.

14  Q.    Let me finish my question.  That way it's a cleaner record.

15  A.    Thank you.

16  Q.    By "financial documents," what you're discussing there is

17  the $27,000 that was in the declaration we discussed earlier.

18  A.    That is correct.

19  Q.    The next paragraph says, "It is one thing to ask us to

20  remove your product."

21  A.    Now, it doesn't -- excuse me.  You're right.

22  Q.    Mr. Schaefer, "your product" there is referring to the

23  Destiny 2 cheat?

24  A.    Yes.

25  Q.    The next sentence says, "What he does not comprehend is

 1  that we were making game cheats when he was in high school.  We

 2  are not new to this.  We will be producing cheating long after

 3  he's gone."

 4      You're just saying you were making cheats a long time ago?

 5  A.   Quite a while.

 6  Q.   And the plan is continue to make cheats.

 7  A.   That hasn't been determined.  At this point right now,

 8  we're not making anything.

 9  Q.   Second-to-the-last paragraph, and I apologize for the

10  language -- wording here.  It says, "We can bend over and take

11  it from him, if need be, but in doing so, it motivates us."

12      And then you continue:  "In the old days, sites would put

13  the source code on public forums for every 14-year-old to get

14  and make a hack for your game.  Most of the time when they do

15  it, they make it a free, public cheat accessible to everyone.

16  Imagine players having access to cheaters for free.  I don't

17  think anyone wants to go back to those days.  The net-net would

18  be you would have more cheaters in your game than before the

19  crusader came in.  Is that what you're looking for in your

20  game?"

21      That paragraph, that's a threat to release the cheat

22  publicly?

23  A.   Not at all.  That is a fact -- that is a stand-up fact.

24  That is exactly what has happened in the old days, and that is

25  what these people do.

1    I'm not a cheat maker so I don't have any control of that.

2    I've never had access to any cheats.  But I can tell you this:

3    This is exactly what has gone on in this community.  And if

4    Mister -- your expert, if he has any experience in it, he can

5    validate that -- that's exactly what's going on -- because his

6    people go to those sites where they put those cheats on for

7    free.

8        This is -- this is not a veiled threat.  This is simply

9    stating fact of what's going on.

10        Nobody wants to go back to those days.  We took the cheat

11   business and turned it legitimate.  We did everything to make it

12   so that this day would never happen in court.  We visited many

13   times -- about what we were doing, that it was ethical, and that

14   it was legal, and every time, when we visited every court case

15   that came along the way, we were in the right, and we're in the

16   right on this one here.

17        We have not copied anything that you guys have, not a

18   single thing, and you have yet to prove it, we have copied

19   anything.

20            THE COURT:  All right.  I think you've answered the

21   question --

22            THE WITNESS:  Thank you.

23            THE COURT:  -- and a little more, but I'll let the

24   answer stand.

25        Do you have any further questions?

1          MR. MARCELO:  Nothing further, Your Honor.

2          THE COURT:  We're going to take our afternoon recess

3    at this time.

4          MR. MANN:  Your Honor, I just have a very short cross,

5    and I'd like to follow -- Mr. Schaefer is part of our

6    case-in-chief later, so I'd --

7          THE COURT:  You want to cross him now, do you?

8          MR. MANN:  I'd like to cross him now, no more than

9    five or ten minutes.

10         THE COURT:  All right.  Let's hear it.

11                        CROSS-EXAMINATION

12   BY MR. MANN:

13   Q.   Now, Mr. Schaefer, we've heard a lot of testimony during

14   your examination, they accused you of spoliation, correct?

15   A.   That's correct.

16   Q.   And how many times have you been deposed in this case?

17   A.   Three or four times.  I don't remember how many anymore.

18   Q.   They've taken three or four depositions of you.  Do you

19   remember how many hours of deposition you've been subjected to?

20   A.   Probably 25 to 30 hours.

21   Q.   All right.  Do you believe they asked the same questions

22   over and over again?

23   A.   Countless.

24   Q.   Okay.  Now, did they ask you questions about spoliation?

25   A.   Yes.

1    Q.    Did they accuse you of spoliating evidence?

2    A.    Yes.

3    Q.    Did they ever ask you the question why you did what you

4    did?

5    A.    Never.

6    Q.    And today is the first day we're hearing why you did what

7    you did?

8    A.    Yes.

9    Q.    Now, at the very beginning of your examination, there was a

10   little bit of excitement.  We saw a little bit of a video.  I

11   don't want to get into the details of that.  But I believe you

12   said you wanted to explain, explain the context.

13   A.    I can explain it very easy.

14   Q.    Why did you react the way you did?

15   A.    I reacted the way I did because, above that line of

16   testimony, Mr. Marcelo, in his friendly voice, asked me if I was

17   having sex with my landlord.

18          MR. MARCELO:  Objection; misstates the evidence.

19          THE WITNESS:  It's in the record.

20          THE COURT:  There's nothing that you're supposed to

21   say or do at this time, counsel.

22          MR. MARCELO:  Understood.  Thank you.

23          MR. MANN:  No further questions, Your Honor.  I'll

24   save the rest for our case-in-chief.

25          THE COURT:  All right.  Fine.

1      Do you have any other redirect?  Limited solely to the

2  cross.

3           MR. MARCELO:  Very briefly, just one part.

4                (Pause in the proceedings.)

5           THE COURT:  Counsel, do you have redirect or not?

6           MR. MARCELO:  Yes, Your Honor.  I'm looking for the

7  cite for the first clip that was played.  I'm not replaying the

8  clip, but I do want to respond to what was said about the clip.

9  I'm just trying to find the actual cite.  It may be in the

10 record as well.

11          THE COURT:  Well, he'll be on the stand again.  You

12 can find it later.

13          MR. MARCELO:  Understood.  Thank you, Your Honor.

14          THE COURT:  All right.

15     So as I understand it, the plaintiff has no further

16 witnesses, and you're going to rest at this point; is that

17 right, Mr. Rava?

18          MR. RAVA:  That's correct, Your Honor.

19          THE COURT:  All right.  You have to say those magic

20 words for us.

21          MR. RAVA:  Plaintiff rests its case, Your Honor.

22          THE COURT:  Thank you.  Lawyers always have a tough

23 time saying that.

24     Ladies and gentlemen, what that means is that the

25 plaintiffs have put on their case, and it will be, after the

1   break, the defendants' opportunity to present their case and

2   call their witnesses.  It also means we're making good progress

3   with respect to the timing of the case, and I'll have more

4   information for you, hopefully, later today, or tomorrow, for

5   sure.

6        Anyway, we're going to take a 15-minute recess.

7        We will be adjourning at four o'clock today.  I have

8   another commitment, and so for sure you're going to be out of

9   here by 4:00.

10            (Court in recess 2:27 p.m. to 2:44 p.m.)

11            THE COURT:  All right.  Counsel, you may call your

12  first witness.

13            MR. MANN:  Thank you, Your Honor.  The defendants call

14  David Schaefer.

15            THE COURT:  Mr. Schaefer, you're reminded you're still

16  under oath, sir.

17            THE WITNESS:  Yes, sir.

18                      DAVID SCHAEFER,
           having been previously sworn, testified as follows:
19

20                    DIRECT EXAMINATION

21  BY MR. MANN:

22  Q.   Mr. Schaefer, fortunately, as a result of a lot of

23  testimony you already gave, this will make my examination a

24  little shorter than I had originally planned, but I want to have

25  you flesh out a few things.

1          In your testimony, you said that you wanted to find -- or

2     you brought Phoenix Digital into existence to make cheat-selling

3     legitimate.  Can you tell us what you meant by that?

4     A.    In the decades before, all the sites were kind of shady,

5     they weren't reputable.  You couldn't be sure that you weren't

6     going to get some virus, you know, in the software that you got

7     from them.  There were all kinds of things going on in the

8     business.

9          And Mr. Conway and Mr. Green wanted to create a site --

10    along with me, wanted to create a site where we got it right, we

11    got it where people wanted it to be.

12         And when we started the site, we were making about -- they

13    were making about $80 a month, and they asked me to come over

14    and help them build this site.

15         Well, that was the foundation for what we did, was to

16    create a website where people could go to, where they were

17    treated fairly, where the product they got wasn't corrupt,

18    where -- you know, a place that you would want to come back to,

19    instead of these other competitors that we had going on.  And so

20    that's why we created the business.

21         And we went from, like I said, probably $80 a month to, at

22    our peak, we were probably doing around $100,000 a month.  And

23    once the lawsuit was put into place, that killed it.

24    Q.    Okay.  I'll get into that, but prior to that time, what is

25    your basic business model?  How do you bring cheats to the

1    public?

2    A.    What happens is, the gaming companies announce that they're

3    going to do game releases.  So then we have a number of

4    engineers that produce product, and we leave the door open to

5    whatever product -- whatever games that are coming out, for them

6    to make a product.

7        Then if multiple people have made a product, then we look

8    at what's the best product that's being offered by those

9    engineers, and choose that one to sell on our site.

10        If there's no product being offered, then, you know,

11    evidently, we don't offer any.  But if there's only one engineer

12    that's offering that product, then we're forced to put that

13    product up, as long as it's not a bad product.  And we have had

14    products in the past where we put it up and then saw it was no

15    good and took it back down, because it kills business.

16    Q.    Now, you mentioned the bad product.  What would be defined

17    as a "bad product"?

18    A.    Well, exactly what Mr. Kaiser was describing to you folks.

19    He is 100 percent correct that there are engineers out there

20    that do it exactly the way he says he does it.

21        But about 2000-, 2005, there was a shift away from that.

22    He is a little behind the curve on exactly how cheats are made

23    because that's not his expertise, so I don't blame him for that.

24    We made a commitment that we are never going to do product that

25    is built in the way that he described it to be done.

1    Q.    And why is that?

2    A.    Because there have been a number of lawsuits that have been

3    out there, and we have -- every time there's one of those

4    lawsuits out there, we look at the foundation of those results

5    and what it was, what they are, and make a decision, if we're in

6    conflict with what the decisions were in them.  Because we have

7    never wanted to be in the place where we're right now.  We were

8    forced to be put into this place.

9    Q.    And just to be clear, sir, is this the first time you've

10   been sued?

11   A.    Yes, this is the first time I've been sued.

12   Q.    So these lawsuits you're referring to were not lawsuits

13   you've been in, they are lawsuits that others have been in?

14   A.    Yes, others have been in.

15   Q.    So it's sort of a wise man learns from the mistakes of

16   others?

17   A.    Yeah.

18   Q.    Now, you understand that you're selling cheat software.

19   Does that subject you to a lot of scrutiny, just the nature of

20   the business you're in?

21   A.    Absolutely.

22   Q.    Do you take steps to ensure that you stay on the right side

23   of the line?

24   A.    Absolutely.

25   Q.    Could you describe for the jury some of those steps that

1    you take?

2    A.    We never allow, like I had said earlier, any of the

3    software, like he describes, because that would completely open

4    us up to lawsuit.

5          Second of all, we never allow anybody to put anything out

6    that might have something -- it's called "caving."  What will

7    happen is, you'll have a program, and then you'll go to use the

8    program, and then there's something hidden in there that you

9    don't know about that will corrupt your computer or cause

10   problems to other people.

11         I mean, we've actually seen where software like this will

12   automatically start taking over other machines.  And so if you

13   want to keep your business up and running and have a good

14   reputation, this is what you have to do.

15   Q.    Now, over course of the years, have very many people

16   complained about you selling cheat software?

17   A.    You mean developers, or individuals?

18   Q.    Well, let me put this a little bit quantitative.

19         Over the course of the history of Phoenix Digital, do you

20   have an idea of how many cheats you've sold or made available?

21   A.    Over 100.

22   Q.    Okay.  So for 100 different games?

23   A.    Yes.

24   Q.    Okay.  Of those games, how many of those developers

25   contacted you and said, We don't like this?

1    A.    I think we had one or two small studios that came to us and

2    said, Hey, we think you're violating DMCA.

3    Q.    And what action did you take?

4    A.    Took it down immediately, just like we did with their

5    product.  That's been our policy from day one.  We don't want to

6    get into this, and here we are.

7    Q.    And the overwhelming majority of the other cheat

8    manufacturers haven't complained?

9    A.    Never.  I mean, the biggest studios out there have never

10   peep.

11   Q.    Okay.  I want to -- we heard some discussion about a cease

12   and desist letter that was dated November 4 -- let me back up a

13   little bit, just to get our dates right.

14        I believe Bungie said that the Phoenix Digital cheat was

15   introduced around December of 2019; does that sound right?

16   A.    I'm bad about dates.  If you're saying that's what they

17   said, then that's what they said.

18   Q.    There's no reason to dispute that, is there?

19   A.    No.

20   Q.    Okay.  Now, approximately a year later, a letter dated

21   November 4, 2020, was sent to -- purportedly sent to Mr. Conway,

22   Mr. Green, and you.  Do you remember we've seen testimony about

23   that?  You've seen the letter --

24   A.    The cease and desist.

25   Q.    The ceases and desist letter.

1    Now, regardless of whether you received the letter directly

2    or whether it came from Mr. Conway, the fact is you did see that

3    letter?

4    A.    That is correct.

5    Q.    And what action did you take when you got that letter?

6    A.    We first verified that the takedown notice was legitimate.

7    Because we have been served very legitimate-looking takedown

8    notices from our competitors, because if we take down, they get

9    more sales.

10    So the first thing we had to do was go verify that it was a

11    legitimate takedown notice, and after we established that fact,

12    then we took the cheat down.

13    Q.    And, roughly, how long did that take?

14    A.    Well, we took the cheat down, probably, within a week.  The

15    problem that we had was we probably had a half dozen or so

16    lagging sales, and that's a result of recurring subscriptions,

17    ones that would automatically renew, and until we found who

18    those recurring were and got them out of the loop, which was the

19    next month later, then that was done.

20    Q.    Okay.  Now, I wanted to get into some of these alleged

21    spoliation issues.

22    You received the cease and desist letter sometime in

23    November 2020.  You don't deny that, correct?

24    A.    That is correct.

25    Q.    Okay.  Prior to that time, had anyone told you to preserve

1    evidence or preserve records?

2    A.    No.

3    Q.    Okay.  Now, what document-retention policy did the company

4    have in place at the time that letter was received?

5    A.    The policy that we have in place for document retention is

6    one that we've had for a number of years.

7          As you folks know -- and I'm sure you've experienced,

8    whether it's credit cards or your personal information or

9    whatever -- there are websites that get hacked, and that

10   information gets dumped.  We are very aware of that, and it's

11   happened to us twice.

12         So what we decided, as a group, to do is, we created what's

13   called a "cron."  And what a cron is, is, like, every Tuesday on

14   the calendar this is going to happen.

15         So what we did was created this cron, and the cron

16   automatically deletes the customary information and the other

17   information that's on regarding those products so that somebody

18   can't dump that and either use it against us or use it against

19   any of our customers.  That's a safeguard that we put in place

20   for them as a result of our database being dumped.

21   Q.    Okay.  Mr. Schaefer, I'm sure you've the experience of you

22   go to a website and you want to pay with a credit card, and they

23   tell you, We're not going to save this information.

24   A.    Right.

25   Q.    And that's for the protection of the person making the

1   payment, correct?

2   A.   Right.

3   Q.   Is that why you were doing -- well --

4   A.   We couldn't save the credit card information.  We didn't

5   process the payments.  We would send the customer to the

6   PayPals, to the Stripes, to the Payssions, and they would

7   process the transactions, and then they'd, in turn,

8   electronically send us back a notification that the payment has

9   been processed.

10  Q.   So at the time you received the letter, the November 4,

11  2020, cease and desist letter, had most of the information

12  regarding the sales and distribution of the cheat software that

13  is at issue here, had that already been deleted?

14  A.   Yes.

15  Q.   So what we're really talking about here is a period between

16  your receipt of the letter sometime in November of 2020 and when

17  the last of the *Destiny 2* cheats were actually distributed,

18  correct?

19  A.   For the most part, yes.

20  Q.   All right.  And you admit that that information you did not

21  take immediate steps to preserve, correct?

22  A.   Didn't even think about it.  My thinking was all the

23  processors that handle these transactions, we can go there and

24  get that information; why do I need to keep it, and why do I

25  need to put my customers at risk for it?

1    Q.    Okay.  Now, after you received the cease and desist letter

2    and you took product down, did you ever hear anything from

3    Bungie?  Let's -- prior to June, did you ever hear anything from

4    Bungie?

5    A.    Dead quiet.

6    Q.    Did they ever say, Are you going to respond to our letter?

7    A.    No.

8    Q.    Did they ever say, Are you preserving information?

9    A.    No.

10   Q.    What was the next thing that happened in this respect?

11   A.    About a 70-page lawsuit.

12   Q.    And when was that?

13   A.    The date?

14   Q.    Well, roughly, was that June of 2021?

15   A.    I'm bad about dates.

16   Q.    But it is -- whatever it is, it's written down?

17   A.    Whatever the filing date was by Perkins.

18   Q.    I'll represent to you it was about six months later.

19   A.    Okay.

20   Q.    Okay?

21        Now, after you got sued -- and I don't want you to reveal

22   any discussions you may have had with lawyers, whether it was me

23   or anyone else -- but did you consult with lawyers after you got

24   sued?

25   A.    Yes.

1   Q.   And did those lawyers advise you to preserve documents?

2   A.   Yes.

3   Q.   From that day forward, did you preserve documents?

4   A.   Yes.

5   Q.   And have you turned over all the documents that have been

6   requested that you have custody and control over?

7   A.   All the documents that we had in custody and control have

8   been handed over to them.

9   Q.   And you have submitted to three depositions yourself?

10  A.   Yes.

11  Q.   And your colleagues, Mr. Green and Mr. Conway, were deposed

12  as well?

13  A.   Yeah, I believe they were each deposed once or twice.

14  Q.   Sure.  And Mr. May, who is not Mr. May -- well, let me ask

15  you, has Mr. May ever been a part of Phoenix Digital?

16  A.   Never.

17  Q.   Has he ever been an employee of Phoenix Digital?

18  A.   Never.

19  Q.   And he's been deposed as well, has he?

20  A.   Yeah, a number of times.

21  Q.   Would you say Phoenix Digital [sic] has pretty much put you

22  through the ringer as far as discovery?

23  A.   No, we're done.  We're done.  There's no revenue being

24  generated.

25  Q.   And they left no stone unturned, correct?

1  A.   They've been pretty good about that.

2  Q.   Thank you.

3       Now, we've heard some testimony from Dr. Kaiser, that one

4  way of creating a cheat is to copy source code, or copy some

5  sort of code; is that correct?

6  A.   Yes.

7  Q.   Any reason to dispute that?

8  A.   No, I don't have any reason to dispute that.

9  Q.   Okay.  Do you have a policy as to whether you'll work with

10 a developer who actually does that?

11 A.   We never will.

12 Q.   Why's that?

13 A.   Because it leaves it open to legal -- just what we have

14 going on right now.

15 Q.   So is one of the things that you are concerned about when

16 you decide to offer a cheat is whether the cheat has been

17 developed in a way that will not cause legal trouble?

18 A.   That is correct.

19 Q.   In other words, you want cheats that have been developed

20 legally?

21 A.   That is correct.

22 Q.   Now, at one point, Bungie, I believe, demanded that you

23 provide the Bitcoin wallet information for Andreas Banek,

24 correct?

25 A.   That is correct.

1    Q.    Okay.  Initially, did you provide that information?

2    A.    No.  I didn't have it.

3    Q.    Okay.  Did they persist in asking you for it?

4    A.    Yes, they did.

5    Q.    Were you able to give it to them?

6    A.    Yeah.  I reached out to Mr. Banek and said, Hey, we've

7    received this order from the court to give them documents.

8          He provided us with Bitcoin wallets that he was subject to,

9    and we passed that over to the plaintiff.

10   Q.    Was any of that information available on the website?

11   A.    Yes.  They could've -- they could've -- as you saw in that

12   response letter that we gave to a cease and desist, we listed

13   callofdutyhacks.ru, and we knew that Banek was with

14   callofdutyhacks.ru because the exhibits that they gave us show

15   that they'd been to his website.  And on his website, on his

16   purchase page, is the very same Bitcoin account that we used to

17   do transactions with him.  They could have gone right there, and

18   they had been there and chose not to get it, and, instead,

19   accused us of spoliation.

20   Q.    So they were asking for information that was freely

21   available on a public website?

22   A.    That is correct.

23          MR. MARCELO:  Objection; lack of foundation; lack of

24   personal knowledge as to how Mr. Schaefer knows where Bungie had

25   been and what it knew.

1          MR. MANN:  Let me rephrase.

2          THE COURT:  Just a moment.

3      You'll have a chance to cross-examine the witness.  I'll

4  deny what I understand to be your motion to strike.

5          MR. MARCELO:  Thank you, Your Honor.

6          MR. MANN:  Thank you.

7  Q.   (By Mr. Mann)  Now, again, Mr. Schaefer, they did ask you

8  for that Bitcoin address?

9  A.   Yes.

10 Q.   And it was available on the website?

11 A.   Yes.

12 Q.   Now let's get into some of the accusations, the turning --

13 really, what is the issue before us, copyright infringement.

14      Did Phoenix Digital ever have the source code for the cheat

15 at issue in this case?

16 A.   We've never had the source code for any cheat ever.

17 Q.   And why is that?

18 A.   Because that's not what's used to run the game.

19 Q.   Well, let me rephrase it a different way.

20      Can you explain to the jury -- let's say I want to get a

21 cheat for a game.  I want to use *Destiny 1* -- 1, 2, 3, whatever.

22 I want to get a cheat for that.  I'm sitting at my computer.  I

23 go to the AimJunkies' website.  Can you walk me through what I

24 would do in order to interact with your website and get access

25 to the cheat that I want?

1    A.    The first thing that you would have to do to get access to

2    purchase cheats is you would have to become a member of the

3    website.

4    Q.    And what do you do to do that?

5    A.    You register on the website, and there is an automated

6    feature that approves your registration, as long as you haven't

7    been banned for, you know, anything that is out of our realm of

8    accepted behavior, and then you're accepted to go ahead and go

9    into the website.  You become a member of the site.

10   Q.    Do I have to pay any money at this point?

11   A.    No.

12   Q.    Okay.  Then what happens next?

13   A.    Then once you go into the website, then you would look at

14   the cheats that are offered on a web page, and you can click on

15   that one there.  And as they showed you guys, the features page,

16   you can look at the features and make a decision on what you

17   wanted to purchase.

18   Q.    And this all appears on the AimJunkies' website, what the

19   features are?

20   A.    That is correct.

21   Q.    In fact, I think we've seen some screenshots of that

22   earlier.

23   A.    Yes.

24   Q.    Okay.  So then I decide here's the cheat I want.  How do I

25   go about getting that cheat?

1    A.    Okay.  So what happens in the process is, they click "buy."

2    A page comes up, which is whatever vendor it is that they choose

3    to purchase from, whether it's PayPal or Payssion or Stripe, all

4    of those vendors that were listed.  In fact, the PayPal wasn't

5    even listed on them anymore because it had been taken down.

6         But they click on the "buy."  It takes them -- well, we'll

7    use PayPal.  They click on "buy," it takes them to PayPal.

8    PayPal lists the subscription and what the purchase price is.

9    They pay PayPal directly.  Once the transaction is confirmed,

10   then we receive an electronic notification, which goes to the

11   loader that says load that subscription for them.

12   Q.    This is a loader that you got from a third party;

13   Whitewater, I believe it was.

14   A.    That is correct.

15   Q.    Then once they get access to the loader, what happens?

16   A.    Then the player has access to use the cheat any time that

17   they want to use it during the dates that the subscription is

18   effective.

19   Q.    And let's just put some numbers on this.  What does a

20   subscription typically cost?

21   A.    If I remember right, the *Destiny 2* direct was $34.95.

22   Q.    Okay.  So if I pay $34.95, I can use the *Destiny 2* cheat

23   for one month, is it?

24   A.    Thirty days.

25   Q.    Thirty days.

1      So now let's say I paid my money, I got my subscription to

2  the *Destiny 2* cheat, what do I need to do, if you know?  I know

3  you said you're not on the technical side of this, but if you

4  know, you know; if you don't know, that's fine, too.

5      What does a user do in order to fire up the cheat?

6  A.   To be honest with you, I don't know, because a lot of those

7  games have different things that you have to do to set the cheat

8  up to go with the game, and I haven't gamed, like I said, in,

9  probably, a dozen years, let alone opened the cheats to see

10  what's going on.  I'm more of an administrator there, because

11  the years of me playing have come and gone.  So I can't talk to

12  exactly what they had to do.

13  Q.   I guess what I'm getting at is, the business model is --

14  somebody doesn't come to Phoenix Digital and say, Hey, let me

15  have a Phoenix Digital cheat, and you say, Oh, yeah, hold on a

16  second, I've got one right here on the shelf, and you take it

17  down and hand it to them.

18  A.   No, we inventory nothing.

19  Q.   So the cheat is actually supplied by someone else, correct?

20  A.   That is correct.

21  Q.   And who do you believe the cheat supplier is?

22  A.   For the *Destiny 2*?

23  Q.   I'm sorry.  Let's confine this to the subject matter of the

24  case.

25      Let me rephrase the question.

1       To the best of your knowledge, who actually supplies the

2   *Destiny 2* cheat to the ultimate user?

3   A.    That was easy.  That was Banek.

4   Q.    Banek.

5       So when somebody makes a request for the *Destiny 2* cheat,

6   in essence, a request is made to Banek, and he says -- or, more

7   likely, his computer equipment will then say, okay, send the

8   *Destiny 2* cheat to this particular computer?

9               MR. MARCELO:  Objection, Your Honor; leading.

10              THE COURT:  Don't lead the witness.

11              MR. MANN:  Certainly, Your Honor.

12              THE COURT:  And slow down a little bit.

13  Q.    (By Mr. Mann)  What's your understanding as to how -- if

14  you know, your understanding -- how the cheat software gets from

15  Mr. Banek to the ultimate user?

16  A.    Okay.  There's -- we have -- this Whitewater loader that we

17  were using, one of the reasons why we chose it is, one of the

18  features are, the coders have an option of loading their DLLs up

19  into the loader, which was on Whitewater's website.  I don't

20  think we even got into Whitewater.  Whitewater is the guy who

21  designed and engineered the loader.

22      We leased the loader from Whitewater to -- you know, to use

23  that for our loader.  And one of the features on that loader

24  gave the engineers an option to where either they can load the

25  DLL to that loader, or they can have the DLL stored somewhere

1  else.  That's the program that we've been talking about.  Excuse

2  me.

3       So how this works is, just like when you make a purchase

4  and you hit "buy" and it goes to PayPal and the transaction

5  happens at PayPal, and then the communication comes back.  It's

6  the same thing with the loader, except for a little different.

7       The customer hits "load," so then the communication goes to

8  the loader.

9       If the engineer has decided that they want to host their

10 cheat locally, you know, on their own computer or on some other

11 computer that they control, they have that option.  We had a

12 toggle on there where we could toggle.  So if it was hosted on

13 the loader, then it just automatically took it off the loader

14 and sent it to the customer.

15      And the engineers decided that he didn't -- and sometimes

16 they just don't trust them being stored there for being hacked,

17 they store it locally, then the loader makes a call to their

18 website -- or to their server, wherever that is at, and then the

19 cheat is passed over to the loader, and then from the loader to

20 the customer.

21      There's a little bit of lag involved in that, but it gives

22 the engineers a little more peace of mind that we don't have

23 their DLL.

24 Q.   And it's never in the possession of Phoenix Digital,

25 correct?

1  A.    Never.  We've never had a cheat that's been in our

2  possession, ever.

3  Q.    Okay.  Do you recall in the -- I believe it might have been

4  yesterday, Phoenix Digital was accused of refusing to provide a

5  copy of the cheat software.  Do you recall that testimony?

6  A.    Yes, I do.

7  Q.    Okay.  Did you refuse to provide a copy of the cheat

8  software?

9  A.    I can't provide a copy of the cheat software if I don't

10  have it, and I never had it.  I've never had a copy of any of

11  the cheats that we've ever sold.

12  Q.    And, in fact, you took down the *Destiny 2* cheat software

13  from the AimJunkies site in very early 2021, correct?

14  A.    Okay.  We're back to dates.

15  Q.    Shortly after you received the cease and desist letter.

16  A.    Yes.

17  Q.    Thank you.

18        Now, let's get into a little bit of the dollars associated

19  here.

20        You were here when Mr. Voth testified as to the overall

21  gross sales of the *Destiny 2* cheat software, correct?

22  A.    Yes.

23  Q.    And he testified that, as a result of his thorough

24  examination, he determined approximately $43,000 and change were

25  the gross sales of the *Destiny 2* cheat software?

1    A.    He testified that that was what he had access to.

2    Q.    Okay.  But does that number sound accurate?

3    A.    For those platforms, yes, it's 100 percent accurate.

4    Q.    Okay.  Now, what did you think your overall sales were of

5    the *Destiny 2* cheat software?  "Yours," meaning Phoenix

6    Digital's.

7    A.    I can't give you an exact number because I don't have them,

8    and like I said, I invite them to go.  Like I said before in

9    previous testimony, we couldn't go to Payssion and we couldn't

10   go to PaymentWall to get them because those accounts had been

11   closed.  They could have gone to those entities and gotten that

12   information by a subpoena, just like they chose to do with

13   PayPal, but they chose not to do.

14        But when they asked me about those accounts, I had told

15   them probably 90 -- no, I take that back -- probably 75 percent

16   of our sales was PayPal, another 20 percent of our sales was on

17   Stripe, and the other 5 percent was spread between these other

18   vendors.

19        So when we remember sitting there arguing about dollars,

20   I'm, like, I don't care if you doubled the number.  You want to

21   make it that we sold $80,000, I'm fine with that.  I mean, we

22   never wanted to argue about the money.  I mean, if 80 makes them

23   happy, that's fine, but they were accusing us of having millions

24   of dollars, when I know for a fact that any of the cheats that

25   we sell, we might get 1 or 2 or 3 percent from any of those

1  other payment processors involved, and we told them that.

2      And I truly believe -- and this is my opinion -- this is

3  why they never went after that information, because they knew

4  there wasn't any money there.

5  Q.   Now, Mr. Schaefer, let's turn to the suggestion that you

6  made millions and millions of dollars selling the *Destiny 2*

7  cheat.

8      Did you make millions and millions of dollars selling the

9  *Destiny 2* cheat?

10  A.   No.

11  Q.   Did you make $100,000 selling the *Destiny 2* cheat?

12  A.   No.

13  Q.   Is it somewhere, possibly, north of $43,000?

14  A.   Yeah, absolutely.  If I was to throw a number out, you

15  know, and stand by that number, I would say $50,000 is probably

16  a fair number.

17  Q.   So when you took down the cheat software after receiving

18  the cease and desist letter, this was not a huge moneymaker for

19  you, was it?

20  A.   To the actual -- no.  The game itself, at that time, was

21  underperforming, and so were the cheat sales.  They have a lot

22  of issues with the game, and there was a lot of complaints going

23  on in the community.  So the volume of gameplay, which we track,

24  was actually less after we stopped selling cheats.  They were --

25  actually had less players on the servers after we stopped

1    selling cheats than before.

2    Q.    Okay.  But, Mr. Schaefer, I just want it confined to -- I

3    know you want to discuss what effect the lawsuit has had on you,

4    but I just want to determine when -- when you took the *Destiny 2*

5    cheat down off the AimJunkies' website -- when Phoenix Digital

6    took it down off the AimJunkies' website in early 2021, can you

7    estimate what fraction of your overall revenue that represented?

8    A.    I don't understand the question.

9    Q.    Did this make up the bulk of the revenue for the company?

10   A.    The *Destiny 2*?

11   Q.    Yes.

12   A.    No, no.  Maybe 3 percent.  I'm guessing -- don't quote me

13   on this, but if I had to -- you know, and I looked at the

14   numbers -- maybe 5 percent of our sales.

15   Q.    So, again, it wasn't a major problem for you to cease and

16   desist, was it?

17   A.    It's fairly simple for you folks to do the math.  You saw

18   the amount of monthly sales that we had in the PayPal

19   documentation, which I'm sure they'll give you, and you'll get a

20   chance to look at it.

21        So if you take $40,000 -- or let's just take $80,000.  I'm

22   saying $50,000, but let's go with $80,000, and take it into each

23   one of those month-to-month gross sales that they provided you

24   receipts for, you're going to find it's a small percentage of

25   what's been taken in.

1   Q.    And let's talk about the expenses that the company has.

2   Let's go with $50,000, but even if it's $80,000 --

3   A.    Sure.

4   Q.    -- no big deal.

5         Do you get to keep all that money?  Do you get to keep all

6   50?

7   A.    No.

8   Q.    And I think we've already heard this, but, again, explain

9   for the jury.  $50,000 comes in, what happens to that money?

10  A.    Twenty-five goes out immediately -- all right.  Excuse me.

11        50 percent of the money that's collected, gross, goes to

12  the coder.  The coder is responsible for the taxes on that, like

13  I said, their retirement, their healthcare, all of that stuff,

14  because they're a contractor.

15        The other 50 percent of that money we take and we pay our

16  staff that maintains the site.  They're not employees, they're

17  volunteers, and some volunteer more than others.  And we have --

18  so, you know, we'll give them something -- we'll throw them

19  something to say, Hey, thanks for being there.  Because we have

20  a lot of volunteers, too.  They're great people.  They love the

21  product.  That's why they're there.

22        And then we have server costs that are involved.  We have

23  payment processing.  You know, we were -- we were paying easily,

24  between all the payment processors, $25- to $3,000 a month, just

25  in the Stripe and PayPal and all of these other -- their

1  processing fees.  I mean -- I mean, even PaymentWall --

2  PaymentWall -- hit us for over 50 percent for every transaction.

3  So that $34.95 cheat instantly became $17 cheat, and then half

4  of that $17 went to the coder, and the other half of that -- we

5  got $8 out of that, and we haven't even taken expenses out of

6  it.  That's just fees.

7  Q.    Do you have an idea of what your overall profit margin is

8  for the company?

9  A.    Right now?

10  Q.    At the time in question.  Let's say between -- in the year

11  2020.

12  A.    I don't know.  I mean, I don't remember what the gross was

13  per month.  I can pretty much -- if I know what the gross is, I

14  could pretty much figure off of that.

15  Q.    Well, I mean, you say you get 50 cents on every dollar.

16  First of all, half of it you have to spend on the coder, and

17  then you have an idea of the remaining 50 percent.  Just,

18  historically, how much of that turns into money that can be put

19  into your pocket as opposed to --

20  A.    Typically, if you looked at those payouts that they showed

21  you, there were times when we were getting $5,000 a month

22  apiece, there were times when we were getting $2,000 a month

23  apiece, there was times when we were getting $80 apiece, and now

24  we're not getting anything.

25  Q.    Has this lawsuit had an effect on Phoenix Digital?

 1  A.   Absolutely.  It killed it.

 2  Q.   Can you explain to the jury how this lawsuit killed it?

 3            MR. MARCELO:  Objection, Your Honor; relevance.

 4            THE COURT:  I don't know that it's relevant, counsel.

 5            MR. MANN:  The answer stands, I take it?

 6            MR. MARCELO:  Objection, Your Honor; move to strike.

 7            THE COURT:  The answer doesn't stand.  The jury is to

 8  disregard the last response by the witness about the effect of

 9  the loss.  It's not relevant to whether there was copyright

10  infringement.

11            MR. MANN:  Thank you, Your Honor.

12  Q.   (By Mr. Mann)  There have been a lot of accusations against

13  you in this case.  Have you knowingly lied to anyone in this

14  case?

15  A.   No.

16  Q.   Have you knowingly destroyed information that you believe

17  to be relevant in this case?

18  A.   No.

19  Q.   Do you believe that Phoenix Digital has done anything wrong

20  in this case?

21  A.   I know we haven't.  I know for a fact we have not.

22  Q.   And what's the basis for that?

23  A.   Because what Mr. Kaiser describes as what we did was being

24  done 20 years ago.  That's not how -- that's -- the technology

25  has evolved.  He's so far behind on what's going on.  He is

 1  clue- -- I mean, I know he has a Ph.D. and we need to call him

 2  "Doctor" and he's Mr. Respectful, but in my world, I wouldn't

 3  hire him.  He doesn't have a clue.

 4  Q.    Have you engaged in any copyright infringement?

 5  A.    No, we have not.

 6          MR. MANN:  I have no further questions, Your Honor.

 7          THE WITNESS:  Can I qualify that answer?

 8          MR. MANN:  Certainly.

 9  A.    We may have used a logo in our advertising.  I'm not going

10  to say we didn't.  And if that qualifies, I don't know.

11      But as far as the software, this -- I believe this lawsuit

12  is about software, and as far as software goes, absolutely not.

13          MR. MANN:  Thank you.  No further questions, Your

14  Honor.

15          THE COURT:  All right.  Cross of the witness?

16          MR. MARCELO:  Yes, Your Honor.

17                      CROSS-EXAMINATION

18  BY MR. MARCELO:

19  Q.    Mr. Schaefer, we just heard quite a bit of technical

20  information in your testimony.

21  A.    I wouldn't call it "technical information."

22          THE COURT:  There is not a question.  Just wait for

23  the question.

24          THE WITNESS:  Sorry.

25  Q.    (By Mr. Marcelo)  You're not a computer expert?

1   A.   No, I'm not a computer expert at all.

2   Q.   You don't know the difference between a driver and an

3   executable file?

4   A.   I know what a Windows .sys file is.  I'm not sure I know

5   what the other two are.

6   Q.   You don't have a technical understanding of how video games

7   operate.

8   A.   Not at all.

9   Q.   You don't know how the *Destiny 2* cheat operates.

10  A.   Not at all.

11  Q.   You don't know how the cheat loader operates.

12  A.   Not at all.

13  Q.   No one at Phoenix Digital does.

14  A.   Excuse me?

15  Q.   No one at Phoenix Digital does.

16  A.   That's because we didn't have control over it.

17  Q.   I'm just asking you, is that correct?

18  A.   That is correct.

19  Q.   And you don't have coding experience?

20  A.   Not a bit.

21  Q.   Other than HTML, which helps you make websites?

22  A.   Yeah.  That was from, probably, 20 years ago.

23  Q.   Yeah, a pretty long time ago.

24  A.   Yeah.  HTML 4.

25  Q.   You do know, however, that the cheats AimJunkies

1    distributes use DLL injectors, right?

2    A.    Some of them do, and some of them, I believe, don't.

3    Q.    In fact, all of them do, don't they?

4    A.    No, that would be you putting words in my mouth.  I never

5    said that.

6    Q.    Mr. Schaefer, let's turn to your October 28th, 2022,

7    deposition, page 130.  This will be lines 22 through 131/2.

8          "QUESTION:  Are all the cheats distributed by AimJunkies,

9    do that use DLL injectors?

10          "ANSWER:  As far as I'm aware, yes.

11          "And is that because the White [sic] loader requires the

12    cheat to have a DLL detector?

13          "Yes."

14          That was your testimony?

15    A.    That is correct.

16    Q.    Mr. Schaefer, you mentioned policies regarding the types of

17    cheats you allowed to be sold.

18    A.    Uh-huh.

19    Q.    Were those written policies?

20    A.    No.

21    Q.    No record of those policies?

22    A.    No.

23          As a group, we sit on TeamSpeak or whatever the

24    communication software is, and we actually talk about it.  We

25    don't pass memos between cubicles, because there are no memos

1    and there are no cubicles.  There's no teams, none of that.

2    It's three guys with a business.

3    Q.   Mr. Schaefer, we heard some testimony about how the cheat

4    gets to the consumer.

5         The cheat passes through a Phoenix Digital computer to get

6    to the consumers, right?

7    A.   It passes through Whitewater's server.

8         MR. MARCELO:  Mr. Blackburn, if you would pull up

9    Exhibit 63.

10        THE COURT:  Is this an admitted exhibit, counsel?

11        MR. MARCELO:  Yes.

12        THE COURT:  Tell us what it is.

13        MR. MARCELO:  This is Phoenix's responses to

14   interrogatories.  We had looked at a different interrogatory

15   previously.

16   Q.   (By Mr. Marcelo)  Now, Interrogatory No. 6 -- this is on

17   page 2, and, again, these are interrogatories you provided in

18   this case, right?

19   A.   Right.

20   Q.   Okay.  It asks you to describe all facts relating to how

21   Phoenix Digital allows the customer to access the third-party

22   developer's computer server and download the cheat software

23   directly from the third-party developer, as described in

24   paragraph 5, the declaration of David Schaefer, in opposition to

25   plaintiff's motion for preliminary injunction.

1      Do you see that?

2  A.   Yeah.  I don't know what it means, but, yes, I see that.

3  Q.   Well, let's talk about your response.

4      Supplemental response -- this is on page 3 -- you write,

5  "After further review, the answer above is slightly in error in

6  that after placing an order, the customer is directed and

7  connected with a third-party developer's computer server, which

8  then passes the product through a Phoenix Digital computer to

9  the customer's computer."

10      Did I read that right?

11 A.   Yeah, you read that right, but it's incorrect.  And

12 "Phoenix" is spelled incorrect.

13 Q.   And then, Mr. Schafer, you continued the answer:  "As of

14 May 5th, 2022, Phoenix Digital no longer owns the aimjunkies.com

15 website and has no access to information regarding the identity

16 or location of each server where the relevant products were

17 hosted."

18      Those relevant products are the cheat software.

19 A.   I don't understand what you're saying.

20 Q.   The word "relevant products," that's referring to the cheat

21 software?

22 A.   The *Destiny 2*.

23 Q.   Right, the *Destiny 2* cheat software.

24 A.   That is correct.

25 Q.   Now, Mr. Schaefer, one last item.

1          Before you got off the stand, previously --

2    A.    Uh-huh.

3    Q.    -- you had indicated that, in the line before --

4    A.    I didn't say "in the line before."

5    Q.    Mr. Schaefer, let me finish the question.

6              MR. MANN:  Your Honor, this goes beyond the scope of

7    my direct.

8              MR. MARCELO:  Your Honor, you expressly permitted to

9    ask of this question at the end of the question.

10             THE COURT:  All right.  Start your question over

11   again, slowly, so I can understand what you're asking.

12             MR. MARCELO:  I will.

13   Q.    (By Mr. Marcelo)  Mr. Schaefer, you recall a clip was

14   played in the beginning of your testimony today, the first time

15   you were testifying, right?

16   A.    Yes, correct.

17   Q.    We cut it off partway through.

18   A.    The judge cut it off.

19   Q.    And you testified that the reason you were acting that way

20   is because, in the line before, I'd asked you something about

21   your sex life.

22   A.    Can you show me where it says that in the court record?

23   Please, somebody?

24             MR. MARCELO:  Your Honor, are we able to review

25   Mr. Schaefer's answer to that question?

1          THE COURT:  Now, the question, counsel, you want me to
2    read it into the record what he had previously testified?
3          MR. MARCELO:  This would be the response to, I
4    believe, Mr. Mann's possibly second-to-the-last --
5              (The court confers with the court reporter.)
6          THE COURT:  Yes.  Okay.
7          MR. MARCELO:  It's regarding the video clip.
8          THE COURT:  Let me back up a little bit, just for the
9    record.
10       "There was a question that, essentially, said, 'Now, at the
11   very beginning of your examination, there was a little bit of
12   excitement.  We saw a little bit of a video.  I don't want to
13   get into the details of that, but I believe you said you wanted
14   to explain the context.
15       "I can explain it very easy.
16       "Why did you react the way you did?
17       "I reacted the way I did because, above that line of
18   testimony, Mr. Marcelo, in his friendly voice, asked me if I was
19   having sex with my landlord."
20         MR. MARCELO:  That is it, Your Honor.  Thank you.
21         THE COURT:  That's the answer, and this is a rough
22   draft.  It was, obviously, Mr. Marcelo, in his friendly voice,
23   asked him that.
24         MR. MARCELO:  Thank you, Your Honor.
25         THE COURT:  All right.

 1              THE WITNESS:  Can I hear that again?  Can I hear that
 2    again?
 3              THE COURT:  You don't need to hear that again.
 4         You want me to read your answer again?
 5              THE WITNESS:  Yes, please.
 6              MR. MARCELO:  No, Your Honor.
 7              THE WITNESS:  Yes, please.
 8              MR. MARCELO:  No, Your Honor.  But what I'd like to
 9    flag is, I intend to play the clip with a couple of pages before
10    it, but I just wanted to flag this because I know Your Honor had
11    concerns with playing the clip the first time around, but I
12    think it's important to show the context here.
13              THE COURT:  Well, I think you can ask questions about
14    it.  If there's nothing in the clip above, then it will probably
15    be the defendant that will have to find it.
16              MR. MARCELO:  Yes, Your Honor.
17         Mr. Blackburn, if you will play, from that deposition, I
18    believe it is page 26.  That is the October 31st, 2022,
19    deposition.  It's page 26, line 11, through 29, line 11.
20                        (Video is played.)
21              MR. MANN:  Your Honor?
22                        (Video is played.)
23              THE COURT:  All right.  I think we've heard enough.
24              MR. MARCELO:  Yes, Your Honor.  Just two quick
25    questions.

```
 1              THE COURT:  Do you have any objection?

 2              MR. MANN:  I was going to say that this is way beyond

 3    the scope of my direct examination, but, you know, we've heard

 4    it.  We can't unhear it.

 5              MR. MARCELO:  Two quick questions.

 6    Q.   (By Mr. Marcelo)  Lisa's Repair was a name that was being

 7    paid in managed draws monthly, correct?

 8              MR. MANN:  This is clearly beyond the scope of my

 9    direct.

10              THE COURT:  It's already been established.

11              MR. MARCELO:  Nothing further.

12              THE COURT:  Anything further of this witness?

13              MR. MANN:  I believe we've reviewed the salacious

14    matters, and no further questions.

15              THE COURT:  All right.  You may step down.

16         The defense may call their next witness.

17              MR. MANN:  The defendants call Jordan Green.

18              THE COURT:  You're reminded you're still under oath,

19    sir.

20              THE WITNESS:  Thank you.

21                        JORDAN GREEN,
              having been previously sworn, testified as follows:
22
                        DIRECT EXAMINATION
23    BY MR. MANN:

24    Q.   Good afternoon, Mr. Green.  And, again, as a result of the

25    examination that we heard this morning, I don't want to go over
```

1  familiar ground.  The jury has heard a lot of who you are and

2  what you do and so forth, but I do want to go a little bit

3  further and more into your background relationship with Phoenix

4  Digital.

5        When do you recall you joined Phoenix Digital?

6  A.   I would say sometime in -- this could be off, but sometime

7  around 2010, I was approached by Jeffrey Conway.  At the time,

8  he was a member of or running, like, a gaming site, a bunch of

9  people who play games together, and at the time I was running a

10 cheat site that was called Velocity Cheats.  And he was

11 interested in having me create a version of my software to,

12 essentially, supply to his buddies in his gaming clan, and that

13 intention and project ended up turning into what Phoenix Digital

14 became.

15 Q.   Now, prior to that time, had you been involved in creating

16 cheats?

17 A.   Yes.

18 Q.   Can you explain to the jury a little bit about what your

19 background is, how you got involved in the cheating community

20 and developing cheats?

21 A.   Yeah.

22       So in 2006, I was playing a game called *Battlefield 2*, and

23 I ran into someone who was doing something rather interesting.

24 Essentially, there were cars on parachutes raining from the sky,

25 and I thought that was cool.  So I asked him, What is this?  And

1  through that investigation, I ended up meeting people and

2  forming connections, and I ended up learning how to program and

3  learning how to modify video games to do what I want them to do.

4  Q.   Why did you do that?

5  A.   For a while I wanted to learn how to program, but I needed

6  something that was going to -- like, a project to create to get

7  me to the end goal, it would get me all the way, and it ended up

8  being that cheated had ended up teaching me that.

9  Q.   Now, have you been an extensive game player, video game

10  player?

11  A.   I would say I play a moderate amount of video games.

12  Q.   Would you say you're a super serious competitor?

13  A.   No.

14  Q.   Are you serious about getting to the top levels of the

15  game?

16  A.   No.

17  Q.   Okay.  Did you develop cheats on your own?

18  A.   I did.

19  Q.   What was the purpose of developing cheats if you were not a

20  serious game player?

21  A.   I was actually just interested in how the games worked.  I

22  like taking things apart and learning how they work and putting

23  them together.  And reverse engineering is kind of like a

24  puzzle.  You have to find things that you don't know about, and

25  it started out as a hobby for me.

1  Q.    And, again, you weren't creating cheats in order to make

2  yourself one of the top players of the game, correct?

3  A.    No.

4  Q.    Okay.  Can you explain to the jury a little bit, without

5  getting super technical, but how do you go about developing a

6  cheat?

7  A.    There are several ways to do it, but the way that I ended

8  up doing it was, you have to find out some information.  This

9  was gone over, in part, in other testimony.  But you need to

10  know where the player is in the world, you need to know where

11  you are in the world, you need to know where your camera is,

12  that first-person view, where it is in the world.  And when you

13  have all that information together, you can plug it into a piece

14  of math functionality called a world-to-screen function.  This

15  converts from a 3D space to the 2D screen space displayed on

16  your monitor.

17       In my experience, this math is not unique or special or --

18  or based on each game.  It's something that is very much a

19  standard algorithm.

20       So in my experience, I found a world-to-screen function

21  example on a learn-how-to-create-a-game website, and I learned

22  how it worked and wrote a version of my own.

23  Q.    Now, you mentioned you need to know where something is,

24  whether it's an opposing player, where the camera is, where your

25  weapon is.  What do you mean by "know where it is"?

1    A.    Okay.  So the way this works is in memory.  You'll have

2    code, which is the code that is running the program, and you'll

3    have data.  The data is not executable, and the data can be

4    based on the runtime, what is happening at that any given

5    moment.

6         And so if I'm in the game world of any given video game,

7    let's say I'm standing and I move to the right.  Well, there

8    will be three decimal values that will describe my 3D position

9    in the game world, and it will say I moved to the right, and it

10   will change my X value, or it increases it.

11        So I can use a utility to search for what values have

12   changed.  So I'll move; search; Okay, what changed?  And then I

13   won't move, and then I'll do a few searches; Hey, it hasn't

14   moved; and then I'll move again.  And then through this

15   repetitive action, you can find, Hey, this is where my player

16   position is in memory.

17        And then from there, you can do what are called "pointer

18   searches."  So a pointer in code is a memory address, so a piece

19   of data that just has the value of another memory address.  It's

20   just saying, Hey, we're interested in what's over here.

21        So you can search for these pointers above where you found

22   the player position, and you can construe, Hey, this is how the

23   game is storing this data.

24   Q.    I just want to be a little bit clear here and make sure

25   that the -- this takes place on your computer, correct?

1    A.    Yes.

2    Q.    Okay.  You're not going into any Bungie servers or anything

3    like that, are you?

4    A.    Absolutely not.

5    Q.    You're not breaking into Bungie's secure -- you're not

6    going past their firewalls or anything?

7          MR. RAVA:  Your Honor, I'm going to object to this.

8    He's already testified that he's never played a Bungie game, and

9    he is not an expert.  So to the extent he's offering evidence,

10   he's not a percipient witness, and to the extent he's offering

11   expert opinion, it's improper.

12         MR. MANN:  Fair enough, Your Honor.  I will withdraw

13   those questions.  I'll make them more general.

14   Q.    (By Mr. Mann)  Let's not refer to Bungie.  We do not know

15   how the Bungie cheat works.  You did not create the Bungie

16   cheat, correct?

17   A.    I did not.

18   Q.    Okay.  You created for other games, though?

19   A.    Yes.

20   Q.    When you create a cheat for another game, do you have to go

21   into the servers of whoever it is that provides that data?

22         MR. RAVA:  Object to the relevance, Your Honor.

23         THE COURT:  I don't think it's relevant.  He's not an

24   expert.  He's certainly not designated as an expert for the

25   trial.  So I think you're beyond the pale.

1          MR. MANN:  But under Rule 703, he can testify as to

2    matters within his own general knowledge.  He's not offering an

3    opinion here.  I'm simply asking him what he has done with his

4    own knowledge.  I'm not asking for an opinion.

5          MR. RAVA:  Your Honor, that's --

6          THE COURT:  Just a moment, please.

7      I'll sustain the objection.  Ask another question.

8    Q.    (By Mr. Mann)  Mr. Green, have you ever prepared a cheat

9    without copying the source code?

10          MR. RAVA:  Object to the relevance, Your Honor.

11          THE COURT:  Overruled.  You may answer that question.

12          THE WITNESS:  Can you please repeat the question?

13          MR. MANN:  Certainly.

14   Q.    (By Mr. Mann)  In the course of developing cheats, have you

15   ever created a cheat without copying the source code of the

16   game?

17   A.    Yes, I have created a cheat without copying the source code

18   of the game.

19   Q.    Have you ever created a cheat without copying the object

20   code of a game?

21   A.    Yes.

22   Q.    Have these cheats been successful?

23          MR. RAVA:  Object to the relevance of this line of

24   questioning.

25          THE COURT:  Sustained.

1        Let's move on, counsel.

2    Q.   (By Mr. Mann)  Well, let's get into the specifics here.

3    You did not create the *Destiny 2* cheat that is at issue here,

4    correct?

5    A.   That's correct.

6    Q.   Okay.  Do you have any understanding as to who did create

7    that cheat?

8    A.   My understanding is that Banek created the cheat.

9    Q.   What do you know about Mr. Banek?

10   A.   I know that he is a cheat coder and he purportedly lives

11   somewhere in Eastern Europe.

12   Q.   Have you ever actually met Mr. Banek?

13   A.   No, I have not.

14   Q.   Have you ever communicated with Mr. Banek?

15   A.   No, I have not.

16   Q.   Have you ever seen the source code for the cheat?

17   A.   Specifically the *Destiny 2* cheat?  No, I have not.

18   Q.   Have you ever seen the object code for the *Destiny 2* cheat?

19   A.   No, I have not.

20   Q.   Have you ever seen anything that leads you to believe it

21   was copied?

22        MR. MANN:  I'll withdraw that question.

23   Thank you, Mr. Green.  I have no further questions.

24        THE WITNESS:  Thank you.

25        THE COURT:  Cross of the witness?

1                      CROSS-EXAMINATION

2   BY MR. RAVA:

3   Q.    Mr. Green, I heard you testify about that you needed, in

4   order to develop a cheat, to know where you are in the game,

5   right?

6   A.    Yes.

7   Q.    And you need to know where others are in the game, right?

8   A.    Yes.

9   Q.    And in order to find that information out, you're looking

10  at the code for the game, right?

11  A.    No.

12  Q.    Where are you looking?

13  A.    I am looking at data.  It is not executable code.

14  Q.    You said earlier that when you created the cheat, you

15  wanted to -- when you first created it, you were doing it

16  because you wanted to modify the video game to do what you

17  wanted.  That's what you said, right?

18  A.    Yes.

19  Q.    You want to modify the video game that's published by

20  someone other than you, right?

21        Have you ever published a video game, Mr. Green?

22  A.    No, sir.

23  Q.    So you want to modify a game published by someone else to

24  do what you want?

25  A.    Could I answer with the example that I had in my mind when

1    I answered that question?

2    Q.    Answer my question, sir.

3    A.    I -- yes, I would modify -- the game would be -- I would

4    write a cheat that would change the way that the gameplay

5    experience worked, putting my effect on it, and then that would

6    be the experience that I would produce.

7         But this was very early on in my cheating experience.  I

8    was speaking to experiences in 2006 and 2007.

9              MR. RAVA:  No further questions, Your Honor.

10             THE COURT:  Anything further?

11             MR. MANN:  No, Your Honor, I'm done with Mr. Green.

12             THE COURT:  Thank you, sir.  You may step down.

13        I want to ask the lawyers some questions, and the jury can

14   listen in.

15        One more witness?

16             MR. MANN:  Yes.  Mr. May.

17             THE COURT:  How long will that take?

18             MR. MANN:  A half an hour, 45 minutes.

19        With Your Honor's permission, I would suggest, if we want

20   to break now, we can finish up very early tomorrow.  I think

21   we'll rest our case, depending on cross-examination, before

22   10:00.

23             THE COURT:  Does the plaintiff anticipate having any

24   rebuttal case to present at this point?

25             MR. RAVA:  I think it's likely that we will have a

 1    short rebuttal.  It will probably be -- it will certainly be

 2    less than an hour.  It can be less than a half an hour.

 3              THE COURT:  So what I'm hearing is that -- and I know

 4    lawyers sometimes ask more questions than they think they're

 5    going to ask, and one thing leads to another.

 6         But we're really talking about an hour or two of testimony,

 7    maximum tomorrow; is that right?

 8              MR. RAVA:  From our perspective.

 9              THE COURT:  Here's what I'm going to propose:  We need

10    to address instructions, and that means I meet with the lawyers

11    and we talk about the instructions that I tell them I'm going to

12    present.  They may object to something, and we'll spend a little

13    time on that.

14         Maybe what we can do is let the jury come in a little late,

15    let's say ten o'clock.  We may have you sitting in the jury room

16    for a little while, but I think, if we have the lawyers come in

17    at 8:30, we resolve the instructions, and we can have the jury

18    come in at 10:00 and hear the evidence.  I think we can have the

19    reading of the instructions and final argument tomorrow

20    afternoon.

21              MR. MANN:  Yes, Your Honor.  And we will be presenting

22    a motion, as we discussed earlier.

23              THE COURT:  Yes.

24              MR. RAVA:  And we will also have a motion.

25         Your proposal sounds good, Your Honor.

```
1          THE COURT:  I think we can do it tomorrow.  Sometimes
2    things don't go exactly as you hope or plan, but I think that we
3    do need to address instructions.  I can't stay tonight.  I'm
4    sorry.  I'm thinking let's have the jury come back at ten
5    o'clock tomorrow.  You heard what has been said.  We're hopeful.
6          Let me ask one last question.  There's always another
7    question after the last question, but final argument, how long
8    would you anticipate final argument to take?  Just so we all
9    have an idea of how much time we need.
10          MR. MARCELO:  I think, in total, and rebuttal, an
11   hour.
12          MR. MANN:  I'll say 45 minutes, but I'll try and do it
13   in less.
14          THE COURT:  I think we can do it.  Now, we may have to
15   stay a little bit later tomorrow night.  I wouldn't go past
16   5:00.  We'll probably get you in that jury room to begin
17   deliberating before you go home tomorrow.  But, in any event,
18   you'll then have Friday to deliberate, and if you reach a
19   verdict, wonderful.  If not, we'll bring you back on Tuesday.
20          All right.  So I think we've got a plan.  I let the jury
21   sit in and listen just to give them an understanding of what we
22   need to do and how long things are likely to take.
23          So, ladies and gentlemen have a pleasant evening.  You're
24   reminded not to discuss the case.  Please be back in the jury
25   room prior to ten o'clock tomorrow morning, and the clerk, at
```

1    that time, will let you know where we are.

2         I think that will do it for the night.  Have a pleasant

3    evening, folks.  Please be back at ten o'clock, and we'll see

4    you tomorrow.

5                    (Proceedings adjourned at 3:55 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

EXAMINATION OF                                          PAGE

JAMES MAY            DIRECT EXAMINATION          228
                     (cont'd)
                     BY MR. MARCELO

                     CROSS-EXAMINATION           251
                     BY MR. MANN

                     REDIRECT EXAMINATION        262
                     BY MR. MARCELO

JEFFREY CONWAY       DIRECT EXAMINATION          265
                     BY MR. DINI

                     CROSS-EXAMINATION           291
                     BY MR. MANN

DREW VOTH            DIRECT EXAMINATION          294
                     BY MR. RAVA

                     CROSS-EXAMINATION           308
                     BY MR. MANN

JORDON GREEN         DIRECT EXAMINATION          314
                     BY MR. RAVA

                     CROSS-EXAMINATION           324
                     BY MR. MANN

DAVID SCHAEFER       DIRECT EXAMINATION          326
                     BY MR. MARCELO

                     CROSS-EXAMINATION           386
                      BY MR. MANN

DAVID SCHAEFER       DIRECT EXAMINATION          389
                     BY MR. MANN

                     CROSS-EXAMINATION           415
                     BY MR. MARCELO

JORDAN GREEN         DIRECT EXAMINATION          423
                     BY MR. MANN

                     CROSS-EXAMINATION           431
                     BY MR. RAVA

PLAINTIFF EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---------|----------|-----------|
| 15 | 229 | |
| 16 | 270 | |
| 20 | 274 | |
| 22 | 276 | |
| 23 | 279 | |
| 27 | 275 | |
| 38 | 346 | |
| 46 | 349 | |

DEFENSE EXHIBITS

| EXHIBITS | ADMITTED | WITHDRAWN |
|----------|----------|-----------|
| N/A | | |

# C E R T I F I C A T E

       I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

       Dated this 27th day of May 2024.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter