UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

BUNGIE, INC., a Delaware corporation,  )
                                       )
                    Plaintiff,         ) CASE NO. C21-00881-TSZ
v.                                     )
                                       ) Seattle, Washington
PHOENIX DIGITAL GROUP LLC, an          )
Arizona limited liability company;     ) May 23, 2024
JEFFREY CONWAY, an individual;         ) 9:00 a.m.
DAVID SCHAEFER, an individual;         )
JORDAN GREEN, an individual; and       ) JURY TRIAL, DAY 4 of 5
JAMES MAY, an individual,              )
                                       )
                    Defendants.        )
                                       )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS S. ZILLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:


  For the Plaintiff:        WILLIAM C. RAVA
                            JACOB P. DINI
                            CHRISTIAN W. MARCELO
                            Perkins Coie
                            1201 3rd Avenue, Suite 4900
                            Seattle, WA 98101-3099


  For the Defendants:       PHILIP P. MANN
                            Mann Law Group PLLC
                            403 Madison Avenue North, Suite 240
                            Bainbridge Island, WA 98110



  Reported by:              NANCY L. BAUER, CCR, RPR
                            Federal Official Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov

1           PROCEEDINGS

2    _____

3           THE FOLLOWING PROCEEDINGS WERE HELD
            OUTSIDE THE PRESENCE OF THE JURY:

4

5           THE COURT:  Good morning, ladies and gentlemen.

6    Please be seated.

7       I indicated yesterday -- good morning, counsel -- that we

8    would address instructions this morning.  I'd like to do it

9    informally, with the court reporter just standing by.  I wanted

10   to go through the instructions as we've proposed them, hear your

11   views, see if there are changes that we need to make, and then,

12   immediately, we'll go into formal exceptions, where, hopefully,

13   you won't repeat everything you said but, at least, make your

14   exceptions to protect your record.

15      What I'm going to propose, we've given you both a red-line

16   and a clean version, so let's just walk through the red-line.

17   And what I'm going to do is, first, ask -- so we'll go off the

18   record.  At any time you want to go on the record, fine, we'll

19   give you an opportunity to do that.

20           (Off the record 8:35 a.m. to 8:42 a.m.)

21           MR. MARCELO:  The language would be added to the

22   bottom of Instruction No. 12, and it would be, "An officer of a

23   limited liability company may be personally liable for copyright

24   infringement, which he authorized or directs or in which he

25   participates."

1          And the citation for that is *Grover Products v. Airhorns of*

2   *Texas,* Central District of California, 2008 Westlaw 6118435 at

3   page 3.

4               THE COURT:  We can go off the record, Madam Court

5   Reporter.

6               (Off the record 8:44 a.m. to 8:51 a.m.)

7               THE COURT:  Let's go on record and have you read it so

8   I can look at it.  And where would it go?

9               MR. MARCELO:  Your Honor, this would go -- Instruction

10  No. 14, under "how copyright is obtained," and it would just be

11  added on to the next paragraph.

12              THE COURT:  I'm sorry.  It would be added to the "how

13  copyright is obtained" paragraph?

14              MR. MARCELO:  It would be the second paragraph of that

15  section, yes.

16              THE COURT:  Okay.

17              MR. MARCELO:  Because both source code and object code

18  constitute two representations of the same work, the owner of a

19  copyright and computer program may elect to submit, either as

20  part of its deposit copy or its copyright registration, both

21  source code and object code are protected by a copyright

22  registration for computer program.  A copyright owner is only

23  required to submit an identifying portion, at least the first

24  and last 25 pages of such code, as part of its deposit copy.

25              Likewise, for an audiovisual work, a copyright owner is

 1    only required to submit a representative portion of the

 2    copyrightable content, which may include series of photographs

 3    depicting representative portions of the work.

 4        These identifying portions provide copyright protection for

 5    the work as a whole, and not merely the excerpts of that work

 6    deposited with the copyright office.

 7              THE COURT:  You must get paid by the word.

 8              MR. MARCELO:  Unfortunately, when I pulled from

 9    the statute, it is a wordy statute.

10              THE COURT:  Well, I think we can -- just a moment.

11              MR. MARCELO:  Okay.

12              THE COURT:  So turn to Stipulated Fact No. 3.

13    Instruction 5, doesn't that cover that?  They own all rights,

14    title, and registrations, period, and that's what you agreed to.

15              MR. MARCELO:  You're right.  And, Your Honor, perhaps

16    simply adding a very short sentence there, that that

17    registration covers the entirety of the work and not just the

18    portions submitted as a deposit.

19              THE COURT:  Would you say the registrations cover both

20    software and object code and source code in their entirety, or

21    something like that?  That's all we really need, isn't it?

22              MR. MARCELO:  Yes, Your Honor.

23              MR. MANN:  I agree, Your Honor.

24              THE COURT:  So let me just draft it, and then I'll

25    read it to you.

 1       All right.  I propose that we add, at the end to Stipulated

 2   Fact 3, "these registrations cover all of the source code and

 3   object code of these materials."

 4            MR. MARCELO:  And the only addition I'd suggest is

 5   "and audiovisual."  The point being, there is also a copyright

 6   registration, in which are images -- sample representative

 7   images attached, and the entirety of the audiovisual is covered

 8   by that.

 9            THE COURT:  Source code, comma, object code and

10   audiovisual portions of these materials?

11            MR. MARCELO:  I don't think "portions" would be

12   correct because the --

13            THE COURT:  Just audiovisual?

14            MR. MARCELO:  Or simply it could be "the entirety of

15   the work."

16            THE COURT:  "And the entirety of the work"?

17            MR. MARCELO:  Yes, Your Honor.

18            THE COURT:  Mr. Mann, are you going to be objecting to

19   that?

20            MR. MANN:  Can I have the entire thing read back,

21   please, Your Honor?

22            THE COURT:  Of course.

23       At the end of paragraph 3, I would insert "these

24   registrations cover all of the source code and object code and

25   the entirety of these works."

 1          MR. MANN:  "These registrations" at the beginning part

 2   of it?  My only concern is these works relate to the

 3   registration, but I think that's pretty clear.

 4       We can live with that, Judge.  No objection.

 5          MR. MARCELO:  Yes.  Thank you, Your Honor.

 6          THE COURT:  What I'm looking at is the case that you

 7   cited with respect to officer liability.  I don't think it goes

 8   with Instruction 12.  It may be that we need a 12A, which would,

 9   basically, say that an officer of an infringing corporation is

10   personally liable if he uses the corporation as an instrument to

11   carry out a willful and deliberate infringement, or if he

12   derives financial benefits from that activity, or something like

13   that.

14       Do you have any problem with that?

15          MR. MANN:  No.  I don't think it's, actually, going to

16   come off.  If it makes him happy, let's put it in.

17          THE COURT:  All right.  I think that would be -- this

18   comes out of this *Grover Products* case that counsel cited to me.

19   I'll give you the cite again, counsel, if you want to look it

20   up.  It's 2018 Westlaw 6118435.  And I would only -- well, it

21   cites to a California case involving criminal activity.

22       So there is a Ninth Circuit case on copyrights.  It appears

23   to be the law, and it may be an issue -- I think it probably is

24   an issue in the case.

25       So we're going to draft it up.  You'll have the chance to

 1   see the exact language.

 2       Well, let me just give it to you.

 3           MR. MANN:  Sure.

 4           THE COURT:  Actually, it's going to be a new

 5   instruction, isn't it?

 6       All right.  I'm going to read it into the record.  It's a

 7   little different because of what's in the case.

 8       First, I'll read what the case parenthetic says.

 9       "An officer of an infringing corporation will be personally

10   liable if he uses the corporation as an instrument to carry out

11   his willful and deliberate infringements, or he derives

12   financial benefit from the infringing activities, either as a

13   major shareholder or through other means."

14       Now, I don't think "major shareholder," I don't think we

15   need to deal with that.

16           MR. MANN:  There's only two of them in this case, Your

17   Honor.

18           THE COURT:  Exactly.  And I don't think we need to

19   deal with the willful and deliberate infringements.  So the way

20   I've, kind of, taken that out, and here's what my proposed 12A

21   is:

22       "An officer of a corporation or a limited liability

23   corporation can" rather than -- the case says "will," but "can

24   be personally liable" -- well, I think it should be "is," "is

25   personal liable if he uses the corporation" -- now, I'm not

1  going to repeat "limited corporation" -- "he uses the

2  corporation to carry out an infringement, or if he derives

3  financial benefits from the infringing activity."

4      MR. MARCELO:  No objection to that.

5      MR. MANN:  Your Honor, I'd like to inquire.  I don't

6  have the case in front of me, but if the original case does

7  refer to "willful," and, frankly, I don't know if it does or

8  not, but if it is in the original case, I'd like to track the

9  language of the original case and put "willful" in there.

10     Because I think it does make a difference whether -- I

11 agree that if a director or a controller of a corporation

12 willfully engages in conduct, he can and probably should be held

13 liable, but if it's an innocent infringement or if it's an

14 unknowing infringement, I don't think that the law goes quite

15 that far.  And, again, if we're going to rely on this case, I

16 would ask that the actual language of the case be tracked.

17     THE COURT:  All right.  I think that's a valid point.

18 I don't think we need to say "willful" or "deliberate.  It's the

19 same.  So I would say "uses the corporation to carry out any

20 willful infringement, or if he derives financial benefit from

21 the infringing activity."

22     Doesn't that cover both aspects?

23     MR. MARCELO:  Yes.

24     MR. MANN:  I agree.

25     THE COURT:  That will be 12A.

1        All right.  Let's move on, then.

2        We were talking about Instruction 14, page 2, and we were

3    talking about an add-on, but I think we've cured that issue by

4    making a change to the stipulated facts.

5        So are there any other objections to 14?

6             MR. MARCELO:  No, Your Honor.

7             MR. MANN:  And this includes 14A, C, et cetera, Your

8    Honor?

9             THE COURT:  Just 14 at this point.

10            MR. MANN:  Oh, I see.  We're not at 14.  Got it.

11   Understand.

12       No, Your Honor, this looks fine to us.

13            THE COURT:  All right.  So let's go to 14A.  It's what

14   we had before, but we've taken out a lot.  Any objection to 14A?

15            MR. MARCELO:  No, Your Honor.

16            MR. MANN:  No, Your Honor.

17            THE COURT:  How about 14B?

18            MR. MARCELO:  No, Your Honor.

19            MR. MANN:  Likewise, no objection.

20            THE COURT:  And 14C?

21            MR. MARCELO:  None.

22            MR. MANN:  No, Your Honor, we have no objection to

23   14C.

24            THE COURT:  All right, 14D?

25            MR. MARCELO:  No, Your Honor.

1          MR. MANN:  If I may have just one moment?

2     No objection, Your Honor.

3          THE COURT:  Number 15 dealing with the counterclaim?

4          MR. MARCELO:  No objection.

5          MR. MANN:  We have no objection to the addition, Your

6  Honor.

7          THE COURT:  And we made an addition at the end.

8          MR. MANN:  Yeah, I think that is the law.

9          THE COURT:  I think it is the law.  It's the *iSpot.tv,*

10 *Inc.* case.  I think it's appropriate to add it.

11    Any objection to 15A?

12         MR. MARCELO:  No, Your Honor.

13         MR. MANN:  No, Your Honor.

14         THE COURT:  How about 16?

15         MR. MARCELO:  No, Your Honor.

16         MR. MANN:  No, Your Honor.

17         THE COURT:  And 16A?

18         MR. MARCELO:  No, and to the extent it's helpful,

19 plaintiffs have no more objections to the remainder of the

20 instructions.

21         MR. MANN:  Likewise, Your Honor.  We don't have any

22 objections, either.

23         THE COURT:  Wonderful.

24    Why don't we take five or ten minutes.  We'll change these,

25 and then you can make your formal exceptions.

1          MR. MARCELO:  Thank you, Your Honor.

2          MR. MANN:  Thank you.

3              (Court in recess 9:12 a.m. to 9:25 a.m.)

4          THE COURT:  We've given you, now before you,

5   hopefully, the Stipulated Fact No. 15 with a red-line add, a new

6   12A, which I think are the only two changes that we were talking

7   about.

8       Have you had an opportunity to read them?

9          MR. MARCELO:  Yes, Your Honor.

10         MR. MANN:  Yes, Your Honor.

11         THE COURT:  Are you prepared, then, to take your

12  formal exceptions to the instructions, if there are any?

13         MR. MARCELO:  Yes, Your Honor.

14      The only objection plaintiff maintains is reserving an

15  objection on the spoliation order, to the extent it changes

16  prior to the end of -- close of trial.

17         THE COURT:  And we didn't make any changes so far to

18  that.

19         MR. MARCELO:  Yes, Your Honor.  Understood.

20         THE COURT:  All right.  So that's the only exception

21  that you have to the court's instructions?

22         MR. MARCELO:  Yes, Your Honor.

23         THE COURT:  We'll do it both ways, give you two

24  versions, and then we'll decide at the end.

25      So, Mr. Mann, any exceptions to the court's proposed

 1    instructions?

 2             MR. MANN:  The only -- it's more of a question.

 3        My understanding on the spoliation instruction is that you

 4    were going to strike, at least preliminarily, the instructions

 5    as to James May.

 6             THE COURT:  Yes.

 7             MR. MANN:  Okay.  So out of an abundance of caution,

 8    if I say "no objections," I say "no objections to the

 9    instruction without the references to James May."

10             THE COURT:  That's fine.

11             MR. MANN:  Okay.  Thank you, Your Honor.  With that

12    understanding, we have no objections.

13             THE COURT:  All right.

14        We also gave you a verdict form.  We haven't talked about

15    that yet.  Any objection to the court's proposed verdict form?

16             MR. MARCELO:  Not from plaintiff, Your Honor.

17             MR. MANN:  Likewise, Your Honor, no objection.

18             THE COURT:  All right.  Let me ask this:  Are we going

19    to be able to finish the testimony this morning?

20             MR. MANN:  Yes, Your Honor.  I anticipate calling

21    James May.  I hope to spend no more than a half an hour with

22    him.

23        And as I said, we have the expert, preliminarily, standing

24    by to testify, if needed.  I hope that won't be the case.

25             Outside of the cross-examinations, if I take an entire hour

1    with both those witnesses, I'd be surprised.  Hopefully less.

2              THE COURT:  Do you anticipate any rebuttal case?

3              MR. RAVA:  Yes, we do anticipate -- there's likely to

4    be rebuttal testimony.  We think it will be short.

5              THE COURT:  All right.  So we'll put together a packet

6    of instructions and get them out here in the next -- well, soon.

7         But I think this is an appropriate time, if you have a

8    motion to make.  The plaintiff has rested.  Now, the defendant

9    hasn't rested their case, but I'm not sure there is a motion

10   appropriate from the plaintiff's standpoint, is there?

11             MR. DINI:  Not at this time, Your Honor, but

12   plaintiffs anticipate bringing a motion for judgment as a matter

13   of law once defendants' case rests.

14             THE COURT:  As to the counterclaim?

15             MR. DINI:  And as to Bungie's claim.

16             THE COURT:  All right.

17             MR. MANN:  If I may have a moment, Your Honor?

18             THE COURT:  Well, counsel, it seems to me that

19   plaintiff should make their motion to challenge the -- if you

20   think you're entitled to a directed verdict in the claims, we

21   should hear that, and we'll reserve on the counterclaim until we

22   have it in the case.

23             MR. DINI:  Your Honor, our understanding, under

24   Rule 50(a)(1), is that judgment as a matter of law is

25   appropriate after a party has been fully heard on an issue

1    during the jury trial.  And we're not sure, because the

2    defendants are in the middle of their case-in-chief, whether

3    they have been fully heard on Bungie's copyright infringement

4    claim.

5            THE COURT:  I think that's appropriate.  We'll just

6    hold off.

7            MR. MANN:  Well, Your Honor, I can address this now.

8    It took me a while to get some of my research here.  Ms. Nassar

9    was helping me with the legal research.

10           Can I make the argument here, or would you prefer at the

11   podium?

12           THE COURT:  You may.

13           MR. MANN:  Okay.  Thank you, Your Honor.

14           We're making a motion under Rule 50 for a judgment as a

15   matter of law.  We believe that there is a complete failure of

16   the evidence on key points in this case.

17           We heard the testimony of Dr. Kaiser, and he was,

18   basically, the only witness to testify in this case regarding

19   copyright infringement.

20           Mr. Guris, who also testified on behalf of Bungie, admitted

21   that he did not look at the cheat software.  He admitted he only

22   looked at the loader, and, most importantly, he admitted during

23   my cross-examination that he was never asked to opine as to

24   whether there is copyright infringement on the part of the

25   *Destiny 2* cheat software.

1          Now, I have a case here, Your Honor, that I think is

2     directly on point.

3          This is *Antonick v. Electric Arts, Inc.*  This is cited at

4     841 F.3d 1062.  It's a Ninth Circuit case from 2016.

5          And the very first --

6               THE COURT:  Let me just be sure I got the cite.

7     841 F.3d 1062.

8               MR. MANN:  That's correct, Your Honor.

9               THE COURT:  Thank you.

10              MR. MANN:  And it's A-n-t-o-n-i-c-k v. E-l-e-c Arts,

11    Inc.

12         And I would bring this case to your attention, but I think

13    the gist of the case, the importance of the case is summarized

14    in the very first paragraph.  I'll read the very first

15    paragraph.

16         "In this case, the plaintiff claimed copyright

17    infringement, but the contents of the copyrighted work and the

18    allegedly infringing works were never introduced into evidence.

19    The district court held that the claim failed as a matter of

20    law.  We agree and affirm."

21         Now, in this case, I think it's undisputed that we do not

22    have a copy of the *Destiny 2* cheat software.  We don't have the

23    source code for it.  We do not have the object code for it.

24         More importantly, and this was touched on earlier this

25    morning, Your Honor, with respect to the trademark

 1    registrations, and I agree, we have no dispute, that the

 2    registration is not limited to simply what was deposited.  But

 3    we specifically requested the source code for any copying that

 4    they thought took place.  The reason being that, if you say we

 5    copied your source code, we want to see that source code.

 6        What they produced to us is what we see in those copyright

 7    registrations.  I specifically asked Dr. Kaiser if he could

 8    point to where in those deposit copies there's any infringement.

 9    He said, No, I can't, but there are 25 million lines of code

10    that aren't there.  Those 25 million lines of code have never

11    been produced.  We've never seen them.  They've never introduced

12    it.

13        We are classically right in the fact pattern of the

14    *Antonick* case.  The contents of the copyrighted works and the

15    allegedly infringing works were never introduced into evidence.

16    The claim failed as a matter of law.  We agree and affirm.

17        That is, basically, the gist of our argument here.

18        And I have some additional cases that Ms. Nassar has found

19    for us that, I think, would be appropriate here.

20        Would you mind if she reads the case citations into the

21    record, Your Honor?

22            THE COURT:  Certainly.

23            MS. NASSAR:  *Seiler v. Lucas Film Limited*.  That's at

24    808 F.2d 1316, 1319.  That's a Ninth Circuit case, 1987.

25        There can be no proof of substantial similarity and thus of

1    copyright infringement unless Seiler's works are juxtaposed with

2    Lucas's and their contents compared.  Applying the best-evidence

3    rule in a copyright action.

4         Second is also *Seiler v. Lucas Film Limited*.  That's 808

5    F.2d 1316, 1319.  That's also a Ninth Circuit -- same case.

6              THE COURT:  That's the cite you just gave me.

7              MS. NASSAR:  Yes, same case.

8         Proof of the infringement claim consists of the works

9    alleged to be infringed.

10        Next case --

11             THE COURT:  I understood the first citation you gave

12   me to be 808 F.2d 1316 --

13             MS. NASSAR:  Yes.

14             THE COURT:  And the second cite was the same cite?

15             MS. NASSAR:  Same cite, sir, yes.  Yes, Your Honor.

16        There's also a First Circuit case and a Fifth Circuit case

17   that affirmed the same holdings as the Ninth Circuit has held.

18             THE COURT:  Well, we don't need them.  We've got the

19   Ninth Circuit.

20             MS. NASSAR:  And then the last Ninth Circuit I have is

21   *Olson v. National Broadcasting Company*, and that's at 855 F.2d

22   1446, 1448, and 1451, Ninth Circuit 1988, granting judgment as a

23   matter of law to copyright defendant because no reasonable jury

24   could have found substantial similarity.

25             MR. MANN:  And, Your Honor, there's another case we've

1    been relying on in this matter, almost from the start.  That's

2    *Lewis Galoob v. Nintendo*.  I have the cite for you here.

3        It looks like -- okay.  It's *Lewis Galoob* -- G-a-l-o-o-b --

4    *Toys, Inc. v. Nintendo of America, Inc.*  That's cited at 964

5    F.2d 965.  It is a Ninth Circuit case from 1992.  And this is,

6    again, a case that is very much similar, if not directly on

7    point.

8        This was a case of a Game Genie device that was used to, in

9    essence, help enhance performance -- you could call it

10   "cheat" -- in a Nintendo game.  And what that would do is, it

11   would do the same thing.  It would draw graphics on the screen

12   that people would then use to perform better in the game.  No

13   different than the cheats that we're dealing with here.

14       And that case specifically held that making those changes

15   to the visuals is not a derivative work, and, therefore, is not

16   a case of copyright infringement.

17       Now, during my examination of Dr. Kaiser, I asked some

18   specific questions on this.  I said, Does the cheat software

19   create an audiovisual work?

20       His answer, I believe, was "no."  He agreed with me that

21   the graphics are created by the *Destiny 2* game, and all the

22   cheat software does is simply draw a box around it.

23       The second factor in the *Galoob* case is, does it replace

24   the game?  In other words, if I buy the cheat, does that mean

25   that I no longer have to buy the game and, thereby, deprive the

1    game manufacturer of the sale?  The answer is "no."

2          Dr. Kaiser agreed, during my cross-examination, that in

3    order to use the cheat software, you still have to have a

4    legitimate Bungie game, and you can't use this without opening

5    up a Bungie account and agreeing to their terms and getting the

6    game from Bungie.  In other words, this is not a substitution

7    where here's a copyrighted work but I can deprive the infringing

8    work and deprive a sale.

9          So that's the second *Galoob* factor.

10         I believe, I got testimony from Dr. Kaiser saying that, no,

11   the cheat software is not a stand-alone product.  You always

12   have to run it in conjunction with the game.

13         The third factor is, is it permanent change?  Is this

14   ephemeral or is it fixed?  I think "fixed" was the key language

15   they used in the *Galoob* case.  Does this make -- are the changes

16   fixed?  And in the *Galoob* case, the court held that, no, these

17   are, sort of, transitory changes, they don't exist very long,

18   and they're only very, very temporary.

19         I attempted to bring that out in my examination by, if you

20   remember that business where I had the copy of the graphic from

21   the *Destiny 2* game, and I used the ELMO to draw a box on it, and

22   then after we could see the box on the graphic, I held the

23   original paper out so everybody could see there was no permanent

24   change to the graphic itself.

25         I think there's no question here that there is no fixation

 1    of any change to the work.  It's not a derivative work.

 2        Now, I could probably go on for hours, I don't think you

 3    want to hear that, but that's the gist of my argument.  It comes

 4    down to they haven't proved, they haven't provided the necessary

 5    elements here.

 6        And another one I may argue -- well, I will argue -- is by

 7    their own admission, there are 25 million lines of code that

 8    Dr. Kaiser agreed with me are not made public.  That goes

 9    directly to the access issue.

10        In fact, these lines of code that have been produced so far

11    in connection with the deposits are themselves marked "highly

12    confidential, attorneys' eyes only."  Based on that, my clients

13    cannot see those things.  Up until today, they've not seen those

14    things.  So how can they have access if the 25 million lines of

15    code are retained as, essentially, a highly guarded trade secret

16    of Bungie?

17        So for all those reasons, we believe that Bungie has failed

18    in its obligation and its duty to provide a credible case of

19    infringement.  These are fatal defects, as stated by the

20    *Antonick* case.  And I'd like to make one more reference to some

21    of the language from the *Antonick* case.

22        It's held that the expert testimony cannot satisfy a

23    copyright infringement.  Plaintiff's burden of proof under the

24    intrinsic test, which depends on the response of an ordinarily

25    reasonable person.

1        So you can't satisfy this by having an expert come in and

2    say, "In my opinion, it infringes."  There has to be more.  We

3    have to see comparisons.  They have to produce both works.  In

4    the absence of both works being in evidence, as a matter of law

5    under the *Antonick* case, you can not sustain a finding of

6    copyright infringement.

7        That's the basis of my motion, Your Honor.  I'll be happy

8    to answer any questions you may have.

9              THE COURT:  Do you wish to respond?

10             MR. DINI:  Yes, Your Honor.  As initial -- I can speak

11   the from the podium, actually, Your Honor?

12             THE COURT:  Certainly.

13             MR. DINI:  Your Honor, an entry of judgment as a

14   matter of law on a Rule 50 (a)(1) motion is only proper when the

15   evidence presented at trial permits only one reasonable

16   conclusion.

17       Critically, the court is required to view the evidence in

18   the light most favorable to the nonmoving party.  In this case,

19   it would be Bungie, and in the event of conflicting inferences

20   can be drawn from the facts, the case must go to the jury.

21       So, in essence, if the parties disagree about the facts,

22   then the case must go to the jury.

23       Here, there's substantial disagreement about the facts and

24   what the facts show, specifically as to copying.

25       As we discussed earlier this morning when we were talking

1    about the jury instructions, access and substantial similarity

2    is one way that a plaintiff can show or may show copyright

3    infringement.  But another way a plaintiff can prove copyright

4    infringement is by evidence of direct copying, and that's what

5    we have here in this case.

6         Dr. Kaiser testified the code that was necessary for the

7    cheat software to work was found inside of *Destiny 2*.  That's

8    the only place where that code existed.  This code included

9    functions related to rendering, functions related to player

10   positions, functions related to combatant positions, and

11   functions related to player input.  These were all copyrighted

12   code that were inside of *Destiny 2*.  That's what Dr. Kaiser

13   testified about.

14        Dr. Kaiser testified that the only way the cheat software

15   could work is by copying those portions and incorporated those

16   copies into the cheat software code.

17        Dr. Kaiser was testifying as both an expert witness and a

18   percipient witness as the one who wrote the very code that the

19   defendants necessarily had to copy.  That's, again, what

20   Dr. Kaiser testified to.

21        Mr. Guris and Dr. Kaiser both testified that in order for

22   the cheat software to operate, it must necessarily inject into

23   the *Destiny 2* game process, modifying the game itself.  And

24   that's an important point here:  Modified the game itself.

25        Referring to opposing counsel's case, *Galoob v. Nintendo of*

1    *America*, at page 968, I'm quoting here.  It says, quote, The

2    altered displays do not incorporate a portion of a copyrighted

3    work in some concrete or permanent form.

4        That was essential to the court's holding in that case.

5        Here, Dr. Kaiser's testimony establishes the opposite of

6    that; that, in this case, Bungie's copyrighted work, the code

7    that was necessary to find where players are, to move a player's

8    reticle, were found inside defendants' cheat software in order

9    for it to operate.

10       So there is evidence here in this case that there was a

11   physical change to the code in *Destiny 2* and that that code

12   included Bungie code, copied Bungie code.

13           THE COURT:  Well, let me ask you this:  What evidence

14   in the record is there that Mr. May directly copied the code?

15           MR. DINI:  Your Honor, there's evidence that Mr. May

16   attached reverse-engineering tools to *Destiny 2* over a hundred

17   occasions.

18           THE COURT:  And the only evidence is that he was not

19   successful.  Isn't the only evidence that's really in the record

20   is that this cheat version came from some source other than

21   Mr. May?

22           MR. DINI:  That's what Mr. May says, Your Honor,

23   but granting -- if I may?

24           THE COURT:  That's what he says, but no other witness

25   has said anything else, has it?

1          MR. DINI:  Dr. Kaiser has said that Mr. May was

2     reverse engineering *Destiny 2* in order to develop a *Destiny 2*

3     cheat.

4          And the circumstantial evidence regarding Mr. May's conduct

5     throughout this case, certainly a reasonable inference that can

6     be drawn.  And in this case, when there are conflicting

7     inferences, we must believe the nonmoving party.

8          The inference that can be drawn is that Mr. May was the one

9     that developed the cheat software.  He connected

10    reverse-engineering tools starting the day after *Destiny 2* went

11    free-to-play.  He connected reverse-engineering tools in the

12    time leading up to Phoenix Digital's announcement of a *Destiny 2*

13    cheat.  He continued connecting reverse-engineering tools while

14    that cheat was updated, and he connected reverse-engineering

15    tools as *Destiny* was being updated so that he could create an

16    updated cheat.

17         As Mr. Schaefer said and Mr. May said, Phoenix Digital

18    would only have one cheat from one developer, and Mr. May would

19    ask Mr. Schaefer if he could develop a cheat for a particular

20    video game, and if the answer was no, then he would move on.

21         We know from Mr. Schaefer's testimony that Mr. May asked

22    Mr. Schaefer if he could develop a cheat, and then we know that

23    Mr. May spent months -- over a year -- reverse engineering

24    against *Destiny 2*.  That's the activity that he said, when he

25    develops a cheat, that's what he does.  He reverse engineers and

1    tests, and we know that he used the cheat software, at least, a

2    couple of times, and that's consistent with his process of

3    testing when he's creating cheats.

4              THE COURT:  I've heard enough on Mr. May.

5         Do you have anything else in substance you want to raise on

6    your motion -- on defending the motion?

7              MR. DINI:  Yes, Your Honor, I do, briefly.

8              THE COURT:  Briefly.

9              MR. DINI:  Yes.

10             THE COURT:  Let's hear it.

11             MR. DINI:  During Dr. Kaiser's cross-examination,

12   Mr. Mann was showing him scrolling through portions of the

13   source code of *Destiny 2* that were submitted with the Copyright

14   Office, and that was in Exhibit 2, and Mr. Mann asked Dr. Kaiser

15   to identify portions of the code that Bungie alleges was copied

16   in order to create the cheat software, and he specifically

17   referenced ability interfaces that were shown in that source

18   code.

19        So there is certainly direct evidence from Dr. Kaiser

20   pointing to specific code that was copied.

21        And finally, Your Honor, I'll finish on this point:  Unlike

22   any of these other cases here, we have a spoliation instruction,

23   specifically as it relates to access to the cheat software.

24        The reason -- one of the reasons that there is no cheat

25   software in this case is because of what was spoliated;

1    specifically, the defendants intended to interfere with Bungie's

2    ability to go to trial, and that's what's being shown here.

3        They deleted access to the cheat software, and their

4    actions are the reason why the source code and object code of

5    the cheat software was not presented at trial today.

6        Thank you.

7        THE COURT:  The court is going to defer ruling on the

8    Rule 50 motion by the defendant.

9        So I think we're at a point where -- I wanted to raise one

10   other issue, and then we'll take a brief recess.

11       I understand from the clerk that you've agreed on exhibits.

12   There are, at least, five exhibits which are either videos or

13   spreadsheets.  The jury won't have those when they deliberate.

14       So if they wanted to see a video or if they wanted to see

15   the spreadsheets, we'd have to bring them into court, set up a

16   computer, and show them the video or allow them to access the

17   one exhibit, I think, which is the spreadsheet.  And you'd have

18   to be here as well.  We wouldn't show it to the jury without

19   counsel present.

20       It's not going to go to the jury room.  I just wanted

21   everybody to understand that.  Do you have any problem with

22   that?

23       MR. MARCELO:  Your Honor, for clarification, the

24   exhibits, those natives and the video, I believe, were submitted

25   electronically on a thumb drive or otherwise, and you're saying

1    that that wouldn't go back to them?

2          THE COURT:  They won't have a computer.  We could give

3    them the thumb drive, but they couldn't see what's on it.  If

4    they wanted to, what the procedure would be, is we would bring

5    them back here into the courtroom, and we would probably allow

6    your tech people to run whatever they needed to see.  I'm

7    informing you that that's what's going to happen if we get

8    there.

9        The jury will get a face page for these exhibits, telling

10   them what it is, but they won't otherwise have the video or the

11   spreadsheets.

12       All right.  We'll be in recess for ten minutes.

13               (Court in recess 9:52 a.m. to 10:03 a.m.)

14             THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:

15

16         MR. MANN:  Good morning, ladies and gentlemen of the

17   jury.  You may call your witness.

18         MR. MANN:  Thank you, Your Honor.  The defendants call

19   James May.

20         THE COURT:  You're reminded you're still under oath,

21   sir.

22         THE WITNESS:  Yes, sir.

23                     JAMES MAY,
          having been previously sworn, testified as follows:

24

25         THE COURT:  You may inquire.

1          MR. MANN:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MR. MANN:

4    Q.    Good morning, Mr. May.

5    A.    Good morning.

6    Q.    Mr. May, I just want to make sure that we're all clear on

7    one thing.

8          Did you have anything to do with the development of the

9    cheat software that is at issue here?

10   A.    I did not.

11   Q.    Do you recall seeing that cease and desist letter that was

12   dated November 4, 2020, that we've seen here, many times?  It

13   was directed to David Schaefer --

14   A.    Yes, I recall seeing that.

15   Q.    Good.

16         Was that letter ever sent to you?

17   A.    It was not.

18   Q.    Bungie never sent you a cease and desist letter; is that

19   correct?

20   A.    That is correct.

21   Q.    Did you ever receive any directive from Bungie to preserve

22   evidence?

23   A.    I did not.

24   Q.    Now, we had some testimony here, I believe, during the

25   examination yesterday.  You were accused of destroying evidence

1  by buying a new computer; do you remember that?

2  A.   Yes --

3        MR. MARCELO:  Objection, Your Honor.  Counsel is

4  testifying.

5        THE COURT:  Overruled.  You may answer.

6  Q.   (By Mr. Mann)  Okay.  Can you tell the jury why you bought

7  a new computer?

8  A.   Okay.  So the lawsuit already started at this point.

9  Before we got discovery, I had already had a computer prior to

10 the new computer.  This computer was starting to get random blue

11 screens and starting to run slow.

12    I purchased another computer before getting discovery, from

13 Bungie, before I knew that any of this action would be taken for

14 the countersuit.

15    So I bought a new computer, thinking that my computer was

16 corrupted, without having any facts at that point.  It was an

17 assumption at that point.

18    Once I got the new computer, I wiped the old computer --

19 the operating system, and then I copied all my -- or, sorry.  I

20 copied those files that I needed for the new computer, then I

21 wiped the operating system for the old computer and reformatted

22 it and put a new operating system on there for, like, a clean

23 slate.

24 Q.   Mr. May, you preserved your original files, correct?

25 A.   Correct, I did.

1    Q.    Would there be any reason to destroy those files?

2    A.    No.

3    Q.    Okay.  Now, this was -- well, let me ask you this:  Did you

4    ever -- when you changed your computer -- when you bought a new

5    computer, did you have any idea that you could file a

6    counterclaim?

7    A.    No, I did not.

8    Q.    What changed that?

9    A.    Later on -- and I don't remember the exact time in June

10    when we got discovery back -- we received a document that

11    verified that they had been doing this.

12            MR. MANN:  Ms. Nassar, if you could pull up Exhibit --

13    this is a plaintiff's exhibit, actually -- 56.  And, again, Your

14    Honor, this is admitted into evidence, and we'll show it to the

15    jury.

16    Q.    (By Mr. Mann)  Is this the document in question?

17    A.    Yes, it is.

18    Q.    And this is a document that I provided to you after we

19    received it from Bungie in discovery?

20    A.    Yes, correct.

21    Q.    Again, for the record, this is a document that Bungie has

22    produced?

23    A.    Yes.

24    Q.    Okay.

25            Now, did you have an opportunity to scan the contents of

1    this document?

2    A.    Yes, I have.

3    Q.    What, if anything, did you observe or conclude after

4    looking at this?

5    A.    I observed that -- Dr. Kaiser testified that anything

6    attached to the process would be in this list.  There are system

7    files on here, drivers, that are never attached to the process,

8    that are on here.

9    Q.    Okay.  Now, how did you feel when you saw this?  What was

10    your reaction?

11    A.    I felt like my privacy had been invaded.

12    Q.    And why was that?

13    A.    Because they had gained access to files I did not give

14    permission to.

15    Q.    Okay.  Now, let's take a look -- and just for the sake of

16    clarity, some of the files we're looking at here do attach to

17    the *Destiny 2* game.  You're not denying that, are you?

18    A.    Correct.

19    Q.    In fact, probably the bulk of these things do attach to the

20    *Destiny 2* game; is that correct?

21    A.    Yes, correct.

22    Q.    And, again, you admit -- you heard the testimony -- you

23    admit that, on several occasions, you did try to develop a cheat

24    for *Destiny 2.*

25    A.    Correct.

1    Q.    You don't deny any of that stuff?

2    A.    I do not.

3    Q.    Okay.  Good.

4          Now, can you identify some or all of these that do not

5    attach to the *Destiny 2* game?

6    A.    Yes.  Can you scroll down?

7    Q.    It may be by the number.  These things are conveniently

8    numbered on the left-hand side.  If you'd refer to them by

9    number, that would be --

10   A.    Stop right there, please.

11   Q.    Which number?

12   A.    Number 45, row C, or column 3.

13   Q.    Column 3?

14   A.    Yes.

15   Q.    Okay.  So if we can go to -- if you can explain to the jury

16   what that means to you and what that file is.  Tell us what you

17   know about that.

18   A.    The ReClasskernel64.sys file, as you can see there in

19   column 3, is not a program that ever attaches to the *Destiny 2*

20   process.  And that file, specifically, was created by me.

21   Q.    In fact, do you recall -- I believe it was during the

22   examination of you by Bungie -- that you were asked about --

23   were you asked about this file?

24   A.    Yes, I was.

25   Q.    And did they take you through it and ask you how you

1    developed it and what you did?

2    A.    Yes.

3    Q.    Do you recall what you said about it?

4    A.    Yes.

5          So the normal ReClass program doesn't have access for an

6    elevated handle to gain access to memory in a game.  This

7    provides --

8                THE COURT:  Slow down.

9                THE WITNESS:  Yes, sir.

10   A.    This provides an elevated handle to the computer to gain

11   access for ReClass to attach to that memory.  This never

12   actually attaches to the game itself.

13   Q.    (By Mr. Mann)  And, again, this is something that you

14   created yourself?

15   A.    Yes, correct.

16   Q.    And then you described it yesterday, actually, in response

17   to questions asked of you by Bungie, not me?

18   A.    Yes.

19   Q.    Now, looking at the highlighted part here, in yellow, if I

20   went to your computer and looked at the screen and wanted to see

21   all files that were contained on your computer, would I see

22   exactly what we see here?

23   A.    No.

24   Q.    Are there differences?

25   A.    Yes.

1    Q.    Can you explain to the jury what those differences are?

2    A.    There is a line here on column 3, where it starts with an

3    MD5 hash 8D98.  That hash could only be generated by,

4    specifically, having physical access to that file and run

5    through a program to get that hash.

6    Q.    Now, considering that this -- I believe Dr. Kaiser

7    testified that he created this document, or produced this

8    document.  Do you recall hearing that testimony the first day of

9    trial?

10   A.    I do.

11   Q.    Okay.  Again, what we see here, 8D98D83, et cetera, et

12   cetera, did you create that?

13   A.    Yes.  Oh, sorry.  The hash itself, I did not create that

14   hash, no.

15   Q.    Those numbers would not appear on your computer?

16   A.    That is correct.

17   Q.    Is it reasonable to conclude that it must have been created

18   elsewhere?

19   A.    Correct.

20   Q.    And since it's on a Bungie document, it's reasonable to

21   conclude they did it?

22   A.    Yes.

23          MR. MARCELO:  Objection; leading.

24          THE COURT:  It is leading, but the answer will stand.

25   Q.    (By Mr. Mann)  Now, Mr. May, are there any other instances

1   on this sheet that we see here that indicate files that were not

2   connected to the game?

3   A.   There are several.

4   Q.   Okay.  Just in the interest of time -- I know we want to

5   move quickly here and try to get this done -- but can you just

6   point to a few numbers?

7   A.   Line 53, column 3.

8   Q.   And that, again, is a program that does not connect to the

9   game?

10  A.   Correct.

11  Q.   The game being *Destiny 2*?

12  A.   That's correct.

13  Q.   And does that have an MD5 hash associated with it?

14  A.   It does.

15  Q.   And for the jury's clarification, can you tell us what that

16  is?  I mean, what part is the MD5 hash?

17  A.   The MD5 hash starts in row 52 -- sorry -- it's 53, column

18  3, and it starts with 6E73A01.

19  Q.   Okay.  Are there any other instances here of --

20  incidentally, is that a program you created?

21  A.   No, that is not.

22  Q.   That is not.  Do you know who did create it?

23  A.   Phoenix Digital.

24  Q.   So Phoenix Digital created this?

25  A.   It's created by the loader.  I don't know if they,

1    specifically, created it.  I know it's their product, yes.

2    Q.    Okay.  Let's get some other examples here.  And I don't

3    want them all, but I want to establish that it's not just a

4    once -- one instance.  Can you show us a few more of these?

5    A.    Yes.

6          So you've got row 61, column 3.  And you will see the same

7    hash as before, as they used as the identifier for that program.

8    Q.    And, again, is this a program that you wrote?

9    A.    Yes, that one is.

10   Q.    And does this attach to the game?

11   A.    No, it does not.

12   Q.    Let's do two more in this document, and I think we'll have

13   made our point.

14         Are there any other files here that do not attach to the

15   game?

16   A.    Again, row 78, column 3.

17   Q.    Okay.  And can you tell the jury what this is?

18   A.    It is the same file created with the loader that's

19   generated.  It's a system file, also a driver, that never

20   attaches to the game.

21   Q.    And is there an MD5 hash associated with this file?

22   A.    There is.  It starts with 6E73A01E5.

23   Q.    And, again, is that a number that you created?

24   A.    It is not.

25   Q.    Is that a number that you put onto your own computer in

1    this file path?

2    A.    It is not.

3    Q.    Let's do one more, and I think we've beaten

4    this dead horse.

5    A.    There's several here.  You can see where every time it says

6    AimJunkies binary pound right here, you can just scroll over,

7    and it shows the system -- the system file being loaded.

8    Q.    Okay.  Now, do you see where it says "backslash, question

9    mark, question mark, C colon"?  Does "C" tell you anything?

10    A.    That would be any C drive on my hard drive.

11    Q.    Okay.  Were there any files that were accessed on a drive

12    other than your C drive?

13    A.    There probably were, but -- there's several on this list

14    right here, but I don't know what else they could have accessed.

15    Q.    Does it appear they've accessed things other than your C

16    drive?

17    A.    Yes.  Sorry.  They've also they accessed my G drive.  If

18    you go down to line 89, column 3.

19    Q.    Okay.  What is -- again, just to clarify for us, what is a

20    G drive?

21    A.    That is my external hard drive with all of my work files on

22    it.  It also has tax documents and other personal information.

23    Q.    Now, does that drive still exist?

24    A.    Yes, it does.

25    Q.    When you were asked to produce documents, did you produce

1    them from that drive?

2    A.    I did.

3    Q.    Now, I want to talk a little bit about the measures you

4    take to protect your computer.

5         What sort of security measures do you use on your computer?

6    A.    I use the Windows Firewall, and I have password-protected

7    folders.

8    Q.    And these are passwords you create?

9    A.    Yes.

10   Q.    Okay.

11        Now, to access the information we see here on this exhibit,

12   would it be necessary to get past your firewall?

13   A.    Yes, it would.

14   Q.    Would it be necessary to get past your password

15   protections?

16   A.    Yes, it would.

17   Q.    How many passwords would it take to get to what we see here

18   on this document?

19   A.    Two passwords.

20   Q.    Can you explain to the jury how you have that set up?

21   A.    So, obviously, there's a Windows login password, and then I

22   have specific passwords set on my folders for all of my private

23   files.

24   Q.    Okay.  Now, can anyone get into your computer files without

25   your permission?

1    A.    No.

2    Q.    Okay.  Now, on the computer we're talking about here, the

3    one that contains these files that we see here in the exhibit,

4    what additional information, if any, do you maintain on that

5    computer?

6    A.    So as I stated before, I have personal files on there, such

7    as tax documents; I have photos from family members; and

8    anything I've ever worked on, that's personal to me, is in that

9    folder.

10   Q.    Do you have financial information?

11   A.    Yes, I do.

12   Q.    Things like social security number?

13   A.    Yes.

14   Q.    Do you consider this information personal?

15   A.    I do.

16   Q.    Do you intend to share that information with the rest of

17   the world?

18   A.    No.

19   Q.    Did you give Bungie permission to access any of these

20   files?

21   A.    I did not.

22         MR. MANN:  Thank you, Your Honor.  No further

23   questions.

24         THE COURT:  Cross of the witness?

25         MR. MARCELO:  Yes, Your Honor.

1                          CROSS-EXAMINATION

2    BY MR. MARCELO:

3    Q.    Good morning, Mr. May.

4    A.    Good morning.

5          MR. MARCELO:  Mr. Blackburn, if we can pull back up

6    Exhibit 56 that we were just looking over.

7    Q.    (By Mr. Marcelo)  I want to touch on the same files that

8    you've just discussed.

9          My understanding is, there was, essentially, two files you

10   were discussing that appear multiple times on the spreadsheet;

11   is that right?

12   A.    Correct.

13   Q.    Okay.  One of the files is the ReClasskernel64.sys file?

14   A.    Yes, correct.

15   Q.    And the other file has a string of random numbers and

16   letters followed by .sys, and that's the AimJunkies' loader

17   driver, right?

18   A.    Correct.

19   Q.    Okay.  So let's start with the first one, the

20   ReClasskernal64.sys.  That's a driver file for a

21   reverse-engineering tool, right?

22   A.    Driver file for reverse-engineer tool?  Yes.

23   Q.    Right.  It's the driver file for the ReClass

24   reverse-engineering tool that we were talking about yesterday.

25   A.    That is a driver file for renamed ReClass file that you see

1  up there.  Yes, it uses that driver.

2  Q.    And that's a good point.  There was a number of ReClass

3  tools being used, but you're saying this is the driver file for

4  just the renamed ReClass reverse-engineering tool?

5  A.    Correct.

6  Q.    And you did attach the renamed ReClass reverse-engineering

7  tool to *Destiny 2*?

8  A.    Yes.

9  Q.    I think I heard you testify you created the

10  ReClasskernal64.sys file?

11  A.    Yes.  I did a lot of research for it, yes.

12  Q.    Can I call it the "ReClass driver" so I don't have to

13  repeat myself?

14  A.    Yes.

15  Q.    Okay.

16        You just compiled code for that driver from online sources,

17  right?

18  A.    I used online sources to help me create it, yes.

19  Q.    And, in fact, you would say you compiled it just by

20  grabbing pieces of code from GitHub?

21  A.    Yes, I would, but I still had to write the code.

22  Q.    But it was all public information that you grabbed?

23  A.    My research was public.  Not everything was public.  I did

24  use public information.

25  Q.    Mr. May, I'm going to direct your attention to your

1    deposition testimony from October 25th of 2022.  This is page

2    157, lines 19 through 22.

3         "QUESTION:  Did you create the driver it loads?

4         "ANSWER:  Basically, I just grabbed information off the

5    Internet to be able to grab the handle.  So it was all public

6    information."

7    A.   That is correct, the handle was public information.

8    Q.   The AimJunkies' cheat loader, that's the other file on this

9    spreadsheet you discussed?

10   A.   Yes.

11   Q.   You didn't create the loader driver, right?

12   A.   No, I did not.

13   Q.   Phoenix Digital didn't create the loader driver?

14   A.   I don't believe so.

15   Q.   Did anyone ever tell you that Phoenix Digital had created

16   the loader driver?

17   A.   I don't believe so.

18   Q.   Do you recall submitting a sworn declaration stating that

19   Phoenix Digital owned the copyrights to the loader driver?

20   A.   I believe so, yes.

21   Q.   Phoenix Digital doesn't own the loader though, does it?

22   A.   It does not own the loader, that I've been told.  I believe

23   that they leased the loader.  That, I've heard in this

24   testimony.

25   Q.   That Phoenix Digital didn't create the loader?

 1   A.   From this testimony I've heard, they did not create the

 2   loader, no.

 3   Q.   So your sworn declaration regarding that they owned the

 4   copyright to the loader, what was that based on?

 5   A.   That was based on that -- they leased the loader, so why

 6   would they not own the copyright to that?

 7   Q.   Were you ever told that simply leasing a loader means that

 8   you own a copyright to something?

 9   A.   No.  That was just speculation.

10   Q.   You were just speculating in your sworn declaration?

11   A.   Yes, in this instance, I guess I was.

12   Q.   Do you recall that, in your amended complaint, you allege

13   that you owned the copyright to the loader?

14   A.   No, I did not own the copyright to the loader.  I never

15   said that I owned the copyright to the loader.

16   Q.   Do you recall that you filed an amended complaint in this

17   case alleging these claims?

18        MR. MANN:  Your Honor, for a point --

19   A.   I do not remember that at all.

20        THE COURT:  I think it's not called an "amended

21   complaint."  It's an amended answer and counterclaim.

22        MR. MARCELO:  Thank you, Your Honor.  You are correct,

23   and I was not specific enough.

24        THE COURT:  Why don't you just refer it to as "the

25   counterclaim."

1        MR. MARCELO:  Okay.

2   Q.   (By Mr. Marcelo)  The counterclaim, you remember filing the

3   counterclaim?

4   A.   Yes.

5   Q.   And do you recall that, in those counterclaims, you alleged

6   to own copyrights to the loader driver?

7   A.   No, not to the loader driver, no.

8        MR. MARCELO:  Mr. Blackburn, let's pull up Exhibit 103.

9   Do not publish the exhibit, though, please.

10  Q.   (By Mr. Marcelo)  Mr. May, you recognize this as your

11  answer and amended counterclaims?

12  A.   I guess so.

13  Q.   Filed November 21st, 2022?

14  A.   Okay.

15  Q.   Let's go to page 14.

16       THE COURT:  Any objection to publishing it?

17       MR. MANN:  No objection, Your Honor.

18       THE COURT:  You can publish page 14, or any other page

19  of this document, to the jury.

20       MR. MARCELO:  Understood.  And, Your Honor, just to be

21  clear, we're not intending to offer it into evidence; merely as

22  impeachment.

23       THE COURT:  I'm not intending to admit it into

24  evidence, either.

25       MR. MARCELO:  Thank you, Your Honor.

1   Q.   (By Mr. Marcelo)  Page 14, paragraph 19.

2   A.   Paragraph 19?

3   Q.   Yeah.  I suppose it begins on page 13, but the part I want

4   to focus on is on page 14.

5        Now, you see where it says, "The randomly named .sys files,

6   such as CANOBX14.sys," in document Exhibit C; see that sentence?

7   A.   Yes.

8   Q.   And at the bottom of the paragraph, you wrote, "Mr. May

9   holds copyright in these files, pursuant to 17 U.S.C., Section

10  201"?

11  A.   That would be incorrect, because I've never owned

12  copyrights to those files.

13  Q.   Right.  That's what I'm asking.

14       Your counterclaim in which you allege that you own

15  copyrights to the loader file, that's incorrect?

16  A.   Yes.  I do not own copyrights to the loader file.

17  Q.   Mr. May, the remaining files on Exhibit 56 -- well, and

18  including the two we just discussed -- those were either related

19  to reverse engineering or the cheat loader, right?

20  A.   There was nothing related to the cheat loader besides the

21  system file on there.

22  Q.   Right.  Okay.  So the system files relate to the cheat

23  loader?

24  A.   Yes.

25  Q.   And all the other files listed relate to reverse

1  engineering?

2  A.   Other system files on there relate to -- like, the files

3  from G, the system file ReClass64, that relates to my files, not

4  the AimJunkies' loader.

5  Q.   Understood.  And my question was, simply, I understand it

6  relates to your file, but it also relates to reverse

7  engineering, right?

8  A.   Oh, yes, correct.

9  Q.   And you're not claiming that Bungie was improperly

10 accessing these files that you admit attached to *Destiny 2*,

11 right?

12 A.   The ones that attached to *Destiny 2*, I'm not saying they

13 improperly -- I'm saying they could have -- they did, obviously,

14 access them, but I'm saying those were not files -- files like

15 those were not created specifically by me.  Those were not

16 original works.  The ones down here, the ReClass64.sys, that's

17 an original work.  I'm saying that was copyrighted by me, and

18 that is mine.

19 Q.   I want to walk through the security measures that you had

20 discussed.  I heard "firewall" and "password"; is that right?

21 A.   Yes, sir.

22 Q.   Okay.  Let's talk about the firewall first.  You said there

23 was a Windows Firewall?

24 A.   Yes.

25 Q.   The Windows Firewall on your computer controls what files

1  the computer can access?

2  A.    It protects from intrusions.

3  Q.    But once a program is permitted past the Windows Firewall

4  and it's running on your computer, you'd agree that it could

5  access anything on your computer?

6  A.    If was permitted past it, yes, it could.

7  Q.    And you knew that before you played *Destiny 2*?

8  A.    Sorry.  Can you rephrase that?

9  Q.    You knew that if a program is permitted past a Windows

10 Firewall, it could access any programs on your computer; you

11 knew that before you played *Destiny 2*?

12 A.    I knew that any game is limited to their files and not

13 another person's files.

14 Q.    Mr. May, when you downloaded *Destiny 2*, you allowed it

15 access through your Windows Firewall, right?

16 A.    Any game would be allowed past the firewall, yes.

17 Q.    To play *Destiny 2,* you would have to let it past the

18 firewall.

19 A.    Yes.

20 Q.    Bungie didn't force you to let it past its firewall, right?

21 You chose to?

22 A.    I would say any game is usually allowed past a firewall.

23 Q.    And I'm talking about you yourself.  You wanted to use

24 *Destiny 2*, because you were attaching reverse-engineering tools,

25 right?

1  A.    Yes.

2  Q.    And to do that, you needed to let it past your firewalls.

3  A.    To play the game, yes.

4  Q.    Okay.  Let's talk about your passwords.  I heard two sets.

5  One is your password for your Windows -- the login?

6  A.    Yes.

7  Q.    Okay.  That's, like, if my computer is off, I turn it on,

8  the first screen says to enter your password.  That's what

9  you're talking about?

10  A.    Yes.

11  Q.    Okay.  Before you even open *Destiny 2*, you, of course, have

12  to enter that password, right, because you need to turn on your

13  computer?

14  A.    Correct.

15  Q.    Okay.  Bungie is not entering that password for you?

16  A.    No.

17  Q.    And then you said there were passwords on certain folders.

18  A.    Oh, yes, sir.

19  Q.    And there's files in those files, I presume?

20  A.    Yes, sir.

21  Q.    Great.

22        For those files that you allege Bungie accessed, they were

23  already running on your computer when you opened *Destiny 2*,

24  weren't they?

25  A.    The system file would have been running if the ReClass was

1   at that time, yes.

2   Q.   Right.  And you would agree that all those files on

3   Exhibit 56, they were running on your computer when you opened

4   *Destiny 2*?

5   A.   I would say that the system file was running in the

6   background.  Apart from the *Destiny 2* process, it shouldn't have

7   been on that list in the first place.

8   Q.   And to make them run, you had to enter the passwords, at

9   some point, into the folder, right, to click on the file?

10  A.   Yes.

11  Q.   Because to access it and double-click, you're entering the

12  password?

13  A.   Yes.

14  Q.   Bungie did not reach over and type in the password?

15  A.   I'm not sure if they gained access while it was closed or

16  not.

17  Q.   But you know that you entered the password.

18  A.   I know I entered the password, yes.

19  Q.   Mr. May, when you reverse engineer video games to make

20  cheats, you know that video game developers can detect the

21  reverse-engineering tools you use?

22  A.   Yes.

23  Q.   And you try certain methods to try to avoid detection,

24  right?

25  A.   Yes.

1  Q.   Like renaming the tool?

2  A.   Correct.

3  Q.   You used the ReClasskernal64.sys file, a ReClass driver, to

4  try to avoid detection as well, right?

5  A.   I used it to, yes, to gain access to memory at a higher,

6  elevated state.

7  Q.   And the goal was to avoid detection.

8  A.   That was one of the reasons, to see if I would be detected

9  doing that, yes.

10 Q.   When you used *Destiny 2*, you agreed to its privacy policy?

11 A.   Yes.

12       MR. MARCELO:  Mr. Blackburn, if you could pull up

13 Exhibit 105.  This is a stipulated exhibit.

14 Q.   (By Mr. Marcelo)  Mr. May, this is Bungie's privacy

15 statement, January 1st, 2020?

16 A.   Okay.

17 Q.   This was attached to your counterclaims?

18 A.   Yes.

19 Q.   You agreed to this privacy policy?

20 A.   Correct.

21 Q.   Let's go to page 4.  Near the bottom of the page, it

22 identifies "categories of information we automatically collect

23 and have collected in the past 12 months."  Do you see that?

24 A.   I do.

25 Q.   And right below it, one of the listings is "Bungie services

 1   use data, including information about your use of the Bungie

 2   services, the pages and content that you view, the referring and

 3   exiting pages, your access times, the links you click, and other

 4   actions taken in the Bungie services."

 5   A.   Correct.

 6   Q.   And you, of course, agreed to that?

 7   A.   Yes.

 8   Q.   Okay.  Let's go to page 5, paragraph 3.  Bungie discloses

 9   the business purposes for collecting that information.

10   A.   Where's that at?  I'm sorry.

11   Q.   It's under paragraph 3, under "use of information."  Do you

12   see it says "Our business purpose for collecting and using

13   information"?

14   A.   I do.

15   Q.   Okay.  And one of those purposes is to prevent fraudulent

16   use of the Bungie services?

17   A.   Yes.

18   Q.   And next page, the top of page.

19   A.   Sorry.  Where is?

20   Q.   There we go.

21   A.   Oh, there we go.

22   Q.   The next bullet point is that it will use information to

23   enforce their terms and legal rights?

24   A.   Correct.

25   Q.   And the next bullet point is they'll use the information to

1   prevent or address potential or actual injury or interference

2   with Bungie's rights, property, operations, users, or others who

3   may be harmed or may suffer loss or damage.

4   A.    Yes.

5   Q.    Those were all identified to you and what you agreed to?

6   A.    In the privacy policy, yes.

7   Q.    Mr. May, we heard some testimony about the wiping of your

8   computer.

9   A.    Correct.

10  Q.    You agree that you wiped your computer and the hard drives,

11  right?

12  A.    Yes.

13  Q.    You wiped files from your C, D, F, G, and H drives in May

14  of 2022.

15          MR. MANN:  Your Honor, I believe that misstates

16  testimony.

17          THE COURT:  Well, you can ask the question.

18      The question is a statement rather than a question.  Why

19  don't you ask it again, counsel, in a question format.

20  Q.    (By Mr. Marcelo)  Mr. May, is it correct that you wiped the

21  files from your C, D, F, G, and H drives in May of 2022?

22  A.    The external drive was never wiped.

23  Q.    And which one is the external drive?

24  A.    It was G at that -- I don't know if it was G at that time.

25  I wiped the drive.  When you plug it in and unplug it, it

1  changes drives, depending on how many drives you have plugged in

2  at the time.

3  Q.    But you agree that you wiped the other drives?

4  A.    Yes, because they had nothing related to any of the files

5  related in this case anyway.

6  Q.    You say just not the G drive?

7  A.    Yeah.  That's my external drive, yes.

8  Q.    Mr. May, I'm going to direct you to your testimony, March

9  23, 2023.

10 A.    Okay.

11 Q.    This is page 94, lines 9 through 19.

12        "QUESTION:  Okay.  Do you still have access to the C, D, F,

13 G, and H drives from your old computer prior to May 2022?

14        "It's all been cleaned since then, since I moved over to

15 the new PC.

16        "So is that a "no," you don't have access to those files

17 anymore?

18        "No.  Because I cleaned everything and wiped everything

19 when all this was going on.  The only thing I have are all the

20 files on my external drive that still were developed and

21 everything."

22 A.    That's correct.  Everything from my external drive was kept

23 that related to this case.

24 Q.    But all the other files -- you had made some references

25 to -- you thought Bungie, maybe, accessed some other files --

1    those were all wiped?

2    A.    All the files I made reference to in this were the files

3    right here.  At that time, it was the G drive, but that is my

4    external drive, yes.

5    Q.    Mr. May, my question was, you had made reference to that

6    you thought Bungie may have accessed other files on your

7    computer, but those were all wiped, other than the files that we

8    saw on Exhibit 56.

9    A.    Yes.  Please note that all of this was done before I got

10   any testimony -- or, I mean, any documents from Bungie.  I was

11   not planning on filing a counterclaim until I got those

12   documents.  I never knew I would file a counterclaim, up until

13   that point.  So those files were already gone before this.

14   Q.    Mr. May, does your computer processing system or operating

15   system track activities on your computer, do you know?

16   A.    It probably does.

17   Q.    When you wiped your computer, did you save all that

18   information?

19   A.    I wouldn't know what to do -- or how to do that, no.

20   Q.    When you got your new computer, you just threw away your

21   old computer?

22   A.    Yes.  I wiped the old computer and installed a new

23   operating system, and, hopefully, if I needed it again, I could

24   use it.

25   Q.    Did Bungie ever have an opportunity to review your old

1  computer?

2  A.    No.

3  Q.    Did Bungie ever have an opportunity to review the

4  processing system or operating system of that computer?

5  A.    They never asked.

6  Q.    But you had wiped it, right?

7  A.    Yes.  But this was all done before I filed my countersuit.

8  I didn't know I was going to file a countersuit at that point.

9            MR. MARCELO:  Nothing further, Your Honor.

10           THE COURT:  All right.  Anything further?

11           MR. MANN:  Short redirect, Your Honor.

12           THE COURT:  All right.

13                    REDIRECT EXAMINATION

14  BY MR. MANN:

15  Q.    Mr. May, I just want to clarify a few points here.

16        Mr. Marcelo said you had no copyrights in your ReClass64;

17  do you recall that?

18  A.    Yeah, I do recall that.

19  Q.    Okay.  Now, do you have a copyright registration in that?

20  A.    I do not.

21  Q.    Do you believe that you are the author of that work?

22  A.    I do.

23  Q.    Okay.  Do you know what -- that sentence we said, "by

24  operation of 17 U.S.C.," do you know what that means?

25  A.    I do not.

1    Q.    You're not a lawyer?

2    A.    No, I'm not a lawyer.

3    Q.    But I just want to make clear.  You are not claiming that

4    you have a copyright registration on that program, correct?

5    A.    That is correct.

6    Q.    But you, nevertheless, believe, yourself, you are the

7    author of that program, correct?

8    A.    Correct.

9    Q.    Thank you.

10         Now, again, is that the ReClass64.sys?

11   A.    Yes, sir.

12   Q.    Thank you.

13         Now, when you signed up with Bungie and you wanted to play

14   the Bungie *Destiny 2* game, and you clicked on -- well, let's

15   talk real world.

16         Did you see -- when you signed on, did you, actually, see

17   their limited software license agreement?

18   A.    I never scrolled through anything or looked at it, no.  I

19   just, kind of, clicked past anything that was on the screen.

20   Q.    Okay.  So, basically, it says "click here if you want to

21   continue," and you click here, even though it says, "I, hereby,

22   certified," blah, blah, blah?

23   A.    Yeah.  Nobody ever reads those things.

24   Q.    Okay.  Now, is the privacy policy actually on the screen at

25   the time?

1    A.    I don't believe so.

2    Q.    It's a fact, isn't it, that it makes with reference, in the

3    limited software license agreement, to the privacy policy?

4    A.    Yes.

5    Q.    And to get to the privacy policy, you have to go somewhere

6    else?

7    A.    Correct.

8    Q.    So first you'd to read the license agreement that virtually

9    nobody reads, you'd have to notice the privacy policy, and then

10   you'd have to click on that, and then go to privacy policy,

11   correct?

12   A.    Yes.

13   Q.    Okay.  Now, do you see anything in the privacy policy that

14   permits Bungie to look wherever they want on your computer?

15   A.    I do not.

16   Q.    Okay.  If you knew -- if you knew that by playing

17   *Destiny 2*, Bungie would be free to look wherever they want on

18   your computer, would you have agreed to play it?

19   A.    If I knew beforehand, no.

20   Q.    Now, let's talk, again, about the ReClass64.sys file.  You

21   saw the privacy policy that said that we can look at stuff on

22   your computer for the Bungie system.  Do you remember seeing

23   that language?

24   A.    Somewhere along those lines, yes.

25   Q.    Okay.  I tried to take notes here.  It says, "Within the

1  Bungie service."  I think that was the language of the privacy

2  policy.

3  A.    Yes.

4  Q.    Does the ReClass64.sys file, does that work within the

5  Bungie service?

6  A.    It does not.

7  Q.    Is that external to the Bungie service?

8  A.    It is.

9  Q.    Would you interpret that as being something outside of what

10  Bungie said they could look at?

11  A.    Yes.

12  Q.    Okay.  Now, we got into you were wiping files.  Again, can

13  you clarify for the jury, one more time, which files you cleaned

14  on your computer?

15  A.    So all the files that I clean on my computer are the

16  operating systems and, basically, any game that was installed on

17  there.

18       So before all this happen, before I knew I was going to

19  file a countersuit, I wiped the computer and copied the files

20  over from my hard drive, the external hard drive, and kept those

21  on that drive to the new computer, so that way I could have any

22  copies of all my work files and everything without having to

23  worry about it.

24       And then I'd wipe the old computer, so that way I had a

25  clean slate, and it wouldn't be corrupted anymore.

1        But this was all before I knew I was going to file a

2   counterclaim.

3        I had no idea that the documentation that I would get from

4   discovery would show that they'd been on my computer.  So then

5   that's when I filed the counterclaim, but those files were gone

6   before the counterclaim on that previous computer, but the

7   relevant files were still on the new computer because I still

8   had my external drive.

9   Q.    Okay.  Let's talk a little bit about this claim that you

10  were destroying evidence that would be helpful to Bungie and

11  harmful to you.  It's the other way around, isn't it?

12  A.    Yes.

13              MR. MARCELO:  Objection, Your Honor; misstates

14  testimony from counsel.

15              MR. MANN:  I'll rephrase, Your Honor.

16              THE COURT:  The jury is to disregard the last question

17  and answer.

18        Ask another question.

19              MR. MANN:  Certainly.

20  Q.    (By Mr. Mann)  Mr. Marcelo asked you, if you had those

21  files, it would show who accessed your computer when, correct?

22  A.    Could you repeat that question?

23  Q.    Sure.

24        Mr. Marcelo, I don't mean to put words in his mouth, I

25  understood the question to be that, if you had retained those

1    original drives, you would have data showing when files were

2    accessed and by whom, or something to that effect.  Do you

3    recall that question?

4    A.    I do.

5    Q.    Okay.  Now, if you had that information, wouldn't that show

6    when Bungie was accessing your computers?

7    A.    I would assume so, yes.

8    Q.    And wouldn't that be helpful to your case?

9    A.    It would be.

10   Q.    Would it make sense for you to destroy information and

11   evidence that would be helpful to your case?

12   A.    No.

13   Q.    And, again, this all happened before you saw that green

14   sheet exhibit that showed -- that made you think that you had a

15   counterclaim, correct?

16   A.    Yes, correct.

17            MR. MANN:  No further questions, Your Honor.

18            THE COURT:  Anything further?

19            MR. MARCELO:  Very briefly.

20                          RECROSS-EXAMINATION

21   BY MR. MARCELO:

22   Q.    Mr. May, you used the ReClass driver tool to help you see

23   memory in *Destiny 2*, right?

24   A.    I used it to get an elevated handle to ReClass, but it did

25   not attach to the game itself, no.

1    Q.    And the elevated handle, that was in order to read memory

2    in --

3    A.    Yes.

4    Q.    -- *Destiny 2*?

5    A.    Yes.

6              MR. MARCELO:  Nothing further.

7              THE COURT:  Thank you, sir.  You may step down.

8              THE WITNESS:  Thank you, sir.

9              MR. MANN:  Your Honor, at this time, the defendants

10    rest.

11              THE COURT:  All right.  Does the plaintiff have a

12    rebuttal case that you wish to pursue, evidence that you want to

13    put in?

14        Ladies and gentlemen of the jury, let me just tell you, as

15    I told you at the beginning.  In a trial, the plaintiff goes

16    first, and then they rest when all their evidence is presented.

17    Then the defendant goes next.  They've now rested.  But the

18    plaintiff, in their claim, have the burden of proof, and because

19    they do, they have a right to recall witnesses or provide what

20    we call "rebuttal" testimony or evidence.

21        So that's what we're doing now, finding out whether they

22    wish to call any witnesses to rebut, in any way.  They have the

23    final say, if you will, because they're the plaintiff.

24              MR. RAVA:  Yes, Your Honor.  We would like to call

25    Dr. Ed Kaiser back to the stand.

Case 2:21-cv-00811-TSZ    Document 308    Filed 06/17/24    Page 62 of 144
Edward Kaiser - Rebuttal direct by Mr. Rava          May 23, 2024

500

```
 1              THE COURT:  All right.  You may do so.

 2         You're still under oath.

 3                         EDWARD KAISER,

             having been previously sworn, testified as follows:
 4

 5                   REBUTTAL DIRECT EXAMINATION

 6   BY MR. RAVA:

 7   Q.    Good morning, Dr. Kaiser.

 8   A.    Good morning.

 9   Q.    Have you been in the courtroom yesterday and today while

10   the defendants have put on their case?

11   A.    Yes, I have been.

12   Q.    And have you been paying attention to the testimony?

13   A.    The entire time.

14   Q.    Dr. Kaiser, you heard Mr. May just say that he was

15   experiencing problems with his computer that caused him to wipe

16   it -- wipe it down.  Is there anything that you heard that

17   suggests that that was caused by any of Bungie's programs,

18   Dr. Kaiser?

19   A.    Not at all.

20   Q.    Mr. May also testified that he downloaded the *Destiny 2*

21   game onto his computer, right?

22   A.    I heard him say that, yes.

23   Q.    Now, when he had the *Destiny 2* on his computer, did he have

24   only those thousand lines that you submitted to the Copyright

25   Office on his computer?
```

1   A.    No.  He had the whole game client.  He had all 25 million

2   lines of code in there.

3   Q.    And would that have included the code with the guards and

4   the guards guarding the guards and the other things you

5   described on Tuesday?

6   A.    Yes.

7   Q.    He had the entire program on his computer?

8   A.    Yeah, he had the entire program running on his computer.

9   Q.    And he wouldn't be unique, as a *Destiny 2* player, right?

10  Every *Destiny 2* player would have that.

11  A.    Yes.  It's standard for every player playing *Destiny 2*.

12  Q.    All right.  Dr. Kaiser, what does the process running on

13  Mr. May's computer, or anyone playing *Destiny 2* on a computer,

14  do when those guards or those guards guarding the guards detects

15  something attacking the process?

16  A.    Yeah.  They notice that something is abnormally happening

17  to the game.  One of those examples is another process has

18  attached a handle, whether it's elevated or not, and then it

19  takes note of that.  It observes that as part of the telemetry

20  of the game, and it reports it back to the *Destiny 2* services

21  that the game is being manipulated in a way that is unexpected.

22  Q.    So only if the game is manipulated and unexpected does the

23  user's computer send something back to Bungie?

24  A.    Absolutely; otherwise, there would be too much data.

25  Q.    And what it sends back is something that we've called here,

Case 2:21-cv-00811-TSZ    Document 308    Filed 06/17/24    Page 64 of 144
Edward Kaiser - Rebuttal direct by Mr. Rava                    May 23, 2024

502

1   I think, "MD5 hash"; is that right?

2   A.    That is correct.  That is an internationally, globally

3   known standard.

4   Q.    And when Bungie gets that MD5 hash from a computer that's

5   been identified as manipulating the game, can Bungie see any

6   personal data from that MD5 hash?

7   A.    No.  It's just a series of letters and numbers.

8   Q.    Does it know what the content of that file is?

9   A.    Not at all.

10  Q.    Can it access that file?

11  A.    No.

12  Q.    The file resides where?

13  A.    On the computer.

14  Q.    On which computer, Dr. Kaiser?

15  A.    Sorry.  Can you back up and restate the question, please?

16  Q.    The file identified by the MD5 hash, on whose computer does

17  it reside?

18  A.    It still stays on the player's computer.

19  Q.    And Bungie doesn't know what the contents of that file is?

20  A.    Not at all.

21  Q.    Does the *Destiny 2* cheat loader file attach to the

22  *Destiny 2* process on the user's computer?

23  A.    Yes.  It is commonly referred to as a "handle."  That is

24  the way one process establishes a link to another process.

25  Q.    Dr. Kaiser, I believe it was yesterday, Mr. May testified

1    to various other ways in which he says the *Destiny 2* cheat could

2    have been created without copying *Destiny 2* code.  Were you

3    present for that testimony?

4    A.    I was.

5    Q.    And he mentioned something called, I believe he said a

6    "mouse event"; do you remember that?

7    A.    I've heard him say that in the past.  I don't remember him

8    saying that yesterday, though.

9    Q.    All right.  Well, what is a mouse event, Dr. Kaiser?

10   A.    A this event is the operating system.  It's, basically, how

11   it interprets from the keyboard or the mouse, those inputs, and

12   sends them to whatever process is in the foreground of the

13   operating system.

14   Q.    All right.  Is that how the cheat here operated,

15   Dr. Kaiser?

16   A.    I don't believe so.  It's inconsistent with an

17   injection-based cheat.

18   Q.    Dr. Kaiser, you were also in the courtroom, were you not,

19   during Mr. Schaefer's testimony?

20   A.    I was, yes.

21   Q.    Could you do your job if you were 15 years behind the

22   times?

23   A.    No, I could not.

24   Q.    What do you do to stay current, Dr. Kaiser?

25   A.    I attend conferences; I do research; we do simulations and

1  prototype, launch these techniques, to learn how the techniques

2  work.  We don't write cheats, but we write prototype software to

3  understand how the technique works, and develop countermeasures

4  and preventions for it.

5  Q.    Would you have caught James May 100 times if you weren't

6  current on techniques, Dr. Kaiser?

7  A.    I don't believe that would be possible.

8  Q.    Dr. Kaiser, speaking of Mr. May and his 100 times.

9         In your experience, does someone who is reverse engineering

10  code 100 times in the space of 13 months, is that person just

11  doing that casually, just for their own interests?

12  A.    Not at all.

13  Q.    What does that type of activity suggest to you?

14         MR. MANN:  Your Honor, this calls for speculation.  I

15  believe it's outside the area of this witness's expertise.

16         THE COURT:  Sustaining the objection.  It does call

17  for speculation.

18  Q.    (By Mr. Rava)  Dr. Kaiser, in your job, have you supervised

19  or been part of investigations relating to manipulations and

20  attacks on the *Destiny 2* code?

21  A.    Yes, I have, many times.

22  Q.    Approximately, how many?

23  A.    Personally involved, probably close to 100; in terms of

24  supervising other analysts on our team, probably low hundreds,

25  maybe 3-, 400 times.

1  Q.   And do you identify patterns of behavior in connection with

2  those investigations to assist you in future investigations?

3  A.   Yes.

4  Q.   What are the sorts of things that you're looking for?

5  A.   We're looking for the types of programs that are attaching

6  to the game; we look for the frequency; how quickly they logon

7  to the game; what they're doing while they're in the game; those

8  sorts of patterns.

9  Q.   And how do those patterns help you do your job of

10 protecting the integrity of the game?

11 A.   Well, we have limited resources, and so we focus those

12 resources on the most pressing threats.

13 Q.   Dr. Kaiser, is there anything you heard, over the course of

14 the last day from the defendants' case, that changes your

15 conclusion that the *Destiny 2* cheat software copies the Destiny

16 code?

17 A.   No.

18 Q.   Why not?

19 A.   I heard James May say that the purpose of reverse

20 engineering was to look at the object code and to copy it and

21 plug and play it into the cheat loader.

22 Q.   Did you hear anything from Mr. Schaefer?

23 A.   I heard Mr. Schaefer say it was a DLL injection loader.

24 Q.   Is that consistent with your conclusion?

25 A.   Yes.  That's entirely consistent with copy, inject, modify.

1    Q.    What about Mr. Green, Dr. Kaiser, did you hear anything

2    from him that confirmed your conclusion?

3    A.    I don't believe I heard any technical explanation, but I

4    recall his testimony explain motivation.

5    Q.    Dr. Kaiser, are you proud of the work you do at Bungie?

6    A.    I'm very proud of the work I do at Bungie.

7              MR. RAVA:  Thank you.  I have no further questions.

8              THE COURT:  Cross of the witness?

9              MR. MANN:  Yes, Your Honor.  I'll keep it brief.

10                    REBUTTAL CROSS-EXAMINATION

11   BY MR. MANN:

12   Q.    Good morning, Dr. Kaiser.  I want to clarify.

13         Is it Bungie's contention that the cheat Mr. May attempted

14   to make is the cheat software that was in contention here in

15   this lawsuit?

16   A.    Can you rephrase the question, please?

17   Q.    Certainly.

18         You're talking about Mr. May's efforts to create a cheat.

19   I want to know which cheat are we talking about in this lawsuit,

20   the one sold by Phoenix Digital, or one that's purportedly

21   created by Mr. May?

22              MR. RAVA:  I object to the form of that question.

23              THE COURT:  Overruled.  You may answer.

24   A.    I don't believe it's alleged.  I believe Mr. May did create

25   the cheat that is at the heart of this lawsuit.

1    Q.   (By Mr. Mann)  Okay.  So you're saying that the cheat that

2    Mr. May testified he tried to make and never did make is really

3    what's at issue in this lawsuit; do I understand you correctly?

4    A.   Yes, that is my belief.

5    Q.   Okay.

6         Now, I'd like to put up Exhibit 56, I believe.  And no

7    surprise, that's that green sheet we've seen before.

8         I'd like you to take -- can you see it, Dr. Kaiser?

9    A.   Yes, I can see it.

10   Q.   Okay.  Thank you.

11        If you look at -- let's go to just row 1.  Actually, let's

12   go down to the ReClass one.  Let's look at No. 46.  Do you see

13   that?

14   A.   Yes, I do.

15   Q.   Okay.  Do you see the second line, which is paren,

16   8D98DB3A27," et cetera, et cetera.  Do you see that?

17   A.   That is, actually, the first line, but it's broken over,

18   but, yes, I do see it.

19   Q.   Whichever line it is, sir, do you see the one that says

20   "8D98D"; do you see that?

21   A.   Yes, I do see that.

22   Q.   Okay.  Good.

23        That's an MD5 hash, is it not?

24   A.   That's correct.

25   Q.   That MD5 hash does not reside on Mr. May's computer, does

1    it?

2    A.    That question doesn't exactly make sense.  Can you clarify

3    it?

4    Q.    I will try.

5          You're familiar with what an MD5 hash is, correct?

6    A.    I'm very familiar, yes.

7    Q.    An MD5 hash is, you take a piece of computer code -- it can

8    be a program, typically, it's a program -- you run it through a

9    so-called hash function, correct?

10   A.    Yes.

11   Q.    And what comes out of that hash function is a bunch of

12   gibberish, in essence, correct?

13   A.    Well, yes.  It's a series of 1s and 0s that is

14   irrepresented in hexadecimal as numbers plus the letters A

15   through F.

16   Q.    In fact, it's called a "hash" function because it looks

17   like hash, a bunch of stuff chopped up; isn't that the origin of

18   the name?

19   A.    I don't believe that to be true, but I don't --

20   Q.    But the purpose is, if I have a program and I feed it, in

21   its entirety, into an MD5 hash function, the MD5 hash function

22   will create a unique set of 1s and 0s and so forth that can be

23   read in hexadecimal form, if you want it?

24   A.    Probabilistically unique, that's correct.

25   Q.    Exactly.  But it not going to be Shakespeare.  It's not

1  going to be something you can read and understand.

2  A.    Yes.  Essentially, it's 128 bits of data.

3  Q.    Good.

4        Now, if I take that program and if I make just one little

5  change, one little change in the program, and I run it through

6  the MD hash function, I'm going to get a different output,

7  aren't I?

8  A.    That's one of the cryptographic properties of that, that's

9  correct.

10  Q.    Exactly.  So isn't -- basically, the whole idea of the hash

11  function is, I can take something that I want to protect and I

12  don't want people to read, but I want to be able to compare it

13  to something else, I can run it through a hash function, you can

14  run something else through the hash function, and if you get the

15  same hash, that tells you they must be identical, correct?

16  A.    That was a really long question, but, yes, it is used for

17  verifying that two pieces of software or sets of data match

18  without looking at the contents of that data.

19  Q.    Okay.  So, basically, it's a way of, like, doing passwords,

20  for example.  If I've got a password, I run it though a hash

21  function, and then when it goes to whatever I'm sending it to,

22  nobody can read my password.

23  A.    That is a really weird, technical question.  Can you

24  please --

25  Q.    Sure.  Sure.

1          Let's say I'm not particularly concerned about security,

2    and my password is "password."

3    A.    Okay.

4    Q.    Imagine that.  I'm not a cryptographic expert.  I don't

5    really care about security.  I just use "password" as my

6    password.

7          I run it through an MD5 hash.  What's going to come out is

8    going to be something that doesn't look anything like

9    "password," correct?

10   A.    That is correct.

11   Q.    But if you want to compare it to somebody else, and my

12   computer knows my password should be "password," and it creates

13   the same MD5 hash, that way, if those two hashes that nobody can

14   read, nevertheless, match up, it means it must have been the

15   same word that was put into the hash function in the first

16   place.

17   A.    That's correct.

18   Q.    And the whole idea is, you know, when this stuff is flying

19   through the Internet, people can't read it.  That's basic

20   security.  That's how most of these things function today,

21   correct?

22   A.    That is incorrect.

23   Q.    It is?

24   A.    It is not used for encryption.

25   Q.    I'm not saying it's used for encryption.  I'm saying it's

1    to enable comparison of password without the person doing the

2    comparison actually knowing what those words are.

3    A.    No.  The question you asked was about sending data across

4    the Internet securely, which is a different cryptographic

5    primitive called "encryption."

6    Q.    Okay.  Well, no, I'll tell you what.  We got a little bit

7    diverted.

8          What I want to know is, did James May's computer create

9    that hash we see here in line 46?

10   A.    Yes.

11   Q.    His own computer created that hash?

12   A.    It was computed on his computer, yes.

13   Q.    This was not created by Bungie?

14   A.    Can you clarify what you mean by "created by Bungie"?

15   Q.    What I mean is, did Bungie take this program, run it

16   through a hash function, and then associate that hash with

17   Mr. May's ReClass program?

18   A.    The *Destiny 2* software running on Mr. May's computer

19   created that hash.

20   Q.    Created that hash?

21   A.    It computed that hash.

22   Q.    Okay.  But you heard Mr. May testify that this ReClass

23   program is not something that is attached to the game, correct;

24   you heard that testimony?

25   A.    I heard him say that, and that's incorrect.

1    Q.    But you heard him say that?

2    A.    I heard him say that, yes.

3    Q.    But you're telling me, if I understand you correctly, is,

4    nevertheless, the Bungie game created that program -- created

5    that hash for a program that Mr. May says is not attached to the

6    game.

7    A.    He alleges that it's not attached to the game.

8    Q.    The point I wanted to get from you, if you will answer, is,

9    are we in agreement that that hash that we see here is created

10   by a Bungie product or by Bungie itself?

11   A.    It is created by *Destiny 2*, the processes that have

12   attached to it, yes.

13   Q.    So that is something that is created by *Destiny 2*?

14   A.    Yes.

15   Q.    Okay.  And in order to create that hash, you have to have

16   access to the entire program, correct?

17   A.    The *Destiny 2* process is running in memory.  It has access

18   to its entire program, that's correct.

19   Q.    Has this hash ever been provided to any third parties?

20   A.    This hash, in particular?

21   Q.    Any of the hashes that were obtained from Mr. May's

22   computer.

23         MR. RAVA:  I object to the scope of this.  It goes

24   well beyond the testimony.

25         THE COURT:  Overruled.  You may answer.

1    A.    Can you restate the question?  Sorry.

2    Q.    (By Mr. Mann)  Are you familiar with a company called

3    "Novacoast"?

4    A.    I am.

5    Q.    Can you tell the jury who Novacoast is?

6          MR. RAVA:  Your Honor, I object to the relevance and

7    the scope.

8          THE COURT:  Where are we going with this, counsel?

9          MR. MANN:  Where we're going with this is, it's our

10   theory that, by taking this information, this could be uploaded

11   to a database that keeps track of suspect programs, and that the

12   purpose of doing this is so they could see what programs on

13   Mr. May would be of concern to them, and because of the new

14   hash, they could say somebody else is running something.  If

15   it's the same hash, they could say, aha, that's May or that's

16   Aimjunkies or that's...

17         THE COURT:  I'm going to overrule the objection and

18   permit brief inquiry into this.

19         MR. MANN:  I'm very near the end; two or three

20   questions.  I'm sure you've heard that before.

21         THE COURT:  I have.

22   Q.    (By Mr. Mann)  Okay.  Sir, can you answer my question?

23   A.    There was a lot of confusing stuff there.  Can you please

24   restate?

25   Q.    (By Mr. Mann)  Was this hash ever provided to Novacoast,

1   any of the hash that we see on this document?

2   A.    No, I don't believe so.

3   Q.    Okay.  Now, you testified you prepared this document,

4   correct?

5   A.    Yes, I did.

6   Q.    Okay.  And you said this is a summary or a compilation of

7   the information you received from James May's computer?

8   A.    No, I never said that.

9   Q.    The question I have is:  Is this the entirety of everything

10  that was ever obtained off of Mr. May's computer, or is there

11  other information that does not appear on this document?

12  A.    These are rows in our banned database.  This is not

13  information obtained off of James May's computer.

14  Q.    Is this the entirety of the information that was obtained

15  off of James May's computer, or is there other information?

16  A.    There is associated metadata.

17  Q.    But it doesn't appear on this, correct?

18  A.    That's correct.

19  Q.    We're in the homestretch here.  I just want to clarify.

20        Have you yourself ever created a cheat?

21  A.    No.

22              MR. MANN:  No further questions, Your Honor.

23              THE COURT:  Any further questions, counsel?

24                    REBUTTAL REDIRECT EXAMINATION

25  BY MR. RAVA:

1    Q.    Dr. Kaiser, what would you compare an MD5 hash to?  What is

2    a path analogy?

3    A.    I believe in my prior testimony, I compared it to the ISBN

4    number on the back of a book.  It uniquely identifies what the

5    book is without, you know, having to read the whole book.

6    Q.    Without looking at the content of the book?

7    A.    You don't need to look into the book.

8    Q.    And, Dr. Kaiser, you work at a video game company?

9    A.    I do, yes.

10   Q.    Would it be strange for you to be building cheats while

11   working at a video game company?

12   A.    Yes.  We're not in the business of building video game

13   cheats.

14   Q.    But, nonetheless, isn't it part of your job to understand

15   how cheats work and protect the game from those cheats?

16   A.    Yes.

17   Q.    So what do you do to understand how cheats work so that you

18   can form opinions about the mechanics and underlying technology,

19   and work with the company to protect the valuable product that

20   you put on the marketplace?

21   A.    As I said earlier, we do research.  We have diagnostics

22   that tells us, from our perspective, what is happening to the

23   game, how it is being changed and manipulated.  From there, we

24   create theories about how it's working.  We do research across

25   the Internet and with other companies about what the techniques

 1    are to create those anomalies.  We build prototype programs that

 2    is a simplified version of the game.  It will create a prototype

 3    program that will then attempt those techniques against the

 4    little dummy test program.  And then we will observe, if we see

 5    those same symptoms.  It's, basically, science.

 6    Q.    The science of cheats?

 7    A.    The science of cheats, yes.

 8    Q.    That's your education, and that's your work experience?

 9    A.    On a daily basis, yes.

10    Q.    For 20-some-odd years, Dr. Kaiser?

11    A.    Yes.  I think I'm coming up on 20 years this October.

12          MR. RAVA:  No further questions.

13          THE COURT:  Anything further, counsel?

14          MR. MANN:  No, Your Honor.

15          THE COURT:  Does the plaintiff have any further

16    rebuttal testimony or evidence?

17          MR. RAVA:  No, Your Honor.  Plaintiff rests its

18    rebuttal case.

19          THE COURT:  All right.  Ladies and gentlemen, we've

20    got all the evidence in now.  It's all good.

21          We're going to take about a 10-, 15-minute recess.  When

22    you come back, I hope that we're going to be in a position where

23    I can read you the instructions.  It may take 20 minutes.

24    You'll have copies of the instructions, and you can read along

25    with me.

1    When we finish that, it will probably be just about noon,

2    we'll take our noon recess.  When you come back, we're going to

3    get our final arguments started about one o'clock.  So that's

4    where we are.

5        Please rise for the jury.

6            THE FOLLOWING PROCEEDINGS WERE HELD
             OUTSIDE THE PRESENCE OF THE JURY:

7

8        THE COURT:  We had a discussion, two or three days

9    ago, about AimJunkies and whether it was itself a party that

10   needed to be in the case, and I think we agreed that it was not

11   a party.  I'm not sure it's even an entity.  But, in any event,

12   that we could remove all reference to it; is that correct?

13       MR. RAVA:  Yes, that is the --

14       MR. MANN:  That was our understanding --

15       MR. RAVA:  -- that was our understanding of the

16   conversation we had on Monday, I believe.

17       THE COURT:  I don't think we have made a record of it,

18   so the clerk should note in the minutes today that AimJunkies is

19   no longer -- I guess it's aimjunkies.com -- is no longer an

20   entity that's in the case.

21       And the reason I bring it up is the instructions and the

22   caption will be modified accordingly to eliminate any reference

23   to it.  I just wanted to be sure that you knew in advance, and

24   everybody agrees.

25       MR. MANN:  No problem, Your Honor.

1    MR. RAVA:  Understood, Your Honor.  Thank you.

2    THE COURT:  All right.  Let's take our --

3    MR. DINI:  Your Honor, when would you like -- Bungie

4  has a motion for judgment as a matter of law.  Would you like to

5  hear that before, during this break, or lunch?  When would you

6  like to hear that?

7    THE COURT:  Why don't you -- how long is it going to

8  take?

9    MR. DINI:  I'm hoping to keep it short, Your Honor,

10  under 10 minutes.  I just want to make my record.

11    THE COURT:  Well, I want to be sure our instructions

12  are in, and then I'll come back, and you can do it before we

13  bring the jury in.

14    (Court in recess 11:17 a.m. to 11:39 a.m.)

15    THE FOLLOWING PROCEEDINGS WERE HELD
    OUTSIDE THE PRESENCE OF THE JURY:

16

17    MR. DINI:  Your Honor, Bungie moves for judgment as a

18  matter of law against James May on his counterclaim against

19  Bungie for violation of the Digital Millennium Copyright Act.

20    There's three elements that Mr. May needed to prove in

21  order to prove his claim:  That he used one or more

22  technological measures that he, effectively, controlled access

23  to; second is a work protected under copyright; and the third is

24  that Bungie circumvented those measures.

25    Based on the testimony we heard today, assuming everything

1  Mr. May said was true, this case is, actually, really simple.

2      Mr. May says he has two technological protection methods:

3  Firewalls and passwords.

4      Mr. May admits that he allowed *Destiny 2* past his firewall.

5  *Destiny 2* did not circumvent or defeat a technological measure

6  to get around the firewall.

7      Mr. May admits that he and only he entered the passwords to

8  open the files that he claims Bungie accessed.  Even assuming

9  Bungie had this broad access to his computer and could access

10  files that were running on Mr. May's computer, they were

11  available because Mr. May had allowed *Destiny 2* access past the

12  firewall and had opened the files on his computer using those

13  passwords.  Bungie didn't do that.

14      As you know, in the jury instructions, the mere accessing

15  of files alone is not circumvention of technological measures.

16  Circumvention of technological measures is only the defeating of

17  digital measures guarding the copyrighted material.

18      Assuming everything Mr. May said was true, that did not

19  happen.

20      Mr. May also failed to show that any of the works accessed

21  by Bungie were protected under the Copyright Act.

22      As the jury instructions note, Mr. May had to show -- it

23  was not enough to show that Mr. May merely wrote code.  That

24  alone is not enough to show that Mr. May owns a copyright.  But

25  that's all Mr. May said.  He never said what that code did, he

1  never said what portions of the code he wrote, he never

2  testified that any of that code was original.  Put simply, all

3  we know about these files is that Mr. May claims to be the

4  author of them.  That is not enough to sustain a claim under the

5  Digital Millennium Copy Right Act, and for those two reasons,

6  Bungie requests that the court grant its motion for judgment as

7  a matter of law against James May.

8       Bungie also moves for judgment as a matter of law on

9  certain theories of its copyright infringement claims.

10      First, Bungie asks that the court grant judgment against

11 James May on Bungie's claim for copyright infringement of

12 *Destiny 2*'s audiovisual and software code copyrights.  This is a

13 direct copyright infringement theory.

14      There's two elements to direct copyright infringement.  The

15 first is undisputed; Bungie owns audiovisual and software code

16 copyrights in *Destiny 2* and *Destiny 2: Beyond Light*.

17      The second element is that James May infringed the

18 *Destiny 2* code.  We allege that this has been done on two

19 different theories.

20      First, James May, as a user of the *Destiny 2* cheat.

21 Mr. May admits that he used the *Destiny 2* cheat sold on the

22 AimJunkies' website, and the parties stipulated to what those

23 cheat features do.

24      The ESP cheat feature draws boxes around characters and

25 creates a modified visual display, a derivative work of the

1    *Destiny 2* game.  It also teleports characters, and can

2    automatically aim, based on code that is only found inside the

3    *Destiny 2* process, and, therefore, must be present inside the

4    *Destiny 2* cheat that Mr. May was using.

5        As a user of the cheat software, when Mr. May injected the

6    copied code and created the modified display on his computer,

7    that was an infringement.

8        The second way that Mr. May infringed the copyrights is

9    because Mr. May had unauthorized copies of the entire *Destiny 2*

10   code on his computer.

11       Mr. May admits that he accessed *Destiny 2* pursuant to the

12   LSLA and subject to the conditions of the license agreement.

13   Mr. May admits that he violated the provisions of that license

14   agreement that prohibited reverse engineering, terminating the

15   license and revoking his access to the *Destiny 2* game.

16       Mr. May, thereafter, accessed *Destiny 2* over 100 times

17   without agreeing to the LSLA, in violation of the LSLA; in other

18   words, the copy of *Destiny 2* on his computer was unlicensed and

19   unauthorized, and, therefore, infringing.  That's the second

20   theory of direct liability against Mr. May.

21       Bungie also moves for judgment as a matter of law on its

22   vicarious infringement theory against all defendants.

23       There was underlying direct infringement by a third party:

24   The cheat users and the cheat developers.  The cheat users had

25   unauthorized copies of portions of *Destiny 2* code that were

1    resident in the cheat software, and the cheat developers were

2    actively reverse engineering, copying code and incorporating it

3    into the cheat.

4         The second element of vicarious infringement is that the

5    defendants directly benefitted financially from the infringing

6    acts of those third parties.  This part is easy.  No one

7    disputes it.

8         Mr. Conway testified that the PayPal accounts on Phoenix

9    Digital's websites that accepted payments for the *Destiny 2*

10   cheat ultimately followed money through the Phoenix Digital

11   business account to each of the managing members of Phoenix

12   Digital, and Mr. May's financial benefit was the fact that he

13   was paid 50 percent of the cheat software revenue.

14        And the third element of vicarious infringement is

15   satisfied.  That's that the defendants have the right and

16   ability to supervise the infringing activities, because Messrs.

17   Conway, Schaefer, and May had full, complete, and exclusive

18   authority to manage the business.  They had this authority, and

19   they chose to never stop the sales of the cheat software.

20        And the satisfaction of the fourth element, which is that

21   defendants failed to exercise the right and ability to control

22   the infringing activity, Mr. May failed to exercise this

23   authority because he continued to develop cheat software, the

24   *Destiny 2* cheat software, at issue in this case.

25        Finally, Bungie, moves for judgment as a matter of law in

1    its contributory copyright infringement theory against all

2    defendants.  Again, there's underlying direct infringement,

3    which we discussed earlier.  Defendants knew or had reason to

4    know of the infringing activity of the third parties.  Those

5    would be the users and the developer of the cheat software.

6        This knowledge is undisputed because defendants advertised

7    the cheat software's features.  The cheat software features

8    themselves could have only occurred but for copying of *Destiny 2*

9    code.

10        And defendant's intentionally induced or materially

11   contributed to the infringing acts of the cheat users and

12   developers because the Phoenix Digital defendants provided the

13   website and payment processing platforms through which the cheat

14   sales were made, and Mr. May created the cheat software,

15   inducing the users of the cheat software to infringe.

16        For these reasons, Bungie requests judgment as a matter of

17   law on its primary claims.

18            THE COURT:  All right.  I'm going to take the matter

19   under advisement and reserve ruling.

20        Bring the jury out, and I'll instruct them.

21            THE FOLLOWING PROCEEDINGS WERE HELD
             IN THE PRESENCE OF THE JURY:

22

23            THE COURT:  Please be seated, ladies and gentlemen.

24   Ladies and gentlemen of the jury, this is the time in trial when

25   the judge instructs you on what the law is.  Each of you have a

 1    copy of the instructions, and I'm going to literally read these

 2    instructions to you word for word.  If I read it different or

 3    skip a word, the printed word controls, unless I stop and say we

 4    have to modify that or whatever.  So, in other words, I'm

 5    intending to read it word for word.

 6         It's long, but please bear with me.  This will allow us,

 7    after lunch, to directly hear the final arguments.

 8                  (The instructions are read to the jury.)

 9              THE COURT:  I'm going to ask the jury to put the

10    instructions on the seat where they are, and we're going to take

11    our lunch now for an hour.  I'll ask you to be back in the jury

12    room by 1:10.  I'll finish reading the instructions after lunch.

13    There's so many of them, I think we will break now in order to

14    focus better, and I will read the rest of the instructions to

15    you after our lunch break.  There's another 20 or so pages, and

16    then a verdict form, and as soon as we're done with the

17    instructions, there will be the closing arguments, with a break

18    between the defendants' closing and the plaintiff's closing.

19         So we're in recess now for approximately one hour.

20                  (Court in recess 12:15 p.m. to 1:15 p.m.)

21                  THE FOLLOWING PROCEEDINGS WERE HELD
                     OUTSIDE THE PRESENCE OF THE JURY:
22

23              MR. MANN:  My understanding was the spoliation

24    instructions with respect to James May, your preliminary

25    inclination was to remove those.

1          THE COURT:  And I didn't remove them.

2          MR. MANN:  Could I enter an objection to that on the

3    record?

4          THE COURT:  Certainly, you may.

5          MR. MANN:  Okay.  I wanted to make sure I wasn't

6    waiving it.

7          THE COURT:  You're not.

8          MR. MANN:  Thank you, Your Honor.

9       I would like to enter a formal objection to the spoliation

10   instruction, particularly as it relates to James May.

11      I believe that the instruction, as written, with respect to

12   James May, does not comport with the evidence that was,

13   actually, introduced here at trial.  It does not comport with

14   the actual testimony of James May, nor was there any successful

15   attempt to rebut the testimony of James May, and for that

16   reason, defendants would like to reserve an objection.

17      With respect to Instruction No. 9, and, in particular, the

18   last three paragraphs of Instruction 9, actually, appearing at

19   lines 19 through 22, that relate to James May.

20      Thank you.

21         THE COURT:  Let me raise another issue.

22      If you take a look at Instruction 16B, this deals with the

23   counterclaim.  We say "If you find for May on the counterclaim,

24   you must determine the measure of damages."  I think he's

25   entitled to nominal or zero damages and still recover under the

May 23, 2024

```
 1   Act.  Don't we need something in there to say -- so it can be
 2   argued that -- because under the jury verdict form, there's a
 3   place for them to find actual damages, but they could write
 4   "zero," which probably is what they would write, because I
 5   didn't hear any evidence of damages.
 6        But, as I understand it, he would have an opportunity, if
 7   they recovered on that, to get statutory damages, and you could
 8   elect that after the jury returns.  Is that what you understand
 9   the law to be?
10        MR. MARCELO:  Yes, Your Honor.
11        THE COURT:  So we don't need an "if any," or don't we
12   need to allow him to make that argument?
13        MR. MARCELO:  Allowed to make the arrangement if there
14   are any damages?  Yes, Your Honor.
15        THE COURT:  If you don't find actual damages, write
16   zero.
17        MR. MARCELO:  Yes, Your Honor, we agree.
18        THE COURT:  Well, if you can make that argument, then
19   we don't need to change the instructions, as long as you're all
20   in agreement that that is a possibility, and I think he is
21   entitled to that.
22        MR. MARCELO:  We agree, Your Honor.
23        THE COURT:  All right.  Well, then, I think you can
24   make that argument, and you're good to go.
25        Let's bring in the jury.
```

```
 1                THE FOLLOWING PROCEEDINGS WERE HELD
                  IN THE PRESENCE OF THE JURY:
 2

 3        THE COURT:  Ladies and gentlemen, I read about half of
 4   these instructions before lunch.  Now I'm beginning to read the
 5   rest of the instructions, and I'm starting at
 6   Instruction No. 14A.  Once again, it is my intent to read them
 7   word for word, unless I stop and make a change.
 8                (Jury instructions are read.)
 9        THE COURT:  You have a copy of the verdict form.  The
10   original will be given to you here, and that's the one you'll
11   sign, but I wanted you to see what the verdict form looks like.
12        It is, "Do you find for Bungie on direct copyright
13   infringement?"
14        Question 2 is vicarious copyright infringement.
15        Question 3 is contributory copyright infringement.
16        Then on page 3, if you've found any of those three, then
17   what amount of damages that you're being asked to award with
18   respect to each defendants.
19        Question 5, then, deals with Mr. May's counterclaim, and it
20   just asks you whether you find for Mr. May on the counterclaim,
21   and, if so, then you need to proceed to Question 6, and indicate
22   what amount of actual damages, if any, do you award to Mr. May
23   for his counterclaim.
24        All right.  That concludes the reading of the instructions.
25   We can now hear from plaintiff's counsel.
```

1        You may proceed.

2            MR. MARCELO:  Thank you, Your Honor.

3                    PLAINTIFF'S CLOSING ARGUMENT

4            MR. MARCELO:  Defendant needed what was inside

5    *Destiny 2,* that's why they worked so hard to get into it.

6    That's why they kept reverse engineering, using different tools,

7    different techniques to try to get into *Destiny 2*, because they

8    needed the code for their cheat to work.

9        And then once they got their cheat working, they needed to

10   get back into the code so that users could use those cheats, so

11   that people could play Bungie's game and cheat, to beat

12   legitimate players who are following the rules.

13       And then they got caught, and they started covering their

14   tracks, because they didn't want Bungie to see what was inside

15   of the cheat software, because they knew Bungie would see its

16   code.  Dr. Kaiser would have said, "Hey, I wrote that.  Why is

17   that in there?"  And they didn't want you to see that code.

18       This afternoon, I'm going to talk about five subjects.  The

19   first is a brief timeline of what we've discussed here.

20       Second, we're going to talk about the cheat development and

21   its operation, how did they create the cheat, how does the cheat

22   work.

23       Third, the defendants' role both in creating the cheat,

24   but, also, in this litigation, why we're here now and why you

25   have that spoliation instruction.

1        The fourth one is your job.  That's after the lawyers are

2   done talking, you go deliberate, when you go apply facts to law.

3   I'm going to walk through that.

4        And the fifth one, as I flagged, the spoliation of

5   evidence, right?  That is intentionally deleting evidence so

6   that Bungie can't have it and so that you can't see it.

7        Let's talk about the timeline first.

8        In October of 2019, *Destiny 2* goes free-to-play.

9   Immediately after, James May begins reverse engineering the

10  game.  Right?  He discussed what reverse engineering is.

11       He takes reverse-engineering tools, he attaches them to the

12  game, and he can see the object code in the game.  And it's

13  important, because to develop cheats, he has to copy that code.

14  He described it as plug and play.  He takes it from the game;

15  plug it into the cheat; play.

16       Mr. May begins testing the *Destiny 2* cheat.  He told you

17  that's part of his process.  When he creates a cheat, he needs

18  to test the cheat.  He needs to make sure the cheat works so

19  that it can be released.  And, if the game is updated, so that

20  he can update the cheat so they work together.  It's complex

21  code.  He constantly needs whatever the latest code is in

22  *Destiny 2*.

23       First version of the cheat is released December 17th, 2019.

24  It just has the ESP feature.  That's the red boxes.  You heard a

25  lot about those red boxes.

1          Soon after, the other features are released, OPK and

2    aimbot.  Those are allowing the players to aim, and they're

3    allowing the players to move characters so that they can

4    level-up quicker so that they don't actually have to do the

5    work.

6          Now, those cheat features, the parties have agreed that

7    that is how they work; that ESP draws the boxes around

8    characters.  It can tell you how far you are from characters.

9    And the parties agree that OPK moves other characters and that

10   aimbot aims for you so you barely even have to touch a mouse.

11         One more cheat release.  That's November 11th of 2020.  And

12   that is after Bungie, on November 10th, releases the *Destiny 2*

13   expansion.  One day after it releases its *Destiny 2* expansion,

14   Phoenix Digital releases the updated *Destiny 2* cheat.

15         Listen carefully, as we go along, to this.  November 11th,

16   when we get to Exhibit 56, which shows James May reverse

17   engineering *Destiny 2*, just watch how many times -- how hard

18   he's working that day to get a cheat out right away.  That whole

19   time period -- you'll see Exhibit 56 -- Mr. May is reverse

20   engineer *Destiny 2*.

21         Now, November 4th -- jumping back a week -- the defendants

22   received a letter, the letter that said stop selling your cheats

23   and preserve all documents.  And you heard Mr. Schaefer say, "We

24   did it immediately, we stopped everything."

25         First, no.

1          They released an updated version of the cheat a week after

2    getting that letter.  You can see their Twitter, where they post

3    a tweet saying that the updated expansion is out.  That's a week

4    after they get the letter.  They're not acting to take

5    everything down.  They're working to get more things out.

6          Then November 20th, you get the letter back from Mr. Conway

7    and Mr. Schaefer, and the letter claims, Hey, we actually sold

8    the website sometime ago.

9          But Mr. Green told you -- he's part of Phoenix Digital --

10   he tells you that's not true.  "I mean, I wasn't in that letter,

11   but I know that we didn't sell the website."

12         We'll come back to that.

13         Starting around the end of November 2020, Phoenix Digital

14   begins deleting all the evidence of the cheat software.  It's

15   just delete, delete, delete.  That's what he's doing.

16         Okay.  How is the cheat developed?  How does it operate?

17   This is the second part on that road map.

18         Copy, injected, modify.  You heard those words a lot

19   because most of the witnesses, both defendants and Bungie's,

20   said those words.

21         Copy.  Dr. Kaiser explained how the *Destiny 2* code works.

22   It's computer software.  It goes in order, sequential.  It will

23   go, Hey, do process A, and then that section will say go to B,

24   and then B says go to C, and it goes down the order.

25         And Dr. Kaiser explained that *Destiny 2* is this complex,

1    layered game with 25 million lines of code.  A single act of

2    pressing the button to buy our weapon, thousands of lines of

3    code shown as this A, B, C, D.  Right?  That is just the simple

4    act of saying, I'd like to fire in that direction.

5         And it's how you know that the *Destiny 2* code is in the

6    cheat, because the game is too complex to not take this code,

7    this code which tells the computer, hey, this is where I'm

8    aiming, and change it.  Right?  We know the cheat has to play

9    where the players aim.  We know the cheat has to move the

10   character.  There's just some common sense here.  Even without a

11   Ph.D. in anti-cheats, you know that if you're taking a character

12   and you're moving it, the underlying code, the game, has to be

13   changing.  You can't actually affect the game without being in

14   there.

15        And Mr. May confirmed, when he's creating these cheats,

16   that's what he's seeing.  He's seeing object code.  When he's

17   attaching his ReClass tools, he's seeing the game code.  Why?

18   Because he needs to output the code, copy the structure, and put

19   it into the cheat.  That's how you know these cheats are made

20   with the code.

21        We had a known cheat developer -- he admitted he was a

22   cheat developer -- Mr. May.  Now, Dr. Kaiser said the cheat has

23   to copy the code to work.  Mr. May didn't sit up there and say,

24   No, it doesn't.  I'm a cheat developer.  I know that it doesn't.

25   And it's because Mr. May also knows the only way to make this

1   cheat work is to copy the code.  So he can't go up there and

2   tell you there's a different way.

3        Inject.  This is the loader.  You've heard the word

4   "loader" a lot.  You saw the demonstrative, the same one that's

5   up.

6        The loader is the needle.  So if the cheat software is the

7   payload, the loader is what's injecting it into the *Destiny 2*

8   game itself.

9        And it's critical because, as I mentioned, the code has to

10  be changed for players to move around.  So the cheat needs to

11  get its way into the game to affect it.  That's what the loader

12  does.

13       And you can just read the instructions on defendants'

14  website.  "Do not just start using the cheat software without

15  knowing how to inject it properly."  It's injecting the cheat.

16  Every single witness that went up there, defendants' and Bungie,

17  said injection, DLL injector.

18       Mr. Guris explained it's the only way the cheat could

19  operate within the *Destiny 2* game.

20       Third one, modify.  Now, there's two modifications

21  occurring.  There's the modification of the code.  That's where

22  the cheat is being injected into the game code, and now you have

23  a different code underlying the game.  That's one modification.

24       The other modification is what we've seen, many times.  The

25  easiest example is the red boxes.  They're just easy to see that

 1    that's a modification.  A non-cheater can't see those red boxes.

 2    They can't see the distance between players.

 3        Harder to see but maybe more clearly showing that it's a

 4    modification is OPK, moving a player within the game.  You can't

 5    do that without modifying the game.

 6        My third point on the road map, defendants' role.

 7    Defendants had a role in three separate infringing activities:

 8    The creation of the cheat, the sale of the cheat, and the use of

 9    the cheat.

10        Creation of the cheat.  Now, Mr. May explained why he's

11    reverse engineering, why he's reverse engineering so many times.

12    Because every time the game is updated, he needs to get back in

13    and reverse engineer.

14        And remember, he's spending 30 minutes to an hour every

15    time.  On Exhibit 56, that list of times, every time he's in

16    there, 30 minutes to an hour reverse engineering.  And he

17    testified he doesn't waste his time making cheats he can't sell.

18    He calls Mr. Schaefer and says, Hey, can I make this cheat?  Is

19    somebody else making it?  Can I make it?  And Mr. Schaefer

20    either says yes or no.  And Mr. May confirmed, If he says no, I

21    don't make it.  Mr. May told Mr. Schaefer, "I'd like to make a

22    cheat for this game," and Mr. Schaefer, clearly, said yes,

23    because Mr. May continued to make the cheat.

24        Exhibit 56, there's over 100 entries of Mr. May accessing

25    *Destiny 2*.  I told you we'd get to November 11th.  Right?  This

1    is the day after the *Destiny 2* expansions were released.  Look

2    at the number of times Mr. May is reverse engineering *Destiny 2*

3    on that day.

4         Look at the number of tools he's using.  He has the

5    ReClass.net.exe.  That's a reverse-engineering tool.  The

6    ReClasskernel64 driver allows him to see the memory better.

7    He's got the blah64 reverse-engineering tool.  Two rows down,

8    he's got the cheat engine reverse-engineering tool.  He's

9    attaching different tools, different times, trying to avoid

10   detection because he needs to get this cheat out.

11        Okay.  Cheat's made.  We've got to get it to the consumers.

12   You saw how the cheat gets to the consumer.  It's in Phoenix

13   Digital's responses and in Mr. Schaefer's deposition testimony.

14   The cheat's on the cheat developer's computer.  That's Mr. May.

15   It goes through Phoenix Digital's computer.  There's a copy on

16   Phoenix Digital's computer, and it goes to the cheat user.

17        Let me back up.

18        The critical part of this, too, is that it's passing

19   through the Phoenix Digital computer.  So there's a cheat.  The

20   cheat has *Destiny 2* code in it, and a copy of that *Destiny 2*

21   code is passing through Phoenix Digital's computer.  That's a

22   copy being made.  That's what we're talking about with

23   infringement.

24        Again, you saw Phoenix Digital admit, several different

25   ways, that when a consumer purchases the cheat, it goes through

1  Phoenix Digital's computer and to the consumer.

2      Third item, its use.  That is the player at home, or

3  Mr. May when he's testing out the cheat.  It's the person who

4  gets to use OPK and ESP and aimbot.  And that's also infringing,

5  because it's modifying the code and because it's modifying what

6  the game looks like.

7      Defendants had a separate role, though, not just in

8  creating the cheat, but in this litigation.  It started

9  November 20th, 2020, when they told Bungie, "Hey, we already

10  sold the website.  I would suggest you contact those other

11  people with regards to this request."  Right?  They're trying to

12  say, "We don't have anything to do with this anymore."

13      But Mr. Green told you that, in 2020, the website was not

14  sold.  You know that that sale was fake, because Phoenix Digital

15  told you so.

16      They did it again.  During the litigation, in May of 2022,

17  they said the website was sold again.  Now, this time around,

18  they released a press release, an announcement that the website

19  was sold.  And you heard Mr. Schaefer explain why he did it.  It

20  was to mess with Bungie, it was to hide things, it was to waste

21  time, waste your time.  He called it a "prank" in federal court.

22  He put a deceased individual on a letter as a prank.

23      But it continued.  He tells, you know, Bungie says, hey, we

24  really need to know where the payments are going, who is being

25  paid, track these payments.  So what payment processors are you

1   using?  And Phoenix Digital says PayPal, Stripe.  Why did they

2   say those two?  Because Bungie already knew about them.  Bungie

3   had those records.  They're not going to give anything they

4   don't want us to have.

5        They don't list, "There's those other payment processors,

6   we're not sure which ones."  They don't say "in addition to."

7   No, no, no.  "There's two, PayPal and Stripe."  That's also

8   false.  Their own website lists numerous other payment methods,

9   including Bitcoin, which, you're selling cheats to people that

10  don't want to get caught.  Do you think they're buying it

11  through PayPal, or Bitcoin?

12       There's a really interesting contrast between Mr. Conway's

13  testimony and Mr. Schaefer's.  Mr. Conway took the stand, and he

14  told you that they had access to PaymentWall, that they had

15  access to Payssion, that the AimJunkies' website tracked every

16  single sale of the *Destiny 2* cheat, and that all three of them

17  -- Mr. Schaefer, Mr. Green, and Mr. Conway -- could have pulled

18  that data.  Think of how easy the whole explanation of how many

19  pieces of software were sold if they could just say, "Hey,

20  here's website information.  This is the exact number that was

21  sold."

22       Instead, they did things like that.  They filed a

23  declaration to this court saying, "Hey, oh, it was $27,000,

24  that's how much we sold," knowing that that was false, knowing

25  that there was other information out there.  And it's because,

1    as you heard when I examined Mr. Schaefer, every time I had to

2    take that binder out, every time I had so say, "Okay, let's see

3    what you actually said," right?  He'd say something like, "Oh, I

4    guess then whatever is in there is the truth," because the truth

5    doesn't really matter to him.  It's just, "What's beneficial to

6    me in this moment."  That's what he says.

7         Number 4 and 5 is your job.  Your job, when you go back to

8    deliberate, will be applying facts to law, the facts you heard

9    this week to the law that Judge Zilly just read out to you.

10   Right?  Was there infringement, was there contributory

11   infringement, vicarious infringement, and did Bungie circumvent

12   technological measures?  That's what you will be doing.

13        The burden of proof here is preponderant of evidence.  That

14   just means more likely than not.  Criminal cases, right, it

15   would be beyond a reasonable doubt.  It's a heavy burden.  This

16   is more likely than not.  It's 51 percent.  I mean, it's 50.1

17   percent, but it's a very close -- it's just more likely than

18   not.  That's what, when you go back to deliberate, you say.  Is

19   it more likely than not that they infringed Bungie's copyrights?

20        Bungie's first claim is for direct copyright infringement.

21   There's three different ways you can infringe a copyright, and

22   direct copyright infringement is where you're directly copying

23   it, you're reproducing it.  Because copyright owners are given

24   protections.  Bungie, as the copyright owner, is the only party

25   that can copy its work, Bungie is the only party that can

1  distribute its work, and Bungie is the only one who can prepare

2  derivative works, works based on its game.

3      And it's meant to protect -- you know, when you put your

4  effort, your blood, sweat, and tears into something, when you

5  write a book, when you make a movie, when you have a great piece

6  of art, or when you make a video game, it protects other people

7  from stealing it and making a quick buck on it.

8      So for direct infringement, there's two elements.  These

9  are the questions you'll go back and answer to determine did any

10  of the defendants directly infringe Bungie's copyrights.

11      The first one is whether Bungie is the owner of a valid

12  copyright.  Now, you'll see in the instructions, you heard from

13  Judge Zilly, that's not at issue.  Bungie has copyrights -- the

14  parties have agreed and the court has instructed -- to *Destiny 2*

15  and *Destiny 2: Beyond Light*.  It's the code and the audiovisual.

16      You heard some noise, confusing testimony about what

17  exactly those covered.  Was it just the images attached to the

18  copyright registration that was submitted or those 25 pages of

19  code, was it the source code, object code?

20      The instructions will inform you of that.  The instructions

21  tell you this is a stipulated fact, No. 3, that Bungie's

22  copyrights cover the entire source code of the games, the entire

23  object code of the game, and the entire audiovisual.  Don't be

24  distracted by the, well did that happen in 2012, 2014?  None of

25  that matters.  Bungie has copyrights.

Case 2:21-cv-00811-TSZ    Document 308    Filed 06/17/24    Page 102 of 144
540
Plaintiff's closing argument                    May 23, 2024

1    So the only question you have to answer here is, did the

2    defendants copy *Destiny 2*?  And, again, they did so by creating

3    this cheat, selling the cheat, and using the cheat.  Right?

4    When they created the cheat, they're taking a section of the

5    code and they're putting it in the cheat itself.  When they're

6    selling the cheat, the cheat is passing from Mr. May's computer

7    to Phoenix Digital's computer to the consumers' computer, and it

8    has a copy of *Destiny 2*'s code in it.

9    And when players are using the cheat, whether it's Mr. May

10    or any of the people at home that bought the cheat, they're not

11    only modifying the code itself, but they're modifying the

12    visuals.  Right?  When they have a game up that has the red

13    boxes and they're moving characters, that's a copy of *Destiny

14    2*'s game.  That's not authorized.  That's not *Destiny 2*'s game.

15    That's the *Destiny 2*'s game with the cheat.

16    And the key here, it's any one of these, or all three, but

17    any one is sufficient.  If you find that just the creation of

18    the cheat, copying the code, that's infringement.  The sale or

19    use, independently, any one of them is sufficient to find

20    infringement.

21    Now, after you deliberate on infringement, you'll see a

22    verdict form, and it's a very simple form, as Judge Zilly

23    indicated.  You just mark which defendants directly infringed,

24    and if you find "yes," you just put a check mark next to "yes."

25    Now, you'll see in the instructions as well that liability

1    of Phoenix Digital and for its officers -- that's

2    Mr. Conway, Mr. Green, and Mr. Schaefer -- they go both ways.

3    Phoenix Digital is liable for the actions of those three, and

4    those three are personally liable for the acts -- the infringing

5    acts of Phoenix Digital, as long as they financially benefited

6    from those infringing acts.

7         There's no dispute there.  All three of them say, "For

8    every copy of the cheat software sold, I got a portion of the

9    profits."  So if you find Phoenix Digital is infringing, the

10   other three will be infringing as well.

11        And, of course, Mr. May in creating the cheat, he's

12   infringing, and in using the cheat, he's infringing.

13        The second theory, vicarious infringement.  It's,

14   essentially, saying, hey, even if you're not the one that did

15   the infringing thing, you can still be liable for it.  And it's

16   when you're able to control the infringing act of somebody else.

17   You have the right or ability to control or supervise it.

18        Easiest example, Phoenix Digital could turn off and on the

19   cheat.  When they did that, users at home, they couldn't use the

20   cheat anymore.  If they turned it off, that's the ability to

21   control the infringing acts of the person at home.

22        And you heard -- again, I'll repeat it one last time, maybe

23   again -- but when the cheat software is transferred from James

24   May to Phoenix Digital to the user, you know that they each have

25   control -- the right and ability to control that cheat.  They

1   can stop the sale of that cheat.

2        The second question is just whether they directly

3   benefited.  Each one of them testified, "Yes, for every

4   cheat" -- for the cheat developer, James May -- "that I sold, I

5   got 50 percent," and the three founders of Phoenix Digital, they

6   split their 50 percent.

7        And, finally, just that the defendants failed to exercise

8   their right.  Right?  That's just a fact that, yes, they had the

9   switch, and they didn't turn it off.  The fact that any cheats

10  were sold means they didn't turn it off.

11       Again, a very simple verdict form.  You'll mark whether,

12  for each defendant, whether they vicariously infringed.

13       Third and final one is contributory infringement.  It's

14  similar to vicarious infringement, but instead of the right and

15  ability to control, the question is, Did you contribute to this

16  materially?  Did you intentionally induce somebody to infringe?

17       So if you take, for instance, the creation of the cheat

18  software, when Phoenix Digital is giving Mr. May in-house

19  cheat-development tools to use to make his cheats, when they're

20  paying them to make their cheats, when you talk about the sale

21  of the cheat and the use of the cheat, and Mr. May is providing

22  a copy of the cheat, that's materially contributing.  I mean,

23  you can't contribute much more than giving the actual infringing

24  product to somebody else.

25       And when Phoenix Digital is advertising, emails and tweets,

1  saying, Hey, come use our cheats, that's intentionally inducing,

2  right?  That's saying to the user at home, Come buy our cheats,

3  come use our cheats."

4      And second element of contributory infringement is just

5  that they knew or had reason to know of the infringing

6  activities.  Did the defendants know the cheat was being

7  created?  Yeah.  Did they know it was being sold?  Yes.  Did

8  they know it was being used?  Yes.  They sold these copies.

9  And, again, it's knew or had reason to know.  Of course they had

10  reason to know that when they sold the cheat, it would be used.

11      Same verdict form.  Mark "yes" for any defendants that are

12  contributorily liable.

13      And the different theories, they're not exclusive.  You

14  can, and we think you should, mark "yes" to all defendants for

15  all three claims.  But, certainly, there should be no defendant

16  that doesn't have a check mark next to a "yes" in, at least, one

17  of those boxes.

18      And damages.  When Mr. Rava stood here on Monday, he didn't

19  hide the fact that the damages in this case aren't high.  We

20  have heard why the damages are what they are, because there's no

21  documentation on these.  It's whatever Bungie could pull out.

22      But the key is whether it's the $40,000 or the $80,000 that

23  Mr. Schaefer suggested they sold.  The money is not why Bungie

24  is here.  Bungie is here to protect its IP.  Bungie is here to

25  make sure that the game that their developers worked on, that

1    their artists worked on, that Dr. Kaiser, when he sat in that

2    windowless room in the dark writing code for years, that that's

3    protected from people that make cheats and that ruin the game

4    for others.

5        The last one.  Spoliation of evidence.  You heard the

6    instruction from Judge Zilly regarding spoliation of evidence.

7    Again, it's intentionally deleting evidence that they were

8    supposed to preserve.

9        And here's the key.  This is a really important

10   instruction, and I would ask that you read it once, twice, and

11   then right before you enter your decision, maybe read it again.

12   Read why they deleted the evidence:  With an intent to deceive

13   Bungie, or otherwise interfere with Bungie's ability to proceed

14   to trial.

15       They're deleting evidence with an intent to prevent Bungie

16   from giving you the evidence you need to decide a case.  And

17   this isn't at issue.  This has been decided.  The court has

18   decided and instructed that this is true.

19       Mr. May, he wiped four hard drives, and why did he do it?

20   To deprive Bungie of the evidence that he destroyed.  And what

21   does that mean?  If you deprive Bungie of the evidence, it's

22   depriving you of the evidence.

23       And you'll also see what exactly was destroyed.  And I know

24   the text is small here, because there's a lot on the screen.

25   There's a lot of things that were deleted.

1       Look at No. 1, though.  Access to the cheat software and

2   records of the cheat software.

3       So when you heard Mr. Mann, on Monday, say they don't have

4   the cheat, Bungie didn't hide from that.  Mr. Rava also told you

5   about the cheat.  Dr. Kaiser said we don't have the cheat.

6   Mr. Guris said we don't have the cheat.  Nobody is hiding that.

7   We don't have the cheat because they deleted it.

8       Records relating to the sales of the cheat software.  When

9   you hear why -- why would we waste everyone's time for $40,000?

10  Point to this instruction.  Because they deleted the records

11  relating to the sales of the cheat software.

12      And the loader software, you heard Mr. Guris get examined

13  in depth about what loader did you review?  Why was it the 2022

14  loader?  It's right here.  Because Phoenix Digital --

15  Mr. Schaefer, Mr. Conway, and Mr. Green -- deleted the loader

16  software.  And you'll see, at the end of that instruction, that

17  you may presume that those things that were deleted, that they

18  were unfavorable.

19      The reason you have that presumption, the ability to have

20  the presumption, is because Bungie was never able to say, Hey,

21  what's in those files?  We don't know what was in those

22  documents because they were deleted to hide it from you.

23      Now, I need to touch on Mr. May's counterclaims, briefly.

24      Mr. May brought counterclaims in this case, and it was

25  largely to create mud, to muddy-up the waters.  He claims that

1    his files were accessed.  And he points to Exhibit 56.  Remember

2    his testimony on that exhibit.  Every single file relates to

3    reverse engineering or the cheat loader.  Those are the only

4    files he's claiming were accessed.

5         But even when you get into the claims itself, that's when

6    you see that they knew they don't actually have a claim, and

7    they're trying to shoehorn something in here.  So they have to

8    show that what was -- that when Bungie, allegedly, circumvented

9    something, it actually accessed a copyrighted work.

10         But the copyrighted work, he doesn't have any registrations

11    for it.  Mr. May needs to show that it was copyrighted by

12    proving to you that he wrote original, creative code that's

13    protectable.

14         And you'll see the instruction that it is not enough for

15    him to show that he created an assorted number of lines of code

16    in order to prove that the works are protected.  He needs to

17    show that the original parts were independently developed by

18    him, and not copied from another work.

19         Think about, first, what you didn't hear from Mr. May.  You

20    didn't hear what parts of the code he supposedly wrote in that

21    reverse-engineering driver.  You didn't hear how much of that

22    code was supposedly wrote in that reverse-engineering driver.

23    You didn't hear what the function of that code he supposedly

24    wrote in that reverse-engineering driver.

25         What you did hear is that it was publicly available, and he

 1  compiled the information from online.  He grabbed it from

 2  GitHub.

 3       He also needs to show circumvention of a technological

 4  measure.  And this is key, because there was a lot of focus on

 5  what Bungie did, did it access files, did it copy files?

 6       First, completely innocent.  Dr. Kaiser explained exactly

 7  what they collected.  MD5 hash.  It's like -- he explained it's

 8  like an ISPN number on a book.  Right?  You don't see the title

 9  of the book, you don't see anything else.  You see that number.

10  And if you pull out another book and you don't see the title of

11  it, you just say, Oh, these have the same numbers.  Whatever

12  this is, they're the same thing.  That's all that MD5 hash is.

13       But to be clear, it doesn't, actually, matter to Mr. May's

14  claims, because the question is, was there a circumvention of a

15  measure, a technological measure?  Right?

16       And so what you heard was "firewall" and "password."  Mr.

17  May had a firewall and a password.  Mr. May granted *Destiny 2*

18  permission past his firewall, because, as he explained, that's

19  just how games work.  And the password -- the first password was

20  to his computer, to turn it on.  *Destiny 2* is not even in the

21  realm of this.  Bungie is not reaching over and typing in his

22  launch password to get into his computer.

23       And the other password, you heard Mr. May say he already

24  opened the files.  He already typed in those passwords.  The key

25  is, do you know why he even entered those passwords?  Because

 1    they're reverse-engineering tools, and he's using them to hack

 2    into *Destiny 2*.  That's why he already has those files open.

 3         Bungie is not circumventing anything.  Mr. May let Bungie

 4    access those files because he needed to so he could create the

 5    cheat.

 6         And so you'll see a similar verdict form for Mr. May,

 7    asking whether you find for him on his circumvention, and I

 8    think the evidence points to there can't be any answer other

 9    than "no" here.

10         I appreciate all of your time sitting through this trial,

11    and we ask that you find in favor of Bungie on all of its

12    claims.

13         Thank you.

14         THE COURT:  Ladies and gentlemen, we're going to take

15    about a 10-minute recess, just to get the blood flowing.  It

16    will be a short recess, but, nevertheless, approximately 10

17    minutes.  We'll be in recess.

18         (Court in recess 2:14 p.m. to 2:26 p.m.)

19         THE COURT:  Please turn your attention now to Mr.

20    Mann, who will give the closing on behalf of the defendants.

21                    DEFENDANTS' CLOSING ARGUMENT

22         MR. MANN:  Thank you, Your Honor, Mr. Marcelo, ladies

23    and gentlemen of the jury.

24         When this case first came into my office nearly three years

25    ago, I was looking forward to this day, because I knew this case

 1    had no merit whatsoever.  It was brought against innocent

 2    people, who had done nothing wrong, by a large company and a

 3    powerful law firm, who are making wild accusations, because, in

 4    their own words, they wanted to put cheaters and those who

 5    assist them on notice that Bungie will not tolerate cheating in

 6    *Destiny 2*.  They did not say, "We're here because we want to

 7    defend the law," they did not say, "We're here because we think

 8    someone violated our rights," they wanted to make an example out

 9    of anyone who dared have a cheat for *Destiny 2*, whether it was

10    lawful or not.

11        Now, as I was sitting here listening to the argument of

12    Mr. Marcelo, I was wondering, are we in the same courtroom, did

13    we hear the same case?  We're not talking ancient history.  This

14    is testimony we heard two days ago.  Did you hear any of the

15    testimony to support the allegations and the arguments that

16    Bungie is now making?

17        Last Monday, when we listened to Mr. Rava make his opening

18    statements, he made all sorts of wild promises, "We're going to

19    prove this, we're going to prove that."  I said this is a case

20    that never should have been brought.  I said this is a case of

21    Goliath versus David.  I said it was a case of sue first and ask

22    questions later.  And, ironically, that turns out true.

23        As it turns out, this case was filed in June of 2021, and

24    Dr. Kaiser himself said he first learned of the AimJunkies'

25    cheat software four months later.  Literally, they sued before

 1    they got a person to come in and make the case.

 2         But let's focus on what we actually heard here.  Let's

 3    focus on the testimony.

 4         There were two witnesses called by Bungie to make their

 5    case, Dr. Kaiser and Mr. Guris.  Those are the only two

 6    witnesses called in their case-in-chief.

 7         Let's remember what Dr. Kaiser said.  When I took his

 8    cross-examination -- and if you remember, when I was doing my

 9    cross-examination, Judge Zilly, quite rightly, told me,

10    "Mr. Mann, this is a case about copyright infringement."  He was

11    absolutely right.  This is a case about copyright infringement,

12    and nothing else.

13         So I grilled Mr. Guris -- I'm sorry -- Dr. Kaiser.  I

14    couldn't get a straight answer out of him on much of anything.

15    But when he finally did understand my questions and stop playing

16    games, pretending not to understand me, we got some important

17    testimony out of him.  And this is what I'm going to rely on,

18    the testimony that you actually heard, not the made-up testimony

19    that Bungie would like to present now.

20         Dr. Kaiser has never actually created a cheat.  His

21    expertise is in detecting cheating.  I confirmed that this

22    morning.  He never actually has created a cheat.  Yet, he says

23    you have to copy the software, you have to copy the source code

24    or the object code in order to create a cheat.  I can disprove

25    that very, very easily.

1          Mr. Schaefer here testified, I believe yesterday, two days

2     ago, that in running his company, he understood that he was

3     playing a somewhat dangerous game.  In the cheat software

4     business, people are going to be looking at him very, very

5     closely.  He said, because of that, he wants to keep his nose

6     clean.  He knew that, "No, there's a line here.  I better not

7     put one toe over that line because bad things are going to

8     happen, and I'll be in trouble."  He made a conscious effort not

9     to infringe copyrights or to infringe anyone's rights.  What did

10    he say?  He said, "I will only get cheats" -- "I will only

11    distribute cheats that were developed by not copying software."

12    He knew that if somebody copies this stuff, you're going to be

13    charged with copyright infringement.

14         He testified that he had products for about 100 games, if

15    not more, 100 different games that he had cheats for that he'd

16    been selling over the years.

17         I asked him, standing here, "How many people have ever

18    complained about this?"  He said, "Maybe one or two."  And I

19    said, "What happened then?"  He said, "Well, I took the cheats

20    down."  I specifically asked him, "Have you ever been sued?"  He

21    said, "Never."  And this is the very first lawsuit that has ever

22    brought against this company.

23         And this is a public record.  If that was nonsense, if

24    Mr. Schaefer and Phoenix Digital had been sued 27 times, that's

25    all public record, you could do a very easy search and get every

1    single lawsuit.  And given the thoroughness of Bungie's counsel,

2    if they had an opportunity to challenge me and to challenge Mr.

3    Schaefer on that, they would have done so.

4        The fact of the matter is, Mr. Schaefer's run a successful

5    company.  He has sold cheats for over 100 games.  Not one

6    person, other than Bungie, has ever accused them of infringing a

7    copyright.  That is proof positive, in the real world, that it

8    is successful to have created a successful cheat that doesn't

9    infringe copyrights.  Unless their theory is Bungie is the only

10   company in the game business that knows about copyrights, and

11   everyone else is too dumb to bring a lawsuit.  Do you believe

12   that?  That's a question you should ask.

13       Their whole theory is based on Dr. Kaiser's theory that, in

14   order to create a cheat, you must -- you must -- you must copy

15   the source code or the object code.  Other than his unsupported

16   testimony, they've got nothing to support copying in this case.

17       What we've got is Mr. Schaefer's successful company that

18   has provided cheats for over 100 other games, without ever once

19   ever being sued for copyright infringement.

20       Now let's talk about actual copying.  Now, we've heard a

21   lot of talk about reverse engineering here.  Reverse engineering

22   is not, in and of itself, against the law.  If it were, we would

23   be charged with reverse engineering.  We're not; we're charged

24   with copyright infringement.

25       Reverse engineering is one of those things, woo, it sounds

1    bad, but it goes on in industry all the time.  Every time

2    somebody comes up with a new product, somebody comes up with a

3    new electronic gadget, competitors will take it apart and look

4    at it.  Anytime someone comes up with an improvement in an

5    automobile and an airplane, that's what happens.  That's

6    entirely legitimate.  That's how we make progress.

7         What you can't do, you can't infringe a patent.  You can't

8    steal trade secret information.  You can't bribe somebody to,

9    Hey, give me a copy of what's in that file cabinet.  But buying

10   a product on the open market, taking it apart, looking at it,

11   seeing how it works, there's no law against that.  There may be

12   a contract against that, but Phoenix Digital, Jordan Green, and

13   Jeff Conway never signed any contracts with Bungie.

14        That came up.  I don't know if you remember.  I started

15   making some objections, or I brought it out in my examination.

16   I said, "Wait a minute.  Yeah, they're showing a contract, but

17   have they shown any evidence that these guys over here ever

18   agreed to that contract?"  That's not in there.  There's no

19   contract.

20        Now, James May is an exception, we've admitted that.  But

21   the three Phoenix Digital defendants never signed any sort of

22   license agreement or other contract with Bungie.

23        In fact, they all testified that they never played the

24   game.  They never went to the Bungie website.  They never played

25   the game.  They never saw any contract.  They are not bound by

1   any contract.  This is what we heard.  Did you hear any evidence

2   to the contrary?  Each one of these men denied ever playing

3   *Destiny 2*.  Each one of them denied ever signing a contract with

4   Bungie.

5        That license that they paraded up in front of us has

6   absolutely no bearing in this lawsuit.

7        Now let's get to, again, Judge Zilly told you this is a

8   copyright case.  Yes, this is a copyright case.  Elements of

9   copyright is copying.  That is an essential element of

10  copyright, you have to copyright.

11       How do you know something's been copied?  It's in your

12  instructions.  There's a well-recognized test.  There are

13  elements you have to have.  The first is access.  You can't copy

14  something that you don't see.  You can't copy something that you

15  don't know about.  If I've never heard of something, how can I

16  copy it?  It's just common sense.

17       Now, we heard some testimony -- when I was talking to

18  Dr. Kaiser, and I was taking him through those copyright

19  registrations.  Remember, we had four of them, and we had them

20  up here on the screen?  And I was pointing out, well, it only

21  says that's the new material and so forth, and then there's a

22  lot of source code listed.  I asked him, "Okay.  Can you show me

23  what part of this is copied?"  He said, "I can't do that."  He

24  never showed anything.  He never said, "Well, yeah, this section

25  over here is copied over here."  But he said, "Oh, but this

1    isn't the whole story."  He said, "There are 25 million more
2    lines of code that don't appear in these copyright
3    registrations."
4        Let's accept that as true.  25 million lines of code that
5    do not appear in the copyright registration.  I specifically
6    asked him, "Is this stuff publicly available?"  "Oh, no, it
7    isn't."
8        And when you go back and deliberate, and you look at the
9    evidence, take a look at the copyright registrations for the
10   source code.  Those will be Plaintiff's Exhibit 2 and 4.  If you
11   look down to the very bottom, you'll see a legend that says,
12   "Highly confidential, attorneys' eyes only."  That is something
13   that happens here in these lawsuits, you know, when some party
14   says, "Oh, these documents are so sensitive, I don't want people
15   seeing them."  And sometimes they say, "These are so sensitive,
16   I don't even want your own client seeing them."  These were
17   designated highly confidential, attorneys' eyes only, which
18   means that I, properly, could not show them, and I did not show
19   them, but I'm under a court order saying I can't even show those
20   pieces of source code to my clients, yet somehow they copied it.
21   Figure that one out.
22       And this is based on Dr. Kaiser's own testimony.  He's the
23   one that said there are 25 million lines of code that aren't in
24   those registrations.  They aren't in this courtroom, either.
25   How are you going to make any sort of determination as to

1   whether those things are substantially similar to anything

2   unless you can see them?

3        Which brings me to the second point of copying.  You need

4   access, and there has to be substantial similarity between the

5   copyrighted material and whatever it is that's accused of being

6   a copyright infringement.

7        And that's getting confusing now.  When we started this

8   case, I thought this case was about the cheat software that was

9   distributed by Phoenix Digital.

10       And just to make things clear, we don't deny selling the

11  cheat software, we don't deny what the cheat software does.  You

12  know, that's not what this case is about.  We even stipulated

13  that they've got copyrights and they're valid.  We're not

14  saying, "No, you don't have copyrights."  We're not going to

15  make any of those kinds of arguments, whether something is

16  sufficiently a copyright.  We admit they've got copyrights;

17  we've got cheat software.

18       What we don't admit and we won't admit and cannot be proved

19  because there's no evidence of it whatsoever, we did not copy

20  anything.  We did not copy what's in those copyright

21  registrations.

22       Now, as I said when this case started, we're talking about

23  the cheat software developed and so -- no, I shouldn't say

24  "developed."  It was not developed.  It was developed by someone

25  else.  It was a cheat software distributed by Phoenix Digital.

 1    Listening to the closing argument here today, I'm hearing for
 2    the first time, no, James May is the mastermind behind this, and
 3    he's the one that developed the cheat and he's the one that
 4    distributed it through Phoenix Digital.  Have you heard any
 5    testimony to that?  Have you seen any proof of that?
 6        Mr. Schaefer has told the truth on this from day one, and
 7    that is that the cheat software was developed by someone else.
 8    Phoenix Digital does not develop the cheat software, Phoenix
 9    Digital does not produce the cheat software, Phoenix Digital
10    distributes the cheat software.
11        The same way you can go and buy products on Amazon.  Amazon
12    is not making the millions and millions of products that appear
13    on its website.  It merely distributes these things.  These
14    people are a smaller version of that, much smaller, but the
15    principle is the same.  Phoenix Digital serves as, sort of, an
16    Amazon for cheat software.  We've said that since day one.
17    We've seen no proof to the contrary.  And now, for the first
18    time, without any testimony or evidence whatsoever, the new
19    theory is James May is the mastermind, he put this together, he
20    created the cheat software.  Why are they now picking on James
21    May?  Because they're afraid of James May's counterclaim.
22        At the beginning of this case, I told you -- I said, "You
23    know, one of these people doesn't belong here, and that's James
24    May."  There's the Phoenix Digital defendants.  We all admit
25    that.  We're not denying Phoenix Digital, what it is and who the

1    participants are, but we have said, consistently, that James May
2    has never been a part of Phoenix Digital.  He was an independent
3    developer of software, who, from time to time, would have his
4    software sold or distributed through Phoenix Digital on that
5    50/50 basis.

6         You heard testimony from both men.  David Schaefer said, "I
7    want to have just one cheat per game, so if there's already a
8    cheat that we have, we don't want another one."  And Mr. May
9    testified that, "Sometimes I make a cheat that works.  Most of
10   of the time I don't."

11        It's like songwriting.  You know, you make these things,
12   and you never know which one is going to be the hit, but you
13   create enough of them and put them out there, and, hey, this one
14   made some money, these other five didn't.  But that's Mr. May's
15   sole connection to this entire lawsuit here.

16        And the reason they swept him up -- and this ties in to
17   that green exhibit that we've seen, the spreadsheet of what's on
18   James May's computer, that's where they saw a connection.  They
19   know that James May was repeatedly logging into *Destiny 2* for
20   purposes of trying to reverse engineer and trying to create a
21   cheat.  We don't deny that.  Mr. May has admitted that.

22        What happened is, in the course of looking where they
23   shouldn't be looking, they saw a connection to AimJunkies.  And
24   AimJunkies, I should say, that's the website name -- or that's a
25   website being operated by Phoenix Digital.  It's a little bit

1    confusing.  So sometimes when we refer to "AimJunkies," what

2    we're really referring to is the AimJunkies' website that, at

3    one time, was operated by Phoenix Digital.

4         But they saw, Aha, James May, known offender.  Here is

5    something not in the programs connected to the actual game.  It

6    was a development tool developed by Mr. May, but it made some

7    reference to AimJunkies, so that's where they made the

8    connection.  Aha, May and AimJunkies are working together, let's

9    sue them all.  That's why we're here.

10        But the story is -- we've said this from day one -- Mr. May

11   is not a part of Phoenix Digital.  He never has been an owner.

12   He is nothing more than someone who creates cheats and, from

13   time to time, is able to distribute them through Phoenix

14   Digital.

15        And the irony of this is, after they sued him, and we're

16   well involved in the case, then we discover that they're poking

17   around in his computer.  They produced this document.  I'm not a

18   computer expert.  I pass it on to my clients and say, Hey,

19   what's this all about?  And then they look at it and say, "Holy

20   mackerel.  Do you know what this means?"  "No, what?"  "It means

21   they're getting into my computer."  "Explain it to me."

22        Then, "Hey, I think we got counterclaim here.  They can't

23   be doing that.  I know they want to sue you, but they have to

24   play by the rules, too."  And they didn't play by the rules.

25        And now what they're trying to say is that, "Oh, James May

1  let me do this."  Now, I said we have to show some technological

2  measures.  It doesn't have to be much, but the technological

3  measures that Mr. May used are firewalls and passwords.  And in

4  order to get to these files, they had to get there past the

5  firewall and the passwords.

6      Now, this is critical.  They don't have to actually get in

7  there and start hacking.  Let's, sort of, make an analogy to I

8  want to break into a bank vault or something.  I want to get

9  into a bank.  I want to steal money from a bank.  I can figure

10 out an elaborate plan, sneak in at night and bypass the alarms,

11 and pick the lock on the vault and stuff like this, and break

12 into the vault.

13     Another way I can do it is to pretend I'm the vault

14 technician.  I'm here to service the vault and make sure

15 everything is running.  Oh, okay, we'll open it up and let you

16 in.

17     That's bypass it by subterfuge.  That's exceeding

18 authority, which is another way that you can bypass the

19 technological measures.  It doesn't have to be done

20 electronically.  It doesn't have to be done through gadgetry or

21 wizardry.  It can be done through false pretenses, and that's

22 what Bungie did here.

23     They said, "We're going to look at your computers for

24 things related to the game."  I forgot the exact language, but,

25 you know, it was this morning we went into it.  We never said

1    that we didn't have the authority to look at the tools that

2    Mr. May was using that attached to the *Destiny 2* game.  What we

3    are saying is Mr. May never gave them authority to look at the

4    tools that he used otherwise, the tools that don't attach to the

5    game.

6         And that's why I was asking him -- if you remember, I was

7    up here -- Now, Mr. May, do these specific things -- and we

8    agreed, okay, the bulk of them do attach to the game.  We're not

9    complaining about those.  But there are a half a dozen or more

10   that do not attach to the game, and that's what we're

11   complaining about.  And I asked Mr. May, "Does this attach to

12   the game?"  "No, it does not."

13        And furthermore, we know that Bungie was messing around

14   with this.  It was like pulling teeth with Dr. Kaiser, but,

15   eventually, I got him to admit that the MD5 hash that appears on

16   that is -- again, it was a little bit of wordplay.  It took me a

17   while to get it out -- he said, "Oh, it's not done at Bungie,"

18   but, eventually, I got him to say how was it done.  "Oh, it's

19   done by the *Destiny 2* game"; in other words, you know, the

20   *Destiny 2* game has to get that entire program to create the

21   hash, or the *Destiny 2* software that's on the program.

22        So at the end of the day, it's done by *Destiny 2*, it's done

23   by Bungie, and they had access to those files.  That's the

24   nature of our counterclaim.

25        And the irony of this is, we didn't even know this at the

 1    time Mr. May supposedly destroyed key evidence.  They're

 2    accusing -- I mean, think about the nerve it takes.  They get

 3    caught violating Mr. May's rights, and they say it's his fault

 4    because he took corrective steps to fix his computer.

 5         Let's take an analogy.

 6         Somebody breaks into my house.  They break the glass on the

 7    door, and they knock the door down.  The door might have DNA

 8    evidence on it, but I've got rain coming in, I put up a new

 9    door.  "Aha, you destroyed evidence.  That door could have been

10    evidence.  How dare you fix your own property.  You're

11    destroying evidence."  That is the nature of the spoliation

12    claim that they're making against Mr. May.

13         The fact that his computer stopped working, was running

14    poorly, he goes out and buys a new computer.  He's a computer

15    guy.  He knows what's going on.  He goes, "Hey, I know what's

16    corrupted on this thing.  I'm going to save all my files."

17         I don't know if you've ever bought a new computer, but they

18    say save all your files and install a new operating system.

19    That's what Mr. May did, and now that's the crime of the

20    century.  And as I pointed out, why would he do that?  The

21    evidence that was on his computer would be evidence that Bungie

22    was up to no good.  It makes no sense that he would destroy

23    evidence, knowingly destroy evidence or intentionally destroy

24    evidence that helps his case.

25         So that's the nature of the counterclaim, and I suspect

 1    that's why they're now picking on James May.  They're afraid of

 2    him.

 3         And let's talk a little bit -- I'm out of order, but you're

 4    going to see an instruction in there about damages.  Now, I

 5    could have put Mr. May up here and asked him, you know, how was

 6    he harmed, and he could say sleepless nights, loss of appetite,

 7    worried about data being compromised and, "Oh, I need a million

 8    dollars," but we're not going to do that.  We're not going to

 9    play that game.

10         But we are going to ask you, if you think there was some

11    sort of damage caused to Mr. May by Bungie's compromising and

12    looking at files that they shouldn't be looking at, even a

13    token, even a nominal amount of damages would be sufficient.

14         You know, we're not making to make millions of dollars on

15    this case and stuff like that.  I'm not going to pretend to ask

16    you for serious damages to Mr. May, but, again, it's the

17    principle of the thing.

18         Not only do they sue him without merit, they break into his

19    computer, look at his files, and then accuse him of being bad

20    when he turns around and says, "What are you guys up to?"

21    That's the nature of Mr. May's counterclaim.

22         Now let's get back to copyright infringement.  I want to go

23    back to Dr. Kaiser again.

24         I asked him very specific questions.  "Have you seen the

25    source code for the Phoenix Digital cheat software?"  He

1  answered, "No."  I think I asked that several times, just to

2  make sure he's not misinterpreting my question or trying to, you

3  know, "Well, you didn't actually ask me about this, you asked

4  about this."  No.

5       So I asked several times to pin it down.  He did not see

6  the source code for the *Destiny 2* cheat.  He did not see the

7  object code for the *Destiny 2* cheat.  Nobody at Bungie has seen

8  the object code or the source code for the *Destiny 2* cheat.

9       Now, I made reference to the mysterious John Doe, and I

10 hope I didn't disappoint you, but we didn't need him.  We didn't

11 need him because Dr. Kaiser truthfully testified that the only

12 time Bungie had a copy or had the *Destiny 2* cheat from Phoenix

13 Digital was on January 3rd of 2021, when they obtained it from

14 the AimJunkies' website operated by Phoenix Digital, and they

15 put it on a computer, and it ran for a few minutes and then

16 crashed, and it never ran again.  That is the sole use of the --

17 that's the only time that they actually had the cheat software

18 that's at issue here and actually made an attempt to run it.

19      Now, the other thing -- Ms. Nassar, if you'll put up the

20 declaration.  You saw this during the trial, and I asked

21 Dr. Kaiser about this.  You know, this is the document -- this

22 is a declaration that was filed in the course of this lawsuit.

23 Over the last three years, a lot of papers have been flying

24 around, going through the court, and so forth.

25      But on July 20th of 2023, Dr. Kaiser saw it fit to file a

1  sworn declaration with this court, and it says right here,

2  "Bungie used the cheat software once to conclude that the

3  various features of the cheat software were functional.  After

4  its first use, the cheat software stopped working, and Bungie

5  was unable to relaunch it."  Key point here:  "Bungie has never

6  had a copy of the cheat software on a machine capable of

7  analyzing it."

8       Dr. Kaiser himself is telling you, under oath, that they

9  were never able to analyze the cheat software.  So how are they

10  going to know whether there's any substantial similarity?  By

11  his own admission, they were never able to analyze it.  Now they

12  turn around and they try to blame us for it.  They say, "Oh,

13  well, you were hiding the cheat software, and we couldn't see it

14  again."

15       What they conveniently forget is, on November 4th of the

16  year before, 2020, they sent out three cease and desist letters

17  saying, "Take this product down."  Mr. Schaefer said, "Fine," he

18  took the product down.  Is there any mystery that it's no longer

19  available on the Phoenix Digital site?  That's precisely what

20  they demanded happen.  And, again, in a bizarre way of trying to

21  blame others, they say it's Phoenix Digital's fault because its

22  cheat software is no longer available.  It's no longer available

23  from Phoenix Digital because they complied with the cease and

24  desist letters that Bungie themselves sent.

25       They're saying, "Oh, that's spoliation of evidence."  You

1    heard Mr. Schaefer testify on the spoliation.  And let's talk

2    about that a little bit.  You saw the little bit of excitement

3    we had here.

4        When this case started, I said because they don't have a

5    case, they're going to attempt to smear my clients, and you saw

6    an attempt in that direct examination.  Fortunately, you saw

7    Judge Zilly say, "None of that in my courtroom"; otherwise, we

8    would have seen three more hours of things like that.

9        But what they haven't told is, remember, "This is day two

10   of your deposition, this is from day two of your deposition."

11   Did you see anything from day one of the deposition?

12   Mr. Schaefer was deposed for almost three days.  You saw him in

13   those videos.  He's tired.  He's leaning back.

14       The thing is, if you don't know anything about depositions,

15   and if you don't, you're probably lucky.  Unlike in this

16   courtroom, where we have a judge who makes people follow rules

17   and enforce order, in a deposition it's anything goes.  It's

18   just lawyers in a conference room, and the lawyer can ask

19   whatever he wants.  As a defending lawyer, I have very few ways

20   I can tell a witness not answer.  It's basically you can't ask

21   about what your lawyer, you can't ask about what your doctor,

22   you can't ask about what your spouse said, you can't ask about

23   what your clergyman said.  But with the exception of those, you

24   can ask any question you want, and the witness is obligated to

25   answer.  And this goes on and on and on and on, and they keep

 1    asking the same questions over and over and over and over, and

 2    they start getting into delicate matters, and that's why

 3    Mr. Schaefer acted the way he did.  Everyone has a breaking

 4    point.  And they did this for, "Aha, wait till we show the jury

 5    this."  You saw a little snippet of it.  Fortunately, we didn't

 6    see -- I'm sure they're disappointed they couldn't show more.

 7    But this is a man speaking from the heart when he gave those

 8    answers.

 9        Now let's talk about what you're really here for.  That's

10    to assess credibility.  That's the primary function of you, as

11    jurors.  You've got a lot of common sense.  Collectively, you

12    have more than any one person in this courtroom.  And you have

13    life experience, and you can look at people and say, "Yeah, he's

14    telling the truth," or "there's something about him I don't

15    like."

16        You saw Mr. Schaefer.  In fact, you saw all my clients

17    testify.  Compare them to Dr. Kaiser.

18        The other thing -- remember this.  I'm going a little bit

19    out of order here.  But key thing I asked Dr. Kaiser.  He said

20    he never compared the source code, he didn't have the source

21    code, he didn't have the object code, he never made any

22    comparison.  He could not show me any substantial similarity

23    between the product that's accused here, the *Destiny 2* cheat

24    from Phoenix Digital, and the copyrights that we've seen.

25        I asked him -- and this is a key point -- I said, "Is it

 1    your contention -- is it Bungie's contention that the loader" --

 2    you've heard a lot about the loader -- "is it Bungie's

 3    contention that the loader is an infringement?"  According to my

 4    notes, and he said, "No, we're not contending that the loader is

 5    the infringement."  So that means the cheat software that's the

 6    sole thing.  So all this talk about the loader, that's not

 7    accused of anything.  That's not accused of the infringement.

 8    And that came right out of the mouth of Dr. Kaiser.  I hope you

 9    took notes.  I hope you'll remember that.  But, according to my

10    notes, that's what I heard.  You, of course, will rely on your

11    own memory, but if you heard that, too, I hope you'll remember

12    they're not accusing the loader.

13        Now let's talk about Mr. Guris.  I tried to get his

14    testimony stricken on the basis that it's totally irrelevant

15    because it doesn't relate to anything, but, you know, it came

16    in.  But the key thing that I did get out of him, and I think,

17    you know, in fairness, Mr. Guris, I think, was far more

18    forthcoming than Dr. Kaiser was in answering questions.  At

19    least he understood my questions and gave me straight answers.

20    But he readily admitted, "No, I was not asked to provide any

21    opinion as to whether the *Destiny 2* cheat software from Phoenix

22    Digital infringes any Bungie's copyright."  He clarified that.

23    He gave a bunch of opinions.

24        I said, "Mr. Guris, I want to be absolutely clear here.

25    Were you asked to give an opinion as to whether the *Destiny 2*

1   cheat software from Bungie infringes any" -- sorry -- Phoenix

2   Digital -- "the cheat software from Phoenix Digital, were you

3   asked to give any opinion as to whether that infringes any

4   Bungie copyright?"  "No, I was not."

5        So, again, because this is a copyright infringement case,

6   Mr. Guris's testimony is absolutely irrelevant to this.  And he

7   readily testified to that, and I think you heard that.

8        So, you know, these are the key things.  Dr. Kaiser admits

9   he hasn't done any sort of comparison.  Mr. Guris admits that he

10  wasn't hired to provide any sort of opinion.  I don't see that

11  they have a case.

12       Then as far as the access, they've even admitted that the

13  25 million lines of code, some of which may be copied, but they

14  can't tell us which, but, in any event, it's not here in this

15  courtroom, and, furthermore, my clients never could have gotten

16  it because it's highly confidential and not available to them.

17  There's no access.  So the copyright claim here has to fail.

18  Bungie cannot prove it.  The essential elements just are not

19  there.

20       So I think that's about it.

21       Now, obviously, you've got the jury instructions, and

22  you'll read them.  But the important thing is, you've heard the

23  testimony, and the important instructions that you have here,

24  the most important instructions, in my view, are make your own

25  mind up.  You do not have to accept the testimony of anyone.

 1   You don't have to believe me.  You make your mind up as to who

 2   you think is credible, who you think is telling the truth.  You

 3   don't have to have a Ph.D. to tell the truth.  Anyone can tell

 4   the truth.  Anyone can tell lies.  But your primary function

 5   here is to help us sort out who's who.

 6        You heard the testimony from David Schaefer.  You heard the

 7   testimony from James May.  You heard the testimony from Jordan

 8   Green.  You heard, remotely, the testimony from Jeffrey Conway.

 9   Compare how they answered questions to how Bungie's witnesses

10   answered questions.

11        Now, as to damages, I'm not going to make a fool of myself

12   by saying we didn't do it.  There's no liability.  But if there

13   is liability, only hit us with a small number.  We're not going

14   to make that argument.  You guys make up your own mind, if you

15   get that far, if you think there's liability.

16        You heard Mr. Schaefer say, "Look, I don't care if it was

17   $40,000, I don't care if it was $80,000.  That's not a big --

18   that's not what we're not here fighting about.

19        And, again, the spoliation.  You heard Mr. Schaefer say

20   what actually happened.

21        They get this letter from a lawyer that they never heard

22   of.  It makes a false accusation that they violated a Bungie

23   license that they knew they never entered into.  They know what

24   they did.  So they read the letter, and what's he talking about

25   here, I never did that.  So they say take down the products, and

1    they take down the products.  And then there's all this legalese

2    here about preserve all this evidence, blah, blah, blah.

3         You heard what Mr. Schaefer said about the spoliation.  He

4    said, okay, the product started being sold in December of 2019.

5    Shortly, less than a year later, after most of the product had

6    already been sold, they get the cease and desist letter.  For

7    the 11 months prior to that, they had a document policy of

8    auto-deleting things.  So by the time the cease and desist

9    letter arrived, the bulk of the sales records have already been

10   deleted.  And this is before they were told you better save this

11   stuff.

12        So according to Bungie's theory, somehow Phoenix Digital

13   should have known that a year from now, we're going to get a

14   cease and desist letter so we better start saving this stuff

15   because a year from now, we're going to be challenged by Bungie.

16   It makes absolutely no sense.

17        You heard what Mr. Schaefer did say.  He said, look, what

18   they're nailing me on is this:  I've got 50 copies of something.

19   I get rid of one of them, and I only have 49, and somehow that's

20   the crime of the century?

21        The copies were available from PayPal.  He told them where

22   things were, "We sold through here, we sold through here."

23   These are fine lawyers, they know how to serve subpoenas.

24   There's no problem there.  They can track this stuff down.

25        And furthermore, Mr. Schaefer never denied selling this

1    stuff.  He even admitted to if you want to call it a bigger

2    number, call it a bigger number, yet, again, that is somehow the

3    crime of the century here.  That is what the spoliation is all

4    about.

5           And he also testified that, after he consulted counsel,

6    after getting sued, he complied with the directives to preserve

7    things.  This all happened in this brief period.  And let's look

8    at that brief period.

9           From Phoenix Digital's point of view, they get a letter

10   saying take down this stuff.  Consistent with their policy, they

11   say, "Okay, we'll take it down."  End of story.  That should be

12   the end of the problem.

13          Six months later, they get sued.  You know, "How come you

14   haven't been saving documents for the last six months?"  "Huh?

15   We did what you told us to do.  What's the problem?"

16          But, again, the problem is not, you know, trying to get

17   money.  It's to put cheaters and those who assist them on notice

18   that Bungie will not tolerate cheating in *Destiny 2*.  They put

19   that right on their complaint.

20          So, again, I'm going to ask you to listen to the evidence

21   you actually heard, not the story they would like to tell.

22   Listen to the evidence you've actually heard -- and we're not

23   talking about ancient history.  This was two days ago when the

24   witnesses were standing -- sitting up there explaining this to

25   you, or making their testimony.

1      So I'm hopeful that you will return a verdict in favor of

2  my clients.

3      I want to thank you all for serving on the jury.  Jury

4  service -- I don't know if you've done this before -- but it's

5  one of the things that makes our country great, the fact that we

6  can come in here and, like civilized people, put our dispute in

7  front of you and ask you to make the decision, and we'll abide

8  by the decision you make.  It's a great thing to serve on a

9  jury.  I've been on this side of a jury box many times, but I've

10  never had the privilege of sitting where you people are.  And

11  considering my profession, it's unlikely that will ever happen.

12  So, in a way, I envy you.  You're doing a job I'd like to have

13  someday and probably won't.

14      But, again, on behalf of my clients, I like to thank you

15  all.

16          THE COURT:  All right.  Mr. Marcelo?

17          MR. MARCELO:  Thank you.

18              PLAINTIFF'S REBUTTAL ARGUMENT

19          MR. MARCELO:  You've seen the stipulations.  You've

20  heard the testimony.  This is not a complex case.  Many of the

21  facts are agreed to.  How the cheat software itself works,

22  whether Bungie has copyrights, and you'll read those

23  stipulations.  You'll see David Schaefer personally controlled

24  every aspect of the cheat sale.  These are agreed-upon facts.

25      So all that's left here is a little bit of cleanup, I

1   think.

2        Mr. Mann came up here and he spoke a little bit about the

3   law, but it needs some cleaning up.

4        He raised that Bungie has to show substantial similarity in

5   access, and he kept claiming that that's not possible because

6   you don't have two sets of codes.  That's just wrong.

7        If you go to your jury instructions, No. 14, page 2, proof

8   of copying, you'll see it says, "To prove that a defendant or

9   defendants copied the *Destiny 2* copyrighted works, Bungie may

10  show the defendant or defendants had access and that there was

11  substantial similarity."

12       That's because the other way of proving copying is proving

13  that there was actual copying.  The reason this rule exists,

14  that you could show substantial similarity and access is because

15  often it's hard to actually catch somebody copying your work.

16  You see two paintings, and unless you saw the person painting

17  the painting, then you just have to compare them.

18       That's not the case here.  We have Mr. May reverse

19  engineering and copying the code and Dr. Kaiser explaining how

20  they have to copy the code.  And this isn't guesswork or

21  speculation.  It's a formula.  It's a science.  Two plus X

22  equals five, and Dr. Kaiser says X equals three.  It's not a

23  guess.  Algebra is not a guess.  Science isn't a guess.  He's

24  explaining that's the only way the cheat could work.

25       And it's critical.  You heard the rebuttal to Dr. Kaiser

 1    was Mr. Schaefer's testimony that he ran a legit business and he

 2    hadn't been sued before.  Why wasn't it the cheat developer?

 3    Why wasn't it Mr. May saying, "Hey, I've developed cheats."  You

 4    heard Mr. Mann say Dr. Kaiser can't talk about developing cheats

 5    because he's never developed one.  They have a cheat developer.

 6    He could have -- if there was another way, he would have sat up

 7    there and said there was another way.

 8         And I think it's clear Dr. Kaiser doesn't need to develop

 9    cheats in order to be able to know how to develop a cheat.  We

10    don't make our police detectives commit crimes before they

11    investigate a crime.  You don't say, "You can't investigate

12    this.  Did you ever break and enter into a house?"

13         Another area of the law that needs to be cleaned up,

14    spoliation.  Mr. Mann said it was a theory, it was a claim.

15    It's not a claim or a theory.  It is a court order that

16    spoliation occurred.  It's a court order that the deletions

17    occurred and that they did it with the intent to deprive Bungie

18    of the evidence and impair their ability to go to trial.  This

19    isn't a theory, a claim, something that Bungie needs to prove.

20    It's already proven.

21         Also, a few facts to clean up.  We heard testimony that

22    some other developer made the cheat, this boogyman, Andreas

23    Banek.  He was used as a shield for a number of things.  The

24    cheat development, the website sale in 2020, and the website

25    sale in 2022.  Any time defendants need to say, "We don't have

1    it anymore," or "it wasn't us," they point to Mr. Banek.  Is

2    there a single document with Mr. Banek's name on it?  Is there

3    any transactions with it?  The only person who has testified

4    they've ever spoken to, communicate, interact with Mr. Banek is

5    Mr. Schaefer, but he shreds everything regarding that.

6        To revisit, real fast, substantial similarity and access,

7    note that even if that were the case, access is Exhibit 56, the

8    reverse engineering of the game.

9        Substantial similarity is the image of the game, Exhibit

10   29, with the red boxes.

11       The *Destiny 2* game without the cheat, exactly the same

12   without those red boxes.  Those are substantially similar.

13       Again, Bungie doesn't need to prove copying that way.  It

14   proves copying through Dr. Kaiser's testimony, through the

15   testimony of all the witnesses here, but it could prove copying

16   in that manner.

17       And one last thing.  Mr. Mann, again, raised the copyright

18   registrations and the code on it, and it seems to be a

19   fundamental misunderstanding of what source code is and object

20   code.

21       Source code is the human, readable version.  Object code is

22   the computer version.

23       But even with Mr. Mann scrolling through the pages, asking

24   Dr. Kaiser, "Can you actually point to anything that was copied

25   in there?"  Dr. Kaiser said, "Yes," and he pointed at code in

 1   there.  And then Mr. Mann scrambled back and said, "Oh, wait,

 2   but that says 2015 above it."

 3        But, again, Dr. Kaiser can recognize copy code like that in

 4   a cheat that fast because he wrote the code, and he wrote the

 5   book on cheats.

 6        Thank you.  Nothing further.

 7             THE COURT:  All right.  Ladies and gentlemen you've

 8   heard all the evidence.  You've heard the arguments.  I'm going

 9   to ask you to go to the jury room and begin your deliberations.

10        We will normally send you home at four o'clock, and we'll

11   bring you out here into open court and give you some

12   instructions for not discussing it once you leave here.  But

13   you're now directed and asked to go to the jury room.  Take your

14   notes, take your jury instructions.  The clerk will bring in the

15   exhibits, and then you can begin your deliberations.

16             THE FOLLOWING PROCEEDINGS WERE HELD
                 OUTSIDE THE PRESENCE OF THE JURY:
17

18             THE COURT:  I just wanted to say, on the record, that

19   I appreciate the manner in which you tried to case.  I think the

20   issues have been well presented on both sides, and you've done

21   it in a timely fashion, if you will.  It's been an interesting

22   case.

23        The jury is going to be sent home at four o'clock.  I'll

24   bring them out here and tell them not to discuss the case and to

25   leave.  You're free to be here at four o'clock or not, but I

1  would ask you to agree so that one side is not here and the

2  other side is here.

3      In the morning, they will come into the jury room,

4  directly, and I will tell them tonight, at four o'clock, that as

5  soon as they're all there -- I'll ask them to be there by, at

6  least, 9:00 -- as soon as they're all present, they can begin

7  deliberations, but they all have to be involved in all of the

8  deliberations.  And we'll ask them to deliberate until -- so we

9  won't see them in the morning.  There's no need for you to be

10  here.

11      If I get a question, we'll alert you and get your input

12  before we respond.  You need to be within 10, 15 minutes, max,

13  of the courtroom so that, if I have a question, you can be here

14  so we can discuss it, and I can promptly give them a response.

15      Obviously, if we get verdict, you need to be here.  They'll

16  be anxious to give you the verdict and be on their way.

17      So what I'd like you to do is give a couple of contact

18  numbers -- well, at least from the plaintiff's standpoint.

19  You've got several lawyers.  Mr. Mann, we need your contact

20  information.  Keep your cell phones on.  And let me ask, just

21  while we're on the record, do you wish to be here at four

22  o'clock?

23          MR. RAVA:  Yes, Your Honor.

24          MR. MANN:  Certainly, Your Honor.

25          THE COURT:  Okay.  Thank you, we'll be in recess.

1        I took under advisement all the motions, and the minutes,

2   Madam Clerk, should reflect there was a motion by the

3   plaintiff for a Rule 50, and I deferred, and there was a motion

4   by the plaintiff to dismiss, and there were three different

5   motions that were made.  I'm intending that all of them be

6   deferred and to be ruled on after the verdict.

7        Thank you.

8              (Proceedings adjourned at 3:20 p.m.)

9              THE FOLLOWING PROCEEDINGS WERE HELD
                IN THE PRESENCE OF THE JURY.
10

11        THE COURT:  Ladies and gentlemen, it is four o'clock.

12   It is time for all of us to go home.  It's been a long day and a

13   long week.

14        Let me tell you that, first, remind you that you cannot

15   talk about the case with anyone, once you walk out of here,

16   until you return in the morning.  And I'll ask you to be back in

17   the jury room by nine o'clock.  Now, you can't talk about the

18   case in the jury room until everybody gets there so that

19   everybody has an opportunity to hear what everyone else has to

20   say.  But if you all get there before nine o'clock and you're

21   all in the room, you can start deliberating.

22        We won't see you in the morning.  You'll go directly to the

23   jury room.  And we'll see you when you have a note or a verdict

24   or a question.

25        Let me tell you that if your deliberations go into the noon

1   hour, the government will buy you lunch.  The clerk will give

2   you menus for lunch.  They'll be there in the morning when you

3   arrive.  You'll fill them out, if you need to, and give them to

4   the clerk, and the clerk will bring the lunches to you.  If you

5   don't want to eat your lunches in the jury room, you can go down

6   to the jury assembly room, or you can take them outside, if it's

7   a nice day, but I doubt it will be.

8        I'm going to ask you to deliberate tomorrow until you reach

9   a verdict or until four o'clock, in which we'll have the same

10  kind of conversation we're having now, and then I'll ask you to

11  go home for the weekend.

12       Have a pleasant evening, folks.  Thank you for your

13  service, and we'll see you sometime tomorrow.  It won't be when

14  you first arrive.  Go directly to the jury room.

15       Have a nice night.  The jury is excused for the evening,

16  and we'll be in recess.

17

18            (Proceedings adjourned at 4:02 p.m.)

19

20

21

22

23

24

25

INDEX

EXAMINATION OF                                                    PAGE

JAMES MAY                    DIRECT EXAMINATION        466
                            BY MR. MANN

                            CROSS-EXAMINATION         478
                            BY MR. MARCELO

                            REDIRECT EXAMINATION      493
                            BY MR. MANN

                            RECROSS-EXAMINATION       498
                            BY MR. MARCELO

EDWARD KAISER               REBUTTAL                  500
                            DIRECT EXAMINATION
                            BY MR. RAVA

                            REBUTTAL                  506
                            CROSS-EXAMINATION
                            BY MR. MANN

                            REBUTTAL REDIRECT         514
                            EXAMINATION
                            BY MR. RAVA


PLAINTIFF'S CLOSING ARGUMENT                          528

DEFENDANTS' CLOSING ARGUMENT                          548

PLAINTIFF'S REBUTTAL ARGUMENT                         573

C E R T I F I C A T E


            I, Nancy L. Bauer, CCR, RPR, Court Reporter for

the United States District Court in the Western District of

Washington at Seattle, do hereby certify that I was present in

court during the foregoing matter and reported said proceedings

stenographically.

            I further certify that thereafter, I have caused

said stenographic notes to be transcribed under my direction and

that the foregoing pages are a true and accurate transcription

to the best of my ability.



            Dated this 27th day of May 2024.


                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter